UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

T&R PROPERTIES, INC.,
et al.

Plaintiffs

-vs- CASE NO. 2:24-cv-03761

BERLIN TOWNSHIP, et al.

Defendants

Deposition of MEGHAN RAEHLL, taken by the Plaintiffs as upon cross examination and pursuant to the Federal Rules of Civil Procedure as to the time and place and stipulations hereinafter set forth, at the offices of Wesp Barwell Berardino, 475 Metro Place South, Suite 350, Dublin, Ohio, at 11:08 a.m., on Friday, August 29th, 2025, before Heather M. Lunsford, a Certified Court Reporter and Notary Public within and for the State of Ohio.

* * * * * *

Page 2

# QUICK REFERENCE INDEX

WITNESS: MEGHAN RAEHLL

APPEARANCES: PAGE 3

| | DX | CX | RDX | RCX |
|---|---|---|---|---|
| BY: MR. ZACKS | | 4 | | |

## EXHIBITS

| | MARKED | PAGE |
|---|---|---|
| PLFS': | 1 | 5 |
| PLFS': | 2 | 56 |
| PLFS': | 3 | 56 |
| PLFS': | 4 | 56 |
| PLFS': | 5 | 56 |
| PLFS': | 6 | 100 |
| PLFS': | 7 | 136 |

## INFORMATION REQUESTED

| | PAGE |
|---|---|
| BY: MR. ZACKS | 110 |

* * * * *

APPEARANCES:

ON BEHALF OF PLAINTIFFS

Joshua Nagy, Esq.
Attorney at Law
Wesp Barwell Berardino
475 Metro Place South, Suite 350
Dublin, Ohio 43017
jnagy@wesplaw.com

Benjamin S. Zacks, Esq.
Attorney at Law
Zacks Law LLC
The E. Building
33 S. James Road, 3rd Floor
Columbus, Ohio 43213
bszacks@zackslawfirm.com

Andrew L. Margolius, Esq.
Attorney at Law
Margolius, Margolius & Associates
55 Public Square, Suite 1170
Cleveland, Ohio 44113
andrew@margoliuslaw.com

ON BEHALF OF DEFENDANTS

Paul-Michael La Fayette, Esq.
Attorney at Law
Freeman Mathis & Gary
65 East State Street, Suite 2550
Columbus, Ohio 43215
paul.lafayette@fmglaw.com

ALSO PRESENT

Ronald Joseph Sabatino

* * * * * *

Page 4

MEGHAN RAEHLL,

of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

CROSS EXAMINATION

BY MR. ZACKS:

Q. Good morning. My name is Benjamin Zacks, and I am one of the attorneys for T&R Properties and Berlin Apartments and Berlin Industrial and the warehouses. And then along with me is Josh Nagy, who is my co-counsel, as well as Andrew Margolius and JR Sabatino at that end of the table.

Would you please state your full, legal name for the record?

A. Meghan Borghese Raehll.

Q. And could you spell the Borghese part?

A. B-O-R-G-H-E-S-E.

Q. And what is your address?

A. 4935 State Route 37 East, Delaware, Ohio, 43015.

Q. And is that your physical, personal residence address?

A. Yes.

Page 5

Q. Okay. And who else lives there with you?
A. My husband and my son.
Q. And how old is your son?
A. 11.
Q. And what school district does your son go to?
A. Olentangy Local School District.
Q. What grade is he?
A. Sixth.
(Plaintiffs' Exhibit 1 was marked for identification.)
BY MR. ZACKS:
Q. If you could, I'm going to hand you what has been marked as Plaintiffs' Exhibit Number 1 and ask if you can identify that document?
It is a deposition notification that we provided to your counsel in regard to today's deposition. Have you ever seen that document before?
A. Yes.
Q. And do you have any reason to believe that that document is in any way not something that you are appearing as a result

of today? You're here today pursuant to the subpoena, correct?
A. Correct.
Q. And so you have not -- you did receive this before today?
A. Yes.
Q. Okay. Great. Thank you.
Are you under any medical conditions that would impair your ability to understand questions or answer them today?
A. No.
Q. Do you take any medication?
A. I am currently on penicillin for recovering from strep throat.
Q. But other than that, no other medications today?
A. No.
Q. And do you have any other types of impairment that would require me to repeat questions to you or learning disabilities? Anything that might impact your ability to truthfully and honestly answer questions today?
A. No. But I may need you to speak up. I have a ruptured eardrum in my left ear.

Q. I also have hearing issues, so the reverse is also true. If you need to speak up and, also, if you can speak up so everybody in the room can hear you, that would be helpful as well.

If you don't understand one of my questions, you can ask me to repeat the question or to rephrase the question. The objective today is to get your answers to my questions.

If you answer a question, is it okay if I assume that you understood the question?

A. Yeah.

Q. Okay. Is there any other reason today that, in terms of answering questions, that you might have any type of reason to not answer questions?

A. No.

MR. LA FAYETTE: Object -- I guess I would object as to, obviously, privilege, but go ahead.

THE WITNESS: No.

BY MR. ZACKS:

Q. Since he raised the issue of

privilege, my objective is not to get to any conversations you had that were confidential conversations where you did not intend to disclose the results of that to a third party, and our questions to you today are in your capacity as a trustee of Berlin Township.

At times we may distinguish between that and your own points of view, but I will try to do that in my question. Do you understand --

A. Yes.

Q. -- those instructions?

And lastly, just because as we go through the course of the day, it's not uncommon for people to not always answer verbally and out loud.

A. Yes.

Q. So if you would always answer verbally and out loud as we go.

The other thing that may be important is when we are looking at different exhibits, we've learned that some of the exhibits require you to point at things and so you have to be very descriptive in what you're pointing at.

Page 9

So if you could do that while we're going through the course of today, we'd appreciate it.

A. Yes.

Q. Please state for us your educational background going from the most recent, like college, to high school.

A. I have an educational specialist degree from the University of Kentucky, 2020; Ph.D. in philosophy from the State University of New York at Buffalo, 2016.

I have a master of arts in philosophy from Duquesne University, 2010. I have a master of divinity degree from Ashland Theological Seminary, 2005.

I have a master of arts degree in religion, with an emphasis in philosophy of religions, from Trinity International University, 2005. I have a bachelor of arts degree in philosophy, with a minor in history, from Ohio Dominican University, 2003. I graduated from Whetstone High School, 2000.

Q. Thank you. Very impressive list of degrees along the way.

In that experience, particularly,

do you have any other certifications or items related to zoning and land use or anything of that character?

A. I completed a program through the Delaware Area Chamber of Commerce in 2022.

Q. And what was that program?

A. It was called Delaware County Leadership.

Q. And what did that program involve?

A. The program involved, essentially, different aspects of the county that included government, economic development, and a host of other, I would call it, field trips where we would tour various facilities, farms, courthouses, county sites.

Q. Did -- other than those particular things, did you look at any developments along the way? Was that part of the field trips?

A. I don't recall the specifics of where all we visited, but we did visit farms. We visited the Skinner Farm.

We had an economic development day in which we discussed, among other topics, the Berlin Business Park.

Q. Anything else? You looked like you

Page 11

were thinking. That's why I said that.
A. I was.
Q. Okay. Other than that experience, there's no other training or education that you had in regard to zoning, is that accurate?
A. I also attend conferences, like the Economic Development 411.
Q. How often is that?
A. I've attended -- it's an annual conference. I've attended once, physically, and reviewed that material virtually.
Q. And other than that, anything else that you've done in the area of being educated in regard to zoning or land use?
A. I own five rental units.
Q. Okay. And where are those rental units located?
A. The Ohio State University campus area.
Q. And what are the addresses of the units?
A. I don't remember all of the addresses off the top of my head.
Q. Which ones do you remember?
A. 2204 Indiana Avenue, single family.

2248 Indiana Avenue, single family. 25 -- 250 and 252 Hudson, double. And then one on Indianola.

Q. And did you purchase the 2204 -- strike that.

What year did you come to own 2204?

A. On or around 2005.

Q. And if you could describe that property in terms of -- you said it was a rental unit, correct?

A. It is now. It was our primary residence when we bought it.

Q. Okay. That was in 2005?

A. Uh-huh.

Q. And then when did you convert it to a rental unit?

A. On or around 2013.

Q. And did you have to go through any kind of a process to convert that to a rental?

A. I don't understand your question.

Q. It was a single family residence?

A. Yes.

Q. And what was it zoned at that time?

A. Single family residence.

Page 13

Q. And when it was a single family residence, did you have to convert that zoning in order to make it a rental unit?

A. No.

Q. So you just began advertising it?

A. We worked with Ohio State housing at that time.

Q. And what did you do with Ohio State housing?

A. I don't know all of the details of what we did. I know we advertised through them.

Q. So you mean advertised so you could get tenants?

A. Yes.

Q. And how many tenants did you get at that time?

A. I don't understand your question.

Q. How many bedrooms were you trying to rent out in the, in the single family home for them?

A. It's a two bedroom.

Q. So it's a two bedroom unit? Okay.

And so you consider that now to be student housing?

A. Yes.
Q. And since the time that you converted it in, roughly, 2013 into a rental, have you had any occasion to apply for any type of zoning, zoning changes or conditional use permits or anything of that nature?
A. No.
Q. I'm going to ask the same general questions as to each property.
A. Okay.
Q. So could you, as it relates to the 2248 Indiana address, the same questions, when you acquired it and, subsequently, if it was not a rental unit at the time, what you had to do to make it a rental, if anything.
A. 2248 we purchased on or around 2016, perhaps 2015. We purchased it cash and we restored it and we listed it through the same mechanisms as before, I believe.
Q. You said we. Who is the we that was doing it?
A. My husband and I.
Q. Is it owned individually by your husband and you, or is it in a company name?
A. Individually.

Q. Individually by each of you?
A. Correct.
Q. Okay. And how many apartments or rental units are in 2248?
A. Two bedroom single family.
Q. And then 250/252 Hudson, same questions.
A. The Hudson property was purchased on or around 2015-2016. It's a double, three bedrooms on each side, and we restored it and followed the same process as with the other ones.
Q. And is that one also owned by you and your husband?
A. Yes.
Q. Not in a company?
A. Correct.
Q. And then the one on Indianola, describe that one, please.
A. Indianola was purchased on or around 2018-2019. Single family, three bedroom. We restored it and followed the same protocol.
Q. And in following that same protocol, that was also owned by you and your husband?
A. Yes. Personally.

Q. And from the standpoint of -- you described all of these as single family properties and from the standpoint of single family properties, single family properties for rental purposes, correct?

A. Hudson is a double, but yes.

Q. Are you personally familiar with the Fair Housing laws as related to rental units?

A. Yes.

Q. And when -- how did you become aware of the Fair Housing laws related to rental units?

A. When we purchased our properties.

Q. All of the properties?

A. Yeah.

Q. So when you purchased the first one, which was your residence, you were aware of Fair Housing --

A. Yes.

Q. -- at that point in time?

A. Yes.

Q. And what do you understand about the Fair Housing-related responsibilities in regard to rental units?

A. Could you be more specific about

Page 17

your question?

Q. I will try, but I'm trying to understand the scope of your understanding of Fair Housing law.

So from the standpoint of the Fair Housing that you became aware of when you first became aware of it, what were the reasons you were inquiring as to Fair Housing laws?

A. I'm not sure I understand your question so --

Q. I'll repeat it. I'll change it.

A. Okay.

Q. You indicated in your testimony that you had some familiarity with Fair Housing at the time you began to investigate or purchase your properties.

A. Correct.

Q. So what is it that you began to understand about the Fair Housing laws when you first purchased the first property?

A. When we first purchased the first property on Indiana, we purchased it knowing, hoping, that one day we could utilize it as a rental at some point.

So at that time we looked into general means and ways that you go about creating a rental unit, and it was at that time that -- when you work with, like, Ohio State University or those kinds of housing, that you come across various documentation about ensuring that you're following equal opportunity practices in terms of when people apply for your rental unit, how you advertise in making you certain that you're engaged in a manner that is fair and consistent in practices.

Q. Any other concerns you had when you were learning about Fair Housing? Such as how much you could charge in rents, the type of tenants you would be able to rent to, things of that nature?

A. No.

Q. Were you aware of the concept of affordable housing at that time?

A. I don't remember.

Q. Over the years that you have owned these properties, have you been concerned about being able to price the rentals such that people would be able to afford to rent

it?

A. Yes.

Q. And what is the range that you have determined is appropriate for your rentals?

A. We rent, as I understand it, mid to lower market value and for me, that means less than $500 per bedroom.

Q. And in qualifying your tenants, what process do you go through?

A. My husband does that.

Q. Are you not involved at all?

A. No.

Q. Do you know the process your husband goes through?

A. No.

Q. How would you describe the tenants in terms of their demographics of who are renting from you?

A. I don't think I can generalize for all that -- the houses.

Q. Do you rent to any minorities?

A. Have we?

Q. Yes.

A. Yes.

Q. And -- okay. Let's go back to

the -- some of the introductory questions that I have.
So in regard to your education, is there anything other than -- I can't relay all of the long list that you gave me. It's very impressive. Do you want to go by doctor?
A. No.
Q. No? Okay.
Is there any other educational experiences that you have had in regard to zoning, Fair Housing, anything?
A. I would say just general research.
Q. Okay. And when you say general research, what do you mean by that?
A. What I mean by that is making certain that I stay apprised to events that are going on at the county and at the state level related to zoning.
So, for example, I'm the legislative Chair of the Delaware County Township Association, and we look at zoning laws as part of a broader township law review and ensure that the interest of townships are being represented at the state level.
Q. Okay. And you -- when you say at

the state level, you mean at -- in the legislature?

A. Correct. We work with the Ohio Township Association on that.

Q. Do you do anything as it relates to, particularly, training of trustees or BZA members or anything like that in your general research?

A. BZA, no. I wouldn't do anything with that. Could you be more specific about training for trustees? What do you mean?

Q. Well, have you come across articles or other items in your research that explain how trustees should be educated, trained in doing their jobs?

A. Could you give me an example?

Q. Well, is there a manual that you're aware of in your research that indicates what the responsibilities are of trustees and how they execute their roles?

A. There is a manual we are provided through the Ohio Township Association, Trustee Handbook. We go to the Ohio Township Association annual conference and there are often numerous sessions related to zoning,

Page 22

zoning practices, zoning procedures, that are conducted or facilitated by, mainly, attorneys, not always.

Q. Okay. So I think you answered that that is -- is that part of your general research or that's part of your specific activities that you've engaged in while you've been a trustee?

A. The latter.

Q. Okay. So in the former, which is the general research, is there any other general research that you have done independently, on your own, to understand this, apart from what you've done with the Ohio Township Association?

A. Is that a question about like have I looked at zoning laws on my own? Is that what you're asking?

Q. Yes. Well -- okay. That, to you, is general research, looking at zoning laws?

A. Different case laws throughout the state, yes.

Q. Okay. And have you looked at specific cases related to the issues that are the subject matter of this lawsuit?

Page 23

A. I have reviewed various cases.
Q. You have? When you say you've reviewed various cases, what type of cases are you reviewing and how were they relevant to your investigation of what you were looking for related to this lawsuit?
A. Nothing related to this lawsuit.
Q. Okay. All right. What is your occupation?
A. Township trustee.
Q. How long have you been township trustee?
A. January 1st, 2022, to present.
Q. And prior to that -- do you have any other occupations, currently?
A. Yes.
Q. What is that?
A. I work at Franklin University.
Q. And what do you do at Franklin University?
A. I'm Assistant Dean for the Center for Teaching Excellence.
Q. How long have you been at Franklin University?
A. Nineteen years.

Page 24

Q. Nineteen?
A. {Witness nods head.}
Q. Okay. Kind of overlaps with everything else I'm going to assume.
So prior to becoming a trustee, was your role at Franklin University your only occupation?
A. No.
Q. What other roles did you have? What other roles or occupations did you do --
A. I've served as adjunct faculty at various institutions.
Q. Anything else other than serving as adjunct faculty?
A. Teaching assistant. Kind of similar but distinct.
Q. How long ago was that?
A. Twenty eleven/2012.
Q. So you indicated you became a trustee on January 1st of 2022 --
A. Yes.
Q. -- correct?
And prior to January 1st of 2022, how did you become interested in becoming a trustee?

A. I was interested in serving my neighborhood and my community.
Q. Okay. That's pretty general. What did you do to get involved with your neighborhood and community?
A. There were a number of things. There was a trash contract situation. Neighbors were unhappy with the trash pick-up. We worked with the trustees at the time.
Q. When you said we worked with the trustees at the time, are you referring to this happening in Berlin Township?
A. Yes.
Q. What year was that?
A. Twenty-seventeen/2018, thereabouts.
Q. What else did you do? You said there were a number of things. The trash contract is the only one you've told me about.
A. The Berlin Business Park.
Q. When did you get involved with the Berlin Business Park?
A. Probably around 2018, yeah.
Q. What was the nature --
A. Probably about 2018.
Q. Sorry. We're talking -- it makes

her mad, for the right reasons.
What is it that you were doing in regard to the Berlin Business Park in 2018?
A. Neighbors had questions. I would ask questions.
Q. You said neighbors had questions. Were those questions directed to you that you then investigated and gave them answers or what happened?
A. General questions that I would try to find the answer to with general research or reaching out to a trustee or reaching out to the county.
Q. Okay. What trustee did you reach out to?
A. At different points, all three.
Q. Who were the three you reached out to?
A. Tom D'Amico -- Thomas D'Amico, Ronald Bullard, Ken O'Brien.
Q. Anyone else?
A. There were no other trustees during that time.
Q. And then other than the Berlin Business Park and the trash contract, what

other issues got you involved in becoming interested in your neighborhood and your community?
A. Very interested in history, and I was intrigued by the history of the cemeteries in the township, especially with Alum Creek having been brought into the township and the moving of the cemetery that was on that land.
Learned more about that. Got involved with the historical society. I like learning about the background of the names of streets. I like learning about the etymology. Even the way you pronounce -- pronunciate Berlin and why we pronunciate Berlin like Berlin and not Berlin. Just general lifelong learning and sharing and understanding.
Q. So in the context of the history that you were investigating for -- you say the correct pronunciation is?
A. Berlin.
Q. Berlin?
A. Emphasis on the B.
Q. Emphasis on the B? That's the etymological difference?
A. Yes.

Page 28

Q. What does that distinguish that from, if you put the emphasis on the B?
A. I was told it distinguishes it from Berlin, Germany. It's the American way of saying it.
Q. And when you were exploring that, what was the negative connotation that you were exploring?
A. For Berlin?
Q. Yes.
A. It's my understanding that it shifted because it didn't want to be associated with World War II.
Q. Didn't want to be associated with World War II in what respect?
A. With respect to Berlin, Germany.
Q. What were the implications of World War II that they wanted to shift away from?
A. I don't know. You'd have to ask them.
Q. You did the research, though?
A. Yes.
Q. What did it tell you?
A. They said they didn't want to be associated with Berlin, Germany, and World War

II.
Q. And the they you're referring to is who?
A. Ohio Historical Society.
Q. So the Ohio Historical Society is the who you're talking about, not necessarily Berlin Township?
A. Their residents, too. There was a resident I spoke with. I can't remember her name.
Q. Was that because there's a negative association with Berlin as a result of World War II?
A. I don't know. You'd have to ask them.
Q. Did they tell you that at the time you --
A. They said they did not want to be associated with Berlin, Germany, at the time, so they changed the pronunciation.
Q. So you didn't inquire further at that point, even though you're a very inquisitive person, right?
A. Correct.
Q. That was sufficient for your

Page 30
historical research is what you're telling me?
A. General research.
Q. Other than your historical research, the questions regarding the Berlin Business Park that you were answering to neighbors and trying to find answers from trustees, and the trash contract, anything else that got you involved in your neighborhood and community?
A. I coached my son's soccer team.
Q. All right. From the standpoint of those items, coaching your son's soccer team, is there anything else you were doing before you became a trustee in January of 2022 related to being involved in your community and your neighborhood?
A. We were -- the trustees, I spoke with the trustees, but I also spoke with county officials related to the Berlin Business Park.
Q. What county officials are you referring to?
A. At the time it was Robert -- Bob -- Lamb and Rob Platt.
Q. Anyone else?
A. Prior to 2022, I think those were

Page 31

primary contacts of the county. I believe I may have spoken to Tiffany Maag before 2022.

Q. Could you tell me for Robert Bob Lamb, Rob Platt, or Tiffany Maag, what their roles were in the county?

A. Rob Platt is the economic -- was the economic development director for the county at the time the business park was being formed. Rob Platt was the economic development coordinator. Tiffany Maag was/is the -- oversees the sewer for the county.

Q. Okay. Any other county officials that you can recall you may have had contact with for the Berlin Business Park prior to becoming a trustee?

A. The county had different associates that I recall speaking with. I recall speaking with Superintendent Mark Raiff for Olentangy Local Schools. I recall speaking with somebody from Montgomery Rose, Montgomery Rose Group.

I recall speaking with somebody from a group NBBJ. I recall speaking with Scott Sanders, not just about the business park with Scott but, also, trails. That's all

Page 32

that I can recall at this time.
Q. Okay. So let me ask this question from the standpoint of, have you been involved in any litigation at all?
A. Yes.
Q. You have been? What is the litigation you've been involved with?
A. Are we not involved in litigation right now?
Q. I get to ask the questions. You get to give the answers.
A. Then I don't understand what question you're asking.
Q. I'm asking you to tell me what litigation you have been involved in both as a trustee and as an individual.
A. Okay. As a trustee, I don't recall all the cases but I can provide what I can recall.
Q. Please do.
A. This case, state case concerning T&R Properties; a zoning case involving Rockford Homes, Evans Farm; a case related to the 2013 TowerCo, LLC, cellular tower; a case involving a left turn lane and the redesign of Piatt

Page 33

Road, the resurfacing of Piatt Road. That's all for trustee.

Q. Okay. And individually?

A. Individually, a case in which the neighbor's dog came onto my property and attacked our dog and mauled it to death.

Q. I'm sorry about that.

Any other individual cases?

A. Not to my knowledge.

Q. Let's go back for a second.

So when you say this case, are you talking about the -- this exact lawsuit that is pending in both Federal court and the 25-06 and -- that was originally filed in the state court? Is that the full scope of what you're talking about for this case?

A. Yes.

Q. And then you said a state case with T&R Properties was the second item?

A. Yeah. Well, there was, kind of, two components to that in my view. There's what we're dealing with here, the Federal civil level and then the state. But you can combine them, if you want.

Q. Okay. So you're not referring to

Page 34

the case that T&R Properties had against Berlin Township many years ago?

A. No.

Q. Are you aware of that case?

A. Yes.

Q. And what do you know about that case?

A. I am aware that T&R Properties sued the township. I don't know much about it. Most of what I know was told to me by Ron Sabatino himself and that -- he indicated he won the case.

Q. And when did Mr. Sabatino tell you that?

A. The first time I met him, he told me that.

Q. Okay. When was the first time you met him?

A. I would say sometime in '22. Late '22/early '23.

Q. And when you say Ron Sabatino, is Ron Sabatino present today?

A. No.

Q. Okay. So this is Ron Sabatino, as you understand it to be, the principal of T&R

Page 35

Properties?
A. Yes.
Q. What was the occasion for you and Mr. Sabatino to have met?
A. He wanted to provide public comment at a trustee meeting.
Q. And was he able to make that public comment?
A. Yes.
Q. What was the topic of the public comment?
A. It was related to applications for the business park and growth, I'd say generally, as I recall it.
Q. Are those the applications for the mixed use development that had been applied for yet, or was that before this particular mixed use development had been applied for?
A. I think it was prior to the actual application, but I don't recall the exact details.
Q. But you have a general recollection that he told you about the lawsuit that he had filed many years ago and prevailed upon?
A. Yes.

Page 36

Q. Did you ever investigate that?
A. No.
Q. Have you had any conversations with any of the other trustees about that prior lawsuit?
A. Ken, no. No. Not for Ron, either.
Q. When you say Ron, you mean Ron Bullard?
A. Yes.
Q. What about Mr. D'Amico?
A. Mr. D'Amico was not trustee at the time that I was trustee.
Q. I understand.
A. Okay.
Q. I'm just trying to clarify whether you had any conversations with any trustees about the lawsuit.
A. No.
Q. Initially, you indicated you thought you had.
A. No. As I, as I recall, the initial time was Mr. Sabatino, Ron, himself, saying it, and then it came up again as in the sense of this had occurred a number of years ago, but there was no conversation about it.

Page 37

Q. And so when --
A. I don't know about the lawsuit.
Q. You don't have any knowledge of the lawsuit?
A. Not in any significant detail in any way.
Q. And you haven't investigated to see --
A. No.
Q. -- what happened with T&R Properties --
A. No.
Q. -- in regard to that old lawsuit?
A. Correct.
Q. Okay. And as far as you can recollect, all Ron indicated to you was that he had prevailed in the lawsuit. Did he tell you that the township ended up paying him money?
A. I don't believe he told me that, no.
Q. Are you aware that that happened?
A. Now I am.
Q. But before me mentioning -- me asking the question, you were not sure of that?

A. No.
Q. All right. In your litigation history testimony, is there anything that you have -- can recall you may have left out?
A. I don't recall. Yeah. No, I don't believe so. I've given you everything I can remember.
Q. All right. What did you do to prepare for today's deposition?
A. I spoke briefly with counsel, Paul, I reviewed some of the meeting minutes, and that was about it.
Q. Okay. When did you review the meeting minutes?
A. I looked a couple over the last two days or so.
Q. Have you had any conversations with any of the other trustees about their testimony?
A. No.
Q. Have you had any conversations with anyone about the testimony of anyone at the BZA level or the trustees over the last few days in these depositions?
A. No.

Page 39

Q. From the standpoint of your review of the meeting minutes, what minutes did you review?
A. I looked through -- perused through late '22, April of '23. Perused through late summer/early fall '23. Looked through spring '24.
Q. Any other minutes?
A. No.
Q. How many different meetings do you recall having taken a look at over that period of time? Ten? Fifteen? Smaller numbers? How many minutes?
A. Like that I reviewed in the last couple days you're asking?
Q. Yes.
A. Okay. Yeah, I'd say probably about, about ten, ten to 12.
Q. Ten to 12. And did you only look at trustees' minutes, or did you look at other minutes of other officials of Berlin Township?
A. Just trustee minutes.
Q. So that was to familiarize you with possible questions that you may have to answer? Is that one of the reasons you did

that?
A. Yeah. Just generally to review. You know, it's been a couple of years and just wanted to kind of go back and get a general sense.
Q. And do you have any reason to believe that those minutes -- strike that.
Do you believe that those minutes you reviewed fairly and accurately captured what had transpired at those meetings?
MR. LA FAYETTE: Objection.
THE WITNESS: Could you rephrase the question?
MR. ZACKS: I'm going to ask a different question.
BY MR. ZACKS:
Q. Were you present at those meetings based on your review of the minutes?
A. Yes.
Q. You were present at all of those meetings?
A. All the ones that I reviewed, yes.
Q. Okay. So in reviewing the minutes of the meetings that you reviewed in preparation for today, do you have any reason

Page 41

to believe that those minutes accurately captured what had transpired in regard to what occurred at those meetings?

MR. LA FAYETTE: Objection. Go ahead and answer.

THE WITNESS: I would say that those meeting minutes provide an accurate summary.

BY MR. ZACKS:

Q. Okay. You have no reason to refute the minutes, themselves, in terms of their accuracy, is that correct?

A. There's some typos.

Q. So there may be typos but other than typos, you believe they captured of the gist of the meeting and what was captured during the course of the meeting?

A. Yes.

Q. And what is the process as a trustee, that you're aware of, that Berlin goes through to create those minutes?

A. It's my understanding that the minutes are created from the fiscal officer who is the keeper of record for our township.

Q. And what does the fiscal officer do

to do that, to capture the minutes as you described? What do they do?

A. I can't provide insight into his process.

Q. Is the fiscal officer somebody who reports to the trustees?

A. No.

Q. Do you report to the fiscal officer?

A. No.

Q. Are you coequals?

A. We are both duly-elected officials that operate as independent entities but -- for the purposes of our functions, but for them to be able to employ folks, we have to actually appropriate money for them.

Q. So you're the appropriation arm for them to do their job?

A. Yes.

Q. So let's go from the -- so from the standpoint of the minutes, who records the minutes and what transpires at a meeting when you are present?

A. The fiscal officer.

Q. And how does the fiscal officer do that? Do they write notes? Do they do

transcription? Do they do recordings? What is it?

A. From what I've observed in his process, he uses a recording device on his computer and he takes many handwritten notes throughout the meeting.

Q. And so beyond that, you aren't sure until you see the minutes what they have become based upon what transpired at a meeting. Is that how that works?

A. Yeah.

Q. So you only look at what that person creates at the time. Do you write minutes yourself or notes --

A. No.

Q. -- when you're in a meeting?

A. Not generally.

Q. For a meeting do you -- there was a bang so that's -- in your process, when you were preparing for the minutes that you reviewed, the meetings of the minutes you reviewed, excuse me, what do you get before the meeting?

A. You're fine. I don't think I understand what you're asking.

Q. Do you get a packet from the fiscal officer? Do you get -- what are the materials that you get in preparation for a typical meeting?

A. Oh, okay. The fiscal officer will send meeting minutes in advance of meetings, if there are any prepared, and that's what we get before the meeting.

The fiscal officer does not provide anything else. We have a township administrator who provides like a packet in preparation for our meetings.

Q. Okay.

A. It usually consists of an agenda, any documentation we're going to review at the meeting.

Q. And do you assist -- excuse me. Let me backtrack.

In 2022, were you the Chairperson of the Board of Trustees?

A. No.

Q. Okay. When did you become the Chairperson?

A. Twenty twenty-three.

Q. And are you currently Chairperson?

Page 45

A. Yes, actually.
Q. Okay. So 2022, you were not Chairperson. Twenty-three and '24, you're the Chairperson?
A. No.
Q. Okay.
A. We rotate. I'm, I'm Chair right now because Trustee O'Brien will be resigning from his position effective September 1st. So we rotate.
So I was Chair in '23, and then Ron was Chair in '24, Ken was Chair in '25, and I was Vice Chair. So when Ken steps away, now I'm Chair.
Q. What is the distinction of the role that the Chairperson plays versus the Vice Chair of the trustees?
A. Facilitating the actual meetings.
Q. Only during the meetings?
A. Pretty much.
Q. And how do, how do the trustees divide up other responsibilities based on subject matter of the work of the trustees?
A. So trustees have liaisons assigned, so that's how we divvy up the work. We have a

township administrator now so, you know, it kind of all folds up through her now.

Q. So in the years that you've been a trustee, what liaison roles have you played?

A. Liaison for parks and trails, liaison for technology, liaison for zoning, and liaison for township building facility.

Q. Do you serve on any Delaware County boards, commissions, or any other roles at the county level?

A. The Delaware County Township Association. That's all.

Q. Going back to the liaison roles, have you been for the parks, the technology, zoning, and the township in all of the years of your trusteeship? Were those the liaison roles that you've played or have they changed?

A. All of the same.

Q. All of the same?

A. Yes. Parks and trails didn't exist, initially, so I became that when we established the board -- the committee.

Q. So let's talk a little bit about your role as technology. What is that role as a liaison? What do you do in regard to being

a technology liaison?
A. I revamped the township website, procured the contract through Advise, helped initiate the connection of fiber from the fire department to the township hall so that we could have a closed-loop circuit and have the county and the township together because we have county EMS.
Q. Excuse me. You said a county E Mess?
A. We have county EMS.
Q. Oh, EMS. Okay.
A. Yes.
Q. And in the technology role, is that how to use the technology as well, whether to use it --
A. I procure -- sorry.
Q. Whether to use e-mail or communication tools as part of the technology?
A. Are you asking if I train on the --
Q. No. If in the role, do you cover the issue of policies related to use of e-mails and things of that nature and using technology?
A. Policy would be a board discussion.

I did create the social media policy, but that was a discussion with the board.

So with the technology role, I brought forward the recommendation to create YouTube, I brought forward the recommendation to have a social media policy, I brought forward the recommendation to have a Smart Board, I brought forward the camera use, security camera usage, the microphone at the township hall.

But all these are decisions that then the board discusses and makes.

Q. So you're saying that the board actually establishes the policy? You were the liaison that helped initiate the discussion of the policy?

A. Correct.

Q. And then to vote as a trustee whether to accept or reject that policy?

A. Correct.

Q. Were all of your recommendations accepted?

A. No.

Q. Which one was not?

A. I wanted to allow comments on social

Page 49

media. I wanted to have Instagram. I wanted to have LinkedIn. I wanted a different Smart Board.
Q. Excuse me one second. Keep answering the question. I'm just looking at what I'm being handed.
A. I wanted a different Smart Board. I wanted different microphones. That's all I can recall in technology.
Q. Did you create, for the board, e-mail addresses?
A. No.
Q. Did you suggest that there be a group e-mail message that would apply so you could send one thing to all three trustees simultaneously?
A. That was discussed as a board. That was not initially my suggestion.
Q. So you created a general category that if anybody wanted to send something to all three trustees at once, there is an address that represents trustees?
A. Correct. And the fiscal officer is on that.
Q. In that group?

Page 50

A. Uh-huh.
Q. And you understand, technologically, that was -- is managed by you and the liaison, or someone else at the township?
A. As I understand it, that is managed by Accent Services.
Q. How do you spell Accent?
A. A-C-C-E-N-T.
Q. And who is Accent Services?
A. They are our current e-mail and phone provider.
Q. And when you said current, how long have they been it as far as -- while you've been a trustee?
A. Since I started.
Q. So since 2022, they've been the sole contractor for your e-mail?
A. They are no longer sole. We're moving to county e-mail.
Q. Okay. But -- so that's -- they will be in addition to them. When you say we're moving to county e-mail, what do you mean?
A. The township administrator is having us migrate onto the county technology-wise, so I don't know what that process is going to

look like.
Q. You said that you had helped create the website.
A. Yes.
Q. Okay. What was the purpose of the website?
A. To provide access of information from the township to the public.
Q. What type of information?
A. Newsletters, zoning items, committee work, meeting minutes, agendas, announcements, calender of events.
Q. So, essentially, to be the face of the township to anybody who wanted to learn about it online?
A. Provide access to information, yes.
Q. Okay. And does it describe the policies of the township?
A. There are policies posted on there.
Q. And so if somebody was to review the website, they'd be able to rely upon determining that there were policies that Berlin Township had adopted that are now being disclosed on the website, is that correct?
A. Yes.

Page 52

Q. And anybody who thought that they wanted to live in Berlin Township could go there and learn about Berlin Township?
A. You can go on the website and learn about Berlin Township.
Q. Okay. And what type of documentation on the website would tell you about what it might be like to live in Berlin Township?
A. Our newsletter. We have a lot of resident resources. We have our officials listed. We have zoning. We have pictures.
Q. If I could direct your attention to your statement about zoning, what is in regard to zoning on the township -- what is in regard to zoning on the website?
A. Oh, okay. We have information about our Zoning Commission. We have information about permits. We have information about our Zoning Resolution. We have information about our Comprehensive Land Use Plan.
We post our notification of hearings on our website and our Facebook. We have contact information.
Q. And when you say contact

Page 53

information, that's in regard to specific --
A. Zoning staff, people.
Q. And what zoning staff are you referring to that they can get to? Is that the zoning --
A. Zoning secretary.
Q. Secretary? Inspector?
A. Uh-huh.
Q. Clerk? Things of that nature?
A. Yes. All that is on there.
Q. Including the trustees?
A. Yes.
Q. Anything in regard to the Berlin Business Park?
A. Yes.
Q. What in regard to the Berlin Business Park?
A. We have a map. We have a description of the workflow and application process for that. We probably -- well, I think that's pretty much it.
Q. And when these things are posted on the website, do you believe that they are the official documents and records of the township?

A. To my knowledge, we post what we've adopted as a board, yes.
Q. All right.
A. Though, I will say, actually, we post drafts, too, of things, or have.
So if there's working documents that are being considered for hearing purposes, let's say, there may be draft forms of items on our website, too.
Q. So the purpose of it is to be a resource for anybody that might be wanting to become involved or understand what is happening at any particular event that is posted? Is that your testimony?
A. I would say provide access to information, yeah.
Q. Okay. And it's reliable information that -- it's the official documents if it was the minutes or the resolutions or things of that nature, correct?
A. It would depend on what the document is.
Q. So if it was minutes of a meeting, as an example, as to what transpired then, that would be the official record of what

transpired during that meeting and what resolutions might have been passed if it was a meeting where you took a vote on a resolution, is that correct?

A. Not necessarily.

Q. Okay. Explain your answer.

A. Well, the official meeting minutes are with the fiscal officer. So anybody can come in and ask for the official meeting minutes.

What may or may not get posted online, I can't say. I would assume that in most cases they match, but I couldn't say that in every case that the official meeting minutes in a draft that gets posted is accurate.

Q. But, generally speaking, you have no reason to believe that the posted minutes really differ from the minutes that the fiscal officer keeps?

A. I have no reason to believe that.

Q. All right. We have a lot of exhibits here. I think we've got to mark them all and get them in the record here.

MR. MARGOLIUS: Why don't we go

Page 56

off the record for a second? Is that what you were thinking?

MR. LA FAYETTE: Take a quick break while you do that.

(A recess was taken from 12:20 p.m. until 12:36 p.m.)

(Plaintiffs' Exhibit 2 was marked for identification.)

(Plaintiffs' Exhibit 3 was marked for identification.)

(Plaintiffs' Exhibit 4 was marked for identification.)

(Plaintiffs' Exhibit 5 was marked for identification.)

BY MR. ZACKS:

Q. I'm handing you minute -- meeting minutes that we received from either the website or a public records request or from your website or production of documents, one of those three.

So you have Numbers 2 through 5. If you could, for a moment, just take a look at each one of them and tell us if you recognize those and if you believe that these are the minutes that you reviewed when you

were preparing, or part of it.
A. This is quite small. The print is quite small.
MR. LA FAYETTE: We've got a bigger one, if you want.
MR. ZACKS: This one has a light on the side if you --
THE WITNESS: Oh, cool. Very cool.
MR. NAGY: The future.
BY MR. ZACKS:
Q. Have you had a chance to review those?
A. Yes.
Q. And do you believe that those accurately are the minutes that you had previously reviewed?
A. Yes. They are the minutes I previously reviewed, to my knowledge.
Q. Let's turn our attention to Exhibit 2, which is the first of them, dated April 10th, 2023.
And on the third page, it looks like there is a reference to the, I believe this is the public policy hearing discussion,

which begins on the bottom of page two in regard to T&R Properties. Do you see that at the bottom of page two?
A. Right here?
Q. Yes.
A. And going to here?
Q. Yes.
A. And I'm referencing page three?
Q. Yes.
A. Yes.
Q. All right. So could you explain for us what's happening in the minutes, at that point in time, beginning from page two to page three before the resolution at the bottom of page three?
A. I am explaining the protocol for how the BBP Case 23-001 industrial warehouse BIO and the Berlin mixed use development procedures would unfold.
Q. All right. And are you the only speaker during that time?
A. On page three?
Q. Yes.
A. No.
Q. Okay. Who else is speaking, if you

Page 59
can tell from the minutes?
A. It appears from page three that it is myself, RJ Sabatino, and Ron Bullard.
Q. All right. And in those statements you indicated when you called this, that this was in regard to the industrial warehouse BIO, correct?
A. Correct.
Q. And BIO stands for what?
A. The Berlin Industrial Overlay.
Q. And it also has the word and after BIO and says and the Berlin mixed use development. Do you see that?
A. Yes.
Q. And when you were calling this one, that is a conjunctive in terms of and. So it's both the consideration of the BP 23-001 plus the mixed use development, correct?
A. Unclear about the titling, but I can say that the case number is correct.
Q. Okay. So your use of the term mixed use development indicates that there is an additional use besides the one that is apparently described under the BIO, isn't that accurate?

Page 60

A. I, I can't say for sure what I was referencing at that point in time.

Q. All right. Now previously you indicated that you don't actually write up these minutes yourself, right?

A. Correct.

Q. Was this meeting recorded, to your knowledge?

A. Yes, to my knowledge it was recorded.

Q. So the minutes, as far as you can tell, are based upon the recording and whatever notes the person who was making the minutes for your consideration created, correct?

A. Yes.

Q. Okay. And you have no reason to believe that something is really omitted, but you really don't know?

A. I would say that the meeting minutes are summaries so it -- it's not intended to be a verbatim word-for-word description of the event.

Q. And so in the paragraph that begins RJ Sabatino for T&R Properties explained that

Page 61

this is for the Berlin Industrial Overlay application for an industrial project at the Chapman property at 36/37 and Lackey Old State, the development proposes to extend Reed Parkway westward for access to a road that will be called South Plunkett Road and the development proposed to have a total of 480,000 square feet of industrial, each building will be 120,000 square feet and Sabatino said that they have received substantial interest in the buildings -- do you see that?

A. Yes.

Q. And do you recall that taking place?

A. Yeah. I would say that that's a summary similar to how I recall it.

Q. Okay. And then you make a clarification in the next paragraph that the board is considering the one parcel with the industrial tonight only, so there will be no comments regarding the other application.

Do you see that?

A. Yes.

Q. And what other application are you referring to?

A. The -- I don't think I knew exactly how the other application was going to come through at the time, but it was going to be the application related to the residential portion --

Q. So the --

A. -- of their parcel.

Q. So the Berlin apartments, basically? Is that what you recall?

A. I don't recall calling them apartments.

Q. Okay. But in the paperwork that you would have had in front of you, as it relates to that application, it would have described the applicant and in the context of this lawsuit, that applicant is Berlin Apartments, LLC, isn't that correct?

A. Correct.

Q. Okay. But that is who you're referring to in that sentence?

A. That is the other application I'm referring to, yes.

Q. And you then begin to describe this concept of the overlay.

A. Uh-huh.

Page 63

Q. And you describe it as, what you called it, as an administrative review.
A. Correct.
Q. Can you explain what is going on as it relates to that summary?
A. T&R Property opted to apply for zoning by utilizing cloud overlay zoning. The Berlin Business Park is zoning that requires an administrative process to be implemented.
The legislative change took place at the time of the cloud zoning, and so the clarification I'm providing here is just that, that the legislative act of the Berlin Business Park had already been implemented through the overlay itself and so what we were doing there for the BIO was administrative review to ensure that the process for the overlay had been followed.
Q. All right. So as far as your testimony today, the BIO, by this time, was already granted over the industrial parcel?
A. It hovers like a cloud, but it has to be called down to be used. So the use comes with the administrative -- through the administrative process and review.

Page 64

Q. Okay. And when you say the administrative process, where do we find that administrative process?

A. I'm not sure I understand your question.

Q. What document of Berlin describes the administrative process?

A. We have a Berlin Business Park application procedure --

Q. Okay.

A. -- and we have a workflow.

Q. And in the application procedure and the workflow, is that part of the Zoning Resolution?

A. The applications are not generally part of the Zoning Resolution, like in and of themselves, but the description of how they go about doing it is in the Zoning Resolution.

Q. And if it meets all the administrative review and then you accept all of the exhibits, does that automatically become zoned BIO and able to be ground broken as a result of that?

A. I don't think it's fair to say automatic.

Page 65

Q. Okay. Explain what --
A. The board has to approve, as an administrative procedure, what has occurred. And once the board approves that, because it's not a legislative act, that approval is not subject to referendum.
Q. Now you keep saying because it's not a legislative act. What do you mean by a legislative act and what is the basis of your opinion?
A. Sure. When amendments are made by the board, there is a difference between a process or approving a procedure and actually enacting that as a legal, as a legal solution for the then zoning.
So, for example, when we passed the business park, that act of the overlay zoning was legislative which meant that the cloud zoning overlaid that parcel. But it's an overlayer. It's not an actual rezoning. The actual administrative rezoning takes place through the procedures that then are followed.
So assuming that everything aligns with the administrative process, the board would then approve it and then at that

Page 66
time, the rezoning takes place through that act.
Q. And is that rezoning that takes place in a cloud pull-down a legislative process or is that an administrative process?
A. The pulling down is a process that takes place as an administrative review at that point.
Q. Okay. But in the end, after it's pulled down, you would vote in favor of that, pulling it down onto that particular parcel. Is that an administrative process at that point or legislative?
A. What we go through in that process is administrative.
Q. And when you vote in favor of it, does that result in something that is legislative or is that an administrative approval?
A. That is an administrative approval that effectively implements what had already been approved.
Q. So if I said it another way, you're basically applying your Zoning Resolution by pulling down the BIO. After it's completed

Page 67

its administrative review, once you vote that that has occurred, that land is basically under that cloud zoning?

A. Correct. Well, it's under the zoning of the codes that they called down from the cloud.

Q. Okay. Whatever the, whatever the codes were -- and when you say codes, what do you mean by codes?

A. There's hundreds of codes that are open within the cloud, so you have to call down the code to utilize it on that property.

Q. Okay. When you say there's hundreds of codes, are you talking about the NAICS codes and permitted use codes?

A. Yes.

Q. So that's what you're referring to when you say codes?

A. Yes.

Q. It's not a separate part of your Zoning Resolution or some other code that you were referring to?

A. No.

Q. It's only the NAICS codes that you have adopted under the BIO being permitted

Page 68

uses?
A. Yes. And those have to be called down within the administrative review process.
Q. When you vote to approve that, they're automatically called down as you described?
A. Not automatically. The codes that are requested are called down.
Q. Okay. So -- we'll get to that.
A. Okay.
Q. So on page four --
A. Yes.
Q. -- what's going on, on page four? It looks like they're presenting to you the different components in the -- in your administrative review, is that correct? Such as lighting, parking spaces, loading spaces, open space, things of that nature?
A. I would not describe that as page four. Maybe I'm looking at the wrong page.
Q. We're -- I'm pointing at -- we are looking at the same page, but I jumped to the mid part there.
A. The middle?
Q. Yes. Because that's what that is,

Page 69

yeah.
A. Okay. Sorry. What was the question?
Q. The question is whether or not T&R is basically explaining and completing what you called the administrative review process, because then it comes down to Mr. -- saying T&R is excited to move forward on the project and is proud of its full compliance with the BIO. Do you see that?
A. Yes, I see that sentence.
Q. And then a motion is made by you, seconded by O'Brien -- Trustee O'Brien, that is, and all three of you vote yes, correct?
A. Yeah. But I would not describe this as explaining compliance with the administrative process.
Q. Okay. Explain, because on the preceding page there was a resolution to accept the binder that was previously accepted from BBP 23-001 as Exhibit Number 1.
A. Uh-huh.
Q. And you guys -- you move again for that to happen, O'Brien seconds, all three of you agree.

Now you have a resolution to accept Mr. Sabatino's letter, which he then kind of explains the letter on the next page. And then you vote to, apparently, accept that as Exhibit 2, correct?

MR. LA FAYETTE: I'm going to object.

THE WITNESS: I would describe page four as Mr. Sabatino, what he says, we are sending this letter -- on page four, paragraph three -- we are sending this letter with a primary purpose of clarifying items from our planning commission hearing and have made simple change regarding lighting to ensure we entirely follow the Berlin Industrial Overlay.

I took this letter as a response to the Delaware County Regional Planning.

BY MR. ZACKS:

Q. And then you accepted that letter as part of the record?

A. That is correct.

Q. All right. And then there is the sentence after you do that, that says, the above letter states changes that were made

Page 71

upon the request of the ARB.
A. Uh-huh.
Q. Do you know who is speaking that?
A. No.
Q. Okay. Then there is a general conversation summary that says there was a general lengthy discussion regarding the plan between the trustees, Sabatino, and Mark Mann, the engineer for T&R Properties, concerning the clarification of open space, traffic concerns, mailbox locations and design, trash disposal and lighting. Do you see that?
A. Yes.
Q. Do you have any recollection of anything different than just a general conversation at that point?
A. No, I do not.
Q. And then you see you ask the question if they were aware of the noise restriction hours being from 10 p.m. to 6 a.m., which includes the running of trucks, and Sabatino confirmed that they would be following the noise restriction hours, correct?
A. Correct.

Page 72

Q. And then we go on where you ask the question what, specifically, was modified in the initial design of the structure after the ARB's -- meaning Architectural Review Board's -- feedback, and he answers and says, they have muted the colors to more clearly earth tones outlined in the BIO, along with glass.

You then go on to say that the ARB specifically commented that the building design itself was dated. Sabatino comments to conceptual renderings of architectural elevations are displayed in the updated binder, which you had previously approved to be part of the record, is that correct?

A. Correct.

Q. And then, below are what the trustees asked Sabatino to do and the changes that had happened since the prior -- before he comes back for the approval on April 24th, correct?

A. Correct.

Q. Okay. And he just gives a long list and says add NAIC codes, at the bottom of that list, that are fitting for the design of the

Page 73

building. This is not required but suggested. Okay. Do you see all that?

A. Yes, I see this.

Q. Okay. And do you believe that that answered all your questions that you had raised in the interim at that point?

A. I don't know that I can answer that question.

Q. Okay. Who could answer that question if you can't as the trustee of the trustees -- I mean the Chairperson of the trustees?

A. Well, I think that within a -- the application and the hearing, there may have been other questions that we just didn't have time to get to up to that point, but I do think that this resolved the ARB concerns at the time.

Q. Okay. So I think we're both on the same page.

A. Okay.

Q. The ARB concerns are resolved at that time and there's an expectation that he's coming back on April 24th for an approval -- potential approval, excuse me.

Page 74

A. Potential approval, yeah. And there were other items, I think, that were still outstanding.

Q. Yes. And those are in the paragraph that is at the end of that part.

A. Oh. Yeah.

Q. Are those the four items you're referring to? Namely, the letter to the fire chief, the metes and bounds issues being addressed, any additional NAICS codes that meet the -- that the applicant feels are fitting within the design and would like to be considered by the board, as well as the number of changes that have been requested based on the discussion with the board as provided to them.

A. Yeah.

Q. Okay. So, essentially, fire chief letter, metes and bounds issue, codes that we referred to before which are the NAICS codes, or NAICS codes, and then a general sentence at the end which isn't real -- exactly clear, correct?

A. Correct. That's not super clear, but it was from the discussion, yeah.

Q. And then you go on to handle a -- to recess and to continue that to April 24th?
A. Yes.
Q. And you all -- you make the motion, O'Brien seconds, and all three of you vote in favor?
A. Correct.
Q. And then you begin a consideration. You have a resolution to accept, BZC 23-003, which is The Residences at Berlin Township, as this describes them, which is the application of Berlin Apartments, correct?
A. I don't recall calling it apartments. I recall it being The Residences at Berlin Township.
Q. But you were aware from your review of them that those residence --
A. That there was an LLC, yeah.
Q. That there -- no, that was not my question.
A. Sorry.
Q. But, yes, it was an LLC named Berlin Apartments. You recall that?
A. Yes.
Q. Okay.

Page 76

A. I do.
Q. And you understand that the use of those apartments was rental?
A. Yes.
Q. Okay.
A. I believe that they were referenced as townhomes, though.
Q. We can look at the things that you're --
A. Yeah.
Q. -- looking at.
This appears to be making the binder part -- Exhibit 1 part of the application complete. That's what you voted in favor of, right?
A. Correct.
Q. For a use that is apartments? You're accepting only the binder. I'm not saying you're accepting apartments.
A. Townhomes.
Q. So you think it was townhomes? And when you say townhomes, what's the distinction between a townhome and apartment to you?
A. To me it was -- I didn't make that distinction. It was what I -- when I reviewed

that, it was two-story townhomes was the description. And then that was opposed to what was in our business park which were quad unit single story apartments at that time.
Q. Were you -- do you recall if you were looking at any drawings of the mixed use development at the time you were considering this?
A. Like did I have a binder and was I reviewing it? Yes.
Q. You did?
A. Yes.
Q. So you would have had whatever the drawings were and whether they were one building, two building, all of what you're talking about now?
A. Yes.
Q. All right. Let's move on then.
It appears that there is a recess for a period of time, and then something about the Berlin Township Comprehensive Use Plan that occurs.
A. Yes.
Q. All right. And that is to a time certain -- it looks like you're -- this is

Page 78

going to be a different day or what's going on next? Is that just an interruption in the minutes? It's a little hard to tell. It's just jumping in there.
A. I couldn't tell you --
Q. Okay.
A. -- for sure what happened there.
Q. But let's read in the record, then. So it says that you called the BZC 22-003 to order at 9:25.
A. Yes.
Q. And then you begin to explain that there are two courses of actions that can be taken moving forward. They could reject the plan and have BZC take it up and begin the process over again so that they would be able to see the substantive changes that have been made, or the board should schedule a joint meeting with the BZC, go over the Land Use Plan together and integrate -- I'm just reading because it's easier for the record -- and their feedback within the context of the trustees' meeting and then approve those adjustments. Since the deadline is not until the end of the year, her thoughts are to

Page 79

reject it and let BZC start the process all over so that they have ample time to go through the plan and make changes to it.

O'Brien and Bullard agree with you, and then you make the motion to reject the Comprehensive Land Use Plan, is that correct?

A. Correct.

Q. And then you all three vote in favor of rejecting the Land Use Plan in anticipation of additional review of that by the BZC, is that accurate?

A. Correct.

Q. Okay. So when you rejected the Land Use Plan at that point in time, what was the state of the current Land Use Plan if you are rejecting the Land Use Plan?

A. Well, we were rejecting the proposed changes to the Land Use Plan, so we were operating with the same plan we had before.

And the purpose of this was really just to be able to cleanly and thoughtfully integrate BZC feedback with our feedback.

Q. So you weren't eliminating a Land

Page 80

Use Plan?
A. Correct.
Q. You were just going back to whatever the old plan was?
A. No. The old plan was the only thing that was in effect --
Q. Okay.
A. -- for the entirety of that time.
Q. And at that point in time, where could a person, who was trying to understand your plan, find that Comprehensive Land Use Plan that was in effect?
A. We had -- to my knowledge, we had the Comprehensive Land Use Plan on our website, and we also had a draft version of the Comprehensive Land Use Plan that we were considering that was on Delaware County Regional Planning's site.
Q. So they would have a sense of what the old plan was?
A. Yes.
Q. And then they would see what changes were trying to be made?
A. Yes.
Q. And you had been involved in that

Page 81

whole process, isn't that pretty much true, as a trustee?

A. No. The process for updating the Comp Land Use Plan was that it would go through -- there had been board feedback over the past couple years. We give that information to our zoning staff.

Our zoning staff initiates it through the BZC. The BZC, when they complete their work and approve it, it goes to the trustees.

So we don't oversee that whole process. Oftentimes, we don't see what happens until the end result of what was proposed for change.

Q. Okay. But in the context of your role as the liaison for zoning, you would have been involved in that process similar to how you had previously indicated today that you had been that liaison; plus, you had also been the person who had been involved in the business park aspects of the township's view of how the different clouds get pulled down, is that correct?

A. That's accurate.

Page 82

Q. Okay. So you were understanding at that time that, as it relates to the T&R application, it was an application in the business park for --
A. Which application?
Q. The T&R application is both. It's the project of the mixed use development for the site plan that they had proposed when they originally proposed the mixed use plan, which was about a year -- I think, actually, we're in '23, this was in December of '22 when they first proposed going through your process of pulling everything down and understanding the process, correct?
A. No.
Q. No? Explain.
A. The Berlin residences, The Residences at Berlin, were not applied through the Berlin Business Park overlay process.
Q. Okay. Wasn't it in the business park?
A. The land is in the business park, but the cloud overlay zoning is one tool that can be utilized and they did not come through the Berlin Business Park as their procedure of

Page 83

The Residences at Berlin.

Q. Let's backtrack a second.

A. Yeah.

Q. You were involved in, before becoming a trustee, understanding the business park is part of Berlin's activity, and you were involved in studying the business park, correct?

A. Can you be a little bit more --

Q. I believe your earlier testimony was that you had been involved with the Berlin Business Park before you were a trustee.

A. I was a resident who was involved with, yes, aspects of that.

Q. Okay. And what are the aspects that you were involved in?

A. I think, like I mentioned before, we were -- we talked about county officials, we talked about township trustees, we had a -- you know, talked with neighbors, sent things out to neighbors, talked with neighbors, go to the zoning meetings -- I think I said all that before.

Q. Okay. You did.

A. Okay.

Page 84

Q. You said you were the liaison during the entire time to deal with the business park issues with zoning from the time you became a trustee, forward, all the way to the present, correct?

A. The business park was passed well before I was a trustee.

Q. I understand that.

A. Okay.

Q. But in your work for the township as a trustee, you were the trustee liaison to understand how the business park would work within the zoning that Berlin's resolution controlled, isn't that accurate?

A. Yes and no.

Q. Okay. What is the no component of your answer?

A. Yes in the sense of if there were supervisory aspects related to zoning, certainly, I would have known about that component.

No in the sense of just like with the other functions of our township, liaisons are not exclusive and so zoning matters are board issues, not individual liaison issues.

Page 85

So, for example, the Comprehensive Land Use Plan, our whole board is involved in that. It's not the liaison that is the one that is responsible for making the changes. It's the board that is responsible for making the changes.

Q. So what your testimony is, that in order to approve the business park, it would have taken a vote of the trustees?

A. Correct.

Q. And they would have been relying upon the trustee who was -- the trustee who was the liaison for, in this case, you being the liaison related to the business park issues when they're considering the Comprehensive Plan in 2023?

MR. LA FAYETTE: Objection. Go ahead.

THE WITNESS: I don't think it's accurate to say they would be relying on me to make a decision.

BY MR. ZACKS:

Q. I'm not suggesting they were.

A. Okay.

Q. My question was whether or not they

were relying on you, as the zoning liaison, and the most knowledgeable trustee in regard to having studied it deeper, when a recommendation would be brought before them that involved the business park.

A. I would say that's inaccurate.

Q. And why?

A. Well, because both Trustee Bullard and Trustee O'Brien have been trustees for a very long time, been involved with zoning for a very long time, been involved with our township for a very long time, and they were the ones that passed the Berlin Business Park before I was trustee.

So I would not say that they were relying on me to inform or influence by. I would say that as the liaison, I would be supervising the staff to make certain that, for example, drafts get posted or, you know, hey, are we going to make certain that this, this hearing gets heard or can you make certain that feedback from the board gets over to the BCZ and their meeting? Those kinds of things.

I would say it's more day-to-day

functionality that a liaison is responsible for, less influence and oversight of that respective area.
Q. Have they, that being Mr. Bullard or, or Mr. O'Brien, ever voted against one of your recommendations as a liaison in zoning?
A. Yes.
Q. Give me an example. When did that happen?
A. I don't remember the exact case. There was a split vote and I voted in favor and Trustee O'Brien did not vote in favor of it. And I think in that one, Trustee Bullard voted in favor, so it ended up passing. I don't recall the case number.
Q. Do you recall the issue?
A. I don't. It was, it was something related to a change from the preliminary plan to what they were bringing forward, but I don't recall the exact issue.
Q. Do you recall if it was in the business park area?
A. No, it was not in the business park area.
Q. So it doesn't have any direct

Page 88

relevancy to the conversation we're having about T&R's applications, isn't that true?

A. I would say that's inaccurate.

Q. That's accurate?

A. That's inaccurate.

Q. It's inaccurate?

A. Yeah.

Q. So --

A. Your question was can we -- do we split vote. Do we ever not agree on zoning.

Q. My question was whether or not they ever do not accept your recommendation.

A. Okay. So the answer is yes.

Q. I understand your answer is -- the answer is yes to which question?

A. That they, they do not -- the answer is yes, that they do not always accept my recommendation.

Q. Okay. Now I'm going to ask the next question. So in the context of your recommendations on the T&R applications, did they ever vote against your recommendation?

A. Any motion I brought forward related to T&R Properties, the BIO, which was in the business park, overlay zoning, and the

Page 89

Berlin -- Residences of Berlin, which is not in the overlay zoning, they did not disagree with.

Q. Okay. So that's a yes?

A. Can you rephrase --

MR. LA FAYETTE: Objection.

THE WITNESS: -- the question?

BY MR. ZACKS:

Q. You qualified your answer by saying they did not go against your recommendation, so I said that that's a yes to the question, because the question was in the context of did they ever go against your recommendation and you basically said yes, they never went against my recommendation.

MR. LA FAYETTE: Objection. She said in the BIO.

MR. ZACKS: My question was in regard to the T&R applications. It wasn't just as to the BIO. So your objection stands on the record, but you're coaching the witness.

MR. LA FAYETTE: I'm not coaching the witness. I'm just making sure we have a clean record. That's all.

Page 90

MR. ZACKS: I'm just saying you're coaching the witness because you distinguished something that wasn't in the question.

MR. LA FAYETTE: She distinguished something that you asked a broader question and her answer was narrower. You're free to do it. You're free to say whatever. She's the one that distinguished it, not me.

BY MR. ZACKS:

Q. So your testimony today is that in the context of the T&R votes that you had with the other two trustees, that you were always unanimous, isn't that accurate?

A. Yes.

Q. Okay. Let's go to Exhibit Number 3, and I believe that you've already suggested that that document is something that you were familiar with, but since we were on 2, I wanted to make sure we had the right one in front of you.

So now take a minute because, again, we were on a different tangent a minute ago, to look at Number 3. This purports to be

the meeting on April 24th, which is the one that the April 10th indicated was going to be coming forward on the application.

Do you agree with that representation after you take a quick look? I'm just speaking out loud because you're using the magnifying class because it's really small print, and I'm just letting them know on the record.

A. Thank you. Yes.

Q. Okay. And then on page two is where you called the hearing on BBP 23-001, continuation of the April tenth hearing, correct?

A. Correct.

Q. And then you begin to summarize the protocol again. And then there is a long legal description that is described for the parcel.

A. Uh-huh.

Q. If you turn the page to -- it's a little -- see if you're -- page two, page three is the legal description.

A. Uh-huh.

Q. The next page, which is on the back

side -- they're front and back --
A. Uh-huh.
Q. -- looks to be the drawing of something superimposed over what says the Berlin Industrial Overlay application. Do you see that?
A. Correct.
Q. And these are your official minutes, correct?
A. It looks like something happened with printing here.
Q. Okay. So I can represent to you this is how we received them. We didn't do that.
That particular page is a little confusing, other than it's showing us, essentially, the apartments it looks like, to me, not necessarily the industrial portion which was being continued, correct?
A. I would say it's representing both in this picture.
Q. Okay. And when you say it's representing both, where on the picture do you see the warehouses?
A. I -- the parcel of the BIO is next

Page 93

to, and to be clear, that's west of The Residences at Berlin.
Q. Okay. So you're suggesting that the legal description is that center piece that has, in our view, only words and then a dark area to the top of the page and a, a highlighted dark area to the bottom of the page, is that correct?
I don't see any buildings that look like warehouses on this picture.
A. This looks like it was the, the layout for the representation. It looks like there's -- it's a little bit hard for me to see these, the graphic, but it looks like perhaps there's the clarification of the open space being represented in this picture, which was a request of the trustees.
So where it says 15.5 percent, it looks like the BIO portion they are representing where the green space was going to go and --
Q. Yeah.
A. -- what portion was therein.
Q. So the highlighted portion is what you're talking about is the green space?

A. I believe that this -- yeah. I believe that that's what I'm looking at here.
Q. Okay.
A. And then it has the representation, it looks like, of where the, where the multi-use path was -- is going to go, which was another request from the prior meeting. This looks like it might be a boundary document.
Q. Okay. So it's a little confusing to you, as well as us, to try to figure it out.
When you said it looks like we're talking about the multi-use paths --
A. Yes.
Q. -- that discussion picks up on the next page at the top, correct?
A. It looks like it's on the page, too. Let me look. Yes.
Q. Okay. So that's the narrative of the multi-use public path going through the private property, right?
A. Yes.
Q. And you're expressing a concern of the location of that public path, correct?
A. Correct.

Page 95

Q. And, and the answer that you get is -- do you find it satisfactory to you based upon what Mr. Mann explains? Again, I'm trying to make sense of your minutes, so help me to understand what your concern was on page five in that big long paragraph.

A. It looks like O'Brien mentions the no paths in the public right-of-way throughout the township. I echo that. I indicate we had this discussion, and it looks like Trustee Bullard and Trustee O'Brien agreed.

Q. Okay. In your -- I understand you're trying to read it fast, so take a minute because it looks like T&R's engineer explains that if they put the path where you're asking them to put it, it's a path to nowhere.

A. Yeah. That is what gets explained, and I respond to that.

Q. And you say that it was conceptualized --

A. That the way it was conceptualized, the path was to follow in a safe manner down the 36/37 corridor, so that would eventually attach to potentially the Ohio to Erie Trail

which has a route that comes on off of 36/37 on the other side of the pedestrian parkway that the city of Delaware has. I was explaining it wouldn't be a path to nowhere forever.

Q. But it would be a path to nowhere until it connected up, that would be correct, at that time?

A. Or until somebody connected it, yes.

Q. Okay.

A. It wouldn't be a path to nowhere, though.

Q. I understand the technical statement you're making --

A. Okay.

Q. -- that somewhere down the road somebody might build a path that would connect it. That's your testimony, correct?

A. My testimony is that it's not going to be a path to nowhere.

Q. But you don't know when the Ohio-Erie Trail would connect to it, is that correct?

A. Not the Ohio-Erie Trail. I don't know when, when it would be connected to

another property.

Q. Okay. So until that happens, it's a path to an undetermined place?

A. Correct.

Q. Then you moved on to Bullard agrees with O'Brien and says that because of the future maintenance, it needs to stay out of the right-of-way so the cost would fall on HOA's or the owners of the properties and not the township.

So that seems to have been the concern of why it -- of the issue of its location, is that correct?

A. It was future maintenance needs.

Q. Okay. And then Sabatino reads the other conditions for approval letter into the record. And let's focus, for a moment, on number ten, okay?

I understand that the numbering goes 1, 2, 4, 5, 8, 10, but that's because it was the ones that were being addressed, not a historical -- there must have been a historical list previously that the other ones were in.

So you asked Mr. Sabatino if he

Page 98

compared the NAICS codes he brought forth to the ones that are specified and called out in the BIO and he, according to this says, no.

He said he misunderstood and asked the real estate experts and municipalities as to which ones are attractive to potential business owners.

Now what's not here is what we're talking about, correct? We don't even describe that we're talking about a NAICS code for a warehouse and building, correct?

A. I think they called out 493 warehousing in this paragraph ten.

Q. You see 493 in here?

A. Yes.

Q. Where?

A. In --

Q. I see. I missed it. 493 in the middle part there.

So it's talking about warehousing and storage at 493. Are you familiar with that 493 code?

A. I'm generally familiar.

Q. Okay. Did you do any research at the time of this discussion, or at any time

Page 99

considering that this application as a trustee, of the specifics of what are called for in NAICS 493 warehousing and storage?
A. Yeah.
Q. You did?
A. Yes.
Q. And what did you do?
A. I went online and I looked at the NAICS codes. I also reached out to Scott Sanders with DCRPC. And I also spoke with, let's see, spoke with somebody in economic development at the county.
And at some point I reached out to other people, but I don't know if that was before or after this date.
Q. Okay. In regard to what you -- when you said you don't know what was before or after, does that mean -- are you referring to the research you did on your own or just the conversations --
A. Conversations that I had.
Q. At this point in time, when you were referring to the code, you believed you understood what storage and warehousing included?

A. I do believe that.

MR. ZACKS: I'm going to hand you what's being marked as a new exhibit.

(Plaintiffs' Exhibit 6 was marked for identification.)

BY MR. ZACKS:

Q. I'm handing you what purports to be from the web the North American Industry Classification System, NAICS Code 493. Do you see that?

A. Yes.

Q. Is this the definition that you had previously researched?

A. This is similar to it.

Q. Okay. And when you read it, what does it describe as the particular characteristics of the code?

A. Primarily engaged in operating warehousing and storage facilities for general merchandise, refrigerated goods, and other warehouse products. These establishments provide facilities to store goods. They do not sell the goods the handle. These establishments take responsibility for storing the goods and keeping them secure.

Page 101

Would you like me to continue?
Q. Sure.
A. Okay. They may also provide a range of services, often referred to as logistics services, related to distribution of goods. Logistics services can include labeling, breaking bulk, inventory control and management, light assembly, order entry and fulfillment, packaging, pick and pack, price marking and ticketing, and transportation arrangement. However, establishments in this industry group always provide warehousing or storage services in addition to any logistics.
Q. It's on the back side, also, please.
A. In addition to any logistic services. Furthermore, the warehousing or storage of goods must be more than incidental to the performance of services, such as price marking.
Bonded warehousing and storage services located in free trade zones are included in the industries of this subsector.
Q. So at the time that you were considering this code, were you aware that this was a spec warehouse building and that in

Page 102

the context of that, they did not even know exactly who were going to be tenants in the building?

A. I was aware that it was a spec. I wasn't aware of whether or not they had tenants or procured tenants or had people.

Q. In the prior, in the prior hearing, he says that to you and tells you they don't know how the building is going to be -- who it's going to be used by.

A. Yeah. But I, I'm not going to speculate on whether or not they have tenants identified by this moment in time or not.

Q. Okay. But as far as you know, at the time that you're evaluating this on April 24th, he's not telling you the specific party that is going to actually be in the property --

A. Correct.

Q. -- is that correct?

Okay. All right. So you seem to have a concern that is related to the classification. What is your concern, at that time, related to why 493 should not be a use code under the BIO?

Page 103

A. The primary concern, at this moment in time, was that 493 was not identified as a permitted use under the Berlin Industrial Overlay within the codes permitted.
Q. And do you know why that was so at that time?
A. Yes.
Q. What is the answer?
A. The codes were assessed at the time that the Berlin Business Park overlay was put into place -- this was prior to me being a trustee -- and it was a result of the codes that those trustees and the county agreed upon that they passed.
Q. Okay. So you had individual knowledge before you were trustee of this, of the idea that the 493 code was specifically being excluded?
A. Yes.
Q. Okay. And what is the basis of that position?
A. A group of residents got together at the township hall and went through with the county and with Trustee Bullard every single NAICS code that got selected for the BIO and

Page 104

the BCO and they crossed them off.

Q. And if, if Trustee Bullard said that he had no recollection of that ever happening in his testimony with us the other day, would you suggest that he's just mistaken?

A. I would be surprised if he did not remember that event.

Q. Okay. And so you have specific recollection, when you were present, that 493 was stricken from the use code?

A. Not 493, but warehousing and storage, definitely the wording warehousing and storage, was struck.

Q. So the wording warehouse and storage but not the NAICS code --

A. I don't recall the exact number that they were striking, but they struck close to, I don't know, I would say waywards of 50 different codes.

Q. And what was the concern of -- or in the character of the code, what was the intensity of the use -- or what were they worried about?

A. I can't speak specifically to warehousing but in that meeting it was -- they

didn't want things that would tear up the roads, you know, create potential hazards, those kinds of things was, when they were going through, what they were looking at.

Q. Did -- so the meeting that you were referring to that Bullard was at and you were at previously, did you have any conversation with Mr. Bullard in the context of this, discussing this 493 code while acting as the Berlin Township Trustee liaison?

A. No.

Q. Okay. For that meeting that you were talking about, were minutes taken of that meeting?

A. No. It was in 2019 before I was trustee. I do believe it was posted on the website, though, and Trustee Bullard met with Rob Platt and a few different residents. I don't recall who all showed up.

It was a few hours, I recall, sitting there going line by line through each and every of those NAICS codes, and they were talking, having a conversation about it. And we were all looking at it, listening, you know, trying to understand what different code

uses are. That's what I recall about that situation.

Q. Okay. And you said it was in 2019? What part of the year? What month if -- do you have any recollection?

A. I can't recall.

Q. Okay.

A. It may have actually even been -- no. I'm almost positive it was 2019 because Covid, of course, hit in 2020, and they had the remainder of the business park meetings, like, virtual.

So this would have been 2019. I can't remember the month, I'm sorry.

Q. Okay. But I'm trying to help with the month.

A. Yeah.

Q. So from the standpoint of Covid, Covid, from your understanding, I'm trying to recollect, when does Covid begin?

A. March of 2020.

Q. March of 2020?

A. Yes.

Q. So that's not 2019?

A. That's why I'm saying it would have

Page 107

had to have been 2019 because we were all there at the township hall. We had an informal meeting. And the business park, I think, passed somewhere around -- there were two parts of it, but the final part was later in 2020 post-Covid.

Q. Okay. So you're saying that in 2020, it wasn't this meeting?

A. Huh-uh.

Q. This was when the business park was approved?

A. Yes.

Q. Okay.

A. Yes.

Q. So we're back to the meeting so -- and you have no recollection of the season? Whether it was hot or cold? We're just trying to be able to pinpoint this meeting that we are first learning about, okay?

A. I was a resident so I, I -- you know, I wasn't responsible for this meeting. I don't recall. I do know that it was posted on a website -- on the previous website, and I don't know who all showed up.

Q. Okay.

A. I can name a couple people but --
Q. Who?
A. Trustee Bullard.
Q. Other than Bullard and Rob --
A. Rob Platt.
Q. -- Platt.
A. A woman named Christina, a resident. I don't, I don't know who else. I can't recall.
Q. Okay. And did you go to this meeting alone, or were you with your husband?
A. I went alone.
Q. Okay. And did you have any paperwork that you took with you?
A. Yes. I had printed out the working draft copy at that time.
Q. And when you say you printed that out, where did you obtain that from?
A. It was on the website or I, I think maybe Rob Platt gave it to me. I don't remember.
MR. ZACKS: Paul?
MR. LA FAYETTE: Yes, sir.
MR. ZACKS: We don't have anything in this regard, in regard to the

public records request that we had requested from the township about this alleged meeting.

MR. LA FAYETTE: Okay.

MR. ZACKS: So if you could please look back to see?

MR. LA FAYETTE: I'm making a note right now because I haven't seen it, either. I wasn't aware of it.

MR. ZACKS: Part of the problem we have is online doesn't go back to 2019.

MR. LA FAYETTE: Right.

MR. ZACKS: But the public records request, I believe, went back to 2018 --

MR. LA FAYETTE: Yeah.

MR. ZACKS: -- as an example.

MR. LA FAYETTE: If I could just clarify, when you were saying that it was on the website, were you saying it was on the township website or the Delaware Regional Planning Commission?

THE WITNESS: I was meaning the township website.

MR. LA FAYETTE: Okay. All right. We'll go ahead --

Page 110

BY MR. ZACKS:
Q. Okay. And that's your recollection, you got it from the township website, not Delaware Regional Planning?
A. No, I didn't get the document. I think I got the document from Delaware County Regional -- no, the economic development, Delaware County, from Rob Platt.
Q. So not the township's website?
A. I don't believe I got it off the township website at the time.
MR. ZACKS: All right. If you could check, that would be appreciated.
MR. LA FAYETTE: I'll check to see if it was. If it wasn't --
MR. ZACKS: Because the public records request included anything related to the business park with the county so --
MR. LA FAYETTE: Clearly. Yes.
MR. ZACKS: -- I'd appreciate that.
BY MR. ZACKS:
Q. In most of your testimony today, when you say that you spoke with somebody, okay, do you mean that you actually had a

Page 111

verbal conversation with someone or do you mean that you communicated with them in some other way?
A. Verbal is what I mean when I say speak.
Q. Okay. So if you sent somebody a text or anything like that, you would have answered that that was a text?
A. Yeah.
Q. Okay. And did you regularly use texting to communicate with people before you were a trustee?
A. Same amount as -- I do both.
Q. You do both now?
A. I do both. I did both.
Q. Okay. And when you text -- how many telephone numbers do you have?
A. Would you like me to look at my phone?
Q. No, no, no. I mean in the -- you use to text people, do you have one telephone number that you use on your phone?
A. I have two numbers.
Q. You have two numbers? What are those two numbers?

A. My trustee number is 614-832-1952, and my personal number is 614-822-1883.

Q. Okay. I didn't write real good there. Trustee one is 614?

A. 832-1952.

Q. Okay. And did you have the trustee number -- when did you begin to use the trustee number?

A. When I became trust -- well, I had the number before. It was a Google voice number, and then I started using it as a trustee number when I became trustee.

Q. Okay. And that, we can assume, was on January 1st of 2022 like you previously testified?

A. Yes.

Q. Prior to that, did you use the Google voice separately from your regular mobile?

A. I had a separate number prior to that. But I didn't really use the 832 number, so I figured it was a good number to keep --

Q. Okay.

A. -- distinct.

Q. And that, you said, is through

Page 113

Google voice. It's not through your typical carrier? Your mobile phone carrier, your cellular service, or is it from -- you signed up online to -- you could have a Google voice number separate and apart from your mobile number, right?
A. Yes. And you can have a separate -- but it all comes to the same phone through the same network.
Q. Okay. So you have a Google phone? Is that what you're saying?
A. No.
Q. Who's your provider for your mobile?
A. I don't -- Visible.
Q. Visible?
A. Visible, yeah.
Q. And has it always been Visible while you've had that mobile?
A. Well, I've had -- yes.
Q. And during the time period that we're talking about prior to date?
A. Prior to that I was on Mint Mobile with a different device.
Q. Are you saying Mint?
A. Mint, M-I-N-T.

Page 114

Q. Okay. Mint Mobile with a different device, but the same phone number?
A. Yes.
Q. Okay. And the records for Mint Mobile are part of Visible, as far as you know?
A. No. They're two different cell services.
Q. And do all of the trustees use separate mobile numbers for their trustee work, as far as you know?
A. As --
Q. Not all --
A. I don't know.
Q. You don't know?
A. I don't know.
Q. Okay. All right. We took the detour to get involved with Exhibit 6. Let's go back to Exhibit 3.
All right. On page eight there is a motion to approve the application, BBP 23-001, T&R Properties as submitted by Berlin Township Zoning Commission, plus all the exhibits. Do you see that?
A. Yes.

Page 115

Q. So at that point you are approving the BIO pull-down on April 24th, is that correct?
A. We are approving Case BB -- BBP 23-001, correct.
Q. Okay. So going back to your earlier testimony about the pull-down at that point in time, you, as the trustees, are approving the application for the warehouse subject to the development plan being implemented. Is that how you would describe it?
A. No.
Q. How would you describe it?
A. That we were approving the use codes that were requested by the applicant.
Q. Okay. So you were only approving the use codes by the applicant at that point in time, which are the ones that are on the preceding page, Exhibit 7 (sic)? It starts on seven and carries over to page eight.
A. Yes. Well -- I'm sorry. Page six to seven? Read the line-by-line NAICS code, and then on page seven?
Q. Correct. Yeah. The actual codes happen on page seven, but you're correct --

Page 116

A. Okay.
Q. -- the introductory paragraph about it starts on page six.
A. Correct. Correct.
Q. And --
A. That is what we approved.
Q. And then before you approved that, you had approved additional exhibits that were part of the application on page seven?
A. Correct.
Q. Okay. And then at that point -- and then you took a recess after doing that. Let me backtrack a second.
So one of the things in your minutes is that each of your actions has a separate resolution number which, in this case, the resolution we're talking about is Resolution 23-04-36 when you approve those codes, correct?
A. Correct.
Q. But it -- then you have the BBP 23-001. And in the interim, you had other resolutions, which were accepting the exhibits, correct, on page seven?
A. I lost track of you there.

Page 117

Q. Go back to page seven.
So you have Resolution 23-04-34 which is accepting the additional Exhibits 3 through 6?
A. Yes.
Q. The subsequent one, Resolution 23-04-35?
A. Yes.
Q. And then this one becomes 23-04-36, correct?
A. Yes.
Q. Okay. And so you guys established these resolution numbers, which are not directly tied to anything related to how the applicant numbers were set up. They're just different systems. One is resolutions, one is an application?
A. Yes.
Q. Okay. Next what happens is you are now having the conversation about the Residences of Berlin Township, BZC 23-003. That's on page eight, correct?
MR. LA FAYETTE: Down at the bottom.
THE WITNESS: Oh. Yes.

Page 118

BY MR. ZACKS:
Q. Okay. And the next couple of pages describe issues specific to that application, right? The next pages are essentially a conversation between the trustees and the applicant beginning on the bottom of page eight going through page nine, up to page 11, before you ask for public comments -- wait.
Oh, at the bottom of ten, that concludes. Then you open up for public comments for those in favor of the project, correct?
A. Correct.
Q. Okay. So let's ask -- let's go through some of the discussion between you, you being the trustees, and the applicant.
In mid page nine, roughly, it says Sabatino stated that the multi-family portion is necessary for the entire project to happen. Do you see that sentence?
A. Yes.
Q. When he's saying that, you understand him to be describing the mixed use project, correct?
A. I understand him to be talking about

Page 119

BZC Case 23-003.

Q. So the answer is no? You think he's only talking about the apartments -- The Residences at Berlin?

A. Yes, I think he's only talking about the apartments --

Q. Okay?

A. -- and the multi-family portion being necessary.

Q. Is that what you believe happened in your review at the time, or is that your testimony today based on that sentence?

A. Are you -- could you rephrase that?

Q. I'm distinguishing between the possibility that this summary doesn't capture everything that happened.

So I'm asking you if the general statement, Sabatino stated that the multi-family portion is necessary for the entire project to happen, you're appearing to indicate that you believe the entire project he's referring to in that sentence is only The Residences at Berlin?

A. At that time we were only considering The Residences at Berlin.

Page 120

Q. Okay. So that's all you thought was happening at that time, I understand.
A. Well, for multi-family to be necessary, I thought the multi-family that he's referencing here, and even at the time, was The Residences at Berlin.
Q. Understood.
A. Okay.
Q. Now he explains that the original plan was 376 apartments, including one, two, and three bedrooms, with cementitious/hardy plank siding, stainless steel appliances, granite countertops. After feedback from the Delaware Planning Commission, they made changes to include a reduction of 70 units, and they added a 350-foot buffer from the neighbors to the east at the shortest point, in addition to the mound with evergreens, 70 percent open space/central green space with fire pits, pathways with benches and high-end apartments. Do you see that?
A. Yes.
Q. And then O'Brien indicates that he likes the look of Buildings A and B but does not like the look of the townhomes.

Page 121

Do you understand what his concern was about the townhomes?
A. Yes.
Q. What was it?
A. He did not like the spacing and the fact that what was coming through was not what Delaware County Regional Planning had recommended --
Q. Okay.
A. -- which he explains in the next sentence.
Q. So he -- four units per acre is what he talks about in the next sentence, right?
A. Yes. He wants to follow Delaware County Planning Commission recommendations with four units per acre.
Q. And that the units are at least 800 square feet?
A. Yes.
Q. That's what he's saying?
A. Yes.
Q. So how does, how does that relate to not liking the look of the townhomes?
A. You'd have to ask him.
Q. We did. He explained, and I'll

Page 122

represent to you, his testimony was that he didn't like the way they were front-loaded garages.

MR. LA FAYETTE: Objection. Go ahead.

BY MR. ZACKS:

Q. So that's all he said, okay?

But here he then appears to either -- it doesn't describe additionally what he was saying or it changes topics to following what he believes to be the Delaware County Regional Planning Commission recommendation.

Did you have that recommendation with you on the day of that meeting?

A. Yes, we did.

Q. Okay. And when you say you had it, what do you mean you had it?

A. We had a note indicating DCRPC's considerations for the business park, and DCRPC had recommended R-4. That is also when the business park was established, what they said was sufficient for that area as well.

Q. Okay. We'll get to that, but you're saying that he -- and the he you're referring

Page 123

to is O'Brien?
A. That O'Brien wanted to utilize what was DCRPC's recommendations.
Q. But you said he had a piece of paper a minute ago in your testimony. The he you're referring to is O'Brien?
A. No. I, I took your question to be did you have information on DCRPC's recommendation.
Q. Correct.
A. And I said yes.
Q. You said you had the physical --
A. And that was from Scott Sanders.
Q. So you had the physical piece of paper at the hearing is what I was getting at.
A. Okay.
Q. I'm trying to understand what document you were relying upon.
A. Yeah.
Q. And do you now recall whether you actually had a document, or did you just have Mr. O'Brien's recollection of what was the recommendation?
A. We had a document from DCRPC, and that document recommended R-4 for that area.

Q. Okay. And you believe that document recommended it based upon minutes where you had adopted it as their recommendation at a prior point in time?
A. Yes.
Q. Okay. Do you know when that -- we'll come back to that because we'll --
A. Okay.
Q. -- pull the document back up.
A. That's fine.
Q. Now continuing on in the interest of time, he asked how many units per square acre the plan is. That, I believe, he is O'Brien there. And Mr. Sabatino answers 6.9 per square acre. And you explain that there are -- they being, I believe, the applicant -- are requesting four variances, a density divergence, a setback divergence, a parking divergence, and a divergence from the 800 square foot minimum one bedroom unit to 750 to 800 square feet for one bedroom units, correct?
A. I recall this.
Q. You recall that?
A. Uh-huh.

Page 125

Q. Okay. Now you describe that they are requesting four variances.
A. Uh-huh.
Q. Do the trustees have the ability to grant variances?
A. Yes.
Q. Okay. And that is in your Zoning Resolution?
A. Yes.
Q. Okay. And where in your Zoning Resolution is that?
A. Well, it depends on how they bring the application through.
Q. Okay.
A. But it's in a few different places.
Q. Okay. You're pretty familiar with it, so explain. Where is it? What are the different places where you have the authority to grant variances?
A. For our Zoning Resolution, I mean, I believe we actually have statutory authority to in the Ohio Revised Code. But for the Zoning Resolution, I can't direct you to the exact spot where this particular item is listed.

But if they brought it through as a PRD, PRD process is described in a different location than our TPUD, which is different than our business park process.

So it would have just depended where, where we were -- what it was coming through, where it would be located, and I don't know the page numbers.

Q. You go on to say that they are requesting a PRD with a TPUD overlay per the BZC's recommendations. And I believe the they that you're referring to, again, is the applicant, is that correct?

A. Yes.

Q. Okay.

A. I'm referring to the applicant.

Q. Can you explain what you mean by saying that they are requesting a PRD with a TPUD overlay per the BZC recommendations?

A. I can really only briefly summarize what my understanding of this is which is, that as I understand it, the applicant was unclear about what application was fitting for what they wanted to do with that parcel and there were discussions about whether or not to

Page 127

use the business park overlay -- which they ultimately did not use -- and how to make it fit with their specific uses.

So in reviewing the BZC minutes there was -- appeared to me a recommendation initiated by BCZ to align that application with what the BZC thought was a more appropriate process to go through.

Q. Okay. But I'm trying to understand, is there, in your code, a TPUD overlay?

A. So, I mean, the TPUD, in and of itself, it's not a cloud zoning but, effectively, it is an overlay and it can be utilized in the PR -- to, to kind of cover the PRD.

It would be -- it was unusual. It is not a typical application that I had seen but it wasn't -- it didn't strike me as impermitable.

Q. Okay. And when you say what didn't strike you as being impermitable because isn't it true that the TPUD does not permit apartments?

A. Well, the TPUD, I think there was a restriction there, but the ability for the PRD

Page 128

to kind of compliment that and potentially allow for the, the variance was an option.

Q. Okay. So you have testified that you believe that the trustees had the ability to grant a variance and so if you liked the plan and felt that it should be a TPUD overlay allowing apartments, could you have done that?

A. I don't know that I would say like is the right word. If the plan was in keeping with promoting safe -- safety, health, general welfare for the public, that generally has been our threshold.

Q. Okay. So how does the health, safety, and welfare of the general public affect what you are saying, that they're requesting a PRD with a TPUD overlay?

A. In that case I wasn't -- I was providing a description. I was not assessing what had come through at that particular sentence.

Q. But if I understand your prior testimony, you're recognizing that there is no technical TPUD overlay in your Zoning Resolution.

A. We have a TPUD.

Q. Overlay?
A. It does not permit, it does not permit the residences. It doesn't permit rental units, but we have it.
Q. I understand you have it. You have a TPUD but it's not an overlay, isn't that accurate?
A. A TPUD, effectively, is an overlay, but it's not cloud zoning, if that's what you mean.
Q. Okay. So from -- so when you say overlay here, do you mean cloud zoning?
A. No, I don't mean cloud zoning.
Q. Okay. So there seems to be some --
A. I mean over-layering this PRD. I don't mean creating a cloud or doing anything related to the PUD.
Q. So what's the difference if I go under a PRD, okay, and you allow the density to deal with the TPUD definition, which is a transitional PUD, okay, or a planned unit development, correct, what is the difference between a PRD and a TPUD?
A. Well, the PRD was going to allow the residential.

Page 130

Q. TPUD doesn't allow residential?
A. For the rental, I mean.
Q. Oh. For the rental residential?
A. Yes.
Q. So let's be clear. Rental is the distinction but you could say, based on your testimony today, we're going to grant a variance in the PRD to -- I mean in the TPUD, that you considered to be like an overlay, treat this application as if it would be permitable to have apartments?
A. Rental, rental units, yeah.
Q. You could have done that?
A. That was within our scope.
Q. And you -- all right.
And now you get into the conversation with Raehll -- you clarified that Sabatino is aware that municipalities and townships operate with independent zoning due to the many references to Delaware city apartments that were made on the application, to which he said yes.
She -- I think which is you -- said that everything that gets compared needs to be compared by the precedent of the

Page 131

township itself. Do you see that?
A. Yeah.
Q. What are you referring to at that point? What are you trying to say?
A. I'm trying to say that it's comparing apples to oranges to compare municipalities and township zoning.
Q. Okay.
A. That it's irrelevant.
Q. Okay. So you believed, at that point, that was irrelevant?
A. The examples provided by Mr. Sabatino in the application process did not speak to the application itself and really didn't bear any weight on whether or not we were or were not going to approve that application.
Q. Okay. These generalities that you use, what are the specifics that you're referring to of these other things that he referred to that --
A. I don't recall all of them from the application, but in this particular section, density was prevalent. There were a couple other things that he mentioned and, you know,

Page 132

in my view it was comparing apples to oranges.
Q. Okay. So you're indicating at this point that you have a problem with the four units per acre being exceeded, is that correct? You, collectively, as in the trustees, because it's attributed to O'Brien at that point.
A. Yes. This is the section where we are talking about the requested density on page nine.
MR. ZACKS: All right. I'm sorry. Say that answer again.
(The requested portion of the record was read.)
BY MR. ZACKS:
Q. Okay. What is your understanding of density?
A. Could you be more specific?
Q. What does density mean to you as the zoning liaison as it relates to our subject matter of how many apartments you would be able to get based upon the density that you would be willing to approve?
A. The number of permitted units on a particular parcel.

Page 133

Q. Okay. So when you say permitted units, are you using that they have to apply for a permit, or are you saying an amount of density per acre that is permitted?

A. The latter.

Q. Okay.

A. That's a good clarification.

Q. That's what I thought.

So you make the statement here that everything that gets compared needs to be compared by precedent of the township itself. What do you mean by that?

A. In this particular moment what I was describing was basically that it would be more helpful if he, meaning RJ, would have provided comparables because he was describing a level of density that he was calling low density but, for us, it was a higher density than we had for that area.

So in that particular moment, I was trying to align the applicant to understand what we are talking about is our township's zoning and his application within our township. We're not talking about the city of Delaware. We're not talking about

Page 134

Orange. We're not talking about Sunbury. We're talking about Berlin Township.
Q. Okay. So let's talk about Berlin Township. How many apartments have been approved by Berlin Township since the creation of the business park in the business park?
A. I would say a few hundred.
Q. A few hundred?
A. Yes.
Q. In the business park?
A. Uh-huh.
Q. What was that development called?
A. Well, there were two that came through.
Q. What are they?
A. It was -- one was -- oh, I'm trying to think of the name. Elysian.
Q. That was a couple hundred itself?
A. I want to say -- I don't remember the exact number. I thought it was about a hundred.
Q. Okay.
A. And then the other one, which was more significant number-wise, was -- it was a short-term rental off of Ardin Communities and

Page 135

they ended up annexing, but they had been approved through the business park.

Q. Okay. They were approved in the business park in what density?

A. That one was a little bit of a different one but -- yeah. I think that one was -- they both came through Elysian -- R-10, I think it was.

Q. R-10?

A. Yes.

Q. What does R-10 mean?

A. Twelve dwelling units per acre.

Q. Okay. R-10 --

A. I'm sorry. Ten dwelling units per acre. I apologize.

Q. We'll take the other two if you want to give them to us, but all things being equal, I think it's ten.

So you're saying that the Elysian property was approved at 10 per acre, okay. Yet this particular property in the business park was not approved for 6.97?

A. Correct.

Q. Okay. And why is that?

A. Because of the location of the

Page 136

parcel and the nature of the transitional zoning.

(Plaintiffs' Exhibit 7 was marked for identification.)

BY MR. ZACKS:

Q. All right. So if I understand your answer, you're saying that because of where the Elysian was located, that it would bear the R-10, okay.

I've handed you what been marked as Plaintiffs' Exhibit Number 7. This is the population density figure from your Comprehensive Use Plan, page 28 of Chapter 6, under housing. Are you familiar with this document?

A. Yes.

Q. Okay. And based upon this document, could you describe the location of where you would call the Elysian property to be?

A. The Elysian property is -- I don't know how to describe this on -- the north, northeast corner of -- over by -- right off of 36/37 and the intersection of North Old State.

Q. Okay. So that's in an area that is not in the area where the T&R property is,

Page 137

which is south of 36/37, correct?
A. Correct.
Q. And it is over in an area that is to the far east. And has that been built?
A. To my knowledge, I don't believe that they've started construction.
Q. Okay. So -- but it was approved for ten over in that part of the township?
A. Correct.
Q. And you said that the other parameter was because of its relationship to transition?
A. Yes.
Q. What are you talking about? What's the transition?
A. If you look at the T&R property, you have a number of FR-1 homes lining up to the east and to the south of the T&R property. And the transitional nature of that was we wanted to have movement from, you know, the FR-1 to have higher density before it hits either commercial, industrial, or other higher densities.
Q. Okay. But in the location transition here, where the T&R property is

Page 138

located, isn't that an area that, just like the area where the R-10 Elysian is, was basically designated under the use plan as FR-1 to begin with? Both are FR-1, correct?

A. Both are FR-1.

Q. Okay. Yet in this situation, isn't there also homes along North Old State Road?

A. Not where Elysian is.

Q. What do you mean not where Elysian is? Not immediately adjacent? Is that what you're saying?

A. No. Not on the same side and where Elysian would be backing to that -- those homes.

Q. Okay. So you're saying that --

A. And then it's commercial on the other side.

Q. All right. So you are analyzing it from the standpoint of the development of Elysian to the east, right? That was the to east based upon -- strike that.

Elysian is along Old North State Road when you approved it for R-10?

A. Elysian is -- the frontage of Elysian is 36/37.

Q. So it comes all the way down to the same street --
A. Yes.
Q. -- that the T&R property touches?
And that one, as far as you know, has not been built but you went from one unit per acre to ten, correct?
A. Yes.
Q. Okay. So what percentage of deviation is that from what was allowed under the zoning that they originally had? Sounds like a thousand percent increase.
A. I would disagree with that statement.
Q. Okay. And how would you -- what percentage increase is it?
A. Well, it was -- it had the overlay of R-10 already on it.
Q. R-10 is an overlay?
A. Yeah.
Q. R-10 is an overlay?
A. R-10 is the business park overlay.
Q. Oh. So you're suggesting that R-10 is an overlay because somebody decided that a particular R-10 was put in the general

Page 140

business park description?
A. Yeah. But they have to follow the Berlin Business Park overlay process to call down that use. It's a commercial-residential property.
Q. Did they do it under a BIO?
A. They did it under the BCO, yeah.
Q. Okay. So the answer is they didn't do it under a BIO?
A. They did it under the Business Park Zoning Overlay zoning. They did it as an overlay, an administrative review process.
Q. I know you want to say and testify what you want the outcome to be --
A. No.
Q. -- but I want you to answer my question. My question was, it a BIO?
A. I can't answer your question accurately because BIO and BCO are two components of the Berlin Business Park overlay which follows the exact same process.
So they're under -- one is under Article 15, one is Article 19. They follow the exact same process.
Q. Okay. But the process is not what

Page 141

we're talking about. We're talking about the density.

A. Okay. But I thought you were asking about how they got it.

Q. No. I'm trying to understand from the point of view of what you were doing in deciding to go all the way to ten from an FR-1 because, as we understand, the application's zoning for the apartments was FR-1 and they were seeking to get 6.97, correct?

A. Are you talking about Elysian?

Q. No.

A. Okay.

Q. I'm talking about the zoning category for both Elysian -- let's break it down simply.

Elysian's zoning category was FR-1, correct?

A. With an overlay.

Q. No. The overlay is not -- FR-1 is an overlay? Now you're telling me that?

A. No.

Q. I'm not trying to confuse you. I want you to answer my question.

A. Yeah.

Page 142

Q. Was Elysian --
A. Elysian had a cloud zoning over it.
Q. Before it applied?
A. Correct.
Q. And it was because it existed is what your point is?
A. The cloud zoning was over FR-1, yes.
Q. Cloud zoning for the business park is what you're saying, correct?
A. Yeah.
Q. It's a little confusing in your code. That's why we're trying to understand --
A. Sure.
Q. -- what you, as a trustee and the zoning liaison --
A. Sure.
Q. -- understood to be the issue, okay?
So if the issue is, was BIO applied to Elysian, your answer would be no?
A. Correct.
Q. All right. If the answer (sic) was BCO was not applied to the apartments for T&R, your answer would be that's correct, too?
A. Correct.

Page 143

Q. All right. And then your other testimony implied that the business park itself is an overlay, and I'm asking you where does that say that in your code?

A. The Berlin Business Park -- and I, I appreciate your clarification -- the Berlin Business Park has two components to it, the BIO and BCO. The fundamental difference was the code uses. The process to go through it was the same.

So you're asking me about how Elysian jumped from FR-1 to R-10, and I'm telling you that it was an administrative review for the Berlin Business Park to bring down the overlay that had permitted an R-10 use already.

Q. For apartments that have yet to be built?

A. Correct.

Q. Okay.

A. It was an overlay. It was cloud zoning.

Q. Okay.

A. So we didn't, we didn't rezone the property. We administratively reviewed and

Page 144

applied the R-10 overlay to Elysian.
Q. Okay.
A. That same aspect for T&R Properties, they could have used the business park overlay to get to R-4 because that was what was approved for that area. So they could have called down that R-4 and gone through the overlay process and it would have been an administrative review similar to how the BIO was.
Q. But they didn't come through the overlay process.
A. They didn't.
Q. But you used --
A. You're asking about Elysian.
Q. Let me finish my question. But you then decided not to grant them above an R-4 when your code under an FR-1 would have provided for them to have any of the categories that you would have agreed were appropriate in the area, which could go all the way up to R-20, okay, under your code, isn't that correct?
A. No.
Q. And why not?

Page 145

A. I would say that it's speculation that we would not have gone above R-4.

Q. It's speculation?

A. Yes.

Q. And the reason you wouldn't have gone above R-4 is why?

A. I'm, I'm saying it's speculation we would not have gone above R-4. We were told to vote on 6.97 by the applicant who requested the vote.

Q. I understand --

A. So we would not go --

Q. -- your conclusionary answers. I'm asking -- so you wouldn't go -- but you recognize that the request that they were making was not under an overlay?

A. Yes.

Q. And your discretion to deny it is based upon that it was in an area that was designated under the overlay as R-4?

A. No.

Q. What are you saying?

A. I'm saying that we voted to turn down 6.97.

Q. Irrespective of R-4?

Page 146

A. There was not -- so, so in the process, when Mr. Sabatino was presenting it, he was going back and forth with the overlay. We were looking at the application itself.

Trustee O'Brien said he didn't want anything more than the R-4. We said we were not going to vote in favor of 6.97.

Q. But just as a matter of your own --

A. We thought --

Q. -- judgment --

A. No, no --

Q. -- it's too high a density?

A. For that transitional area and that particular parcel, the infrastructure, the safety concerns that we brought up at the time, we were not going to go the 6.97.

Q. What safety concern --

A. And that's what we were asked about.

Q. What safety concerns were you bringing up at that time?

A. We had some concerns about the, the infrastructure of the roads, the quality of the roads, the access for residents turning out onto 36/37. We had a few other different concerns that, you know, had we not voted that

Page 147

night, maybe we could have talked about more.
Q. So the concerns you just described, weren't they already taken care of because the plan had already been approved for a right turn in/right turn out, out of 36/37, according to traffic study, and the traffic engineer, so you guys were second-guessing the traffic engineer on that issue?
MR. LA FAYETTE: Objection.
BY MR. ZACKS:
Q. Isn't that accurate?
A. We wanted more details.
Q. Other than the drawing that would show an in/out, what detail were you looking for?
A. We were looking at speed limits. We were looking at the Reed Parkway entrance --
Q. Okay. Let's be clear --
A. -- in proximity to the --
Q. I'm interrupting you because I wasn't talking about the Reed Parkway entrance. I'm talking about your answer saying it was a safety concern on 36/37.
A. Yeah.
Q. And you're suggesting that even

Page 148

though the evidence before you, which you had accepted as all of the exhibits, demonstrated that the traffic engineer for Delaware County, who sets the speed limits and everything, had no concerns whatsoever and it gave --

A. We wanted more information.

Q. You wanted more information? So at what point is it reasonable for you to second-guess a traffic engineer?

MR. LA FAYETTE: Objection.

THE WITNESS: I would say I wasn't second-guessing them. I would say that I just wanted more information.

BY MR. ZACKS:

Q. But what is the more information you wanted? You knew the speed limit. It wasn't changing. So what other information did you want?

A. There were considerations of a light at Lackey Old State and 36/37.

Q. Did the traffic engineer say there should be a light there caused by this traffic study?

A. Well, there was some back and forth, in my view, on this because it sounded like

Page 149

eventually there would need to be a light there and --
Q. Simply because of this development?
A. No. Because of the way that Berlin Business Park is building out. So I wanted more information on what their conceptualization for how, how all the roads leading into that area were going to be handled.
Q. At what point would have you stopped your conceptualization of something that wasn't even before you?
A. I don't understand the question.
Q. The question is you used the term that you were doing conceptualizations without taking into account what the traffic engineer had told you about the safety of the in/out on 36/37.
A. I wouldn't say that's accurate.
MR. LA FAYETTE: Objection.
BY MR. ZACKS:
Q. Okay. Explain your conceptualization concept of what you were worried about that you were communicating that needed more information.

Page 150

MR. LA FAYETTE: Objection.

MR. ZACKS: Answer the question.

THE WITNESS: I wanted to have more of an understanding of if the densities were to increase, how would we be able to ensure that that safety stayed the same.

There were a couple of traffic studies that had been done in that area, and they all were related to, when we looked at them initially, the business park as a whole.

So as had been cited, we didn't want 36/37 to turn into another situation like 23 in Orange. So the access points was something we wanted to understand more.

BY MR. ZACKS?

Q. Okay. So what do you mean 23 in Orange?

A. It was referenced quite a bit, the ODOT is quite concerned about the way that the business park is going to be built out and its finished product.

When you look at 23 in Orange Township now, there are so many access points, right in/right out, that it's become very high trafficked and now they can't come in and

Page 151

effectively do a lot of that mitigation that had they been more thoughtful in their planning out, they would have been able to, for example, keep good widths and have, you know, the build-out and have access points controlled.

So my understanding is that ODOT is very concerned, specifically about that area, and that they want to limit the in/out access and they want to figure out a way to end up solving for it so that in 30 years, we don't end up with a similar problem over on 36/37.

Q. Okay.

A. And they have had -- they have proposed quite a few different things for that area.

Q. At the time when you're sitting in the meeting talking to -- from the standpoint of the minutes of the meeting, where do you discuss anything related to this conceptualization of your ODOT concern?

A. I discussed safety concerns in this meeting.

Q. Where? Safety concerns related to

Page 152

ODOT and what you just testified to.
A. To roads.
Q. Where? Show me on the page.
A. Okay. Sabatino -- page 13, the last paragraph. Sabatino said Raehll mentioned that she did not see the transitional case and the safety case and said that is why she is not in favor of the density.
Q. That's your statement that ODOT -- the concern that you had --
A. It's a summary.
Q. -- for 30 years down the stream?
A. It's a summary of some of the things that came up in the meeting. You asked me to point to a page, and I pointed.
Q. If that's the best you got, that's the best you got. It's not very persuasive.
MR. LA FAYETTE: Objection.
BY MR. ZACKS:
Q. However --
MR. LA FAYETTE: We're not looking for an argument. You can ask her questions.
BY MR. ZACKS:
Q. The point becomes -- so as you look

at this, you never mentioned the term ODOT and that you had a conceptual idea that somehow this was related to --

A. I brought up safety.

Q. -- what Orange Township experienced 30 years after that business park had been developed.

MR. LA FAYETTE: Objection.

BY MR. ZACKS:

Q. Is that your testimony?

A. What I said was that I was not in favor of the density due to safety concerns --

Q. Okay.

A. -- and that's on record. The minutes will speak for themselves.

Q. The minutes -- you have done a little bit of legal research, I know, when you say that.

MR. ZACKS: Let's go ahead and take a break.

(A lunch recess was taken from 2:33 p.m. to 3:18 p.m.)

MR. ZACKS: We're back on the record after our lunch break.

BY MR. ZACKS:

Page 154

All right. We were talking about Exhibit Number 3, which is the April 24th minutes, and we were essentially on page nine discussing the density issue.

I want to put on the table for you a question about -- so you said you had the safety concerns related to the conversation that we previously had on traffic.

Did you have any safety concerns regarding children or any other issue?

A. I believe I asked that question at the time, and I received a satisfactory answer regarding the sidewalks and walkability.

Q. And that would have included children?

A. I would assume so, yes.

Q. I don't want you to assume. It's your testimony. So when you said that you thought you had satisfactory -- if you want to look at the minutes and give us --

A. I don't believe that I specifically referenced or was necessarily thinking of only children. I was thinking of pedestrian safety, though.

Page 155

Q. Okay. So on page ten, there's an impact on schools. Was that an issue?
A. Page ten? Where are you referencing?
Q. I'm just glancing through, trying to find any other issues to see if you had other concerns on safety.
A. Sorry. I'm just reviewing page ten very briefly.
Q. Okay.
A. No. Nothing on page ten.
Q. Nothing on page ten and nothing anywhere else in the minutes for that discussion in regard to safety?
A. Not that I can recall at this time.
Q. Okay. All right. You had indicated that you believed that there was some transition needed, though, right?
A. Yes.
Q. And the transition that you believed was needed was from the standpoint of comparing it to where Elysian exists, and there was no apparent line of homes like there is on Old State Lackey Road that butt-up against this property is that --

Page 156

A. I didn't compare to Elysian at the time.
Q. At the time of this?
A. It was just transitional zoning.
Q. So the transitional zoning you're referring to is specifically to those homes that are on Old State -- Lackey Old State Road?
A. Or off of Lackey Old State Road. There's a -- it's on the east side and on the south side, there is a subdivision called Bainbridge Ravines on the south that follows along the Reed Road property.
Q. So you're referring to --
A. All those homes, yes.
Q. All those homes, but I'm just trying to describe --
A. Yeah.
Q. -- in the exhibit. We're referring to Exhibit 7.
So halfway down on that exhibit, on Old -- Lackey Old State Road, there is an indentation of a road there. That is not Reed Road, right?
A. Okay. I don't know how to do this

Page 157

other than pointing. There is an abutting -- a road that comes out right after Reed Road, and that is Bainbridge Ravines.
Q. So that's Bainbridge Ravines, but Reed Road is north of Bainbridge Ravines that you're referring to, right?
A. Correct.
Q. And that road, which is a road that is a stub at this point --
A. Yes.
Q. -- is intended to be part of the roadway of the business park area based on the plan that was submitted by our clients, correct?
A. The Berlin Industrial Overlay area, yeah.
Q. Okay. So the answer is yes?
A. Well, you said business park, and as you know, it's -- business park is a little more encompassing than the BIO area.
Q. Right. But it's in this area. It's in the area of the application is my point.
A. Yes.
Q. Okay. And then from the standpoint of the transition, what transition would you

Page 158

want from Sweeney Road towards the subdivision or from Roloson Road? Is there any transition issue you have there?

A. I'd have to have a little bit more specific information.

Q. Well, it's your understanding --

A. It's a -- it's generally true, about transitional zoning for me, if that's what you're asking.

Q. Okay. So you generally believe you need to have some transition between a particular residential use and a different type of use?

A. No.

Q. What do you mean?

A. That's not true.

I don't understand your question, so I'm just trying to be able to answer it.

Q. My question is to try and understand. You're the one who testified that you have -- want to see some type of transition.

A. Yes.

Q. I'm trying to understand transition between what and what relative to this

Page 159

application.
A. Okay. Relevant to this application, in that specific area, we were looking to have transitional use between the NAICS codes that would be used and/or any different types of residential.
Q. Okay. So you don't want single family residential up against apartments? Is that what your testimony is?
A. No, that's not my testimony.
Q. Okay. So explain to --
A. I think that you, you had -- we had conceptualized in that area that we would have one home per acre, FR-1 uses, and those homes, they -- there's a significant number of homes, both to the east and the south, and what I would want to see is I would want to see some transitional spacing between when you have lower to, either, higher heights or higher density.
So height was also a concern, too, for this specific parcel in this area.
Q. Okay. And how was height a concern? What was the concern about height that you're referencing now?

Page 160

A. Well, generally, you know, I think there was a maximum height allowance for the buildings, and we didn't want to have like a 55-foot building right next to a 35-foot single family home.

Q. So that was a safety concern or just a general concern?

A. Height is generally a safety concern, too. We had concerns about our ability to, you know, take care of a fire that high up with our, with our apparatus that we have.

We talked about needing to potentially doing aerial -- invest in aerial for our safety support services as the -- specifically, as the industrial overlay comes into play because the industrial overlay permits heights that are higher than the commercial overlay.

Q. Okay. So let's move on from the standpoint of the -- let's go back to the density discussion.

A. Okay.

Q. So what density could have worked in any transitional analysis that you would have

approved based on the -- we were starting with the apartments at FR-1?
A. I don't understand your question.
Q. Well, your code provides and you could, on FR-1, go up to 20, right?
A. It just depends on what you brought the application through with.
Q. Okay. But the code from an FR-1 could go up to as many as 20?
A. There are options for that.
Q. Okay. And it can be at ten or above ten, right?
A. There are options at different areas in our township for that.
Q. Okay. So in this one, if you had had this transitional spacing that you wanted, or whatever that is, what type of a variance would you have given in order to get to the 6.97 or some other number close to that?
MR. LA FAYETTE: I'm going to object. Just for clarification, are you asking her individually or as a board?
MR. ZACKS: She is the liaison on the board, so I want her opinion as the zoning liaison.

Page 162

MR. LA FAYETTE: That's fine.
THE WITNESS: I'm sorry. Could you reframe that question?
(The requested portion of the record was read.)
THE WITNESS: As this came through -- I don't know that I can speculate what that would look like. I can only really react to what we had before us.
I thought the apartments were, overall, had some great concepts. It had a fire pit. I would describe them as upscale and luxurious, I believe that's the term that RJ used at the time, and I think that that warranted, in my view, a look at the R-4 density. And it's regrettable to me that we weren't able to further discuss without having the vote be demanded by the applicant.
I don't know what that would look like to take to get to 6.97, in my view, but somewhere between you know -- above four was certainly something that I was interested in having a conversation about. And what that would look like, at this point, is complete speculation because the applicant didn't have

Page 163

that discussion with us.
BY MR. ZACKS:
Q. Okay. And in the context of your concerns about safety and other things, didn't the applicant in the minutes ask to understand what it was you were talking about and you declined to have that conversation?
A. At that point because I had already spoken to him through our meetings, I had already made clear. There was a lot of reiteration and repetitiveness of some of the things that we had discussed with the applicant previously.
And I felt that, as with the meeting minutes, the meeting minutes and my discussion with him had already provided the insight that he needed to have a solid understanding of what the concerns were.
Q. So on Exhibit Number 7 --
A. Yeah.
Q. -- it indicates that there is really, apparently, only a single place on the entire map where you have densities that are in the darkest color, which indicates the highest density, correct, being the area on

Page 164

the left-hand corner over by Route 23, which I believe is called Worthington Estates.

That's the only place where you have the purplish density that approaches 13 to 14 units per acre, according to your population density map, correct?

A. Correct.

Q. So most of the township is basically single family or very, very low density, isn't that true?

I mean, everything on here is basically very, very light yellow to white, which is on the lower end of the scale; whereas, the only place that shows on the high end of the scale of this, up to four units per acre -- 14, excuse me, is that area southwest of 23, correct?

A. That's true as far as the population density existed at the time of this exhibit.

Q. Okay. And the time of this exhibit is at the time of the adoption of -- this comes out of your Comprehensive Land Plan, so that's the time that you're referring to in 2023?

A. This map, as I recall, was provided

by to us by Delaware County Regional Planning. So I don't know if it is indicative of 2023 at the time we adopted the Comprehensive Land Use Plan or if it's from the consensus -- the census, I mean, from 2020. You'd have to check with Delaware County Regional Planning.
Q. I don't have to check. It says it right on the document. It says it was prepared by Delaware County Regional Planning on 7/6 of 2023. Do you see that?
A. Well, it's a little hard to see.
Q. It's small, I agree.
A. It's very tiny.
Q. But that's what it says, right?
A. Hold on. Yeah, it says it was prepared by Delaware County Regional Planning 7/6/2023.
Q. So density was your main concern at the point that you felt you wanted to pause and have a conversation with the client is that --
A. I'm sorry. I don't understand what you're saying.
Q. Was density your main concern about the application when you were considering it

Page 166

on the 24th of April?
A. It was one of my concerns, yeah.
Q. The question was, what's your main concern?
A. I don't know that I can say what the main or emphasize. I mean, there's -- there were -- I brought forward what the concerns were and --
Q. Right. But your concerns were basically to say that you were not really willing to accept the 6.97, right?
A. That is correct, as it was submitted, as we voted, we all voted no to that 6.97.
Q. All right. From that standpoint you recognized that all the paperwork, which was in support of the application, demonstrated that they had exceeded the buffering required by your code, they had exceeded the open space required by your code, yet you still had a concern about transition --
A. I'm sorry. I'm very distracted right now. I'm not sure what --
(The requested portion of the record was read.)

Page 167

BY MR. ZACKS:
Q. So did you still have a concern about transition at that point?
A. Could you clarify what you mean by code?
Q. Your zoning resolution is your code, and that's what I mean by the code.
A. Well, you said exceeded the buffer?
Q. Yes.
A. I don't know what reference you're making to that. Is that the business park buffer?
Q. No. Your, your resolution, which you had accepted the applications based upon, including all of the ways in which it would protect the landowners who were on Old Lackey State Road, indicated in your code that all you need to have is a 250 foot buffer.
A. Well -- no. That's inaccurate.
Q. Why?
A. Because they didn't submit their application through the Business Park Overlay. The 250 foot buffer was not part of that application because they didn't apply under the business park.

Page 168

So that there was a buffer, yeah. I was impressed with that. I thought that the layout for that was good and as I understand it, there were some physical conditions related to the property that basically kind of created that situation and I was fine with the buffer.

Q. So if they had postponed, as you had requested, what would you have been looking for in terms of information between then and the next time it would come up?

A. I would have wanted to hear more about -- there was some discussion about luxury and luxurious, and I wanted to have more of a discussion about that because there was something that I thought, between what RJ was saying, what Trustee Bullard was saying, that I thought we could have more discussion on.

Q. Can you -- when you say luxury, is that the size of the one bedrooms?

A. RJ -- I think it's in here at some point -- RJ mentions the word luxurious, and Trustee Bullard said something to the effect of based on the size of the apartments, he

Page 169

didn't know that you could call that luxurious and, for me, I wanted to have more of a conversation about that.

Q. Okay. So on page ten, Bullard stated that he has a problem with, quote, luxury, end quote, apartments being under 800 square feet and questioned the examples that Sabatino showed. Is that what you're referring to?

A. Yes. And then Sabatino respectfully disagreed with Bullard on that, and I think that there was room for more discussion.

I think that there was also room to have more discussion about potential amenities, potential integration with, you know, the multi-use path on, on 36/37. Like I said before, I think that, you know, we weren't ready to vote on 6.97 that night.

Q. So other than the luxury apartments issue, what other issue would you have wanted more information?

A. I can't recall everything at the time. I think that -- I don't know if I mentioned that maybe we could talk more about it and hold off the vote and that RJ requested

Page 170

the vote regardless. I think I've pretty much made clear in the minutes and what I've described to you today.

Q. Okay. So you basically had no other concerns?

A. That's not what I'm saying. I'm saying what I described at the time of the meeting was what was brought up and that's reflected in the minutes and I've mentioned what those concerns were to you already.

Q. And other than those concerns, which you've testified to about today or the ones that you left open by saying there's something else in the minutes, what else in the minutes are the concerns that you had?

A. The minutes will speak for themselves.

Q. I understand they speak for themselves. I want to know what you recall based upon studying the minutes and answering the question.

A. And I did answer your question, sir.

Q. Okay. So you had no other concerns?

A. I brought up safety concerns today.

Q. The same safety -- other than the

Page 171

stuff at 36/37 in terms of the in/out, which we're going to get more information from ODOT under your prior testimony, anything else?

A. Transitional zone, the transitional spacing, the roads, the -- you know, the things that we've talked about.

Q. Okay. All right. So if all of those concerns were resolved to the point where they were not of concern to you any longer, would you have supported 6.97?

A. As the application existed in the form of that evening, no.

Q. Okay. And the reason is because of the form of the application?

A. No. I mean -- when I say concerns, density was a concern. So are we saying that resolving the concern would have meant bringing down the density that evening?

Q. That -- assume that for the moment in your answer, yes.

A. Then that would have been a whole different discussion we would have been having.

Q. How much more lower density would you have wanted? I mean, the density is on

Page 172

the, on the incomplete numbers of a .97 as an example. Can you say that five would have been acceptable? You earlier testified that you thought maybe something above four now.

A. Yes.

Q. Why would something above four have made the difference if all of those concerns were taken care of?

A. I don't know that I, I exactly said it the way that you phrased it for something above four.

As I recall what you said -- what you asked it was you wouldn't go above four, and I said that's not what we were considering that night. We were not considering whether or not we would or would not have gone above R-4. What we were considering was 6.97.

Q. I understand, but the applicant was trying to understand what type of a density was going to be acceptable to the trustees.

A. The applicant made it very clear that he was not going to go down in the density.

Q. He indicated in the minutes that what he was going to do was try to seek a

variance for the density under the PRD, isn't that correct, if you didn't approve it?
A. Yes.
Q. Isn't that what he did?
So if all of your concerns were resolved and the only thing was that it was still at 6.97, would you have voted for or against it?
A. I can't speculate because that's not what I had before me to vote on.
Q. Okay. All right. Let's -- did you reach out to anybody about the concerns of -- at ODOT ever?
A. Yeah.
Q. Who?
A. Tony Turkowski. Tony Turkowski.
Q. Do you know how that is spelled?
A. Oh. Hardest question yet.
T-U-R-K-O-W-S-K-I.
Q. We're both on the same page on that, I guess.
What is Tony's role, and why were you reaching out to him?
A. Tony is the -- I know he was promoted. He -- I believe he's the director

Page 174

of District 6, which is that district area. And we've spent, actually, a fair amount of time talking about the ongoings of ODOT's activities all along 36/37 because, as you know, we have the Sunbury Parkway, we have a few other items.

And I did speak with him about 36/37 and, specifically, about Lackey Old State and 36/37 area, and that's who I spoke with.

Q. And you spoke with him after this meeting?

A. No. I spoke with him before the meeting. I've spoken with him -- we speak on a -- I would say every six months or so. We try to get -- we've gotten ODOT to come to our township meetings to talk about projects in the area.

Q. Was his name T-U-R-K-O-W or Turkowski?

A. Turowski.

Q. Turowski?

A. No. I don't know how to spell it.

Q. Okay.

A. I'm sorry.

Case: 2:24-cv-03761-JLG-KAJ Doc #: 102 Filed: 08/28/26 Page: 175 of 347 PAGEID #: 3280



Page 175

Q. But you don't think it's C-H?
A. No.
Q. It's a T?
A. I thought it was a T.
Q. When you spoke with him -- that's him, okay. It's a T.
A. Okay. I got that part right.
Q. Internet research during the deposition. It's a T.
Okay. So when you spoke to him before the meeting, did you speak to him after the meeting, also, in regard to --
A. We speak regularly --
Q. -- this issue?
A. -- in regards to the access issues all along 36/37. It's not uncommon to talk about Lackey Old State-36/37 area, specifically.
Q. And from the standpoint of the impact on this application at Lackey Old State, what was the issue that you and he spoke about before and after?
A. Well, it was, it was really access. It was the, it was the right in/right out, but it also was that specific intersection of

Page 176

Lackey Old State and 36/37 and what to do about that.

There's been some conceptualization of, like, going with a bridge over 36/37 to continue on. There's been -- they have a lot of different ideas of what to do to mitigate traffic.

And what I've really been trying to understand is -- and he has referenced these kinds of items, too, related to ensuring it does not become a 23 situation with the congestion, that the thought is if you could do 23 all over again, what would you do to have it be in a better spot today than it was -- than it is.

And so we talked about that in relationship to Lackey Old State intersection in relation to the T&R Properties because you have the Lackey Old State and then you have that turn in/turn out pretty close to that intersection, but sufficiently far enough for the right turn.

He had mentioned that they were not going to -- I don't know when he mentioned it in my conversations with him -- but he did

mention that they were not going to allow the left turn out.

And so we talked about the R cut and how the R cut would at least get the traffic flow kind of going until there was a light at the intersection, potentially, which that's -- I don't know when or if that's the solution, but really how to manage that traffic flow for what you would have coming in.

Q. So your testimony is that this application for 297 apartments, which was not approved, would have created this whole problem along 36/37?

MR. LA FAYETTE: Objection.

THE WITNESS: That's not my testimony.

BY MR. ZACKS:

Q. Okay. What is your testimony?

A. I wanted more information related to what that specific new density impact would have on that specific area.

Q. So you wanted more information and you -- so assume you got that information and it said that based on the traffic study, it's

Page 178

years away from actually creating the problem that Tony was worried about. Would you have then voted for the 6.97?

A. I couldn't say what I would have or wouldn't have voted on at the time. I mean, I had what I had at the -- in front of me, and I was asked to make the vote.

Q. All right. Did you ever reconsider that vote?

A. I don't understand the question. Do I wish I would have voted yes for 6.97?

Q. No. Was there a process where the applicant ever asked for a reconsideration?

A. Yes.

Q. And did you then, after a lapse of time, accept reconsideration of the application?

A. I asked the applicant if there was any new information that would significantly or substantively have altered, had we known about it at the time, and the applicant indicated no.

Q. So I understand the applicant indicated no. The question is whether or not you were actually communicating with the

Page 179

applicant about the ODOT concerns, which you have been describing in this testimony, to have them have information on something that would have helped you reconsider the application?

A. We asked numerous times for additional information and for data around this project, and the applicant brought what the applicant brought.

Q. Can you show any information request that you made to have information from ODOT by the applicant to address the concerns you've expressed?

A. No, there's no documentation.

Q. Okay. And did you ever verbally describe it to the applicant?

A. Yes.

Q. When?

A. Initially, I believe on our first meeting, we had a discussion about talking with ODOT, and I think that the applicant indicated that he did talk to ODOT at some point during that process.

Q. Okay. So after this meeting, there was no communication about communicating to

Page 180

him to go back to ODOT? You never communicated with him is what your testimony is about going to ODOT --
A. Correct.
Q. -- after this meeting?
Your testimony a minute ago was but before the meeting, when you first were discussing it with him, and he said he already talked to them, correct?
A. I don't know when he shared that he had spoken with them, which meeting it was, but I did have knowledge that he had spoken with them.
Q. Okay. But you never communicated to him that you had this safety concern about conversations you were having with Mr. Turkowski, is that --
A. I asked him if there was any new information for me to consider.
Q. Okay. So other than the general, you never talked about your specific concern you're describing today?
MR. LA FAYETTE: Objection.
{No answer was given.}
BY MR. ZACKS:

Page 181

Q. All right. Let's turn your attention to Exhibit Number 4.

MR. MARGOLIUS: Could you identify the date?

MR. ZACKS: June 12th, 2023, Berlin Township Trustees meeting.

BY MR. ZACKS:

Q. Do you have it?

A. Yes.

Q. Okay. If you look at page three, on the bottom it says that at 7 p.m., there is a discussion, or something, where you received a letter from Mr. Sabatino in regard to the application, correct?

A. Yes.

Q. And this is after the meeting on the 24th of April?

A. Yes.

Q. And in here he is communicating with the trustees about the issue in regard to the buffering zones, all the additional amenities, and describing that there is still a density divergence question and a parking divergence, and a rental units divergence question, correct?

Page 182

A. One moment. Yes, he still has a density divergence, parking divergence, and rental unit divergence.
Q. So he is communicating with you, after the meeting, trying to give you additional information of what he's learned.
And on page five, he complains that they were asked to join the township JEDD and that they had said yes and that it had been calculated that as a result of that, the township would receive approximately $500,000, correct?
A. That is what he said.
Q. And then -- do you not believe him?
A. I have no reason to not believe him.
Q. Okay. Well, the way you said it, it was like that wouldn't be true.
A. Just reading back -- that's what he said.
Q. All right. So then he's trying to work on the very issue with the density with you, isn't that accurate?
A. Correct.
Q. Okay. Then the next sentence there, you want to know if there were any other

Page 183

changes, and I'm assuming that changes is to the density itself. Was that your question?
A. Any -- no. It was broader. It was any other changes since the last meeting.
Q. Okay. And so he's basically saying no, other than what he just told you about the JEDD?
A. He said no.
Q. Were you aware that the township would have received $300,000 in the prior -- under a JEDD that he had yet to participate in if it was approved?
A. So the JEDD was a revenue projection. It wasn't like there was a check waiting to be written to the township. It's something that was going to develop over time.
Q. Okay. And did -- it looks like, in the next paragraph, Mr. O'Brien seemed to be okay with the size of the units now because he likes the plan, but he can't get to the density that they're asking for, is that accurate?
A. He asked how they would be ADA accessible.
Q. I was reading the next sentence.

Page 184

A. Oh. Yeah. He --
Q. Likes the plan but he can't get to the density. That's what he says, right?
A. He wondered how it would be ADA accessible, and then he also said he cannot get to the density they are asking.
Q. So he didn't get an answer on the ADA is what you're saying?
A. I don't recall getting an answer on the ADA accessibility for him.
Q. Now in the next paragraph you say -- Raehll said they acquired the land knowing that R-4 was proposed for this area, and they justified increasing the density by adding amenities but it does not get them so far that they get 6.97. And you asked if there was a number they would agree with, right?
A. I'm sorry. Where are you at now?
Q. I'm in that third paragraph.
A. Okay.
Q. It's very small print, I understand.
A. Yes. Correct.
Q. Okay. And he said they were generally aware of that, but it's the gateway to the industrial park. Did you consider this

Page 185

to be a gateway to the industrial park?
A. I don't know what that means.
Q. So is that a no?
A. It's not a no. It's I don't know what that means. I don't know what gateway to the industrial park means in respect to this application.
Q. Well, you understand that the Reed Parkway Road would have to be finished and built into as they had shown you on the drawings, correct?
A. I do understand that.
Q. Who would pay for that?
A. I'm not privy to what the county's negotiations or agreements or who they worked with, specifically, for builders to accomplish their various tasks.
Q. So for the roadway, but it was not the township that was going to have to pay, correct?
A. It was not the township, yes.
Q. So that was not a concern of yours, who was going to --
A. There was not concern about payment from the township. I was concerned about,

Page 186
eventually, the overall road maintenance and how we were going to maintain the business park as a township, which is part of what the JEDD will help support.

Q. Okay. So did you have a sense that the JEDD would take care of that maintenance, or you didn't know?

A. No, I didn't have a sense it would take care of that maintenance. I had a sense that it would help with that, with diversifying some of that financial --

Q. On the density issue, then, we're still at the problem because Mr. Sabatino is suggesting they can't lower the density because that's what any developer would need, right?

A. That is what Mr. Sabatino stated.

Q. And at that point in time, were you still believing that density was still a problem no matter what any developer would do?

A. I disagree with that statement.

Q. And why?

A. We established those densities -- the township established those densities with recommendation from Delaware County Economic

Page 187

Development, Bob Lamb, at the time, and Rob Platt, and the Delaware County Regional Planning stated that those densities could work.

Q. So you were relying upon that?

A. Generally.

Q. Okay. Even though the topography and everything that had been asked under your code was basically being exceeded with the exception of the density?

A. Can you repeat that?

(The requested portion of the record was read.)

THE WITNESS: The density was being exceeded, too. It was higher density.

BY MR. ZACKS:

Q. Right. What was the highest density that you felt could work?

A. I can't speculate on that because I didn't have an answer from RJ on this, and I can only work with what's in front of me. 6.97 wasn't going to work for our board.

Q. When you were saying that Delaware was saying that the density could work, you're referring to the R-4?

Page 188

A. Correct.
Q. Now when they made their conditional approval of the overall mixed use application initially, what was the density at that time?
A. I can't recall.
Q. Was it higher than 6.97?
A. I believe that they objected to the density at the time that they -- I can't remember.
Q. Okay. So it doesn't matter to you that they went from 370, roughly, down to 297 in terms of density? When they brought the plan at 6.97, they reduced at least 70 units. And the conditional approval from Delaware Regional Planning was based upon the 370 number, correct?
A. Delaware County Regional Planning did not approve of the density for that area.
Q. They made a conditional approval of the application and sent it to you to deal with the consideration of how to address the R-4 designation that showed up on your map, correct?
A. Delaware County did not approve of the density that was being proposed in that.

Page 189

Q. So it's your testimony today that what their actual recommendation is was to not approve it solely on the R-4?
A. No.
Q. What are you saying?
A. I'm saying exactly what I said, which is they did not approve of the density that was being proposed in what was before them.
Q. But they issued a conditional approval, correct?
A. For -- sorry. I can't really hear.
Q. Is that your hearing issue or --
A. It's like there's a lot of noise over there.
Q. Okay. Over there, you mean at the end of the table?
A. Yes.
MR. ZACKS: Okay. Could you reread the question back?
(The requested portion of the record was read.)
THE WITNESS: Yeah, that's still my same statement.
BY MR. ZACKS:

Q. Okay. So you have not looked at, in preparation for today, what the conditional approval was, is that correct?

A. I recall the -- I recall reviewing that document and I recall them not recommending the density that was brought forward and for them to say that the township should work on this.

Q. Yes. But the time of their conditional approval was at the beginning of the process, isn't that correct?

A. Towards the beginning, yeah.

Q. Yeah. Way before any of these changes that you had -- that they had suggested or that the applicant had agreed to do?

A. They suggested changes, yes, and their suggested changes were before what the applicant had agreed to do, yes.

Q. And so the only issue, which then is before you at this point in time, is whether to reconsider the discussion of the density, which is where you decided not to in these minutes to ultimately reconsider, correct?

A. I think these minutes are saying

Page 191

that the applicant would not lower and reconsider the density.

Q. Okay.

A. I'm sorry. Are we on page five?

Q. Yes.

A. Sabatino said if that is not sufficient, they cannot lower the density because it is what they need and what any other developer will need.

Q. All right. And then at the end of, at the end of that conversation, which I believe is part of the public comment, Sabatino said that they know that there are issues with the BIO overlay and the Comprehensive Land Use Plan and encourages them to revisit because there are substantial flaws in the plan. All three trustees agreed that it was a good plan but the density was too high, right?

A. Correct.

Q. So the fundamental issue, at the end of that conversation, is that the density was too high?

A. At this conversation, yeah.

Q. Okay. And in the comment that

Page 192

Mr. Sabatino -- did you understand what the BIO overlay issues were?

A. If you stated the issue, I could say if I was aware of it or not. I don't --

Q. Well, you had previously testified, I believe, that the BIA -- BIO --

A. O, yeah.

Q. -- excuse me, that the BIO overlay was not what they were asking for --

A. Correct.

Q. -- under the apartments. They were not pulling the BIO down.

A. Correct.

Q. They were not pulling down a BCO.

A. Correct.

Q. But in their minds, it was in the business park, right?

A. I -- the business park is overlay zoning. So if you're saying the land exists with cloud zoning on it, yes, but it's -- the business park isn't overlay zoning. It's not the parcel of land.

Q. Okay. So at that point it was an impasse and now we -- Mr. Sabatino says that they cut the density by 30 percent and they

Page 193

would like a vote tonight, is that --
A. What page?
Q. June 12th, page six.
A. Yep.
Q. Okay. And do you vote on it that night?
A. Yes.
Q. Okay. And where do you do that? What's the resolution number?
A. Resolution 23-06-05.
Q. Motion to approve the application?
A. Oh -- to approve the application? Sorry.
Q. No. I'm just clarifying.
A. Okay.
Q. That is the motion to approve the Application BZC 23-003, The Residences of Berlin Township and all exhibits, 1-20, with latter exhibits taking precedence over earlier exhibits. And Bullard makes the motion, O'Brien seconds it, and you all three vote no?
A. Correct.
Q. Okay. So that's when the vote happens?
A. Yes.

Page 194

Q. Not on the prior minutes that we were talking about in the prior exhibit, right?
A. Correct.
Q. Okay. So we did postpone the vote in the end, and we still never overcame the concern about density?
A. Correct.
Q. Okay. So at this hearing were there any safety concerns that were discussed with the applicant?
A. I don't recall if there were.
Q. Okay. Do the minutes reflect there were?
A. I don't recall from --
Q. You have the minutes in front of you. If you want to look at them again to refresh your recollection, please do.
A. Thank you. May I take a moment?
Q. Yes.
A. It looks like there were some safety concerns brought up in this, other than the density.
Q. Where are you in the minutes?
A. Page five. We already mentioned

Page 195

O'Brien asked about ADA accessibility. It looks like we have some resident comments where they bring up traffic lights, noise.

Q. Okay. So you're referring to still the ADA accessibility question as it would relate to the CB units were located and how they would be ADA accessible.

A. Yeah.

Q. You're saying that is a safety concern?

A. Yes. And then --

Q. And then you're saying that Mr. Acker, who lives down the street, is -- says that he lives down the street and it's going to impact every house on Lackey Old State Road and bring traffic lights and noise. Is that what you're referring to?

A. Yes.

Q. And then he says anything above R-4 is a crime and will create a ghetto. Do you agree with that?

A. No, I do not.

Q. Okay. Would a ghetto be a safety concern?

A. No. I disagree with that statement.

Page 196

Q. I understand. I'm asking a different question. So do you believe -- so you disagree with both parts of the statement, that anything above R-4 is a crime?

A. Yes.

Q. And do you believe that it will not create a ghetto?

A. I believe it would not create a ghetto.

Q. Okay. And what is a ghetto, in that context, from your point of view? Because he was speaking --

A. He was speaking. You'd have to ask him.

Q. Okay. But from your standpoint, you said it wouldn't create a ghetto, right?

A. No.

Q. So it wouldn't create a ghetto. What is a ghetto from your point of view?

A. I mean, when I think of ghetto, I think of Warsaw and concentration camps.

Q. So you did not find those concerns to be valid in any capacity?

A. No.

Q. Do you know who Jason DeChristopher

Page 197

is?

A. I believe this is a typo.

Q. Why?

A. I believe that the gentleman's name is Jasper DeChristopher.

Q. Okay.

A. If that is the same person then, yes, I do know him, but I do not know a Jason DeChristopher.

Q. And do you know where he lives?

A. Not off the top of my head, no.

Q. Isn't it true that he lives south of where the Reed Parkway would be?

A. If this is Jasper, yeah.

Q. Okay. That is Jasper then. I believe you're correct, it's a typo.

A. Okay. Yeah.

Q. And then Jasper, at the time he's making the public comment, was he already put on the BZC?

A. Yes.

Q. So do you make it a habit of having people who serve on the Zoning Commission, which considers the issues, make public comment?

Page 198

A. Do I make it the habit? I don't control public comment. Residents are free to show up and provide public comment.

Q. Isn't it true that you also had conversations with your counsel at Delaware Regional Planning that Mr. Jasper had conflicts of interest in participating in the BZC?

A. I remember having conversations about conflicts of interest. And the way it was resolved at the time was that each person has to pursue their own line of questioning with their respective counsel on whether or not they were or not going to participate due to conflicts of interest. That's just generally true.

Q. Did it concern you, as a trustee, that you had somebody that was speaking against an application who had participated in the Zoning Commission discussions about it?

A. What concerned me was just making certain that whatever the legal guidance was, that we were following that legal recommendation.

Q. So, so did it or did it not concern

Page 199

you as the zoning liaison trustee?

A. I think in -- at the time, I wanted to make certain that everyone did their due diligence, that there would not be a conflict of interest.

I wouldn't say it was necessarily with Jasper only. The Berlin Business Park overlay is huge, and so having a fair and consistent practice to me is important because we had, you know, trustees recuse themselves when it was planned because their properties were abutting to the business park or they were -- had some interest in it and they had to recuse themselves.

So I remember getting educated and wanting to make certain that the Zoning Commission was educated on what the parameters were for whether or not you should recuse yourself and ensuring that everyone understood what those parameters were and were seeking legal counsel on it.

Q. But my question is --

A. Yes.

Q. -- not whether you were pursuing an understanding of the legal. My question is,

Page 200

as a trustee and a Doctor in theology and philosophy, whether you believed it would be harmful to have a member of the BZC participate in public comments against a development that they could or influence the vote on?

A. Harmful? No. And it's public comments so, in my view, you would have issues of free speech come up, potentially, especially because he gave his public comment.

MR. LA FAYETTE: Can we take a two-minute break?

(A recess was taken from 4:18 p.m. until 4:40 p.m.)

BY MR. ZACKS:

Q. All right. In front of you is what was referred to as Exhibit BZA Sutton Number 5 -- yes, Number 5, which is the Berlin Township Comprehensive Use Plan, okay?

A. Okay.

Q. Chapter three of that plan has a drawing that describes the development patterns in the township.

A. I'm sorry. Can you give me one moment to get to it?

Q. Chapter three, page seven.
A. Oh.
Q. You're there?
A. Yes.
Q. Thank you. So on page seven, that is a map that also carries the very small date of 7/6/23, prepared by Delaware Regional Planning Commission, like the prior Exhibit Number 7 today that we were talking about which describes the density.
After that exhibit, there is a complete listing of all of the apparent zoning reviews since 2000 that have happened in the township. The first one is dated 12/28/2000, and the last one is dated 1/26/23, which is the T&R Properties' application.
There's actually two there but the way this one shows, it was for 368 multi-family units. Do you see that?
A. Yes. Are you referring -- okay. So the second to last one?
Q. Correct.
A. Okay. Yes, correct.
Q. All right. And when you look in that, that -- excuse me --

Page 202

A. You're fine.
Q. The column that says MF lots, which is multi-family lots, in the definitions --
A. Oh.
Q. -- indicates that there have been very few multi-family applications during that time, from 2000 all the way up to '23. In fact, it identifies one, two, three, four, five, six, seven, eight, nine -- ten total of all of these, is that correct?
A. I'm not seeing MF designation.
Q. It's in the top of the column that says MF lots, second from the right-hand side.
A. I'm seeing MR, is that --
MR. LA FAYETTE: I think he's right there.
MR. ZACKS: I'm at the top, MF.
THE WITNESS: Okay. MF lots, got it.
BY MR. ZACKS:
Q. Multi-family lots, which indicate apartments, okay, or something that involves multi-family.
Now in that it also seems to indicate whether the applications were

Page 203

approved or pending or withdrawn along the way. Do you see that?

A. Yes.

Q. Okay. Now in all of that information, as a trustee since 20022 --

A. Yes.

Q. -- how many approved multi-family developments have happened in the township?

A. Since 2022?

Q. Yes.

A. You have one listed here, and then there were two others that don't appear to be listed here.

Q. Okay. What are the two that were listed here and what are the two that don't appear to be listed here?

A. You have one listed here, which is The Shire.

Q. Yes.

A. And then the two that are not appearing here was Elysian and the Residential Art of Community Metro.

Q. Okay. So you take issue with there's an additional, potentially, two?

A. Yes.

Page 204

Q. Is that what you're saying?
A. Correct. Since --
Q. Twenty twenty-two.
A. Yes.
Q. Okay. And of those which were talked about, how many of them started out in FR-1 and then sought to be moved to PRD. Include the other two, if you choose.
A. The other two were not PRD.
Q. Okay. So there's only one in this list that seems to be a PRD?
A. Yes. From 2022, yes.
Q. And in 2022, other than Elysian, which is not on here, which did include apartments, is there any other development that involved apartments other than the T&R one?
A. The residential hotel short-term housing that Metro brought through. It's called Ardin, I think is what it's called.
Q. It's an FR-1 to PRD?
A. No.
Q. Then that doesn't answer my question.
A. Sorry.

Page 205

Q. My question is related to FR-1's to PRD's.
A. Okay. Thank you for the clarification.
Q. Thank you. Now answer the question, please.
A. One other than T&R.
Q. Okay. And that one other one is which one you're testifying to now?
A. Oh. I'm sorry. Sorry, I was looking at the wrong line here. The Shire was OCPUD, so it was not PRD.
Q. And it didn't start as FR-1, either, did it?
A. No. I got caught on the lines because they're small. I was looking at the CBS Construction by mistake.
Q. Okay.
A. My apologies.
Q. So back to the general question. Isn't it true that T&R Properties is the only one?
A. The only --
Q. On this list and it's the only -- and it and Elysian are the only two that were

Page 206

under the PRD that went from the FR-1 -- I take that back. Strike that.
Elysian wasn't a PRD.
A. Correct. T&R Properties was the only one.
Q. Okay. Now in the context of the development changes that were happening, all right, while you were going through this during the five-year period that is illustrated in the development pattern map on the first page of Exhibit 3.1, it looks like --
A. Are you on page nine still?
Q. Seven.
A. Seven?
Q. The first page of this part.
A. Got it.
Q. Okay. What does that development pattern show for the area where the T&R properties is? I don't have a color one to help you.
A. Yeah. Okay. It appears to me to be showing that it's a proposed subdivision.
Q. Okay. And as it relates to multi-family, isn't it true that on this map

Page 207

the only multi-family, which are the hatched lines, appear to be appropriate like the one that appears to be in Sunbury now, which is over on the far right-hand side, it's the hatched multi-family, that one, I believe, has been annexed to Sunbury.

A. Yes.

Q. So it's no longer part of the township, right?

A. Correct. We did approve it.

Q. The other one that exists in this one is the one on North Old State Road, and that's Elysian, right, which hasn't been built?

A. Correct.

Q. The only other multi-family, in the far right-hand corner, that is still in the township by Shanahan Road and 23, correct?

A. That's not the only other one.

Q. That one at Shanahan and 23, that's the only one there, correct?

A. Oh. The only one there, yes.

Q. And the only other one that exists looks like it's on South Old State Road and Lackey, which changes its name, I guess, or it

just got cut off on the map, but to the southern central part on Hollenback, correct?

A. Correct.

Q. So based upon this, it doesn't look like much multi-family is being built in Berlin Township. Would you agree with that as a trustee?

A. I would say that, currently, there does not exist much multi-family. This is proposed, approved, or built, and I think that we have more multi-family planned, as part of our Berlin Business Park Overlay, going across significant acreage to the north.

Q. But there's no applications for it, right?

A. We do not have proposed -- as this picture indicates, we do not have proposed subdivisions are currently rezoned. We have overlay, and we have taken action to implement a cloud overlay to be able to address that.

Q. So based upon development and change, is it fair to say that based upon this map, particularly, that a lot of Berlin Township is being annexed into the city of Delaware?

Page 209

A. I don't know what you mean by a lot.

Q. Well, isn't that whole area to the middle part to the left, south of Berlin Station Road, south of the railroad tracks, west of the railroad tracks, being annexed rather than staying in the township?

A. The city and the county have a sewer and water services plan which typically would accompany annexation, but I don't think it's fair to say that it's planned or going to be annexed.

Q. It says city of Delaware there, doesn't it?

A. Yeah.

Q. So it's already been annexed, hasn't it?

A. I'm sorry. Are you referring to the white section --

Q. No. I'm talking --

A. -- south of 36/37?

Q. No. There's two sections that says city of Delaware. The part --

A. Yeah.

Q. -- along Sweeney Road and the railroad tracks north of Curve Road, that area

Page 210

has been annexed into the city --
A. Major portions of that area have, that's correct.
Q. If you go straight south from there, after the big white space, the next area which appears in the gray is also an area that has been annexed to the city of Delaware, isn't that accurate?
A. That's accurate in that --
Q. So the conclusion is that there -- the city of Delaware is clearly annexing land in this development and change at the same time that you are attempting to have these overlays happen, correct?
A. The overlays are not taking place over any land that the city has contracted with the county to provide services of sewer and water for.
Almost all the parcels that are to the west of the railroad track are in an agreement with the county, between the county and the city, to provide services for annexation.
Q. So for multi-family development, where you have services such as water, sewer,

Page 211

utilities, roadways that exist that have been determined by traffic engineers, such as my clients' property, isn't that the appropriate place for higher density to happen?

A. I think that, as you look across the Berlin Business Park, that you have to balance the zoning, and I think we do have, generally, higher zoning already planned for that -- those general overlay areas.

Q. What density would you have for those multi-family in those areas you're referring to?

A. We have the overlay across and we have different categories based on the location and the integration with existing homes and residences and we have R-10 in some areas, we have R-4 in other areas for the overlay.

Q. So where on this map would you put the R-10?

A. Where Elysian has it.

Q. Anywhere else?

A. Yeah.

Q. Where?

A. Generally, away from larger,

existing single-family residences. So I think it would be appropriate where we have already defined it within the Berlin Business Park BIO and BCO.

Q. Okay. So where is that on this map?

A. I would need to reference the Business Park map to point it out.

Q. Okay. The Business Park map, isn't that in your Comprehensive Plan?

A. Yes.

Q. Well, you have the Comprehensive Plan to reference, please.

A. Okay.

Q. Do you know the section? You were earlier, very quick, to tell us what section it was, right, what's the Business Park section?

MR. LA FAYETTE: Objection.

THE WITNESS: I was actually referencing the Zoning Resolution. This is the Comprehensive Land Use Plan.

BY MR. ZACKS:

Q. I understand, but you said you were familiar with both and were involved in both.

A. I am. I don't remember the exact

Page 213

pictures --

Q. That's fine.

A. -- of the map on Comp Plan. It actually -- you said what page?

MR. LA FAYETTE: Fifty-nine.

THE WITNESS: There's this one, too. It's referenced in a couple sections.

BY MR. ZACKS:

Q. What page are you on?

A. I'll reference -- I won't use page 20. I'm going to reference from page 59.

Q. Okay. And when you're referencing on page 59, can you describe what you're referencing, please?

A. Yes. I'm specifically referencing the Berlin Industrial Overlay that's located approximately between Sweeney Road and Lackey Old State from the west to the east, and then roughly between Plunkett to Baker Road north of 36/37, and then south of 36/37 on parcels that abut up to, and sometimes include, Curve Rad and -- yes.

Q. Okay.

A. Is that a fair description?

Q. I'm sorry?

Page 214

A. Is that a fair description?
Q. Well, yeah. And, roughly, how big is that, do you know?
A. I don't recall the acreage split by the BIO versus the BCO. I think the overall acreage was -- ended up being somewhere around 1400-plus acres.
Q. Okay. So 1400 to 1800 is a fair assessment, right?
A. I think 1800 is a little high.
Q. It's not that important.
A. Okay.
Q. It's 1400 at least, right?
A. Yes. I'd say around there.
Q. And in that map that you're looking at on page 59, that's where the R-4 designation appears and the R-10's indicating residential areas to be overlaid at possibly R-10 or R-4, correct?
A. Yeah. For -- and just to be clear, it's map two on page 59.
Q. Map two. The bottom --
A. Yes. That's not the full 1400. That's -- the 1400 is total over it.
Q. Okay. But that area that you're

Page 215

describing --
A. Yeah.
Q. -- that we're looking at is south of 36/37?
A. Yes. The area --
Q. And 36/37 is the major arterial street going through the township? There's also 23, which goes through the southwest corner, and then the only other complete traversing the township would be Cheshire?
A. At this time, yes.
Q. Okay. So on Cheshire Road, we don't have any multi-family, correct? That is similar to the list that we saw before in the Comprehensive Plan, correct?
A. On Cheshire Road we do have multi-family.
Q. Where do you have the multi-family that's apartments rentable?
A. We have The Shire, which was OCPUD that was passed that is multi-family.
Q. So it's not like ours. Next. Where do you have something that is like ours that is multi-family?
A. We have no other zoned on Cheshire

Page 216

multi-family --
Q. And any other --
A. -- to my knowledge.
Q. -- multi-zoned, other than the one on 23 that is to the southwest corner of -- you have to go back to what we used as Exhibit 7.
A. Yes.
Q. It's a single page.
A. Yep. I have it right there.
MR. LA FAYETTE: He's talking about this one.
MR. ZACKS: Yep.
THE WITNESS: The multi-family on 20 -- or off of 23 is also not apartments.
BY MR. ZACKS:
Q. That's not apartments?
A. No.
Q. What is that?
A. If -- are we talking about Worthington Arms.
Q. Yes.
A. It's a manufactured home community.
Q. Is it rented?
A. I believe that there are rentals

Page 217

there, yes.
Q. So it's a manufactured home community with the density of -- it might be hard to tell on yours because it's colorized, but it's clearly in 13 to 14 --
A. It's higher, yes.
Q. And why is that appropriate there?
A. I didn't plan it for there. I don't --
Q. I understand. You're a trustee. If you're asked to compare where densities should be based upon higher density, why is that one there? It has around it very little density, some homes, very similar to the other areas that are around our property.
And so the question is, why there and not where our property is?
MR. LA FAYETTE: Objection.
THE WITNESS: That's not apartments, either. So similar to Cheshire, it's not comparable to T&R property.
BY MR. ZACKS:
Q. So there's nothing comparable to T&R that is west of North Old State Road?
A. Nothing comparable to T&R that is

Page 218

west of North Old State Road?

Q. Isn't that a correct statement? It doesn't take a lot. There's no high density in that area, based upon the map. There's none on the other map that you were looking at.

Isn't the answer pretty simple to say there really isn't any multi-family apartments along the area that is the center of the Berlin Business Park overlays?

MR. LA FAYETTE: Objection.

THE WITNESS: I, I disagree.

BY MR. ZACKS:

Q. Okay. It's a yes or no question. What do you mean you disagree? It's not fair to say that is true? There's nothing built on your maps.

A. There's nothing built, that's a fair statement. Yes, there is nothing built.

Q. Is there anything approved?

A. There's nothing approved right now.

Q. Okay. Do you take or have any notes regarding the T&R development?

A. To my knowledge I handed over everything for the public record request. I

didn't -- I don't have anything else to hand over.

Q. When you say you handed it over, who did you hand it over to and when?

A. Our county prosecutor.

Q. You delivered them, these notes that you're referring to, to him physically?

A. No.

MR. LA FAYETTE: Objection.

THE WITNESS: Documentation. Anything I had, I handed to them in a public record request. I don't have any notes.

BY MR. ZACKS:

Q. All right. That was in 2023 when that would have happened, okay. And you have an ongoing duty to supplement that if you came up with anything after you gave that initial series of notes to them.

Did you ever give them anything else?

MR. LA FAYETTE: Objection. She didn't say notes. She said documents.

THE WITNESS: We've responded to every public record request providing any material at the time that existed. I don't, I

Page 220

don't know any of anything else that we have that we haven't provided you with.

BY MR. ZACKS:

Q. When you say we have, is that you, yourself, included in that group?

A. Yes.

Q. Okay. All right. On the map, in regard to the development plan on page seven where we were looking, of Chapter 3, the Sunbury property that was annexed on the far right-hand side that you recognized was annexed, was that an overlay approved and then subsequently annexed?

A. There's two properties that were annexed. The first property that was annexed did not come through the township. The second property that was annexed did come through the Berlin Commercial Overlay --

Q. Okay.

A. -- and was approved.

Q. Is that the one that was a Berlin Commercial Overlay multi-family and the one that shows on that map? It's that page. You turned it -- yes. It's page seven of Chapter 3. That's the one in front of you.

Page 221

A. The -- so this property is a little bit -- there's two -- I'm trying to describe this.

There's two images here, actually, and they're two different parcels and the larger box, and underneath, is -- are the multi-family properties that did not come through the township.

At the front, that tinier box that is directly connected to 36/37, that is the parcel that came through the Berlin Commercial Overlay and then later annexed to Sunbury after our approval.

Q. Okay. And has that multi-family been built?

A. The -- I know it is a simple question, but they are in the process of building the front portion of that property. The back portion is built and, to my knowledge, is being rented out at this time. The front portion is still being constructed.

Q. And as a trustee, what are you going to do to stop this annexation from happening?

MR. LA FAYETTE: Objection.

THE WITNESS: You know, I think a

Page 222

lot about that. The city of Delaware has an agreement with the county to provide the sewer and water across all of that area west of the railroad tracks, essentially.

And what's been interesting is, not until recently with failed income tax levies at the city level, that they have now started to reconsider their annexation plans.

We are interested in collaborating with the city of Delaware to engage in potential JEDD's to create a win-win situation for both the city, so that they don't have to annex and then, also, maintain that land.

But then, also, we can be provided with an adequate diversification of our tax base to be able to address the various growth demands that will take place on that side.

BY MR. ZACKS:

Q. Isn't it true that they basically get the annexations because they are much more flexible in their density than --

A. I disagree.

Q. -- than as to -- you disagreed

Page 223

before I finished the question.

MR. LA FAYETTE: Let him finish and then disagree. I'm kidding. Let him finish his question.

BY MR. ZACKS:

Q. Isn't it true that they provide for higher densities than you do for most multi-family apartments?

A. That's true.

Q. And isn't density one of the drivers in terms of whether or not people who want their land developed can develop it in an economic way?

A. I can't speculate why property owners initiate annexation.

Q. Isn't your job to figure out how to stop the annexations from happening?

MR. LA FAYETTE: Objection.

THE WITNESS: I don't think that is the trustees' job.

BY MR. ZACKS:

Q. No? Not to development and change and to actually use your Zoning Resolution to the effect that that would not be something that is more advantageous for landowners to

Page 224

have their land annexed rather than develop within the township?

MR. LA FAYETTE: Objection. Go ahead and answer.

THE WITNESS: That's a little bit more of a nuanced question. Could we break that apart a little bit?

MR. ZACKS: No. I like the question the way it is. I'd like you to try and answer it.

(The requested portion of the record was read.)

THE WITNESS: I think zoning is voted in by the people for townships. It's not something townships automatically are responsible for. I think, because the people of our township have voted in zoning, that as a trustee I have a responsibility to represent the residents' interests, and balance and consider demands of growth in one of the fastest growing townships in the fastest growing county in the state of Ohio with the realities of all kinds of economic issues that arise.

BY MR. ZACKS:

Page 225

Q. And yet in this case the major problem for allowing it to go forward, even though you've already testified that you could have granted variances on the density, we've gotten there, result in the fact that the developer told you that without that density of 6.97, that they can't do the project, you have concluded that it's better to vote that down than to allow for that multi-family development to happen at 6.97 even though your code permits higher densities?

MR. LA FAYETTE: Objection. Go ahead and answer.

THE WITNESS: We voted down 6.97.

BY MR. ZACKS:

Q. I know that. That's not responsive to my question.

A. I don't understand your question insofar as are you asking me if I think I should have voted to allow 6.97?

Q. No, I'm not letting you ask me questions.

A. Okay.

Q. I want you to answer my question.

A. I just wanted clarification. Can

Page 226

you read the question back?

(The requested portion of the record was read.)

THE WITNESS: Okay. Thank you.

MR. LA FAYETTE: Objection. Foundation.

MR. ZACKS: Foundation was all morning but --

THE WITNESS: Oh. I just lost the first part.

(The requested portion of the record was read.)

MR. LA FAYETTE: Continuing objection.

THE WITNESS: Yes to the question of we could have allowed the variances. Yes to the question that there are other places in the township that have higher density. Yes to the fact we turned it down. No to the fact that the Zoning Code allowed that density on this parcel in the township.

BY MR. ZACKS:

Q. Okay.

A. I think that answers it all.

Q. I think that answers it all, but you

Page 227

said that the Zoning Code doesn't allow it but you already testified you could grant the variance.

A. Correct.

Q. If you can grant the variance under the Zoning Code, how does the Zoning Code not allow you to get to the higher density?

MR. LA FAYETTE: Objection. Go ahead and answer.

THE WITNESS: The trustees can approve it, but then that's not the way that the code is allowing for permissibility.

So it's not what was planned. That density is not what's planned for that area and, yes, we could permit that density vis-a-vis a variance, yes.

BY MR. ZACKS:

Q. And so is there any reason, other than what your prior testimony is regarding that you wanted to talk to ODOT, other than the number of the density, that you did not support the project?

A. I know that there were a few different safety concerns that we've already brought up, and I think that I've already

Page 228

testified to that. But if there's something more specific that I can --
Q. It's your testimony. Is there anything else?
A. I think I've provided what was asked.
Q. Is that a no, there's nothing else other than what you provided?
A. Yes.
Q. Yes, there's nothing else?
A. I don't know how you're asking --
Q. Just clarifying the record.
A. I don't know.
MR. LA FAYETTE: We need Ken to come in here and -- go ahead. I'm sorry.
THE WITNESS: No, there's nothing else.
BY MR. ZACKS:
Q. Okay. No, there's nothing else?
A. Yes and, no, there's nothing else.
Q. Nothing else. You're sticking with nothing else?
A. Well, and what has been provided, yes.
Q. Okay. Good. All right. Could this

Page 229

industrial parcel have been used for agricultural purposes?

A. The industrial portion after we passed the overlay?

Q. Yes.

A. Theoretically, we could allow the use to continue through a grandfathered clause through nonconforming use. So, yes, theoretically, but not as far as it is permitted within the BIO and the zoning has changed.

Q. So the zoning has changed; therefore, in the BIO without some additional variance, conditional use permit, something along those lines --

A. Yes. Grandfathered.

Q. -- it is not permitted to be used as agricultural farming?

A. Grandfather clause, too, but, yes, everything else you said, yes.

Q. And does Berlin Township want this parcel to be used as agriculture in the future?

A. Our plan is our plan. I can't say what Berlin Township wants. I can speak to

Page 230

myself, if that's what you want me to answer. Do I want it to be used as agricultural?

Q. Yes. Do you, as the township trustee and the person who is the liaison for zoning, think that it should be used for agriculture in the future?

A. I don't have an opinion on that.

Q. Okay. That's neither a yes or no.

A. I don't have an opinion on that.

Q. As the zoning liaison officer and in the planning, do you think that Business Park Overlay areas that you've identified should continue to be used as agricultural based upon the changes that are happening and the idea that you actually have moved to a use-based code as opposed to the traditional zoning category codes?

A. If, if the property owners would like to continue to utilize the zoning, that is at their discretion. They are welcome to do that. I don't have an opinion on that.

Q. In your comment about the grandfather, if it's not presently being farmed, would the grandfather theory that you had espoused be able to somehow resurrect the

use that is not being done?
MR. LA FAYETTE: Objection.
THE WITNESS: Could you repeat the question?
BY MR. ZACKS:
Q. Do you know if it's currently being used for farming?
A. I do not know if it's currently being used.
Q. If it has stopped being used for farming, does the grandfather clause cease to --
A. Continuous use to condition for grandfathering, if that's the question.
Q. That is. So if, factually, the use has stopped, your testimony would be that the grandfather theoretical argument also evaporates?
A. A grandfather clause generally requires a continuous use.
Q. So that's a yes?
MR. LA FAYETTE: Objection. Go ahead.
BY MR. ZACKS:
Q. If continuous use stops --

Page 232
A. If continuous use stops --
Q. -- then the grandfather clause does not apply, is that accurate?
A. That would be one of the options that I would say is not available any longer.
There are still other options, that we discussed previously, related to how they could continue to use it if they wanted to pick back up on an agricultural use.
Q. Are you aware of -- so then in order to make the argument that continuing -- that the grandfather clause would apply, continuous use cannot have stopped is your testimony?
A. I'm saying generally related to the grandfather clause, because we're speaking in a hypertheoretical right now, that, generally, continuous use is a condition for grandfather clausing.
Q. Are you familiar with -- that the Olentangy School District owns a parcel of land within the overlay area?
A. Yes.
Q. Okay. And can that parcel be used for multi-family development?
A. Yes.

Page 233

Q. And how?
A. It's my understanding at the time that all landowners were approached and asked if they wanted to participate in having an overlay on their land, and so they would do the same process if they wanted to utilize that overlay zoning.
Q. So they would have to go a BIO or a BCO based on your testimony today --
A. This is only the BIO. They don't have BCO as an option over that parcel.
Q. That's the only one that they chose was the BIO?
A. The BIO is, essentially, everything west of Lackey Old State. The BCO is, essentially, anything east of Lackey Old State. So they actually don't overlap with one another.
Q. So our client would not have used the BCO is your argument?
A. Correct.
Q. All right. So in regard to that area on the BIO map that you're referring to in the Comprehensive Use Plan in front of you, I believe that's page 59, bottom half --

Page 234

A. Yes, page 59.

Q. -- in that area, do you foresee that R-10 is something that would make sense for the school to do on that land?

MR. LA FAYETTE: Objection.

THE WITNESS: It's my understanding that the property owners had a say and chose what they wanted to have and within -- and if they wanted to participate in the overlay zoning. I can't speculate on what Olentangy was thinking or --

BY MR. ZACKS:

Q. And the designation of an area as R-10, okay, do you know who made that designation?

A. I don't know who made that designation.

Q. Do you know who made any of the R-10's, R-4's, or any of the other overlay designations?

A. It's my understanding that Delaware County Economic Development developed the plan that then was considered by the trustees at the time, which I was not included.

Q. Okay. So you weren't included

Page 235

because you were not yet a trustee is what you're saying?

A. Correct.

Q. But you have participated in parts of that process as a resident?

A. Yes. Yes, I have.

Q. In the minutes of the June 12th or the March 27th, 2023, in both cases, is ODOT ever mentioned in those minutes?

A. I don't know.

Q. Okay. Take a look at them. I couldn't find them. I'll represent to you I can't see any discussion related to ODOT.

A. Sorry. Which two?

Q. The 4/27/23 and the 6 --

MR. LA FAYETTE: 4/24.

MR. ZACKS: Thank you.

THE WITNESS: So in these two, 4/24 -- June 12th and April 24th?

MR. LA FAYETTE: Yes.

THE WITNESS: So to be clear, you want me to review these meeting minutes and see if I see if ODOT is mentioned in --

MR ZACKS: Yes.

MR. MARGOLIUS: Let's go off the

Page 236

record for a second.

(A discussion was held off the record.)

BY MR. ZACKS:

Q. Okay. Have you reviewed the minutes of both meetings?

A. No.

Q. You've completed your minute review of the minutes of the first meeting?

A. Yes.

Q. And was ODOT in those minutes?

A. Yes. No, sorry.

Q. Okay. Now you're going to the second one?

A. Yes.

Q. Now the first one was Exhibit Number 3, correct?

A. Correct.

Q. Okay. Have you review both exhibits?

A. Yes.

Q. And does ODOT appear in it?

A. I don't see ODOT appear in the minutes.

Q. Okay. And so based upon that

Page 237

answer -- so the reason for the denial in those minutes was never discussed with the applicant during the course of those meetings, isn't that accurate?

A. That's inaccurate. That's not accurate.

Q. During those meetings? So the minutes don't reflect it, but you believe it happened?

MR. LA FAYETTE: Objection.

THE WITNESS: No. You said the reason for the denial, and that was not the only reason for the denial.

BY MR. ZACKS:

Q. One of the reasons for denial was that -- was ODOT ever discussed with the applicant?

A. Not by June 12th. We made it clear why we were rejecting the application on June 12th.

Q. Okay. Was there any evidence -- was the evidence that you were relying upon in regard to safety concerns speculative in nature?

MR. LA FAYETTE: Objection.

Page 238

THE WITNESS: I don't think so.
BY MR. ZACKS:
Q. Why not?
A. We had questions, the board, when I say we, we had questions about safety that we were not provided clear data on when asked for or clear information on. For example, ADA accessibility.
Q. Anything else?
A. No. I don't think it was speculative.
Q. So you just don't believe it was speculating about possible things that could happen and you didn't, you didn't really ask for information about ADA because wasn't the answer that the ADA issues were already covered in the exhibits which had been given to you?
MR. LA FAYETTE: Objection.
THE WITNESS: I don't recall receiving an answer.
MR. ZACKS: I'm going to, at this point, postpone the deposition to a future date based upon that we have not completed our questions and the lateness of the hour. I

understand you made yourself available, but it is a holiday weekend.

You've indicated you would stay here forever, I know you were not feeling well -- now we're speaking to the court reporter, so that's clear -- and based upon the court not having ruled upon the motion, we wouldn't be able to use all of our time anyway in case we have other questions.

With that, I'm going postpone. We're going to order as well. And any other comments from my co-counsel at this point?

MR. MARGOLIUS: No.

MR. ZACKS: Okay. We stand adjourned.

(The deposition was recessed at 5:37 p.m.)

* * * * *

Page 240

# C E R T I F I C A T E

STATE OF OHIO
SS:
COUNTY OF PREBLE

I, Heather M. Lunsford, the undersigned, a Certified Court Reporter and Notary Public within and for the State of Ohio, do hereby certify that before the giving of aforesaid deposition, said MEGHAN RAEHLL, was by me first duly sworn to depose the truth; the whole truth, and nothing but the truth; that the foregoing is the deposition given at said time and place by said MEGHAN RAEHLL; that said deposition was taken in all respects pursuant to the agreement and stipulations of counsel hereinbefore set forth; that said deposition was taken in stenotypy by the court reporter and transcribed into typewriting under her supervision; that the transcribed deposition is to be submitted to the witness for her examination and signature; the court reporter was neither a relative of nor attorney for any of the parties to the case, nor relative of nor employee for any of the counsel and has no interest whatever in the result of the action; I am not under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I herein set my hand and official seal of office this 21st day of September 2025.

Heather M. Lunsford
Notary Public, State of Ohio

My commission expires
June 29, 2027

Page 241

Errata Sheet

NAME OF CASE: T&R PROPERTIES vs BERLIN TOWNSHIP

DATE OF DEPOSITION: 08/29/2025

NAME OF WITNESS: Meghan Raehll

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________

_______________________

**EXHIBITS**


| | |
|---|---|
| EXHIBIT BY: MR. ZACKS | I:110 |
| EXHIBIT PLFS': | I:5 |
| EXHIBIT PLFS': | I:56 |
| EXHIBIT PLFS': | I:56 |
| EXHIBIT PLFS': | I:56 |
| EXHIBIT PLFS': | I:56 |
| EXHIBIT PLFS': | I:100 |
| EXHIBIT PLFS': | I:136 |

**8-29-25 Plaintiffs' Exhibit 1 MR** 5:11,15,16 69:21 76:13

**8-29-25 Plaintiffs' Exhibit 2 MR** 56:7 57:20,21 70:5

**8-29-25 Plaintiffs' Exhibit 3 MR** 56:9 90:17 114:19 154:2 236:16,17

**8-29-25 Plaintiffs' Exhibit 4 MR** 56:11 181:2

**8-29-25 Plaintiffs' Exhibit 5 MR** 56:13

**8-29-25 Plaintiffs' Exhibit 6 MR** 100:4 114:18

**8-29-25 Plaintiffs' Exhibit 7 MR** 115:19 136:3,11 156:20 163:19 201:8,9 216:6,7

**$**

**$300,000** 183:10

**$500** 19:7

**$500,000** 182:11

**1**

**1** 5:11,16 69:21 76:13 97:20

**1-20** 193:18

**1/26/23** 201:15

**10** 71:20 97:20 135:20

**10th** 57:22 91:2

**11** 5:5 118:7

**12** 39:18,19

**12/28/2000** 201:14

**120,000** 61:9

**12:20** 56:5

**12:36** 56:6

**12th** 181:5 193:3 235:7,19

**13** 152:4 164:4 217:5

**14** 164:5,16 217:5

**1400** 214:8,13,23,24

**1400-plus** 214:7

**15** 140:23

**15.5** 93:18

**1800** 214:8,10

**19** 140:23

**1st** 23:13 24:20,23 45:9 112:14

**2**

**2** 56:7,21 57:21 70:5 90:20 97:20

**20** 161:5,9 213:11 216:15

**2000** 9:22 201:13 202:7

**20022** 203:5

**2003** 9:21

**2005** 9:15,19 12:8,14

**2010** 9:13

**2013** 12:18 14:3 32:23

**2015** 14:17

**2015-2016** 15:9

**2016** 9:11 14:16

**2018** 25:22,24 26:3 109:14

**2018-2019** 15:21

**2019** 105:15 106:3,9,13,24 107:1 109:10

**2020** 9:9 106:10,21,22 107:6,8 165:5

**2022** 10:5 23:13 24:20,23 30:13,25 31:2 44:19 45:2 50:16 112:14 203:9 204:12,13

**2023** 57:22 85:16 164:24 165:2,10 181:5 219:14 235:8

**22** 34:19 39:5 82:11

**22-003** 78:9

**22/early** 34:20

**2204** 11:25 12:4,7

**2248** 12:1 14:12,16 15:4

**23** 34:20 39:5,6 45:11 82:11 150:13,16,22 164:1,17 176:11,13 202:7 207:18,20 215:8 216:5,15

**23-001** 58:17 59:17 69:21 91:12 114:22 115:5 116:22

**23-003** 75:9 117:21 119:1 193:17

**23-04-34** 117:2

**23-04-35** 117:7

**23-04-36** 116:18 117:9

**23-06-05** 193:10

**24** 39:7 45:3,12

**24th** 72:20 73:24 75:2 91:1 102:16 115:2 154:2 166:1 181:17 235:19

**25** 12:1 45:12

**25-06** 33:14

**250** 12:1 167:18,23

**250/252** 15:6

**252** 12:2

**27th** 235:8

**28** 136:13

**297** 177:12 188:11

**2:33** 153:22

**3**

**3** 56:9 90:17,25 114:19 117:3 154:2 220:9,25 236:17

**3.1** 206:11

**30** 151:11 152:12 153:6 192:25

**35-foot** 160:4

**350-foot** 120:16

**36/37** 61:3 95:24 96:1 136:23 137:1 138:25 146:24 147:5,23 148:20 149:18 150:12 151:13 169:16 171:1 174:4,8,9 175:16 176:1,5 177:14 209:20 213:20 215:4,6 221:10

**368** 201:18

**37** 4:21

**370** 188:11,15

**376** 120:10

**3:18** 153:22

**4**

**4** 56:11 97:20 181:2

**4/24** 235:16,19

**4/27/23** 235:15

**411** 11:7

**43015** 4:22

**480,000** 61:8

**493** 98:12,14,18,21,22 99:3 100:9 102:24 103:2,17 104:9,11 105:9

**4935** 4:21

**4:18** 200:13

**4:40** 200:14

**5**

**5** 56:13,21 97:20 200:18

**50** 104:18

**55-foot** 160:4

**59** 213:11,13 214:16,21 233:25 234:1

**6**

**6** 71:20 100:4 114:18 117:4 136:13 174:1 235:15

**6.9** 124:14

**6.97** 135:22 141:10 145:9,24 146:7,16 161:19 162:20 166:11, 14 169:18 171:10 172:17 173:7 178:3,11 184:16 187:22 188:6,13 225:7,10,14,20

**614** 112:4

**614-822-1883** 112:2

**614-832-1952** 112:1

**7**

**7** 115:19 136:3,11 156:20 163:19 181:11 201:9 216:7

**7/6** 165:10

**7/6/2023** 165:17

**7/6/23** 201:7

**70** 120:15,18 188:13

**750** 124:20

**8**

**8** 97:20

**800** 121:17 124:19,21 169:6

**832** 112:21

**832-1952** 112:5

**9**

**97** 172:1

**9:25** 78:10

**A**

**A-C-C-E-N-T** 50:8

**a.m.** 71:21

**ability** 6:9,21 125:4 127:25 128:4 160:10

**abut** 213:21

**abutting** 157:1 199:12

**Accent** 50:6,7,9

**accept** 48:19 64:20 69:20 70:2,4 75:9 88:12,17 166:11 178:16

**acceptable** 172:3,20

**accepted** 48:22 69:20 70:20 148:2 167:14

**accepting** 76:18,19 116:23 117:3

**access** 51:7,16 54:15 61:5 146:23 150:13,23 151:5,10 175:15,23

**accessibility** 184:10 195:1,5

**accessible** 183:24 184:5 195:7

**accompany** 209:9

**accomplish** 185:16

**account** 149:16

**accuracy** 41:12

**accurate** 11:5 41:7 55:16 59:25 79:12 81:25 84:14 85:20 88:4 90:15 129:7 147:11 149:19 182:22 183:22 210:8,9 232:3

**accurately** 40:9 41:1 57:16 140:19

**Acker** 195:13

**acquired** 14:13 184:12

**acre** 121:12,16 124:12,15 132:4 133:4 135:12,15,20 139:7 159:14 164:5,16

**acreage** 208:13 214:4,6

**acres** 214:7

**act** 63:13 65:5,8,9,17 66:2

**acting** 105:9

**action** 208:19

**actions** 78:13 116:15

**activities** 22:7 174:4

**activity** 83:6

**actual** 35:19 45:18 65:20,21 115:24 189:2

**ADA** 183:23 184:4,8,10 195:1,5,7

**add** 72:24

**added** 120:16

**adding** 184:14

**addition** 50:21 101:13,15 120:18

**additional** 59:23 74:10 79:11 116:8 117:3 179:7 181:21 182:6 203:24 229:13

**additionally** 122:9

**address** 4:20,24 14:12 49:22 179:12 188:21 208:20 222:17

**addressed** 74:10 97:21

**addresses** 11:20,23 49:11

**adequate** 222:16

**adjacent** 138:10

**adjunct** 24:11,14

**adjustments** 78:24

**administrative** 63:2,9,16,24,25 64:2,3,7,20 65:3,21,24 66:5,7,12, 15,18,20 67:1 68:3,16 69:6,17

140:12 143:13 144:9

**administratively** 143:25

**administrator** 44:11 46:1 50:23

**adopted** 51:23 54:2 67:25 124:3 165:3

**adoption** 164:21

**advance** 44:6

**advantageous** 223:25

**advertise** 18:9

**advertised** 13:11,13

**advertising** 13:5

**Advise** 47:3

**aerial** 160:14

**affect** 128:15

**afford** 18:25

**affordable** 18:20

**age** 4:2

**agenda** 44:14

**agendas** 51:11

**agree** 69:25 79:4 88:10 91:4 165:12 184:17 195:21 208:6

**agreed** 95:11 103:13 144:20 190:15,19 191:17

**agreement** 210:21 222:2

**agreements** 185:15

**agrees** 97:5

**agricultural** 229:2,18 230:2,13 232:9

**agriculture** 229:22 230:6

**ahead** 7:22 41:5 85:18 109:25 122:5 153:19 224:4 225:13 227:9 228:15 231:23

**align** 127:6 133:21

**aligns** 65:24

**alleged** 109:2

**allowance** 160:2

**allowed** 139:10 226:16,20

**allowing** 128:7 225:2 227:12

**altered** 178:20

**Alum** 27:6

**amendments** 65:11

**amenities** 169:15 181:21 184:15

**American** 28:4 100:8

**amount** 111:13 133:3 174:2

**ample** 79:2

**analysis** 160:25

**analyzing** 138:18

**and/or** 159:5

**Andrew** 4:12

**annex** 222:13

**annexation** 209:9 210:23 221:23 222:8 223:15

**annexations** 222:22 223:17

**annexed** 207:6 208:24 209:5,11, 15 210:1,7 220:10,12,13,15,17 221:12 224:1

**annexing** 135:1 210:11

**announcements** 51:11

**annual** 11:9 21:24

**answering** 7:16 30:5 49:5 170:20

**answers** 7:9 26:8 30:6 32:11 72:5 124:14 145:13 226:24,25

**anticipation** 79:10

**apartment** 76:23

**apartments** 4:9 15:3 62:8,11,16 75:12,14,23 76:3,17,19 77:4 92:17 119:3,6 120:10,21 127:23 128:7 130:11,21 132:21 134:4 141:9 142:23 143:17 159:8 161:2 162:10 168:25 169:6,19 177:12 192:11 202:22 204:15,16 215:19 216:15,17 217:20 218:9 223:8

**apologies** 205:19

**apologize** 135:15

**apparatus** 160:11

**apparent** 155:23 201:12

**apparently** 59:24 70:4 163:22

**appeared** 127:5

**appearing** 5:25 119:20 203:21

**appears** 59:2 76:12 77:19 122:8 206:22 207:3 210:6 214:17

**apples** 131:6 132:1

**appliances** 120:12

**applicant** 62:15,16 74:11 115:15,17 117:15 118:6,16 124:16 126:13,16,22 133:21 145:9 162:18,25 163:5,13 172:18, 21 178:13,18,21,23 179:1,8,9,12, 16,21 190:15,19 191:1 194:11

**application** 35:20 53:19 61:2,21, 24 62:2,4,14,21 64:9,12 73:14 75:11 76:14 82:3,5,6 91:3 92:5 99:1 114:21 115:9 116:9 117:17 118:3 125:13 126:23 127:6,17 130:10,21 131:13,14,17,23 133:23 146:4 157:22 159:1,2 161:7 165:25 166:17 167:22,24 171:11,14 175:20 177:12 178:17 179:5 181:14 185:7 188:3,20 193:11,12,17 198:19 201:16

**application's** 141:8

**applications** 35:12,15 64:15 88:2,21 89:19 167:14 202:6,25 208:14

**applied** 35:16,18 82:18 142:3,20, 23 144:1

**apply** 14:4 18:9 49:14 63:6 133:2 167:24 232:3,12

**applying** 66:24

**appreciated** 110:13

**apprised** 20:16

**approached** 233:3

**approaches** 164:4

**appropriation** 42:16

**approval** 65:5 66:19,20 72:20 73:24,25 74:1 97:16 188:3,14,19 189:11 190:3,10 221:13

**approve** 65:2,25 68:4 78:23 81:10 85:8 114:21 116:18 131:16 132:23 173:2 188:18,24 189:3,7 193:11,12,16 207:10 227:11

**approved** 66:22 72:14 107:11 116:6,7,8 134:5 135:2,3,20,22 137:7 138:23 144:6 147:4 161:1 177:13 183:12 203:1,7 208:10 218:20,21 220:12,20

**approves** 65:4

**approving** 65:13 115:1,4,8,14,16

**approximately** 182:11 213:17

**April** 39:5 57:21 72:20 73:24 75:2 91:1,2,13 102:15 115:2 154:2 166:1 181:17 235:19

**ARB** 71:1 72:10 73:17,22

**ARB's** 72:4

**architectural** 72:4,12

**Ardin** 134:25 204:20

**area** 10:5 11:13,19 87:3,22,24 93:6,7 122:23 123:25 133:19 136:24,25 137:3 138:1,2 144:6,21 145:19 146:13 149:8 150:8 151:9,17 157:12,15,20,21,22 159:3,13,22 163:25 164:16 174:1,9,18 175:17 177:22 184:13 188:18 206:19 209:2,25 210:2,5,6 214:25 215:5 218:4,9 222:3 227:15 232:21 233:23 234:2,13

**areas** 161:13 211:9,11,17 214:18 217:14 230:12

**argument** 152:22 231:17 232:11 233:20

**arise** 224:24

**arm** 42:16

**Arms** 216:21

**arrangement** 101:11

**Art** 203:22

**arterial** 215:6

**Article** 140:23

**articles** 21:12

**arts** 9:12,16,19

**Ashland** 9:14

**aspect** 144:3

**aspects** 10:11 81:22 83:14,15 84:19

**assembly** 101:8

**assessed** 103:9

**assessing** 128:18

**assessment** 214:9

**assigned** 45:24

**assist** 44:17

**assistant** 23:21 24:15

**associates** 31:16

**association** 20:21 21:4,22,24 22:15 29:12 46:12

**assume** 7:12 24:4 55:12 112:13 154:17,18 171:19 177:24

**assuming** 65:23 183:1

**attach** 95:25

**attacked** 33:6

**attempting** 210:13

**attend** 11:6

**attended** 11:9,10

**attention** 52:13 57:20 181:2

**attorneys** 4:8 22:3

**attractive** 98:6

**attributed** 132:6

**authority** 125:18,21

**automatic** 64:25

**automatically** 64:21 68:5,7 224:15

**Avenue** 11:25 12:1

**aware** 16:10,17 17:6,7 18:19 21:18 34:4,8 37:21 41:20 71:19 75:16 101:24 102:4,5 109:8 130:18 183:9 184:24 192:4 232:10

**B**

**B-O-R-G-H-E-S-E** 4:19

**bachelor** 9:19

**back** 19:25 33:10 40:4 46:13 72:20 73:24 80:3 91:25 92:1 101:14 107:15 109:5,10,13 114:19 115:6 117:1 124:7,9 146:3 148:24 153:23 160:21 180:1 182:18 189:20 205:20 206:2 216:6 221:19 226:1 232:9

**background** 9:6 27:11

**backing** 138:13

**backtrack** 44:18 83:2 116:13

**Bainbridge** 156:12 157:3,4,5

**Baker** 213:19

**balance** 211:6 224:19

**bang** 43:19

**base** 222:17

**based** 40:18 43:9 45:22 60:12 74:14 95:2 119:12 124:2 130:6 132:22 136:17 138:21 145:19 157:12 161:1 167:14 168:25 170:20 177:25 188:15 208:4,21,22 211:14 217:12 218:4 230:13 233:9 236:25

**basically** 62:8 66:24 67:2 69:5 89:14 133:14 138:3 164:8,12 166:10 168:5 170:4 183:5 187:9 222:21

**basis** 65:9 103:20

**BB** 115:4

**BBP** 58:17 69:21 91:12 114:21 115:4 116:21

**BCO** 104:1 140:7,19 142:23 143:8 192:14 212:4 214:5 233:9,11,15,20

**BCZ** 86:23 127:6

**bear** 131:15 136:8

**bedroom** 13:22,23 15:5,21 19:7 124:20,21

**bedrooms** 13:19 15:10 120:11 168:21

**began** 13:5 17:16,19

**begin** 62:23 75:8 78:12,15 91:16 106:20 112:7 138:4

**beginning** 58:13 118:6 190:10,12

**begins** 58:1 60:24

**believed** 99:23 131:10 155:17,20 200:2

**believes** 122:11

**believing** 186:19

**benches** 120:20

**Benjamin** 4:7

**Berlin** 4:9 8:6 10:24 25:12,19,21 26:3,24 27:14,15,20,21 28:4,9,16, 25 29:7,12,19 30:4,18 31:14 34:2 39:21 41:20 51:23 52:2,3,5,8 53:13,16 58:18 59:10,12 61:1 62:8,16 63:8,13 64:6,8 70:15 75:10,12,15,22 77:21 82:17,18, 19,25 83:1,11 86:13 89:1 92:5 93:2 103:3,10 105:10 114:22 117:21 119:4,23,25 120:6 134:2, 3,5 140:3,20 143:5,6,14 149:4 157:15 181:6 193:18 199:7 200:18 208:6,12,23 209:3 211:6 212:3 213:16 218:10 220:18,21 221:11 229:21,25

**Berlin's** 83:6 84:13

**BIA** 192:6

**big** 95:6 210:5 214:2

**bigger** 57:5

**binder** 69:20 72:14 76:13,18 77:9

**BIO** 58:17 59:6,9,12,24 63:16,20 64:22 66:25 67:25 69:10 72:7 88:24 89:17,20 92:25 93:19 98:3 102:25 103:25 115:2 140:6,9,17, 19 142:19 143:8 144:9 157:20 191:14 192:2,6,8,12 212:3 214:5 229:10,13 233:8,10,13,14,23

**bit** 46:23 83:9 93:13 135:5 150:18 153:17 158:4 221:2 224:5,7

**board** 44:20 46:22 47:25 48:2,8, 12,13 49:3,7,10,17 54:2 61:19 65:2,4,12,25 74:13,15 78:18 81:5 84:25 85:2,5 86:22 161:22,24 187:22

**Board's** 72:5

**boards** 46:9

**Bob** 30:22 31:3 187:1

**Bonded** 101:20

**Borghese** 4:16,17

**bottom** 58:1,3,14 72:24 93:7 117:24 118:6,9 181:11 214:22 233:25

**bought** 12:13

**boundary** 94:8

**bounds** 74:9,19

**box** 221:6,9

**BP** 59:17

**break** 56:4 141:15 153:20,24 200:12 224:6

**breaking** 101:7

**bridge** 176:5

**briefly** 38:10 126:20 155:9

**bring** 125:12 143:14 195:3,16

**bringing** 87:19 146:20 171:18

**broader** 20:22 90:7 183:3

**broken** 64:22

**brought** 27:7 48:4,5,6,8 86:4 88:23 98:1 126:1 146:15 153:4 161:6 166:7 170:8,24 179:8,9 188:12 190:6 194:22 204:19 227:25

**Buffalo** 9:11

**buffer** 120:16 167:8,12,18,23 168:1,7

**buffering** 166:18 181:21

**build** 96:17

**build-out** 151:5

**builders** 185:16

**building** 46:7 61:9 72:10 73:1 77:15 98:11 101:25 102:3,9 149:5 160:4 221:18

**buildings** 61:11 93:9 120:24 160:3

**built** 137:4 139:6 143:18 150:20 185:10 207:14 208:5,10 218:16, 18,19 221:15,19

**bulk** 101:7

**Bullard** 26:20 36:8 59:3 79:4 86:8 87:4,13 95:11 97:5 103:24 104:2 105:6,8,17 108:3,4 168:17, 24 169:4,11 193:20

**business** 10:24 25:19,21 26:3,25 30:4,19 31:8,14,24 35:13 53:14, 17 63:8,14 64:8 65:17 77:3 81:22 82:4,19,20,22,25 83:5,7,12 84:2, 6,12 85:8,14 86:5,13 87:22,23 88:25 98:7 103:10 106:11 107:3, 10 110:18 122:20,22 126:4 127:1 134:6,10 135:2,4,21 139:22 140:1,3,10,20 142:8 143:2,5,7,14 144:4 149:5 150:10,20 153:6 157:12,18,19 167:11,22,25 186:2 192:17,18,21 199:7,12 208:12 211:6 212:3,7,8,16 218:10 230:11

**butt-up** 155:24

**BZA** 21:6,9 38:23 200:17

**BZC** 75:9 78:9,15,19 79:1,11,23 81:9 117:21 119:1 126:19 127:4,7 193:17 197:20 198:8 200:3

**BZC's** 126:11

## C

**C-H** 175:1

**calculated** 182:10

**calender** 51:12

**call** 10:13 67:11 136:19 140:3 169:1

**called** 10:7 59:5 61:6 63:2,23 67:5 68:2,5,8 69:6 78:9 91:12 98:2,12 99:2 134:12 144:7 156:11 164:2 204:20

**calling** 59:15 62:10 75:13 133:17

**camera** 48:8,9

**camps** 196:21

**campus** 11:18

**capacity** 8:6 196:23

**capture** 42:1 119:15

**captured** 40:9 41:2,15,16

**care** 147:3 160:10 172:8 186:6,9

**carrier** 113:2

**carries** 115:20 201:6

**case** 22:21 32:21,22,23,24 33:4, 11,16,18 34:1,4,7,12 55:14 58:17 59:20 85:13 87:10,15 115:4 116:17 119:1 128:17 152:6,7 225:1

**cases** 22:24 23:1,3 32:18 33:8 55:13 235:8

**cash** 14:17

**categories** 144:20 211:14

**category** 49:19 141:15,17 230:17

**caught** 205:15
**caused** 148:22
**CB** 195:6
**CBS** 205:17
**cease** 231:11
**cell** 114:7
**cellular** 32:24 113:3
**cementitious/hardy** 120:11
**cemeteries** 27:5
**cemetery** 27:8
**census** 165:5
**center** 23:21 93:4 218:9
**central** 208:2
**certifications** 10:1
**certified** 4:3
**Chair** 20:20 45:7,11,12,13,14,17
**Chairperson** 44:19,23,25 45:3, 4,16 73:11
**Chamber** 10:5
**chance** 57:12
**change** 17:12 63:10 70:14 81:15 87:18 208:22 210:12 223:22
**changed** 29:20 46:17 229:11,12
**changing** 148:17
**Chapman** 61:3
**Chapter** 136:13 200:21 201:1 220:9,24
**character** 10:3 104:21
**characteristics** 100:17
**charge** 18:15
**check** 110:13,14 165:6,7 183:14
**Cheshire** 215:10,12,16,25 217:20
**chief** 74:9,18
**children** 154:11,16,24
**choose** 204:8
**chose** 233:12 234:8
**Christina** 108:7
**circuit** 47:6
**cited** 150:11
**city** 96:3 130:20 133:25 208:24 209:7,12,22 210:1,7,11,16,22 222:1,7,10,12
**civil** 33:22
**clarification** 61:18 63:12 71:10 93:15 133:7 143:6 161:21 205:4 225:25
**clarified** 130:17
**clarify** 36:15 109:18 167:4
**clarifying** 70:12 193:14 228:12
**class** 91:7
**classification** 100:9 102:23
**clause** 229:7,19 231:11,19 232:2, 12,15
**clausing** 232:18
**clean** 89:25
**cleanly** 79:22
**clear** 74:22,24 93:1 130:5 147:18 163:10 170:2 172:21 214:20 235:21
**Clerk** 53:9
**client** 165:20 233:19
**clients** 157:13
**clients'** 211:3
**close** 104:17 161:19 176:20
**closed-loop** 47:6
**cloud** 63:7,11,22 65:19 66:4 67:3,6,11 82:23 127:12 129:9,12, 13,16 142:2,7,8 143:21 192:20 208:20
**clouds** 81:23
**co-counsel** 4:11
**coached** 30:9
**coaching** 30:11 89:21,23 90:2
**code** 67:12,21 98:10,22 99:23 100:9,17 101:24 102:25 103:17, 25 104:10,15,21 105:9,25 115:22 125:22 127:10 142:12 143:4,9 144:18,22 161:4,8 166:19,20 167:5,6,7,17 187:9 225:11 226:20 227:1,6,12 230:16
**codes** 67:5,8,9,10,14,15,18,24 68:7 72:24 74:10,19,20,21 98:1 99:9 103:4,9,12 104:19 105:22 115:14,17,24 116:19 159:4 230:17
**coequals** 42:10
**cold** 107:17
**collaborating** 222:10
**collectively** 132:5
**college** 9:7
**color** 163:24 206:20
**colorized** 217:4
**colors** 72:6
**column** 202:2,12
**combine** 33:23
**comment** 35:5,8,11 191:12,25 197:19,25 198:2,3 200:10 230:22
**commented** 72:10
**comments** 48:25 61:21 72:11 118:8,11 195:2 200:4,8
**Commerce** 10:5
**commercial** 137:22 138:16 160:19 220:18,22 221:12
**commercial-residential** 140:4
**commission** 52:18 70:13 109:21 114:23 120:14 121:15 122:12 197:23 198:20 199:17 201:8
**commissions** 46:9
**committee** 46:22 51:10
**communicate** 111:11
**communicated** 111:2 180:2,14
**communicating** 149:24 178:25 179:25 181:19 182:4
**communication** 47:19 179:25
**Communities** 134:25
**community** 25:2,5 27:3 30:8,14 203:22 216:23 217:3
**Comp** 81:4 213:3
**company** 14:24 15:16

**comparable** 217:21,23,25

**comparables** 133:16

**compare** 131:6 156:1 217:11

**compared** 98:1 130:24,25 133:10,11

**comparing** 131:6 132:1 155:22

**complains** 182:7

**complete** 76:14 81:9 162:24 201:12 215:9

**completed** 10:4 66:25 236:8

**completing** 69:5

**compliance** 69:9,16

**compliment** 128:1

**component** 84:16,21

**components** 33:21 68:15 140:20 143:7

**Comprehensive** 52:21 77:21 79:6 80:11,14,16 85:2,16 136:13 164:22 165:3 191:15 200:19 212:9,11,21 215:15 233:24

**computer** 43:5

**concentration** 196:21

**concept** 18:19 62:24 149:23

**concepts** 162:11

**conceptual** 72:12 153:2

**conceptualization** 149:7,11,23 151:22 176:4

**conceptualizations** 149:15

**conceptualized** 95:21,22 159:13

**concern** 94:23 95:5 97:12 102:22,23 103:1 104:20 121:2 146:17 147:23 151:22 152:10 159:21,23,24 160:6,7,9 165:18,24 166:4,21 167:2 171:9,16,17 180:15,21 185:22,24 194:7 195:10,24 198:17,25

**concerned** 18:23 150:19 151:8 185:25 198:21

**concerns** 18:13 71:11 73:17,22 146:15,19,21,25 147:2 148:5 151:23,25 153:12 154:7,10 155:7 160:9 163:4,18 166:2,7,9 170:5, 10,11,15,23,24 171:8,15 172:7 173:5,12 179:1,12 194:10,22 196:22 227:24

**concluded** 225:8

**concludes** 118:10

**conclusion** 210:10

**conclusionary** 145:13

**condition** 231:13 232:17

**conditional** 14:5 188:2,14,19 189:10 190:2,10 229:14

**conditions** 6:9 97:16 168:4

**conducted** 22:2

**conference** 11:10 21:24

**conferences** 11:6

**confidential** 8:2

**confirmed** 71:22

**conflict** 199:4

**conflicts** 198:7,10,15

**confuse** 141:23

**confusing** 92:16 94:10 142:11

**congestion** 176:12

**conjunctive** 59:16

**connect** 96:17,22

**connected** 96:7,9,25 221:10

**connection** 47:4

**connotation** 28:7

**consensus** 165:4

**consideration** 59:17 60:14 75:8 188:21

**considerations** 122:20 148:19

**considered** 54:7 74:13 130:9 234:23

**considers** 197:24

**consistent** 18:11 199:9

**consists** 44:14

**constructed** 221:21

**construction** 137:6 205:17

**contact** 31:13 52:24,25

**contacts** 31:1

**context** 27:17 62:15 78:22 81:16 88:20 89:12 90:13 102:1 105:8 163:3 196:11 206:6

**continuation** 91:13

**continue** 75:2 101:1 176:5 229:7 230:13,19 232:8

**continued** 92:19

**continuing** 124:11 226:13 232:11

**continuous** 231:13,20,25 232:1, 12,17

**contract** 25:7,18 26:25 30:7 47:3

**contracted** 210:16

**contractor** 50:17

**control** 101:7 198:2

**controlled** 84:14 151:6

**conversation** 36:25 71:6,16 88:1 105:7,23 111:1 117:20 118:5 130:17 154:8 162:23 163:7 165:20 169:3 191:11,22,24

**conversations** 8:2,3 36:3,16 38:17,21 99:20,21 176:25 180:16 198:5,9

**convert** 12:16,20 13:2

**converted** 14:3

**cool** 57:8,9

**coordinator** 31:10

**copy** 108:16

**corner** 136:22 164:1 207:17 215:9 216:5

**correct** 6:2,3 12:11 15:2,17 16:5 17:18 21:3 24:22 27:19 29:24 37:14 41:12 48:17,20 49:23 51:24 54:20 55:4 59:7,8,18,20 60:6,15 62:17,18 63:3 67:4 68:16 69:14 70:5,22 71:24,25 72:15,16,21,22 74:23,24 75:7,12 76:16 79:7,8,13 80:2 81:24 82:14 83:8 84:5 85:10 91:14,15 92:7,9,19 93:8 94:16,24, 25 96:7,18,23 97:4,13 98:9,11 102:19,20 115:3,5,24,25 116:4, 10,19,20,24 117:10,22 118:12,13, 24 123:10 124:22 126:13 129:22 132:5 135:23 137:1,2,9 138:4 139:7 141:10,18 142:4,9,21,24,25

143:19 144:23 157:7,14 163:25 164:6,7,17 166:12 173:2 180:4,9 181:14,25 182:12,23 184:22 185:11,20 188:1,16,23 189:11 190:3,11,24 191:20 192:10,13,15 193:22 194:4,8 197:16 201:22,23 202:10 204:2 206:4 207:10,15,18, 21 208:2,3 210:3,14 214:19 215:13,15 218:2 227:4 233:21 235:3 236:17,18

**corridor** 95:24

**cost** 97:8

**counsel** 5:19 38:10 198:5,13 199:21

**countertops** 120:13

**county** 10:7,11,15 20:17,20 26:13 30:18,20 31:1,5,7,11,12,16 46:8,10,11 47:7,8,9,11 50:19,22, 24 70:18 80:17 83:18 99:12 103:13,24 110:6,8,18 121:7,15 122:12 148:3 165:1,6,9,16 186:25 187:2 188:17,24 209:7 210:17,21 219:5 222:2 224:22 234:22

**county's** 185:14

**couple** 38:15 39:15 40:3 81:6 108:1 118:2 131:24 134:18 150:7 213:7

**courses** 78:13

**court** 33:13,15

**courthouses** 10:15

**cover** 47:21 127:14

**Covid** 106:10,18,19,20

**create** 41:21 48:1,4 49:10 51:2 105:2 195:20 196:7,8,16,18 222:11

**created** 41:23 49:19 60:14 168:6 177:13

**creates** 43:13

**creating** 18:3 129:16 178:1

**creation** 134:5

**Creek** 27:6

**crime** 195:20 196:4

**CROSS** 4:5

**crossed** 104:1

**current** 50:10,12 79:16

**Curve** 209:25 213:21

**cut** 177:3,4 192:25 208:1

**D**

**D'AMICO** 26:19 36:10,11

**dark** 93:5,7

**darkest** 163:24

**data** 179:7

**date** 99:15 113:21 181:4 201:6

**dated** 57:21 72:11 201:14,15

**day** 8:14 10:23 17:24 78:1 104:4 122:15

**day-to-day** 86:25

**days** 38:16,24 39:15

**DCRPC** 99:10 122:21 123:24

**DCRPC's** 122:19 123:3,8

**deadline** 78:24

**deal** 84:2 129:20 188:20

**dealing** 33:22

**Dean** 23:21

**death** 33:6

**December** 82:11

**Dechristopher** 196:25 197:5,9

**decided** 139:24 144:17 190:23

**deciding** 141:7

**decision** 85:21

**decisions** 48:11

**declined** 163:7

**deeper** 86:3

**defined** 212:3

**definition** 100:12 129:20

**definitions** 202:3

**degree** 9:9,14,16,20

**degrees** 9:24

**Delaware** 4:21 10:5,7 20:20 46:8,11 70:18 80:17 96:3 109:20 110:4,6,8 120:14 121:7,14 122:11 130:20 133:25 148:3 165:1,6,9,16 186:25 187:2,23 188:14,17,24 198:5 201:7 208:25 209:12,22 210:7,11 222:1,10 234:21

**delivered** 219:6

**demanded** 162:18

**demands** 222:18 224:20

**demographics** 19:17

**demonstrated** 148:2 166:17

**densities** 137:23 150:4 163:23 186:23,24 187:3 217:11 223:7 225:11

**density** 124:17 129:19 131:24 132:9,17,19,22 133:4,17,18 135:4 136:12 137:21 141:2 146:12 152:8 153:12 154:4 159:20 160:22,24 162:16 163:25 164:4,6, 9,19 165:18,24 171:16,18,24,25 172:19,23 173:1 177:21 181:22 182:2,21 183:2,21 184:3,6,14 186:12,14,19 187:10,14,15,17,24 188:4,8,12,18,25 189:7 190:6,22 191:2,7,18,22 192:25 194:7,23 201:10 211:4,10 217:3,12,13 218:3 222:23 223:10 225:4,6 226:18,20 227:7,14,15,21

**deny** 145:18

**department** 47:5

**depend** 54:21

**depended** 126:5

**depends** 125:12 161:6

**deposed** 4:4

**deposition** 5:18,20 38:9 175:9

**depositions** 38:24

**describe** 12:9 15:19 19:16 51:17 62:23 63:1 68:19 69:15 70:8 98:10 100:16 115:11,13 118:3 122:9 125:1 136:18,21 156:17 162:12 179:16 213:13 221:2

**describes** 64:6 75:11 200:22 201:10

**describing** 118:23 133:14,16 179:2 180:22 181:22 215:1

**description** 53:19 60:22 64:17 77:2 91:18,23 93:4 128:18 140:1 213:24 214:1

**descriptive** 8:24
**design** 71:11 72:3,11,25 74:12
**designated** 138:3 145:20
**designation** 188:22 202:11 214:17 234:13,15,17
**designations** 234:20
**detail** 37:5 147:14
**details** 13:10 35:21 147:12
**determined** 19:4 211:2
**determining** 51:22
**detour** 114:18
**develop** 183:16 223:12 224:1
**developed** 153:7 223:12 234:22
**developer** 186:15,20 191:9 225:6
**development** 10:12,22 11:7 31:7,10 35:16,18 58:18 59:13,18, 22 61:4,7 77:7 82:7 99:12 110:7 115:10 129:22 134:12 138:19 149:3 187:1 200:5,22 204:15 206:7,10,18 208:21 210:12,24 218:23 220:8 223:22 225:10 232:24 234:22
**developments** 10:17 203:8
**deviation** 139:10
**device** 43:4 113:23 114:2
**differ** 55:19
**difference** 27:24 65:12 129:18, 22 143:8 172:7
**diligence** 199:4
**direct** 52:13 87:25 125:23
**directed** 26:7
**directly** 117:14 221:10
**director** 31:7 173:25
**disabilities** 6:20
**disagree** 89:2 139:13 186:21 195:25 196:3 218:12,15 222:24 223:3
**disagreed** 169:11 222:25
**disclose** 8:4
**disclosed** 51:24
**discretion** 145:18 230:20
**discuss** 151:21 162:17
**discussed** 10:23 49:17 151:23 163:12 194:10 232:7
**discusses** 48:12
**discussing** 105:9 154:4 180:8
**discussion** 47:25 48:2,15 57:25 71:7 74:15,25 94:15 95:10 98:25 118:15 155:14 160:22 163:1,16 168:13,15,18 169:12,14 171:22 179:20 181:12 190:22 235:13 236:2
**discussions** 126:25 198:20
**displayed** 72:13
**disposal** 71:12
**distinct** 24:16 112:24
**distinction** 45:15 76:22,25 130:6
**distinguish** 8:7 28:1
**distinguished** 90:3,6,9
**distinguishes** 28:3
**distinguishing** 119:14
**distracted** 166:22
**distribution** 101:5
**district** 5:6,8 174:1 232:20
**divergence** 124:18,19 181:23,24 182:2,3
**diversification** 222:16
**diversifying** 186:11
**divide** 45:22
**divinity** 9:14
**divvy** 45:25
**doctor** 20:6 200:1
**document** 5:17,21,24 54:21 64:6 90:19 94:9 110:5,6 123:18,21,24, 25 124:1,9 136:15,17 165:8 190:5
**documentation** 18:6 44:15 52:7 179:14 219:10
**documents** 53:24 54:6,18 56:19 219:22
**dog** 33:5,6
**Dominican** 9:21
**double** 12:2 15:9 16:6
**draft** 54:8 55:15 80:15 108:16
**drafts** 54:5 86:19
**drawing** 92:3 147:13 200:22
**drawings** 77:6,14 185:11
**drivers** 223:10
**due** 130:19 153:12 198:14 199:3
**duly** 4:3
**duly-elected** 42:11
**Duquesne** 9:13
**duty** 219:16
**dwelling** 135:12,14

### E

**e-mail** 47:18 49:11,14 50:10,17, 19,22
**e-mails** 47:23
**ear** 6:25
**eardrum** 6:25
**earlier** 83:10 115:6 172:3 193:19 212:15
**earth** 72:7
**easier** 78:21
**east** 4:21 120:17 137:4,18 138:20,21 156:10 159:16 213:18 233:16
**echo** 95:9
**economic** 10:12,22 11:7 31:6,7, 9 99:11 110:7 186:25 223:13 224:23 234:22
**educated** 11:13 21:14 199:15,17
**education** 11:4 20:3
**educational** 9:5,8 20:9
**effect** 80:6,12 168:24 223:24
**effective** 45:9
**effectively** 66:21 127:13 129:8 151:1
**elevations** 72:13

**eleven/2012** 24:18

**eliminating** 79:25

**Elysian** 134:17 135:7,19 136:8, 19,20 138:2,8,9,13,20,22,24,25 141:11,15 142:1,2,20 143:12 144:1,15 155:22 156:1 203:21 204:13 205:25 206:3 207:13 211:21

**Elysian's** 141:17

**emphasis** 9:17 27:22,23 28:2

**emphasize** 166:6

**employ** 42:14

**EMS** 47:8,11,12

**enacting** 65:14

**encompassing** 157:20

**encourages** 191:15

**end** 4:13 66:9 74:5,22 78:25 81:14 151:11,12 164:13,15 169:6 189:17 191:10,11,21 194:6

**ended** 37:18 87:14 135:1 214:6

**engage** 222:11

**engaged** 18:10 22:7 100:18

**engineer** 71:9 95:14 147:7,8 148:3,9,21 149:16

**engineers** 211:2

**ensure** 20:23 63:17 70:15 150:6

**ensuring** 18:7 176:10 199:19

**entire** 84:2 118:19 119:20,21 163:23

**entirety** 80:8

**entities** 42:12

**entrance** 147:17,22

**entry** 101:8

**equal** 18:7 135:18

**Erie** 95:25

**espoused** 230:25

**essentially** 10:10 51:13 74:18 92:17 118:4 154:3 222:4 233:14, 16

**established** 46:22 117:12 122:22 186:23,24

**establishes** 48:14

**establishments** 100:21,24 101:11

**estate** 98:5

**Estates** 164:2

**etymological** 27:24

**etymology** 27:12

**evaluating** 102:15

**Evans** 32:23

**evaporates** 231:18

**evening** 171:12,18

**event** 54:13 60:23 104:7

**events** 20:16 51:12

**eventually** 95:24 149:1 186:1

**evergreens** 120:18

**evidence** 148:1

**exact** 33:12 35:20 87:10,20 104:16 125:24 134:20 140:21,24 212:25

**EXAMINATION** 4:5

**examined** 4:4

**examples** 131:12 169:7

**exceeded** 132:4 166:18,19 167:8 187:9,15

**Excellence** 23:22

**exception** 187:10

**excited** 69:8

**excluded** 103:18

**exclusive** 84:24

**excuse** 43:22 44:17 47:9 49:4 73:25 164:16 192:8 201:25

**execute** 21:20

**exhibit** 5:11,15 56:7,9,11,13 57:20 69:21 70:5 76:13 90:17 100:3,4 114:18,19 115:19 136:3, 11 154:2 156:19,20,21 163:19 164:19,20 181:2 194:2 200:17 201:8,11 206:11 216:6 236:16

**exhibits** 8:22,23 55:23 64:21 114:24 116:8,24 117:3 148:2 193:18,19,20 236:20

**exist** 46:20 208:9 211:1

**existed** 142:5 164:19 171:11 219:25

**existing** 211:15 212:1

**exists** 155:22 192:19 207:11,23

**expectation** 73:23

**experience** 9:25 11:3

**experienced** 153:5

**experiences** 20:10

**experts** 98:5

**explain** 21:13 55:6 58:11 63:4 65:1 69:18 78:12 82:16 124:15 125:17 126:17 149:22 159:11

**explained** 60:25 95:18 121:25

**explaining** 58:16 69:5,16 96:4

**explains** 70:3 95:3,15 120:9 121:10

**exploring** 28:6,8

**expressed** 179:13

**expressing** 94:23

**extend** 61:4

**F**

**face** 51:13

**Facebook** 52:23

**facilitated** 22:2

**Facilitating** 45:18

**facilities** 10:14 100:19,22

**facility** 46:7

**fact** 121:6 202:8 225:5 226:19

**factually** 231:15

**faculty** 24:11,14

**failed** 222:6

**fair** 16:8,11,18,23 17:4,6,8,15,20 18:11,14 20:11 64:24 174:2 199:8 208:22 209:10 213:24 214:1,8 218:15,18

**fairly** 40:9

**fall** 39:6 97:8

**familiar** 16:7 90:20 98:21,23 125:16 136:14 212:24 232:19

**familiarity** 17:15

**familiarize** 39:23

**family** 11:25 12:1,22,25 13:1,20 15:5,21 16:2,4 159:8 160:5 164:9

**Farm** 10:21 32:23

**farmed** 230:24

**farming** 229:18 231:7,11

**farms** 10:14,20

**fast** 95:13

**fastest** 224:21

**favor** 66:10,16 75:6 76:15 79:9 87:11,12,14 118:11 146:7 152:8 153:12

**FAYETTE** 7:20 40:11 41:4 56:3 57:4 70:6 85:17 89:6,16,23 90:5 108:23 109:3,6,11,15,17,24 110:14,19 117:23 122:4 147:9 148:10 149:20 150:1 152:18,21 153:8 161:20 162:1 177:15 180:23 200:11 202:15 212:18 213:5 216:11 217:18 218:11 219:9,21 221:24 223:2,18 224:3 225:12 226:5,13 227:8 228:14 231:2,22 234:5 235:16,20

**Federal** 33:13,22

**feedback** 72:5 78:22 79:23,24 81:5 86:22 120:13

**feels** 74:11

**feet** 61:8,9 121:18 124:21 169:7

**felt** 128:6 163:14 165:19 187:18

**fiber** 47:4

**field** 10:13,18

**Fifteen** 39:12

**Fifty-nine** 213:5

**figure** 94:11 136:12 151:10 223:16

**figured** 112:22

**filed** 33:14 35:24

**final** 107:5

**financial** 186:11

**find** 26:11 30:6 64:2 80:11 95:2 155:6 196:22 235:12

**fine** 43:24 124:10 162:1 168:6 202:1 213:2

**finish** 144:16 223:2,4

**finished** 150:21 185:9 223:1

**fire** 47:4 74:8,18 120:20 160:10 162:12

**fiscal** 41:23,25 42:5,8,23,24 44:1,5,9 49:23 55:8,19

**fit** 127:3

**fitting** 72:25 74:12 126:23

**five-year** 206:9

**flaws** 191:17

**flexible** 222:23

**flow** 177:5,9

**focus** 97:17

**folds** 46:2

**folks** 42:14

**follow** 70:15 95:23 121:14 140:2,23

**foot** 124:20 167:18,23

**foresee** 234:2

**forever** 96:5

**form** 171:12,14

**formed** 31:9

**forms** 54:8

**forward** 48:4,5,7,8 69:8 78:14 84:4 87:19 88:23 91:3 166:7 190:7 225:2

**Foundation** 226:6,7

**FR-1** 137:17,21 138:4,5 141:7,9,18,20 142:7 143:12 144:18 159:14 161:2,5,8 204:7,21 205:13 206:1

**FR-1's** 205:1

**Franklin** 23:18,19,23 24:6

**free** 90:8 101:21 198:2 200:9

**front** 62:13 90:22 92:1 178:6 187:21 194:16 200:16 220:25 221:9,18,21 233:24

**front-loaded** 122:2

**frontage** 138:24

**fulfillment** 101:9

**full** 4:14 33:15 69:9 214:23

**functionality** 87:1

**functions** 42:13 84:23

**fundamental** 143:8 191:21

**future** 57:10 97:7,14 229:23 230:6

G

**garages** 122:3

**gateway** 184:24 185:1,5

**gave** 20:5 26:8 108:20 148:5 200:10 219:17

**general** 14:8 18:2 20:12,13 21:7 22:5,11,12,20 25:3 26:10,11 27:15 30:2 35:22 40:4 49:19 71:5,7,15 74:21 100:19 119:17 128:10,14 139:25 160:7 180:20 205:20 211:9

**generalities** 131:18

**generalize** 19:19

**generally** 35:14 40:2 43:17 55:17 64:15 98:23 128:11 158:7,10 160:1,8 184:24 187:6 198:16 211:7,25 231:19 232:14,16

**gentleman's** 197:4

**Germany** 28:4,16,25 29:19

**ghetto** 195:20,23 196:7,9,10,16,18,19,20

**gist** 41:15

**give** 21:16 32:11 81:6 87:8 135:17 154:21 182:5 200:24 219:19

**glancing** 155:5

**glass** 72:8

**good** 4:7 112:3,22 133:7 151:4 168:3 191:18 228:25

**goods** 100:20,22,23,25 101:5,17

**Google** 112:10,18 113:1,4,10

**government** 10:12
**grade** 5:9
**graduated** 9:22
**grandfather** 229:19 230:23,24 231:11,17,19 232:2,12,15,17
**grandfathered** 229:7,16
**grandfathering** 231:14
**granite** 120:13
**grant** 125:5,19 128:5 130:7 144:17 227:2,5
**granted** 63:21 225:4
**graphic** 93:14
**gray** 210:6
**great** 6:7 162:11
**green** 93:20,25 120:19
**ground** 64:22
**group** 31:21,23 49:14,25 101:12 103:22 220:5
**growing** 224:21,22
**growth** 35:13 222:18 224:20
**guess** 7:21 173:21 207:25
**guidance** 198:22
**guys** 69:23 117:12 147:7

**H**

**habit** 197:22 198:1
**half** 233:25
**halfway** 156:21
**hall** 47:5 48:10 103:23 107:2
**hand** 5:14 100:2 219:1,4
**Handbook** 21:23
**handed** 49:6 136:10 218:24 219:3,11
**handing** 56:16 100:7
**handle** 75:1 100:23
**handled** 149:9
**handwritten** 43:5
**happen** 69:24 87:9 115:25 118:20 119:20 210:14 211:4 225:10
**happened** 26:9 37:10,21 72:19 78:7 92:10 119:10,16 201:13 203:8 219:15
**happening** 25:12 54:13 58:12 104:3 120:2 206:7 221:23 223:17 230:14
**hard** 78:3 93:13 165:11 217:4
**Hardest** 173:18
**harmful** 200:3,7
**hatched** 207:1,5
**hazards** 105:2
**head** 11:23 24:2 197:11
**health** 128:10,13
**hear** 7:4 168:12 189:12
**heard** 86:21
**hearing** 7:1 54:7 57:25 70:13 73:14 86:21 91:12,13 102:7 123:15 189:13 194:9
**hearings** 52:23
**height** 159:21,23,24 160:2,8
**heights** 159:19 160:18
**held** 236:2
**helped** 47:3 48:15 51:2 179:4
**helpful** 7:4 133:15
**hereinafter** 4:3
**hey** 86:20
**high** 9:7,22 146:12 150:24 160:11 164:14 191:19,23 214:10 218:3
**high-end** 120:20
**higher** 133:18 137:21,22 159:19 160:18 187:15 188:6 211:4,8 217:6,12 223:7 225:11 226:18 227:7
**highest** 163:25 187:17
**highlighted** 93:7,24
**historical** 27:10 29:4,5 30:1,3 97:22,23
**history** 9:20 27:4,5,17 38:3
**hit** 106:10
**hits** 137:21
**HOA's** 97:9
**hold** 165:15 169:25
**Hollenback** 208:2
**home** 13:20 159:14 160:5 216:23 217:2
**homes** 32:23 137:17 138:7,14 155:23 156:6,15,16 159:14,15 211:16 217:14
**honestly** 6:22
**hoping** 17:24
**host** 10:12
**hot** 107:17
**hotel** 204:18
**hours** 71:20,23 105:20
**house** 195:15
**houses** 19:20
**housing** 13:6,9,25 16:8,11,18 17:4,6,8,15,20 18:5,14,20 20:11 136:14 204:19
**Housing-related** 16:23
**hovers** 63:22
**Hudson** 12:2 15:6,8 16:6
**huge** 199:8
**Huh-uh** 107:9
**hundred** 134:7,8,18,21
**hundreds** 67:10,13
**husband** 5:3 14:22,24 15:14,24 19:10,13 108:11
**hypertheoretical** 232:16

**I**

**idea** 103:17 153:2 230:14
**ideas** 176:6
**identification** 5:12 56:8,10,12,14 100:5 136:4
**identified** 102:13 103:2 230:12
**identifies** 202:8
**identify** 5:16 181:4

**II** 28:13,15,18 29:1,13
**illustrated** 206:10
**images** 221:4
**immediately** 138:10
**impact** 6:21 155:2 175:20 177:21 195:15
**impair** 6:9
**impairment** 6:19
**impasse** 192:24
**impermitable** 127:19,21
**implement** 208:19
**implemented** 63:9,14 115:10
**implements** 66:21
**implications** 28:17
**implied** 143:2
**important** 8:21 199:9 214:11
**impressed** 168:2
**impressive** 9:23 20:6
**in/out** 147:14 149:17 151:9 171:1
**in/right** 147:5 150:24 175:24
**in/turn** 176:20
**inaccurate** 86:6 88:3,5,6 167:19
**incidental** 101:17
**include** 101:6 120:15 204:8,14 213:21
**included** 10:11 99:25 101:22 110:17 154:15 220:5 234:24,25
**includes** 71:21
**including** 53:11 120:10 167:15
**income** 222:6
**incomplete** 172:1
**increase** 139:12,16 150:5
**increasing** 184:14
**indentation** 156:23
**independent** 42:12 130:19
**independently** 22:13
**Indiana** 11:25 12:1 14:12 17:23
**Indianola** 12:3 15:18,20
**indicating** 122:19 132:2 214:17
**indicative** 165:2
**individual** 32:16 33:8 84:25 103:15
**individually** 14:23,25 15:1 33:3,4 161:22
**industrial** 4:10 58:17 59:6,10 61:1,2,8,20 63:21 70:16 92:5,18 103:3 137:22 157:15 160:16,17 184:25 185:1,6 213:16 229:1,3
**industries** 101:22
**industry** 100:8 101:12
**influence** 86:16 87:2 200:5
**inform** 86:16
**informal** 107:3
**information** 51:7,9,16 52:17,18,19,20,24 53:1 54:16,17 81:7 123:8 148:6,7,13,15,17 149:6,25 158:5 168:10 169:21 171:2 177:20,23,24 178:19 179:3,7,10,11 180:19 182:6 203:5
**infrastructure** 146:14,22
**initial** 36:21 72:3 219:17
**initially** 36:19 46:21 49:18 150:10 179:19 188:4
**initiate** 47:4 48:15 223:15
**initiated** 127:6
**initiates** 81:8
**inquire** 29:21
**inquiring** 17:8
**inquisitive** 29:23
**insight** 42:3 163:17
**Inspector** 53:7
**Instagram** 49:1
**institutions** 24:12
**instructions** 8:12
**integrate** 78:20 79:23
**integration** 169:15 211:15
**intend** 8:3
**intended** 60:21 157:11
**intensity** 104:22
**interest** 20:23 61:11 124:11 198:7,10,15 199:5,13
**interested** 24:24 25:1 27:2,4 162:22 222:9
**interesting** 222:5
**interests** 224:19
**interim** 73:6 116:22
**International** 9:18
**Internet** 175:8
**interrupting** 147:20
**interruption** 78:2
**intersection** 136:23 175:25 176:17,21 177:6
**intrigued** 27:5
**introductory** 20:1 116:2
**inventory** 101:7
**invest** 160:14
**investigate** 17:16 36:1
**investigated** 26:8 37:7
**investigating** 27:18
**investigation** 23:5
**involve** 10:9
**involved** 10:10 19:11 25:4,20 27:1,10 30:8,14 32:3,7,8,15 54:12 80:25 81:18,21 83:4,7,11,13,16 85:3 86:5,10,11 114:18 204:16 212:24
**involves** 202:22
**involving** 32:22,24
**irrelevant** 131:9,11
**Irrespective** 145:25
**issue** 7:25 47:22 74:19 87:16,20 97:12 142:18,19 147:8 154:4,11 155:2 158:3 169:20 175:14,21 181:20 182:21 186:12 189:13 190:20 191:21 192:3 203:23
**issued** 189:10
**issues** 7:1 22:24 27:1 74:9 84:3,25 85:15 118:3 155:6 175:15 191:14 192:2 197:24 200:8 224:23

**item** 33:19 125:24

**items** 10:1 21:13 30:11 51:10 54:9 70:12 74:2,7 174:6 176:10

J

**January** 23:13 24:20,23 30:13 112:14

**Jason** 196:25 197:8

**Jasper** 197:5,14,15,18 198:6 199:7

**JEDD** 182:8 183:7,11,13 186:4,6

**JEDD's** 222:11

**job** 42:17 223:16,20

**jobs** 21:15

**join** 182:8

**joint** 78:18

**Josh** 4:11

**JR** 4:12

**judgment** 146:10

**jumped** 68:22 143:12

**jumping** 78:4

**June** 181:5 193:3 235:7,19

**justified** 184:14

K

**keeper** 41:24

**keeping** 100:25 128:9

**Ken** 26:20 36:6 45:12,13 228:14

**Kentucky** 9:9

**kidding** 223:3

**kind** 12:20 24:3,15 33:20 40:4 46:2 70:3 127:14 128:1 168:5 177:5

**kinds** 18:5 86:23 105:3 176:10 224:23

**knew** 62:1 148:16

**knowing** 17:23 184:12

**knowledge** 33:9 37:3 54:1 57:19 60:8,9 80:13 103:16 137:5 180:12 216:3 218:24 221:20

**knowledgeable** 86:2

L

**LA** 7:20 40:11 41:4 56:3 57:4 70:6 85:17 89:6,16,23 90:5 108:23 109:3,6,11,15,17,24 110:14,19 117:23 122:4 147:9 148:10 149:20 150:1 152:18,21 153:8 161:20 162:1 177:15 180:23 200:11 202:15 212:18 213:5 216:11 217:18 218:11 219:9,21 221:24 223:2,18 224:3 225:12 226:5,13 227:8 228:14 231:2,22 234:5 235:16,20

**labeling** 101:6

**Lackey** 61:3 148:20 155:24 156:7,9,22 167:16 174:8 175:17, 20 176:1,17,19 195:15 207:25 213:17 233:15,16

**Lamb** 30:23 31:4 187:1

**land** 10:2 11:14 27:8 52:21 67:2 78:19 79:6,10,14,16,17,19,25 80:11,14,16 81:4 82:22 85:2 164:22 165:3 184:12 191:15 192:19,22 210:11,16 212:21 222:14 223:12 224:1 232:21 233:5 234:4

**landowners** 167:16 223:25 233:3

**lane** 32:25

**lapse** 178:15

**larger** 211:25 221:6

**lastly** 8:13

**late** 34:19 39:5

**law** 17:4 20:22

**lawful** 4:2

**laws** 16:8,11 17:9,20 20:22 22:17,20,21

**lawsuit** 22:25 23:6,7 33:12 35:23 36:5,17 37:2,4,13,17 62:16

**layout** 93:12 168:3

**Leadership** 10:8

**leading** 149:8

**learn** 51:14 52:3,4

**learned** 8:22 27:9 182:6

**learning** 6:20 18:14 27:11,12,16 107:19

**left** 6:25 32:25 38:4 170:13 177:2 209:3

**left-hand** 164:1

**legal** 4:15 65:14 91:18,23 93:4 153:17 198:22,23 199:21,25

**legislative** 20:20 63:10,13 65:5, 8,9,18 66:4,13,18

**legislature** 21:2

**lengthy** 71:7

**letter** 70:2,3,10,11,17,20,25 74:8, 19 97:16 181:13

**letting** 91:8 225:21

**level** 20:18,24 21:1 33:23 38:23 46:10 133:16 222:7

**levies** 222:7

**liaison** 46:4,5,6,7,13,16,25 47:1 48:15 50:3 81:17,20 84:1,11,25 85:3,13,14 86:1,17 87:1,6 105:10 132:20 142:16 161:23,25 199:1 230:4,10

**liaisons** 45:24 84:23

**lifelong** 27:15

**light** 57:6 101:8 148:19,22 149:1 164:12 177:6

**lighting** 68:17 70:14 71:12

**lights** 195:3,16

**likes** 120:24 183:20 184:2

**liking** 121:23

**limit** 148:16 151:9

**limits** 147:16 148:4

**line-by-line** 115:22

**lines** 205:15 207:2 229:15

**lining** 137:17

**Linkedin** 49:2

**list** 9:23 20:5 72:23,25 97:23 204:11 205:24 215:14

**listed** 14:18 52:12 125:25 203:11,

13,15,16,17

**listening** 105:24

**listing** 201:12

**litigation** 32:4,7,8,15 38:2

**live** 52:2,8

**lives** 5:1 195:13,14 197:10,12

**LLC** 32:24 62:17 75:18,22

**loading** 68:17

**Local** 5:8 31:19

**located** 11:17 101:21 126:7 136:8 138:1 195:6 213:16

**location** 94:24 97:13 126:3 135:25 136:18 137:24 211:15

**locations** 71:11

**logistic** 101:15

**logistics** 101:4,6,13

**long** 20:5 23:11,23 24:17 50:12 72:23 86:10,11,12 91:17 95:6

**longer** 50:18 171:10 207:8 232:5

**looked** 10:25 18:1 22:17,23 38:15 39:4,6 99:8 150:9 190:1

**lost** 116:25 226:9

**lot** 52:10 55:22 151:1 163:10 176:6 189:14 208:23 209:1 218:3 222:1

**lots** 202:2,3,13,18,21

**loud** 8:16,19 91:6

**low** 133:17 164:9

**lower** 19:6 159:19 164:13 171:24 186:14 191:1,7

**lunch** 153:21,24

**luxurious** 162:13 168:14,23 169:1

**luxury** 168:14,20 169:6,19

**M**

**M-I-N-T** 113:25

**Maag** 31:2,4,10

**mad** 26:1

**made** 65:11 69:12 70:14,25 78:18 80:23 120:14 130:21 163:10 170:2 172:7,21 179:11 188:2,19 234:14,16,18

**magnifying** 91:7

**mailbox** 71:11

**main** 165:18,24 166:3,6

**maintain** 186:2 222:13

**maintenance** 97:7,14 186:1,6,9

**major** 210:2 215:6 225:1

**make** 13:3 14:15 35:7 61:17 75:4 76:24 79:3,5 85:21 86:18,20,21 90:21 95:4 127:2 133:9 178:7 197:22,24 198:1 199:3,16 232:11 234:3

**makes** 25:25 48:12 193:20

**making** 18:10 20:15 60:13 76:12 85:4,6 89:24 96:14 109:6 145:16 167:11 197:19 198:21

**manage** 177:8

**managed** 50:3,5

**management** 101:8

**Mann** 71:8 95:3

**manner** 18:11 95:23

**manual** 21:17,21

**manufactured** 216:23 217:2

**map** 53:18 163:23 164:6,25 188:22 201:6 206:10,25 208:1,23 211:19 212:5,7,8 213:3 214:15, 21,22 218:4,5 220:7,23 233:23

**maps** 218:17

**March** 106:21,22 235:8

**Margolius** 4:12 55:25 181:3 235:25

**mark** 31:18 55:23 71:8

**marked** 5:11,15 56:7,9,11,13 100:3,4 136:3,10

**market** 19:6

**marking** 101:10,19

**master** 9:12,14,16

**match** 55:13

**material** 11:11 219:25

**materials** 44:2

**matter** 22:25 45:23 132:21 146:8 186:20 188:10

**matters** 84:24

**mauled** 33:6

**maximum** 160:2

**meaning** 72:4 109:22 133:15

**means** 18:2 19:6 185:2,5,6

**meant** 65:18 171:17

**mechanisms** 14:19

**media** 48:1,6 49:1

**medical** 6:8

**medication** 6:12

**medications** 6:16

**meet** 74:11

**meeting** 35:6 38:11,14 39:2 41:7, 16,17 42:21 43:6,10,16,18,23 44:4,6,8,16 51:11 54:23 55:1,3,7, 9,14 56:16 60:7,20 78:19,23 86:23 91:1 94:7 104:25 105:5,12, 14 107:3,8,15,18,21 108:11 109:2 122:15 151:19,20,24 152:14 163:15 170:8 174:12,14 175:11, 12 179:20,24 180:5,7,11 181:6,16 182:5 183:4 235:22 236:9

**meetings** 39:10 40:10,17,21,24 41:3 43:21 44:6,12 45:18,19 83:22 106:11 163:9 174:17 236:6

**meets** 64:19

**Meghan** 4:1,16

**member** 200:3

**members** 21:7

**mention** 177:1

**mentioned** 83:17 131:25 152:5 153:1 169:24 170:9 176:23,24 194:25 235:9,23

**mentioning** 37:23

**mentions** 95:7 168:23

**merchandise** 100:20

**Mess** 47:10

**message** 49:14
**met** 34:15,18 35:4 105:17
**metes** 74:9,19
**Metro** 203:22 204:19
**MF** 202:2,11,13,17,18
**microphone** 48:9
**microphones** 49:8
**mid** 19:5 68:23 118:17
**middle** 68:24 98:19 209:3
**migrate** 50:24
**minds** 192:16
**minimum** 124:20
**minor** 9:20
**minorities** 19:21
**Mint** 113:22,24,25 114:1,4
**minute** 56:16 90:23,24 95:14 123:5 180:6 236:8
**minutes** 38:11,14 39:2,8,13,20, 21,22 40:7,8,18,23 41:1,7,11,21, 23 42:1,20,21 43:8,13,20,21 44:6 51:11 54:19,23 55:7,10,15,18,19 56:17,25 57:16,18 58:12 59:1 60:5,11,14,20 78:3 92:8 95:4 105:13 116:15 124:2 127:4 151:20 153:15,16 154:3,21 155:13 163:5,15 170:2,9,14,16,20 172:24 190:24,25 194:1,13,16,24 235:7,9,22 236:5,9,11,24
**missed** 98:18
**mistake** 205:17
**mistaken** 104:5
**misunderstood** 98:4
**mitigate** 176:7
**mitigation** 151:1
**mixed** 35:16,18 58:18 59:12,18, 21 77:6 82:7,9 118:23 188:3
**mobile** 112:19 113:2,5,13,18,22 114:1,5,10
**modified** 72:2
**moment** 56:22 97:17 102:13 103:1 133:13,20 171:19 182:1 194:19 200:25
**money** 37:19 42:15
**Montgomery** 31:20
**month** 106:4,14,16
**months** 174:15
**morning** 4:7 226:8
**motion** 69:12 75:4 79:5 88:23 114:21 193:11,16,20
**mound** 120:18
**move** 69:8,23 77:18 160:20
**moved** 97:5 204:7 230:15
**movement** 137:20
**moving** 27:8 50:19,22 78:14
**multi-family** 118:18 119:8,19 120:3,4 201:19 202:3,6,21,23 203:7 206:25 207:1,5,16 208:5,9, 11 210:24 211:11 215:13,17,18, 21,24 216:1,14 218:8 220:22 221:7,14 223:8 225:9 232:24
**multi-use** 94:6,13,20 169:16
**multi-zoned** 216:4
**municipalities** 98:6 130:18 131:7
**muted** 72:6

**N**

**Nagy** 4:11 57:10
**NAIC** 72:24
**NAICS** 67:14,24 74:10,20,21 98:1,10 99:3,9 100:9 103:25 104:15 105:22 115:22 159:4
**named** 75:22 108:7
**names** 27:11
**narrative** 94:19
**narrower** 90:7
**nature** 14:6 18:17 25:23 47:23 53:9 54:20 68:18 136:1 137:19
**NBBJ** 31:23
**necessarily** 29:6 55:5 92:18 154:23 199:6
**needed** 149:25 155:18,21 163:17
**needing** 160:13
**negative** 28:7 29:11
**negotiations** 185:15
**neighbor's** 33:5
**neighborhood** 25:2,5 27:2 30:8, 15
**neighbors** 25:8 26:4,6 30:5 83:20,21 120:17
**network** 113:9
**newsletter** 52:10
**Newsletters** 51:10
**night** 147:1 169:18 172:15 193:6
**Nineteen** 23:25 24:1
**nods** 24:2
**noise** 71:19,23 189:14 195:3,16
**nonconforming** 229:8
**north** 100:8 136:21,23 138:7,22 157:5 207:12 208:13 209:25 213:19 217:24 218:1
**northeast** 136:22
**note** 109:7 122:19
**notes** 42:25 43:5,14 60:13 218:22 219:6,12,18,22
**notification** 5:18 52:22
**nuanced** 224:6
**number** 5:16 25:6,17 36:24 59:20 69:21 74:13 87:15 90:17,25 97:18 104:16 111:22 112:1,2,7,8, 10,11,12,20,21,22 113:5,6 114:2 116:16 132:24 134:20 136:11 137:17 154:2 159:15 161:19 163:19 181:2 184:17 188:16 193:9 200:17,18 201:9 227:21 236:16
**number-wise** 134:24
**numbering** 97:19
**numbers** 39:12 56:21 111:17,23, 24,25 114:10 117:13,15 126:8 172:1
**numerous** 21:25 179:6

Case: 2:24-cv-03761-JLG-KAJ Doc #: 102 Filed: 08/28/26 Page: 259 of 347 PAGEID #: 3364




**O**

**O'BRIEN** 26:20 45:8 69:13,24 75:5 79:4 86:9 87:5,12 95:7,11 97:6 120:23 123:1,2,6 124:13 132:6 146:5 183:18 193:21 195:1

**O'Brien's** 123:22

**object** 7:20,21 70:7 161:21

**objected** 188:7

**objection** 40:11 41:4 85:17 89:6,16,20 122:4 147:9 148:10 149:20 150:1 152:18 153:8 177:15 180:23 212:18 217:18 218:11 219:9,21 221:24 223:18 224:3 225:12 226:5,14 227:8 231:2,22 234:5

**objective** 7:9 8:1

**observed** 43:3

**obtain** 108:18

**occasion** 14:4 35:3

**occupation** 23:9 24:7

**occupations** 23:15 24:10

**occurred** 36:24 41:3 65:3 67:2

**occurs** 77:22

**OCPUD** 205:12 215:20

**ODOT** 150:19 151:7,22 152:1,9 153:1 171:2 173:13 174:16 179:1,11,21,22 180:1,3 227:20 235:8,13,23 236:11,22,23

**ODOT's** 174:3

**officer** 41:23,25 42:5,8,23,24 44:2,5,9 49:23 55:8,20 230:10

**official** 53:24 54:18,25 55:7,9,14 92:8

**officials** 30:18,20 31:12 39:21 42:11 52:11 83:18

**Oftentimes** 81:13

**Ohio** 4:22 9:21 11:18 13:6,8 18:4 21:3,22,23 22:15 29:4,5 95:25 125:22 224:22

**Ohio-erie** 96:22,24

**Olentangy** 5:8 31:19 232:20 234:11

**omitted** 60:18

**ongoing** 219:16

**ongoings** 174:3

**online** 51:15 55:12 99:8 109:10 113:4

**open** 67:11 68:18 71:10 93:15 118:10 120:19 166:19 170:13

**operate** 42:12 130:19

**operating** 79:20 100:18

**opinion** 65:10 161:24 230:7,9,21

**opportunity** 18:8

**opposed** 77:2 230:16

**opted** 63:6

**option** 128:2 233:11

**options** 161:10,13 232:4,6

**Orange** 134:1 150:13,17,22 153:5

**oranges** 131:6 132:1

**order** 13:3 78:10 85:8 101:8 161:18 232:10

**original** 120:9

**originally** 33:14 82:9 139:11

**outcome** 140:14

**outlined** 72:7

**outstanding** 74:3

**over-layering** 129:15

**overcame** 194:6

**overlaid** 65:19 214:18

**overlap** 233:17

**overlaps** 24:3

**overlay** 59:10 61:1 62:24 63:7,15,18 65:17 70:16 82:19,23 88:25 89:2 92:5 103:4,10 126:10,19 127:1,10,13 128:6,16,23 129:1,6,8,12 130:9 139:17,19,21,22,24 140:3,11,12,20 141:19,20,21 143:3,15,21 144:1,4,8,12 145:16,20 146:3 157:15 160:16,17,19 167:22 191:14 192:2,8,18,21 199:8 208:12,19,20 211:9,13,18 213:16 220:12,18,22 221:12 229:4 230:12 232:21 233:5,7 234:10,19

**overlayer** 65:20

**overlays** 210:14,15 218:10

**oversee** 81:12

**oversees** 31:11

**oversight** 87:2

**owned** 14:23 15:13,24 18:22

**owners** 97:9 98:7 223:15 230:18 234:7

**owns** 232:20

**P**

**p.m.** 56:6 71:20 153:22 181:11 200:14

**pack** 101:9

**packaging** 101:9

**packet** 44:1,11

**pages** 118:2,4

**paper** 123:4,15

**paperwork** 62:12 108:14 166:16

**paragraph** 60:24 61:18 70:11 74:4 95:6 98:13 116:2 152:5 183:18 184:11,19

**parameter** 137:11

**parameters** 199:17,20

**parcel** 61:19 62:7 63:21 65:19 66:11 91:19 92:25 126:24 132:25 136:1 146:14 159:22 192:22 221:11 226:21 229:1,22 232:20,23 233:11

**parcels** 210:19 213:20 221:5

**park** 10:24 25:19,21 26:3,25 30:5,19 31:8,14,25 35:13 53:14,17 63:8,14 64:8 65:17 77:3 81:22 82:4,19,21,22,25 83:6,7,12 84:2,6,12 85:8,14 86:5,13 87:22,23 88:25 103:10 106:11 107:3,10 110:18 122:20,22 126:4 127:1 134:6,10 135:2,4,22 139:22 140:1,3,10,20 142:8 143:2,5,7,14 144:4 149:5 150:10,20 153:6 157:12,18,19 167:11,22,25 184:25 185:1,6 186:3 192:17,18,21 199:7,12 208:12 211:6 212:3,

7,8,16 218:10 230:11

**parking** 68:17 124:18 181:23 182:2

**parks** 46:5,14,20

**parkway** 61:5 96:2 147:17,21 174:5 185:9 197:13

**part** 4:18 10:18 20:22 22:5,6 47:19 57:1 64:13,16 67:20 68:23 70:21 72:15 74:5 76:13 83:6 98:19 106:4 107:5 109:9 114:5 116:9 137:8 157:11 167:23 175:7 186:3 191:12 206:16 207:8 208:2, 11 209:3,22 226:10

**participate** 183:11 198:14 200:4 233:4 234:9

**participated** 198:19 235:4

**participating** 198:7

**parts** 107:5 196:3 235:4

**party** 8:4 102:16

**passed** 55:2 65:16 84:6 86:13 103:14 107:4 215:21 229:4

**passing** 87:14

**past** 81:6

**path** 94:6,20,24 95:15,16,23 96:4, 6,11,17,20 97:3 169:16

**paths** 94:13 95:8

**pathways** 120:20

**pattern** 206:10,19

**patterns** 200:23

**Paul** 38:10 108:22

**pause** 165:19

**pay** 185:13,19

**paying** 37:18

**payment** 185:24

**pedestrian** 96:2 154:24

**pending** 33:13 203:1

**penicillin** 6:13

**people** 8:15 18:8,25 53:2 99:14 102:6 108:1 111:11,21 197:23 223:11 224:14,16

**percent** 93:18 120:19 139:12 192:25

**percentage** 139:9,16

**performance** 101:18

**period** 39:11 77:20 113:20 206:9

**permissibility** 227:12

**permit** 127:22 129:2,3 133:3 227:15 229:14

**permitable** 130:11

**permits** 14:6 52:19 160:18 225:11

**permitted** 67:15,25 103:3,4 132:24 133:1,4 143:15 229:10,17

**person** 29:23 43:12 60:13 80:10 81:21 197:7 198:11 230:4

**personal** 4:23 112:2

**personally** 15:25 16:7

**persuasive** 152:17

**perused** 39:4,5

**Ph.d.** 9:10

**philosophy** 9:10,13,17,20 200:2

**phone** 50:11 111:19,22 113:2,8, 10 114:2

**phrased** 172:10

**physical** 4:23 123:12,14 168:4

**physically** 11:10 219:7

**Piatt** 32:25 33:1

**pick** 101:9 232:9

**pick-up** 25:8

**picks** 94:15

**picture** 92:21,23 93:10,16 208:17

**pictures** 52:12 213:1

**piece** 93:4 123:4,14

**pinpoint** 107:18

**pit** 162:12

**pits** 120:20

**place** 61:14 63:10 65:21 66:1,4,7 97:3 103:11 163:22 164:3,14 210:15 211:4 222:18

**places** 125:15,18 226:17

**plaintiffs'** 5:11,15 56:7,9,11,13 100:4 136:3,11

**plan** 52:21 71:7 77:21 78:15,20 79:3,6,10,15,16,17,19,20 80:1,4, 5,11,12,14,16,20 81:4 82:8,9 85:2,16 87:18 115:10 120:10 124:13 128:6,9 136:13 138:3 147:4 157:13 164:22 165:4 183:20 184:2 188:13 191:15,17, 18 200:19,21 209:8 212:9,12,21 213:3 215:15 217:8 220:8 229:24 233:24 234:22

**plank** 120:12

**planned** 129:21 199:11 208:11 209:10 211:8 227:13,14

**planning** 70:13,18 109:21 110:4 120:14 121:7,15 122:12 151:3 165:1,6,9,16 187:3 188:15,17 198:6 201:8 230:11

**Planning's** 80:18

**plans** 222:8

**Platt** 30:23 31:4,6,9 105:18 108:5,6,20 110:8 187:2

**play** 160:17

**played** 46:4,17

**plays** 45:16

**Plunkett** 61:6 213:19

**point** 8:23 16:20 17:25 29:22 58:13 60:2 66:8,13 71:16 73:6,16 79:15 80:9 99:13,22 115:1,7,17 116:11 120:17 124:4 131:4,11 132:3,7 141:6 142:6 148:8 149:10 152:15,25 157:9,22 162:24 163:8 165:19 167:3 168:23 171:8 179:23 186:18 190:21 192:23 196:11,19 212:7

**pointed** 152:15

**pointing** 8:25 68:21 157:1

**points** 8:8 26:16 150:13,23 151:5

**policies** 47:22 51:18,19,22

**policy** 47:25 48:1,6,14,16,19 57:25

**population** 136:12 164:6,18

**portion** 62:5 92:18 93:19,23,24 118:19 119:8,19 132:13 162:4 166:24 187:12 189:21 221:18,19, 21 224:11 226:2,11 229:3

**portions** 210:2

**position** 45:9 103:21
**positive** 106:9
**possibility** 119:15
**possibly** 214:18
**post** 52:22 54:1,5
**post-covid** 107:6
**posted** 51:19 53:22 54:14 55:11, 15,18 86:19 105:16 107:22
**postpone** 194:5
**postponed** 168:8
**potential** 73:25 74:1 98:7 105:2 169:14,15 222:11
**potentially** 95:25 128:1 160:14 177:6 200:9 203:24
**PR** 127:14
**practice** 199:9
**practices** 18:8,12 22:1
**PRD** 126:2,10,18 127:15,25 128:16 129:15,19,23,24 130:8 173:1 204:7,9,11,21 205:12 206:1,3
**PRD's** 205:2
**precedence** 193:19
**precedent** 130:25 133:11
**preceding** 69:19 115:19
**preliminary** 87:18
**preparation** 40:25 44:3,12 190:2
**prepare** 38:9
**prepared** 44:7 165:9,16 201:7
**preparing** 43:20 57:1
**present** 23:13 34:22 40:17,20 42:22 84:4 104:9
**presenting** 68:14 146:2
**presently** 230:23
**pretty** 25:3 45:20 53:21 81:1 125:16 170:1 176:20 218:7
**prevailed** 35:24 37:17
**prevalent** 131:24
**previous** 107:23
**previously** 57:17,19 60:3 69:20 72:14 81:19 97:23 100:13 105:7 112:14 154:8 163:13 192:5 232:7
**price** 18:24 101:9,18
**Primarily** 100:18
**primary** 12:12 31:1 70:12 103:1
**principal** 34:25
**print** 57:2 91:8 184:21
**printed** 108:15,17
**printing** 92:11
**prior** 23:14 24:5,23 30:25 31:14 35:19 36:4 72:19 94:7 102:7 103:11 112:17,20 113:21,22 124:4 128:21 171:3 183:10 194:1, 2 201:8 227:19
**private** 94:21
**privilege** 7:22 8:1
**privy** 185:14
**problem** 109:9 132:3 151:12 169:5 177:14 178:1 186:13,20 225:2
**procedure** 64:9,12 65:3,13 82:25
**procedures** 22:1 58:19 65:22
**process** 12:20 15:11 19:9,13 41:19 42:4 43:4,19 50:25 53:20 63:9,17,25 64:2,3,7 65:13,24 66:5,6,12,14 68:3 69:6,17 78:16 79:1 81:1,3,13,18 82:12,14,19 126:2,4 127:8 131:13 140:3,12, 21,24,25 143:9 144:8,12 146:2 178:12 179:23 190:11 221:17 233:6 235:5
**procure** 47:17
**procured** 47:3 102:6
**product** 150:21
**production** 56:19
**products** 100:21
**program** 10:4,6,9,10
**project** 61:2 69:8 82:7 118:11,19, 24 119:20,21 179:8 225:7 227:22
**projection** 183:14
**projects** 174:17
**promoted** 173:25
**promoting** 128:10
**pronounce** 27:13
**pronunciate** 27:13,14
**pronunciation** 27:19 29:20
**properties** 4:9 16:3,4,13,14 17:17 18:23 32:22 33:19 34:1,8 35:1 37:11 58:2 60:25 71:9 88:24 97:9 114:22 144:3 176:18 199:11 205:21 206:4,20 220:14 221:7
**Properties'** 201:16
**property** 12:10 14:9 15:8 17:21, 23 33:5 61:3 63:6 67:12 94:21 97:1 102:18 135:20,21 136:19,20, 25 137:16,18,25 139:4 140:5 143:25 155:25 156:13 168:5 211:3 217:15,17,21 220:10,15,17 221:1,18 223:14 230:18 234:7
**proposed** 61:7 79:18 81:15 82:8, 9,12 151:16 184:13 188:25 189:8 206:23 208:10,16,17
**proposes** 61:4
**prosecutor** 219:5
**protect** 167:16
**protocol** 15:22,23 58:16 91:17
**proud** 69:9
**provide** 32:18 35:5 41:7 42:3 44:10 51:7,16 54:15 100:22 101:3,12 198:3 210:17,22 222:2 223:6
**provided** 5:19 21:21 74:15 131:12 133:15 144:19 163:16 164:25 220:2 222:16 228:5,8,23
**provider** 50:11 113:13
**providing** 63:12 128:18 219:24
**proximity** 147:19
**public** 35:5,7,10 51:8 56:18 57:25 94:20,24 95:8 109:1,12 110:16 118:8,10 128:11,14 191:12 197:19,24 198:2,3 200:4, 7,10 218:25 219:11,24
**PUD** 129:17,21
**pull** 124:9
**pull-down** 66:4 115:2,7

**pulled** 66:10 81:23

**pulling** 66:6,11,25 82:13 192:12, 14

**purchase** 12:4 17:16

**purchased** 14:16,17 15:8,20 16:13,16 17:21,22,23

**purplish** 164:4

**purports** 90:25 100:7

**purpose** 51:5 54:10 70:12 79:21

**purposes** 16:5 42:13 54:8 229:2

**pursuant** 6:1

**pursue** 198:12

**pursuing** 199:24

**put** 28:2 95:15,16 103:10 139:25 154:5 197:19 211:19

**Q**

**quad** 77:3

**qualified** 89:9

**qualifying** 19:8

**quality** 146:22

**question** 7:8,11,13 8:9 12:21 13:18 17:1,11 22:16 32:2,13 37:24 40:13,15 49:5 64:5 69:3,4 71:19 72:2 73:8,10 75:20 85:25 88:9,11,15,20 89:7,11,12,18 90:4, 7 123:7 140:17,18 141:24 144:16 149:13,14 150:2 154:6,12 158:17, 19 161:3 162:3 166:3 170:21,22 173:18 178:10,24 181:23,24 183:2 189:20 195:5 196:2 199:22, 25 204:24 205:1,5,20 217:16 218:14 221:17 223:1,4 224:6,9 225:17,18,24 226:1,15,17 231:4, 14

**questioned** 169:7

**questioning** 198:12

**questions** 6:10,20,22 7:7,10,16, 18 8:5 14:9,12 15:7 20:1 26:4,5,6, 7,10 30:4 32:10 39:24 73:5,15 152:23 225:22

**quick** 56:3 91:5 212:15

**quote** 169:5,6

**R**

**R-10** 135:7,9,11,13 136:9 138:2, 23 139:18,19,21,22,23,25 143:12, 15 144:1 211:16,20 214:19 234:3, 14

**R-10's** 214:17 234:19

**R-20** 144:22

**R-4** 122:21 123:25 144:5,7,17 145:2,6,8,20,25 146:6 162:15 172:17 184:13 187:25 188:22 189:3 195:19 196:4 211:17 214:16,19

**R-4's** 234:19

**Rad** 213:22

**Raehll** 4:1,16 130:17 152:5 184:12

**Raiff** 31:18

**railroad** 209:4,5,25 210:20 222:4

**raised** 7:25 73:6

**range** 19:3 101:3

**Ravines** 156:12 157:3,4,5

**reach** 26:14 173:12

**reached** 26:17 99:9,13

**reaching** 26:12 173:23

**react** 162:9

**read** 78:8 95:13 100:15 115:22 132:14 162:5 166:25 187:13 189:22 224:12 226:1,3,12

**reading** 78:21 182:18 183:25

**reads** 97:15

**ready** 169:18

**real** 74:22 98:5 112:3

**realities** 224:23

**reason** 5:23 7:15,17 40:6,25 41:10 55:18,21 60:17 145:5 171:13 182:15 227:18

**reasonable** 148:8

**reasons** 17:8 26:1 39:25

**recall** 10:19 31:13,17,19,22,23 32:1,17,19 35:14,20 36:21 38:4,5 39:11 49:9 61:14,16 62:9,10 75:13,14,23 77:5 87:15,16,20,21 104:16 105:19,20 106:1,6 107:22 108:9 123:20 124:23,24 131:22 155:15 164:25 169:22 170:19 172:12 184:9 188:5 190:4,5 194:12,15 214:4

**receive** 6:5 182:11

**received** 56:17 61:10 92:13 154:13 181:12 183:10

**recent** 9:6

**recently** 222:6

**recess** 56:5 75:2 77:19 116:12 153:21 200:13

**recognize** 56:24 145:15

**recognized** 166:16 220:11

**recognizing** 128:22

**recollect** 37:16 106:20

**recollection** 35:22 71:14 104:3,9 106:5 107:16 110:2 123:22 194:18

**recommendation** 48:4,5,7 86:4 88:12,18,22 89:10,13,15 122:13, 14 123:9,23 124:3 127:5 186:25 189:2 198:24

**recommendations** 48:21 87:6 88:21 121:15 123:3 126:11,19

**recommended** 121:8 122:21 123:25 124:2

**recommending** 190:6

**reconsider** 178:8 179:4 190:22, 24 191:2 222:8

**reconsideration** 178:13,16

**record** 4:15 41:24 54:25 55:24 56:1 70:21 72:15 78:8,21 89:21, 25 91:9 97:17 132:14 153:14,24 162:5 166:25 187:13 189:22 218:25 219:12,24 224:12 226:3, 12 228:12 236:1,3

**recorded** 60:7,10

**recording** 43:4 60:12

**recordings** 43:1

**records** 42:20 53:24 56:18 109:1,13 110:17 114:4

**recovering** 6:14

**recuse** 199:10,14,18
**redesign** 32:25
**reduced** 188:13
**reduction** 120:15
**Reed** 61:4 147:17,21 156:13,23 157:2,5 185:8 197:13
**reference** 57:24 167:10 212:6,12 213:10,11
**referenced** 76:6 150:18 154:23 176:9 213:7
**references** 130:20
**referencing** 58:8 60:2 120:5 155:4 159:25 212:20 213:12,14, 15
**referendum** 65:6
**referred** 74:20 101:4 131:21 200:17
**referring** 25:11 29:2 30:21 33:25 53:4 61:25 62:20,22 67:17,22 74:8 99:18,23 105:6 119:22 122:25 123:6 126:12,16 131:3,20 156:6,14,19 157:6 164:23 169:9 187:25 195:4,17 201:20 209:17 211:12 219:7 233:23
**reflect** 194:13
**reflected** 170:9
**reframe** 162:3
**refresh** 194:18
**refrigerated** 100:20
**refute** 41:10
**regard** 5:19 11:5,14 16:24 20:3, 10 26:3 37:13 41:2 46:25 52:14, 15 53:1,13,16 58:2 59:6 86:2 89:19 99:16 108:25 155:14 175:12 181:13,20 220:8 233:22
**Regional** 70:18 80:18 109:20 110:4,7 121:7 122:12 165:1,6,9, 16 187:2 188:15,17 198:6 201:7
**regrettable** 162:16
**regular** 112:18
**regularly** 111:10 175:13
**reiteration** 163:11
**reject** 48:19 78:14 79:1,5
**rejected** 79:14
**rejecting** 79:10,17,18
**relate** 121:22 195:6
**related** 10:2 16:8,11 20:18 21:25 22:24 23:6,7 30:14,18 32:23 35:12 47:22 62:4 84:19 85:14 87:18 88:23 101:5 102:22,24 110:17 117:14 129:17 150:9 151:21,25 153:3 154:7 168:5 176:10 177:20 205:1 232:7,14 235:13
**relates** 14:11 21:5 62:13 63:5 82:2 132:20 206:24
**relation** 176:18
**relationship** 137:11 176:17
**relative** 158:25
**relay** 20:4
**relevancy** 88:1
**relevant** 23:4 159:2
**reliable** 54:17
**religion** 9:17
**religions** 9:18
**rely** 51:21
**relying** 85:11,20 86:1,16 123:18 187:5
**remainder** 106:11
**remember** 11:22,24 18:21 29:9 38:7 87:10 104:7 106:14 108:21 134:19 188:9 198:9 199:15 212:25
**renderings** 72:12
**rent** 13:20 18:16,25 19:5,21
**rentable** 215:19
**rental** 11:15,16 12:11,17,20 13:3 14:3,14,15 15:4 16:5,8,11,24 17:25 18:3,9 76:3 129:4 130:2,3, 5,12 134:25 181:24 182:3
**rentals** 18:24 19:4 216:25
**rented** 216:24 221:20
**renting** 19:18
**rents** 18:15
**repeat** 6:19 7:7 17:12 187:11 231:3
**repetitiveness** 163:11
**rephrase** 7:8 40:12 89:5 119:13
**report** 42:8
**reports** 42:6
**represent** 92:12 122:1 224:18 235:12
**representation** 91:5 93:12 94:4
**represented** 20:24 93:16
**representing** 92:20,23 93:20
**represents** 49:22
**request** 56:18 71:1 93:17 94:7 109:1,13 110:17 145:15 179:10 218:25 219:12,24
**requested** 68:8 74:14 109:1 115:15 132:9,13 145:9 162:4 166:24 168:9 169:25 187:12 189:21 224:11 226:2,11
**requesting** 124:17 125:2 126:10, 18 128:16
**require** 6:19 8:23
**required** 73:1 166:18,20
**requires** 63:8 231:20
**reread** 189:20
**research** 20:12,14 21:8,13,18 22:6,11,12,20 26:11 28:21 30:1,2, 3 98:24 99:19 153:17 175:8
**researched** 100:13
**residence** 4:24 12:13,22,25 13:2 16:17 75:17
**residences** 75:10,14 82:17,18 83:1 89:1 93:2 117:21 119:4,23, 25 120:6 129:3 193:17 211:16 212:1
**resident** 29:9 52:11 83:13 107:20 108:7 195:2 235:5
**residential** 62:4 129:25 130:1,3 158:12 159:6,8 203:21 204:18 214:18
**residents** 29:8 103:22 105:18 146:23 198:2
**residents'** 224:19

**resigning** 45:8

**resolution** 52:20 55:3 58:14 64:14,16,18 66:24 67:21 69:19 70:1 75:9 84:13 116:16,17,18 117:2,6,13 125:8,11,20,23 128:24 167:6,13 193:9,10 212:20 223:23

**resolutions** 54:19 55:2 116:23 117:16

**resolved** 73:17,22 171:8 173:6 198:11

**resolving** 171:17

**resource** 54:11

**resources** 52:11

**respect** 28:15,16 185:6

**respectfully** 169:10

**respective** 87:3 198:13

**respond** 95:19

**responded** 219:23

**response** 70:17

**responsibilities** 16:23 21:19 45:22

**responsibility** 100:24 224:18

**responsible** 85:4,6 87:1 107:21 224:16

**responsive** 225:16

**restored** 14:18 15:10,22

**restriction** 71:20,23 127:25

**result** 5:25 29:12 64:23 66:17 81:14 103:12 182:10 225:5

**results** 8:4

**resurfacing** 33:1

**resurrect** 230:25

**revamped** 47:2

**revenue** 183:13

**reverse** 7:2

**review** 20:22 38:13 39:1,3 40:2,18 44:15 51:20 57:12 63:2,17,25 64:20 66:7 67:1 68:3,16 69:6 72:4 75:16 79:11 119:11 140:12 143:14 144:9 235:22 236:8,19

**reviewed** 11:11 23:1,3 38:11 39:14 40:9,22,24 43:21,22 56:25 57:17,19 76:25 143:25 236:5

**reviewing** 23:4 40:23 77:10 127:4 155:8 190:4

**reviews** 201:13

**Revised** 125:22

**revisit** 191:16

**rezone** 143:24

**rezoned** 208:18

**rezoning** 65:20,21 66:1,3

**right-hand** 202:13 207:4,17 220:11

**right-of-way** 95:8 97:8

**RJ** 59:3 60:25 133:15 162:14 168:16,22,23 169:25 187:20

**road** 33:1 61:5,6 96:16 138:7,23 155:24 156:8,9,13,22,23,24 157:2,5,8 158:1,2 167:17 185:9 186:1 195:16 207:12,18,24 209:4,24,25 213:17,19 215:12,16 217:24 218:1

**roads** 105:2 146:22,23 149:7 152:2 171:5

**roadway** 157:12 185:18

**roadways** 211:1

**Rob** 30:23 31:4,6,9 105:18 108:4,5,20 110:8 187:1

**Robert** 30:22 31:3

**Rockford** 32:22

**role** 24:6 45:15 46:24 47:14,21 48:3 81:17 173:22

**roles** 21:20 24:9,10 31:5 46:4,9,13,17

**Roloson** 158:2

**Ron** 34:10,21,22,24 36:6,7,22 37:16 45:12 59:3

**Ronald** 26:20

**room** 7:4 169:12,13

**Rose** 31:20,21

**rotate** 45:7,10

**roughly** 14:3 118:17 188:11 213:19 214:2

**route** 4:21 96:1 164:1

**running** 71:21

**ruptured** 6:25

## S

**Sabatino** 4:12 34:11,13,21,22,24 35:4 36:22 59:3 60:25 61:10 70:9 71:8,22 72:11,18 97:15,25 118:18 119:18 124:14 130:18 131:13 146:2 152:4,5 169:8,10 181:13 186:13,17 191:6,13 192:1,24

**Sabatino's** 70:2

**safe** 95:23 128:10

**safety** 128:10,14 146:15,17,19 147:23 149:17 150:6 151:23,25 152:7 153:4,12 154:7,10,25 155:7,14 160:6,8,15 163:4 170:24,25 180:15 194:10,21 195:9,23 227:24

**Sanders** 31:24 99:10 123:13

**satisfactory** 95:2 154:13,20

**scale** 164:13,15

**schedule** 78:18

**school** 5:6,8 9:7,22 232:20 234:4

**schools** 31:19 155:2

**scope** 17:3 33:15 130:14

**Scott** 31:24,25 99:9 123:13

**season** 107:16

**second-guess** 148:9

**second-guessing** 147:7 148:12

**seconded** 69:13

**seconds** 69:24 75:5 193:21

**secretary** 53:6,7

**section** 131:23 132:8 209:18 212:14,15,17

**sections** 209:21 213:7

**secure** 100:25

**security** 48:9

**seek** 172:25

**seeking** 141:10 199:20

**selected** 103:25
**sell** 100:23
**Seminary** 9:15
**send** 44:6 49:15,20
**sending** 70:10,11
**sense** 36:23 40:5 80:19 84:18,22 95:4 186:5,8,9 234:3
**sentence** 62:20 69:11 70:24 74:21 118:20 119:12,22 121:11, 13 128:20 182:24 183:25
**separate** 67:20 112:20 113:5,7 114:10 116:16
**separately** 112:18
**September** 45:9
**series** 219:18
**serve** 46:8 197:23
**served** 24:11
**service** 113:3
**services** 50:6,9 101:4,5,6,13,16, 18,21 114:8 160:15 209:8 210:17, 22,25
**serving** 24:13 25:1
**sessions** 21:25
**set** 117:15
**setback** 124:18
**sets** 148:4
**sewer** 31:11 209:7 210:17,25 222:2
**Shanahan** 207:18,20
**shared** 180:10
**sharing** 27:16
**shift** 28:18
**shifted** 28:12
**Shire** 203:18 205:11 215:20
**short-term** 134:25 204:18
**shortest** 120:17
**show** 147:14 152:3 179:10 198:3 206:19
**showed** 105:19 107:24 169:8 188:22
**showing** 92:16 206:23
**shown** 185:10
**shows** 164:14 201:18 220:23
**sic** 115:19 142:22
**side** 15:10 57:7 92:1 96:2 101:14 138:12,17 156:10,11 202:13 207:4 220:11 222:19
**sidewalks** 154:14
**siding** 120:12
**signed** 113:3
**significant** 37:5 134:24 159:15 208:13
**significantly** 178:19
**similar** 24:15 61:16 81:18 100:14 144:9 151:12 215:14 217:14,20
**simple** 70:14 218:7 221:16
**simply** 141:16 149:3
**simultaneously** 49:16
**single** 11:25 12:1,22,25 13:1,20 15:5,21 16:2,3,4 77:4 103:24 159:7 160:5 163:22 164:9 216:9
**single-family** 212:1
**sir** 108:23 170:22
**site** 80:18 82:8
**sites** 10:15
**sitting** 105:21 151:18
**situation** 25:7 106:2 138:6 150:12 168:6 176:11 222:12
**Sixth** 5:10
**size** 168:21,25 183:19
**Skinner** 10:21
**small** 57:2,3 91:8 165:12 184:21 201:6 205:16
**Smaller** 39:12
**Smart** 48:7 49:2,7
**soccer** 30:9,11
**social** 48:1,6,25
**society** 27:10 29:4,5
**sole** 50:16,18
**solely** 189:3
**solid** 163:17
**solution** 65:14 177:8
**solving** 151:11
**son** 5:3,4,7
**son's** 30:9,11
**sought** 204:7
**sounded** 148:25
**Sounds** 139:11
**south** 61:6 137:1,18 156:11,12 159:16 197:12 207:24 209:3,4,20 210:4 213:20 215:3
**southern** 208:2
**southwest** 164:16 215:8 216:5
**space** 68:18 71:10 93:16,20,25 120:19 166:19 210:5
**space/central** 120:19
**spaces** 68:17
**spacing** 121:5 159:18 161:16 171:5
**speak** 6:24 7:2,3 104:24 111:5 131:14 153:15 170:16,18 174:7, 14 175:11,13 229:25
**speaker** 58:21
**speaking** 31:17,18,19,22,23 55:17 58:25 71:3 91:6 196:12,13 198:18 232:15
**spec** 101:25 102:4
**specialist** 9:8
**specific** 16:25 21:10 22:6,24 53:1 102:16 104:8 118:3 127:3 132:18 158:5 159:3,22 175:25 177:21,22 180:21 228:2
**specifically** 72:2,10 103:17 104:24 151:8 154:22 156:6 160:16 174:8 175:18 185:16 213:15
**specifics** 10:19 99:2 131:19
**speculate** 102:12 162:7 173:9 187:19 223:14 234:10
**speculation** 145:1,3,7 162:25
**speech** 200:9

**speed** 147:16 148:4,16

**spell** 4:17 50:7 174:23

**spelled** 173:17

**spent** 174:2

**split** 87:11 88:10 214:4

**spoke** 29:9 30:16,17 38:10 99:10,11 110:24 174:9,11,13 175:5,10,22

**spoken** 31:2 163:9 174:14 180:11,12

**spot** 125:24 176:14

**spring** 39:6

**square** 61:8,9 121:18 124:12,15, 20,21 169:7

**staff** 53:2,3 81:7,8 86:18

**stainless** 120:12

**standpoint** 16:1,3 17:5 30:10 32:3 39:1 42:20 106:18 138:19 151:19 155:21 157:24 160:21 166:15 175:19 196:15

**stands** 59:9 89:20

**start** 79:1 205:13

**started** 50:15 112:11 137:6 204:6 222:8

**starting** 161:1

**starts** 115:19 116:3

**state** 4:14,21 9:5,10 11:18 13:6,8 18:5 20:17,24 21:1 22:22 32:21 33:15,18,23 61:4 79:16 136:23 138:7,22 148:20 155:24 156:7,9, 22 167:17 174:9 175:21 176:1,17, 19 195:16 207:12,24 213:18 217:24 218:1 224:22 233:15,17

**State-36/37** 175:17

**stated** 118:18 119:18 169:5 186:17 187:3 192:3

**statement** 52:14 96:13 119:18 133:9 139:14 152:9 186:21 189:24 195:25 196:3 218:2,19

**statements** 59:4

**states** 70:25

**Station** 209:4

**statutory** 125:21

**stay** 20:16 97:7

**stayed** 150:6

**staying** 209:6

**steel** 120:12

**steps** 45:13

**sticking** 228:21

**stop** 221:23 223:17

**stopped** 149:10 231:10,16 232:13

**stops** 231:25 232:1

**storage** 98:21 99:3,24 100:19 101:13,17,20 104:12,13,14

**store** 100:22

**storing** 100:24

**story** 77:4

**straight** 210:4

**stream** 152:12

**street** 139:2 195:13,14 215:7

**streets** 27:12

**strep** 6:14

**stricken** 104:10

**strike** 12:5 40:7 127:18,21 138:21 206:2

**striking** 104:17

**struck** 104:13,17

**structure** 72:3

**stub** 157:9

**student** 13:25

**studied** 86:3

**studies** 150:8

**study** 147:6 148:23 177:25

**studying** 83:7 170:20

**stuff** 171:1

**subdivision** 156:11 158:1 206:23

**subdivisions** 208:18

**subject** 22:25 45:23 65:6 115:9 132:20

**submit** 167:21

**submitted** 114:22 157:13 166:13

**subpoena** 6:2

**subsector** 101:22

**subsequent** 117:6

**subsequently** 14:13 220:13

**substantial** 61:11 191:16

**substantive** 78:17

**substantively** 178:20

**sued** 34:8

**sufficient** 29:25 122:23 191:7

**sufficiently** 176:21

**suggest** 49:13 104:5

**suggested** 73:1 90:18 190:15, 17,18

**suggesting** 85:23 93:3 139:23 147:25 186:14

**suggestion** 49:18

**summaries** 60:21

**summarize** 91:16 126:20

**summary** 41:8 61:16 63:5 71:6 119:15 152:11,13

**summer/early** 39:6

**Sunbury** 134:1 174:5 207:3,6 220:10 221:13

**super** 74:24

**superimposed** 92:4

**Superintendent** 31:18

**supervising** 86:18

**supervisory** 84:19

**supplement** 219:16

**support** 160:15 166:17 186:4 227:22

**supported** 171:10

**surprised** 104:6

**Sutton** 200:17

**Sweeney** 158:1 209:24 213:17

**sworn** 4:3

**System** 100:9

**systems** 117:16

### T

**T&r** 4:8 32:21 33:19 34:1,8,25 37:10 58:2 60:25 63:6 69:4,8 71:9 82:2,6 88:21,24 89:19 90:13 114:22 136:25 137:16,18,25 139:4 142:23 144:3 176:18 201:16 204:16 205:7,21 206:4,19 217:21,23,25 218:23

**T&r's** 88:2 95:14

**T-U-R-K-O-W** 174:19

**T-U-R-K-O-W-S-K-I** 173:19

**table** 4:13 154:5 189:17

**takes** 43:5 65:21 66:1,3,7

**taking** 61:14 149:16 193:19 210:15

**talk** 46:23 134:3 169:24 174:17 175:16 179:22 227:20

**talked** 83:18,19,20,21 147:1 160:13 171:6 176:16 177:3 180:9, 21 204:6

**talking** 25:25 29:6 33:12,16 67:14 77:16 93:25 94:13 98:9,10, 20 105:13,23 113:21 116:17 118:25 119:3,5 132:9 133:22,24, 25 134:1,2 137:14 141:1,11,14 147:21,22 151:19 154:1 163:6 174:3 179:20 194:2 201:9 209:19 216:11,20

**talks** 121:13

**tangent** 90:24

**tasks** 185:17

**tax** 222:6,17

**Teaching** 23:22 24:15

**team** 30:9,11

**tear** 105:1

**technical** 96:13 128:23

**technologically** 50:2

**technology** 46:6,14,24 47:1,14, 15,19,24 48:3 49:9

**technology-wise** 50:24

**telephone** 111:17,21

**telling** 30:1 102:16 141:21 143:13

**tells** 102:8

**ten** 39:12,18,19 97:18 98:13 118:9 135:14,18 137:8 139:7 141:7 155:1,3,8,11,12 161:11,12 169:4 202:9

**tenants** 13:14,16 18:16 19:8,16 102:2,6,12

**tenth** 91:13

**term** 59:21 149:14 153:1 162:13

**terms** 7:16 12:10 18:8 19:17 41:11 59:16 168:10 171:1 188:12 223:11

**testified** 112:15 128:3 152:1 158:20 170:12 172:3 192:5 225:3 227:2 228:1

**testify** 140:13

**testifying** 205:9

**testimony** 17:14 38:3,19,22 54:14 63:20 83:10 85:7 90:12 96:18,19 104:4 110:23 115:7 119:12 122:1 123:5 128:22 130:7 143:2 153:10 154:19 159:9,10 171:3 177:11,17,19 179:2 180:2,6 189:1 227:19 228:3 231:16 232:13 233:9

**text** 111:7,8,16,21

**texting** 111:11

**Theological** 9:15

**theology** 200:1

**theoretical** 231:17

**theoretically** 229:6,9

**theory** 230:24

**thereabouts** 25:15

**thing** 8:20 49:15 80:5 173:6

**things** 8:23 10:17 18:16 25:6,17 47:23 53:9,22 54:5,19 68:18 76:8 83:20 86:24 105:1,3 116:14 131:20,25 135:17 151:16 152:13 163:4,12 171:6

**thinking** 11:1 56:2 154:23,24 234:11

**Thomas** 26:19

**thought** 36:19 52:1 120:1,4 127:7 133:8 134:20 141:3 146:9 154:20 162:10 168:2,16,18 172:4 175:4 176:12

**thoughtful** 151:2

**thoughtfully** 79:23

**thoughts** 78:25

**thousand** 139:12

**threshold** 128:12

**throat** 6:14

**ticketing** 101:10

**tied** 117:14

**Tiffany** 31:2,4,10

**time** 12:24 13:7,17 14:2,14 16:20 17:16 18:1,4,20 25:9,11 26:23 29:16,19 30:22 31:8 32:1 34:15, 17 36:12,22 39:12 43:13 58:13,21 60:2 62:3 63:11,20 66:1 73:16,18, 23 77:4,7,20,24 79:2,15 80:8,9 82:2 84:2,3 86:10,11,12 96:8 98:25 99:22 101:23 102:13,15,24 103:2,6,9 108:16 110:11 113:20 115:8,18 119:11,24 120:2,5 124:4,12 146:16,20 151:18 154:13 155:15 156:2,3 162:14 164:19,20,21,23 165:3 168:11 169:23 170:7 174:3 178:5,16,21 183:16 186:18 187:1 188:4,8 190:9,21 197:18 198:11 199:2 202:7 210:13 215:11 219:25 221:20 233:2 234:24

**times** 8:7 179:6

**tinier** 221:9

**tiny** 165:13

**titling** 59:19

**today** 6:1,5,10,16,23 7:9,16 8:5 9:2 34:22 40:25 63:20 81:19 90:12 110:23 119:12 130:7 170:3, 12,24 176:14 180:22 189:1 190:2 201:9 233:9

**today's** 5:20 38:9

**told** 25:18 28:3 34:10,15 35:23 37:20 145:8 149:17 183:6 225:6

**Tom** 26:19

**tones** 72:7

**tonight** 61:20 193:1

**Tony** 173:16,24 178:2

**Tony's** 173:22

**tool** 82:23

**tools** 47:19

**top** 11:23 93:6 94:16 197:11 202:12,17

**topic** 35:10

**topics** 10:23 122:10

**topography** 187:7

**total** 61:7 202:9 214:24

**touches** 139:4

**tour** 10:14

**tower** 32:24

**Towerco** 32:24

**townhome** 76:23

**townhomes** 76:7,20,21,22 77:1 120:25 121:2,23

**township** 8:6 20:21,22 21:4,22, 23 22:15 23:10,11 25:12 27:6,7 29:7 34:2,9 37:18 39:21 41:24 44:10 46:1,7,11,15 47:2,5,7 48:10 50:4,23 51:8,14,18,23 52:2,3,5,9, 15 53:25 75:10,15 77:21 83:19 84:10,23 86:12 95:9 97:10 103:23 105:10 107:2 109:2,20,23 110:3, 11 114:23 117:21 131:1,7 133:11, 24 134:2,4,5 137:8 150:23 153:5 161:14 164:8 174:17 181:6 182:8, 11 183:9,15 185:19,21,25 186:3, 24 190:7 193:18 200:19,23 201:14 203:8 207:9,18 208:6,24 209:6 215:7,10 220:16 221:8 224:2,17 226:18,21 229:21,25 230:3

**township's** 81:22 110:9 133:23

**townships** 20:23 130:19 224:14, 15,21

**TPUD** 126:3,10,19 127:10,11,22, 24 128:6,16,23,25 129:6,8,20,23 130:1,8

**track** 116:25 210:20

**tracks** 209:4,5,25 222:4

**trade** 101:21

**traditional** 230:16

**traffic** 71:10 147:6,8 148:3,9,21, 22 149:16 150:7 154:9 176:7 177:5,9,25 195:3,16 211:2

**trafficked** 150:25

**Trail** 95:25 96:22,24

**trails** 31:25 46:5,20

**train** 47:20

**trained** 21:14

**training** 11:4 21:6,11

**transcription** 43:1

**transition** 137:12,15,25 155:18, 20 157:25 158:2,11,22,24 166:21 167:3

**transitional** 129:21 136:1 137:19 146:13 152:6 156:4,5 158:8 159:4,18 160:25 161:16 171:4

**transpired** 40:10 41:2 43:9 54:24 55:1

**transpires** 42:21

**transportation** 101:10

**trash** 25:7,8,17 26:25 30:7 71:11

**traversing** 215:10

**treat** 130:10

**Trinity** 9:18

**trips** 10:13,18

**trucks** 71:21

**true** 7:2 81:1 88:2 127:22 158:7, 16 164:10,18 182:17 197:12 198:4,16 205:21 206:25 218:16 222:21 223:6,9

**trust** 112:9

**trustee** 8:6 21:22 22:8 23:10,12 24:5,20,25 26:12,14 30:13 31:15 32:16,17 33:2 35:6 36:11,12 39:22 41:20 45:8 46:4 48:18 50:14 69:13 73:10 81:2 83:5,12 84:4,7,11 85:12 86:2,8,9,14 87:12,13 95:10,11 99:2 103:12, 16,24 104:2 105:10,16,17 108:3 111:12 112:1,4,6,8,12 114:10 142:15 146:5 168:17,24 198:17 199:1 200:1 203:5 208:7 217:10 221:22 224:18 230:4 235:1

**trustees** 21:6,11,14,19 25:9,11 26:22 30:6,16,17 36:4,16 38:18, 23 42:6 44:20 45:17,21,23,24 49:15,21,22 53:11 71:8 72:18 73:11,12 81:11 83:19 85:9 86:9 90:14 93:17 103:13 114:9 115:8 118:5,16 125:4 128:4 132:6 172:20 181:6,20 191:17 199:10 227:10 234:23

**trustees'** 39:20 78:23 223:20

**trusteeship** 46:16

**truthfully** 6:22

**Turkowski** 173:16 174:20 180:17

**turn** 32:25 57:20 91:21 145:23 147:5 150:12 176:20,22 177:2 181:1

**turned** 220:24 226:19

**turning** 146:23

**Turowski** 174:21,22

**Twelve** 135:12

**Twenty** 24:18 44:24 204:3

**Twenty-seventeen/2018** 25:15

**twenty-three** 44:24 45:3

**twenty-two** 204:3

**two-minute** 200:12

**two-story** 77:1

**type** 7:17 14:5 18:15 23:3 51:9 52:6 158:13,21 161:17 172:19

**types** 6:18 159:5

**typical** 44:3 113:1 127:17

**typically** 209:8

**typo** 197:2,16

**typos** 41:13,14,15

## U

**Uh-huh** 12:15 50:1 53:8 62:25 69:22 71:2 91:20,24 92:2 124:25 125:3 134:11

**ultimately** 127:2 190:24

**unanimous** 90:15
**unclear** 59:19 126:23
**uncommon** 8:15 175:16
**underneath** 221:6
**understand** 6:10 7:6 8:10 12:21 13:18 16:22 17:3,10,20 19:5 22:13 32:12 34:25 36:13 43:25 50:2,5 54:12 64:4 76:2 80:10 84:8,12 88:14 95:5,12 96:13 97:19 105:25 118:23,25 120:2 121:1 123:17 126:22 127:9 128:21 129:5 133:22 136:6 141:5, 8 142:13 145:11 149:13 150:14 158:17,20,24 161:3 163:5 165:22 168:3 170:18 172:18,19 176:9 178:10,23 184:21 185:8,12 192:1 196:1 212:23 217:10 225:18
**understanding** 17:3 27:16 28:11 41:22 82:1,13 83:5 106:19 126:21 132:16 150:4 151:7 158:6 163:18 199:25 233:2 234:7,21
**understood** 7:12 99:24 120:7 142:18 199:19
**undetermined** 97:3
**unfold** 58:19
**unhappy** 25:8
**unit** 12:11,17 13:3,23 14:14 18:3, 9 77:4 124:20 129:21 139:6 182:3
**units** 11:15,17,21 15:4 16:8,12, 24 120:15 121:12,16,17 124:12, 21 129:4 130:12 132:4,24 133:2 135:12,14 164:5,15 181:24 183:19 188:13 195:6 201:19
**University** 9:9,10,13,19,21 11:18 18:5 23:18,20,24 24:6
**unusual** 127:16
**updated** 72:13
**updating** 81:3
**upscale** 162:12
**usage** 48:9
**use-based** 230:15
**utilities** 211:1
**utilize** 17:24 67:12 123:2 230:19 233:6
**utilized** 82:24 127:14
**utilizing** 63:7

**V**

**valid** 196:23
**variance** 128:2,5 130:8 161:17 173:1 227:3,5,16 229:14
**variances** 124:17 125:2,5,19 225:4 226:16
**verbal** 111:1,4
**verbally** 8:16,19 179:15
**verbatim** 60:22
**version** 80:15
**versus** 45:16 214:5
**Vice** 45:13,16
**view** 8:8 33:21 81:22 93:5 132:1 141:6 148:25 162:15,20 196:11, 19 200:8
**virtual** 106:12
**virtually** 11:11
**vis-a-vis** 227:16
**Visible** 113:14,15,16,17 114:5
**visit** 10:20
**visited** 10:20,21
**voice** 112:10,18 113:1,4
**vote** 48:18 55:3 66:10,16 67:1 68:4 69:14 70:4 75:5 79:9 85:9 87:11,12 88:10,22 145:9,10 146:7 162:18 169:18,25 170:1 173:10 178:7,9 193:1,5,21,23 194:5 200:6 225:8
**voted** 76:14 87:5,11,14 145:23 146:25 166:13 173:7 178:3,5,11 224:14,17 225:14,20
**votes** 90:13

**W**

**wait** 118:8
**waiting** 183:15
**walkability** 154:14
**wanted** 28:18 35:5 40:4 48:25 49:1,2,7,8,20 51:14 52:2 90:21 123:2 126:24 137:20 147:12 148:6,7,13,16 149:5 150:3,14 161:16 165:19 168:12,14 169:2, 20 171:25 177:20,23 199:2 225:25 227:20 232:8 233:4,6 234:8,9
**wanting** 54:11 199:16
**War** 28:13,15,18,25 29:13
**warehouse** 58:17 59:6 98:11 100:21 101:25 104:14 115:9
**warehouses** 4:10 92:24 93:10
**warehousing** 98:13,20 99:3,24 100:19 101:12,16,20 104:11,12, 25
**warranted** 162:15
**Warsaw** 196:21
**was/is** 31:10
**water** 209:8 210:18,25 222:3
**ways** 18:2 167:15
**waywards** 104:18
**web** 100:8
**website** 47:2 51:3,6,21,24 52:4, 7,16,23 53:23 54:9 56:18,19 80:15 105:17 107:23 108:19 109:19,20,23 110:3,9,11
**weight** 131:15
**welfare** 128:11,14
**west** 93:1 209:5 210:20 213:18 217:24 218:1 222:3 233:15
**westward** 61:5
**whatsoever** 148:5
**Whetstone** 9:22
**white** 164:12 209:18 210:5
**widths** 151:4
**win-win** 222:11
**withdrawn** 203:1
**woman** 108:7
**won** 34:12
**wondered** 184:4
**word** 59:11 128:9 168:23
**word-for-word** 60:22

**wording** 104:12,14

**words** 93:5

**work** 18:4 21:3 23:18 45:23,25 51:11 81:10 84:10,12 114:11 182:21 187:4,18,21,22,24 190:8

**worked** 13:6 25:9,10 160:24 185:15

**workflow** 53:19 64:11,13

**working** 54:6 108:15

**works** 43:10

**World** 28:13,15,17,25 29:12

**worried** 104:23 149:24 178:2

**Worthington** 164:2 216:21

**write** 42:25 43:13 60:4 112:3

**written** 183:15

**wrong** 68:20 205:11

**Y**

**year** 12:6 25:14 78:25 82:10 106:4

**years** 18:22 23:25 34:2 35:24 36:24 40:3 46:3,15 81:6 151:11 152:12 153:6 178:1

**yellow** 164:12

**York** 9:11

**Youtube** 48:5

**Z**

**Zacks** 4:6,8 5:13 7:24 40:14,16 41:9 56:15 57:6,11 70:19 85:22 89:8,18 90:1,11 100:2,6 108:22, 24 109:4,9,12,16 110:1,12,16,20, 22 118:1 122:6 132:11,15 136:5 147:10 148:14 149:21 150:2,15 152:19,24 153:9,19,23,25 161:23 163:2 167:1 177:18 180:25 181:5, 7 187:16 189:19,25 200:15 202:17,20 212:22 213:8 216:13, 16 217:22 218:13 219:13 220:3 222:20 223:5,21 224:8,25 225:15 226:7,22 227:17 228:18 231:5,24 234:12 235:17,24 236:4

**zone** 171:4

**zoned** 12:24 64:22 215:25

**zones** 101:21 181:21

**zoning** 10:2 11:5,14 13:2 14:5 20:11,18,21 21:25 22:1,17,20 32:22 46:6,15 51:10 52:12,14,15, 16,18,20 53:2,3,5,6 63:7,8,11 64:13,16,18 65:15,18,19 66:24 67:3,5,21 81:7,8,17 82:23 83:22 84:3,13,19,24 86:1,10 87:6 88:10, 25 89:2 114:23 125:7,10,20,23 127:12 128:23 129:9,12,13 130:19 131:7 132:20 133:23 136:2 139:11 140:11 141:9,14,17 142:2,7,8,16 143:22 156:4,5 158:8 161:24 167:6 192:19,20,21 197:23 198:20 199:1,16 201:12 211:7,8 212:20 223:23 224:13,17 226:20 227:1,6 229:10,12 230:5, 10,16,19 233:7 234:10

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

PLAINTIFF'S EXHIBIT NO. 1

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

T&R Properties, Inc, et al.,
*Plaintiff*
v.
Berlin Township, et. al.,
*Defendant*

Civil Action No. 2:24-cv-03761

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: Trustee Megan Raehll

*(Name of person to whom this subpoena is directed)*

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Wesp Barwell Berardino<br>475 Metro Place South, Suite 350<br>Dublin, Ohio 43017 | Date and Time:<br>August 29, 2025 at 11:00am |
|---|---|

The deposition will be recorded by this method: stenographically

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 8/13/2025

*CLERK OF COURT*

OR

*Signature of Clerk or Deputy Clerk*

/s/ Joshua S. Nagy
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* , who issues or requests this subpoena, are:
Joshua Nagy - 475 Metro Place S., Suite 350, Dublin, OH 43017 - jnagy@wesplaw.com - (614) 204-2904
for Plaintiffs T & R Properties, Berlin Industrial LLC & co-counsel with Mr. Margolius for Berlin Apartments LLC

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 2:24-cv-03761

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* Joshua S. Nagy
on *(date)* 8/13/2025 .

☑ I served the subpoena by delivering a copy to the named individual as follows:
electronic mail upon counsel of record by agreed service
on *(date)* 8/13/2025 ; or

☐ I returned the subpoena unexecuted because:
.

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$ .

My fees are $ n/a for travel and $ n/a for services, for a total of $ 0 .

I declare under penalty of perjury that this information is true.

Date: 8/13/2025

/s/ Joshua S. Nagy
*Server's signature*

Joshua S. Nagy
*Printed name and title*

475 Metro Place S., Suite 350, Dublin, OH 43017
*Server's address*

Additional information regarding attempted service, etc.:

Print | Save As... | Add Attachment | Reset

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

**(i)** is a party or a party's officer; or

**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

PLAINTIFF'S EXHIBIT 2 8-29-25 MR

**BERLIN TOWNSHIP TRUSTEES**

5:30 p.m. **Trustee Meeting April 10, 2023**

**HELD AT:** This meeting was held at 3271 Cheshire Rd, Delaware, OH

**CALL TO ORDER:** Meghan Raehll, Trustee Chairman

**PLEDGE OF ALLEGIANCE:** Meghan Raehll led the Pledge of Allegiance

**ROLL CALL:** Meghan Raehll, Ken O'Brien, Ron Bullard, Claudia Smith, Fiscal Officer and Theresa Taylor, Fiscal Officer Assistant

**ATTENDANCE:** Jeff Leckrone, Joe Thomas, Chris Rinehart, RJ Sabatino, Mark Mann, Steve Cuckler and Chris Paykoff

**PUBLIC COMMENT:** Raehll "Now is the time for public comment and this period for public comment is unrelated to the hearing at 6:00 p.m. and at 7:00pm where the public will have the opportunity to provide comments specific to the development in question.

Those who wish to provide a comment outside of that hearing may come to the lectern, and provide your first name, last name, and address. Commentators will have 4 minutes each. Please note the board does not directly respond to comments or inquiries but topics may come up in the public meeting context and questions from residents can always be directed to the appropriate person or liaison outside of the public meetings".

There were no public comments.

**RESOLUTION 23-04-04** **APPROVE THE 03/27/23 REGULAR MEETING MINUTES, THE 04/03/23 SPECIAL MEETING MINUTES AND DISPENSE WITH THE READING**

Motion: O'Brien
Second: Raehll
Vote: O'Brien yes, Raehll yes and Bullard yes

Without objection, Raehll skipped down the to the zoning department on the agenda.

**Zoning Department-**

**Metro Development Extension Request-** Joe Thomas asked for an extension for the planned commercial district on Berlin Meadows. They have extended North Road by Shale Meadows elementary school but are having difficulties with lack of sewer in the commercial development. They had a couple different housing builders in contract for the single-family portion but due to Covid in March of 2020 they have backed out. These builders were supposed to help extend the sewer to this area. To bring the sewer to the area will be approximately $2.5 million dollars without help from the single-family portion of the development. Thomas is asking for a three-year extension on the planned commercial preliminary development plan to bring in a final development plan.

Raehll clarified that the request was for an extension of three years and not for any changes to the plan, to which Thomas answered yes. O'Brien's thoughts are that three years would not be necessary because all that needs to be completed is the final development plan to know what they are going to do and thinks a year would be sufficient. Bullard said that they have made quite a bit of progress and feels a year's extension would be enough. Raehll said that she is comfortable with an 18-month extension based on the progress that has been made and this is the first extension being requested. O'Brien would agree to an 18-month extension but that the applicant understands that this will be the only extension granted.

**RESOLUTION 23-04-05** **MOTION TO APPROVE AN EXTENSION OF BZC 19-001 PRELIMINARY PLAN TO OCTOBER 10, 2024, WITH THE ACKNOWLEDGEMENT BY THE APPLICANT THAT THIS WILL THE ONE-TIME REQUEST FOR AN EXTENSION ON THIS PROJECT**

Motion: Raehll
Second: O'Brien
Vote: O'Brien yes, Raehll yes and Bullard yes

Without objection, Raehll moved to the health insurance renewal topic in the old business section of the agenda.

**Old Business-**

**Health Insurance Renewal-** Jeff Leckrone explained that it was requested by the board to market the prices of other health insurance options. After doing this, Leckrone recommends staying with the current plan which will have an 8.9% increase for the year but remains one of the lowest costs for health insurance for the number of employees the township has. He said that most of the employees were happy with the benefits that they currently have. Raehll asked how much it would be to add EAP to the plan, Leckrone said it would be an additional $36/month but the life insurance currently with Principle would have to move to Anthem. O'Brien would like to wait until the next trustee meeting to make a final decision in order to speak with the fire department and allow more time for collective bargaining to review the plan.

**Additional Life Insurance-** The trustees were not interested in any additional life insurance.

*****5:45 P.M.*****TIME CERTAIN*****TOWER CO LITIGATION UPDATES******

**RESOLUTION 23-04-06** — **RECESS TO EXECUTIVE SESSION PURSUANT TO ORC 121.22 (G)(3) TO CONFERENCE WITH AN ATTORNEY FOR THE PUBLIC BODY CONCERNING DISPUTES INVOLVING THE PUBLIC BODY THAT ARE THE SUBJECT OF PENDING OR IMMINENT COURT ACTION – THREE TRUSTEES, THE FISCAL OFFICER, THE FISCAL OFFICER ASSISTANT AND CHRIS RINEHART TO ATTEND- 6:30 P.M.**

Motion: Raehll
Second: O'Brien
Vote: Raehll yes, Bullard yes and O'Brien yes

**RESOLUTION 23-04-07** — **MOTION TO RETURN TO REGULAR SESSION- 7:09 P.M.**

Motion: Bullard
Second: O'Brien
Vote: Raehll yes, Bullard yes and O'Brien yes

Raehll "We met in executive session and no decisions were made and no actions were taken".

**RESOLUTION 23-04-08** — **MOTION TO HAVE CHRIS RINEHART OF RINEHART LEGAL SERVICES AND AUTHORIZE TRUSTEE O'BRIEN TO ENGAGE IN DISCUSSIONS WITH COUNCIL RELATED TO OUR FEDERAL CASE CONCERNING REPRESENTATION AND TAKE ACTIONS AS NEEDED**

Motion: Raehll
Second: Bullard
Vote: Bullard yes, O'Brien yes and Raehll yes

*****7:00 P.M. TIME CERTAIN***T & R PROPERTIES BBP 23-001*********

Raehll called the BBP 23-001 Industrial Warehouse BIO and the Berlin Mixed Use development to order at 7:10 p.m.

Raehll said the following:

**<u>DRAFT: Board of Trustees Public Hearing Policy 3/13/23-12/31/23</u>**

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting April 10, 2023**

The following protocol shall be implemented for the Berlin Township Board of Trustee Public Hearings from March 13th, 2023 to December 31st, 2023.

First, the applicant shall provide a very brief presentation.

The presentation will be followed by public comments of those in favor of the proposal and those against the proposal.

In both cases, if any attendee wishes to provide comments or testimony, any comments or testimonies should be directed to the Chair only and should not seek to prevent the Board from accomplishing its business in a reasonably efficient manner.

All public comments should be no longer than 4 minutes. This limit is enforced for all participants regardless of whether in favor or against the proposed.

Attendees who provide public comment shall give their first and last name as well as their address clearly for the record prior to beginning comments.

The Board reserves the right to limit the scope of comment to the relevant subject matter, control disruptive or overly repetitive speakers.

Upon completion of the public comments, board members may provide followed up statements and/or inquiries and the applicant may choose to respond to any additional items before the Chair requests or brings forward a motion to the Board of Trustees.

RJ Sabatino from T & R Properties explained that this is for the Berlin Industrial Overlay application for an industrial project at the Chapman property at 36/37 and Lackey Old State. This development proposes to extend Reed Parkway westward for access to a road that will be called South Plunkett Road. The development proposed to have a total of 480,000 square feet of industrial, each building will be 120,000 square feet. Sabatino said that they have received substantial interest in the buildings.

Raehll clarified that the board is considering the one parcel with the industrial tonight only so there will be no comments regarding the other application. She said they are proposing to bring it in under the overlay, which is designated as an administrative review, this means the board is looking at checking the boxes and if it complies with the design standards. The other application for the rezone for the multi-family will go through our standard zoning procedures and will carry legislative weight. She wanted to make it clear that there is a differential to the applications.

Bullard is concerned that the definition and the boundary of the property is not clear and needs to be more defined.

Raehll said that the binder and letter from Sabatino need to be accepted with exhibit numbers.

**RESOLUTION 23-04-09** **MOTION TO ACCEPT THE BINDER THAT WAS PREVIOUSLY ACCEPTED FOR THE BBP 23-001 AS EXHIBIT #1**

Motion: Raehll
Second: O'Brien
Vote: Bullard yes, O'Brien yes and Raehll yes

**RESOLUTION 23-04-10** **MOTION TO ACCEPT MR. RJ SABATINO'S LETTER AS SENT ON MARCH 9, 2023 AS EXHIBIT #2**

Berlin Township Industrial Project Trustee
Hearing- Planning Commission Response

Applicant: T&R Properties

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting April 10, 2023**

Please allow this letter to enter into the record for applicant T&R Properties Berlin Industrial Overlay submittal to the Berlin Township Trustees and to serve as a response to Berlin Township's Planning Commission administrative review that took place on 2/28/2023.

T&R Properties is excited to move forward with this project, which will serve as a catalyst for the Berlin Industrial Park, along with the applicants separate (but co-dependent) multifamily submittal.

We are sending this letter with the primary purpose of clarifying items from our Planning Commission hearing and have made a simple change regarding lighting to ensure that we entirely follow the Berlin Industrial Overlay text.

Although our industrial submittal objectively meets all code requirements, the Planning Commission of the Township chose to vote "no" due to certain irregularities, errors, or misinterpretations of the Berlin Industrial Overlay text.

This letter serves to address the items as follows:

1. **Lighting**- T&R Properties submitted a lighting plan with 25' light poles which are industry standard. The BIO Code has a requirement that light poles cannot exceed 20' in height. We have changed our lighting plan and photometric plan to accommodate 20' light poles. This revision has been submitted.
2. **Parking Spaces**- The maxes and minimums are reversed in the BIO Code. Planning Commission chose not to interpret this as incorrect, despite acknowledging the error. We do not believe we require a variance for our parking space counts requested. This is standard industry amount parking spaces and will provide adequate parking spaces for the employees of these buildings.
3. **Truck Loading Spaces**-The BIO code states that buildings of our size shall be provided 2 truck loading spaces. We are providing 12 truck loading spaces as the industry standard is 1 per 10,000 sq ft. We have 12 spaces for a 120,000 sq ft building. We do not believe we need a variance for this request, but if we do then allow this to be a request for a variance.
4. **Open Space**- The total area that we are rezoning in our application is acres. Our total site area (excluding public right of way) is 65.47 acres. The open space that we are providing is 19.14 acres, a substantial 29.23%. We far exceed the Berlin Industrial Overlay text of 25%; to provide greater clarification we have created an exhibit to depict this open space which has been submitted for resubmission.

T&R Properties is excited to move forward on this project and is proud of its full compliance with the BIO. RJ SABATINO

Motion: Raehll
Second: O'Brien
Vote: O'Brien yes, Raehll yes and Bullard yes

The above letter states changes that were made upon the request of the ARB.

There was a lengthy discussion regarding the plan between the trustees, Sabatino, and Mark Mann, engineer for T & R Properties concerning the clarification of open space, traffic concerns, mailbox location and design, trash disposal and lighting.

Raehll asked if they were aware of the noise restriction hours being from 10:00 p.m.- 6:00 a.m., which includes the running of trucks. Sabatino confirmed that they would be following the noise restriction hours.

Raehll asked what specifically was modified in the initial design of the structure after the ARB's feedback. Sabatino said that they have muted the colors to more earthy tones as

outlined in the BIO along with glass. Raehll's said that the ARB specifically commented that the building design/style itself was dated. Sabatino committed to conceptual renderings of architectural elevations as displayed in the updated binder.

Below are what the trustees asked Sabatino to do and/or change before he comes back for potential approval on April 24th, 2023:

~Metes and Bounds description to be provided.
~Multi-Use along 36/37 end-to-end parcel.
~Visible headwalls will be covered with natural stone façade on inlets and outlets.
~Sidewalk on both sides of what is conceived to be South Plunkett.
~Central green space at 15% clearly defined.
~No external mailboxes, all mailboxes will be internal to building.
~Noise restriction acknowledgement.
~All lighting shall be downlighting and accommodate a 20-foot height and will not bleed into the road right-of-way.
~Commit to implementing conceptual rendering of what is displayed as architectural with non-peach but grayer tones.
~Up to date letter from the fire chief.
~Commit to adding a booster station or pump for a minimum of 1000 gallons per minute.
~Add NAICS codes that are fitting with the design of the building (this is not required but suggested).

The applicant is requesting to recess and continue the hearing to be able to make amendments to the application.

The four items that the trustees will be looking at are; the letter to the fire chief, the metes and bounds issue being addressed, any additional NAICS codes that the applicant feels is fitting with the design and would like to be considered by the board as well as the number of changes that will be requested by the applicant based on the discussion with the board as provided to them.

**RESOLUTION 23-04-11** **MOTION TO RECESS AND CONTINUE THE BBP 23-001 TO APRIL 24, 2023 AT 6:00 P.M. AT 3271 CHESHIRE ROAD, UPON THE APPLICANTS REQUEST**

Motion: Raehll
Second: O'Brien
Vote: O'Brien yes, Raehll yes and Bullard yes

**RESOLUTION 23-04-12** **MOTION TO ACCEPT BZC 23-003 RESIDENCES AT BERLIN TOWNSHIP BINDER AND MAKE IT EXHIBIT #1**

Motion: Raehll
Second: Bullard
Vote: Raehll yes, Bullard yes and O'Brien yes

**RESOLUTION 23-04-13** **MOTION TO SET DATE, TIME AND PLACE CERTAIN FOR BZC 23-003 RESIDENCES AT BERLIN TOWNSHIP TO APRIL 24, 2023 AT 7:00 P.M. AT 3271 CHESHIRE ROAD**

Motion: Raehll
Second: O'Brien
Vote: Raehll yes, Bullard yes and O'Brien yes

***Recess at 9:13 p.m. Returned at 9:20 p.m.***

***6:00 P.M.*TIME CERTAIN*BZC 22-003 Berlin Twp Comprehensive Land Use Plan***

Raehll called BZC 22-003 to order at 9:25 p.m.

Raehll explained that there are two course of actions that can be taken moving forward; they could reject the plan and have BZC take it up and begin the process over again so that they would be able to see the substantive changes that have been made or the board could schedule a joint meeting with the BZC and go over the land use plan together and integrate

their feedback within the context of the trustee's meeting and then approve those adjustments. Since the deadline is not until the end of the year, her thoughts are to reject it and let BZC start the process over so that they have ample time to go through the plan and make changes to it. O'Brien and Bullard agreed with her.

**RESOLUTION 23-04-14** **MOTION TO REJECT BZC 22-003 BERLIN TOWNSHIP COMPREHENSIVE LAND USE PLAN, WITH THANKS TO THE BZC FOR THE EXCELLENT WORK AND CONSIDERATION OF THE CURRENT DRAFT AND IN ANTICIPATION OF INITIATION OF THE UPDATE TO THE COMP PLAN BEING REVIEWED AND REINITIATED AT A LATER DATE, IN ORDER TO ALLEVIATE HAVING TO REDO IT AGAIN**

Motion: Raehll
Second: O'Brien
Vote: Bullard yes, O'Brien yes and Raehll yes

**RESOLUTION 23-04-15** **MOTION TO ADJOURN BZC 22-003 BERLIN TOWNSHIP COMPREHENSIVE LAND USE PLAN AT 9:33 P.M**

Motion: Raehll
Second: O'Brien
Vote: Bullard yes, O'Brien yes and Raehll yes

**Old Business Cont'd-**

**JEDD-** Raehll is waiting to hear back from Shawn McCarter. She will follow up with him.

**Call In Pay-** Bullard is working with Stucco to bring forth a motion for call in pay.

**Fairview Sign-** Bullard suggested a sign like the one that Olentangy High School has. Raehll asked him to look into the cost. Bullard will follow up.

**Fairview Lot Sales-** Bullard and Foor spoke to Stucco about selling lots to family members of those that are already buried in Fairview. Stucco is exploring options that may be available and will let Bullard know how to proceed.

**Asst. Cemetery Sexton-** Bullard has someone that he would like to ask if they would be interested in the position. He will contact them and bring an answer back to the board. Raehll wants to make sure that we also have an Assistant Cemetery Sexton for Fairview Cemetery as well as Cheshire Cemetery. She is going to confirm the job description and bring it back to the next trustee meeting and then they could potentially open the position and post it.

**Apparel Policy-** Egelhoff has completed the embroidery. Raehll will bring forward a shirt with the design at the next trustee meeting and then can adopt a policy.

**Grant Writer-** Raehll spoke with Alan Freeman and informed him that we did not want to pay him a monthly fee but rather pay him per grant that he completes, similarly to how Orange Township pays him. He said that originally Orange Township paid him a monthly fee for a certain amount of time and then switched over to the pay per contract. He indicated that there would be an initial $2,000 startup fee which would include consulting with all the prospects regarding grants and getting a sense of which ones he would recommend for our township and coming up with a grant writing plan. Smith asked if he had any statistics as to how many he applies for and then gets because she said that the fire department had hired one previously and we never received any grant money. Raehll will ask for some more information from him and bring answers back to the board.

**Hearing Policy-** Raehll stated that we are waiting to here about two key items; if it is an administrative review such as the one related to the BBP does that change anything compared to the legislative hearing and can we limit public comment for time for four minutes for adjacent property owners who received required notification and does that create a special standing for them such that we should not commit to public comment in legislative hearings. Stucco said that he does not think so but will have to get confirmation on that.

**Vacation Use Policy-** This will be discussed at the May 22, 2023 trustee meeting.

**Inventory Amounts-** Smith contacted three people and did not receive any confirmation. She will follow up with Stucco and ask for a more specific answer as to how much items need to cost before they are counted as inventory.

**Street Signs-** Bullard said that Peden completed the inventory for the street signs. It will cost approximately $100/sign to get a replacement sign. Peden is going to contact Victoria Veal and ask her to come up with a program for replacement of the signs. Bullard guesses that there will be approximately 70 signs that need to be replaced. Raehll is going to speak to Peden about finding out more information about getting 'Welcome to Berlin Township' signs and have him bring forth answers to the board.

O'Brien said that Sweeney Road is becoming a dumping ground by the railroad tracks. There are mattresses that have been tossed and now people are putting old TV's on those mattresses. He would like to get the trash removed and possibly put up 'No Littering' or 'Smile for the Camera' signs. Bullard suggested contacting the railroad since it is technically on their property and/or the health department.

| | |
|---|---|
| **RESOLUTION 23-04-16** | **MOTION TO AUTHORIZE TRUSTEE O'BRIEN TO FOLLOW UP WITH GARRETT GULLOZET FROM THE PUBLIC HEALTH DISTRICT CONCERNING THE LETTER TO THE RAILROAD COMPANY AND THE PUBLIC HEALTH CONCERNS ALONG SWEENEY ROAD ON THEIR PROPERTY** |

Motion: Raehll
Second: Bullard
Vote: O'Brien yes, Raehll yes and Bullard yes

**Meeting Video Recordings-** Smith said that she received a resolution from the prosecutor. O'Brien spoke with Stucco about this and he said that are two options available to proceed; we can make the recordings our minutes and they would be the established minutes and those would be our resolutions or we can have the recordings as our minutes and have a journal that would hold all the resolutions. He thinks that we need to state in our resolution that there is an understanding that what is written in the journal would be our officially adopted resolution, not what was said, because if there is a discrepancy one of them has to prevail. Raehll would like to take it slow in terms of what we are live streaming and when because unlike BZC and BZA our meetings run for quite a few hours and she does not want there to be any undue stress on the meetings. She would like to start with streaming the public hearings so that everyone can get used to it and make sure that everything goes smoothly. Raehll suggested that we try to stream the next public hearing on April 24, 2023 and then we can analyze how it worked.

**Fire Department-** Nothing new.

**Fiscal Officer Items-**

**March Bank Statement and Electronic Payments-** The March bank statement and electronic payments balanced and were signed by the trustees.

**Correct ARB Notetakers Pay-**

| | |
|---|---|
| **RESOLUTION 23-04-17** | **MOTION TO INCREASE THE PAY AS A CORRECTION FOR THERESA TAYLOR AND THERESA CANNON TO $17.53/HOUR, RELATED ARB NOTETAKER, EFFECTIVE IMMEDIATELY** |

Motion: Raehll
Second: O'Brien
Vote: O'Brien yes, Raehll yes and Bullard yes

**Cemetery-**

**Pontem Renewal-**

**RESOLUTION** **MOTION TO APPROVE THE RENEWAL SUBSCRIPTION FOR THE**

**BERLIN TOWNSHIP TRUSTEES**

5:30 p.m. **Trustee Meeting April 10, 2023**

**23-04-18 PONTEM SOFTWARE FOR $1350**

Motion: O'Brien
Second: Bullard
Vote: Raehll yes, Bullard yes and O'Brien yes

**Quotes for Filing Cabinets-** Bullard received a quote for fire retardant filing cabinets for $3,976. He is going to look further into them and get more information and bring it back to the board for consideration.

**Road Department-**

**OPWC-** Bullard spoke with Riedel and decided that there were not any roads that would qualify for grants this year.

Per Bullard's and Peden's meeting with Riedel, the county engineer's office will be fixing the culvert/bridge on Sherman Road with their own forces with some coordination by the roads department. Also, the county is looking into our recommendation of a grader patch to fix Winter Street with either a road contract or county forces. Peden will provide an update when more information is available.

**Trustee Items-** Nothing new.

**Zoning Department Cont'd-**

**March Zoning Report-** There are 10 new home builds for the month of March and the YTD is 32.

Bon said that an HOA wanted to remove a fence and Raehll asked him if it was part of the final development plan and it was. She asked what authority the trustees have in the matter to enforce that the fence not be removed since it was in the final development plan. Bullard said that he does not think we have any and O'Brien feels that we do since it is in the plan. Raehll will check the zoning text and follow up with Bon.

**Future Meetings-**
**04/12/23 Parks & Trails Meeting**
**04/13/23 MORPC Meeting**
**04/24/23 Trustee Meeting**
**05/08/23 Trustee Meeting**
**05/10/23 Parks & Trails Meeting**

**Late Items-** Raehll said that Stucco contacted her about signing an Opioid Settlement that we do not have any information on. She does not feel comfortable until we have the information in front of us and does not think that it will be any significant amount that would be worth it. If the amount is $500 or more, the trustees will have a special meeting to sign the papers and make a resolution.

Smith asked if we needed to allocate money for the OTARMA attorney. O'Brien said that we have to pay a deductible, which is 10% of the bill. O'Brien will follow up and find out what needs to be paid.

**RESOLUTION 23-04-19** **RECESS TO EXECUTIVE SESSION PURSUANT TO ORC 121.22 (G)(1) TO CONSIDER APPOINTMENT, EMPLOYMENT, DISMISSAL, DISCIPLINE, PROMOTION, DEMOTION, OR COMPENSATION OF A PUBLIC EMPLOYEE OR OFFICIAL OR THE INVESTIGATION OF CHARGES OR COMPLAINTS AGAINST A PUBLIC EMPLOYEE, OFFICIAL, LICENSEE, OR REGULATED INDIVIDUAL, UNLESS THE PUBLIC EMPLOYEE, OFFICIAL, LICENSEE, OR REGULATED INDIVIDUAL REQUEST A PUBLIC HEARING – THREE TRUSTEES, THE FISCAL OFFICER AND THE FISCAL OFFICER ASSISTANT TO ATTEND – 10:53 P.M.**

Motion: Raehll
Second: Bullard
Vote: Raehll yes, Bullard yes and O'Brien yes

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m.** **Trustee Meeting** **April 10, 2023**

**RESOLUTION 23-04-20** **MOTION TO RETURN TO REGULAR SESSION- 11:08 P.M.**

Motion: Raehll
Second: Bullard
Vote: Bullard yes, O'Brien yes and Raehll yes

Raehll "We met in executive session and no decisions were made and no actions were taken".

**RESOLUTION 23-04-21** **MOTION TO CHANGE THE JOB TITLE FROM CEMETERY SEXTON ASSISTANT TO ASSISTANT CEMETERY SEXTON WITHIN THE HANDBOOK**

Motion: Raehll
Second: O'Brien
Vote: Bullard yes, O'Brien yes and Raehll yes

**RESOLUTION 23-04-22** **MOTION TO OPEN AN ASSISTANT CEMETERY SEXTON POSITION EFFECTIVE IMMEDIATELY, WITH THE PRICE RANGE OF $17.25-$20.00/HOUR, NOT TO EXCEED 20 HOURS PER WEEK AND AUTHORIZE TRUSTEE RAEHLL TO POST THE JOB POSTING**

Motion: Raehll
Second: O'Brien
Vote: O'Brien yes, Raehll yes and Bullard yes

**Adjourn-**

**RESOLUTION 23-04-23** **MOTION TO ADJOURN**

Motion: Bullard
Second: Raehll
Vote: O'Brien yes, Raehll yes and Bullard yes

Meeting was adjourned by Chairman Raehll at 11:10 P.M.

Meghan Raehll, Chair

ATTEST:

Ron Bullard, Vice-Chair

Theresa Taylor, Fiscal Officer Assistant

Ken O'Brien, Trustee

PLAINTIFF'S EXHIBIT 3 8-28-25 MR

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m.** **Trustee Meeting** **April 24, 2023**

**HELD AT:** This meeting was held at 3271 Cheshire Rd, Delaware, OH

**CALL TO ORDER:** Meghan Raehll, Trustee Chairman

**PLEDGE OF ALLEGIANCE:** Meghan Raehll led the Pledge of Allegiance

**ROLL CALL:** Meghan Raehll, Ken O'Brien, Ron Bullard, Claudia Smith, Fiscal Officer and Theresa Taylor, Fiscal Officer Assistant

**ATTENDANCE:** David Stuckey, Frank Reinhard, Anne and Michael Marchiondo, Eric and Debbie Rickabaugh, Tony Stucco, Tim Foor, Jesse Peden, Mark Mann, RJ Sabatino, Darcy Kaplan, Randall Woodings, Jasper DeChristopher, Chuck and Sandy Roddy

**PUBLIC COMMENT:** Raehll "Now is the time for public comment and this period for public comment is unrelated to the hearing at 6:00 p.m. and 7:00 p.m. where the public will have the opportunity to provide comments specific to the development in question.

Those who wish to provide a comment outside of that hearing may come to the lectern, and provide your first name, last name, and address. Commentators will have 4 minutes each. Please note the board does not directly respond to comments or inquiries but topics may come up in the public meeting context and questions from residents can always be directed to the appropriate person or liaison outside of the public meetings".

There were no public comments.

**Approval of Minutes-**

**RESOLUTION 23-04-32** **APPROVE THE 04/10/23 REGULAR MEETING MINUTES AND DISPENSE WITH THE READING**

Motion: Bullard
Second: O'Brien
Vote: O'Brien yes, Raehll yes and Bullard yes

**Old Business-**
Without objection from the board Raehll moved down the agenda to discuss items concerning Fairview Cemetery.

**Fairview Sign-** Bullard showed the trustees the Oak Grove Cemetery sign that is used in Delaware as a consideration for a new sign at Fairview Cemetery. O'Brien did not like it. Raehll asked Bullard and Foor to find out more information concerning changing the name of the cemetery, considering different sign options and possible funding for the sign. Bullard will bring more information back to the board for consideration.

**Fairview Lot Sales-** Bullard is waiting to hear back from the prosecutor's office concerning selling lots to family members of those that are already buried in Fairview.

**Asst. Cemetery Sexton-** Bullard said that Jackie Buell is interested in the assistant cemetery sexton position for Cheshire Cemetery and he would like to offer her the position. He will get the paperwork together and bring a proposal back to the board for consideration. Raehll asked Bullard to speak with her and see if she may be interested in also helping with Fairview Cemetery.

**Communications-** The new telephone contact information for Fairview Cemetery is 740-513-6834 and will be added to the website. Bullard asked Foor to copy all of the trustees on all written communications and/or any voicemails that he receives. Foor asked if the address of Fairview Cemetery, 5035 Columbus Pike, could be posted somewhere because currently the old address is still posted and he has trouble with deliveries being sent to the wrong place. Raehll asked that he reach out to Rippel and have it posted on the website to specify the address for deliveries and the address where mail is to be sent.

**Cemetery-**

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m.** **Trustee Meeting** **April 24, 2023**

**Fence at Fairview-** Bullard explained that part of the fence had been hit by a car and the remaining fence is unstable. He recommends taking it down and replacing it as the trustees see fit. O'Brien asked if grant money could be used to replace it, which Bullard said that it can. The trustees like the look of the split-rail fence, Bullard will look into the cost.

**File Cabinets for Cemetery-** Bullard received quotes for fire-proof file cabinets and suggested purchasing one and if another is needed one could be purchased for cemetery items. He spoke with Rippel and she said that she has one for the zoning department but that the other ones she uses are not fire-proof. Raehll will speak with her and get a sense of the needs of the zoning department, she is wanting to begin the digitalization process and have things doubly stored which would help mitigate the need in the type of file cabinets that are purchased.

********6:00 P.M. TIME CERTAIN***T & R PROPERTIES BBP 23-001********

Raehll called the BBP 23-001 hearing to order at 6:12 p.m., this is a continuation from the April 10, 2023, hearing. Without objections, Raehll said the following:

The following protocol shall be implemented for the Berlin Township Board of Trustee Public Hearings from March 13th, 2023 to December 31st, 2023.

First, the applicant shall provide a very brief presentation.

The presentation will be followed by public comments of those in favor of the proposal and those against the proposal.

In both cases, if any attendee wishes to provide comments or testimony, any comments or testimonies should be directed to the Chair only and should not seek to prevent the Board from accomplishing its business in a reasonably efficient manner.

All public comments should be no longer than 4 minutes. This limit is enforced for all participants regardless of whether in favor or against the proposed.

Attendees who provide public comment shall give their first and last name as well as their address clearly for the record prior to beginning comments.

The Board reserves the right to limit the scope of comment to the relevant subject matter, control disruptive or overly repetitive speakers.

Upon completion of the public comments, board members may provide followed up statements and/or inquiries and the applicant may choose to respond to any additional items before the Chair requests or brings forward a motion to the Board of Trustees.

RJ Sabatino sent the below documents to the trustees:

**LEGAL DESCRIPTION**

Situated in the State of Ohio, County of Delaware, Township of Berlin, being in Farm Lots 2 and 3, Section 2, Township 4, Range 18 in the United States Military District, and being all of a 69.196 acre tract as conveyed to Berlin Industrial LLC in Official Record 2022, Page 2091 and part of a 5.001 acre tract as conveyed to Clifton E. Jackson in Official Record 1686, Page 338 as further described as follows;

Commencing at the northwest corner of Lot 414 as created in Huntley Estates recorded in Plat Book 23, Slide 39, the southwest corner of a 1.786 acre tract as conveyed to Meridian Homes Inc. in Deed Volume 759, Page 2027 and being in the east line of a 49.633 acre tract as conveyed to Berlin Apartments LLC in Official Record 2022, Page 2063;

Thence with the west line of said 1.786 acre tract and the east line of said 49.633 acre tract, **N 03° 35' 12" E, 250.43 feet** to the northwest corner of said 1.786 acre tract, the northeast corner of said 49.633 acre tract, the southeast corner of an 11.70 acre tract (Parcel 10-WD) as conveyed to the State of Ohio in Deed Book 378, Page 660 and being in the southerly right of way line of U.S. 36/37 as created in DEL-36-13.26;

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting April 24, 2023**

Thence with the north line of said 49.633 acre tract, the south line of a said 11.70 acre tract (Parcel 10-WD) and the southerly right of way line of U.S. 36/37 as created in DEL-36-13.26, **N 72° 07' 39" W, 75.50 feet** to an angle point in said line;

Thence continuing with the north line of said 49.633 acre tract, the south line of said 11.70 acre tract (Parcel 10-WD) and the southerly right of way line of U.S. 36/37 as created in DEL-36-13.26, **N 58° 14' 47" W, 152.61 feet** to the northeast corner of said 5.001 acre tract and an angle point in the north line of said 49.633 acre tract;

Thence with the east line of said 5.001 acre tract and the north line of said 49.633 acre tract, **S 21° 26' 56" W, 451.90 feet** to the southeast corner of said 5.001 acre tract and an angle point in the north line of said 49.633 acre tract;

Thence with the south line of said 5.001 acre tract and the north line of said 49.633 acre tract, **N 68° 33' 04" W, 284.47 feet** to the **TRUE POINT OF BEGINNING** for the land herein after described as follows;

Thence with the south line of said 5.001 acre tract and the north line of said 49.633 acre tract, **N 68° 33' 04" W, 60.69 feet** to the northwest corner of said 49.633 acre tract, being an angle point in the east line of said 69.196 acre tract, and being in the east line of said Farm Lot 2 and the west line of said Farm Lot 3;

Thence with the west line of said 49.633 acre tract, the east line of said 69.196 acre tract, the east line of said Farm Lot 2 and the west line of said Farm Lot 3, **S 03° 25' 14" W, 1065.92 feet** to the southeast corner of said 69.196 acre tract, being an angle point in the west line of said 49.633 acre tract, the southeast corner of said Farm Lot 2 and the northeast corner of said Farm Lot 4;

Thence with the south line of said 69.196 acre tract, the west line of said 49.633 acre tract, the south line of said Farm Lot 2 and the north line of said Farm Lot 4, **N 86° 37' 14" W, 1677.11 feet** to the southwest corner of said 69.196 acre tract, being in the east line of an 85.853 acre tract as conveyed to Ted L. Colflesh in Deed Volume 548, page 50, Tract 5, the southwest corner of said Farm Lot 2, the northwest corner of Farm Lot 4, being in the east line of Farm Lot 11;

Thence with the west line of said 69.196 acre tract, the east line of said 85.853 acre tract, the east line of a 52.058 acre tract as conveyed to Ted L. Colflesh in Official Record 565, Page 87, Parcel 2, the west line of said Farm Lot 2 and the east line of said Farm Lot 11, **N 03° 31' 59" E, 2067.19 feet** to the northeast corner of said 52.058 acre tract, the northwest corner of said 69.196 acre tract and being in the south line of said 11.70 acre tract (Parcel 10-WD) and being in the southerly right of way line of U.S. 36/37 as created in DEL-36-13.26;

Thence with the north line of said 69.196 acre tract, the south line of said 11.70 acre tract (Parcel 10-WD) and the southerly right of way line of U.S. 36/37 as created in DEL-36-13.26, **S 68° 35' 29" E, 1845.58 feet** to the northeast corner of said 69.196 acre tract and the northwest corner of said 5.001 acre tract;

Thence with the east line of said 69.196 acre tract and the west line of said 5.001 acre tract, **S 21° 26' 56" W, 79.50 feet;**

Thence across said 5.001 acre tract, **S 03° 25' 14" W, 373.31 feet** to the **TRUE POINT OF BEGINNING**.

The above description was prepared by Advanced Civil Design Inc. and based on existing Delaware County records, along with an actual field survey. A drawing of the above description is attached hereto and made a part thereof.

The bearings shown Bearings are based on the Ohio State Plane Coordinate System, North Zone, NAD83 (2011). Said bearings were derived from GPS observation and determined a bearing of S68°35'29"E for a portion of the southerly right of way line of U.S. 36/37 as created by DEL-36-13.26.

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting April 24, 2023**

All references used in this description can be found at the Recorder's Office Delaware County, Ohio.




T&R Properties
Berlin Industrial Overlay Application
Meeting Date 4/24/2023
Conditions for Approval

[illegible] to the following items as discussed at the Trustee hearing 4/10/2023:

1. [illegible] parcel to be rezoned BIO is included as a part of thi[illegible]
2. Multi-use path shall be included travelling east to [illegible] alongside the east/west public spine road, to the West of Plunkett Road. Multi-use path shall continue along Plunkett Road to the South and connect to Reed Parkway so that people who wish to access the multi-use path are travelling alongside a public road and not through private property. This is visible in the attached "Lot Coverage- Site" attachment.
3. All visible head walls will have a natural stone facade on them.
4. The central green space shall be clearly identified on the plans, and in the attached "Lot Coverage- Site" attachment, and shall be no less than 15% of total acreage per the BIO code, and all identified lands qualify as central green space in this identified area.
5. All mailboxes for these buildings shall be internal to the buildings, or in centralized location as required by the Post Office.
6. This development shall follow business operation noise restriction requirements from 10pm-6am per Berlin Township code.
7. All lighting shall be down lighting, accommodat[illegible] into road right-of-way.
8. This development shall commit to the implementation of conceptual renderings and architectural elevations that have been submitted. Colors shall be earth-tone/grey and peach colored.
9. The applicant commits to adding a booster station [illegible] to a minimum of 1000 [illegible] if necessary for fire pressure.

[illegible] [NA]ICS codes are added for this property:

[illegible] Food Manufacturing

[illegible] port Activities

[illegible] icine Manufacturing

[illegible] cturing

[illegible] ural Metals Manufacturing

[illegible] t Manufacturing

[illegible] Products and Screw, Nut, and Bolt

ix. [illegible] at Treating, and Allied Activities

x. 3329 Other Fabricated Metal Product Manufacturing

xi. 3334: Ventilation, Heating, Air-Conditioning, and Commercial Refrigeration Equipment Manufacturing

[illegible] [33]41: Computer and Peripheral Equipment Manufacturing

xiii. [illegible] Communications Equipment Manufacturing

[illegible] Audio and Video Equipment Manufacturing

[illegible] 334[illegible] Semiconductor and Other Electronic Component Manufacturing

xvi. 3345: [illegible] Measuring, Electromedical, and Control Instruments Manufacturing

xvii. 3346: Manufacturing and Reproducing Magnetic and Optical Media

xviii. 3351: Electric Lighting Equipment Manufacturing

xix. 3352: Household Appliance Manufacturing

xx. 3353: Electrical Equipment Manufacturing

xxi. 3359: Other Electrical Equipment and Component Manufacturing

He explained that having the multi-use public path going through private property did not make sense to them, so they made minor adjustments to it which is shown in the map document. Raehll asked for clarification of what he means by public path on private property. He said that the multi-use path is for public use and what they understood is it is meant to connect the path to a greater system, so it should be in the public right-of-way for public use and what they changed accomplishes that with the connectivity to the east.

O'Brien said that there are no paths in the public right-of-way in the entire township. Raehll said that it was not in the public right-of-way at the prior meeting and does not understand why they moved it. She said that it is very clearly stated in the BIO that it shall be required to be placed outside of the public right-of-way and where they had previously discussed it would be located would maximize the safety of the residents and others that may use it. Mark Mann, engineer for T&R Properties, stated that if they were to put a path where the trustees had wanted it, it would be a path to nowhere because of residents' homes/commercial so there would be no access but if they brought it down Plunkett Rd and across Reed Pkwy it could go over to Old State Road, which then it would be available space to build a shared-use path. Raehll said that the way it was conceptualized, the path was to follow in a safe manner down the 36/37 corridor so that it would eventually attach to potentially the Ohio-Erie trail which has a route that comes off of 36/37 and on the other side the pedestrian parkway that the city of Delaware has. O'Brien said that he wants it to be put where it was decided at the April 10, 2023, hearing due to the liability and the fact that the trustees have made every other developer comply. Bullard agrees with O'Brien and says that because of the future maintenance it needs to stay out of the right-of-way so that the cost would fall on HOA's or the owners of the properties and not the township.

Sabatino read the above Conditions for Approval letter, the following items coincide with the numbers on the Conditions for Approval letter and were specifically addressed/asked by the trustees:

1. The acreage for the metes and bounds are 69.169 acres.
2. The multi-use path discussion is stated above.
4. The central green space will be 15.5% of the total tracked acreage which is 10.15.
5. O'Brien said that if the mailboxes were not going to be inside of the buildings a discussion would need to be had on the specifics. Raehll suggested that they reference Berlin Farms West as noted in the May 16, 2022, minutes for the design standards and clarify the language as to what the mailboxes would look like if they were outside or inside of the buildings.
8. Raehll wanted to clarify that the 'Conceptual Renderings-Architectural Elevations' were to be specifically those that were displayed/noted at the April 10, 2023, hearing.
10. Raehll asked Sabatino if he compared the NAICS codes he brought forth to the ones that are specifically called out in the BIO, to which he said no. He said he misunderstood and asked real estate experts and municipalities as to which ones are attractive to potential business owners. She told him to compare what he has to what is allowed in the BIO and strike the ones that are not called out in the BIO. Sabatino said that the original code they filed for was 493/Warehousing and Storage and this was discussed at the original hearing. Raehll looked at the original application and said that he did not indicate the use nor specify any NAICS codes. She said that what was specifically discussed at the previous hearing was that they go through and make certain that the NAICS code uses match building designs, there was no commitment either way on NAICS codes because he was going to bring back the NAICS codes that he wanted the trustees to consider. Her feedback is to do the NAICS codes in accordance with what the application process says and if they would like the trustees to consider additional NAICS codes, that would be a question for the board to answer, but they are going for the overlay and the plan is the plan.

Darcy Kaplan, BZC member said that the original application had the NAICS code 236210/Industrial Building Construction on it, which is in the BIO as an approved NAICS code. Raehll confirmed that code 236210 was on the application as of January 12, 2023.

She said that Sabatino wrote the proposed use is Industrial Warehousing. She told him to compare what is actually in the BIO as permissible uses to the list that he wants to have considered and the board will likely extract all of the ones that are not in the BIO. Sabatino said that they were going to review 493/Warehousing and Storage, to which Raehll said that is not an accepted code in the BIO. O'Brien said that they cannot just add a NAICS code to the plan because the plan is what it is. Raehll said this is an administrative review and if he wants them to consider a rezoning or a standard zoning procedure they can, but the application at hand is not that and they would have to start over with a different process. Sabatino respectfully said that without the NAICS code 493/Warehousing and Storage, the Berlin Industrial Park would never happen. Sabatino, Mann and Woodings discussed the permissible uses for the BIO.

Raehll opened up the meeting for public comment related specifically to BBP 23-001.

Kaplan spoke to the trustees about the application at hand and asked them for clarification on a few items.

Sabatino asked for a recess to review the mailbox minutes.

*****Without objection Raehll recessed BBP 23-001 at 7:07 p.m., to be continued at 7:20 p.m. on April 24, 2023 at the township hall.***

**JEDD-** Raehll spoke with Shawn McCarter and they have come up with a draft including Concord Township and The Village of Shawnee Hills for what would happen when the JEDD is initiated within the initial development of the BBP. Importantly the different abatements are attached to the Industrial and Commercial mixed-uses, not to the commercial/residential uses. Her understanding was that the county did not want to incentivize commercial/residential properties because they already have their things going for them. The question is, does that mean we can still compel developers to join the cloud related to the commercial/residential uses. O'Brien's understanding is that in order to get the TIFF they would have to participate in JEDD for commercial/residential, with the exclusion of what Sunbury has annexed. Bullard thought the JEDD was tied to county incentives and Raehll thought the JEDD was tied to the abatements specifically. Raehll will get clarification and continue working with McCarter.

**Call In Pay-** Peden is waiting for clarification from Stucco.

| | |
|---|---|
| **RESOLUTION 23-04-33** | **MOTION TO EXTEND THE CURRENT CALL-IN-PAY PROCEDURES FOR AN ADDITIONAL 30 DAYS** |

Motion: Bullard
Second: O'Brien
Vote: O'Brien yes, Raehll yes and Bullard yes

****Without objection, Raehll called back to order BBP 23-001 at 7:20 p.m.***

Sabatino stated that they are agreeable to the multi-use path change as requested and agreeable to the mailbox addition as referenced to the minutes dated May 16, 2022, including that the mailboxes shall be plumb and maintained at a 90-degree angle.

In regard to the 493 NAICS code, O'Brien explained what the residents were told was that if it is not in the overlay, it would be subject to referendum. Raehll said that from the start of this process he was provided the permissible NAICS codes under the BIO and if he is looking for an explanation as to why this did not come up in discussions, it would be because of what he wrote on the application, which is different from what they were considering. Again, this is an administrative review, the trustees are not rezoning anything, they are checking boxes against an overlay that is already in place and cannot be referendum, that was set up by the residents. Bullard wants it very clear as to what he is voting on and wants it documented.

Sabatino read line by line which NAICS uses (as applied in the BIO) he would like for the trustees to consider. Below are the following codes as specified in the subheading, the 6-digits NAICS codes in the overlay:

a. 3231: Printing and Related Support Activities
b. 3341: Computer and Peripheral Equipment Manufacturing
c. 3342: Communications Equipment Manufacturing
d. 3343: Audio and Video Manufacturing
e. 3345: Navigational, Measuring, Electromedical, and Control Instrument Manufacturing
f. 3346: Manufacturing and Reproducing Magnetic and Optical Media
g. 3391: Medical Equipment and Supplies Manufacturing
h. 3399: Other Miscellaneous Manufacturing
i. 4232: Furniture and Home Furnishing Merchant Wholesalers
j. 4248: Machinery, Equipment, and Supplies Merchant Wholesalers
k. 4239: Miscellaneous Durable Goods Merchant Wholesalers
l. 4251: Whole Trade Agents and Brokers
m. 4441: Building Material and Supplies Dealers
n. 4243: Apparel, Piece Goods and Notions Merchant Wholesalers
o. 4248: Beer, Wine, and Distilled Alcoholic Beverage Merchant Wholesalers
p. 5415: Computer Systems Designs and Related Services

Mann explained where the car parking would be located and confirmed that there is no parking within the setbacks. There are approximately 126 car parking spaces per building, totaling approximately 500.

**RESOLUTION 23-04-34** **MOTION TO ACCEPT EXHIBITS 3-6, WITH LATTER EXHIBITS TAKING PRECEDENCE OVER ANY EARLIER EXHIBITS FOR BBP 23-001 T & R PROPERTIES**

Motion: O'Brien
Second: Bullard
Vote: Raehll yes, Bullard yes and O'Brien yes
Discussion: Raehll "This includes proof of publication, the letter dated April 18, 2023 from Lieutenant Craig Hall granting approval for the booster pump if needed and a letter dated April 21, 2023 from RJ Sabatino listing conditions for approval and a revised map".

Raehll explained where/what the trustees want to see in regard to the multi-use path. It is to span west to east the length of the parcel, in front of the building on the west side, in front of Lot 2 on the east side and outside of the public right-of-way north of the buildings.

Sabatino and Mann questioned where in the BIO it states that a multi-use path has to be placed outside of the public road right-of-way. Raehll said that is referenced in the sidewalks and paths section (11A) of the BIO, Article 19.

Sabatino read an updated version of conditions for approval for the trustees to consider. After discussion, the trustees accepted Sabatino's conditions for approval letter as exhibit #7.

**RESOLUTION 23-04-35** **MOTION TO ACCEPT EXHIBIT 7, WITH LATTER EXHIBITS TAKING PRECEDENCE OVER ANY EARLIER EXHIBITS**

T&R Properties Berlin Letter Amendment

Exhibit 7

Amending Letter Bullet Points:

1. All NAICS Codes are requested as listed in BIO Article 19.

q. 3231: Printing and Related Support Activities
r. 3341: Computer and Peripheral Equipment Manufacturing
s. 3342: Communications Equipment Manufacturing
t. 3343: Audio and Video Manufacturing

u. 3345: Navigational, Measuring, Electromedical, and Control Instrument Manufacturing
v. 3346: Manufacturing and Reproducing Magnetic and Optical Media
w. 3391: Medical Equipment and Supplies Manufacturing
x. 3399: Other Miscellaneous Manufacturing
y. 4232: Furniture and Home Furnishing Merchant Wholesalers
z. 4248: Machinery, Equipment, and Supplies Merchant Wholesalers
aa. 4239: Miscellaneous Durable Goods Merchant Wholesalers
bb. 4251: Whole Trade Agents and Brokers
cc. 4441: Building Material and Supplies Dealers
dd. 4243: Apparel, Piece Goods and Notions Merchant Wholesalers
ee. 4248: Beer, Wine, and Distilled Alcoholic Beverage Merchant Wholesalers
ff. 5415: Computer Systems Designs and Related Services

2. We will comply with with 11A of BIO Article 19. The North-South "Plunkett Road"/proposed road, north of Reed Parkway, shall have sidewalks on both sides. All path and sidewalks are outside of the road right-of-way and we provide a public access easement.
5. If Mailboxes are required by USPS to be outside of building, such mailboxes shall:
    a. Be ADA Compliant and accessible.
    b. Be plum.
    c. Comply with Section 15 of BIO Article 19.
7. No light shall bleed into adjacent properties in compliance with Article 19.05.10 Berlin Industrial Overlay Lighting Standards.

Respectfully requested
RJ Sabatino

Motion: Bullard
Second: O'Brien
Vote: Raehll yes, Bullard yes and O'Brien yes

****Per the applicants request and Without objection, Raehll closed the BBP 23-001 hearing at 8:32 p.m.***

**RESOLUTION 23-04-36** **MOTION TO APPROVE APPLICATION BBP 23-001, T & R PROPERTIES AS SUBMITTED BY THE BERLIN TOWNSHIP ZONING COMMISSION AND ALL EXHIBITS 1-7, WITH THE LATTER EXHIBITS TAKING PRECEDENCE OVER ANY EARLIER EXHIBITS**

Motion: Bullard
Second: O'Brien
Vote: Bullard yes, O'Brien yes and Raehll yes

*****RECESS AT 8:35 P.M. RETURNED AT 8:42 P.M.***

*****7:00 P.M. TIME CERTAIN**The Residences of Berlin Township BZC 23-003*****

Raehll called the BZC 23-003 hearing to order at 8:44 p.m. Without objection from the board, Raehll proposed the following format:

The following protocol shall be implemented for the Berlin Township Board of Trustee Public Hearings from March 13th, 2023 to December 31st, 2023.

First, the applicant shall provide a very brief presentation.
The presentation will be followed by public comments of those in favor of the proposal and those against the proposal.

In both cases, if any attendee wishes to provide comments or testimony, any comments or testimonies should be directed to the Chair only and should not seek to prevent the Board from accomplishing its business in a reasonably efficient manner.

All public comments should be no longer than 4 minutes. This limit is enforced for all participants regardless of whether in favor or against the proposed.

Attendees who provide public comment shall give their first and last name as well as their address clearly for the record prior to beginning comments.

The Board reserves the right to limit the scope of comment to the relevant subject matter, control disruptive or overly repetitive speakers.

Upon completion of the public comments, board members may provide followed up statements and/or inquiries and the applicant may choose to respond to any additional items before the Chair requests or brings forward a motion to the Board of Trustees.

Sabatino stated that the multi-family portion is necessary for the entire project to happen. He explained that the original plan included 376 apartments, including 1, 2 and 3-bedrooms with cementitious/hardy plank siding, stainless steel appliances and granite countertops. After feedback from the Delaware Planning Commission, they made changes to include; a reduction of 70 units, a 350-foot buffer from their neighbors at the shortest point, in addition to the mound with evergreens, 70% open space/central green space with fire pits, pathways with benches and high-end apartments.

O'Brien likes the look of Buildings A and B but does not like the look of the townhomes. He wants to follow the Delaware County Planning Commission's (DCPC) recommendations with 4 units per acre and that the units are at least 800 sq feet. He asked how many units per square acre the plan is. Sabatino said 6.97 units per square acre. Raehll explained that they are requesting 4 variances: Density Divergence, Setback Divergence (Sabatino said that they are no longer requesting this divergence), Parking Divergence and a Divergence from 800 sq. ft minimum one bedroom unit to 750-800 sq ft one bedroom unit. She said that they are requesting a PRD with a TPUD Overlay per the BZC recommendations.

Raehll clarified that Sabatino is aware that municipalities and townships operate with independent zoning, due to the many references to Delaware City apartments that were made on the application, to which he said yes. She said that everything that gets compared needs to be compared by the precedent of the township itself. She asked specifically if he is aware of Berlin Township Zoning resolution, the Comprehensive Land Use Plan, the fact that the density he is requesting does not exist in our township, to which Sabatino said "yes" to all. By asking for his requested density, Raehll asked him why he says it is allowable. He said that the density is what they are requesting and that the multi-family is allowable under their request. Sabatino said that Orange Township recently approved that Wilcox project, to which Raehll said that every township operates independently.

Raehll asked for clarification as to what the 'Spirit of the BIO' means. He said that when they met at the pre-application meeting, Raehll interrupted and said she was not present at that meeting other than introducing herself and shaking his hand, she then left. Raehll said that he knows this because she has sent him 3 or 4 emails when he has requested to meet with her separately and has said to him that all conversations need to take place in a public forum. He agreed with Raehll and said that 'in the spirit of the BIO' means this:

~The BIO has a 250-foot setback from the property owners, and they agreed with that although the PRD does not require it. 'In the spirit of the BIO', they worked hard to obtain the 250-foot setback as a request from the neighbors.

~There is a landscaped mound that is a requirement in the BIO overlay, and they have implemented that into the plan 'in the spirit of the BIO'.
~They are at 73-74% open space/central green space 'in the spirit of the BIO'.

Raehll asked him why he did not submit this under the BIO. He said the BIO has substantial issues, where they are requesting variances that they are not requesting tonight at this meeting. For example, the BIO does not allow more than 4 units/per building where in the Type B buildings they are asking for 16 units/per building. Woodings explained that the first building from the 250-foot setback has to be one-story and at 350-feet can be two-story,

but they want the two-story buildings to be located at the 250-foot setback. Raehll confirmed that they wanted some things but not everything that the BIO offers such as; the building height and building design, to which Woodings agreed. Raehll said that that she does not think it matters too much about the 'Spirit of the BIO' because they are not considering it under the BIO.

Sabatino spoke to the parking divergence and said they believe the 3 per dwelling unit in the BIO is far too excessive and not functional or conducive. He said the BZC requested that they add additional guest parking to which they added 92 extra spaces, totaling 624 spaces provided across the 296/units. O'Brien asked if that count included the spaces in front of the garage, to which Woodings said yes. They are asking for: 1 BR/1.5 spaces, 2 BR/2 spaces and 3 BR/2 spaces. O'Brien asked if that count included the inside garage spaces, to which Sabatino said yes.

O'Brien asked for clarification as to why they are asking for a divergence for the square footage. Woodings said that there are two sizes of 1 BR apartments, and they would be in the same building. Raehll called out that they referenced: Seattle House (681 sq ft), Fourwinds Apartments (681 sq ft), and Northlake Summit (751 sq feet) and explained that none of these are in Berlin Township or under our zoning so the application they are considering is not an administrative review or an Overlay but a legislative hearing that they're considering.

Raehll asked for final thoughts from the trustees before she opened the hearing for public comment. O'Brien likes the plan but reiterated that his two problems are the number of units/per net developable acreage and the 800 min sq. ft requirement because he wants to follow the recommendation of the Delaware Regional Planning Committee and does not feel like he can violate that or fathom that density.

Sabatino stated that this is the gateway to the overlay and the trustees just passed the Industrial portion where those employees will need places to live. Additionally, this is a commercial use with substantial tax revenue at a very low impact on the schools. He said that they cannot make the lower density work and have accommodated the density reduction further than what they thought they could originally absorb. He said to the trustees that they want the business, and the business is driven by rooftops. O'Brien said that we have the rooftops, we need more commercial. Sabatino said that this is commercial and Raehll clarified that it is commercial/residential. Sabatino said that it is taxed commercial, and O'Brien said that it is taxed commercial but the township does not see those taxes because it is Tiffed by the county. Sabatino said that the Industrial is something that is required to be marketable Industrial, is tax abatement so the taxes from the Industrial right now are going to be minimal, the taxes from a rural higher density are going to be a good bit.

Bullard stated that he has a problem with 'Luxury' apartments being under 800 sq feet and questioned the examples that Sabatino showed. Sabatino said that he was attempting to show comparable apartments that are a couple of minutes away. Raehll clarified that those examples are in a city. She said its like comparing apples to oranges because we are not operating under the same zoning codes, and it seems disingenuous to say things like 'rural density' and 'comparable zoning' when it is our zoning and our township because we don't have it yet. She said what he is calling 'rural density' is the highest density in our township. Sabatino said that we have an R10. Raehll said no, we have an overlay that has an R10 and that it has not been enacted and would need to be enacted through all of the restrictions and requirements of said overlay, which T & R Properties opted not to do. She said it can exist in specific parcels related to the BIO but the specific parcels that the trustees are considering for this current standard zoning application exist as an R4 in the Industrial Overlay. Bullard said he could live with the parking spaces.
Sabatino said that he does not mean to be disingenuous and repeated that the township needs the rooftops to supply the workers who want to work and live in the township.

***Raehll opened up the hearing to public comment, beginning with those in favor of the project:***

Frank Reinhard (3645 Berlin Station Rd) stated that he thinks this a great opportunity to start the BBP and believes it will help to jump start the project. There are many incentives and the Delaware County Finance Authority worked hard to put this overlay zoning into place. He understands the trustees' concern with the density and said that it is not

uncommon for there to be smaller units in the Central Ohio housing market. He thinks it is important for Berlin Township to look at what is coming and is personally in favor of the project.

Joe Mitchell (3491 Mariner's Way) is a 15-year resident and would like to see more infrastructure in Berlin Township and is in favor of this project. He would like to see a pool, more bike paths, a library and more ball parks and that this would bring more economy into the township. There needs to be people to support the Industrial and there needs to be houses to support the employees of the Industrial. He said Berlin Township is surrounded by townships where this kind of development exist, Orange Township, Genoa Township and Berkshire Township. It is a trend by developers to have smaller units. Mitchell said that the number of residents this would negatively affect are very few as opposed to the thousands it would positively affect.

***Raehll asked for public comment for those opposed to the project:***

Michael Marchiondo (444 Lackey Old State Rd) thanked the trustees for what he sees as due diligence at this meeting and taking their concerns into account. He said that the board and community have to vote "no" on this project. Marchiondo said there was a year and half of debates on what would be allowed in each area and that the developers would know ahead of time which areas are R4 and R10 and could buy the property accordingly. He said that he thought there were some restrictions on percentages of rentals in those spaces and asked the trustees about them. Raehll said they would comment on it after public comment.

Trustees
The Berlin Commercial Overlay and The Berlin Industrial Overlay were approved in late 2020 after many, many hours of work by Berlin Township's trustees, residents, zoning officials, and county officials. It was requested and put into place to assist our elected officials in controlling the development of nearly 2000 acres within the township. The R4 areas in the BIO and BCO were compromises between existing residents and the township/county officials as all understood the need for revenue from responsible Industrial and Commercial development but also the need to provide zoning buffers to protect the existing residents.

The developer entered contract on the land knowing the overlay indicated R4 (density<4, single story, 4 unit/bldg., no rentals), but wants zoning/variances that are not part of the township land use plan. They mention their plan is in the spirit of the overlay, but with such wide divergences I do not see that connection.

Delaware County Regional Planning Commission (DCRPC) provided a recommendation to the developer of TPUD zoning with a density no greater than 4 (a reference to this being generous when considering the neighboring land use was made by a commission member) along with 20% rental units per the zoning.

The density proposed by the developer is approximately 7, almost double the DCRPC recommendation. Current neighboring properties have a density of 0.3 with single family home values of 350-950+ on acre+ lots. **<u>0.3 to 7.</u>** This does NOT provide stepdown or buffer zoning to current residents.

Variances of density from 4 to approximately 7 and rental units from 20% to 100% are not a "minor departure or exception from the strict rule or literal enforcement or interpretation of zoning provisions". This would greatly alter the essential character of the surrounding neighborhoods and create a detriment to the neighboring properties. The variances are not in the spirit or intent of the zoning requirements, and knowledge of such was present at the time of entering into purchase negotiations on the land.
Numerous other issues with the proposal exist (traffic, building height/stories, mound landscaping, construction in/through USACE backflow areas, impact to long term township residents, etc.) but with only limited minutes I will concentrate on the key items first identified by the DCRPC. Also note that this version of the developer proposal has seen them make improvements from even higher densities and other issues present in the original submittal.
The developer is one part of a larger company which includes Today Homes which is building condo/ranch/townhouse duplex homes in Delaware at Boulder Reserve and Enclave at Adalee with prices of 300+. They tout their BIA Parade of Homes awards but apparently don't wish to bring that level of development to Berlin Township.

If our elected trustees approve the proposed zoning change and variances, then the BCO and BIO overlays are for naught. This MAJOR change would not just open the door, but "kick it off the hinges", to ALL future developers in the BIO and BCO requesting major changes/variances to the proposed zoning and architectural standards while limiting the ability of the zoning board and the trustees to "close" that door. The precedent will be set. There are many other R4 areas still yet undeveloped which will also be at risk and face same issues (density, lack of step-down zoning).

Those in support of the change tout the tax revenue that will be provided. That revenue comes at a price steeper than an industrial site or commercial property (Home Depot, etc.). The added tax revenue must be considered split across 298 new households as that is what you will have. These households will have children, needs for fire and emergency services, expectations for township expenditures such as parks and multi-use paths, roadway needs, etc. On a per household basis the return is less than existing properties. They will imply that only this proposal will allow for the Berlin Business Park to move forward, knowing that others will step forward in their place and be willing to develop within the land use plan.

I plead with you to strongly **REJECT** this proposed zoning change. This developer has been given recommendations/suggestions by the DCRPC, residents, and zoning to adhere to zoning guidelines, yet continues pushing forward with a plan that all levels have pushed back on or rejected.

Today this effects my direct neighbors and myself. But I know that tomorrow it will directly impact our elected officials, zoning officials, and the remainder of the Berlin Township residents neighboring the BIO and BCO. I ask that you hold fast to the BCO and BIO overlay land use plan ideals to protect all residents of Berlin Township.
Thank you.
Jasper and Amy DeChristopher
436 Lackey Old State Rd

Eric Rickabaugh (244 Lackey Old State Rd) agreed with DeChristopher and added that many months were spent with the BZC in trying to craft the overlay to be something that the residents could live with. He is not interested in seeing R4 changed in any way. He said that the township does not need more roofs nor does the school system need more kids. He asked the trustees to keep it at R4.

Chuck Roddy (330 Lackey Old State Rd) is concerned about the traffic and how it will affect wildlife/wetlands, he feels it is our responsibility to make sure they are not disrupted and/or disturbed. He would like to keep the density at a lower number.

Anne Marchiondo (444 Lackey Old State Rd) has similar concerns to her previous opposers of the project. During the year and half of discussions, it was decided that R4 was a decent step-down. She questioned why it was coming to the trustees for consideration, after it had already been voted down by the ARB and the BZC. She asked the trustees to consider that since this is the first project for the BBP, the importance of what precedence it will set. Also, to consider the neighbors when making their decision.

***Raehll closed public comments and asked Sabatino if there was anything specific, he would like to address to the board.***

Sabatino addressed Mitchell's comment about there being a greater benefit to Berlin Township and not to the benefit of their adjacent neighbors. He feels this is false because they are 350-feet away with an 8-foot mound landscaped with evergreen trees and the neighbors will not see the buildings unless they drive Reed Parkway. Sabatino said that there is R10, which cannot be accessed without utilities. The utilities start where their project is which is why there is going to be a water tower and a sanitary sewer lift station. He said this is the gateway to the BBP.

As it relates to for sale housing, there are two located at Hollenback and Lackey Old State Rd that have flustered and failed. The proposed luxury condos are not selling for a variety of reasons including, interest rates have skyrocketed; people want to rent by choice. He attended a One Delaware seminar and learned that 80 individuals are moving to central Ohio a day, and if they don't move to Berlin Township where there is affordable and attainable rental housing, they will go somewhere else and if they go somewhere else, so do

the businesses. Other municipalities and townships do have higher density and are ready to develop industrial buildings.

As relates to preserving wetlands, he said the green space connects to a substantial waterway to help with the wildlife.

Sabatino acknowledged that they are requesting variances and if they are a TPUD Overlay, then they will have to request a 100% rental housing variance. He stated that variances are granted on a case-by-case discretionary basis for the trustees to decide. The trustees are not opening up any floodgates, just because they decide to do something for someone does not mean they have to do the same thing for someone else, it is at their discretion and if there is a special circumstance. The special circumstance in this matter is that they are at the gateway of the BBP, this is where it has to start, and the variances are being requested because they need them to begin the project and they do not have to grant the same variances to anyone else they do not want to grant them to in their sole discretion.

Raehll thanked him with appreciation for the time he took to respond to some of the individual inquiries.

She told Sabatino that it is R4 and a minimum of 800 sq feet or it does not get her vote. Sabatino asked if the other trustees had comments. O'Brien and Bullard said that they agree with Raehll and would also vote no without an R4 and 800 sq ft minimum. Raehll said there is a lot of promise in this project and other issues that could be worked out, but they are at a point that without those two points being addressed, the trustees have told him what their votes would be. Sabatino asked if there were any other concerns. Raehll said that if they are not going to talk about the items that are the non-starters in this particular plan, she is not sure how much further it is worth going into particular aspects.

Sabatino said that they had a relatively low density to begin with and they struck it down by 70 units, Raehll agreed that it is a substantial decrease but he did not start where he should have started, which is the Berlin Townships zoning code and our text and what our text allows and permits. So, these other details are not salient when it comes to them considering what is in their text. She acknowledged that he was right, the trustees do have discretion to deviate from that as it is necessary or as they deem necessary but they do not have to give the insight into the legislative process from why they make decisions that they make. She does not see the safety case, the transitional zoning case or the case for why they are bringing forward what they are because the R4 works as does the square footage.

Sabatino said Raehll mentioned that she did not see the transitional case and the safety case and said that is why she is not in favor of the density. She said no, she did not say that is why she wasn't in favor of the density, she said that is why she is not in favor of the plan. She said the density issue is a safety issue for her, Sabatino asked her to elaborate, and she said no that she does not have to. He said that the plan has been reviewed by the fire department and engineers, to which O'Brien said "and Delaware County Regional Planning who said 4 units/per acre", Sabatino "in accordance with following your zoning", Raehll "and our zoning plan is in accordance with safety for the community, safety with general health", O'Brien "by law, we are to consider Delaware County Regional Planning's vote and remember, they voted that they wanted it to be approved at 4 units/per acre". Sabatino "so the R10 directly adjacent is ok", Raehll "are we considering an R10 on another parcel in another portion of the township or are we considering this parcel, this plan tonight", Sabatino "we're considering this", Raehll "so that's what we are going to restrict the conversation to", Sabatino "Okay, I'm just trying to get a little bit more information, some feedback", Raehll " and we have given you it in I think a very clear and distinct manner", Sabatino "I understand, I was just looking for a bit more specificity I suppose, we just went through a long process with the Industrial and you approved the Industrial, the Industrial will not happen without the multi-family, that means all the hard work that you've been working to do will not happen", Raehll "I'm not going to make a decision based on the hard work I've put into another plan, when I make a decision it's based on the plan I have before me, the merits and in the interest of the community", O'Brien "and I think I've been very specific, RPC recommended and I want to follow their recommendation, it makes sense to me and I don't see a reason to diverge from their recommendation", Bullard "I haven't heard you comment about the RPC's comments, I haven't heard you comment about comments from the BZC, you know what are concerns are and I haven't heard you refute any of that, I heard your presentation it sounds like the same presentation you've given to everybody and I understand it but the divergences and the problems I haven't heard you

respond to", Sabatino "why do we need an R4 zoning versus what we are requesting, I'll go back to the need for housing in central Ohio, the need for housing specifically in this area, the need for housing for the Industrial that was just approved 480,000 sq ft that will need rooftops for it's employees and the tax revenue that will come as a result of a commercial development as opposed to a housing development, in addition the facts that there are other existing housing developments in progress or rather stalled in Berlin Township because of the macroeconomic environments that prohibits or makes it much more difficult to sell homes besides the trends of housing as it relates to bedroom size, you can go one-mile this way, one-mile that way, one-mile south, one-mile north and find multi-family apartments with 120 sq ft less than what we are requesting a variance for, 750 sq ft is a very reasonable 1 BR size, I know there is maybe disagreement on can a 1 BR apartment even be luxury, I would say respectfully say the answer is yes, we have built many of them including the city of Delaware, they are full with a waiting list, because people need this housing, Berlin wants the business, you have created the BIO, you have approved an Industrial project which is great but we can't get there without the multi-family funding the commercial taxes that are required to make any of this happen, if that's not a case" Raehll "you made some good points and all that is true under R4 and 800 sq feet", Sabatino "but at some point it's not and in this point it isn't, I understand why you want R4, why the neighbors want R4, we're 350-feet away we're not 250-away, it's like having an entire different property between them that is buffer, landscaped buffer, green scape with a pond with a fountain in it" "the buffer is far in excess of what would be required of the BIO, we're at a higher density because we need the higher density, and you and the county need the higher density as well for the tax revenue that will help make the rest of the park happen, there is no tax revenue from any of the Industrial because of the tax abatement" Raehll "would you like to amend that at all to say that the county is in favor of higher than R4 because we have it that we've said numerous times that RPC recommended approval at R4", Sabatino "you want me to take back what I said", Raehll "well you said that the county wants it, maybe specify who you mean in the county that wants it", Sabatino "I guess anyone who uses public services in the county would want more tax revenue, maybe that's a speculation", Raehll "that's fine it's just the county/RPC as very explicit in terms of R4 being sufficient and it being approved at R4 was the recommendation, not that we have to go with what they recommend either", O'Brien "we don't but I would want a reason why not and I haven't heard the reason why not", Raehll "that's been her case too".

Raehll asked the applicant what how they would like to proceed. Sabatino asked for a 5-minute recess.

***Per the applicants request and without objection, Raehll recessed hearing BZC 23-003 at 9:55 p.m.***

***Raehll called back to order hearing BZC 23-003 at 10:00 p.m.***

Raehll asked Sabatino if there was anything else that he would like the trustees to consider before closing the hearing. Sabatino stated that they understand there is a R4 zoning in place and understand that it was a long and arduous compromise with 5 or so neighbors, however what the land use classification has done and will continue to do is economically condemn the BBP from ever starting. He said the trustees might as well have voted the industrial down because the industrial will not happen. They are requesting what they are requesting because that is what they need to make it work and what any developer will need, anyone who wants to start the BBP will need what they are asking for. He said they are not asking for anything that they believe to be unreasonable, they are asking for what any developer will need to kick off the BBP. He wants the BBP to happen in a good and controlled way, which he said this plan is with the substantial buffer and it is relatively low density for them and comparable to other adjacent municipalities and townships. They can not make it work for any less density; they are requesting what they are requesting. At this time, they are going to request to table the hearing. Raehll asked if he understood the implications of tabling versus recessing and continuing, Sabatino asked for clarification. O'Brien said that tabling means that at the next meeting if it is not brought up, it is dead. Sabatino asked that the hearing be recessed and continued.
Raehll suggested that they consider working with DCFA during this time to see what they could possibly get bonded, which could kick them back some of the percentage of monies that they would invest in some of the development. She said that could be a way for the township to get what the township has established without making it not make sense for them from a dollar/cent's perspective.

**RESOLUTION 23-04-37** **MOTION TO RECESS AND CONTINUE BZC 23-003 THE RESIDENCES OF BERLIN TOWNSHIP TO JUNE 12, 2023 AT 7:00 P.M. AT 3271 CHESHIRE ROAD, UPON THE APPLICANTS REQUEST**

Motion: Raehll
Second: O'Brien
Vote: Bullard yes, O'Brien yes and Raehll yes

***Without objection, Raehll called BZC 23-003 to close the hearing.**

***Recess at 10:10 p.m. Returned at 10:17 p.m.***

**Road Department-**

**Peden Probation Ends-** Bullard complimented Peden on doing a wonderful job with the roads department and would like to move him out of probation status.

**RESOLUTION 23-04-38** **MOTION TO REMOVE JESSE PEDEN OUT OF HIS PROBATIONARY PERIOD, EFFECTIVE APRIL 30, 2023**

Motion: Bullard
Second: Raehll
Vote: O'Brien yes, Raehll yes and Bullard yes

**RESOLUTION 23-04-39** **MOTION TO PROMOTE JESSE PEDEN TO ROAD SUPERINTENDENT, EFFECTIVE APRIL 30, 2023, AT A PAY RATE OF $30.56/HOUR**

Motion: Bullard
Second: Raehll
Vote: O'Brien yes, Raehll yes and Bullard yes

Bullard said that someone from the HOA in Oldefield Estates contacted him about putting up a fence around the pond at Piatt and Peachblow Road. Peden said that the question arose because of the school that will be going in across the street and the consideration of the safety for the kids. Peden told him that due to the fact of the low school speed and that there have been no accidents at that location, there would be no justification to warrant using township dollars.

Per the Delaware County Sheriff, Bullard is working with Stucco to write a resolution concerning people storing material (rocks, mulch, etc.) in the street.

**Old Business Cont'd-**
**Apparel Policy-** Nothing new.

**Grant Writer-** This will be discussed at the May 5, 2023 trustee meeting.

**Hearing Policy-** Stucco is finding out if the hearing policy would fall under an administrative review policy. For a legislative hearing, is there a special standing for adjacent property owners who have received a required notice, if their comments would fall under public comments or testimonies. Raehll will continue to read the policy during the meeting until further notice.

**Vacation for Zoning Inspector-**

**RESOLUTION 23-04-40** **MOTION TO APPROVE THE VACATION ACCUMULATION FOR JACOB BON FOR UP TO TWO WEEKS WITH PAY, ON THE CONDITION THAT THIS IS A SPECIFIC ACCURANCE AND WITH THE PROVISION THAT SHOULD HE DEPART PRIOR TO THE STANDARD POLICY OF VACATION DISTRIBUTION PER THE HANDBOOK, ANY OUTSTANDING AMOUNT WILL BE PAID BACK TO THE TOWNSHIP OUT OF HIS FINAL CHECK**

Motion: Raehll

Second: Bullard
Vote: Raehll yes, Bullard yes and O'Brien yes

The trustees had a discussion about posting for a township administrator role. Raehll will work on putting something together and bring it back to the board for consideration.

**Inventory Amounts-** Smith spoke with Wendy French from Burnham & Flower insurance group who said that $100 would be a good threshold and possibly even go up to $500 figuring one item would be less than our deductible. Raehll asked her to email this to Stucco and see if he has any concerns. The board would like to take action at the next trustee meeting.

**Meeting Video Recordings-** Smith's recommendation is to record and not make them the official minutes but slim down the discussion in our minutes and if anyone wants to know more about what was said they could refer to the video recording. The board is in agreement with her recommendation. Smith asked if Rippel could post the YouTube recording on the website, Raehll said yes. Smith will contact Stucco and verify the amount of time the recordings need to be kept for records retention.

**Fire Department-** Nothing new.

**Fiscal Officer Items-**
**Meeting with Bank-** Smith made note that the bank raised our earned interest rate from .02% to 3%.

**Health Insurance Renewal-**

**RESOLUTION 23-04-41** **MOTION TO APPROVE ANTHEM MEWA RENEWAL AT THE 8.9% AND MIGRATE THE NON-MEDICAL PRODUCTS TO ANTHEM MEWA, AS WELL AS MIGRATING THE TERM LIFE TO BRING ON THE RESOURCE ADVISOR EAP FOR EMPLOYEES, AS WELL AS RETAIN THE SAME DENTAL AND VISION WITH PRINCIPAL**

Motion: Bullard
Second: O'Brien
Vote: Raehll yes, Bullard yes and O'Brien yes

**Trustee Items-** Scott Belcastro from Trebel LLC will be at the next trustee meeting for discussion on energy aggregation.

**Zoning Department-**
**Set Hearing Date for BZC 23-001 Piatt Road -**

**RESOLUTION 23-04-42** **MOTION TO ACCEPT THE REVISED BINDER FOR BZC 23-001 AND BZC 23-002 PIATT ROAD, WITH THE BZC AMENDMENTS AS SUBMITTED ON APRIL 20, 2023**

Motion: Raehll
Second: O'Brien
Vote: Bullard yes, O'Brien yes and Raehll yes

**RESOLUTION 23-04-43** **MOTION TO SET DATE, TIME, PLACE CERTAIN FOR BZC 23-001 AND BZC 23-002 PIATT ROAD TO MAY 22, 2023, AT 7:00 P.M AT 3271 CHESHIRE ROAD**

Motion: Raehll
Second: O'Brien
Vote: Bullard yes, O'Brien yes and Raehll yes

**Future Meetings-**
**04/27/23 DCRP Meeting**
**05/08/23 Trustee Meeting**
**05/10/23 Parks & Trails Meeting**
**05/22/23 Trustee Meeting**

**BERLIN TOWNSHIP TRUSTEES**

5:30 p.m. **Trustee Meeting April 24, 2023**

**Late Items-** Bullard said that he is resigning from the ARB and will bring forth a resolution.

**Adjourn-**
**RESOLUTION 23-04-44** **MOTION TO ADJOURN**

Motion: O'Brien
Second: Bullard
Vote: O'Brien yes, Raehll yes and Bullard yes

Meeting was adjourned by Chairman Raehll at 11:43 P.M.

Meghan Raehll, Chair

ATTEST:

Ron Bullard, Vice-Chair

Theresa Taylor, Fiscal Officer Assistant

Ken O'Brien, Trustee

PLAINTIFF'S EXHIBIT 4 8-29-25 MR

## BERLIN TOWNSHIP TRUSTEES

**5:30 p.m. Trustee Meeting June 12, 2023**

| | |
|---|---|
| **HELD AT:** | This meeting was held at 3271 Cheshire Rd, Delaware, OH |
| **CALL TO ORDER:** | Meghan Raehll, Trustee Chairman |
| **PLEDGE OF ALLEGIANCE:** | Meghan Raehll led the Pledge of Allegiance |
| **ROLL CALL:** | Meghan Raehll, Ken O'Brien, Ron Bullard and Claudia Smith, Fiscal Officer |

**ATTENDANCE:** Jasper DeChristopher, Tiffany Jenkins, Todd Meyer, Kevin D, Rick Dunlop, Todd Faris, Anna Vagedas, Kevin Daberkow, Chandra Bhupathiraju, Chris Acker, Steve Cuckler, RJ Sabatino, Randall Waddings, David Stuckey, Darcy Kaplan, Eric & Debbie Rickabaugh, Joe Mitchell, Scott Winberry and Chris Paykoff

**Public Comment-** Raehll opened up for public comment not related to hearings of BZC 23-002, BZC 23-001 or BZC 23-003 where the public will have the opportunity to provide comments specific to the developments in question. There were none.

**Approval of Minutes –**
**RESOLUTION 23-06-01** **APPROVE THE 4/24/23 & 5/22/23 REGULAR MEETING MINUTES AND DISPENSE WITH THE READING**

Motion: Bullard
Second: O'Brien
Vote: Raehll yes, O'Brien yes and Bullard yes

**Meeting with Olentangy Schools Regarding TIFF-** Raehll said this TIFF was related to the east side of Berlin Township at 3 B's & K, south of 36/36 between Plumb Road. Todd Meyer and Ryan Jenkins from OLSD asked what specific projects they could plan for. O'Brien said it depends on what is built as Sunbury annexed a portion of Berlin Township and they are going to be helping put in Sunbury Parkway which will cause the township some issues with the off ramp as improvements will need to be done to Sherman Road. Raehll explained what the plans are for Sunbury Parkway as Meyer and Jenkins were not familiar with it. After a lengthy discussion Meyer & Jenkins thanked the trustees for the information.

**Road Department-**
**Shared Use Path Easement-** Tiffany Jenkins Delaware County Engineer's office stated that there was a shared use path easement that has been presented to the trustees for approval and she was here to administrate it. She found out that the property ownership had not been transferred properly and didn't know if they wanted to act upon it yet. O'Brien said no and said we have never done this before. He said in our zoning text it says we do not want it in the road-right-of-way. Jenkins said usually shared path easements are on sub-division plats, but this development is not doing a sub-division plat so in that case in order for the path that the township has requested and required by township zoning to be used by the public it needs to be in an easement that allows that. O'Brien said he doesn't want to assume any lability. After a lengthy discussion they decided to wait until the county gets the updated drawings to show what it is and revisit this at the July 10, 2023, trustee meeting.

*********5:45 P.M. TIME CERTAIN***Piatt Road Commercial BZC 23-002*********

Raehll called the hearing for BZC 23-002 Piatt Road Commercial to order. Raehll said the general procedure for this is that the applicant will provide a brief presentation and then take questions from the board. We will then open it up for public comment of those in favor of the proposal and those against the proposal. From those comments we may have final questions or comments related to the application and at that time we will decide where to go. She turned the meeting over to Mr. Faris.

Mr. Faris said since our last meeting Chandra Bhupathiraju, the owner, has been meeting with perspective tenants so they can get an idea of square footage and parking. They have also been looking at the architecture. Faris asked when and who is involved regarding the deed restrictions and Raehll explained to Stucco what they were trying to do with restricting the use to only a few business types and who would enforce the deed restrictions, the HOA or the township. They discussed different ways to add zoning districts to residential areas

within the township. Raehll said two ideas for this parcel is to figure out deed restrictions where the township could have standings or figuring out the potential for creating a new zoning district that we could adopt and potentially apply to other things. She said they need to have something like this added to the comprehensive land use plan and the zoning text that are being updated. Stucco said he would need to get in contact with the zoning office and research the issue. Bhupathiraju said once they get more clarity on zoning, they can work with the attorneys on the deed restrictions. Bullard said they met with the Delaware County Engineer's office about the mailboxes and came up with the idea to put them in the commercial section so the parking lot could be used. There were no public comments for or against this hearing.

**RESOLUTION 23-06-02** **MOTION TO RECESS AND CONTINUE BZC 23-002 PIATT ROAD COMMERICAIL TO AUGUST 14, 2023, AT 6:00 P.M. AT 3271 CHESHIRE ROAD, DELAWARE, OH 43015 PER THE APPLICANTS REQUEST**

Motion: Raehll
Second: O'Brien
Vote: Raehll yes, O'Brien yes and Bullard yes

*********6:00 P.M. TIME CERTAIN***Piatt Road BZC 23-001*****************

Anna Faris said they met with the Delaware County Engineer and came up with a solution for the mailboxes and they would be moved to the commercial property. She went through he changes the trustees requested and they are listed on the a document dated June 7, 2023.

June 7, 2023
Attn: Jacob Bon, Berlin Township Zoning Inspector
From: Todd Faris, Faris Planning & Design
Re: Piatt Road Development – Preliminary Development Plan BZC 23-001
Cc: Chandra Raju, bhupati2k@gmail.com and Srivital Choppara, vitalprasad@yahoo.com

The preliminary development plan submission for Piatt Road Development has been revised to incorporate comments from the trustees at the hearing on May 22, 2023. Below is a list of documents that have been revised or added to the submission, they are meant to replace the exhibits from the previous submission on 4/18/23.

**Revised/Additional Exhibits:**

- Development Text
- C-1 – Preliminary Development Plan
- C – Illustrative Plan
- D-1 – Overall Landscape Plan
- D-2 – Landscape Enlargement Plan
- D-3 – Open Space Plan
- D-4 – Delaware County Engineer CBU Specification
- E-1 – Conceptual Utility Plan
- E-9 – Fire Truck Turning Exhibit
- E-10 – Hydrant Spacing Exhibit
- E-11 – Berlin Fire Department Letter

Additionally, included in this document are the comments from the trustees at the May 22, 2023 hearing and the applicant's responses.

**Trustee Hearing Comments:**

Applicant must meet with County Engineer along with Trustee Ron Bullard to determine alternate options for CBU locations.
**Applicant met with County Engineer & Trustee Bullard on 5/26/23, a consensus was reached to widen the roadway and place the CBU on the north side of Glenbrook Drive on the PCD portion of the site.** ***See Exhibit C-1 & page 4 of the development text***

All tree species to be used during final development must be provided and approved by trustees
***See page 10 and Appendix 'A' of the development text***

HOA must maintain access to CBU's, including snow removal and general maintenance
***See page 4 of the development text***

HOA to be turned over to homeowners once 17 lots have received final occupancy permits from the zoning inspector
***See page 11 of the development text***

Minimum tree sizes must be established in preliminary development text
***See page 10 of the development text***

All plants shown on the plan currently must be the minimum required plantings for the final development plan
***See page 10 of the development text***

Restate the language in the development text regarding the street tree locations
***See page 8 of the development text***

Include language in the development text stating that the usable open space will be maintained otherwise the plan must come back to the trustees for approval
***See page 7 of the development text***

The pathway along Piatt Road shall be a multi-use path
***See pages 3 & 5 of the development text***

CBU's must be ADA compliant and will remain plumb
***See page 4 of the development text***

An updated fire letter is needed
***See Exhibit E-11***

A crosswalk will be installed to facilitate pedestrian movement from the development to the schools
***See Exhibit C-1 and page 5 of the development text***

O'Brien asked about snout houses and garage door paneling and asked that language be added to the text. There were no public comments for or against this hearing.

**RESOLUTION 23-06-03 003** **MOTION TO RECESS AND CONTINUE BZC 23-001 PIATT ROAD TO JUNE 12, 2023, AT 8:00 P.M. AT 3271 CHESHIRE ROAD, DELAWARE, OH 43015, PER THE APPLICANTS REQUEST**

Motion: Raehll
Second: O'Brien
Vote: O'Brien yes, Bullard yes and Raehll yes

**5 Minute Recess**

****7:00 P.M. TIME CERTAIN***The Residences of Berlin Township BZC 23-003******

R.J. Sabatino said he sent a letter to the trustees this afternoon and Raehll said they would not have had time to review said letter. He gave them copies of it and reviewed the following:

The Residences at Berlin Township
Berlin Township
Delaware County, Ohio
Applicant' T&R Properties for Multifamily PRD Rezoning Request
Trustee Hearing
6/12/2023

T&R Properties is proud to present this project to Berlin Township, a development that will help ameliorate the housing crisis in Berlin/Central Ohio and also provide homes for the greater Industrial overlay area. Since the submission of the application, thousands of apartment units have either received zoning approval and/or started construction in surrounding Township and Municipalities, many in a shorter time than this application has taken and is still pending decision.

This project boasts great resident amenities like swimming pool, pickle ball, outdoor grilling and gathering, and a fitness facility, an increased buffer from neighbors over the approved BIO (we have a 350' buffer as opposed to a 250' buffer), over 70% open space, and two-story apartment homes at a relatively low density. This project will open up hundreds of other acres for good development that Berlin needs. Additionally this project will generate hundreds of thousands of dollars in JED revenue via income tax that would otherwise not exist in the Township.

We have received feedback from the Township, regional planning, and neighbors, and can commit to all of Berlins requests, including 1 bedroom sizes, except for the following items below which we request your consideration for variance:

1. Density Divergence

   We are asking for a rezoning to a PRD to include multi-family with the following density:

   49.898 gross acres * .85 factor in PRD text: 42.413 net acres

   296 units / 42.413 = **6.97 units/acre**

   **We have reduced our unit count substantially** at the request of the Township and neighbors. We believe that this density still allows the project to be functional. For rent housing is in a severe deficiency locally, and the Berlin Industrial Park will need rooftops to drive demand for retail and business. The Berlin Business Park has sat vacant for years due to the BIO zoning/Current Township zoning resolution; the code does not work for good development to take place. Typical garden density in this immediate area is 12+ units to the acre- Seattle House apartments is 240 units, 3-story on 17.5 acres, 13.7 units/acre. Fourwinds apartments is 144 units on 5.12 acres- 28.8 units/acre. Northlake Summit apartments is 252 units on 22 acres- 11.5 units/acre. **The density requested, in addition to providing sufficient quantities of housing, is needed to amortize the substantial cost of the amenities (club space, co work space, fitness facility, swimming pool, pickle ball courts, paths and walkways, grilling space, etc) to these residents; without the density, we cannot support the amenities we are proposing**. The applicant respectfully requests this increase in density for our PRD zoning.

2. Parking Divergences from 3 per dwelling unit to the following:

   We were receptive of Berlin's comments regarding adding additional guest parking. While we still believe that our previous application was overparked and this is at the expense of T&R for increasing pavement and other costs- we have agreed to this nonetheless. Still, this does not meet Berlin's zoning resolution, which is designed for a single family home 3+ bedrooms. While we have increased our parking counts, we respectfully still must request this variance.

   We request a variance for industry standard multi-family parking as follows:
   1BR 1.5
   2BR 2
   3BR 2
   Total Parking: 532
   **Guest Parking: 92 extra spaces**
   Parking Provided: 624

3. Rental Units Divergence. (Optional) If it is the desire of the Trustees to proceed with a TPUD underlying zoning to our PRD, we respectfully request a rental unit divergence for 100% of units in the development to be for rent.

Respectfully, RJ Sabatino

Sabatino said they had been asked if they would join the township JEDD and he said yes and Monica Connors with Economic Development provided an analysis. Steve Cuckler passed the letter out and stated that the total JEDD revenue for this project was $500,000 and Berlin Township would receive $300,000.

Sabatino said they discussed previously that density was a primary issue, and they are open to a conversation on the other items if they can get passed the density that they need. Raehll asked if there were any other changes since their last meeting and Sabatino said no. Bullard said he came up with 1.8 parking spaces per dwelling unit and the overall is 2.1 parking spaces per dwelling unit.

O'Brien asked where the guest parking was and Sabatino pointed them out on the map and said they were scattered throughout the development. He also asked where the CBU units were located and how they would be ADA accessible. O'Brien asked about the bedroom sizes. He said he likes the plan, but he cannot get to the density that they are asking. Raehll said they acquired the land knowing that R4 was proposed for this area and they justified increasing the density by adding amenities but it does not get them so far that they get 6.97 and asked if there was a number they could agree with. Sabatino said they were aware of it but this is the gateway to the industrial park, it will attract businesses, provide housing, and create revenue from the JEDD. Sabatino said if that is not sufficient, they cannot lower the density because this is what they need and what any other developer will need.

Raehll opened up public comment for those in favor of the project.

Joe Mitchell said he is a 15-year resident and has children in the elementary, middle and high school system. He said his 15-year old has lived here her whole life and she does not have any amenities, we don't have a library, a pool, bike paths or a rec center. All of our neighboring townships have all these things and they have them because they have revenue from development. The revenue this project would bring in would provide amenities to thousands of residents.

Raehll opened up public comment for those against the project.

Chris Acker said he lives down there and is this going to impact every house on the Lackey Old State Road and bring traffic, lights and noise. Anything above R4 is a crime and will create a ghetto. He said he has a bathroom that is 800 square foot and you are going to put a living room, bedroom, bathroom and hallway all in there. He asked how many people live in the township that own 1.5 cars to fit in the 1.5 car parking spots. Why build rentals, they would much rather see condos where somebody owns it and will take care of it.

Scott Winberry said the amount of traffic this is going to produce will add to the traffic that is already there.

Eric Rickabaugh said they have been following this development through zoning and through architectural review and now with the trustees and they keep trying to put a square peg in a round hole. All the residents worked together for a long time to get the R4 and feels they could all bend a little bit but they keep coming back with the same thing and it's not what they all agreed to and it's not what will fit that area and would appreciate if they would stand firm.

Jason DeChristopher said when they talk about density, he thinks the project has gone from Delaware County Regional Planning, to zoning and now to the trustee's, at the early stages Delaware County Regional Planning committee recommended conditional approval on lowering the density, The density is higher than what they recommended. So even at the county level the county identified the need to reduce the density based upon the other area uses of the neighboring land. Density is his biggest issue. He said there is a piece of land to the north that is part of the rezoning but not sure it is part of their plan as they have identified it sectioned off and added to northern properties. If you notice the mound curls around the area to the north is actually part of the land being bought but is not showing as part of this development so his guess is it's part of the land that is being used for the density calculations. He thinks the 6.97 might actually be higher. He would like to see improvements in what they are doing with the mound to get to the requirements of the BIO

where there is additional plantings there. And connecting the mound to what is already at Reed Parkway.

Sabatino said they know there are issues with the BIO overlay and the comprehensive land use plan and encourages them to revisit them because there are substantial flaws which we take issue with but any developer will take issue with. All three trustees agreed that it was a good plan but the density was too high. Raehll asked if the applicant wanted a vote this evening and Sabatino said that they did cut the density by 30% and they would like a vote tonight.

**RESOLUTION 23-06-04** **MOTION TO ACCEPT EXHIBITS 19 & 20 LETTER FROM RJ SABATINO, THE RESIDENCESE OF BERLIN TOWNSHIP DATED JUNE 12, 2023 AND LETTER FROM MONICA CONNER DATED JUNE 8, 2023 RESPECTIVIELY WITH LATTER EXHIBITS TAKING PRECEDENCE OVER ANY EARLIER EXHIBITS FOR BZC 23-003**

Motion: Raehll
Second: O'Brien
Vote: O'Brien yes, Bullard yes and Raehll yes

**RESOLUTION 23-06-05** **MOTION TO APPROVE APPLICATION BZC 23-003 THE RESIDENCES OF BERLIN TOWNSHIP AND ALL EXHIBITS 1-20 WITH LATTER EXHIBITS TAKING PRECEDENCE OVER ANY EARLIER EXHIBITS**

Motion: Bullard
Second: O'Brien
Vote: Bullard no, Raehll no, and O'Brien no

**RESOLUTION 23-06-06** **MOTION TO ADJOURN HEARING BZC 23-003 THE RESIDENCES OF BERLIN TOWNSHIP AT 8:05 P.M.**

Motion: Raehll
Second: O'Brien
Vote: Bullard yes, Raehll yes, and O'Brien yes

**5 Minute Recess**

Raehll called BZC 23-001 back to order.

Faris said he has two statements to add and read the following:

1.) Garage doors shall be architecturally treated with panels or other fenestration and shall contain architectural hardware and/or windows.
2.) Forward facing garages shall not extend more than four fee from the main body of the house containing the front door, so long as the front porch extends to or farther than the face of the garage.

**RESOLUTION 23-06-07** **MOTION TO ACCEPT PACKET WHICH INCLUDES-REZONE CONCLUSION LETTER, REQUEST FOR PUBLICATION, PROOF OF PUBLICATION, APPLICANTS REQUEST DATED MAY 25, 2023 AND AMENDMENTS TO THE DEVELOPMENT PLAN DATE JUN 7, 2023 AS EXHIBIT 14 WITH LATTER EXHIBITS TAKING PRECEDENCE OVER ANY EARLIER EXHIBITS FOR BZC 23-001 PIATT ROAD**

Motion: Raehll
Second: Bullard
Vote: Raehll yes, O'Brien yes and Bullard yes

**RESOLUTION 23-06-08** **MOTION TO ACCEPT EXHIBITS LISTED AS 9-13 WITH LATTER EXHIBITS TAKING PRECEDENCE OVER ANY EARLIER EXHIBITS FOR BZC 23-001 PIATT ROAD**

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting June 12, 2023**

Motion: Raehll
Second: O'Brien
Vote: Raehll yes, O'Brien yes and Bullard yes

**RESOLUTION 23-06-09** **MOTION TO ACCEPT THE APPLICANT'S REVISIONS RELATED TO GARAGE DOORS AND FORWARD-FACING GARAGES DATED JUNE 12, 2023 AS EXHIBIT 15 WITH LATTER EXHIBITS TAKING PRECEDENCE OVER ANY EARLIER EXHIBITS FOR BZC 23-001 PIATT ROAD**

Motion: Raehll
Second: O'Brien
Vote: O'Brien yes, Bullard yes and Raehll yes

**RESOLUTION 23-06-10** **MOTION TO APPROVE APPLICATION BZC 23-001 PIATT ROAD WITH ALL EXHIBITS 1-15 WITH LATTER EXHIBITS TAKING PRECEDENCE OVER EARLIER EXHIBITS**

Motion: Bullard
Second: O'Brien
Vote: O'Brien yes, Bullard yes and Raehll yes

**RESOLUTION 23-06-11** **MOTION TO ADJOURN HEARING BZC 23-001 PIATT ROAD AT 8:05 P.M.**

Motion: Raehll
Second: O'Brien
Vote: Bullard yes, Raehll yes, and O'Brien yes

**Fire Department-**

**Requisitions-**
**RESOLUTION 23-06-12** **APPROVE REQUISITION #2023-14 TO MUNICIPAL EMERGENCY SERVICES FOR HUST HYDRAULIC RESCUE TOOL FOR $14,648.90 WITH EXPECTED COST OF $13,317.18.**

Motion: O'Brien
Second: Bullard
Vote: Bullard yes, Raehll yes, and O'Brien yes

**RESOLUTION 23-06-13** **APPROVE REQUISITION #2023-13 TO COLUMBUS SUPPLY FOR RESCUE EQUIPMENT, FOUR NEW WET SUITS FOR $6,515.62 WITH EXPECTED COST OF $5,429.68.**

Motion: O'Brien
Second: Bullard
Vote: Raehll yes, O'Brien yes and Bullard yes

**RESOLUTION 23-06-14** **RECESS TO EXECUTIVE SESSION PURSUANT TO ORC 121.22 (G)(3) TO CONFERENCE WITH AN ATTORNEY FOR THE PUBLIC BODY CONCERNING DISPUTES INVOLVING THE PUBLIC BODY THAT ARE THE SUBJECT OF PENDING OR IMMINENT COURT ACTION, – THREE TRUSTEES, THE FISCAL OFFICER, & TONY STUCCO TO ATTEND- 8:36 P.M.**

Motion: Raehll
Second: O'Brien
Vote: Raehll yes, O'Brien yes and Bullard yes

**RESOLUTION 23-06-15** **MOTION TO RETURN TO REGULAR SESSION- 9:17 P.M.**

Motion: Bullard

Second: O'Brien
Vote: O'Brien yes, Bullard yes and Raehll yes

Raehll "We met in executive session and no decisions were made and no actions were taken." She does feel it would be beneficial to have a special meeting on June 26, 2023. O'Brien suggested that we suspend this meeting and continue it on June 26, 2023. Raehll will coordinate with the following people to attend the meeting, OTARMA representative, Chris Rinehart, Mark Fowler and/or Tony Stucco.

**Old Business-**

**Name Change Resolution-** Stucco said he prepared the resolution to change the name of Fairview Cemetery. Bullard shared that a family had some cemetery lots they did not want so they donated them to the Hospice of Grady Memorial Hospital prior to us taking over the cemetery. He stated that there is an intern working for the prosecutor's office that can hopefully help us work on some things regarding the cemetery. Bullard said they also discussed the building that they want to put up and they were not able to come up with a way that they could use the COG. The prosecutor's office suggested getting an architect and having them draw up plans. Raehll did not understand and after discussing it, it was determined that they were advised by the COG representative that this project fell under ORC 511.12 Plans, Specifications and Contracts for the construction and erection of a memorial building, monument, statue, or memorial, for the purposes specified and within the amount authorized by section 511.08. Stucco suggested that they follow ORC 153 Public Improvements. This clarified it for Raehll.

**Financial Device Transactions Resolution-** Stucco said the trustees need to decide if they want to accept financial transaction devices for one township purpose or more than one township purpose. Raehll said she envisioned it for zoning, but they could use it for cemetery services as well. They discussed having all township offices included in the resolution to be able to accept payments by financial transaction devices. In reviewing the resolution Raehll asked if IWorQ was to be listed under section D. That the Board authorizes the following types of financial transaction devices to be accepted, upon the condition that an agreement setting forth the terms and conditions for payment using such financial transaction device is entered into with the issuing financial institution(s), issuer(s) of financial transaction devices, or processor(s) of financial devices: ______________.
Stucco said they do not qualify as an entity that can accept payments by financial transaction devices as they are not a financial institution. Raehll said the package they bought with IWorQ comes with the ability to process credit cards within the IWorQ's software. Stucco said he doesn't believe they will be the entity that is processing those payments. Raehll said she needs to discuss this with Stucco to understand and they will revisit this on June 26, 2023.

They returned the discussion to renaming Fairview Cemetery. Raehll said they received an email from the cemetery sexton recommending that renaming it with Memorial in the name. They settled on renaming it Evergreen Memorial Cemetery.

**RESOLUTION 23-06-16** **APPROVE CHANGING THE NAME OF FAIRVIEW MEMORIAL PARK TO EVERGREEN MEMORIAL CEMETERY**

**BERLIN TOWNSHIP BOARD OF TRUSTEES**
**DELAWARE COUNTY, OHIO**
**DATE: June 12, 2023**
**RESOLUTION NO. 23-06-16**

**RESOLUTION CHANGING THE NAME OF FAIRVIEW MEMORIAL PARK TO EVERGREEN MEMORIAL CEMETERY**

The Board of Trustees of Berlin Township, Delaware County, Ohio ("Board") met in regular session on June 12, 2023, at 5:30 PM at the Township Hall located at 3271 Cheshire Road, Delaware, Ohio 43015 with the following members present: Trustee Raehll, Trustee O'Brien, and Trustee Bullard

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting June 12, 2023**

Trustee Raehll moved the adoption of the following Resolution:

**PREAMBLE**

**WHEREAS,** via a Judgment Entry of March 7, 2019 in Delaware County Common Pleas Court Case No. 17 CV H 05 0302 (State of Ohio, ex rel. Carol O'Brien v. Fairview Memorial Park, Inc., et al.), the Court held that "All right, title, and interest in the cemetery parcel, as well as any personal or intangible property related to the cemetery, is vested in Berlin Township free and clear of any and all liens that may have been placed on the property"; and,

**WHEREAS,** an October 6, 2020 Entry in the aforementioned case confirmed and approved the transfer of the real property by approving a Fiduciary Deed and directing delivery of the same; and,

**WHEREAS,** the Board took title to, and control of, Fairview Memorial Park, aka Fairview Cemetery (hereinafter "Fairview"), on October 6, 2020, by virtue of a Receiver's Deed from A.C. Strip, in his capacity as court-appointed receiver for the assets and business of Fairview Memorial Park, Inc., an Ohio not-for profit corporation that was recorded on October 8, 2020 in Book 1778 – Pages 813-817, Delaware County Recorder's Office [Parcel # 41833001059000 (Two Tracts: 10.004 acres – Tract 1; and, 1.6747 acres – Tract 2)]; and,

**WHEREAS,** Fairview Memorial Park is located at 5035 Columbus Pike, Lewis Center, Berlin Township, Ohio 43035; and,

**WHEREAS,** R.C. Chapter 517 provides the authority for townships to operate and maintain cemeteries; and,

**WHEREAS,** the Board, for various reasons, wishes to rename Fairview Memorial Park as Evergreen Memorial Cemetery; and,

**WHEREAS,** R.C. § 4767.03(C) provides for the updating of information about a cemetery registration if there is a change in information under R.C. § 4767.04; and,

**WHEREAS,** R.C. § 4767.04(A)(1) provides that a cemetery registration with the Division of Real Estate include the name of the cemetery; and,

**WHEREAS,** R.C. § 4767.04(B) provides that written notification of the change in name of a cemetery be provided to the Division of Real Estate within thirty (30) days of the change occurring.

**RESOLUTION**

**NOW, THEREFORE, BE IT RESOLVED:**

A. That Fairview Memorial Park shall hereinafter be known as Evergreen Memorial Cemetery.

B. That the Township Fiscal Officer is requested to provide written notification of the cemetery name change to the Division of Real Estate and Professional Licensing of the Department of Commerce within thirty (30) days of the passage of this Resolution.

C. That all formal actions of this Board concerning and relating to the passage of this Resolution were adopted in an open meeting of this Board, and all deliberations of this Board and any of its committees that resulted in such formal action were in meetings open to the public in compliance with all legal requirements, including R.C. § 121.22.

D. That this Resolution shall be in full force and effect immediately upon adoption.

Trustee O'Brien seconded the motion.

The roll being called upon its adoption, the vote resulted as follows:

| | | | |
|---|---|---|---|
| YEAS: | Bullard__________ | Raehll______________ | O'Brien____________ |
| NOS: | ________________ | ________________ | ________________ |
| ABSTAIN: | ________________ | ________________ | ________________ |

Signed this 12th day of June 2023 in Berlin Township, Delaware County, Ohio.

**BOARD OF TRUSTEES OF BERLIN TOWNSHIP,**
**DELAWARE COUNTY, OHIO**

_____________________________
Trustee Ron Bullard

_____________________________
Trustee Meghan B. Raehll

_____________________________
Trustee Ken O'Brien

Attest:

_____________________________
Claudia Smith, Township Fiscal Officer
Berlin Township, Delaware County, Ohio

**CERTIFICATE**

State of Ohio, Delaware County

I, the undersigned Township Fiscal Officer of Berlin Township, Delaware County, Ohio, certify that the foregoing Resolution No. 23-06-16 is taken and copied from the record of proceedings of the Board, and that it has been compared by me with the Resolution on the record and is a true and accurate copy. Further, I certify that the adoption of such Resolution occurred in an open meeting held in compliance with R.C. § 121.22.

Date: June 12, 2023 _____________________________
Claudia Smith, Township Fiscal Officer
Berlin Township, Delaware County, Ohio

Motion: Raehll
Second: O'Brien
Vote: O'Brien yes, Bullard yes and Raehll yes

**Apparel Policy-** Bullard said the road department asked if they would consider this policy. Raehll said she read the policy in the handbook, and it was very spars so they can move forward with this for road department employees. The policy she had was for township tee shirts for non-road and non-fire employees. Bullard said the road department wants patches.

**Bank Depository-** Raehll asked if there was anything else that we needed Stucco for and Smith said the resolution for public depositories. They discussed acting bids for active, inactive and interim accounts and O'Brien said it should only be for active account. Stucco said Smith does not need to advertise since they are only accepting bids for active accounts and explained the process for accepting the bids.

**RESOLUTION 23-06-17** **MOTION TO APPROVE REQUESTS FOR APPLICATIONS FOR DEPOSIT OF PUBLIC MONEYS, ACTIVE DEPOSITS**

**BOARD OF TRUSTEES**
**BERLIN TOWNSHIP, DELAWARE COUNTY, OHIO**
**DATE: June 12, 2023**

**RESOLUTION NO. 23-06-17**

**REQUEST FOR APPLICATIONS FOR DEPOSIT OF PUBLIC MONEYS**

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting June 12, 2023**

**(ACTIVE DEPOSITS)**

The Board of Trustees of Berlin Township, Delaware County, Ohio ("Board") met in regular session on June 12, 2023 at 5:30 P.M. at the Berlin Township Hall located at 3271 Cheshire Road, Delaware, Ohio 43015, with the following members present: Trustee Raehll, Trustee Bullard and Trustee O'Brien.
Trustee O'Brien moved the adoption of the following Resolution:

**PREAMBLE**

**WHEREAS**, the Board desires to contract with an eligible financial institution(s) for the deposit of its public moneys (active deposits) pursuant to R.C. § 135.01 *et seq*., and;

**WHEREAS,** applications on the form prescribed by the Board and conforming to the requirements of R.C. § 135.10 will be received from eligible financial institutions beginning on June 18, 2023 until 12:00 noon on July 17, 2023, for the deposit of Berlin Township public moneys (active deposits); and,

**WHEREAS,** the Board will meet to open and examine the applications and designate the depository(ies) at a special meeting held on July 17, 2023 at 5:30 PM at the Berlin Township Hall located at 3271 Cheshire Road, Delaware, Ohio 4315; and,

**WHEREAS,** the designation of depository(ies) will be made and awarded for a period of five (5) years commencing on August 1, 2023; and,

**WHEREAS,** the Board wishes to provide written notice of the Board's desire to receive applications.

**RESOLUTION**

**NOW, THEREFORE, BE IT RESOLVED**:

A. Notice of the Board's desire to receive applications for the deposit of Berlin Township public moneys (active deposits) shall be made and notice thereof provided to eligible depositories in accordance with applicable law as follows:

   The Board of Trustees, Berlin Township, Delaware County, Ohio ("Board") will receive applications on the form prescribed by the Board and conforming to the requirements of R.C. § 135.10 from eligible financial institutions beginning on June 18, 2023 until 12:00 noon on July 17, 2023, for the deposit of Berlin Township public moneys (active deposits). The Board will meet to open and examine the applications and designate the depository(ies) at a special meeting held on July 17, 2023 at 5:30 PM at the Berlin Township Hall located at 3271 Cheshire Road, Delaware, Ohio 43015. The designation of depository(ies) will be made and awarded for a period of five (5) years commencing on August 1, 2023.

   The public moneys of Berlin Township (active funds) shall be deposited in an eligible financial institution(s) as required by law.

   Applications shall state the rate of interest that will be paid on deposits belonging to the Township. The eligible financial institutions the Board considers to be most advantageous and as required by law shall be made the depository or depositories of such public moneys of Berlin Township for a period of five (5) years commencing August 1, 2023.

   Applications shall specify the total maximum amount of public moneys (active deposits) which the applicant desires to receive and have on deposit at any one time during the period covered by this designation.

The public moneys of Berlin Township shall not be deposited in any eligible financial institution until appropriate and sufficient collateral/security has been provided and maintained as required by applicable law. (See R.C. §§ 135.18 and 135.181.) Applications shall state the type of collateral/security proposed to be furnished and the aggregate amount of the provided collateral/security.

Each application shall be accompanied by a financial statement of the applicant, under oath of its cashier, treasurer, or other officer, in such detail as to show the capital funds of the applicant, as of the date of its latest report to the superintendent of financial institutions, the comptroller of the currency, the office of thrift supervision, the federal deposit insurance corporation (FDIC), or the board of governors of the federal reserve system, and adjusted to show any changes therein made prior to the date of the application.

Applications ("Application by Eligible Financial Institution for Designation as Depository") may be obtained from the Berlin Township Fiscal Officer ("Fiscal Officer") at the address for the Fiscal Officer listed below or by email at Clerk@berlintwp.us. Please use this application form to submit an application. Submitted applications should be sealed and boldly endorsed "Application for Deposit of Public Money." Applications shall be submitted in hard copy to the Berlin Township Fiscal Officer as follows:

Claudia Smith, Fiscal Officer
Berlin Township, Delaware County, Ohio
3271 Cheshire Road
Delaware Ohio 43015.

Notice shall be provided by the Township Fiscal Officer to eligible depositories. Applications received before June 18, 2023 or after 12:00 noon on July 17, 2023 shall not be considered. The Board reserves the right to reject any or all bids/applications.

Claudia Smith, Fiscal Officer
Berlin Township, Delaware County, Ohio

B. Copies of this Resolution, together with notice of the Board's desire to receive applications for the deposit of public moneys (active deposits) shall be given to eligible depositories by the Board. The Fiscal Officer is requested to arrange for the mailing and/or delivery of such notice.

C. All formal actions of this Board concerning and relating to the passage of this Resolution were adopted in an open meeting of the Board, and all deliberations of this Board and of any of its committees that resulted in such formal action were in meetings open to the public in compliance with all legal requirements, including R.C. § 121.22.

D. This Resolution shall be in full force and effect immediately upon adoption.

The roll being called upon its adoption, the vote resulted as follows:

| | | | |
|---|---|---|---|
| YEAS: | Bullard______ | Raehll______ | O'Brien______ |
| NOS: | ______ | ______ | ______ |
| ABSTAIN: | ______ | ______ | ______ |

Voted on and signed this 12th day of June 2023 in Berlin Township, Delaware County, Ohio.

**BOARD OF TRUSTEES OF**
**BERLIN TOWNSHIP,**
**DELAWARE COUNTY, OHIO**

____________________
Meghan Raehll

Trustee

_______________________
Ron Bullard
Trustee

_______________________
Ken O'Brien
Trustee

Attest by Township Fiscal Officer

_______________________
Claudia Smith
Berlin Township Fiscal Officer
Delaware County, Ohio

State of Ohio :
Delaware County :

I, the undersigned Fiscal Officer of Berlin Township, Delaware County, Ohio, hereby certify that the foregoing Resolution No. 23-06-17 is taken and copied from the record of proceedings of the Board of Trustees of Berlin Township, Delaware County, Ohio, and that it has been compared by me with the resolution on the record and is a true copy. Further, I certify that the adoption of such resolution occurred in an open meeting held in compliance with R.C. § 121.22.

Date: June 12, 2023

_______________________
Claudia Smith
Berlin Township Fiscal Officer
Delaware County, Ohio

Motion: O'Brien
Second: Bullard
Vote: Bullard yes, Raehll yes and O'Brien yes

**Road Department Continued-**
**Resignation-**

**RESOLUTION 23-06-18** **MOTION TO ACCEPT RESIGNATION FROM SAM DINGUS EFFECTIVE JUNE 8, 2023, WITH GREAT REGRET**

Motion: Bullard
Second: O'Brien
Discussion: Raehll said his resignation indicated that his last date of employment would be June 8, 2023, but it's her understanding that he did not work prior to that. Bullard said he took a weeks' vacation because he wasn't going to get a vacation with his new job. Raehll said she doesn't like the idea that someone doesn't come back to work and paying out the vacation. She said his last day of work should be his last day actually worked. O'Brien said that is not their current policy. And Raehll said we will need to revisit that policy.
Vote: Bullard yes, Raehll yes and O'Brien yes

**RESOLUTION 23-06-19** **MOTION TO DECLARE THE ROADS DEPARTMENT FULLTIME ROAD LABORER POSITION VACANT AND ADVERTISE FOR A REPLACEMENT**

Motion: Bullard
Second: O'Brien
Discussion: O'Brien said when you say advertise do you really mean advertise or just posting it. Bullard said posting it on the website. Raehll said we have had the posting up since April.
Vote: Raehll yes, O'Brien yes and Bullard yes

Bullard said they received a request to get street sweeping done but we have never done any street sweeping. They discussed dates to have a special meeting with ODOT. O'Brien said he had a request on Dale Ford Road for a sign stating "Farm". They want people to

slow down because they pull out on the road with tractors. He said he would bring it up. Bullard said if we have one we can put it up if not we can buy one.

Raehll said she received a call about cottonwood that was hanging over the road. Bullard said Peden checked it out and said it was not in the road right-of-way and we are not authorized to go into public property to cut tree limbs. Bullard said we do not have a bucket truck to do it so we would have to hire a tree company to do it.

**Fairview Lot Sales-** Bullard is still waiting on Stucco.

**Assistant Cemetery Sexton-** Bullard said he will talk to Buell about the pay.

**Welcome To Berlin Township Signs-** Raehll said the design is not completed but she did get the software to complete it. She should have this for the meeting on June 26, 2023.

**Tee Shirt Policy for Non-Road & Non-Fire Employees-**

**RESOLUTION 23-06-20** **MOTION TO APPROVE APPAREL POLICY FOR NON-ROADS AND NON-FIRE EMPLOYEES**

**Apparel Policy for Non-Roads and Non-Fire Elected Official, Employees, and Volunteers**

Township apparel is available to rent or purchase for full-time employees and is available to purchase for part-time employees and volunteers.

*Tier 1*: Two (2) of the township selected shirt items not to exceed $35 per item.

*Tier 2*: One (1) of the township selected shirts item not to exceed $70.

*Tier 3*: One (1) of the township selected apparel items not to exceed $150. Tier 3 must be purchased directly through the apparel provider at employee, elected official, or volunteers' own cost.

**Full-time employees**

Full-time employees wishing to rent apparel may choose from either Tier 1 or Tier 2 noted below.

Full-time employees are permitted to purchase Tier 3 apparel directly from the apparel provider and may keep any Tier 3 apparel upon completion of full-time work.

Full-time employees selecting to rent the apparel shall have it provided by the township and sign an apparel consent agreement that the apparel be returned to the township upon discontinuing full-time employment.

Alternatively, full-time employees may opt to purchase the apparel directly from the township provider for any of the tiers and do not need to return it upon completion of full-time employment.

**Part-time employees/Volunteers**

Part-time employees are not eligible for apparel rental. However, part-time employees and volunteers are permitted to purchase Tier 1 and Tier 2 items directly from the Township's apparel provider.

**Elected Officials**

Elected officials (trustees and fiscal officer) may be provided with Tier 1 or Tier 2 by the township and do not need to return the apparel upon completion of their tenure.

Elected officials are permitted to purchase Tier 3 apparel directly from the apparel provider and may keep any Tier 3 apparel upon completion of their tenure.

Motion: Raehll
Second: O'Brien
Vote: Raehll yes, O'Brien yes and Bullard yes

**RESOLUTION 23-06-21** **MOTION TO APPROVE $1,000 WITH THE ANTICIPATED COST BEING $950 TO EGELHOF FOR 100 PATCHES AND THE COST TO SEW ON THOSE PATCHES EACH TIME**

Motion: Raehll

Second: O'Brien
Vote: O'Brien yes, Bullard yes and Raehll yes

**RESOLUTION 23-06-22** **MOTION TO APPROVE $1,500 TO EGELHOF FOR APPAREL FOR FULL TIME EMPLOYEES THAT ARE NON-ROADS AND NON-FIRE EMPLOYEES AS WELL AS ELEECTED OFFICIALS**

Motion: Raehll
Second: O'Brien
Vote: O'Brien yes, Bullard yes and Raehll yes

**JEDD-** Raehll said one of our partners had a couple questions going back and forth and these should be resolved soon. Monica Connors said they would be able to provide numbers for anyone coming into the business park relating to JEDD costs.

**Grant Writer-** Raehll said this can be taken off the agenda.

**Comp Plan Update-** Raehll said this has been given to zoning and they are working through it so it can also be taken off the agenda.

**Fiber-** O'Brien said he wants to talk to Tiffany Jenkins.

**Fiscal Officer Items-** Smith said the May bank statement balanced.

**Cemetery–** Raehll said we have made significant progress in our timeliness and responsiveness to our residents from all our cemeteries. She would like a spreadsheet created to help keep track of the issues they run across. Bullard said they received the file cabinet and would like to put it in the trustee's office. They discussed removing the desk in the trustee's office as well as some other items.

They discussed planting trees and the types of trees to plant at Evergreen rather than reinstalling a fence. Bullard will work with Grubb Landscaping and Foor.

**Trustee Items-**
**Consideration of TIFF-** Raehll stated that they meet with Olentangy School representatives earlier in the meeting and did not hear any specific considerations. for the board just points for clarification.

**RESOLUTION 23-06-23** **MOTION DECLARING IMPROVEMENT TO CERTAIN REAL PROPERTY TO BE A PUBLIC PURPOSE, AND EXEMPT FROM REAL PROPERTY TAXES; IDENTIFYING CERTAIN PUBLIC INFRASTRUCTURE IMPROVEMENTS THAT ARE A PUBLIC PURPOSE AND, ONCE MADE, WILL DIRECTLY BENEFIT THAT REAL PROPERTY; REQUIRING THE OWNERS OF THAT REAL PROPERTY TO MAKE SERVICE PAYMENTS IN LIEU OF TAXES; ESTABLISHING A TOWNSHIP PUBLIC IMPROVEMENT TAX INCREMENT EQUIVALENT FUND; AND RELATED AUTHORIZATIONS**

Motion: Raehll
Second: O'Brien
Vote: Bullard yes, Raehll yes and O'Brien yes

**Township Specialist Position-** Raehll said she would like to move forward with posting for this position not to exceed 25 hours a week, to help out with recording issues with Evergreen Memorial, with preparing resolutions for the board's consideration, O'Brien said he would like that they prepare resolutions for and against and have them gather information from the county for us. Raehll would like for the person to be able to fill in for Rippel or Bon when they can't have the zoning office open. She also suggested that they do meeting minutes. The pay range was the only other consideration, and she was thinking $20 to $24 an hour. O'Brien said they will need to have a writing skill set to be able to write the resolutions. Raehll would like the position reporting to Bon and have him take on more administrative tasks outside of zoning. Bullard said zoning inspector should be his priority position. Raehll said with getting the IworQ software we are getting the tools to make the zoning inspector's job more efficient, and the township specialist could help in this area and

others. Bullard said he would we willing to consider a person to help the fiscal officer out as well. Raehll said it may not be the same person, but it could if it was two different rolls. O'Brien said he feels it would be better for separate people because once the JEDD gets rolling you'll have more paperwork that someone else should be doing.

**RESOLUTION 23-06-24** **MOTION TO POST THE BERLIN TOWNSHIP SPECIALIST POSITION AT PARTTIME FOR UPTO 25 HOURS PER WEEK AT A RANGE OF $20 TO $24 WITH THE DESCRIPTION LISTED WITHIN OUR EMPLOYEE HANDBOOK AND THE ADDITIONS OF CRAFTING RESOLUTIONS, CURATING INFORMATION FOR VARIOUS DEPARTMENTS, COMPLETING MEETING MINUTES AND OTHER CROSSTRAINING AND FUNCTIONS FOR DEPARTMENTS AS NEEDED**

Motion: Raehll
Second: O'Brien
Vote: Raehll yes, O'Brien yes and Bullard yes

**Records Retention Policy-** Raehll said we are exceeding the record retention policy and are not sticking to it. For example, we have one year for audio and she heard it was not one year for audio but was at whatever time the meeting minutes were transcribed, then the audio would be destroyed. O'Brien said that is in the resolution from the 1990's so we should not confuse that resolution with the records retention. Smith said the records retention says incorporate into official minutes and then retain for one year for audio and video. Raehll said the only safe way to know when they are transcribed is when they are approved. Raehll would like more clarification on how we intend to implement this because there is a liability if we have meetings that are only summations. She said we need to find a way to remove the video off Youtube and Facebook and she will look into it. Smith said she was not involved in the original retention policy and there are so many different retention periods that are hard to go through and there are items on the list that we don't even have. O'Brien said it was done by the prosecutor's office and when you make something so complicated it's hard to comply.

**Succession Planning-** Raehll said we already spoke about this.

**Zoning Department-**
**May Zoning Report-** There are 12 new home builds for the month of May and the YTD is 50.

Raehll said we approved hiring a member for the ARB board, but they are unable to take the position.

**Future Meetings-**
**6/26/23** **6/12/23 Trustee Meeting Continued**
**07/10/23** **Trustee Meeting**
**07/19/23** **Parks & Trails Meeting**
**07/24/23** **Trustee Meeting**
**08/14/23** **Trustee Meeting**

**Late Items-** Bullard said he would like to get items together to be listed on GovDeals.

**RESOLUTION 23-06-25** **MOTION TO RECESS AND CONTINUE BERLIN TOWNSHIP TRUSTEE MEETING TO JUNE 26, 2023 AT 5:30 P.M.**

Motion: Raehll
Second: O'Brien
Vote: Raehll yes, O'Brien yes and Bullard yes

Meeting was recessed by Chairman Raehll at 12:07 P.M.

Raehll called the June 12, 2023 meeting back to order at 5:40 p.m. on June 26, 2023. She stated they had a number of items that they wanted to reconvene upon coming from their time together on June 12, 2023.

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting June 12, 2023**

**RESOLUTION 23-06-26** **MOTION TO APPROVE $1,595.28 TO R.L. PARSONS FOR PARTS FOR FLAIL MOWER**

Motion: Bullard
Second: O'Brien
Vote: Raehll yes, Bullard yes and O'Brien yes

**RESOLUTION 23-06-27** **RECESS TO EXECUTIVE SESSION PURSUANT TO ORC 121.22 (G)(1) RECESS TO EXECUTIVE SESSION PURSUANT TO ORC 121.22 (G)(1) FOR CONSIDERATION OF PPOINTMENT, EMPLOYMENT, DISMISSAL, DISCIPLINE, PROMOTION, DEMOTION, COMPENSATION OF A PUBLIC EMPLOYEE OR OFFICIAL, OR THE INVESTIGATION OF CHARGES OR COMPLAINTS AGAINST A PUBLIC EMPLOYEE, OFFICIAL, LICENSEE, OR REGULATED INDIVIDUAL, UNLESS THE PUBLIC EMPLOYEE, OFFICIAL, LICENSEE OR REGULATED INDIVIDUAL REQUESTS A PUBLIC HEARING AND 121.22 (G) (3) TO CONFERENCE WITH AN ATTORNEY FOR THE PUBLIC BODY CONCERNING DISPUTES INVOLVING THE PUBLIC BODY THAT ARE THE SUBJECT OF PENDING OR IMMINENT COURT ACTION, AND 121.22 (G) (4) PREPARING FOR, CONDUCTING, OR REVIEWING NEGOTIATIONS OR BARGAINING SESSIONS WITH PUBLIC EMPLOYEES CONCERNING THEIR COMPENSATION OR OTHER TERMS AND CONDITIONS OF THEIR EMPLOYEMENT - THREE TRUSTEES, FISCAL OFFICER AND AT DIFFERENT POINTS OUR REPRESENTATION FROM OUR RESPECTIVE COUNSELS TO ATTEND-5:45 P.M.**

Motion: Raehll
Second: Bullard
Vote: Raehll yes, O'Brien yes and Bullard yes

**RESOLUTION 23-06-28** **MOTION TO RETURN TO REGULAR SESSION- 9:17 P.M.**

Motion: Raehll
Second: Bullard
Vote: Bullard yes, O'Brien yes and Raehll yes

Raehll said "We met in executive session and no decisions were made no actions were taken. However, we had a number of conversations regarding specific issues that I think would be beneficial for us to further consider, one being litigation involving open meetings act."

**RESOLUTION 23-06-29** **MOTION TO APPOINT TRUSTEE BULLARD AS THE REPRESENTATIVE FOR THE BOARD RELATED TO ALL MATTERS CONCERNING THE OPEN MEETINGS LITIGATION AND FURTHUR APPOINT SURDYK, DOWD & TURNER CO AS THE REPRESENTATIVE COUNSEL IN THIS CASE**

Motion: Raehll
Second: O'Brien
Discussion: O'Brien said he thinks it is wise based on who has the information to adopt this resolution.
Vote: Bullard yes, O'Brien yes and Raehll yes

Raehll said she posted the township operations specialist position on the website. Bullard said there was no change with the assistant cemetery sexton, and he would have it for the next meeting. Raehll asked if we wanted to pursue the assistant chief position and O'Brien said he though it would be a good thing and to discuss it at the next meeting. Raehll said she wants all our positions to be fully staffed and operational. She said the ARB position was filled but the person never started.

**RESOLUTION** **MOTION TO DECLARE THE 4TH POSITION FOR THE**

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting June 12, 2023**

**23-06-30 ARCHITECTURAL REVIEW BOARD AS BEING VACANT**

Motion: Bullard
Second: Raehll
Discussion: Raehll said this was the position that was vacated by Bullard with the expiration date of December 31, 2023.
Vote: O'Brien yes, Raehll yes and Bullard yes

Raehll said ODOT was okay with having a special meeting on July 10, 2023, at 4:15 p.m. to discuss updates relevant to Berlin Township regarding 36/37 and Sunbury Parkway specifically transportation issue. She will check into inviting others that are interested in the Berlin Business Park. Raehll said Smith mentioned that her and Taylor could not do minutes for the July 24, 2023, meeting and that someone from zoning said they would be willing to serve as a minute's representative and she will send Smith the info as she is the person responsible for the accurate keeping of records of trustee minutes. O'Brien said Smith can hire the person and the board sets the amount of money available. They discussed who should do the meeting minutes for the ARB.

Bullard asked O'Brien if he had an update on the SOG's and O'Brien said he will ask the chief and discuss it at the July meeting as he would like to have it accomplished soon.

**RESOLUTION 23-06-31 MOTION TO SET SPECIAL MEETING FOR JULY 10, 2023 AT 4:15 P.M. LOCATED AT 3271 CHESHIRE ROAD FOR THE PURPOSE OF MEETING WITH ODOT TO DISCUSS UPDATES, TRAFFIC, ROADS WITHIN THE TOWNSHIP. FRIENDLY AMENDMENT TO INCLUDE THE COUNTY IN DISCUSSION WITH STATE, COUNTY AND TOWNSHIP REGARDING ROADS WITHIN THE CONTEXT OF THE DISCUSSION WITH BERLIN TOWNSHIP**

Motion: Raehll
Second: Bullard
Discussion: Bullard said we need to send a notice to the county too. O'Brien asked that they make a friendly amendment to the resolution and Raehll added the friendly amendment.
Vote: O'Brien yes, Raehll yes and Bullard yes

**RESOLUTION 23-06-32 MOTION TO APPROVE NOT TO EXCEED $40,000 TO RINEHART LEGAL SERVICES FOR TOWERCO**

Motion: O'Brien
Second: Bullard
Vote: Raehll yes, Bullard yes and O'Brien yes

**Adjourn-RESOLUTION 23-06-33 MOTION TO ADJOURN**

Motion: Bullard
Second: O'Brien
Vote: Raehll yes, Bullard yes and O'Brien yes

Meeting was adjourned by Chairman Raehll at 9:55 P.M.

Meghan Raehll, Chair

ATTEST:

Ron Bullard, Vice-Chair

Claudia Smith, Fiscal Officer

Ken O'Brien, Trustee

*****Notice: A video recording of this meeting can be found on YouTube or Berlin Townships Facebook page.***

PLAINTIFF'S EXHIBIT 5 8-29-25 MR

**BERLIN TOWNSHIP TRUSTEES**

5:30 p.m. **Trustee Meeting** **September 11, 2023**

**HELD AT:** This meeting was held at 3271 Cheshire Rd, Delaware, OH

**CALL TO ORDER:** Meghan Raehll, Trustee Chairman

**PLEDGE OF ALLEGIANCE:** Meghan Raehll led the Pledge of Allegiance

**ROLL CALL:** Meghan Raehll, Ken O'Brien, Ron Bullard and Claudia Smith, Fiscal Officer

**ATTENDANCE:** Adam Miller, Jeffrey Jordan, Jasper DeChristopher, Larry Buell, Eric & Debbie Rickabaugh, Ron Sabatino, Darcy Kaplan, Jeff & Edie Parker, David Stuckey, Check & Sandy Roddy, Nicki Ackers, RJ Newell, Anne Marchiondo, Sarah Sanders, Terry Al, Todd Faris and Chris Paykoff

**Public Comment-** Raehll opened up for public comment not related to the hearings on T & R Properties the request to reopen BZC 23-003 The Residences of Berlin Township and BBP 23-003 The Elysian at Alum Creek as the public will have the opportunity to provide comments specific to these developments in question.

RJ Sabatino wanted clarification as he knows they are up at 7:00 p.m. and asked if he was able to present at that time as well. Raehll said for public comments he board does not typically does not go back and forth with questions but they were going to allow him to make a presentation. Sabatino thank them.

**Approval of Minutes–**O'Brien said the first one he thought they were not going to do until the end of the meeting. Raehll asked if he was referencing the meeting minutes from June 12, 2023 and O'Brien said yes.

**RESOLUTION 23-09-05** **APPROVE THE 7/24/23 AND 8/14/23 REGULAR MEETING MINUTES, THE 8/28/23 SPECIAL AND 8/29/23 EMERGENCY MEETING MINUTS AND DISPENSE WITH THE READING**

Motion: O'Brien
Discussion: Smith said they did not have the minutes from the special meeting of August 28, 2023 yet and they were just given the minutes from the July meeting today. She asked if anyone had looked them over and the August 14, 2023 minutes had questions on them that she had not received responses to yet. O'Brien asked if she was recommending that they wait on them and Smith said if they read them, have reviewed them and are okay with approving them then she is too but there were questions on some of them. O'Brien withdrew the motion.

**Motion Withdrawn**

Raehll asked if there were any meetings that did not need reviewed and could be approved at this time. Smith said she did the minutes for the August 29th emergency meeting minutes and feels they are ready but the August 14th had red markings and since she was not at that meeting she could not verify what was to be corrected. The minutes from July 24th just came today and she has not had time to review them.

**RESOLUTION 23-09-06** **APPROVE THE 8/29/23 EMERGENCY MEETING MINUTES AND DISPENSE WITH THE READING**

Motion: O'Brien
Second: Raehll
Vote: Raehll yes, Bullard yes and O'Brien yes

Raehll said she will make certain to get any feedback to her for the ability to approve the next cycle.

**Old Business–**
**Evergreen Memorial–**
**Sign-** Raehll said they have been working over the last five to six weeks to look at rebranding efforts for the change from Fairview Cemetery to Evergreen Memorial and asked Bullard if he had any updates. Bullard said they don't have quotes yet for the sign as it

takes time. O'Brien said he did not like the sandstone sign. Bullard said what he like about it was the cost but it should last 100 years and they are also looking at granite which should last a lot longer. O'Brien said he likes those. Bullard said they need to be very careful with the placement of the sign and the trees along Route 23 for visibility and safety because a lot of people go in and out of the cemetery. Bullard read an update from Peden: The phone company is running a new fiber optic cable in the front of the cemetery on ODOT right of way, they also OUPS the front of property and there is a gas line behind the current right of way behind the flags I placed. I think it would be beneficial if we could get Stucco to move faster on easement search cause we now know there are utilities behind ODOT right of way where the board wants the trees and depending on utility easement we may not have ability to install trees, just something to consider with existing utilities. Bullard said they found a way to place trees and that is by taking any area were plots have not sold and placing them there. Raehll asked that they discuss the sign first and said Foor received a quote from Snyder for $12,000 carved on one side and Jahn Monuments quoted the same stone at $50,000 without the request for legs to be added. They liked the dark granite with light writing that they saw. She said Foor had issues with using sandstone because it has a shorter life expectancy than granite. Bullard said they are still waiting on quotes and Raehll said they like the dark color with light writing and if that dictates the type of stone, they use then so be it. Raehll asked Bullard if they could have the quotes by the September 24th meeting and Bullard said he will have any update at that time.

Raehll said the landscaping is super problematic because where Peden placed the white flags there isn't even eight feet between it and the next headstone and only the furthest south portion did not have headstones right there so they could put a batch of trees there, although it would take up plots that are probably there. She said there is a portion that is in Liberty Township that we need to get resolution on. O'Brien said it makes more sense for us to have an agreement and have them to pay us to take care of it. Raehll asked Bullard to have Peden work with Liberty on this. Bullard will go with Peden and walk the cemetery to check into the tree plantings.

**Lot Transfer Forms–** Bullard said they received the form from the prosecutor's office. O'Brien wants it clear that the transfer has to be with a family member only. Raehll said they received a request asking if the trustees would buy back a plot in Cheshire Cemetery, trade one for one near the center of the cemetery or if they could list the lot and sell it and then have the deed transferred. Bullard said we do not buy back plots. Bullard said they have in the past allowed the transfer of plots in Cheshire. Raehll asked what principal we have to reject allowing this plot to be transferred. O'Brien said if there is a row of empty plots he would not object but he doesn't want to sell just one plot that could leave one plot by itself as most people want two or more plots together. Bullard will follow up on the request after discussing this with Buell and bring back to the board.

Raehll wants to make explicit how we will accept the transfer form, we will allow the owner to come in with the person they want to transfer it to come in in person at the township hall and verify their identity. We will allow notarization of the form. Bullard said rules will be put in place who can make these transfers. Raehll asked who can and said the owner can do it for a non-family member because it is via marriage for the current request.

| | |
|---|---|
| **RESOLUTION 23-09-07** | **MOTION TO ADOPT THE TWO PAGE CEMETERY BURIAL RIGHTS TRANSFER FORM DATED 9/11/23 FOR EVERGREEN MEMORIAL** |

**BERLIN TOWNSHIP**
**3271 Cheshire Road**
**Delaware, Ohio 43015**
**(740) 548-5217**

**BURIAL RIGHTS TRANSFER FORM**

Know all persons by these presents that I/we, ________________________, residing at
Name(s)

______________________________________________________________
Address

_______________________________________________
City State Zip Code

_______________________________________________,
County Phone Number

do hereby agree to transfer ownership of/burial rights in the following cemetery lot(s)/gravesite(s) in Berlin Township, Evergreen Memorial Cemetery (fka Fairview Memorial Park), located at 5035 Columbus Pike, Lewis Center, Ohio 43035: Lot(s) _________

Section(s) _________ Grave(s) _________ to _______________________________,
Name(s)

residing at _______________________________________________
Address

_______________________________________________
City State Zip Code

_______________________________________________
County Phone Number

Signed this _____ day of _________, 20__.

_____________________ _____________________
Printed Name: _____________________ Printed Name: _____________________

Witnessed by _____________________
Signature of Berlin Township Official/Representative

**BERLIN TOWNSHIP**
**BURIAL RIGHTS TRANSFER FORM**
**(Page 2)**

I/We, _____________________, residing at _____________________
Name(s) Address

_______________________________________________
City State Zip Code

_______________________________________________
County Phone Number

do hereby wish to accept the transfer of the ownership of/burial rights in the following gravesite(s) in Berlin Township, Evergreen Memorial Cemetery (fka Fairview Memorial Park):

Lot(s) _________ Section(s) _________ Grave(s) ______

from _____________________.
Name(s)

Signed this _____ day of _________, 20__.

_____________________ _____________________
Printed Name: _____________________ Printed Name: _____________________

Witnessed by _____________________
Signature of Berlin Township Official/Representative

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting September 11, 2023**

Approval of transfer of cemetery lot/cemetery grave space(s) on behalf of Berlin Township

_________________________ Date: __________
Name: _________________________
Position: _________________________

All transfers must comply with Berlin Township Board of Trustees Rules and Regulations Governing Evergreen Memorial Cemetery (fka Fairview Cemetery)

Berlin Township will issue a cemetery lot deed(s) to the transferee(s) for the lot(s)/gravesite(s) in Evergreen Cemetery (fka Fairview Memorial Park) indicated above.

Motion: Bullard
Second: O'Brien
Vote: Raehll yes, Bullard yes and O'Brien yes

**Cheshire Tree Trimming Quote-**

**RESOLUTION 23-09-08** **APPROVE $9,775 TO ADAMS TREE SERVICE FOR TREE TRIMMING IN CHESHIRE CEMETERY**

Motion: Bullard
Second: O'Brien
Vote: Bullard yes, O'Brien yes and Raehll yes

**JEDD-**Raehll said for our partners they have resolved all the issues between the different parties.

**Cheshire Road Widening Easement & Fiber-** O'Brien said it's still in the county engineer's ball court whether or not there is sufficient room for a conduit. He said the county did not want to own the fiber because there are costs associated with it. He said it should be in the road right-of-way, done in concert with the county's project but be our project. He feels the cost will be low enough that we can do it by quotes. We would also need to have someone consult for us regarding the fiber. O'Brien said he is waiting on Tiffany Jenkins. Bullard asked about the water and O'Brien said it will solve itself if the county works with us and if they don't then the county is going to have to deal with the water because the need for the water easement is solely because the county wants to take the easement that Del-Co has. If the county won't pay for the Del-Co easement they can pay for us for damages for not having water.

**Collective Bargaining-** O'Brien said he would like to discuss this in executive session later.

**Assistant Road Supervisor-** Bullard said he wants to promote Jeff Evans to assistant road supervisor that would be able to fill in for when the supervisor is not here. O'Brien asked if he would be on probation for 6-months. Bullard said we can do that and Raehll said we can discuss it further in executive session and it has nothing to do with Evans it's more about the organizational structure as we will not have any road laborers if we make this move and it feels very top heavy to her. She wonders if it would be better to wait until we have back-filled positions of the road laborer and then move Evans. Bullard said he's thinking of it as supervising the roads more than supervising the crews. O'Brien said he doesn't have a problem with it as long as there is a 6-month probation because everyone should have that.

**RESOLUTION 23-09-09** **MOTION TO PROMOTE JEFF EVANS TO ASSISTANT ROAD SUPERVISOR AT A PROBATIONARY RATE OF $26.42 AN HOUR WITH A SIX-MONTH PROBATIONARY PERIOD, EFFECTIVE SEPTEMBER 18, 2023, WITH THE EXPECTATION THAT HE WILL GO TO THE ASSISTANT ROAD SUPERVISOR POSITION AT THAT TIME**

Motion: Bullard
Second: O'Brien

Discussion: Raehll made a friendly amendment that the title is technically road superintendent and asked Bullard which he would prefer. Bullard said he likes supervisor. Raehll said no amendment to the resolution at this point but there will be an amendment to the job description at this point. Bullard made a friendly amendment to have it start the next pay period which starts September 18, 2023, which has been added to the resolution.
Vote: Bullard yes, O'Brien yes and Raehll yes

**Electronic Financial Devices-** Raehll said the resolution that they passed last had some errors in it so they need to rescind it. They had the fire department listed and they should not be. There was also confusion on the ways and means of paying and it was significant enough that they want to correct it. O'Brien asked how it was different from what they passed. Raehll said they thought it was the method by payment instead of the actual form of payment such as credit care payments accepted online payments and we said it was related to things that we would accept payment for like administrative duties, permits, etc. Raehll said she worked with the prosecutor's office on it and would send it to Smith.

**RESOLUTION 23-09-10** **MOTION TO REPEAL RESOLUTION 23-08-15 AUTHORIZING ACCEPTANCE OF PAYMENT BY FINANCIAL TRANSACTION DEVICES FOR TOWNSHIP EXPENSES AND DESIGNATING THE TOWNSHIP FISCAL OFFICER AS AN ADMINISTRATIVE AGENT TO SOLICIT PROPOSALS FROM FINANCIAL INSTITUTIONS, ISSUERS OF FINANCIAL TRANSACTION DEVICES, AND PROCESSERS OF FINANCIAL TRANSACTIONS AND REPLACE WITH RESOLUTION 23-09-10 WHICH IS THE ACCEPTANCE OF THE REDLINE VERSION PROVIDED VIA EMAIL TO THE FISCAL OFFICER ON SEPTEMBER 11, 2023 AT 6:30 P.M.**

**BERLIN TOWNSHIP BOARD OF TRUSTEES**
**DELAWARE COUNTY, OHIO**

**DATE: September 11, 2023**

**RESOLUTION NO. 23-09-10**

**RESOLUTION AUTHORIZING THE ACCEPTANCE OF PAYMENTS BY FINANCIAL TRANSACTION DEVICES FOR TOWNSHIP EXPENSES AND DESIGNATING THE TOWNSHIP FISCAL OFFICER AS AN ADMINISTRATIVE AGENT TO SOLICIT PROPOSALS FROM FINANCIAL INSTITUTIONS, ISSUERS OF FINANCIAL TRANSACTION DEVICES, AND PROCESSORS OF FINANCIAL TRANSACTION DEVICES**

The Board of Trustees of Berlin Township, Delaware County, Ohio ("Board") met in public session on September 11, 2023 at 5:30 PM at the Berlin Township Hall located at 3271 Cheshire Road, Delaware, Ohio 43015, with the following members present:

Trustee Bullard Trustee O'Brien Trustee Raehll

Raehll moved the adoption of the following Resolution:

**PREAMBLE**

**WHEREAS,** the Board adopted Resolution Number 23-08-15 on August 14, 2023; and, for the purpose of clarifying certain terms and provisions contained therein, the Board wishes to repeal and replace the same with the Resolution adopted herein.

**WHEREAS,** Berlin Township Zoning Department and Administrative Office accept payments of various fees and rental charges; and,

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m.** **Trustee Meeting** **September 11, 2023**

**WHEREAS,** the Board has determined that the acceptance of payment for Berlin Township ("Township") expenses by financial transaction devices will contribute to the health, safety, and welfare of the Township and its residents; and,

**WHEREAS,** the Board has determined that the acceptance of the payment of fees and expenses, in addition to the acceptance of cash and checks, will increase the efficiency of Township operations and inure to the benefit of Township residents; and,

**WHEREAS,** Berlin Township Zoning Department and Administrative Office fees are established, published, and will be reviewed to ensure that they are both correct and appropriate; and,

**WHEREAS,** R.C. § 503.55 authorizes the Township to accept payments of Township fees and expenses by financial transaction devices; and,

**WHEREAS,** pursuant to R.C. § 503.55(A)(1), financial transaction devices include credit cards, debit cards, charge cards, or prepaid or stored value cards, or automated clearinghouse network credit, debit, or e-check entries that includes, but is not limited to, accounts receivable and internet-initiated, point of purchase, and telephone-initiated applications or any other device or method for making an electronic payment or transfer of funds; and,

**WHEREAS,** pursuant to R.C. § 503.55(A)(2), township expenses includes fees, costs, assessments, fines, penalties, or any other expense a person owes or otherwise pays to the Township; and,

**WHEREAS,** pursuant to R.C. § 503.55(B), the Board shall designate the Township Fiscal Officer as an administrative agent to solicit proposals from financial institutions, issuers of financial transaction devices, and processors of financial transaction devices, to make recommendations about those proposals to the Board, and to assist Township offices in implementing the Township's financial transaction device program.

**RESOLUTION**

**NOW, THEREFORE, BE IT RESOLVED:**

A. That Resolution Number 23-08/15 is hereby repealed and replaced with this Resolution.

B. That the Board authorizes, pursuant to R.C. § 503.55, payments by "financial transaction devices," as defined in R.C. § 503.55(A)(1), for Township expenses.

C. That the Board authorizes the following Township offices to accept payments by financial transaction devices: Berlin Township Zoning Department and Administrative Office.

D. That the Board authorizes any expense considered to be a "township expense" under R.C. § 503.55, including, but not limited to, the following: Fees; costs; assessments; fines; penalties; payments; or any other expense a person owes or otherwise pays to the Township.

E. That the Board authorizes the following types of financial transaction devices to be accepted, upon the condition that an agreement setting forth the terms and conditions for payment using such financial transaction device is entered into with the issuing financial institution(s), issuer(s) of financial transaction devices, or processor(s) of financial devices: Credit cards and/or charge cards (For payments via credit card readers at the Township Offices and via online/internet payments for zoning purposes).

F. That the acceptance of financial transaction devices need not be uniform among different types of Township expenses.

G. That the Board authorizes a surcharge or convenience fee for use of a financial transaction device to be paid by the user of the financial transaction device; and, that the amount authorized as a surcharge or convenience fee shall be determined by the Board after selection of a financial institution(s), issuer(s) of financial transaction devices, or processor(s) of financial transaction devices to facilitate the Board's financial transaction devices program.

H. That every Township office accepting payment by a financial transaction device shall comply with the requirements of R.C. § 503.55(E) notice; namely, that each Township office accepting payment by a financial transaction device shall clearly post a notice in that office and online, if payments are accepted online, that each person making a payment by such a device shall be notified about the surcharge or fee, and that notice to each person making a payment shall be provided regardless of the medium used to make the payment and in a manner appropriate to that medium.

I. That each notice required by R.C. § 503.55(E) shall include all of the following: A statement that there is a surcharge or convenience fee for using a financial transaction device; the total amount of the charge or fee expressed in dollars and cents for each transaction, or the rate of the charge or fee expressed as a percentage of the total amount of the transaction, whichever is applicable; and, a clear statement that the surcharge or convenience fee is nonrefundable.

J. That if a payment by financial transaction device is returned or dishonored for any reason, the person making payment by the financial transaction device shall pay the amount necessary to reimburse the Township for banking charges, legal fees or other expenses incurred by the Township in collecting the returned or dishonored payment; and, that these remedies and procedures are in addition to any other available civil or criminal remedies provided by law.

K. That the Township Fiscal Officer is designated as an administrative agent to solicit proposals, within the guidelines established by the Board in this Resolution and in compliance with the procedures provided by R.C. § 503.55(C), from financial institutions, issuers of financial transaction devices, and processors of financial transaction devices, to review the proposals and to make recommendations about those proposals to the Board, and to assist Township offices in implementing the Township's financial transaction device program.

L. That the Board shall consider the Township Fiscal Officer's recommendation and review all proposals submitted.

M. That the Board may choose to contract with any or all of the entities submitting proposals, as appropriate.

N. That the Board shall provide any financial institution, issuer, or processor that submitted a proposal, but with which the Board does not enter into a contract, notice that its proposal is rejected; and, that such notice shall state the reasons for the rejection, indicate whose proposals were accepted, and provide a copy of the terms and conditions of the successful bids.

O. That the Township Fiscal Officer is hereby requested to send a copy of this Resolution to each Township office identified in this Resolution as an office which may accept payment by financial transaction device.

P. That all formal actions of the Board concerning and relating to the passage of this Resolution were adopted in an open meeting(s) of the Board, and all deliberations of the Board and of any of its committees that resulted in such formal action were in a meeting(s) open to the public in compliance with all legal requirements, including R.C. § 121.22.

Q. That this Resolution shall be in full force and effect immediately upon adoption.

Bullard seconded the Motion.

The roll being called upon its adoption, the vote resulted as follows:

| | | | |
|---|---|---|---|
| YES | O'Brien ________ | Raehll ________ | Bullard ________ |
| NO | ________ | ________ | ________ |
| ABSTAIN | ________ | ________ | ________ |

Signed this September 11, 2023 in Berlin Township, Delaware County, Ohio.

**BOARD OF TRUSTEES OF BERLIN TOWNSHIP**

**DELAWARE COUNTY, OHIO**

________________
Trustee Meghan Raehll

________________
Trustee Ron Bullard

________________
Trustee Ken O'Brien

Attest:

________________
Claudia Smith, Township Fiscal Officer
Berlin Township, Delaware County, Ohio

**CERTIFICATE**

State of Ohio, County of Delaware County

I, the undersigned Township Fiscal Officer of Berlin Township, Delaware County, Ohio, certify that the foregoing Resolution No. 23-09-10 is taken and copied from the record of proceedings of the Board, and that it has been compared by me with the Resolution on the record and is a true and accurate copy. Further, I certify that the adoption of such Resolution occurred in an open meeting held in compliance with R.C. § 121.22.

Date: September 11, 2023

________________
Claudia Smith, Township Fiscal Officer
Berlin Township, Delaware County, Ohio

Motion: Raehll
Second: Bullard
Vote: O'Brien yes, Raehll yes and Bullard yes

**Fire Department-**
**Requisitions-** Chief Miller said they received three estimates to replace the aging tile at the fire station. A.C.T. did not have any commercial references but all residential references were good.

**RESOLUTION 23-09-11** **APPROVE $41,805.17 WITH AN EXPECTED COST OF $34,837.64, TO A.C.T. ADVANCE CLEANING TECHNOLOGY SERVICES FOR THE PURPOSE OF REPLACING THE EXSISTING FLOOR AT THE**

**BERLIN TOWNSHIP TRUSTEES**

5:30 p.m. **Trustee Meeting** **September 11, 2023**

**FIRE STATION WITH LDT CONDITIONALLY THAT IT IS CONFIRMED THAT IT IS A SHAW COMMERICAL GRADE PRODUCT AND THAT THE REMOVAL INCLUDES HAWLING IT AWAY**

Motion: O'Brien
Second: Bullard
Vote: O'Brien yes, Raehll yes and Bullard yes

**RESOLUTION 23-09-12** **APPROVE $15,004 WITH AN EXPECTED COST OF $12,902 TO R & T YODER FOR THE PURPOSE OF REPLACING EXISTING BAY LIGHT FIXTURES WITH LED AND INSTALLING TWO SEVENTY-TWO INCH HUNTER CEILING FANS AND PROCURING THE COUNTY PERMIT AND THIS AMOUNT INCLUDES UPTO $2,500 FOR THE REDRAWING OF THE PLAN AT THE FIRE STATION**

Motion: O'Brien
Second: Bullard
Vote: Raehll yes, Bullard yes and O'Brien yes

**Step Increase- RESOLUTION 23-09-13** **MOTION UPON THE RECOMMEDATION OF CHIEF MILLER THAT CAPTIAIN MALACHAI SWANSON HAVING MET ALL THE GOALS SET FORTH BY THE CHIEF, BE GRANTED STEP 5 PAY WITH AN HOURLY RATE OF $22.24 EFFECTIVE SEPTEMBER 3, 2023**

Motion: O'Brien
Second: Bullard
Vote: Raehll yes, Bullard yes and O'Brien yes

Chief Miller said he received quotes for mulch but would like to do river rock, so they don't have to mulch every year. Raehll said bring a quote to the next meeting.

**Fiscal Officer Items –**
**August Bank Statement and Electronic Payments–** Smith said the bank statement balanced.

**Cemetery–**
**Transfer of Cemetery Plot in Cheshire-** Raehll said we have the Cheshire Cemetery sexton here and asked Buell if we had an issue and Raehll said we discussed the letter that was submitted. Bullard asked Buell what his recommendation was and Buell said the person bought the grave space and was not mislead to think that there would be houses around here sometime. Regardless of where you buy a grave space there will be houses around you. Personally, he is not in favor of transfers a gravel space as you will be setting a precedence. Raehll told Buell that we did discuss this and that getting away from a house is not a good reason for requesting a transfer. After a lengthy discussion it was decided that they could transfer it to a family member or he can keep the site and purchase another one in a different spot in the cemetery. Buell said the rule books need to be updated to include Evergreen and he is almost out of books.

3 Minute recess.

Raehll stated that we have a date, time, place, certain for consideration of T&R Properties request to re-open BZC 23-003 The Residences of Berlin Township. This is a consideration of a request to re-open not a consideration of the application itself. She gave the applicant time for a brief presentation.

RJ Sabatino with T&R Properties and Berlin Apartments LLC, applicant and owner said he has a few points he would like to enter into the record including some comments and two letters dated July 5, 2023 and August 10, 2023. He said they come before the board this evening to review the outstanding issues caused by Berlin Township that they have not experienced with any other township in this county and in the state of Ohio. Also on a

national level in the United States they find no community using such contradictory instructions for zoning permits and allowances for density, setbacks and restrictions when creating overlays and multiuse planning and allowances for density for commercial, industrial and multifamily zones. The township appears under an approved comprehensive plan and the boarder overlay zonings that this area is to be developed to meet it's citizens needs for multifamily housing based upon economic realities so the township can increase its tax base, encourage developments and planning. We have pointed out that the problem remains that causing developers to create amenities and non-usable spaces for open space results in disincentiving developments that meets reasonable expectations for risking capital and obtaining project funding. He said they had expected to have the trustees address this on the county but the meeting scheduled August 18, 2023 was unexpectedly cancelled. After the unexpected cancellation of this open forum to review the issues with the Berlin industrial overlay the depth of the discussion impacting this application have stalled the final decisions and negotiations for approval. They have sent several letters which he would like to enter into the record as he referenced dated July 5, 2023 and August 10, 2023. He said these letters in tonight's presentation raise the discussion of the following issues that pivots investment backed expectations by any property owner. These restrictions are all very unreasonable and infringe upon our land use rights as it pertains to a PUD and TPUD.

1. R4 density. He said 4 units to net developable acre of 3.4 units/acre are taking away property rights to develop the property in an economic manner resulting in denying the land owner and applicants its constitutional rights to develop with reasonable restrictions consistent with the township's adopted zoning code and the needs of it's citizens. The denial of this application is opposite of what the township and the county stated their objective in these areas' of the township. We are requesting for 6.97 units per net developable acre which is far lower density, half or less, than any recent zoning in adjacent and nearby townships and municipalities.

2. Parking. He said 3 spaces per dwelling unit as per the Berlin code is not reasonable in today's economic realities in this area and is not standard in any other municipality or township where proper economic development occurs and has been approved. The applicant is providing 624 total spaces inclusive of sufficient guest parking, which is in far excess of typical residential parking standards in adjacent and nearby townships and municipalities.

3. Rental Units. He said this relates directly to TPUD and said there is a severe limitation on the quantity of units that are allowed to be rented under a TPUD which is irrational and counterintuitive to any viable multifamily development considering the ownership problems and housing needs in the township and county. We are requesting 100% of our units in this application and in this project, be rental units to address this real, current and projected affordable housing deficit situation.

He stated the specific issues for multifamily development with BIO Article 19 as applied in the conditions being imposed, some of which may also overlap with the above PRD and TPUD issues are as follows:

1. Setback from existing residential: a 250' setback from existing residential homes is taking of our property rights and is as if the township is taking our property without allowing investment recoupment and is a taking forbidden by townships, municipalities and government entities under the US and Ohio constitution because the restriction has no rational basis and unduly curtails investment backed expectations. This is why we are bringing these issues to your attention and the county because we have spoken with representative of numerous landowners and prospective developers who have walked away from projects in Berlin Township and the park, because of these real-life problems. We would be the first developer to go through this process under these economic disincentives and this is what called 'economic condemnation'.
2. R-4 Density. As seen in the BIO Section 19.03 C.a. A: Areas designated R-4 density shall not exceed four (4) dwelling units per net developable acre.

Additionally, Berlin Township will receive substantial JEDD revenue from this development of approximately $300,000 per year in perpetuity. We respectfully request approval of our multifamily rezoning, a portion of our mixed-use development that includes this application and our industrial application which we hope you do not delay or postpone its hearing which

he hopes to set for October. He also would like to conclude by adding, as it relates to their application that they were told by zoning staff that the BIO and zoning is subject to minor modifications and that includes density. Again, they respectfully request approval of our multifamily rezoning which is a portion of our mixed-use developments which includes this application BZC 23-003 and their industrial application which they hope to have before them in October.

Respectfully, RJ Sabatino

O'Brien asked if they were doing a new application for the industrial and Sabatino said they are requesting modification of the NAICS codes which is what had been sent previously in other emails and letters to the township. O'Brien asked if this was a new application. Sabatino said if that is what they have to do but it was their understanding that they could modify the NAICS codes. Raehll said the request related to the industrial does not pertain to what we said we would be considering in this particular date, time, place. She understands that he has it in the record so it is duly noted, but that is a separate issue that has already been approved by the board related to that case that application as far as they are concerned has been approved and is complete. She said if he has another issued related to it, it will have to stand outside of the consideration to reopen the case that you are requesting to reopen tonight which relates specifically to the apartments. O'Brien said what he heard was a new application. Raehll said even if it was a revision to the prior application that has already been approved it still isn't pertinent to BZC 23-003. Raehll said what we are here to consider specific to the request to reopen BZC 23-003.

Raehll said she would like to gather some specifics related to some facts and asked Sabatino if when he purchased the land, when he entered into the contract for the land if he was aware of the Berlin Comprehensive Land Use Plan. Sabatino said they were and they were aware of their preapplication hearing and other hearings where they meet with zoning staff and where told that modifications could occur to the BIO and to the zoning. Raehll said "But you were aware of what the comprehensive land use plan said, and the zoning text said." Sabatino said "yes". Raehll said the zoning text indicated that that area was currently zoned as FR1, correct, and that there was a potential for the overlay related to R4 and when he purchased the land that was his understanding of what the zoning code said at that time. Sabatino said with it's inaccuracies and functional flaws, that's correct. Raehll said so the answer was yes, you knew what the zoning was when you purchased the land. Sabatino said with it's inaccuracies, error. Raehll said she wasn't asking about inaccuracies and errors she was asking if he was aware that the overlay had R4 and that the land he purchased was FR1 at the time that he entered into the contract. Sabatino said correct with all the other meeting and representations yes.

Raehll asked if he was aware that within that zoning text it does say that any discussions with zoning commission or other members is non-binding and that any such conversations related to zoning changes may or may not have any pertinence or relevance to the actual zoning application and that the zoning text is what the text is. Sabatino said okay. Raehll asked if that was a yes and he said yes.

Raehll asked what was different about his request to reopen related to his application that the board did not have knowledge of or was not privy to at the time it voted on this application. Sabatino said what they were hoping for and he said in his introduction was to have had this meeting after the August 18th open forum to discuss all the errors and flaws an functional inadequacies that exist in the BIO and your standard zoning resolution. Unfortunately, that hearing was cancelled with no follow up on rescheduling. In addition to that perhaps letting the facts settle as it relates to the substantial JEDD revenue that the township would generate as a result of this project and reiterating the substantial flaws that make proper development not work and economically condemns our property and others. Raehll said he is referencing a hearing on August 18th and said there was no hearing ever scheduled for August 18th. She said there was special meeting that they wanted to call as a board to have conversations about the Berlin Business Park. She said it was an important point of clarification that there was no hearing related to your application or anything on the schedule. What happened was BZC 23-003 had a date, time and place certain for its consideration of application on June 12th. Raehll said at that time they stated as a board what were the items that needed to be resolved in order for them to be comfortable

approving a project, he indicated that there would not be a compromise on the specific points they indicated they would have to have compromise on and he requested a vote for that evening. He got his vote on June 12th and on June 12th they were aware of JEDD revenues, they were aware of the different facts that he brough up related to R4 and they were aware of these difference considerations he put forward. She asked if there was any new information since June 12th that this board needs to have before them that you think would substantively change or alter the outcome of that case because they have already voted on it. Sabatino said whether you call it a special meeting or a hearing that's okay, the meeting/special hearing that was to occur on August 18th did not occur. Raehll said there is a difference between a meeting and a hearing, there is a very substantial difference. Sabatino said okay, as it relates to us coming before you June 12th and you acknowledging the facts as we presented them to you that is our substantial evidence and reasoning for our request for an approval with whatever variances may need be. He said as it relates to density they have already reduced density by 100 units. He asked if they had any comments as it relates to what density, what you are looking for. Raehll said if they would have had any comments, which they did, they were heard at the June 12th hearing related to the application that he requested a vote on. So their comments on reflected in those meeting minutes from the consideration which was a public hearing in consideration of an application that you requested we voted on and she believes there were a number of comments made there and are already on the record that can speak for itself in terms of where we were at, at that time. Sabatino said again he is reiterating the letter that he spoke into the record, that is their position.

Raehll said factually there is nothing new that you're bringing forward for our boards consideration that we didn't have at the time of the vote. Sabatino said only what is in this letter and the prior two letters that they put into the record. Raehll thanked Sabatino and asked the board if they had any comments before they open it up to public comments. Bullard said he had none. Raehll opened it up for public comment.

Jasper DeChristopher said the BIOI and BCO were adopted in late 2021 which was a major effort between the township, the trustees, zoning, the economic development office of Delaware and its directors, the county commissioners, a large multifaceted group of Delaware County organizations. His question is everything that is in the overlay was known at that time, how can two years later it be so out of date, so that it needs to be completely different to allow this property change. The density of 7 versus 4 is being pushed from regional planning, to zoning, to the trustees, it's been voices on by residents. The developer purchased the land knowing the land use expectations and knowing what the zoning was at the time. They had contingency in their purchase that they communicated was dependent upon zoning approval for both their industrial and their residential development. They did not have residential zoning approval when they purchased the property, so they choose to make an investment with the risk of not having that zoning even though they had a contingency to back out of that agreement. The development and the risk of their investment. An investment is not a guarantee. Just because I buy something doesn't mean I get to call the shots on what next. So an investment whether it be land, an automobile, a security, it's a risk, there is a risk to it. They choose to move forward knowing the risk now they don't like the end result. He's sorry, that was their risk and if he made the same risk, he may not like the outcome, but he made the decision. So if they make the decision, it's their decision to live with.

Erik Rickabaugh said he has been there many times and doesn't think he has missed a meeting since 2019. He said he thinks he speaks for his fellow residents that he is getting very frustrated that we have a developer that wants to push something down their throats that is not what they want and not what they approved. Back in 2019, there has been talk about it only being 7 people, 7 homes but it's not, In 2019 he would say that at least 75 to 100 people went to zoning meetings as was just mentioned trying to decide what this property should be and through a lot of hard work the zoning commission, the trustees and the residents agreed that it would be R4 and that is what it should be. To approve anything else would be a slap in the face to all the people that spent all that time and effort. And he doesn't think we need that. And he greatly appreciates the trustees' support of what was approved and what was there and what we all want. As they have said before the township is not responsible for them purchasing property that doesn't fit what they want to put there.

That's their problem, that's their fault. It's not the trustee's fault, it's not the townships' fault. He said we have been all through these meetings, architectural, zoning, trustees and they have either been rejected or been told that this isn't going to be approved every time and they continue to push forward. And what they are trying to do is bully yourselves and the township into accepting something that we don't want. He said it is time to stop this. If they are not going to comply with the zoning, we need to stop listening to them. They are wasting the townships' time and our ability to move forward with a development that is what we want. It's going to be a corn field forever if we keep talking to them, so he appreciates their continued support in doing the right thing. Thank you.

Edie Parker said like her neighbors have said they are not the only ones impacted. Those that live directly on Old State would be the most impacted by it. She said one thing that is upsetting to her is that she doesn't have any trust in this developer. When they first started coming to the meetings they claimed they would have it 250 foot back from their house and they are happy to do that, that they are to be great neighbors and it was going to be awesome and they were going to have all these amenities in there. Now before anyone has let them do this they come before us like petulant children, we're not going to get what we want so guess what, you're going to loose out on all this revenue money. So she wants to let them know that Berlin Township is not for sale and that's the purpose of these public involvement meetings, is to listen to the residents and they want the no go option as far as thing goes, not this deal. She said like her neighbor said they appreciate the trustees as this is a lot, it's a lot for all of us but we have a lot of time and money invested in their homes and T&R Properties has a habit of not maintaining what they build and while she feels for lower income people she doesn't want that in her backyard, so doesn't want it for Berlin Township and thinks we can do better than that and thinks we are better than that. Thank you.

Nicki Acker thanked the board for doing this again and again and she truly appreciates them going through this. She said Berlin Township is a wonderful place to live. We have wonderful schools, wonderful neighborhoods, wonderful people that are moving in to all the new developments that are high dollar developments and it's sad when a developer comes in and gets to do what they want to with revisions and wanting to change codes and all and then they leave, and the residents are stuck with whatever they provide or put in. She believes that T&R Properties also own Dooley Orchards and you can go to the website of the Better Business Bureau and see some of the comments that people have put in with the Better Business Bureau and one that really stood out to her was one of the residents wanted bullet holes fixed in their door. She can't see Berlin Township with something in our area where we would have to worry about our safety. There are also two other comments from the Better Business Bureau link where one of the residents from Dooley Orchard said, "This is just not a safe place to live." There was another one that said, "I feel unsafe in my own apartment." So, if the residents don't feel safe then I don't think the neighbors would feel safe either. Thank you very kindly.

Raehll asked if there were any other public comments, hearing none she closed the time for public comments. O'Brien said he thinks we should provide rebuttal. Raehll said but for public comments are there any here in favor of related to public comments. Hearing none she closed public comments and provided the applicant an opportunity to briefly respond to any questions or statements made if they so choose.

RJ Sabatino thanked the trustees and said he would be quick. It's true nothing has happened in the Berlin Industrial Park, and nothing will with the flaws, the inaccuracies and the economic condemnation that exists. He is happy to answer any questions as it relates to the letter that he spoke into the record and he is hopeful for their vote this evening.

O'Brien asked if he verified that all the things that he stated are true. Sabatino said correct.

Raehll asked if it's the applicants request that the board considers the request to re-open the application for BZC 23-003 and is asking for a vote this evening. Sabatino said yes.

O'Brien said he was hoping to hear some give and take, he was hoping to hear something new so that they could approve it. Raehll asked to approve the reconsideration and O'Brien said yes and perhaps consider approving the plan but he didn't hear anything new. Raehll said she thinks it's important to underscore that we have provided very thoughtfully and

very intentionally a variety and diversity of housing across our township and at least from her perspective the issue of providing that type of diversity and affordable housing is an important priority for anyone that has to make zoning considerations. She said that work was intentionally built into the business park and so there are different areas, there are different parcels, different types of housing. She has said time and time again that we will have a significant deficit and shortage of housing particularly for aging populations and young professionals if we don't do something now. For her the issue is completely irrelevant to that and is contingent on the fact that we built a design, we have a plan, those things are in place, you were aware of it, you have had the application, we have done ever procedure and in fact this is rather a unique situation in and of itself that we are even having a re-consideration to re-open a case in which the trustees have already voted on and she does question first of all whether or not a request pursuant to 519.12 that has already been denied by a board can even be reconsidered but they have been advised that there may be a possibility. She has yet to see any case law on something that the board has denied and then brough back to re-consideration in this way. With that said she does think that they provided them with ample opportunity to bring something forward in hopes that they could have a conversation about something different. About information that may have a significant impact on their decision making at the time on June 12th.

Sabatino said as it relates to your earlier comment for housing diversity the facts of his letter indicate the exact opposite of what you said and that Berlin is absolutely not in favor of any diversity in housing or proper developments. Raehll said that is the statement that you made but the facts are that if you look at our zoning code we do have and have provided a variety and diversity of housing so the facts are stated within our zoning code which you have stated your are familiar with and if you look in there you will find a variety of different amendments, housing types, options. Sabatino said if you will allow me to respond without being interrupted, he supposes beside the facts in his letter, the facts are also how Berlin has consistently passed up opportunities to Orange Township, to the City of Delaware, to Berkshire Township, to elsewhere in the county, housing and industrial due to the deficiencies and economic condemnation in your zoning code both zoning resolution and Berlin Industrial Overlay we provided more than anyone else as it relates to giving up density, 100 units, and here we are restating the facts in our letter and that is all that he has to so thank you. Raehll asked if he was finished, and he said yes. Raehll thanked him.

O'Brien said he has a brief comment and said so you are saying you gave up 100 units, but you didn't have 100 units to give up. When you look at the zoning resolution in the area there is an overlay that provides for 4 units at this location, but you didn't choose to do that you chose to do something else so, you site a variety of restrictions that were imposed on you which are in fact not imposed on you because you didn't do the overlay. The other point that he has is that you are saying there isn't a diversity of zoning available, yet your 6.97 units would be available a few properties over so it's not that Berlin Township doesn't provide a place that would suit what you are request is, there is in fact in our zoning resolution a place where your plan would be welcomed, in his opinion. O'Brien said he also sites that all the adjacent entities provide for the density in which you are requesting and have a history of that and you have testified that you have verified the accuracy of this, he questioned the accuracy of it in particular in the adjacent and closest adjacent township, Brown, he doesn't know a single place in Brown that has this density and you may have it and can provide it to me and he may be wrong but he is not aware of Brown's 6.97 units per acre. Raehll said even in the references provided it's not the case that that density is permissible in every parcel in those areas either. Just like with us there are areas that will allow for more, there are areas that allow for less based on what is written the zoning resolution of those respective entities.

Sabatino asked if he could respond and Raehll said no and asked trustee Bullard if he had anything to say and he said that he can't figure any place in our zoning text that would allows this. He can find it in the overlay, and he can find it in areas other than this particular area, to the west and even to the east where there isn't a lot in the area, a lot of other people there. This is jamming it up against single family residential. Raehll said Sabatino could made his closing remarks and Sabatino said he thinks he is okay. O'Brien said he really wanted to reconsider but he hasn't heard anything new to do so.

**RESOLUTION** **MOTION TO DENY APPLICANT'S REQUEST TO RE-OPEN**

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m.** **Trustee Meeting** **September 11, 2023**

**23-09-14** **THE ZONING APPLICATION FOR BZC 23-003 T & R PROPERTIES**

**BERLIN TOWNSHIP BOARD OF TRUSTEES**
**DELAWARE COUNTY, OHIO**

**DATE: 09-11-2023**

**RESOLUTION NO. 23-09-14**

**RESOLUTION DENYING APPLICANT'S REQUEST TO RE-OPEN THE ZONING APPLICATION FOR BZC 23-003**

The Board of Trustees of Berlin Township, Delaware County, Ohio ("Board") met in regular session on September 11, 2023, at 7:00 PM at the Berlin Township Hall located at 3271 Cheshire Road, Delaware, Ohio 43015, with the following members present:

Trustee Raehll

Trustee Bullard

Trustee O'Brien.

**Trustee O'Brien** moved the adoption of the following Resolution:

**PREAMBLE**

**WHEREAS,** Randall Allan Woodings, AIA, as Agent/Applicant, filed an Application For Preliminary Development Zoning Plan (Resolution To Amend Berlin Township Zoning Text) on January 11, 2023 seeking to amend certain property from FR-1 to PRD (Multi-Family Development); and,

**WHEREAS,** an amended Application was submitted by T&R Properties on March 7, 2023 seeking Density Divergences, Setback Divergences, Parking Divergences, and a Divergence from the per unit minimum square footage requirement; and,

**WHEREAS,** the Berlin Township Zoning Commission (BZC) held hearings on February 14, 2023 and March 21, 2023; and,

**WHEREAS,** the BZC recommended denial of the Application; and,

**WHEREAS,** the Board held hearings on April 24, 2023 and June 12, 2023; and,

**WHEREAS,** on June 12, 2023, the Board voted to deny the Application; and,

**WHEREAS,** on July 5, 2023, T&R Properties requested that the Board re-open and table the Application; and,

**WHEREAS,** on July 10, 2023, the Board continued the matter until September 11, 2023 in order to provide notice of the request to re-open; and,

**WHEREAS,** on September 11, 2023, the Board afforded T&R Properties an opportunity to provide support for and/or to argue the merits of its request to re-open; and,

**WHEREAS,** the Board has considered the matter, including the statements and argument of T&R Properties in support of its request to re-open.

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m.** **Trustee Meeting** **September 11, 2023**

**RESOLUTION**

**NOW, THEREFORE, BE IT RESOLVED:**

A. That the Board has considered the request to re-open, does not find the same to be well-taken, and, therefore, denies Applicant's request.

B. That all formal actions of this Board concerning and relating to the passage of this Resolution were adopted in an open meetings of the Board, and all deliberations of this Board and of any of its committees that resulted in such formal action were in meetings open to the public in compliance with all legal requirements, including R.C. § 121.22.

C. That this Resolution shall be in full force and effect immediately upon adoption.

Trustee Bullard seconded the motion.

The roll being called upon its adoption, the vote resulted as follows:

YES: Bullard_____ O'Brien_____ Raehll_______

NO: ____________ ____________ ____________

ABSTAIN: ____________ ____________ ____________

Signed this September 11, 2023, in Berlin Township, Delaware County, Ohio.

**BOARD OF TRUSTEES OF BERLIN TOWNSHIP,**

**DELAWARE COUNTY, OHIO**

______________________________

Trustee Meghan Raehll

______________________________

Trustee Ron Bullard

______________________________

Trustee Ken O'Brien

Attest:______________________________

Claudia Smith, Township Fiscal Officer

Berlin Township, Delaware County, Ohio

**CERTIFICATE**

State of Ohio, Delaware County

I, the undersigned Township Fiscal Officer of Berlin Township, Delaware County, Ohio, certify that the foregoing Resolution No. 23-09-14 is taken and copied from the record of proceedings of the Board, and that it has been compared by me with the Resolution on the record and is a true and accurate copy. Further, I certify that the adoption of such Resolution occurred in an open meeting held in compliance with R.C. § 121.22.

Date: September 11, 2023

______________________________

Claudia Smith, Township Fiscal Officer
Berlin Township, Delaware County, Ohio

Motion: O'Brien
Second: Bullard

Discussion: O'Brien said he thinks we have covered it and Bullard said he was hoping that there would be substantial changes that they could live with.
Vote: Bullard yes, O'Brien yes and Raehll yes
Raehll called for a 10-minute recess.

*******8:00 PM TIME CERTAIN***BBP 23-003 The Elysian at Alum Creek********

Jordan Yates applicant for Elysian at Alum Creek said he was excited to be here as the first two meetings on this project were met with resounding endorsements both from township members and the public. He reviewed changes that came up at the last meeting which was adding a gazebo by the pond and to continue the walking trail and also to review the exterior materials and lighting. He said there are three parcels that total 31.68 acres with a new density of 10 units per developable acre and complies with the zoning that they are requesting pulling down from the cloud. He reviewed the plans and said the heart of the community would be the 7,000 square foot resort style clubhouse with a pool, fitness center and golf simulator. Todd Faris said one of the items for discussion was the lighting as the code has two different lighting standards for the commercial verses residential and they are unable to find anyone that carries them after checking with twenty-one different vendors and none of them had 1,600 lumens or less. They are asking for 2,800 lumen fixtures at 12-foot height and anything less than that will be too dark and too dangerous. Raehll said this is listed in the overlay as a commercial/residential project.

Yates said their second concern was the use of EIFS which is mostly used on commercial uses and office buildings, and they are asking to use hardy plank. He pointed to the areas where they wanted to make this change. O'Brien asked if this request was given to the ARB and Yates said it was. O'Brien asked what they said, and Yates said they felt it was an omission of the code. O'Brien asked if they approved the change and Yates said no, they passed the buck. Raehll said she read in the meeting minutes that they said it wasn't an omission, their job was to compare it to what the overlay explicitly states, and it's not explicitly stated in the overlay. Then they went to the zoning commission, and they had additional follow up and feedback and they thought there was some potential inconsistencies between the commercial and the residential. O'Brien asked that they be indicate the quantity of EIFS they wanted to do. Yates showed him where on their plans they would change it. Faris said EIFS is not durable. Raehll read from the code the materials that were allowable and it was determined that they could use other building materials to replace the EIFS except vinyl or aluminum, which is prohibited.

There was a lengthy discussion on the color of the buildings as Raehll said there was too much white and Yates said they could look into replacing some of the white with a taupe color so it wasn't so prominent. O'Brien questioned if the fountains in the pond go 10 feet and they said they would add it as a condition. O'Brien said the hill on the property is not complaint and Faris said it was. Raehll read the code that addressed this. O'Brien said he could see if they could extend it so it doesn't go into wet lands. Raehll said there was a conflict with the environmentally sensitive area. Sanders said the mound was created under the perimeter area, section 8. Raehll said she very much appreciates the knowledge and the attempt to be compliant in accordance with the code and their familiarity with it. They decided that the hill should be curved.

There was a lengthy discussion about the landscaping and placement of the hedges to shield headlights from shining into residents' windows. Raehll asked where the multi-use path was located, and they showed her on the plans. Raehll said she was not happy about the lack of walkability in the area. She said it was disappointing that they will not have key connectors for their own residents. Yates said he doesn't believe it is required in the code. For their residents he said the overlay ends at the northern boundary of their property and no one is walking across 36/37. Raehll said they will be walking to the north because the overlay was designed for walkability. Yates said if it is required it will require significant adjustments to their plan but that is on them to make the adjustment and if it is not required, he would request that they make slight adjustments and add a five-foot path. Raehll and O'Brien said they could live with that.

Raehll said she is really impressed with this project as we need these kinds of projects in our township and we planned for it, we welcome it and she wants to make sure they go through it and make sure all the T's or crossed and I's are dotted. She said they have been a really great exemplar in doing their research and bringing forward a proposal that fits in accordance with our zoning resolution, which is a critical thing for townships.

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m.** **Trustee Meeting** **September 11, 2023**

Raehll opened for public comment, hearing none she closed public comment and stated that the application will be making some adjustments at their request.

| | |
|---|---|
| **RESOLUTION 23-09-15** | **MOTION TO RECESS AND CONTINUE HEARING ON BBP 23-003 TILL 10:20 P.M. ON SEPTEMBER 11, 2023, AT 3271 CHESHIRE RD** |
| Motion: | Raehll |
| Second: | Bullard |
| Vote: | Bullard yes, O'Brien yes and Raehll yes |

5 Minute Recess

**Road Department-** Bullard said they have talked about moving the diesel fuel tank down to the fire station and they are getting quotes together. Raehll asked about the storage building and Bullard said he is working with the prosecutor. O'Brien asked if they could work quicker so they could get the concrete pad done before winter.

Raehll said they also have the zoning signs, and they discussed the colors and the size.

| | |
|---|---|
| **RESOLUTION 23-09-16** | **APPROVE $2,800 WITH ANTICIPATED COST BEING $2,249.49 TO KLEEM FOR WELCOME TO BERLIN TOWNSHIP SIGNS AND TO BE EXECUTED BY TRUSTEE BULLARD** |
| Motion: | Raehll |
| Second: | O'Brien |
| Vote: | O'Brien yes, Raehll yes and Bullard yes |

Paykoff asked if he comment on the storage building and said according to the fire inspector, they needed 25 feet between the two buildings which will take them to 3 feet from the ditch and they will need to move the cemetery sign. Raehll said she was not aware of this and said they were talking about connecting it to this building. Paykoff said if you do that you need to bring it up to code.

Raehll called the public hearing back to order at 10:20 and said the applicant has few requests to amend the current plan as we see it today. They reviewed the list of conditions and decided on the following:

1. Fountains in ponds will have a ten (10) foot spray height minimum.
2. Head walls and end walls at pond inlets will have stone veneer, including stucco stone.
3. If the code requires a ten (10) foot multi-use pathway along SR 36-US 37 it will be added. If it is not required a five (5) foot sidewalk will be added along the southern perimeter.
4. Documentation will be provided to the township within 30 days, showing that N. Old State is classified as a local road and therefore, only requires a five (5) foot sidewalk. If it is found to require a ten (10) foot multi-use path to be code compliant, the plans will be modified to include.
5. Mounding along the northwest perimeter, above dog park, shall be extended by twenty (20) feet to the northeast.
6. Omit perennials along the foundations of residential units facing parking lots and adding screening plants of an average of three (3) foot height within four (4) feet of the parking lot/sidewalk. Refer to redlined plans attached. Applicant will provide a final landscape plan to the township within 30 days.
7. Cement board will be used where EIFS is shown on building elevation renderings as submitted. The amount of white will be reduced by at least 50% and replaced with muted natural colors. A new set of final plans shall be submitted to the township by October 11, 2023 to address these conditions.

| | |
|---|---|
| **RESOLUTION 23-09-17** | **MOTION TO ACCEPT DOCUMENTS PROVIDED WITHIN THE BINDER AS WELL AS THE DOCUMENTS PROVIDED AS SUPPLEMEN FOR CONSDIERATION OF THE HEARING ON SEPTEMBER 11, 2023, WITH THE LATTER DATED DOCUMENTS TAKING PRECENDENCE OVER THE FORMER** |
| Motion: | Raehll |

O'Brien asked if she could state how many pages and Raehll asked that the motion be withdrawn as she is not in favor of counting the number of pages for this because they are replacing exhibits from the previous so if she says the number of pages is fifteen that could be irrelevant to the fact that these latter dated documents take precedence over the former. O'Brien said but if he pulls out the first ten pages, he doesn't know that that not the whole exhibit. Raehll said they could title them.
**Motion Withdrawn**

**RESOLUTION 23-09-18** **MOTION TO ACCEPT EXHIBIT 2 THE FIFTEEN PAGE DOCUMENT PROVIDED FOR THE SEPTEMBER 11, 2023, HEARING WITH ALL LATTER DOCUMENTS TAKING PRECEDENCE OVER FORMER**

Motion: Raehll
Second: O'Brien
Discussion: Bullard asked if she counted them and Raehll said she did, she will count them again. For clarity there were fifteen.
Vote: O'Brien yes, Raehll yes and Bullard yes

Raehll said they have accepted all the documents and Faris gave her the exhibits that show what they are adding and what they are removing.

**RESOLUTION 23-09-19** **MOTION TO ACCEPT APPLICANTS REQUEST FOR AMENDMENTS THREE PAGE DOCUMENT AND THE PROPOSED LANDSCAPE ADJUSTEMENTS AS EXHIBIT 3 WITH THE LATTER DOCUMENTS TAKING PRECEDENCE OVER THE FORMER**

Motion: Raehll
Second: O'Brien
Discussion: O'Brien wanted to note in the record that they did sign the request and agreed to provide a typed-up copy of their requested changes.
Vote: Raehll yes, Bullard yes and O'Brien yes

**RESOLUTION 23-09-20** **APPROVE ACCEPTING BBP 23-003 THE ELYSIAN AT ALUM CREEK ALONG WITH EXHIBITS THROUGH THREE WITH THE LATTER EXHIBITS TAKING PRECIDENCE OVER THE EARLIER EXHIBITS**

Motion: Bullard
**MOTION WAS WITHDRAWN**

**RESOLUTION 23-09-21** **APPROVE BBP 23-003 THE ELYSIAN AT ALUM CREEK WITH ACCEPTANCE OF ALL THE EXHIBITS WITH THE LATER NUMBERED EXHIBITS TAKING PRECIDENCE OVER THE FORMER**

Motion: O'Brien

O'Brien said he wasn't ready to accept this. He said he thinks it's technically okay but asked if Bullard would mind adding that the fact is that the applicant has made the request in exhibit three of the request that it's part of it. He knows it is redundant, but he would feel more comfortable with that. Raehll said a friendly amendment to the motion. Bullard said go ahead and word it however you want to word it.
**MOTION WAS WITHDRAWN**

**RESOLUTION 23-09-22** **APPROVE BBP 23-003 THE ELYSIAN AT ALUM CREEK WITH EXHIBITS 1 THROUGH 3 NOTING THAT THE APPLICANT HAS REQUESTED SEVEN CHANGES TO THE APPLICATION AND THOSE ARE INCORPORATED IN THE REZONING**

Motion: O'Brien
**MOTION WAS WITHDRAWN**

**RESOLUTION 23-09-23** **APPROVE BBP 23-003 THE ELYSIAN AT ALUM CREEK AND ACCEPTED EXHIBITS 1 THROUGH 3 WITH THE LATTER TAKING PRECEDENCE OVER THE FORMER AND EXHIBIT 3 NOTING SEVEN REQUESTED CHANGES BY THE APPLICANT AT**

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m.** **Trustee Meeting** **September 11, 2023**

**THIS TIME**

Motion: Raehll
Second: O'Brien
Discussion: Raehll said she would like to reiterate thanking them for working with them but this type of product is exactly what the township needs and appreciates that living in this area so it is worth putting in the detail and effort to get the output of what they are going to see and the kind of diversity of housing and they type of things we need to keep pace with the growth. Bullard said they really recognized the community and support the community and its placement. O'Brien concurred and also said they discussed at length issues that were problematic but in general the application was very well put together. He said the variances with divergences are ones that are appropriate and are not, not in keeping with the intent and the letter of the zoning resolution, so he appreciates them working with the trustees to accommodate some of the requests that they had and that they requested, and he hopes they have success.
Vote: Raehll yes, O'Brien yes and Bullard yes

**RESOLUTION 23-09-24** **ADJOURN HEARING FOR BBP 23-003 AT 11:20 P.M.**

Motion: Bullard
Second: O'Brien
Vote: Bullard yes, O'Brien yes and Raehll yes

**Trustee Items –**
**Assistant Zoning Inspector –** Raehll said we received two applications and would like to discuss this in executive session.

**Township Operations Specialist-** Raehll said one application was received and she would like to discuss this in executive session also.

**Temporary Cemetery Assistant-** Raehll said no application has been received for this.

**Fiscal Officer Succession-** Raehll asked if there was a write in candidate for the fiscal officer position and was told there was. Raehll asked Smith if she wanted to expand her staff and Smith said she hadn't thought about it because she didn't want to hire people and then the new fiscal officer may not want those same people. She would rather have them hire who they want to hire. O'Brien said he thought we needed to be more precise in our appropriations and Raehll asked in what way. O'Brien said he believed that the zoning payroll should come from zoning as there was a time that it came from the general fund as the zoning fund was under funded. Smith said she has been taking it from the zoning fund for the last few years. Raehll asked how they are to get rid of things in the trustee's office regarding inventory and Smith said they just need to complete an inventory sheet when they are getting rid of anything, and she will remove from the list. Smith said she would be having a recycling company come in the next month or two.

**OTA Leadership Academy Training Workshop-**

**RESOLUTION 23-09-25** **APPROVE UPTO $100 FOR TRUSTEE RAEHLL TO ATTEND OTA LEADERSHIP ACADAMY TRAINING WORKSHOPS**

Motion: Bullard
Second: O'Brien
Vote: Bullard yes, O'Brien yes and Raehll yes

**Zoning Department –**
**August Zoning Report –** There were 8 new home permits for August with a YTD total of 89.

**Future Meetings –**
**9/25/23 Trustee Meeting**
**10/9/23 Trustee Meeting**
**10/23/23 Trustee Meeting**

**RESOLUTION** **RECESS TO EXECUTIVE SESSION PURSUANT TO ORC**

**BERLIN TOWNSHIP TRUSTEES**

5:30 p.m. **Trustee Meeting** **September 11, 2023**

| | |
|---|---|
| **23-09-26** | **121.22 (G)(4) PREPARING FOR, CONDUCTING, OR REVIEWING NEGOTIATIONS OR BARGAINING SESSIONS WITH PUBLIC EMPLOYEES CONCERNING THEIR COMPENSATION OR OTHER TERMS AND CONDITIONS OF THEIR EMPLOYEMENT AND 121.22 (G)(1) FOR CONSIDERATION OF APPOINTMENT, EMPLOYMENT, DISMISSAL, DISCIPLINE, PROMOTION, DEMOTION, COMPENSATION OF A PUBLIC EMPLOYEE OR OFFICIAL, - THREE TRUSTEES, FISCAL OFFICER AT-11:45 P.M.** |
| Motion: | Raehll |
| Second: | O'Brien |
| Vote: | O'Brien yes, Raehll yes and Bullard yes |
| **RESOLUTION 23-09-27** | **MOTION TO RETURN TO REGULAR SESSION AT 12:14 P.M.** |
| Motion: | Bullard |
| Second: | Raehll |
| Vote: | O'Brien yes, Raehll yes and Bullard yes |

Raehll said "We met in executive session and no decisions were made and no actions were taken."

| | |
|---|---|
| **RESOLUTION 23-09-28** | **MOTION TO APPOINT JERRY VALENTINE TO THE ASSISTANT ZONING INSPECTOR POSITION AT THE RATE OF $20.70 AN HOUR WITH UPTO SIXTEEN HOURS A WEEK EFFECTIVE SEPTEMBER 14, 2023** |
| Motion: | Raehll |
| Second: | Bullard |
| Vote: | Raehll yes, Bullard yes and O'Brien yes |
| **Late Items – Adjourn- RESOLUTION 23-09-29** | **MOTION TO ADJOURN** |
| Motion: | Bullard |
| Second: | O'Brien |
| Vote: | Raehll yes, Bullard yes and O'Brien yes |

Meeting adjourned by Chairman Raehll at 12:22 p.m.

Meghan Raehll, Chair

ATTEST:

Ron Bullard, Vice-Chair

Claudia Smith, Fiscal Office

Ken O'Brien, Trustee

****Notice: A video recording of this meeting can be found on YouTube or Berlin Townships Facebook page.***

An official website of the United States government



PLAINTIFF'S EXHIBIT 6 8-29-25 MR

# North American Industry Classification System





## Search Results

comparable.

| | |
|---|---|
| 493 | **Warehousing and Storage**T |
| 4931 | **Warehousing and Storage**T |
| 49311 | General Warehousing and StorageT |
| 493110 | General Warehousing and Storage |
| 49312 | Refrigerated Warehousing and StorageT |
| 493120 | Refrigerated Warehousing and Storage |
| 49313 | Farm Product Warehousing and StorageT |
| 493130 | Farm Product Warehousing and Storage |
| 49319 | Other Warehousing and StorageT |
| 493190 | Other Warehousing and Storage |

### 2022 NAICS Definition

T = Canadian, Mexican, and United States industries are comparable.

**Sector 48-49--Transportation and Warehousing**T

**493 Warehousing and Storage**T

Industries in the Warehousing and Storage subsector are primarily engaged in operating warehousing and storage facilities for general merchandise, refrigerated goods, and other warehouse products. These establishments provide facilities to store goods. They do not sell the goods they handle. These establishments take responsibility for storing the goods and keeping them secure. They may also provide a range of services, often referred to as logistics services, related to the distribution of goods. Logistics services can include labeling, breaking bulk, inventory control and management, light assembly, order entry and fulfillment, packaging, pick and pack, price marking and ticketing, and transportation arrangement. However, establishments in this industry group always provide warehousing or storage services in addition to any logistic

services. Furthermore, the warehousing or storage of goods must be more than incidental to the performance of services, such as price marking.

Bonded warehousing and storage services and warehouses located in free trade zones are included in the industries of this subsector.

Is this page helpful?
Yes No

**2022 NAICS Manual**




(reference_files_tools/2022_NAICS_Manual.pdf)

View or download this publication (reference_files_tools/2022_NAICS_Manual.pdf) [PDF, 7MB]

**Reference Files**

2022 NAICS

2017 NAICS

2012 NAICS

2007 NAICS

2002 NAICS

1997 NAICS

Concordances

Downloadable Files

NAICS Update Process Fact Sheet (reference_files_tools/NAICS_Update_Process_Fact_Sheet.pdf) [PDF, 91.0KB]

**Announcements**

**April 30, 2025**
Due to a reduction in government resources, the Dr. NAICS telephone line was discontinued effective April 30th. For all NAICS-related inquiries, please contact us by email at naics@census.gov. We appreciate your understanding and thank you for your continued interest in the North American Industry Classification System.

December 20, 2024 (federal-register_notices/notices/OMB 0388.pdf) [PDF, 224KB] Statistical Policy Directive No. 8 North American Industry Classification System (NAICS - Request for Comments on Possible Revision Updates for 2027; Notice. Vol 89, No. 245

September 14, 2023 (reference_files_tools/NAICS_Update_ NAICS Update Process Fact Sheet is now available.

2022 NAICS Structure with Change Indicator (2022NAICS/2022_NAICS_Structure.xl [XLSX, 86KB]

**Contact Us**

Source: U.S. Census Bureau
North American Industry Classification System (NAICS)
naics@census.gov (mailto:naics@census.gov)

Last Revised: 08/28/2025

(mailto:naics@census.gov)

[PDF] or (/main/www/pdf.html) denotes a file in Adobe's Portable Document Format (/main/www/pdf.html). To view the file, you will need the Adobe® Reader® (http://www.adobe.com/products/reader/) available **free** from Adobe. [Excel] or the letters [xls] indicate a document is in the Microsoft® Excel® Spreadsheet Format (XLS). To view the file, you will need MS Excel installed on your computer, or you can download the latest online Excel Viewer "Microsoft Docs" at https://docs.microsoft.com/en-us/office/troubleshoot/excel/get-latest-excel-viewer. (https://docs.microsoft.com/en-us/office/troubleshoot/excel/get-latest-excel-viewer) This symbol indicates a link to a non-government web site. Our linking to these sites does not constitute an endorsement of any products, services or the information found on them. Once you link to another site you are subject to the policies of the new site.

**CONNECT WITH US (https://www.census.gov/about/contact-us/social_media.html)** (https://www.facebook.com/uscensusbureau) (https://twitter.com/uscensusbureau) (https://www.linkedin.com/company/us-census-bureau) (https://www.youtube.com/user/uscensusbureau) (https://www.instagram.com/uscensusbureau/)

Information Quality (https://www.census.gov/quality/) | Data Linkage Infrastructure (https://www.census.gov/datalinkage/) | Data Protection and Privacy Policy (https://www.census.gov/privacy/) | Accessibility (https://www.census.gov/about/policies/privacy/privacy-policy.html#accessibility) | FOIA (https://www.census.gov/foia/) | Inspector General (https://www.oig.doc.gov/Pages/default.aspx) | No FEAR Act (https://www.commerce.gov/cr/reports-and-resources/no-fear-act) | U.S. Department of Commerce (https://www.commerce.gov/) | USA.gov (https://www.usa.gov/)

**Measuring America's People and Economy**

PLAINTIFF'S EXHIBIT 7 8-27-25 MR

*Figure 6.4 Population Density*



## Future Housing

With sufficient authority and information, a community might anticipate what services it can provide, anticipate its share of the future population of the area, and allocate the proper distribution of housing types. Berlin Township has provided for a variety of housing with transitional zoning and planned growth through the creation of overlay districts. Thoughtfully considering population growth while preserving rural roots and offering spacious areas for families will remain a priority for the township.