IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

\- - -

| | | |
|---|---|---|
| T&R PROPERTIES, ET AL., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | Case No. |
| | : | 2:24-CV-03761 |
| BERLIN TOWNSHIP, ET AL., | : | |
| | : | |
| | : | Judge James L. Graham |
| Defendants. | : | |

\- - -

DEPOSITION OF RONALD JOSEPH SABATINO

\- - -

September 10, 2025
9:01 a.m.
FREEMAN, MATHIS & GARY LLP
65 East State Street
Suite 2550
Columbus, OH 43215

\- - -

Reported by: Tracy J. Schell

\- - -

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:

Benjamin S. Zacks
ZACKS LAW LLC
The e Building
33 South James Road
3rd Floor
Columbus, OH 43213
bszacks@zlglaw.com
614.236.8000

ON BEHALF OF THE DEFENDANTS:

Paul-Michael La Fayette
FREEMAN, MATHIS & GARY LLP
65 East State Street
Suite 2500
Columbus, OH 43215
paul.lafayette@fmglaw.com
614.683.8471

\- - -

Wednesday Morning Session
September 10, 2025
9:01 a.m.

- - -

STIPULATIONS

- - -

It is stipulated by and among counsel for the respective parties herein that this deposition of RONALD JOSEPH SABATINO, a Plaintiff herein, called by the Defendants under the statute, may be taken at this time and reduced to writing in stenotypy by the Notary, whose notes may thereafter be transcribed out of the presence of the witness; and that proof of the official character and qualifications of the Notary is waived.

- - -

I N D E X

\- - -


| WITNESS | PAGE |
|---|---|
| RONALD JOSEPH SABATINO | |
| BY MR. LA FAYETTE: | 5 |


\- - -


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| A | Chapter 12, Development Patterns, Berlin Township | 59 |
| B | Berlin Township Zoning Resolution | 62 |
| C | Article 19, Berlin Industrial Overlay (B10) | 64 |
| D | Plaintiffs' Initial Disclosures | 142 |
| E | Berlin Township Trustees, Trustee Meeting, September 11, 2023 | 151 |

- - -

P R O C E E D I N G S

- - -

RONALD JOSEPH SABATINO

being by me first duly sworn, as hereinafter certified, testifies and says as follows:

EXAMINATION

BY MR. LA FAYETTE:

Q. If you would go ahead and state your full name for the record.

A. Ronald Joseph Sabatino.

Q. And what's your father's name, your father's full name?

A. Philip Ronald Sabatino.

Q. Okay. Have you had your deposition taken before?

A. Yes.

Q. How often?

A. Once before.

Q. Once before.

And what kind of case was it?

A. We were the -- or T&R Properties was the plaintiff. Someone who we were -- had the case against was leaving a lot of fake reviews on some of our

apartment Google pages, so we were trying to get them to stop.

Q. Okay. And how did that -- did that case resolve?

A. It's still ongoing.

Q. Okay. Where is it pending?

A. Franklin County.

Q. Okay. Do you remember -- do you know the name of the defendant?

A. Randall Tamina.

Q. Okay. What's your date of birth?

A. November 26, 1997.

Q. All right. And what's your residential address?

A. 925 Pullman, P-U-L-L-M-A-N, Place, Grandview, Ohio.

Q. And how long have you lived there?

A. A little over a year.

Q. And where did you live before that?

A. At apartments. Do you want the address?

Q. Yeah, if you know them.

A. 600 Goodale.

Q. Okay. And how long did you live at the apartment?

A. A few years.
Q. And are you married?
A. No.
Q. Do you have any children?
A. No.
Q. Where did you go to high school?
A. Wellington in Upper Arlington.
Q. And when did you graduate?
A. 2016.
Q. Did you play any sports there?
A. I played a little golf and a little lacrosse.
Q. Okay. I was coaching baseball in Plain City and I know we played Wellington a couple times.
A. Yeah. We weren't very good as sports.
Q. As I remember the baseball, I would bring the B team to play them. But good academic school, which is what counts in the long run.
Where did you go to college?
A. Ohio State.
Q. And when did you graduate?
A. End of 2019.
Q. And what was your degree in?
A. Business specializing in real estate.
Q. Did you take -- or have you -- or are you

enrolled in any graduate school?
A. No.
Q. Okay. So once you were done at OSU, you were done?
A. That's my plan right now.
Q. Okay. And you're currently employed by T&R Properties; is that correct?
A. Yes.
Q. And your position is director of property management?
A. Yes.
Q. And how long have you had that position?
A. I think about two years.
Q. And did you have any prior positions at T&R?
A. Yes.
Q. And what were those? Well, I guess going in order backwards.
A. So I think around 2016 when I graduated from high school and going into undergrad, I was full-time in the summers kind of as an intern, different accounting internships, collections internships, property management internships, development internships.
When I started full-time, I was all -- at the

end of 2019, development project manager was kind of the title. And then transitioned into director of operations.

Q. Okay. And as I understand, and correct me if I'm wrong, your father owns T&R Properties?

A. Yes.

Q. Okay. He is the sole member or are there other members?

A. In T&R Properties?

Q. T&R Properties.

MR. ZACKS: Objection. It's an Inc.

Q. An Inc. I'm sorry. My bad.

Are there other shareholders that you're aware of besides your father?

A. No.

Q. Okay. So suffice it to say that your internships with the company, you were going to -- you know, your dad was giving you an overview of the business and giving you, I guess, experience in each of the various components of the business?

A. That's what I was doing, yes.

Q. Okay. As far as your position as director of property management, what -- I guess, what does that involve? What's the job description or what are your

job duties?

MR. ZACKS: Objection. Multiple questions, but...

MR. LA FAYETTE: Okay.

BY MR. LA FAYETTE:

Q. Give me the job description and then we'll go from there. Sorry.

A. Property management, we own and manage and operate apartment communities and other real estate, commercial property.

The day to day, we have -- at each apartment community, we have a property manager, potentially leasing agents, and we also have on-site maintenance, a maintenance supervisor and maybe a technician.

And then for every five or six property managers and apartment communities, there's a district manager. And we've got about four district managers and the district managers report to me as well as marketing, collections, HR.

And I coordinate managing kind of what our tasks are and goals are for the district managers and other operations team.

Q. Okay. So is it fair to say -- and, again, when I say it's fair to say, I'm not trying to lead

you. I'm just trying to cut to the chase.
Is it fair to say that as the director of property management, you basically oversee all of those other district managers in ensuring all the various areas of, you know, occupancy and collections and leasing and things of that nature?
A. Correct.
Q. Okay. Do you have --
A. Additionally -- I'm sorry -- so the title is director of property management. However, I am involved in the development of our new projects as well.
Q. Right. I was just going to ask you that. Okay. Is there -- so I would assume -- well, I'm not going to assume anything.
Do you have another title or another position that you hold or is...
A. I would -- director of property management may be synonymous with director of operations.
Q. Okay.
A. I think on the website, it's director of property management, though.
Q. Okay. And as -- to the extent it's synonymous with director of operations, what

responsibilities or what involvement do you have with regard to development of new properties?

A. Looking for land. Looking for property. Coordinating with any landowners. Sending offers if we're interested in purchasing property. Coordinating the due diligence property. Going through zoning as well. Meeting with architects and engineers and other professional consultants as needed.

Q. Okay. And as far as the final decision-making is concerned with regard to development, you know, either purchasing a new property or how you're going to develop that property, does that final decision rest in you or your father or somebody else with T&R Properties?

A. Me or it could be my father.

Q. Okay. Fair to say that you consult with your father pretty regularly?

A. From time to time.

Q. Okay. Do you know, roughly, how long your father has been in this business?

A. Over 40 years.

Q. Aside from apartment complexes, what other properties do you develop? Do you develop single family residential?

A. From time to time.
Q. And industrial commercial?
A. Yes.
Q. Okay. What states? Is it just Ohio or are you outside of Ohio?
A. We're in Ohio, we're in Pennsylvania, we're in Florida, we're in Indiana, Illinois, Georgia.
Q. Okay. How many properties total -- on the apartment complex side, how many total properties are owned by T&R?
A. 25 apartment communities.
Q. And I'm probably not going to ask this question properly, but I'm going to give it a shot.
When it comes to purchasing land and anticipated development for apartment complexes and taking it through the zoning process, are there times where T&R -- that's as far as they take it? And then once the property is purchased, you sell it off to another apartment, some other owner?
A. Typically not.
Q. Okay. Have you done it in Ohio where that's been the case?
A. Where we have...
Q. Where you've basically, you know, purchased

property for development, anticipated apartment complexes, taken it through the zoning process and then once the final development plans are done and set, turned it over to somebody else or sold it?

A. Not in my history with the company.

Q. Okay. Are you a member of any professional organizations?

MR. ZACKS: Because he's the 30(b) rep, is the "you" specific to him or is that to --

MR. LA FAYETTE: Yeah. I'm going to ask specific to you. And I'll get into the kind of 30(b) questions.

BY MR. LA FAYETTE:

Q. Just specific to you for now, do you belong to any professional organizations?

A. The BIA.

Q. And what does the BIA stand for?

A. Building Industry Association.

Q. Okay. Any other organizations?

A. CCIIR, commercial industrial Realtor group [sic].

Q. Do you hold any leadership positions with the BIA?

A. I was on the young professionals committee

with the BIA. No longer a part of that however.
Q. Okay. At present, you don't hold any positions with the BIA other than member?
A. No. I regularly attend their meetings, but yeah.
Q. Does the BIA allow or permit -- aside from individual membership, does it allow corporate membership?
A. Yes.
Q. And is T&R Properties, Inc., a corporate member of the BIA?
A. Yes.
Q. And what about with the COIRR [sic]?
A. What's your question --
Q. As far as --
A. -- leadership?
Q. Yeah, the leadership position for you personally?
A. No.
Q. Okay. And, again, same question as COIRR, is it -- does it allow corporate membership?
A. Yes.
Q. Okay. And is T&R Properties a corporate member?

A. Yes.
Q. Okay. Do you hold any professional licenses? And, again, you individually.
A. I'm a real estate broker.
Q. Okay. And when did you obtain that brokerage license?
A. I got my real estate salesperson's license 2020. And then got my broker's license maybe a year and a half ago.
Q. Okay. 2023-ish?
A. Yeah.
Q. What was involved in obtaining the license?
A. Taking the necessary courses and taking the Board of Realtors exams. And then also having a certain number of sales.
Q. Okay. Do you have continuing education requirements associated with that?
A. Yes.
Q. And how many CE or continuing education hours do you have to take?
A. I'm not sure of the number of hours.
Q. Are you currently active as a real estate -- do you still actively hold your real estate sales license?

A. The sales license is inactive while my broker's license is active.
Q. Okay. And your broker's license is active?
A. It is.
Q. Do you personally own or operate any other corporate entity affiliated with real estate with a real estate brokerage? Do you own a brokerage or operate a brokerage?
A. My broker's license is under T&R Properties.
Q. Okay. So there's no separate entity that you work for?
A. No.
Q. Okay. And fair to say that T&R is your only employer?
A. Yes.
Q. Okay. So I'm going to take you through some of the questions we have with regard -- because you've been identified as the 30(b)(6) representative of the various parties in this case. So I'm going to start out with 30(b) -- you've been identified as the 30(b)(6) representative of T&R Properties?
A. Yes.
Q. And I think you've already spoken and advised that your role with the company is the director of

property management in discussing, you know, your other properties with T&R?

A. Yes.

Q. Okay. Is there any other role that you have with T&R that we haven't discussed?

A. No.

Q. Okay. And aside from essentially developing apartment complex [sic], residential property and commercial property, are there any other, I guess, things that T&R Properties is in the business of?

A. Just owning and managing those communities, those assets.

Q. And with regard to the current lawsuit, what was T&R's role in the development of the -- I guess the project or projects involved in this case?

A. We're one of the applicants.

Q. Okay.

A. To Berlin Township.

Q. Right. And as -- T&R Properties is not the owner of any of the parcels of land involved in this case; is that correct?

A. Correct. They're an affiliate.

Q. Okay. So -- and I guess we'll get into that.

You've also been identified as the 30(b)(6)

representative for Berlin Apartments, LLC.
Are you aware of that?
A. Yes.
Q. Okay. And what is your role with Berlin Apartments, LLC?
A. I'm a managing member -- the managing member.
Q. And what does Berlin Apartments, LLC do?
A. Berlin Apartments, LLC is a single purpose LLC that purchased the property for our to-be-developed, currently undeveloped, apartment community in Berlin Township.
Q. And when you say "for our," you mean for T&R Properties?
A. T&R Properties would manage the apartment community.
Q. Okay. So just to be clear for the record, Berlin Apartments, LLC would purchase the property, T&R would manage the property thereafter?
A. Yes.
Q. Okay. So the actual apartment complex, whatever it might be, would be owned by Berlin Apartments, LLC?
A. Yes.
Q. Okay. And you're the sole member; is that

correct?
A. Of Berlin Apartments, LLC?
Q. Yeah.
A. No.
Q. Okay. Are there other members?
A. Ron.
Q. Who?
A. Phillip Ronald Sabatino.
Q. Okay. Your father?
A. Yes.
Q. Any other members?
A. No.
Q. Okay. The same question as to Berlin Industrial, LLC, you've been identified -- I shouldn't say same question. It's not the same question.
You've been identified as the 30(b)(6) representative of Berlin Industrial, LLC.
You're aware of that?
A. Yes.
Q. Okay. And what is your role with Berlin Industrial, LLC?
A. I'm the managing member.
Q. Okay. And, similarly, is your father the other member?

A. Yes.

Q. Okay.

MR. ZACKS: Objection.

Q. Are there any other members?

MR. ZACKS: Well, the objection is you said is he the other member. He hadn't answered a question regarding who the members were.

MR. LA FAYETTE: I'm doing it backwards.

BY MR. LA FAYETTE:

Q. Are there any other members aside from you and your father?

A. No.

Q. And what does Berlin Industrial, LLC do?

A. It's the landowner of property in Berlin Township that is to be developed for industrial warehousing. And both of these properties, while they're owned separately, make up the mixed use project that is the applications that we put forward to Berlin Township.

Q. Does Berlin Industrial, LLC also own a residential parcel?

A. Say again.

Q. Does Berlin -- with regard to this case and the parcels involved in this -- with regard to the

applications to Berlin Township in this case, does Berlin Industrial, LLC own a residential parcel?

MR. ZACKS: Objection. Can you clarify your question? Are you referring to a parcel as part of this project or just any other parcel?

MR. LA FAYETTE: I'm talking about this project with regard to this litigation.

MR. ZACKS: It's a foundation objection.

MR. LA FAYETTE: Well, I think that's what I --

BY MR. LA FAYETTE:

Q. So with regard to this litigation, there's a number of parcels that are involved that were part of the applications to Berlin Township for zoning, whether it be industrial or the PRD.

You understand that?

A. Yes.

Q. Okay. Does Berlin Industrial, LLC own any of the parcels that were designated for the PRD or the residential component?

A. There was a sliver of property -- is a sliver of property that was going to serve as a secondary access for a portion of the apartment community.

Q. Okay.

A. But to my knowledge, it's nothing. I mean, nothing. That's what I can think of at this time.

Q. It was not something that was going to be developed to have the apartments built on it?

A. The industrial property?

Q. Right.

A. No.

Q. With regard to your deposition today, aside from communicating with your attorney, whom I don't want to know any communications that you've had with any of your attorneys, what did you do, if at all, to prepare for the deposition?

A. I reviewed the complaint.

Q. Okay. Anything else?

A. No.

Q. In your review of the complaint, was there anything that was stated in the complaint that you believe was inaccurate or untrue?

A. No.

Q. And you're aware today that as a 30(b)(6) representative of T&R Properties, Inc., Berlin Apartments, LLC and Berlin Industrial, LLC, you're testifying on behalf of those corporations, correct, or those entities?

A. Yes.
Q. Okay. And you're aware that as a 30(b)(6) representative of those entities, in preparation for your deposition today, you were required to identify certain topics -- or be prepared to testify on certain topics; is that right?
A. Yes.
Q. Okay. And it's your testimony that the only document you reviewed was the complaint?
A. And the notice of deposition with the topics.
Q. Okay. And you believe that you are able to address all of the topics addressed in the notice?
A. Yes.
Q. Okay. Some basic questions.
Are there any medications that you are on that would impair your ability to recall or impair your memory?
A. No.
Q. No medications that would impact your ability to listen to the questions and accurately provide responses?
A. No.
Q. Have you ever been convicted of a crime of dishonesty?

A. No.
Q. Do you individually own any properties, any residential properties?
A. Yes.
MR. ZACKS: Objection. Based on the 30(b) representative. But if you're asking him individually, which I think you are, it's okay.
A. Yes, individually.
Q. Yes. Okay. What are the -- how many properties do you own? And, again, residential.
A. My home address.
Q. Any other?
A. No.
Q. Are you a member of or a shareholder of any -- and, again, individually -- a shareholder of any other entity that owns properties?
A. Yes.
Q. And what entities would those be?
A. It would be -- I don't have all the information for you. I can --
Q. Okay. Would it be -- and I guess what I'm -- and I'm talking about individually, so let me parse this out a little bit.
I understand that in your role with T&R

Properties, you'll be from time to time, as you are in this case with Berlin Industrial, LLC and Berlin Apartments, LLC, the managing member of the entity that's purchasing the land.

And I'm assuming that there's other properties that you have done something very similar with; is that fair?

A. Yes.

Q. Okay. Aside from anything that would have to do with your relationship with T&R Properties and the developments of apartments and other developments that T&R Properties would be involved in, are there any entities that you are a member of that you individually own property?

A. Outside of T&R and affiliate entities, no, besides my home address.

Q. Right. Prior to the Berlin Industrial/Berlin apartment project -- and I guess that's probably the way I'm going to kind of generally relate to what we're talking about in this case, it's either going to be the parcels of properties at issue in this case or the Berlin Industrial/Berlin apartment project just so that we're using the same vernacular throughout the deposition.

Aside from the Berlin Industrial and Berlin apartment project, how many other multiuse projects have you been involved in developing?

A. Would you like me to give you all the information pertaining to those or do you want me to list them?

Q. Yeah. Again, I understand that you've been in your position for a year and a half or -- did I get that right? I might have that wrong.

How long have you been in the position again? I'm sorry.

A. As director of -- about two years.

Q. Okay. So in the last two years, how many of these multiuse projects -- or how many multiuse projects have you been directly involved in?

A. There's one in Etna Township. There's one in Prairie Township. There's one in the City of Delaware -- I'm sorry -- two in the City of Delaware.

And your question is only mixed use projects?

Q. Right.

A. Yeah, so four is what I can think of at this time.

Q. Okay. Including this one?

A. No, not including this one.

Q. Okay. Oh, I'm sorry, yeah, I only counted the City of Delaware once, so that's four. Okay.
Which was the first of the four -- or of the five if you're including the ones involved in this case?
A. I believe it would be the one in Etna Township.
Q. Okay. What's the name of the one in Etna?
A. It's called Highpoint.
Q. And what stage is the development at at this point?
A. We'll be breaking ground in early next year.
Q. And what type of project is it?
A. It's similar to the Berlin mixed use in that it was rezoned from -- or I guess we rezoned the Etna property from an agricultural farm zoning to a mixed use project. It's 220 acres and it makes up 400 apartments and about 400 houses, as well as some retail out parcels and then some industrial.
Q. Okay. And how about --
A. Densities are about, for the apartments, 20 units per acre.
Q. Okay. And as far as the Prairie Township, what's that project called?

A. We call it Galloway East, Villages of Galloway.

Q. Okay. And where is it in its development project?

A. It's ongoing right now.

Q. Okay. Have you actually constructed?

A. Yes.

Q. Okay. So it's a get-occupancy?

A. Yes.

Q. All right. And, again, it had an industrial component and a residential component?

A. So this property is also similar to Berlin Township, mixed use in that we rezoned it from an agricultural use to a mixed use use. And the property is about 170 acres. And it's 240 apartments. Density of about 20 units per acre. 400 houses, for-sale houses. And that is inclusive of the Etna project. But 400 houses and some townhomes, as well as some neighborhood commercial retail.

Q. Okay. And same questions as far as the City of Delaware projects. Let's start with whichever one you want to start with, the first of the two.

What's the name of it?

A. I can start with the Salvation Army

redevelopment on Lake Street. It's on 42. That property is -- was also similar to Berlin, rezoned from an agricultural use to about 600 apartments. Two different apartment communities, 336 units in one, 252 on another and then a retail out parcel. The density is about 20 units per acre.

And then the final that I can think of at this time, also in the City of Delaware, it was annexed from Delaware Township. Similar to Berlin Township in that it was rezoned from an agricultural use to a mixed use project. It's kind of a retail commercial component as well. And then 220 apartments and about 200 homes, single-family homes.

Q. And what's the name of the Delaware Township one?

A. Donovan Farms.

Q. And based on what I think you were telling me, those four different projects would be -- and, again, not identical -- but reasonably similar to what was proposed in Berlin Township as far as multiuse?

A. A mix of uses as well as being rezoned from a farm zoning to mixed use.

Q. Okay. Some of this is just going to be a little bit of background and I'm looking for you to

educate me a little bit as to how in your position as the director of property management you go about identifying properties or pursuing projects.

Take me through the process a little bit.

A. It could be that we are at an economic development outing and a township is presenting -- in the case of Berlin Township -- that they have a new overlay business park that they've put into place or are attempting to put into place and they want to attract development, so then we would be interested in looking over there.

Or a broker could come and approach us and say, here's a piece of property. Maybe you should take a peek at it.

Q. Okay. In this particular case involving Berlin Township, how was it brought to your attention?

A. I sort of answered that in my previous response. We attend -- T&R Properties, myself, attend a lot of different economic development outings and we try to stay abreast of what's going on in the county and central Ohio.

And we attended a Delaware economic development meeting that they have annually or semi-annually, I think, in 2021. And Berlin Township

was presenting. And they were representing that they were in the process of implementing their business park overlay and that they wanted mixed use developments, they wanted industrial warehousing, they wanted apartments.

Also at that meeting, or about the same time, a broker approached us that they've got property in the business park.

Q. Okay. And when they gave their presentation at the economic development meeting, did you have -- did they present a map showing where the property -- where the business park and the overlay would be?

A. That was a portion of the presentation.

Q. Okay. And at some point thereafter after that meeting, a broker approached you?

A. Yes.

Q. Okay. And who did the broker represent?

A. The landowner.

Q. Okay. And I guess I'll get to this, but in this particular case, how many landowners did you purchase property with [sic] in order to -- you know, for this project or for the projects involved in this case?

A. It was a family that owned the parcels. And

there were multiple signers. It was the Chapman family.

Q. Right. Okay.

And do you remember when that economic forum or meeting was with Delaware County?

A. I don't remember the exact dates, but I think sometime in 2021.

Q. Okay. And as I recall from looking at the documents, and, again, I'm trying not to make more exhibits, but as I understand it, you purchased all the properties that are at issue, all the parcels that are at issue in this case, from the various Chapman family members in February of 2022; does that sound right?

A. We went into contract.

Q. Okay. And that's going to lead up to a next question. So you go into contract with the property owners.

And I'm assuming that you have contingencies built into those contracts?

A. Yes.

Q. Okay. And those contingencies include, among other things, that zoning approval for what -- your intended use would be approved?

A. That would be standard.

Q. Okay. And in this particular case, in February of '22, you go into contract with the Chapman family.

When did you actually purchase the property? And when I say you, I mean you as the corporate representative for Berlin.

MR. ZACKS: For T&R.

MR. LA FAYETTE: Or for T&R, yeah.

A. I believe we closed on the property in mid-2023.

Q. Okay. Do you remember how much you paid for the property?

A. In total, it was about $7 million.

Q. Did you retain a separate broker or did you act as -- did you have a separate broker or real estate licensee negotiator engaged in the negotiations to purchase the properties?

A. Myself.

Q. Just yourself?

A. Yes.

Q. Okay. So leading up to this, walk me through a little bit the process on how you determine to purchase a property and for what price.

And I think you talked a little bit about how

you decide the property because you're looking at where there are development opportunities. I'm assuming that, you know, if there's some Amazon facility that's going in place or you get wind of some economic opportunity, you're going to look at property in that area; is that fair?

A. Can you clarify that?

Q. Okay. It's better off if I don't try to play developer.

I'm just going to ask you. How do you determine -- I think you mentioned that one of the ways that you identify properties for purchase is going in -- staying abreast of going to economic development forums, meetings. Other times you were approached by brokers with other opportunities.

Are there other ways that you identify a property, like, hey, this looks like a good area to buy some property?

A. Yeah. When a township or a municipality -- and in this case, Berlin Township -- puts into place this overlay and is presenting at those forums and saying, we want this to happen, we want industrial warehousing, we want mixed use development, we want apartments, we want that, when a township is welcoming

and willing and saying that they'll be flexible and open to development.

Q. Okay. And do you also -- I mean, I -- and, again, I'm being hypothetical. Well, I say hypothetical. I'm guessing is what I'm saying.

So out in -- on the east side, we have the Intel plant that there was word that Intel is going to develop out there.

Did that draw your attention to seeing if there are properties out there that might be worth purchasing and developing?

A. Draw my attention where?

Q. In the area to where the Intel plant was anticipated to go, or would that have been through the various townships and county --

A. I would consider Berlin Township industrial park and overlay and warehousing is -- in fact, economic development did and does as well consider if anything happens in Berlin Township, that the Berlin Township business park can service Intel.

Q. Okay.

A. So that was an additional factor.

Q. Okay. And as far as the price that you paid for the property, how do you determine the price? I

mean, obviously there's going to be a demand. Although I imagine that there's some circumstances where you're just making an offer to somebody that may be not necessarily on the market.

But how do you make a decision on what you're going to pay for a piece of property?

MR. ZACKS: To clarify. This is as to the 30(b) question --

MR. LA FAYETTE: Yes. Yes.

MR. ZACKS: -- and not him personally?

MR. LA FAYETTE: Right. Yeah.

A. These Berlin Township properties that were listed by Scott Cubberly to be sold from the Chapman family, they had purchase prices that they were looking for and we submitted an offer.

Q. How did you determine what offer you were going to make on the parcels? And, again, I'm asking kind of a broader question, not like for this parcel, this parcel, this parcel.

I'm talking about just kind of generally, what goes through your thought process and how do you evaluate whether to pay what they're asking or to offer -- or to make a counteroffer?

A. I'm not an appraiser, but we have an idea of

what we think to be the market price or the market value and that's what we offer.

Q. Okay. Does the anticipated use of the property or the -- well, let me just start with this. Does the zoned use as it exists reflect or impact the value of the property?

A. The way that the property is zoned right now in Berlin Township, the value of what we paid for is not -- is effectively zero.

Q. Okay. Well, I'm asking you a different question.

I'm asking you just generally as a representative of these entities and with T&R, when you're looking at purchasing property, how do you determine the value? What are the factors that you consider?

Setting aside Berlin Township, just in general, what are the factors that you consider when you determine what you're going to be willing to pay?

A. What we believe the use can and should be.

Q. Okay. And determining what the use can and should be would be -- would involve looking at and evaluating the existing zoning of the property?

A. I think that's one of the components.

Q. Right. And another component would be what you think you might be able to get the property zoned as? Is that also a factor?

A. I believe so.

Q. Okay. Which is why you would enter into a contingent agreement when you're purchasing the property, right? I mean, if you're --

Let me ask it this way: If you're looking at a piece of property -- and, you know, all the properties that you've mentioned here, the four other projects aside from the Berlin one were all either farm or agricultural, however their zoning dedicated it -- or dictated it; those were either farm or agricultural. And you're looking at what the potential zoning could be, whether it be, you know, through a PRD or variances from an overlay, kind of like Berline, things of that nature, and you're looking at what those potential would be when you're assessing the value?

A. Based upon Berlin Township's solicitation of mixed use developments and their representations, yes.

Q. Okay. But one of the reasons you go into a con- -- when you go into contract with a contingency with the property owners is because you don't know necessarily that the zoning will be approved; is that

fair?
A. Yes.
Q. Okay. And if the zoning contingency is not met, it allows you to back out of the contract; is that fair?
A. Yes.
Q. Okay. And with regard to -- so let's kind of talk about the, like, apartments. And, again, I'm talking generally.
When you're evaluating the value of that property where you want the apartments to go, you're looking at what the zoning densities would allow for?
A. Based upon a variety of factors and that could be one of them.
Q. And, again, I'm trying to just -- and I'm not trying to be coy here. I'm just trying to understand the process because I'm not a developer. You know, I'm on the back end of all of these situations.
So when you're looking at developing apartments, you have -- I would assume T&R Properties has internal data knowing roughly how much the build-out costs are going to be, knowing the regional area for, you know, what the rates that could be charged for apartments would be, you know, factors such

as that that you build into the back end so you can figure out like is this going to be a profitable purchase.

Is that a fair -- and if you want to extrapolate on it, feel free to do so.

MR. ZACKS: I want to clarify.

What is the question on the table?

Q. The question is, what are the factors that you consider? And I'm suggesting and giving examples that you probably -- T&R Properties, I assume -- let me just start this way.

T&R Properties I assume has a general understanding of different regions of the State of Ohio or in the states where it operates of what the going rate is for rentals?

A. Of rent that we can charge?

Q. Yes.

A. Yes. And it depends, but we have ways to get data like that.

Q. Yeah. And you know roughly -- and, again, in the various states that T&R Properties operates, you have an understanding of roughly what your build-out costs will be to construct the apartments that you want to build?

A. Roughly.
Q. Okay. And from state to state, that may vary, or even location to location within a state, those prices may vary based on the location, things of that nature, the labor force, costs, materials?
A. Yes. It depends on a variety of factors.
Q. And all of those factors would play into kind of your bottom line when you're assessing how much do we want to pay for this property?
A. That's a component.
Q. Okay.
A. For instance -- I'm sorry. Go ahead.
Q. Well, go ahead and explain.
A. No. I lost my thought. I lost my train of thought.
Q. So, you know, if a property owner asks for -- well, let me strike that.
You would agree with me that T&R Properties is in the business of making a profit --
A. Yes.
Q. -- when it builds apartment complexes?
Have there been circumstances where -- and, again, I'm going to ask you in your 30(b)(5) capacity for T&R Properties, have there been circumstances where

you have entered into a contract but because of the zoning contingency, you did not close on the contract or close on the purchase of the property?

A. Not to my knowledge.

Q. Okay. Would it be fair to say that in each of those instances -- again, with the four other developments that we've discussed involving Etna Township, Prairie and the two Delaware sites as well as -- well, just sticking with those four, that T&R Properties felt comfortable with whatever the purchase price was against what its cost for the metrics would be to result in a profit and make it worthwhile going forward with the purchase?

A. Can you repeat the question?

Q. Okay. So in each of those other four developments that we talked about, Etna, Prairie and the two Delawares, the property owners ask for whatever they ask for to purchase. And in those contracts that you entered into, you would have had the contingency, the zoning contingency I'm assuming, correct?

A. Not necessarily the case. I'm not sure.

Q. You don't know one way or the other if you did or didn't?

A. I'm not sure.

Q. Okay. If there was -- if zoning was not approved or if your development did not meet the existing zoning and you knew that you would have variances or divergencies from zoning, would that have been a circumstance that you would have a contingency in the contract?

MR. ZACKS: Objection on the assumptions in this because you changed concepts in your line of questioning, so I'm a little unclear on the question.

Q. Do you understand the question?

A. I'm unclear as well.

Q. Okay. So we have the --

A. It seems like I would have to speculate to give you the answer.

Q. Well, I'll just ask it a very -- maybe a little bit broader.

When you are entering into a contract with a property owner to purchase it for future development, if the zoning were to require -- for your intended use, if the zoning were to require a divergence or variance, would you agree that those would be the contracts in which T&R Properties would require a contingency on zoning?

A. I don't think so necessarily. I think it

could be -- it could depend.
Q. Okay. All right.
With regard to the properties at issue in this case, the Chapman properties, were there zoning contingencies, or were there contingencies in the contract?
A. There were contingencies in the contract.
Q. Among the contingencies in the contract, was it predicated on approval of zoning?
A. I think that was one of the contingencies.
Q. Okay. And you purchased the property -- or T&R -- or I guess the -- yeah, T&R --
Let me back up to this step: So in the contracts that I reviewed, basically the contract was, I think, signed by -- I think it was signed by you, but it said the entity was TBD, to be determined, right?
Do you remember that?
A. It could be. Could have been.
Q. Well, I mean I can pull it.
A. If you have it now.
MR. ZACKS: I think it might make sense only because --
Q. I'll tell you what, because I don't think I printed that one out, let me ask it this way: If T --

and I can produce that later. I just don't want to take a break now to go do it.

When -- who is the entity -- you know, so you signed the contract with the Chapmans to purchase the properties, correct?

A. Yes.

Q. Okay. Were you doing it as T&R Properties making -- was T&R Properties entering the contract or was it you personally?

A. I believe if it was my name, it would have been me personally. But the contract has a provision in it that you can assign it to an affiliate, so that would be the to be determined --

Q. Right.

A. -- component.

Q. And in this case with the properties at issue in this case, it would have been, you know, depending on where the parcel is located, either Berlin Industrial, LLC, or Berlin Apartments, LLC, which were eventually the parties that it was assigned to?

A. Yes.

Q. Okay. With regard to the specific properties at issue in this case, do you recall or could you explain to me what due diligence was performed with

regard to your assessment of the properties as far as whether they would be appropriate for purchase for your intended uses?

A. A title review, environmental review, which is usually a Phase I which gives a historical overview of the property's historical uses, a geotechnical review, soils review, stream and water, utility availability.

Q. Do you look at the infrastructure as well, like roadways?

A. Yes.

Q. Prior to entering into the contract -- well, I guess I'll skip that.

Prior to purchasing the property in 2023, the properties at issue, were you aware of what or how they would be serviced for utilities, whether it be water or sewer?

A. Generally, yes.

Q. All right. What was your general understanding?

A. So these properties at issue are what I'll call the gateway to the business park. And what I mean by that is these two properties mix this mixed use development for apartments and warehousing are at the

stub of a public road called Reed Parkway. And Reed Parkway on it has, or had at the time, plans for a water tower from Del-Co, which would service water, and a Delaware County water and sewer district lift station to service the sanitary sewer.

So going through the process, it was planned that this is where the utilities for the business park would begin. Therefore, this is what needs -- this project is what needs to happen first for the business park to happen. That is what Berlin Township was saying to us, this project needs to happen first.

Q. Okay. And as far as the utilities were concerned, did you have direct involvement in discussing with Del-Co the construction of the water tower?

A. A lot of it, I believe, was already determined with the Chapman family. We had to do -- we had to assist with carving out a little component, a little square for their property of where the water tower was going to be.

Q. Okay. And as far as Delaware County was concerned, did you have an understanding -- or, I guess, did you have to deal with Delaware County directly as to the provision of sewer service, sanitary

sewer?

A. A similar situation.

Q. Okay. As far as that was concerned, though, were the plans finalized, was Delaware, had they committed to extending sewer services to the properties?

A. Well, they committed, Del-Co and Delaware County Regional Water & Sewer committed to having it there and it was -- it's on our -- us, as the developer, to extend those services.

Q. All right. So you would have to be extending the main lines and then eventually all the laterals and everything that have to go to the property?

A. This property requires a substantial number of public improvements, in the 8 figures, for public roadway extension, public water extension, public sanitary, stormwater as well as other public improvements to different roadways in the millions, yeah.

Q. Okay. As far as electric utility, I remember something coming up about electric utility.

Did you have any issues or was the electric utility established that it was going to be able to service the property?

A. Yes, there was -- it's my understanding that before we became involved with the property, there was some consideration of a different user potentially there and they were reviewing electric. And I'm not sure -- I don't know exactly what happened.

But to our knowledge, yes, we have electric availability.

Q. Okay. And was T&R Properties and/or Berlin Apartments, LLC or Berlin Industrial, LLC going to be responsible for extending those services for the electric infrastructure?

A. Yes.

Q. Okay. Did you on behalf of T&R Properties engage in or have any economic development financing tools in place to assist with the extension of the infrastructure, whether it be tax increment financing or anything of that nature?

A. We don't have anything in place.

Q. Okay. Had you negotiated anything at that point?

A. We had met with Delaware County Economic Development, but we have nothing in place.

Q. Okay. Did you have any proposed agreements? Did they have any proposed TIF agreements?

A. I know that Berlin Township had the thought of having those agreements, but we never got to any sort of actual agreement, no.

Q. Okay. So when you were -- and, again, when I say you, I mean T&R Properties -- was looking at these properties and ready and willing to purchase the properties, at that point in time, you did not have any additional, I guess, financial incentives such as a tax increment financing or other development tools to assist in paying for infrastructure expansion?

A. Berlin Township and Delaware County coordinated together to, I think, put into place or they were working to put some of those agreements into place. However, between us and Berlin Township or Delaware County, we did not have anything.

Q. Okay. All right. So at the time that you purchased the property -- and I say you, T&R Properties and then ultimately assigned to Berlin Industrial and Berlin Apartments. At the time that that purchase occurred, it was at least your understanding that you were -- that T&R Properties would be or those two entities would be paying for all the infrastructure development?

A. Yes.

Q. Okay. And did you have in your -- did you obtain, I guess, the cost estimate for each of those?
A. Yes.
Q. For electric, storm, water and then sanitary?
A. I'm not sure if we did for electric, but most of the utility extension, and the public improvements of the roadways. The various roadways like -- there's Reed Parkway, which is one component that we'll have to extend that is in the millions.
Then there's the north/south spine road for the industrial warehousing called Plunkett, a public road, also in the millions.
The improvement of 36/37 at Plunkett, 36/37 at Lackey Old State, and each of those in the millions as well along with the sanitary sewer extensions, water extensions, stormwater extensions.
Q. Okay. And as I understand it, T&R Properties was not reliant on -- and, again, I'm just going to say collectively the entities -- whether T&R, Berlin Apartments, Berlin Industrial, just so I don't have to keep saying it -- the entities were not anticipating or were not counting on -- for purposes of financing and developing these projects, were not counting on tax increment financing?

A. We would love it if we could get it.
Q. Right. But that wasn't -- let's put it this way: If Delaware County and Berlin Township said, no, we're not going to do the tax increment financing, you would have still gone forward with the project?
A. I can't speculate.
Q. Okay. But, I guess --
A. But, I mean, yeah, I mean, I can't speculate. We would love -- it would -- yeah, I mean, I don't know.
Q. Okay. But, again, I guess, you know, I think in any of this, you have to get financing, right, in order to build these developments?
A. Yes.
Q. Okay. And so in order to develop the Berlin Apartments and the Berlin Industrial, the parcels at issue in this case, you had to get financing from who, the bank? Who was the lender?
A. We don't have that in hand right now because, I mean, we've got so many other entitlement items and so forth to go through with this lawsuit.
Q. Okay. But, again, at the time that you were -- you purchased the property for 7 million, right?

A. We purchased that in cash.
Q. You purchased that in cash.
Fair to say that T&R Properties nor the other two entities had the capital to fully develop the properties?
MR. ZACKS: Objection.
Proceed if you can.
A. Yeah, I don't know the answer to that.
Q. Didn't have the cash on hand at least?
A. I don't know the answer to that.
Q. So are you suggesting that T&R Properties and Berlin Industrial and Berlin Apartments, the entities, actually had cash in order to not only extend the infrastructure improvements for the roadways, the sanitary sewer, the water, but also to construct and build the apartments and the industrial buildings?
A. No.
Q. Okay. All right.
You would have been reliant on getting financing. And the financing would be dependent upon, do you have zoning approval, how are you going to development them, and then the bank, or whoever is financing it, assessing whether it's going to be profitable and whether you're going to be able to pay

it back?
A. There's a couple different questions there.
Q. Okay. All right.
MR. ZACKS: Break them out if you could.
Q. So let me ask it this way: How do you get financing for this project? And when I say "this project," I'm talking about these parcels. How did you anticipate getting financing?
A. A construction loan.
Q. And a construction loan from whom?
A. Whoever could give us the best rate and terms.
Q. Okay. And, again, I'm naive in these issues.
Is it a bank? Do you go to the Huntington? And, again, I'm not assuming you go to the local branch. But, you know, do you have Huntington or do you deal with capital investors?
A. It would be debt. It would not be equity.
Q. Right. Okay. And those whoever you would be seeking to take on the debt or whoever you would be seeking to invest -- or not equity. I'm sorry.
Whoever you would be seeking to obtain the construction loans from would want to know that, number one, you can build it, meaning, you know, you get

zoning approval, et cetera, that all the governmental pieces of it or in place that you can actually do it. And then looking at -- I'm assuming you would have to present a business plan to show that you can make it profitable so you can pay back the loan?

A. Yes.

Q. Okay. And at the time that you purchased the property in 2023, the parcels at issue, you had not at that point obtained the financing?

A. We do not have a bank loan or a construction loan.

Q. Okay. Were you in the process of -- had you even taken that step yet?

A. No.

Q. Okay. And I'm assuming that you're not going to waste the bank's time or whoever would lend you the money, their time, if you didn't have the zoning yet?

A. Correct. Yeah. Correct.

Q. You're not going to fill out an application and say, well, we don't know about the zoning, can we be approved? They're going to say no?

A. Correct.

Q. As far as conducting -- did you conduct any studies relative to -- and I'm going to kind of lump it

together, studies or analysis on -- and I'll start with the industrial parcel -- studies or analysis as to what would be necessary to make that property profitable for you to develop it on the industrial side?

A. Can you be more specific?

Q. Okay. Did you have a determination as to what you wanted to build first or were you waiting for potential tenants or businesses to come to you and say, we want this type of a building? Or did you already have it preplanned, like we're going to put in this type of building and wait for the tenants to come?

A. From the get-go at the economic development outings and what Berlin Township communicated to us, the desire is for speculative industrial warehouses, so that's what we were going to build, so speculative industrial buildings.

Q. And those would be -- when you say "speculative industrial," it would have been -- you know, do you have preset plans or cookie cutter plans, design build, something of that nature that you would typically put in?

A. We had advanced -- I mean, we've done other industrial buildings in the past and we have had -- and also for Berlin Township, we had architectural plans

and engineering plans --
Q. Okay.
A. -- of what we were going to build.
Q. Okay. And kind of the same question for the residential side, did you have -- did you -- well, I guess, let me back up.
So as far as the plans for the industrial, you had some architectural planning that you did.
Did you have an understanding or did you perform any studies or have any market analysis on who would go into those buildings and how much they would be willing to pay?
A. I think I've seen data of what rents we could get, but that's probably the extent of it.
Q. Okay. And where did you get that data?
A. I don't recall.
Q. All right. Do you still have that data?
A. I don't recall.
Q. I mean, does T&R Properties have a consultant that would say, okay, we're looking at this parcel. We're looking to put industrial in there. How much are people willing to pay per square foot for industrial?
A. Brokers could communicate that to us that are experts in industrial leasing.

Q. Okay.
A. And that's who we would rely on.
Q. And did you rely on one for this particular case?
A. We never really got to the point of being able to market the properties based upon our inability to lease the properties. Because in order to lease speculative industrial buildings, expert testimony says that you must have the use code 493, warehousing and storage. And if you cannot lease, then you cannot finance either, so then we cannot build.

\- - -

(Deposition Exhibit A marked.)

\- - -

Q. And I guess we can take a look at this now. We might as well. I've marked this as Exhibit A. And, again, we're killing lots of trees here.
I'm going to back up a step. And if you would turn to -- so this is Chapter 12 of the Berlin Township Comprehensive Plan.
Do you recognize it?
MR. ZACKS: Clarification. Do you know which version of the comprehensive plan this is? What year was it adopted?

MR. LA FAYETTE: 2023.
MR. ZACKS: This is the September 2023 one?
MR. LA FAYETTE: Yes.
MR. ZACKS: Okay.
THE WITNESS: But I think that the one that we were seeing going through on our application, the one that we were using was dated earlier than this. However, if it's your representation that this is what I'm looking --
MR. ZACKS: He hasn't made a representation.
THE WITNESS: Oh, okay.
BY MR. LA FAYETTE:
Q. I'm just going to have you -- for the purposes of these questions, I'm going to have you take a look at page 59. And down at the bottom is a map of the Berlin Industrial Overlay.
Do you see that?
A. Yes.
Q. Okay. And you would agree with me that the portion that is marked on the bottom of the page R4, that is where -- that was where you were looking to put the apartments, correct?
A. Where? These are -- this is the property. [Indicating].

Q. Right. Well, not the -- this isn't the entire -- you know, you didn't buy all of this property, correct?
A. All of --
Q. Everything that's marked R4 on this.
A. We did not buy all of that property.
Q. Right. But within that R4 is where you intended to put the apartments, correct?
MR. ZACKS: There's two R4s on it. Could you be specific?
MR. LA FAYETTE: Yeah. I was talking about the one down at the bottom of the page.
MR. ZACKS: Okay. The drawing at the bottom of the page and the bottom of the drawing?
MR. LA FAYETTE: Bottom of the drawing.
MR. ZACKS: South of 36/37?
MR. LA FAYETTE: Yes.
MR. ZACKS: Okay. That's the clarification I needed.
A. But does have frontage on 36/37, a portion of it does.
Q. Right.
A. We bought this property for the apartments.
Q. Right. And I --

A. A portion of this property.

Q. A portion of that property, right. And then same as far as the parcel, there's a middle one that says A. And then in parenthetical, it says IND for industrial. That's between the R4 and between -- it's in the middle of the page on 36/27, that middle parcel, correct?

A. We bought a portion of this. We bought this. [Indicating.]

Q. All right. And what I was referring to is you bought a portion of that middle A industrial parcel, correct, that's south of 36/37?

MR. ZACKS: And east of Wilson Road.

A. Yes.

MR. LA FAYETTE: Yeah, east of Wilson, correct.

A. Yes.

Q. Okay.

- - -

(Deposition Exhibit B marked.)

- - -

I'm going to hand you what I've marked as Exhibit B. And what I've done here is rather than print the entire thing, I've printed the cover page and

then Article 19 of the Berlin Township zoning resolution. Have you seen -- and I've marked this as Exhibit B.

Have you seen this before?

MR. ZACKS: Objection. This is established 6-10 of '24 which is after their application was denied.

A. So the answer is we've seen an earlier version of this that we reviewed when going through the application process.

Q. Okay. You know what, I'm going to have to come back to this. Let's take about a five-minute break so I can get the correct ones here.

MR. ZACKS: Okay. Understood.

(Recess taken.)

MR. LA FAYETTE: Back on the record.

BY MR. LA FAYETTE:

Q. I think the last thing that I was doing was showing you the wrong version of an exhibit.

And so I'm going to hand you what we will now mark as Exhibit C since we've already marked the other one.

And Exhibit C is what was previously --

MR. LA FAYETTE: I'm sorry. You go ahead and

mark it.

- - -

(Deposition Exhibit C marked.)

- - -

Q. I'm handing you what's been marked as Exhibit C. This is a document that was previously marked as Plaintiffs' Exhibit BZA 3 in the depositions of my clients. And if you look at the top, you'll see that this is Article 19, Berlin Industrial Overlay. And at the very top of the page, it says, as adopted by the township trustees on November 23, 2020.

Did I read that right?

A. That's what it says.

Q. Okay. Are you familiar with this document?

MR. ZACKS: A point of clarification. This is not part of the comprehensive plan. This is --

MR. LA FAYETTE: Correct. Yeah. This is part of the zoning resolution.

MR. ZACKS: Okay. That's all. I wanted to clarify that on the record.

BY MR. LA FAYETTE:

Q. So are you familiar with this document?

A. Yes.

Q. All right. Is this a document that you would

have looked at when you were first looking to purchase the property at issue in this case?

A. I can't recall all the times that I've looked at this document. But I can recall that through the process and even before going into the process, Berlin Township stated that they were in the process of implementing the business park and the overlay and that there were errors and inconsistencies, and that they would work through us on those errors and inconsistencies as we would go through the process.

Q. Okay. But, again, when you were going into contract to purchase the property at issue, with regard to the industrial component, this would have been the Berlin Industrial Overlay that you would have been relying on to -- when you wanted to develop the property; is that right?

A. Yes, the work in progress.

Q. Okay. And if you look at basically this entire document except for the first page, the next 10 pages are under Section 19.03. So if you turn to the second page of that exhibit, you see table -- Section 19.03, permitted use table.

Do you see that?

A. I see this.

Q. Okay. And for the next ten pages -- well, and I'll draw your attention also to in the right-hand side of that table, there's a column that says IND.
Do you see that?
A. Yes, I see that.
Q. And IND A would be the subarea on the zoning map.
Do you see that?
A. Yes. The IND is on the map and is also where you pointed.
Q. Right.
MR. ZACKS: And just for clarification sake, the map that you're referring to is the map on page 19-2 that you're referring to above; is that correct?
MR. LA FAYETTE: Yeah.
MR. ZACKS: Okay. I'm just clarifying because that's -- you guys were referring to a map when we had the other map, so I just want to make it clear on the record.
MR. LA FAYETTE: Yeah.
BY MR. LA FAYETTE:
Q. And in correlation to the map on the table, there's a column that says IND. And it says use map reference. And then under that, it says subarea on

zoning map, and it says A.
Do you see that?
A. I see that.
Q. And you understood that IND A, as reflected in the map, is everything in this column, correct?
A. I see that.
And then I also see the purpose of the BIO, which is overlaying encouraging flexibility of design to promote and accommodate efficient use of the land.
Q. Right. I appreciate that.
But my question is, do you see the IND A on the table indicating what the various uses are permitted in the IND A?
A. I see that.
Q. Okay. And if you turn and you can look to the next ten pages, there's an little X in that IND A column. Do you see that?
A. I see the Xs.
Q. Okay. And you understand that those Xs mean that those are permitted uses within the IND A on the zoning map, correct?
A. I see that also acknowledging the flexibility and the in-progress work of the Article 19.
Q. And you would agree with me that -- well,

I'll let you finish going through it. Again, there's ten pages of what are marked as permitted uses for the IND A.

Do you see that?

A. Yes.

Q. Okay. So would you agree with me, going back to the first page, the IND A area on the map, that is where the property that you purchased for the industrial was located?

A. I would agree with that.

Q. Okay. So back to where I was going before with my questions, when you were doing an assessment or evaluation of the property, did you retain anyone, consultants or whatever, to evaluate any of the uses that were permitted for the industrial A on the Berlin Industrial Overlay?

A. Did we consult anyone? I'm just trying to make sure that I understand your question.

Your question is did we consult anyone to review the uses of the Berlin Industrial Overlay?

Q. Yes, to perform an anal- -- I'll clean it up. I think before I was asking you whether or not you had consulted with people, you know, consultants, experts, whatever, to determine -- to assist you in evaluating

whether you would want to purchase this property, whether it would be -- make sense for you to purchase this property. When I say you, I mean T&R and the other entities.

MR. ZACKS: And your question, from a time standpoint, is when they were first looking at it after the --

MR. LA FAYETTE: Prior to contract. Prior to going -- prior to purchasing.

MR. ZACKS: Because I believe that was asked and answered already.

But go ahead.

A. Your question is before we went into contract, did we look at the use codes?

Q. And I think -- all right. Let me --

Go ahead. Did you look at the use codes prior to going into contract?

A. I don't believe so.

Q. Okay. So the use codes identified in Exhibit C you did not review prior to going into contract to purchase the property?

A. I was under the understanding from Berlin Township in their representations to me that this was a work-in-progress and that they were going to be

flexible. And they also, Berlin Township, acknowledged that there were errors in the codes of things that may be missing and inconsistent.

Q. But, again, my question is, did you look at Article 19, Berlin Industrial Overlay, this Exhibit C?

A. I believe I skimmed through it.

Q. All right. Did you retain any experts or consultants to evaluate the profitability or the desirability for T&R Properties to develop the property in accordance with those approved uses listed in Exhibit A for the industrial A area?

A. Did we hire a consultant to review -- I'm having trouble with -- it's a long question.

Q. Okay. So I'll try to break it up as much as I can.

So prior to entering into the contract with the Chapman family to purchase this property that was located in the BIO, you just told me that you may have skimmed this article 19, Exhibit C, right?

MR. ZACKS: Objection to the extent that there was some legal determinations in your question.

But other than that, go ahead and answer.

You said it was in the BIO.

MR. LA FAYETTE: The property that he was

intending to purchase fell within the map for the BIO.
MR. ZACKS: Okay. That's the question.
A. In the contemplated BIO, yes.
Q. Yeah. And you said that you had maybe skimmed Exhibit C, which are the --
A. The use codes.
Q. -- the use codes.
A. Okay.
Q. All right. When you were looking at purchasing this property -- I think we had talked about it a little bit before -- you were trying to determine -- you know, T&R Properties is in the business of making a profit.
And in doing so, did you consult with any market consultants, any kind of experts to determine what uses would be profitable?
A. We never -- or I'm sorry. We did not hire a broker, for instance, a leasing broker to determine the use codes prior to going into contract.
Q. Okay. But what I'm -- I guess what I'm trying to get at more is did you retain any experts? And maybe you are answering the question.
But did you retain any experts or consultants that evaluated all of the use codes that were approved

in this Exhibit C to determine whether or not there would still be profitability for T&R Properties to purchase the property?

A. We did not do that because we knew that there was flexibility or we thought that we knew that there was flexibility to make the reasonable changes that would be required to make a project that is feasible for industrial warehousing, speculative industrial warehousing as well as apartments for our mixed use project.

Q. And that would have been gleaned from your participation at the Delaware Economic Development where the township talked about the BIO?

A. That would be one example. Another example would be the text that says, the overlay encourages flexibility of design to promote and accommodate environmentally sensitive and efficient use of the land.

Q. Well, let's -- where are you reading that? The first sentence or -- wait. Where are we? Tell me where you're reading that.

A. Yeah. It's a component of that first paragraph. Let me see. The second sentence.

MR. ZACKS: Let the record reflect that he's

making the reference to Exhibit C, the first paragraph, Section 19.01, Purpose.

A. And all of the bullet points below that.

Q. Okay. And in looking at that, notwithstanding that first paragraph, you didn't look at it to determine whether there are other uses that would have been appropriate for the property that are listed in the template -- or in the table?

A. I'm sorry. Say the question one more time.

Q. So rather than relying on what was approved as an approved -- among the approved uses in the table in 19.03 of Exhibit C, you relied more on the general language of encouraging efficient use of the land and resources --

MR. ZACKS: Objection.

Q. -- in the introductory paragraph?

MR. ZACKS: Objection.

If you can answer, go ahead.

A. That's a component, yes.

Q. Okay. But you were not -- so you understood at the time that you were entering and going into contract to purchase the property from the Chapman family that -- well, let me back up a second.

Did you have an understanding of what you

wanted to put into the property, what you wanted to develop on the property at the time you purchased it?

A. Yes. We --

Q. What was it that you wanted to put in there?

A. We knew what we wanted to do. And Berlin told us what they wanted. They wanted speculative warehouse development and speculative industrial warehousing, so that's what we proceeded with after getting into contract and going through the process. And understanding that Berlin Township acknowledges this first paragraph about their flexibility and as well that this is in progress and they will work with us to make it happen.

Q. Who told you when you say "they" in Berlin Township? Was there a particular individual that said, yes, we want speculative industrial?

A. Whoever was presenting at the Delaware Economic Development meetings. Meghan Raehil was there.

Q. But she wasn't the one that said it? She was there?

A. I think that she said it.

Q. Okay. Well, that's what I'm asking. I just want to know who said it.

A. Monica Conners was the former economic development director who was also there who said it. And then pre-application meeting when we met with Meghan Raehil as well as the zoning inspector at the time, I think her name was Laura, said it there as well.

Q. Okay.

A. Those are the instances that I can think of. I'm sure there are more.

Q. Right. And you understood at that time that notwithstanding any statements to that, they were encouraging or looking for speculative industrial development on that particular parcel, in the industrial parcels, that it was still subject to zoning approval or subject to the overlay being pulled down, correct, and meeting with the overlay requirements?

A. The in-progress overlay and them being flexible and following what they say in this first paragraph.

Q. And so back to my earlier question, did you or anyone on your behalf of T&R Properties evaluate any of the other approved uses that are identified in Table 19.03 of Exhibit C?

MR. ZACKS: Paul, again, your question is at

any time during this entire process, or is there a point in --

MR. LA FAYETTE: Prior to contract.

MR. ZACKS: Okay.

A. Has anyone else reviewed it? What's your question?

Q. Okay. You went into contract on this property. And I think you told me that, you know, between the industrial portion and the residential portion, you paid $7-plus million, right?

A. Correct, for the mixed use project.

Q. Okay. Prior to investing this $7-plus million in purchasing the property, did you evaluate any of the approved uses and whether that was a potential for T&R Properties to develop the property under one of those other uses in 19.03 on Exhibit C?

A. We looked at these uses, yes.

Q. Okay. And did you evaluate whether or not you were willing to develop it with any of those other uses?

A. Yes. And for the purposes of speculative industrial warehousing, expert testimony -- which speculative industrial warehousing, which is what Berlin Township requested and what we proposed -- for

speculative industrial warehousing, expert testimony says that you must have 493 warehousing and storage as a required use in order to lease the building. And then when you cannot lease the building, if you don't have it, then you cannot finance it either, so, therefore, it will never happen.

Q. So -- but, again, in the warehousing component, NAICS 493 was not among the approved uses, NAICS codes for the industrial overlay, correct?

A. It's approved in the zoning resolution under industrial. So I mean, like the other errors, I mean, in the text, the BIO text that was in progress, it wasn't in here at that time, but it was in other portions of the Berlin zoning resolution.

Q. But under -- the other portions of the Berlin zoning resolution were not the ones relevant to your development? You had applied for the Berlin Industrial Overlay, correct?

A. We applied for the in-progress Berlin Industrial Overlay for the -- for a portion of the mixed use project.

Q. Right. Which would have been the industrial portion?

A. Yes.

Q. And the Berlin Industrial Overlay that was in place at the time prior to your purchase of the property was Exhibit C, correct?

A. I believe so, yes.

Q. Okay. And the NAICS Code 493 was not among -- the warehousing was not approved under Exhibit C, correct, for the industrial A area?

MR. ZACKS: Objection. It calls for a legal conclusion.

A. I don't see that it's listed in here.

Q. Okay. And that's something that you would have looked at before you developed -- or purchased the property, correct?

MR. ZACKS: Objection. Asked and answered.

Go ahead if you want to answer it again.

THE WITNESS: Should I just say that the record speaks for itself?

MR. ZACKS: No. No. Let him --

A. Go ahead.

Q. I think you talked to me before that you wanted -- when you go to purchase a property, one of the things you consider is whether it meets zoning, right?

A. I'm sorry. Whether the property --

Q. When you are purchasing a property on behalf of -- and in your capacity with T&R Properties, you are purchasing the property -- you're looking at what the zoning is on the property, correct?
A. It's one of the factors.
Q. Okay. And when you're purchasing the property in context of the zoning, if the zoning is not approved, that would impact your decision to move forward with the purchase?
A. It could.
MR. ZACKS: Objection. Objection as to, again, timing in your question.
MR. LA FAYETTE: I said prior to purchase.
MR. ZACKS: Okay. I understand. But then you jumped to the idea of when zoning is approved. So your question assumes that they approve for what happened before going into contract and that's not really the intent of your question, so that's why I'm objecting.
A. Yeah, I --
MR. ZACKS: Form of the question.
A. Yeah. It depends on circumstances, yeah.
Q. Okay. But at least at the time prior to the purchase of the Chapman property at issue in this case,

you knew that warehousing was not an approved use under Section 19.03, which is Exhibit C, the Berlin Industrial Overlay, correct?

A. We know that it was not listed in here. However, we also know that the township has this first paragraph and other statements that they've made to us that they'll be flexible in working through the errors in their code.

Q. You would agree with me that nothing in that first paragraph talks about warehousing, correct? It doesn't mention warehousing?

A. It talks about appropriate types of retail, office, commercial and industrial developments.

Q. Right. And it does not say warehousing, correct?

A. Let me look. I don't specifically see the word warehousing. However, industrial/warehousing are -- go hand in hand.

Q. And the experts that you talked -- that you have mentioned before, when you keep saying expert testimony, you're referencing who?

A. Expert testimony relating to warehousing and storage use codes?

Q. Yes. When you were talking about -- you

know, you were talking in general about the overlay and you said expert testimony has said X, Y or Z.
Who's the expert that you're talking about?
A. A couple.
Q. Okay.
A. One being Brian Marsh with JLL. And they're the largest industrial warehousing leasing broker in town here and probably nationally or internationally.
And Brian describes in his testimony that --
Q. Well, I was just asking you who. I don't -- I've seen his testimony --
A. Okay. And then the second one would be Evan Ballman, who works with Berkadia. And he's a mortgage broker. And I believe his group is one of the highest volume -- loan volume mortgage brokers. And he regularly does financing of industrial warehousing assets.
And he said, due to Brian's testimony, if something is not leasable, when it's not leasable, it can't be financeable.
Q. Right. And Brian was retained by T&R Properties to offer testimony at the hearing -- at the various meetings with the township trustees; is that correct?

MR. ZACKS: Objection.
A. What do you mean by "retained"?
Q. Did T&R Properties pay him?
A. No.
Q. Did T&R Properties engage JLL to provide any services?
A. We have in the past, but not for...
Q. Not for the Berlin Overlay?
A. Not for -- yeah.
Q. And what about Mr. Ballman?
A. We did not pay.
Q. Did T&R Properties or the other two related entities retain anyone to offer testimony at either the BZA hearings or in front of the board of trustees?
A. No. Besides myself? Oh, I'm sorry. Would you count our professional consultants like our architects and engineers? Because, I mean, they worked with us -- they worked for us on the application.
Q. So who's your architect?
A. So we had the mixed use project and we have apartments. And for the apartments architects, it was Kontogiannis & Associates. And for the industrial component of the mixed use project, it was DSI. Branko Stankovic is the name.

And the engineering for the mixed use project was done by Advanced Civil Design.

Q. And I think we spoke before about you couldn't recall whether or not a contingency was included in the contracts with the Chapman family for the purchase of the parcels at issue; is that right?

A. We had a contingency.

Q. Okay. And what -- was a zoning contingency among those contingencies?

A. I believe so.

Q. Okay. In 2023, you purchased the property, correct? Berlin Apartments and, you know, Berlin Industrial were --

A. That sounds correct.

Q. -- the purchasers and they're the named owners of the property?

A. That sounds correct.

Q. Okay. That was done prior to zoning approval; is that correct?

MR. ZACKS: Well, objection. When you say "zoning approval," you're saying one of the two parcels, or what are you --

MR. LA FAYETTE: Let me back it up.

MR. ZACKS: Okay.

BY MR. LA FAYETTE:
Q. So as to the Berlin Apartments, LLC, you closed and purchased the residential parcels for the apartment development, correct?
A. We purchased the property.
Q. You purchased the property in 2023, correct?
A. Yes.
Q. Okay. That was done prior to obtaining the densities that you wanted for the apartments, correct? You ultimately sought a variance on the density, correct?
MR. ZACKS: Okay. Wait. There's two questions there. Let him answer the first one first and then answer the second one or whatever you want to do in order, but...
MR. LA FAYETTE: You can read it back.
(Record read as requested.)
A. We still have not obtained the densities for the apartments, correct.
Q. Okay. All right. And at that time, at the time of purchase, what was the zoning of the property?
MR. ZACKS: Objection. Asked and answered previously.
But go ahead.

A. FR1 --
Q. Okay.
A. -- for the -- yeah.
Q. And you would agree with me that Berlin Apartments, LLC and T&R Properties had sought a PRD for the development of the apartments on that parcel?
A. As a component of the mixed use project, which we were told to go -- by Berlin, to do two different applications for the apartment component of that -- we applied for a PRD.
Q. Okay. And at the time that you purchased the property in 2023, that PRD had not yet been approved, correct?
A. It had not.
Q. Okay. And with regard to the industrial parcel for Berlin Industrial, LLC, again, you purchased -- Berlin Industrial, LLC purchased that property in 2023, correct?
A. Yes.
Q. All right. And at that time, I believe the BIO had been approved, correct? They pulled -- you had applied for the BIO for that property?
A. It was approved without the required use codes that we needed.

Q. Right. And so when the approval came down on the BIO, you knew that the NAICS Code 493 was not approved?

MR. ZACKS: Asked and answered.

But go ahead and answer it again.

A. Yes. However, we know that it was not in the BIO text but that Berlin Township, who has requested industrial warehousing development, speculative industrial warehousing --

Q. Again, I understand what you're saying. And I understand what -- I'm asking you, at the time that you purchased the property -- that Berlin Industrial, LLC purchased the property, it did not have zoning approval that included the NAICS 493 use code, correct?

MR. ZACKS: Objection to the extent it requires a legal conclusion.

But go ahead and answer to the extent you can.

A. I'm not a legal expert, but 493 was not included in this, and we thought that Berlin would be flexible.

Q. Again, I understand.

My question is at the time that you purchased the property, the 493 use code was not approved?

A. Correct.
Q. Okay. Would it be fair to say that when you purchased the properties, and I'm talking about both of the properties, the apartments and the industrial, that you assumed on the industrial side that you would be able to get the 493 -- let me scratch that because that was a bad question.
At the time that you purchased the properties for the industrial, you assumed that you were going to be able to get the 493 use code, correct?
A. We thought that Berlin would be flexible and --
Q. But you assumed that you were going to get the 493 use code?
MR. ZACKS: Objection. He answered the question.
A. I can't speak for Berlin, but that's what we need.
Q. I understand.
And my question is, when you purchased the property, you assumed -- when you actually closed to purchase the property, when Berlin Industrial, LLC purchased the property in 2023, you assumed that the township would give you the 493?

A. Yes. We relied on their written statements and verbal statements.
Q. So you were making that assumption?
A. That they would be --
MR. ZACKS: Objection.
Q. Again, you're not answering.
My question is, did you assume that you were going to get it, yes or no?
A. An assumption relying on what they've said in their overlay and their zoning resolution.
Q. Okay. So is that a yes, that you were making that assumption?
A. Based upon that, yes.
Q. Okay. And as far as the apartments were concerned, you made the assumption that your PRD would be approved?
A. We relied on what Berlin Township has said, which is that they would be flexible in their PRDs and in their BIO for our mixed use project to make -- to grant us the approvals required for a feasible project, which includes our density variance and 493 for housing and storage.
Q. And, again, who said that from the township?
A. It's --

Q. Well, specifically with the PRD?
A. Section 11 of the PRD I don't have in front of me. Maybe you do. But Section 11 or the PRD states that they will be flexible in their zoning and reasonable in their zoning.
And the whole point of a PRD, a planned residential district, is to be flexible.
Q. And the flexibility in this PRD was the original -- in going through the PRD, the existing use of the property was FR1, farming, agricultural, correct?
A. That's what the underlying zoning was.
Q. And your understanding of that underlying zoning was one unit per acre, one residential unit per acre, correct?
A. And Berlin Township has the capability to go up to 20 units per acre.
Q. Yeah. But at the time when you purchased the property, it was FR1 and you could have one unit per acre?
A. Yes.
Q. Okay. And when you applied for your PRD, your original application, what were you seeking, units per acre?

A. It was about 376 units, 8-some units per acre.
Q. Okay. And eventually as of the final amended application, it was 6.97 units per acre, correct?
A. Correct, down to 296 units.
Q. Okay. And, again, at the time that you purchased the property, you made the assumption that the township would grant your PRD --
MR. ZACKS: Objection.
Q. -- for the density that you had requested?
A. I've already said the same thing. If you want me to say it again --
Q. Well, you're not answering my question.
My question is yes or no, were you making that assumption --
MR. ZACKS: Objection.
Q. -- that they were going to grant the PRD?
MR. ZACKS: Paul, objection.
And, again, he has answered the question numerous times under the assumption that you're asking him to say. And he said that they were -- he is --
MR. LA FAYETTE: I don't need your testimony.
MR. ZACKS: I know you don't need my testimony, but I don't need you asking him the same

question five times.

MR. LA FAYETTE: Well, he's not answering the question.

MR. ZACKS: He did answer the question. We can go back in the record and see it. That's why you don't want me to testify. I'm not testifying. I'm repeating the record. So if you --

MR. LA FAYETTE: I'm asking a yes-or-no question.

MR. ZACKS: He answered your question.

MR. LA FAYETTE: No, he didn't.

MR. ZACKS: Yes, he did. He answered your question. I can go back in the notes. She can go read it to you.

MR. LA FAYETTE: I'm not going to read your notes. I'm going to ask it again.

BY MR. LA FAYETTE:

Q. Yes or no, when you purchased the property -- when Berlin Apartments, LLC purchased the property for the residential development in 2023, did you assume that the township would grant the PRD, yes or no?

A. With them -- with our reliance on what they've said in their zoning resolution and multiple times in person, yes.

Q. Okay. Thank you.
You understood that when you were in contract to purchase these parcels, they were all FR1, both the industrial component of the parcels and the intended apartment complex?
A. Yes.
Q. Okay. And absent the change in use, they could continue to be agriculturally used, correct?
MR. ZACKS: Objection to the extent that it calls for a legal conclusion.
But go ahead and answer.
A. Yes, the apartments of the mixed use property of the PRD application, which was denied, that property is still FR1. The industrial portion of the mixed use property that was rezoned albeit without the required uses to make the project feasible cannot because it's no longer FR1.
And I acknowledge that the properties were FR1 and the apartment location is still FR1; however, that's not the purpose of why Berlin put in the business park. They don't want it to be FR1. That's what they said.
Q. You've mentioned the term "feasible."
And is that synonymous with profitable?

MR. ZACKS: I'm sorry. I didn't catch that question.

Q. I said you've used the term feasible when you said it's not feasible.

Is that fair to say that that's synonymous with profitable? It's not profitable for you to -- I think your position is it's not profitable for the industrial development to go through without that 493 code, use code?

A. Yeah. We need reasonable density and reasonable uses as it pertains to this property.

Q. Okay. But, again, you keep saying feasible and I'm just making sure that feasible also means profitable. You have to be able to make money to justify the investment; is that fair?

A. Yes.

Q. Okay. So when you went to develop these properties under Article 19 under the business [sic] industrial overlay -- or the Berlin Industrial Overlay, did you understand that in order to pull the overlay down, you have to comply with the requirements of the overlay?

A. Yes. Working through what was in place and what was in progress at the time and knowing that

Berlin Township has flexibility to make changes.
Q. But, again, the Berlin Township's ability to make changes and ability and flexibility doesn't guarantee you any particular zoning, correct?
A. Say that question one more time for me.
Q. Yeah. Well, you're saying that, you know, yeah, you understood that the overlay had certain requirements that you had to meet in order to pull down and use the overlay, right?
A. Their requirements that we met, yes.
Q. Well, there were other requirements -- well, yeah, you met the requirements for the overlay. And I think your position or your statement is that you felt that there was flexibility that they would offer you the 493 use code for the warehousing, correct?
MR. ZACKS: Objection. You mischaracterized it. You said that the township implied there would be flexibility, not that he said. He said he relied upon the township's statement that they were going to be flexible.
MR. LA FAYETTE: Yeah, I don't even know what any of that means. I'll try again.
BY MR. LA FAYETTE:
Q. Your understanding -- what was your

understanding of the flexibility for 493 for the use code?

A. That if this is a use, which it -- this is a use that we need in order to build speculative industrial warehousing and that if the township wants to, according to this purpose of the BIO and the business park, they can do it.

Q. Right. But it was not a guarantee that you would have it, correct, that they would do it?

A. We don't have it as we sit here right now.

Q. Right. Yeah. And going into it, you knew that? Your testimony a few seconds ago was if the township wants to.

A. If they were acting reasonably, then we think that they would.

Q. Okay. And, again, I think this all comes down to you think that they were acting unreasonably? Is that a fair statement, that the township acted unreasonably in not adding the 493 use code?

A. There's more to it than that. I mean, that is an example of them acting unreasonably. And there's standards in the BIO that are unclear, and in their zoning text and their actions overall.

Q. When we're talking about the residential

component, the residential parcel for Berlin Apartments, you were aware that the BIO allowed for -- that the parcel that you were looking -- or that you were purchasing allowed for four residential units under the BIO?
A. Yes.
Q. Okay.
A. The BIO that was in progress, yes.
Q. Right. Why was it that you did not apply for the residential parcel for the BIO?
A. Because Berlin Township told us not to.
Q. Did you have an understanding why?
A. Yes. For the same reason as kind of a lot of my previous answers. There are a lot of errors and inconsistencies in the BIOs in progress. And in order to apply -- or in order to have our use fit better, according to Berlin, and have the flexibility that Berlin said that they would provide us and be reasonable, the standards were that the PRD fit that better for us.
Q. Okay.
A. So they directed our mixed use project to be split into two applications.
Q. Well, then, I guess flipping back to the

industrial, why is it that you applied for the industrial overlay knowing that 493 wasn't included in that list? Why wouldn't you just do it as a planned commercial district?

A. That's what Berlin Township told us to do.

Q. Who told you?

A. The zoning inspector.

Q. Which one?

A. I know that there were multiple through us going on our application. And the first one, I believe, was Laura and then Cathy Rippel was also involved.

And then more recently later in the process, the third zoning inspector that we had to coordinate with was -- I forget the gentleman's name. He was a former firefighter and -- yeah.

Q. All right. But I guess my question is, do you recall who in particular told you don't do this as a PCD, planned commercial district, do it as a -- do it under the BIO?

A. I don't recall. We received verbal communication and then email suggesting to split it up.

Q. Okay. Now, let me back up a second because I may not have clarified this earlier on.

You say we. Was it you having direct communications with the township, or did you have somebody else working with you on this project for T&R Properties or for the various -- the other two entities?

A. It would have been me.

Q. Okay. All right.

A. And then it's possible that an engineer or an architect could have been present.

Q. Okay. But I guess my question is, aside from the generality, do you remember who in particular told you, pull down the BIO for this industrial component as opposed to doing it a planned commercial district?

A. I don't recall.

Q. Okay. And the same question as to the residential, who told you, don't pull this down on the BIO, do it as a PUD?

A. I don't recall. There is an email. Who it's -- from the to line, I don't recall who the person was.

Q. Okay. And did you have an understanding why -- let's start with the industrial one. Why was that -- why was the recommendation to pull down the BIO as opposed to doing a planned district?

A. That's what Berlin wanted, so that's what we

did.

Q. But did you have an understanding? Like, did they say, hey, for this reason or these reasons, here's why it's a better option?

A. I don't recall.

Q. Okay. You just remember them generally saying -- somebody generally telling you, go ahead and do it as a BIO on the industrial side?

A. I believe so, yeah. Based upon what we wanted, that's what they told us to do.

Q. And at that stage where they told you, go ahead and do this as a BIO, had you communicated that we need to have the 493 use code included?

A. I don't recall when we, I mean, explicitly said 493 warehousing and storage. I mean, there were a plethora of issues with the BIO as it was in progress.

For example, reading through the text, there's inconsistencies with quantities of, okay, this square footage, you can only have this many dock doors, for example.

And as a whole when we were coordinating with Berlin Township, Berlin Township again acknowledged we know this is a work-in-progress and we're going to be flexible with you to make this speculative warehouse

industrial development work in conjunction with your apartment community and your mixed use project.

Q. Well, you throw the warehouse component in there.

Who in particular said that the warehouse component would be something that they would work with you on?

A. I don't recall. I mean, it's right here.

Q. Well, you agree with me -- yet again we've covered this -- but under Article 19, 19.01 where you talk -- where it mentions and discusses the purpose of the BIO, it does not state warehousing, correct?

A. It states industrial development. And in order to have industrial developments, warehousing and storage as a use code is what you need.

So, therefore, in order to -- for Berlin to effectuate and to make the business park happen like they want, like they've suggested, like they've said to us in public and in hearings and in this text, that's what we need, that's what they need.

Q. Okay. So your opinion based on what you're telling me is any industrial use that is listed on the ten pages that follow, you know, the pages 19-2 through 19-12 of Exhibit C that identify the approved uses for

industrial A, any industrial use in there is not useful unless it has warehousing?

MR. ZACKS: Objection. I don't believe that was his testimony.

But go ahead and answer. If you want to look at the different uses, you can look at them.

A. Certainly. And warehousing and storage is a component, I would say, of all of these. However, in order to build a speculative industrial development as Berlin Township requested, you need to have warehousing and storage to lease a building and to finance a building.

Q. Okay. So --

A. Go ahead.

Q. Let me clarify, I guess, from what I'm hearing from your testimony.

The Berlin Township overlay and based on what was communicated with you is that they were encouraging speculative industrial development, right?

A. Yes.

Q. Okay. And from what I'm gleaning from your testimony is that you're saying that encouragement for industrial -- speculative industrial had to include a warehouse component. And, therefore, you're

interpreting the speculative industrial to include warehouse because in your view, it has to have it?
A. In an expert's view, it has to have it.
Q. Okay. And which expert?
A. Brian Marsh, as an example.
Q. Okay.
A. And Evan Ballman.
Q. Okay. You would agree with me that all of the other uses that are approved under the industrial A in Exhibit C were also potential beneficial uses of the property?
A. They can be used. However, in order to even have the building, you must have 493 warehousing and storage.
Q. And that would be true for each one of these approved uses in Exhibit C for industrial A?
A. That's what expert testimony says for speculative warehousing and storage.
Q. So if you look at page 19-3, which would be the third page of that Exhibit C.
A. Okay.
Q. You can see under industrial A, it identifies water and sewer line and related construction. If you look a little bit further down, it says foundation,

structure and building exterior contractors. And then under that it has structural steel, framing contractors, masonry contractors, glass and glazing, et cetera.

You're saying that warehousing is essential for each one of those?

A. It's a component. And I believe what the expert testimony says is in order to build speculative industrial developments, these are very specific uses and not that -- I mean, it's possible that some framing contractor needs an industrial building. But a framing contractor can't go into a building that does not exist. And the building can only be built speculatively with having sufficient uses and flexibility like Berlin promises flexibility in their use code and their zoning text and in the in-progress BIO as we were going through with it.

And without that flexibility of having the use of warehousing and storage, the speculative industrial building cannot be built because it cannot be leased. And because it cannot be reasonably leased, it cannot be financed. Therefore, it cannot be built.

Q. Got it. And so I think what I'm understanding from your testimony is that all of the

industrial -- or all of the uses that are approved under the industrial A may be other beneficial uses of the property, but in your view, they're not industrial spec- -- they would not justify an industrial speculative building?

A. Correct.

Q. Okay. Prior to purchasing the industrial parcel, did you communicate with any potential tenants or businesses that would move into that property?

A. No.

Q. Did you conduct any studies regarding what companies would have an interest in doing it?

A. We spoke to Delaware Economic Development. And we're hopeful that Berlin, like they state in their zoning text and they state in their public hearings and so forth, would be flexible. We thought that they would. They weren't.

So we talked to -- but still -- even still, we talked to Delaware County Economic Development and said, hopefully this will be the start of the business park.

But other than that, yeah, that's all I can think of right now.

Q. So you didn't have any agreements with any

potential purchasers or tenants for any of the industrial buildings?
A. No.
Q. Okay. Did you have or did you calculate an anticipated rent that you would charge per square foot for the industrial?
A. I think earlier I spoke to you and already answered that. We had some preliminary research of what achievable rents we could get and that's as far as we got for that.
Q. Okay. And do you have documentation of that research?
A. I think I already said no.
Q. Okay. So I guess when I say -- when you say preliminary research, what do you mean? Did you go on the Internet and look up and just --
A. Yeah.
Q. Okay. But you didn't print out anything? You don't have any hard data saying, I think this is how much somebody will pay?
A. No, I don't think so.
Q. Okay. Had you gotten to the point of actually writing down or putting pen to paper on what you think you would have charged per square foot?

A. In a very high level, I think.
Q. Okay. And what was it that you were going to charge per square foot?
A. I don't have that in front of me. It was a long time ago.
Q. Do you have a document reflecting that?
A. I can look for it.
Q. Okay. Same questions as to the residential units. Did you consult anybody that -- or obtain any studies to see what could be charged or what you intended to charge for the residential units?
A. No, not besides looking at our own apartment communities nearby.
Q. And the apartment communities nearby would have been the two in Delaware?
A. We've got more than two in Delaware, but looking at them generally.
Q. Let me ask this: The Berlin Apartments, LLC property where the apartments were planned to go, how were they -- were they similar in construction design, et cetera, to the Delaware -- the two Delaware developments or are they different?
A. They were similar.
Q. Okay. And do you know what the square

footage -- or, I mean, I guess I should ask you, how do you determine -- I mean, I know as a renter, I go look up and say, okay, well, one bedroom is X.

Do you do your calculations on square footage or one bedroom, two bedroom, three bedroom?

A. Both. And, again, yes, it's similar. This proposed apartment community as part of the mixed use development is similar to those -- I think Flats on Houk, Dooley's Orchard were some that were named in the -- as we went through the hearings, a similar style.

We had 17 16-unit buildings. And then we had -- and those were flats, one and two bedrooms. And then we had 6 4-unit townhome buildings. And all these building types are two-story. And the townhomes are three bed, two and a half bath with attached garage. And we did have some separate detached garage buildings.

I would also say that the apartments proposed here at the request of Berlin Township had an extreme amount of amenities. A large clubhouse. We also added a lot of walking paths at the request of Berlin. A swimming pool, fitness facility.

I'm trying to think. I think that's all I can think of right now, yeah.

Q. And as far as do you know what the price point was for a one-bedroom?

A. I don't have that right now.

Q. Would it have been similar to the two-bedroom?

A. Market rate. Attainable market rate.

Q. But would you have anticipated charging the same amount that you charged for the two properties in Delaware or any existing ones in Delaware?

A. It would be what an attainable market rate rent level is at the time.

Q. I understand what you're saying to some other degree. But to some degree, it's -- an obtainable market rate if I own the apartment complex is going to be as much money as I can charge somebody that's willing to pay it; is that fair?

A. The market rate, like anything else, is what someone is willing to pay. And it's based upon nearby communities. So if we have something nearby or -- for instance, there's Fourwinds right across the street, which is an apartment community that's at a density of 30 units per acre and that would be maybe a competitor.

Q. Okay. Do you know how much Fourwinds was charging?

A. I don't know off the top of my head.
Q. Would you have had to have priced your apartments for Berlin Apartments, LLC and I guess for T&R Properties, would you have had to price them competitive with Fourwinds?
A. I would say so.
Q. Would you have had any documentation indicating how much you would be paying -- that you, I guess, were planning to charge for the residential units?
A. No, I don't. I'm not sure if I -- I could have said something in a public meeting, but I don't recall. If someone asked the question, like -- you know, I can't recall.
Q. And the reason I ask that is in this lawsuit, there's a number of claims that you're making. And one of them is for damages, which would have been -- result in a loss of income that would have come from the apartments. And so I'm trying to estimate what that would be and how you would have calculated it.
A. Are you -- what are you asking me?
Q. Well, I'm asking -- that's why I'm asking, how much would you have charged for the apartments, for the rentals.

A. Okay. And when we're to the point of giving our damages, we can provide all that information.
Q. Well, that's why I'm taking your deposition now. I want to know what damages you have.
A. Okay. So you want me to -- what's the question?
Q. I'm trying to quantify it.
A. Okay.
Q. Do you have a number?
MR. ZACKS: Let's be clear. You're quantifying the per rent, per unit, is that what you're asking?
MR. LA FAYETTE: Yes.
MR. ZACKS: Okay. On a one-bedroom, two-bedroom, three-bedroom?
MR. LA FAYETTE: Yes.
MR. ZACKS: Okay. Then ask that question.
MR. LA FAYETTE: Well, I did and he doesn't know it so that's why I'm trying to get to it. That's why I'm getting him to explain -- I'm just trying to understand that, and I don't have a quantifiable number.
MR. ZACKS: You asked him if --
BY MR. LA FAYETTE:

Q. Are you saying that you don't have a quantifiable number?

MR. ZACKS: No. You asked him if he had any documentation regarding what he was planning to charge, and he answered that question.

Now the question is do you know the numbers.

So I think -- just make the record clear. If you ask him that question, he's going to answer it, so...

BY MR. LA FAYETTE:

Q. My question, and I think you've answered it, you don't have any documentation, right, of what you would have charged for these apartments, whether it be one bedroom, two bedroom, three bedroom or the townhomes?

A. When the time comes that we need to provide numbers of the quantifiable damages, we can provide those numbers. I can give you how we would calculate those numbers.

Q. Okay. How you would calculate them. You haven't calculated them as of today?

A. Right now, no, we have not.

Q. Okay. All right.

You would agree with me that during the

zoning process, these apartments were referred to by, I guess, a combination of yourself and I think your architect, that these were luxury apartments; is that correct?

A. If that's what the minutes say, that's what they say.

Q. Okay. And when you're looking at -- let me see.

Did you understand within the overlay district, looking back at Exhibit C -- and I think you're on the correct page. And, again, this was a previously marked exhibit from, I think, one of the BZA members. I don't remember which one. But in Exhibit C, you can see an area where it's written R10, do you see that, on the map?

A. Yes.

Q. And was it your understanding that that -- those parcels in that area were R10 under the BIO?

A. Under the in-progress BIO, that says R10.

Q. Okay. And you understood -- well, you keep saying in progress.

This was as adopted November 23, 2020?

A. If that's what it says.

Q. Okay. Well, look at the first page. I want

you --
A. Yeah.
Q. Okay. So Exhibit C was the as-adopted BIO as of November 23, 2020, correct?
A. Okay.
Q. Is that a yes?
A. Yes.
Q. Okay. All right.
And so at that time that parcel that we were just referencing where the handwritten R10 is, you can see that -- and, again, I think it was handwritten because we were having trouble seeing the number, but there was an actual R10 typed onto that map.
Do you see that?
A. I see it.
Q. Okay. And you understood at the time that you were negotiating to purchase these properties and up until the time that you purchased these properties, that that parcel, R10, meant that you could have ten residential units per acre, correct?
A. Per net developable acre.
Q. Yeah. And that was -- and the parcels that you purchased are under the R4 or within the R4 where it was four residential units per developable acre if

you were to utilize the BIO?
A. If we were to utilize the BIO, that says R4.
Q. Okay.
A. Understanding as well that Berlin instructed us to use the PRD in consideration of the location of the property being the gateway to the business park, the substantial millions, 10 million plus dollars that encompassed the public developments of the roadways, Plunkett Road, Reed Parkway, the water and sewer --
Q. Who in particular told you that?
A. Can I finish, please?
MR. ZACKS: Let him finish his answer.
Q. You're not answering my question. You already answered it and now you're going off on saying something different.
A. -- the water and sewer, the storm sewer as well as the road developments to 36/37 at Plunkett, understanding all those considerations about the property and that Berlin wants apartments and wants to provide the flexibility as they state in their PRD and they have the capability to go up to R20, that's what -- and we proceeded with the PRD and that's my understanding.
Q. Who told you to do the PRD?

A. Berlin Township.
Q. Who? The person?
A. The zoning inspector at the time.
Q. Which one? The name?
MR. ZACKS: Objection. Asked and answered. He mentioned previously Laura. He had mentioned the other person he referred to --
A. Yeah, Laura or Cathy --
MR. ZACKS: We can't talk at the same time.
MR. LA FAYETTE: But I want to hear his testimony.
MR. ZACKS: I understand. But I'm just repeating what he's already told you. The question was already asked and answered.
MR. LA FAYETTE: No, I don't want to hear what you -- I want to hear him answer the question.
MR. ZACKS: The question -- the objection was on the record. It's asked and answered.
MR. LA FAYETTE: You've got your objection. I appreciate it.
MR. ZACKS: Okay.
MR. LA FAYETTE: Just did --
MR. ZACKS: I don't want the same question asked all day long.

MR. LA FAYETTE: Well, I would like to get the answers.

MR. ZACKS: You have them, three times.

MR. LA FAYETTE: He changes them.

MR. ZACKS: He doesn't. He explains his answer --

MR. LA FAYETTE: Ben, I'm not going to argue with you. I'm trying to get an answer.

THE WITNESS: I haven't changed my answer.

BY MR. LA FAYETTE:

Q. Did you talk to Laura or any of these people that you have mentioned, did you personally have that conversation with them?

A. Yes.

Q. Okay. And they told you to do the PRD for all the reasons that you just mentioned a few minutes ago?

A. They told me in writing, they told me in email and in person, yes.

Q. Okay. All the things that you just talked about, the infrastructure improvements, all these other things, that's why they wanted you to do the PRD?

A. I don't know the exact -- I don't have the email in front of me. The email says to do a PRD

instead of the BIO.

Q. Okay. You would agree with me that any of the discussions that you had with any of the zoning personnel are not binding on the township or the Zoning Commission or the BZA or the trustees?

MR. ZACKS: Objection to the extent that that calls for a legal conclusion.

If you can answer it, go ahead.

A. I'm not a legal expert. However, we, as a developer, like we relied on -- like we've relied on other townships that we've rezoned property from FR1 to mixed use developments like this, we relied on their zoning text and their resolution that indicates their willingness to be flexible and reasonable with rezoning. That's what we rely on, among other things, but yes.

Q. But you would understand that flexible is not a defined term? Flexible is flexible. It doesn't tell you what you're going to get with that flexibility, right?

MR. ZACKS: Objection. The code defines that any word that is not defined by their code is subject to the Webster dictionary. So flexible is a defined term in the --

MR. LA FAYETTE: Ben, no more talking objections, please.

A. We have standards that we need to meet to apply for zoning. And if Berlin Township -- if we meet what Berlin Township's zoning standards are, then we should be approved. And Berlin Township's standards were unfairly applied to us.

Q. Okay. So tell me, how were they unfairly applied to you? And what standards?

First of all, let's start with what standard was unfairly applied?

A. So we have a mixed use project. And specific to the apartment component of the mixed use project, we were denied due to density, is what they said in the --

Q. Right. Your application, your amended application was 6.97 per developable acre, correct?

A. They never gave us a reason why they did not want that density besides to say coded language of safety concerns.

Q. Who said safety concerns?

A. What comes to my mind -- and I've got many examples -- trusting Meghan Raehil.

Q. Okay.

A. That's what I can think of at this time.

So pertaining to the PRD rezoning, which is supposed to be flexible. And when we meet the standards, and we meet the standards, we should be granted the rezoning. And the standards were -- I mean, we were denied without being given a real reason, a quantifiable reason why.

Q. You were in an FR1 district, right? That's what the property was when you bought it?

A. Yes.

Q. Okay. And you were seeking to establish a planned unit development, correct?

MR. ZACKS: Objection. Asked and answered. He said it's a mixed use. Part of it was planned development --

Q. Yeah. But the apartment component was planned use development, correct?

A. Of the mixed used project it is, yes.

Q. And you were seeking something that was looking for just under five additional units per acre than what the underlying zoning approved allowed?

A. Berlin has the capability to go up to 20 units per acre.

Q. Well, any township has the ability, at their discretion, to do whatever they want. But in this

particular context, the zoning was FR1, one unit per developable acre, correct?

A. Yes, and they're supposed to be flexible.

Q. Okay. And, again, this is where we come back to the term flexible, because is there -- I guess is there a point where something is inflexible? I mean, you're basically saying because they didn't agree with you, they were not flexible.

MR. ZACKS: Objection. Mischaracterization.

A. No. Their flexibility has to be reasonable and they were unreasonable as it pertains to applying their standards to us.

Q. Okay. The proposed apartments were 9-foot ceilings; is that right?

A. I don't recall. I mean, I think maybe the first floor was 10 and then the second floor was 9.

Q. Okay. Is that similar to what you have at other apartment complexes?

A. Yes.

Q. Okay. And the cabinetry, it was mentioned as upgraded. I don't know what that...

Do you remember mentioning upgraded cabinetry?

A. I think we said either quartz or granite

countertops, and LVP, which stands for luxury plank flooring, stainless steel appliances.

Q. Okay. And are those amenities that -- I say amenities, but are those components of other apartment complexes that you guys developed, that T&R develops?

A. Yes.

Q. Okay. Is that something standard, to have granite countertops at T&R Properties?

A. Granite or quartz. And it's possible that -- I mean, we use natural material, but...

Q. Okay. So I guess from what I'm understanding or what I'm hearing from you -- and you can correct me if I'm wrong. But what was being proposed for the apartment complex as far as the quality, the type of materials used was something that's kind of a gold standard that T&R Property already uses?

And maybe take out the gold standard.

It's already a standard that you guys already apply in your other apartment complexes?

A. I think so, yes, if I'm understanding you correctly.

Q. Yeah. I mean, if you were at Etna Township, you've got the height of the ceilings, you use the granite or the quartz, you have the LVP, those are

things that you -- amenities -- or I don't want to say amenities, but materials that you use, correct?
A. Finishes, yeah.
Q. Yeah, finishes. Okay.
And as far as the pool and a clubhouse, does T&R Properties offer pools and clubhouses at the other apartment complexes that it owns and operates?
A. It depends.
Q. Okay. How about the ones that are nearby, the Delaware ones, anyone near Delaware?
A. Both of them do.
Q. Okay. So it's not unusual to have a clubhouse and a pool at a T&R property?
A. I would say 20 percent of our communities have pools.
Q. Okay. How about clubhouses?
A. A clubhouse can vary in size, because it also is where the manager or leasing team or maintenance will be. So they vary in sizes.
Q. Okay. But, again, it's something that is -- aside from the office space necessary for employees or operations of the apartment complex, the clubhouse space that would be open to the public for their use of whether it's weight rooms or whatever else you have in

there, is that something that's offered at other T&R Properties?

A. I wouldn't say that.

Q. Okay.

A. Here -- I mean, we don't do gyms everywhere. We were going to do a gym here.

Q. Okay.

A. We don't have a bocce ball court everywhere. We were going to do bocce ball here.

Q. Okay. You do it at some other locations, but not all of them?

A. Not all of them.

Q. Do you disagree with any of the statements made by any -- by the architect in this case, who you guys had retained, when he spoke to the BZA? Actually, let me just strike that.

The architect, what was the name of the architect? I have it written down somewhere.

A. Kontogiannis.

Q. Kontogiannis.

A. The individual's name?

Q. Yes, the individual.

A. Randall Woodings.

Q. Yeah, Randall Woodings.

Randall Woodings mentioned that they're looking at developing this property for higher income persons. We're looking at a higher-income person who would be renting this apartment -- these apartments.

Do you disagree with that statement?

A. I think Delaware County is a higher income place compared to Franklin County and that would be factual.

Q. Okay. And those were the -- again, T&R Properties survives by renting apartments, so that's who you would have to rent to, correct?

MR. ZACKS: Objection.

A. We rent to anyone who's qualified.

Q. Okay. And qualified means you can afford to rent? That's one of the qualifications, right?

A. That's one of the qualifications.

MR. LA FAYETTE: I've got a little ways to go yet. Do you guys want to do a lunch break?

(Discussion off the record.)

- - -

Thereupon, the luncheon recess was taken at 11:55 a.m.

- - -

September 10, 2025
Wednesday Afternoon Session
1:11 p.m.
- - -

BY MR. LA FAYETTE:
Q. I may not be as long as I thought I was going to be, so we may be able to wrap this up a little bit quicker.
So with regard to the industrial parcel -- and I know we've talked about the NAICS, the 493 code.
Do you agree that you were required to seek a variance to have to use that, you had to get a variance from the trustees to use that code? Or that's what you were looking for?
MR. ZACKS: Objection on the legal conclusion who he had to get it from.
But go --
MR. LA FAYETTE: I'm sorry. Yeah.
BY MR. LA FAYETTE:
Q. Just do you agree that you had to get a variance in order to get that to comply with the BIO?
A. Whether it's a variance or a divergence, I mean, the use code of 493, especially compared to so many of these more permitted, more intense uses, it

doesn't make sense why it would not be already a use considering what the extremely more intense uses are existing permitted in the code here.

Like, for example, oil and gas pipeline compared to warehousing and storage.

Q. Right. Understood.

But you understood that you had to get the divergence -- in order to have the 493 in there, that was going to be a divergence to the BOI [sic]?

MR. ZACKS: Just you said BOI. It's a BIO.

MR. LA FAYETTE: I'm sorry.

MR. ZACKS: But that's why he paused.

BY MR. LA FAYETTE:

Q. So for the BIO, you understood you had to get a divergence to include the 493 use code, correct?

MR. ZACKS: Objection to the extent of what a divergence means from a legal standpoint.

But answer to the extent you can.

A. And I'm not a legal expert, but, yes, that's my understanding, that they would be flexible, and yes.

Q. Okay. And you understand that it was within their discretion whether or not to grant that change for the BIO?

We'll call it -- whether you want to call it

a divergence or a variance or whatever, they had to grant or agree to adding the 493?

MR. ZACKS: Objection only to the extent of what is meant by discretion from a legal standpoint.

And the other question is when you say "they," are you referring to the township --

MR. LA FAYETTE: Yes.

MR. ZACKS: -- the trustees or the BZA?

BY MR. LA FAYETTE:

Q. I'll just keep it simple and keep it to the township.

You would agree that the township -- in order for you to use the 493 use code in the BIO, you were required to get a change?

We'll just call it a change if we want to stay away from terms like divergence or variance.

You were going to have that added in and it was going to be subject to the discretion of someone with the village, somebody, whether it be the trustees or the BZA?

A. Yes, in relying on the purpose of the BIO and the purpose of implementing the business part, that they would want industrial warehouse development to happen, that they would need to do that, yes.

Q. Right. And I understand -- and, again, it's not lost on me. You've said it a number of times today. I understand your position is that you believe that they were not reasonable inasmuch as they did not exercise that flexibility to approve the 493?

Is that a fair statement of your position?

A. Say that one more time.

Q. Okay. So we were talking about, you know, in the Chapter 19, you rely -- or Article 19, you reference quite a bit that the township encourages, you know, and will support flexibility for the industrial uses, correct?

A. I believe that Berlin should and Berlin has not by not implementing it.

Q. Right. And your position is that they're unreasonable in not being flexible in allowing that?

MR. ZACKS: Objection to the extent that the position as stated already in the lawsuit is broader than that from a legal standpoint.

But to the extent that as the representative you can answer the question, please do.

A. They are -- yeah, more specifically, they are not being reasonable in that, more specifically, there are so many more permitted uses already here.

For example, like I referenced, oil and gas pipeline, that are more extreme and more intense uses. So it's reasonable that we need warehousing and storage is being much less of an intense use.

And additionally, there are other use codes that reference warehousing as well. For instance, somewhere in here, warehousing and storage as a permitted use.

Q. Okay?

A. Warehousing. But not 493 like should be included.

Q. And, again, that -- that's fine.

And you would agree with me that with regard to the residential parcel and your application for a PUD, you likewise had to seek variances -- you were seeking a variance from the density requirements of their zoning, correct?

A. That's correct.

Q. And, again, you understand that that is something that falls within the discretion of the BZA as to whether to grant a variance?

MR. ZACKS: Objection to the extent it calls for a legal conclusion.

Go ahead and answer.

A. I'm not a legal expert, but, yes, Berlin Township trustees and the BZA had authority, have authority to grant that divergence.

And by not doing so, they have acted unreasonably as we know that they have the capability to go up to R10 and R20. There's R10, for example, right next to us. For example as well, we're on 36/37. For example as well, there are tens of millions of dollars of public improvements that are associated with this mixed use project, and the requested density is necessary to make the project happen.

Q. Okay. You're aware that you appealed -- or I say you, again, as the 30(b)(5) [sic] representative of T&R Properties and Berlin Industrial and Berlin Apartments -- I'm sorry, 30(b)(6) representative -- you appealed the decision of the BZA to the Delaware County Court of Common Pleas, correct?

A. Correct.

Q. And Delaware County Court of Common Pleas affirmed the decision of the BZA, correct?

A. Yes.

Q. And then you took another appeal of that decision from, I think it was Judge Gormley that issued the decision -- you took an appeal of that to the Fifth

District Court of Appeals, correct?
A. Yes.
Q. And the Fifth District Court of Appeals also affirmed the BZA's decision, correct?
MR. ZACKS: Objection on the legal conclusion.
But go ahead and answer to the extent you can.
A. That's my understanding.
Q. Okay. When T&R Properties originally proposed to develop these properties and when you came up with your original mixed use concept for what you intended -- and I say again "you" meaning T&R -- intended to use the property for, did you or did T&R seek any federal funding for -- grant funding or any kind of funding from any governmental source for low-income housing?
A. No.
Q. As part of the process of approving somebody for a lease to be a tenant at one of T&R's apartment complexes, do they have to go through a credit check, background check?
A. Yes.
Q. Okay. Do you know -- and maybe you know and

maybe you don't. But do you know the metrics on, like, what credit score they have to have in order to be a tenant?

A. I don't have that off the top of my head, but there's criteria for credit score.

Q. Okay. Are there other criteria that you look at?

A. Criminal background, income, rental history.

Q. Okay. And those would be factors that T&R would consider for whether or not they would want to lease a property to a tenant?

A. Residential, yes.

Q. And those are consistent across all the T&R Properties?

A. We have the same credit standards for each community.

Q. Okay. So, again, the baseline criteria --

A. Is the same at each community.

Q. With regard to -- I'm looking at -- I'm looking at the wrong exhibit.

MR. LA FAYETTE: Let's go off the record.

(Discussion off the record.)

BY MR. LA FAYETTE:

Q. Let's just ask it this way: You're familiar

with the zoning -- I think you had mentioned in your testimony that adjacent to the R4 property that you intended to develop was -- and I guess you've got it right in front of you -- that R10, right?

A. Yes.

Q. Okay. And in looking at and being -- are you familiar with the area at all?

A. Yes.

Q. Okay. Would you agree with me that the volume of single-family housing abutting the R4 district is greater than any single-family housing that you have abutting the R10 district?

And, again, referencing Exhibit C, page 19-2.

A. Would I -- say it one more time.

Q. Okay. So if you look at the R4 in looking at this map on page 19-2 of Exhibit C, the R4 district, you can see residential properties abutting the R4.

Do you see those lots and the homes?

A. Yes.

Q. And if you look at the R10 district, which is adjacent to the R4 on this exhibit, you notice that there's not nearly as many single-family homes? Would you agree with that?

MR. ZACKS: Paul, just for -- excuse me. I'm

just lost. Which exhibit are you --
MR. LA FAYETTE: We're at C, the second page of C.
MR. ZACKS: That's why I'm lost. Thank you.
A. For the R4 and the R10 areas, there is a 250-foot buffer for each of them against the single-family homes. And in my experience, and in probably any developer's experience, standard buffers from existing uses is anywhere maybe from 25 to 50 feet.
Here it is 250 feet from the BIO, which is completely unreasonable and unheard of. However, still we accommodated Berlin Township by listening to them and doing a PRD application for our apartments of the mixed use developments. We did a PRD at their recommendation.
Even still, we maintained a 250-foot buffer. And then later to accommodate them more, exceeded to a 350-foot buffer from single-family homes, which is a buffer zone unheard of for -- that I've never seen before and so extreme you could -- I mean, it's just completely unreasonable.
Still we attempted to accommodate Berlin by offering this buffer.

Q. Did you ever talk to any of the property owners in the R10 area to see if they were interested in selling?

MR. ZACKS: Which R10?

MR. LA FAYETTE: The R10 that's adjacent to the R4 in exhibit --

MR. ZACKS: Okay. Thank you for clarifying.

A. I don't believe so. However, even if we were to or even if any -- speculating -- if any developer were to, nothing can happen on that R10.

And why can nothing happen on that R10? Because the parcels in question here for our mixed used development is -- again, like I've said, and is in the complaint -- the gateway to the business park because all the utilities begin here, all the public improvements begin here. And we need to have what we've requested as it pertains to our reasonable request for density and reasonable requests for warehousing and storage. We need those things in order to make the project happen and, in turn, make the public improvements happen, the tens of millions of dollars of public improvements of the extension of Reed Parkway, the improvements at 36/37 and for the betterment of the township.

We're doing this for the township as well. And the business park and everything west of our parcels, if it is not developed, then it cannot happen. So, therefore, the R10, there's no reason to go to the R10 right now because -- those R10 parcels, because they're not accessible because we have not extended the public improvements that we want to extend if we're able because we need the density that we've requested and the mixed code 493 warehousing and storage that we've requested.

Q. And so as far as the R10 is concerned, at least the biggest obstacle at this point is a timing obstacle because the other properties in the BIO have to be developed first; is that fair?

A. Our properties have to be developed first.

Q. Okay. Well, there are other properties in the BIO that could connect to the R10?

MR. ZACKS: I'm not sure -- you're talking in the BIO --

MR. LA FAYETTE: Yeah, in this --

MR. ZACKS: -- on that map, on that same map?

MR. LA FAYETTE: Yes, on this same map.

BY MR. LA FAYETTE:

Q. So you see 36/37. And then I always forget

the name of this road.

What's the road on the westbound side?

A. Roloson and Sweeney. Roloson is this one. And then -- is this --

Q. That's the one I was talking about.

A. This one?

Q. Yeah. If I could find something big enough.

MR. ZACKS: The middle road is Roloson. But the other one, you have to look above. Like Plunkett was the one that we were extending. And then this is Curve, Curve Road.

MR. LA FAYETTE: And then what's the one to the west of the purple there?

MR. ZACKS: Sweeney.

MR. LA FAYETTE: That's Sweeney? Okay. Sweeney is what I was talking about.

MR. ZACKS: Okay.

BY MR. LA FAYETTE:

Q. So Sweeney is the western border of the BIO, is it not, in connection with the 36/37 and Sweeney interaction, those large parcels in that corner?

A. That's -- yes, that's what it looks like.

Q. Okay. So you would agree with me somebody could have developed those parcels in order to get to

the R10?

A. There are no utilities there to develop is my understanding.

Q. Okay. But there are no utilities on your property either?

A. That's not accurate. The water and sewer plants -- the water tower and the sewer plant is there for us to extend the public utilities and the roadway. That is why we are the gateway. That is why we are the beginning of the business park if Berlin wants it to happen by granting our reasonable request of density and warehousing and storage.

Q. Got it. If you had the R10 density, you would have been able to develop the apartments; is that fair?

If T&R Properties had an R10 density on this property, it would have been sufficient for developing the apartments, right?

A. I haven't reviewed the text maybe to give you that answer.

However, if you're saying that if we had the capability to build with an R10 density, I mean, that would -- if the only change between the plan we submitted for the apartment portion of our mixed use

was you can have this density, then I think yes. I mean, then that would be a component. That's one piece.

Then we would need the warehousing and storage to make the mixed use project happen.

Q. Okay. And from T&R's position, you would not do one without the other?

A. That's correct, we cannot.

Q. All right. And you're familiar with the "Elysian" or the "Elysian" development?

A. I am aware of it.

Q. And it's in an R10, is that correct, or do you know?

MR. ZACKS: Objection for one second.

Are you referring -- your question, is it presently in an R10 or was it in an R10 when they applied for it? That's my question.

Q. Yes. Was it in an R10 when they applied for it? Do you know? I mean, if you don't know, you don't know.

A. I don't know. I know that they were approved through the BIO for density of R10 --

Q. Okay. And so just --

A. -- in the same meeting that we were denied

for our density of 6.97.

Q. Right. But, again, Elysian's property had R10, your property had R4, right?

A. Elysian has not broken ground because there are no utilities there. Our property, similar to Elysian, is also on 36/37. Besides being on 36/37 as well, we're in the business park and we are the gateway to the business park because we have utilities. And if we are able to move forward, then we can extend those utilities for the betterment of the township.

Q. Okay. But, again, Elysian was in an R10. Your proposed apartments, T&R's proposed apartments are in an R4; is that correct?

MR. ZACKS: Objection. Legal conclusion of being in an R4.

But other than that, if you can answer the question go ahead.

Q. Well, I mean, technically right now they're FR1. But if you're to bring down the BIO for the overlay, it would be an R4?

MR. ZACKS: Objection, again, because, again, that assumes facts that are not in evidence. And, therefore, as a result, he can't make the legal conclusion.

But if you can answer his question, go ahead.
A. And I'm not a legal expert.
Q. So let's keep it simple.
The property that you own right now that Berlin Apartments, LLC owns that it wishes to development for T&R Properties -- or that it holds for T&R Properties to develop for apartments is currently FR1?
A. Currently FR1.
Q. And if the -- if T&R Properties wanted to pull down the BIO to apply, it would then fall within the BIO's R4?
A. That's my understanding, yes, if we wanted to do BIO, but instead we were directed because it fits better to do the PRD by Berlin Township.
Q. Understood. But Elysian was in an R4 -- or an R10 rather?
MR. ZACKS: I think asked and answered. He didn't know. But if you're asking him to look at the map --
MR. LA FAYETTE: Yeah.
BY MR. LA FAYETTE:
Q. On the map, is Elysian --
MR. ZACKS: It's not on that map.

MR. LA FAYETTE: Yeah, it's not on this one.
A. It's in the BCO.
Q. Never mind. We'll skip that question because I think we've already had testimony from the zoning -- a number of people on that.

- - -

(Deposition Exhibit D marked.)

- - -

Q. I'm going to throw a couple of these at you. These were your initial disclosures. And it might be easier for us to just go through these.
I'm going to show you what's been marked as Exhibit D, which are plaintiffs' initial disclosures. And I'm just going to ask you some questions about your knowledge of these individuals and what you -- and, again, as a representative of T&R Properties and as representatives of Berlin Industrial and Berlin Apartments, what you anticipate the testimony would be of these folks.
As far as number 1 is concerned -- well, I guess, have you seen this before?
A. Yes, sometime ago but I haven't reviewed it in a little bit.
Q. If you want to take a look at it, take a look

at it, please. It may even save us time.

A. Okay.

Q. Let's go through this. You have identified Ronald Sabatino, which would be Philip Ronald Sabatino, I assume --

A. Yes.

Q. -- is number 1.

Do you have an understanding of what knowledge he would have regarding this case?

A. You would have to ask him, but -- I mean, I think you would have to ask him.

Q. Okay. And, again, there's nothing tricky here. I'm just trying to figure out what you anticipate he might know. If you've had conversations with him about what he might know, let me know. If you don't know, then you don't know.

A. Okay.

Q. All right. So you don't know what he would talk about or what he would have to say?

A. I think he would generally say what I'm saying.

Q. All right. Was he actually involved in this process? I mean, I think he showed up to a couple meetings I remember seeing in the records.

But was he actively involved in the communications with the zoning folks from the inception of this or was it just you?

A. It was mostly me, but he may have been involved from time to time.

Q. Okay. So he may be able to offer testimony relative to what transpired prior to any of the zoning applications?

A. Yeah, you'd have to ask him.

Q. Okay. And obviously we've talked to you. And we know we've already talked to the trustees. Zoning commission members. Moving on to number --

MR. ZACKS: You said zoning commission members. Is that attached to that we've already talked to them? Because we haven't.

MR. LA FAYETTE: No. No. No. I was skipping that because they would be my clients. I would hope I could find out what they have to say.

BY MR. LA FAYETTE:

Q. As far as number 5 is concerned, you have identified Jeff Benton.

Did you have communications with Jeff Benton concerning anything involving the complaint in this case?

A. I think that he's aware that we are in an active lawsuit. Otherwise, you'd have to ask him.
Q. But do you remember -- and he's a county commissioner, correct?
A. Correct.
Q. And do you remember having any communications with him or direct conversations with him concerning this proposed development?
A. Just to say that we want this to happen, like the county wants this to happen, like Berlin Township wants this -- or we thought wanted this project and the business park to happen.
Q. Okay. Anything else that you can think of?
A. That's all I can think of.
Q. Okay. What about Barb Lewis? To the extent -- have you had any communications with her concerning this lawsuit or the underlying allegations involving the BZA and township trustees' actions?
A. No.
Q. And, again, the reason I'm asking is we could -- your counsel and I could take 400 depositions and I'm trying to narrow the field, save you money, save me some time.
How about Gary Merrell?

A. What's the question?
Q. And, again, did you have any direct communications with Gary Merrell concerning this development?
A. Just that he's aware that we are in an active lawsuit. And I would say similar answer for -- of what I gave for Jeff Benton.
Q. To the extent that you believe he supports the development?
A. I know he does because he said it, yes.
Q. Okay. And when he said it, when would he have said it, at a meeting or at some point with you directly?
A. With me directly.
Q. Okay. How about Chris Bauserman? He's a county engineer.
A. We met with Chris Bauserman and our traffic engineer, who was also our civil engineer for the entire mixed use project, to ensure that all of the public improvements are what needs to be made. And that the project from a traffic perspective is sufficient and safe.
And the response is yes. Chris Bauserman, yes, traffic study completed and it is safe with our

public improvements, which is inconsistent with what Berlin Township members have said as it relates to safety, which doesn't make any sense.

Q. And when you spoke with Mr. Bauserman, when he told you that -- let me back it up a step.

You spoke with your expert and had --

And I guess you met with your expert and Mr. Bauserman, correct?

A. Yes.

Q. And who is your expert, your traffic expert?

A. Advanced Civil Design is our engineer.

Q. All right. And who is the individual?

A. Mark Mann, M-A-N-N.

Q. And so you and Mark Mann met with Mr. Bauserman to discuss the traffic study?

A. Yes. To discuss the project, the mixed use project overall and what improvements would need to be done, as well as the traffic study and so forth.

Q. What information did you provide to him regarding the use of the industrial parcel or parcels?

A. The site plan and that this would be a speculative warehouse development.

Q. Okay. As part of speculative warehouse development, would logistics have fallen within that?

Like a logistics company, would that have been a tenant that you could rent to?

A. I would say based upon the site plan that was submitted -- and this is what I've said in the public meetings as well -- the design is such that when I hear you say logistics or when I hear -- when I heard trustee -- Berlin trustee officials or BZA officials or anyone say logistics, I think they're also -- and they have also directly referred to like a distribution center. And their desire was to not have a distribution center.

And my consistent reply, and the experts's consistent reply is the site plan that we've presented and the buildings that we've presented are such that, no, this cannot be a distribution center because distribution centers and buildings are typically a million square feet buildings with hundreds of dock doors.

And these speculative industrial buildings are, in this first phase, each building is 120,000 square feet and has the standard 1 per 10,000 dock doors, which is 12 dock doors per building in a 120,000 square foot building.

So the design and the site plan is such that

the concern, the primary concern that was voiced to us from Berlin Township as to why they do not want to permit 493 warehousing and storage, which I have answered and other experts have answered, has been resolved.

However, still despite that, they chose to not allow us to have this 493 warehousing and storage.

Q. And I guess had you proposed at any point to agree to a restriction to prohibit logistics?

A. Berlin Township never said anything of the sort besides -- I mean, the BIO overall already has, as we already told them we would comply with, restrictions of when a truck can be coming in and out. It can't be like 2:00 a.m. in the morning -- 2:00 a.m. in the middle of the night.

And we had no problem with that. We have no problem with complying with all of the reasonable standards for Berlin.

But still despite that clarification of the site plan does not allow, in practicality, for a large scale distribution center, which is their concern is what they said, still they chose not to allow 493 warehousing and storage.

Q. Right. But, again, just had you ever --

understanding that they had brought up this issue about concerns about a distribution center, did you offer to say, we will restrict the property to prohibit distribution centers?

A. I don't believe so.

Q. Okay. Is that something that you would have been willing to do?

A. I can't speculate. If Berlin Township said that that was something that they would have wanted, that's something that we could have explored.

Q. Well, I mean, I guess you understood that it was a concern because I think you've said that it was raised multiple times by the township about their concerns about a distribution center.

And I was just asking if you had ever proposed, we're willing to restrict it?

A. And my response that I've given in my last answer along with what I've said in the hearings of the site plan that we've presented in practicality and design, and as the experts say, itself will not allow for a major distribution center, I see that as reasonable -- as a reasonable response and a factual and logical response. So, therefore, I thought that's all that we -- that was -- we did everything we could

in answering their questions.

They never said anything after that. So I thought it was resolved. And I think any reasonable person would presume that response resolves their concerns, but still nonetheless, we were denied.

- - -

(Deposition Exhibit E marked.)

- - -

Q. I'm going to hand you -- I got sidetracked here and this is what happens.

I'm going to hand you what's been marked as Exhibit E. And this is a copy of the September 11, 2023 Berlin Township Board of Trustee meeting, and it's their minutes.

Have you seen this document before?

A. I believe so. I haven't reviewed it in some time.

Q. Okay.

A. I was at this meeting.

Q. If you would -- and we really should have Bates stamped this so we know what pages we're looking at. If you go nine pages in --

MR. ZACKS: Hold it up so he can make sure it's the same.

MR. LA FAYETTE: Yes.

Q. Nine pages in. I think it's down at the very last paragraph of this ninth page in is when the meeting kind of got going --

A. Okay.

Q. -- down here.

So go ahead and if you would, rather than reading the whole thing, if you would read from that bottom part of that ninth page and just read until, I think -- well, it's several pages in -- to the conclusion of the meeting.

But if you want to just take a look at that and familiarize yourself with it and I'll have a couple questions for you.

A. Okay.

MR. ZACKS: For clarity, you're starting with the last paragraph that begins, RJ Sabatino with T&R Properties? Is that where you are?

MR. LA FAYETTE: Yeah, I was. I just lost my place.

MR. ZACKS: Okay.

MR. LA FAYETTE: Yes.

MR. ZACKS: Okay. Not the above paragraph where --

MR. LA FAYETTE: Yeah, no, the above paragraph, too. Start from after the 3-minute recess.

MR. ZACKS: Thank you.

A. And where do you want me to stop?

Q. Go until -- and, again, I'm not making you read this into the record, but go till where -- the resolution to deny the request to reopen. So it's about four or five pages.

A. Okay.

Q. And, again, to the extent that you've seen this before, that could expedite things. But I'm going to give you every opportunity to look at it.

A. Okay. Let me look at it.

Q. So it would have been helpful if we Bates stamped these and I apologize.

Having read that, you see a number of comments that are attributed to you.

Do you have any disagreement that those comments made by you were accurate?

MR. ZACKS: Objection only to the extent that the -- whether they accurately recorded what he said or whether they fully recorded everything that was said is part of my question.

MR. LA FAYETTE: Well, I'm asking him whether

it's --
BY MR. LA FAYETTE:
Q. Does it accurately reflect what you recall stating on the night of the meeting?
A. It was almost two years ago. I mean, I think it is an overview.
Q. Okay. It's an overview.
Is there anything that you read in there that you're like, no, I didn't say that?
A. Nothing stuck out to me at this time.
Q. All right. So if you turn to -- take another -- turn another page. Okay. And that -- if you go down -- so we're on the page where I think there's a first paragraph. Then it says, respectfully, RJ Sabatino?
A. Okay.
Q. If you go down one -- to the next paragraph where it starts, Raehil said that she would like to gather some specifics related to some facts and asked Sabatino if when he purchased the land, when he entered into the contract for the land, if he was aware of the Berlin Comprehensive Land Use Plan.
Sabatino said they were and they were aware of their pre-application hearing and other hearings

where they met with zoning staff and were told that modifications could occur to the BIO and to the zoning.

Raehil said, quote, but you are aware of what the comprehensive land use plan said and the zoning text said, end quote.

Sabatino said, quote, yes.

Did I read that accurately out of the minutes?

A. That's what it reads.

Q. Okay. Do you recall that question?

A. Again, it was two years ago. I'll say vaguely.

Q. All right. I mean, do you disagree with your stating yes in response to the question?

A. Yeah, I think it's consistent with what we've talked about here during this deposition even [sic] that I understand that they have -- they put in this overlay into place, or were in progress of putting the overlay into place. And they also understood that we have this piece of property, this mixed use development with -- which is the gateway to the park, which includes the need for $11 million plus in public improvements of extension of Reed Parkway, extension of water, extension of sewer, improvements to 36/37 for

the betterment of the township and for the opening of the remaining development opportunities in the business park.

And understanding that and understanding that we've complied with their standards and that they still chose to vote us down despite us complying with their standards and -- yes.

Q. Okay. And if you go to the next paragraph down, it says -- and I'll read it. Raehil asked if he was aware that within the zoning text it does say that any discussions with zoning commission or other members is nonbinding and that any such conversations related to zoning change may or may not have any pertinence or relevance to the actual zoning application and that the zoning text is what the zoning text -- is what the text is.

Sabatino said, okay.

Raehil asked if that was a yes.

And he said, yes.

Did I read that accurately?

A. It looks like you read that accurately.

Q. And do you have any dispute that you responded to Trustee Raehil's question with a yes?

A. No. And I agree that the text is what the

text is with Berlin Township's acknowledgment that it was -- it's a work-in-progress and that they're, according to their text, dedicated to being flexible and fair with their zoning when, in our circumstance, they were not.

Q. Okay. Going to the last paragraph on that page, and down below the last sentence of that paragraph starts with, Raehil said at that time they stated as a board what were the items that needed to be resolved in order for them to be comfortable -- and then it goes on to the next page -- approving a project.

He indicated that he would not -- I'm sorry. He indicated that there would not be a compromise on the specific points they indicated they would have to have compromise on and he requested a vote for that evening.

Did I read that right?

A. It looks like you read that correctly. And when Raehil said at the time that they stated as a board what were the items that needed to be resolved, on that June 12th hearing, the trustee said this was a good plan, but the density is too high. And when asked what are their concerns about density, the trustees

responded -- Meghan Raehil responded -- specifically Trustee Chairwoman Meghan Raehil, responded saying safety and that I don't have to further expand on what I mean by safety.

And my response to that is, we've studied every single traffic. We've provided a fire department letter and from all EMS providers that this is a safe development. Our traffic study is approved. And she could not expand on what that safety means.

And presumably because this is coded language for her wanting to deny higher density for her wanting to unreasonably deny us with all these pretext that Berlin Township has against density.

Q. You understood safety to mean the traffic studies, correct, because that's what you provided?

A. When she said safety concerns, she didn't expand on it. How could we know what she's asking for when she doesn't expand on it?

Q. But your response to her concerns and why you think she was unreasonable is because you provided her with responses to the safety concerns saying that you've met with the fire department, you've had the traffic studies, you've done all those things to satisfy the safety concerns; is that fair?

A. We complied with every single safety standard that Berlin had.

Q. Okay.

A. But still Meghan Raehil says that she has safety concerns. Trustee Meghan Raehil says that she has safety concerns.

Q. Would you agree with me that you were given the opportunity to table it and come back at another time after further discussions?

MR. ZACKS: Objection. Are you referring to --

MR. LA FAYETTE: On that night on September 11, 2023.

MR. ZACKS: Right. Because your characterization is not what's going on. This is a motion to reconsider already.

MR. LA FAYETTE: No, I understand.

MR. ZACKS: I know. It just is in your question. That's all I'm saying.

BY MR. LA FAYETTE:

Q. I'm asking you --

MR. LA FAYETTE: Can you read back the question?

(Record read as requested.)

Q. On the September -- at the September 11, 2023 meeting?

A. Well, the trustees decided that they didn't even want to reconsider our application. That's how they voted.

Q. Did you request a vote that night?

If you read the last -- where we left off, the last part that I was reading, he, meaning you, indicated that there would not be a compromise on the specifics points they indicated they would have to have compromise on, and he requested a vote for that evening.

A. Okay.

Q. That was you, correct?

A. Let me look at where you are.

I think this meant these are referring to June 12th, the request for the vote on June 12th.

Q. Okay. Because this is for the reconsideration?

A. Yes.

MR. ZACKS: Correct.

Q. In reference to the June 12th meeting, you requested a vote that night, correct, at the June 12, 2023 meeting?

MR. ZACKS: Do you want to go off record for a minute?

MR. LA FAYETTE: Sure.

(Discussion off the record.)

BY MR. LA FAYETTE:

Q. Would you agree with me prior to the trustees --

A. Are we back on?

Q. Yes.

Would you agree with me that prior to the trustees taking a final vote that resulted in the denial of the application, you were given an opportunity to have further discussions with the township, and you, at that time, demanded them to take the vote which resulted in the denial?

A. I don't agree with that because throughout the entire process, we had accommodated every single one of their requests. We had increased the buffer. We had reduced our density by a hundred units already approximately. And we had done everything that we can for our mixed use development to go through. We told them that this is -- I mean, we've accommodated them. We've met all their standards. And they could not give us a reason why they didn't want the density that we

were proposing besides the coded language of safety.

So what else was there for us to do if they won't give us an issue for us to respond to. We've addressed every single one of their issues and we complied with their standards and they still -- they unjustly treated us --

Q. I'm not looking to argue with you. I understand your position. I'm asking you a very simple question.

Before they made the vote to deny your application, to deny T&R's application, do you agree with me that T&R was given the opportunity to have further discussions and to table the vote?

A. We had -- the previous meeting was a trustee meeting, which we had continued. We had already continued a meeting and we -- if I requested the vote and that's what it says, then I requested the vote.

Q. Okay. Back to Exhibit D. I think you talked about Chris Bauserman and you advised that the county -- as the county engineer, he approved the traffic studies and the plans that were presented by T&R Properties. And I think that's where we left off before I went off on a different tangent.

Jonathan Kabat, what communications have you

had with Jonathan Kabat? He would be the economic development coordinator?

A. I think he is -- so he is currently the economic development coordinator. And I'm not sure how long he's been there. But certainly he's aware of the business park and the county's desire to incentivize development in the business park as well as Berlin's desire to incentivize development and make this business park happen. So certainly he is aware of the business park, and I would presume that he is aware of the lawsuit.

Q. Did you have any personal discussions, private discussions with him?

A. I don't believe so, nothing pertaining to this. The previous economic development lead, Monica Conners, was kind of more active when these public hearings were going on.

Q. Okay.

A. And she's no longer with the county.

Q. And with Monica Conners, what discussions did you have with her?

A. Just our desire to develop the business park.

Q. Would you have had discussions with Monica or any communications with Jonathan Kabat relative to tax

increment financing to assist in the infrastructure for the project?

A. Could have. I mean, I'm aware that the county put those -- or was attempting to put those tools into place with Berlin Township.

Q. Okay. How about Donald Rankey, what communications did you have with Donald Rankey, if any?

A. Nothing that I can recall pertaining to the lawsuit.

Q. Okay. With regard to Robert Skip Weiler --

MR. ZACKS: Well, did you skip Melissa on purpose?

MR. LA FAYETTE: Yes.

MR. ZACKS: Okay. That's fine.

BY MR. LA FAYETTE:

Q. With regard to Mr. Weiler, he was a consultant, wasn't he? Did he consult with or for T&R Properties or any of the entities at issue in this case?

A. Pertaining to this topic of the mixed used developments, he came to speak at the BZA.

Q. Okay. But aside from that, how did he come to speak at the BZA? Was he -- well, how did he come to speak at the BZA, do you know?

A. He's a well known broker in town and also developer. And I'm not sure if he was also looking in the business park. But we -- myself spoke with him and told him what our status was in the business park.

Q. Okay. Did you ask him to come and speak to the BZA at the hearing?

A. We asked, as he's a professional, if he would come.

Q. Okay. He wasn't -- was he paid?

A. No.

Q. So it was just a favor, like, hey, could you come and talk at the BZA about this, this is what's going on; is that fair?

A. I wouldn't say it's a -- I mean, a favor. I mean, it's -- he's just speaking the facts.

Q. Have you -- has T&R Properties ever retained Mr. Weiler for other projects?

A. For other projects we've worked with him.

Q. Okay. What other projects? Let me ask it this way. Maybe it will be a little easier.

In and around the time of the BZA hearings that he came to speak at, was he retained by T&R Properties on any other projects?

A. I wouldn't say that he's been retained

recently as much as he's been a broker for a seller that we've purchased land from.

Q. Okay. And that would have been sometime around the time of this BZA?

A. No. I mean, we weren't in -- I'm trying to think of the last time that we were purchasing land that he was the broker for.

Q. Let me ask this: Do you have any communications, emails, text messages, anything like that, between Mr. Weiler and yourself or any representative of T&R Properties leading up to this BZA meeting?

A. I don't know.

Q. Would you have spoken with him personally or communicated with him directly concerning the BZA hearing?

A. Yes.

Q. All right. And do you remember how that was, was it by phone or email or...

A. I don't recall.

Q. Do you have his personal phone in your phone?

A. Yes.

Q. Okay. When you did have to -- did you have conversations with him regarding this project?

A. What do you mean?
Q. Well, the project as a whole for what you were proposing to do in Berlin Township.
A. He had background knowledge of -- I mean, the densities of what we were proposing versus what any other developer like himself would need to make a project work and so forth, and that's how he was able to speak in his professional capacity.
Q. Okay. How about Brian Marsh, how did he come to appear at the BZA?
A. In a similar way.
Q. Was he -- what is his profession? He's with JLL, correct?
A. I don't recall what his title is. I think it's managing director. But he works in industrial leasing.
Q. And do you -- would -- when you say he's involved in leasing, what do you mean by that?
A. He represents -- he's a real estate broker with JLL and he represents landlords and tenants for industrial buildings, industrial warehouses.
Q. Okay. And has T&R Properties engaged him in the past to be a broker?
A. Yes, for another industrial building.

Q. Okay. Which industrial building?
A. It's in Urbancrest, which is a town near Grove City, for the leasing of an industrial building there.
Q. Okay. And when did he assist in that or was he continuing to assist in that?
A. Five years ago.
Q. Okay.
A. Or 2019.
Q. Fair to say that Mr. Marsh would have been a broker to assist in the leasing of the industrial buildings had they been built in this Berlin Township development?
A. I haven't determined that, but he could be. Any broker could be.
Q. Did you have conversations with him specifically concerning this project, and especially on the development of the commercial side, prior to the BZA meeting?
A. Just similar of providing the background of the project.
Q. Okay. Would you have emails or text messages back and forth with him concerning it?
A. Emails.

Q. Okay. Now, Randall Woodings, he was the architect, correct?
A. Yes, for the apartment component of the mixed use project.
Q. Right. And he was being paid by T&R Properties, correct?
A. In his capacity for architectural services.
Q. And when he testified at the BZA hearing, he was being paid by T&R Properties?
A. Not for his speaking.
Q. Right. But for his architectural services on the project?
A. Yes.
Q. Were you -- had you retained him previously?
A. Yes.
Q. On other apartment projects?
A. Yes.
Q. On any of the four that you talked about earlier, the Etna, Prairie or the two Delawares?
A. One of the Delawares.
Q. Okay. Which one?
A. Flats on Houk. Oh, wait, I'm sorry. So this is the newer development, so it would be -- what did I -- I said Donovan Farms, Salvation Army

Redevelopment, Prairie Township, Etna. A component of the Salvation Army Redevelopment, so one of the four.

Q. Okay. And I think you had mentioned earlier that that was a similar development to what you were planning here in Berlin Township?

A. It's a mixed use development with multifamily and apartments and retail and the density of over 20 or so units per acre.

Q. Evan Ballman. And I forget, you mentioned his name previously and I forget who he was.

Who's Evan Ballman?

A. He's with Berkadia. He's a mortgage broker.

Q. And, similarly, did you engage him to assist with any of the public hearings in this case, whether it be with the BZA or the Board of Trustees?

A. We asked for his expert testimony for the BZA hearings.

Q. And was he compensated for his expert testimony?

A. No.

Q. Had he worked with T&R Properties previously?

A. Yes. He's worked with us and many other developers. The same with the other experts.

Q. As far as retaining him to offer expert

testimony, were you the one that contacted him?

A. We didn't -- when you say "retain," I think that means pay and we did not pay him.

Q. Okay. But you asked him to come?

A. We asked him to come.

Q. And when you say "we," you?

A. I asked him to come.

Q. Did you have a discussion with him regarding what testimony you would like him to offer at the hearing?

A. We gave him the background and the facts and let him come to his conclusion like we did with all the other experts.

Q. Okay. And would you have had emails and communications with him concerning the BZA hearings?

A. I don't think so. I think it would be in person.

Q. Okay. How about Vincent Curry, who is Vincent Curry?

A. Vincent Curry is with a group called Fair Housing Advocates.

Q. Okay. And when did Vincent Curry become involved?

A. After -- I'm trying to think approximately.

It would have been after the BZA hearings, after the accumulation of Berlin Township's blatant public discriminatory language.

Q. Which blatant public discriminatory language are you referencing?

A. Well, let me try to think of examples. One would be Trustee Meghan Raehil vaguely using safety concerns as a pretext for discrimination without giving any further information on what safety concerns she meant.

Another may be a BZA board member asking, quote, what kind of people will live here, quote.

Another may be their request or the trustee -- or township's general request to make the apartment -- or the apartment project of the mixed use project for-sale housing with the pretext that the for-sale housing would be less affordable than apartments for people and, therefore, disproportionately impact racial minorities.

Q. What studies has T&R Properties performed to determine the lower income equates to racial -- I guess racial matters, racial -- I don't know why I'm drawing a blank. I can't use the word. Let me strike that.

What studies has T&R Properties done,

performed or is aware of that equate low-income housing to a racial composition? That's what I was trying to say.

A. There are many expert sources, third-party sources, independent sources. Something that I could think of off the top of my head would be the Fair Housing Advocate Association performing their own determination that Berlin Township has discrimination going on in their leadership against racial minorities. And that study exists.

Q. That's just a opinion.

A. That study exists.

Q. Okay. But it's an opinion rendered by an expert is what you're telling me.

I'm asking, have you done any data yourself? Has T&R Properties requested any data, provided any such data, obtained data like that?

A. The data in the complaint that reviews Berlin Township racial composition versus the State of Ohio is an example of the racial discrimination that's going on because the less number of housing units creates a scarcity which creates an affordability crisis.

And we're in an affordability crisis. It's published by Berlin Township. It's published by

Delaware County. We're in a housing crisis, a housing affordability crisis. And when there's an affordability crisis, a housing crisis, it factually disproportionately negatively impacts minorities.

Q. Okay. And so when you were preparing -- well, I guess maybe I misunderstood this.

So T&R Properties offers low-income housing?

MR. ZACKS: Is that a general question?

MR. LA FAYETTE: Yeah, just general.

BY MR. LA FAYETTE:

Q. Does T&R Properties offer low-income housing?

A. We have in our history of a company. However, it's not just low-income housing as you say low-income housing. When I hear low-income housing, I think of subsided housing.

I'm saying generally as well the lack of supply of any sort of market rate housing -- I'm not just saying this. This is factually true. Any supply increase of market rate housing assists with housing supply. And, therefore, brings affordability more in line with what people can afford.

Q. Okay.

A. So housing does not need to be low income in order to be affordable and attainable. It just needs

to be in densities that are reasonable.

And Berlin Township has not, nor have they ever in their history granted or built in their township a reasonable density apartment community.

Q. But you would agree with me that they actually have approved and have in their overlay approval for R10?

A. No R10 has been constructed in Berlin Township.

Q. I understand that.

But the plan allows for R10?

A. The plan allows for R10. However, it has never been constructed and it never will because there are no utilities there.

Q. Until -- and, again, T&R Properties is the gatekeeper; is that fair?

MR. ZACKS: Objection to the characterization. The gatekeeper related to being the gateway into the infrastructure needed for --

MR. LA FAYETTE: Let him answer.

MR. ZACKS: Okay.

BY MR. LA FAYETTE:

Q. You've talked about the gateway.

You're the one that owns the land at the

gateway. You're the gatekeeper; is that fair?
A. No, that's not fair.
Q. Okay. Why not?
A. We want the projects to happen. We want development in the business park. Berlin Township through their writing and Delaware County -- in coordination with Delaware County to provide incentives potentially has incentivized and solicited development.
We want the development to happen as well. We have explained to Berlin Township that there are a large amount, a vast amount of public improvements required to make the business park happen.
Like I've mentioned before in my deposition here so far, $11 million of Reed Parkway extension, public waterline extension, public sanitary sewer, storm sewer, Plunkett Road improvements, State Route 36/37 improvements. All of those things are needed to happen in order to make the business park happen. And the way that --
Q. Right. And for the business park to happen --
A. For the business park to happen --
Q. -- you have to get your approval?
MR. ZACKS: Let him --

A. For the business park to happen, we need to be able to pay for those improvements. And the only way that we can pay for those improvements is if we have a project that is -- has reasonable investments expectations.

And that happens when we can do two things. When we can have a reasonable requested density of 6.97 compared to the capability of Berlin Township to grant up to 20 or 10. And the common sense use code of 493 warehousing and storage.

And until that happens, we continue to be damaged and Berlin Township does so as well.

Q. Okay. And until those two things are granted, the properties that you own cannot be developed?

A. That's correct.

Q. And will not be developed?

A. We can't develop.

Q. But you won't?

A. We cannot.

Q. Okay. You cannot.

And if you can't, nobody else can in the business park; is that fair?

A. In the BIO in order to get utilities westward

--

Q. They've got to go through you?

A. That's correct.

Q. All right. A couple questions I want to ask --

MR. LA FAYETTE: And, again, we may be -- I may reserve a little bit. You know, again, this depends on --

MR. ZACKS: I understand.

MR. LA FAYETTE: -- whatever the Court does later.

MR. ZACKS: I understand. And I respect that. That's not our -- we can't [sic] create that problem, what the Court did.

THE WITNESS: Can we take a quick break?

MR. LA FAYETTE: Sure.

(Recess taken.)

BY MR. LA FAYETTE:

Q. I have got some questions for you regarding damages.

You had indicated in your discovery responses that there are reputational damages.

Can you explain, number 1, what you meant by that? And number 2, if you have quantified that into a

dollar amount?
A. The damages that we have are ongoing and increasing. And when it's time to present those numbers, based on a variety of factors, I can.
But let me describe to you how I would calculate our damages.
Q. Okay.
A. We have a variety of different types. I'll go one at a time, I suppose.
So the construction of the mixed used development and development of same, we will obtain a developer fee from that of a certain percentage. So let's say that's -- and I don't know what the exact numbers are right now, but if the apartments are per unit $180,000 to construct a single apartment unit times 296 is 50-some million. Plus what it costs to construct our speculative industrial warehousing buildings of 240,000 square feet times the cost per foot to construct those industrial buildings of maybe it's 90 bucks a foot, that total cost times the percentage developer fee of whatever it may be, that is a damage.
The value of the land, which is effectively zero as we have been effectively taken of our land use

rights is a damage.

The --

Q. Let me stop you just for a second just so I can clarify a couple things. And maybe I'm just misunderstanding how this works.

A. Okay.

Q. So the developer fee, what entity takes that, T&R Properties?

A. Yes.

Q. Okay. And who pays the developer fee?

A. It would be out of our bank draw in a way.

Q. I don't understand. So it's going to cost 50 million --

A. It's a component of the profit in a way of the value versus the cost. And I can explain the value here shortly.

Q. Okay. But I'm still trying to get my arms around it sounds like you're taking a percentage fee off your own cost.

A. Yes.

Q. So let's say it cost you a hundred million dollar to develop the entire project.

And what's your percentage?

A. We don't have that right now.

Q. Okay. Ordinarily what's your percentage on mixed use?
A. It could be a few percent.
Q. Two percent you'll say?
A. It could be higher than that. I mean, some projects it's 8 percent.
Q. Okay. So let's split the difference and call it 5 percent. If it costs a hundred million dollars to develop this -- that's the actual cost of what it costs to build everything and get it ready to be leased and rented out -- T&R Properties would take a, hypothetical, 5 percent fee on that, which would be $5 million?
A. Yes.
Q. How does that get paid?
A. By the owners.
Q. And who are the owners, Berlin Industrial and Berlin Apartments?
A. Yes.
Q. Okay. And who is paying them? I mean, how does --
A. The principals.
Q. The principals, like what principals?
A. The entities of -- that have an ownership

interest in Berlin Apartments and Berlin Industrial.

Q. Okay. So Berlin Apartments and Berlin --

A. As if it was any -- if it was not -- if we were building this for someone else, it would be paid by the end owner.

Q. Right. But ultimately the end owner would be -- somebody would be paying you. And maybe I'm misunderstanding the process and where the fee comes into the process. At this point in the process, I'm only seeing money going out, so I'm trying to figure out how the money is coming back.

Are you talking about after tenants take occupancy and start developing revenue, then you get your 5 percent?

A. Usually that's when it's paid, at completion of construction.

Q. Okay. So it's just -- they just take out an additional note or they take out -- you know, whoever the investors are, they're basically fronting additional capital to pay your developer fee as part of doing business to have the project done?

A. As part of developing, yeah.

Q. Got it. And then they -- and obviously their investment is their intention to recoup it from the

tenants eventually?
A. Yes.
Q. Okay. As far as -- so who are the investors in Berlin Apartments, LLC?
A. We are at this time.
Q. Just you and your dad?
A. Yes.
Q. Okay. And is it the same for Berlin Industrial, just you and your dad?
A. Yes.
Q. So you guys have fronted the money for the project -- or you would have fronted the money for the project?
A. Yes.
Q. And that would have come through the bank loans. You would have borrowed -- basically you would have borrowed an additional 5 percent to make -- and, again, using the hypothetical, you would have borrowed the additional 5 percent to pay yourself back the developer fee or pay T&R the developer fee?
A. That is a way that you can explain it.
Q. Okay. I'm just trying to make sure I was following. All right. Again, I went to law school, not math school, so...

All right. So go ahead. You said the value of the land is your own.
Another quick question. Have you attempted to sell the property?
A. No.
Q. Why not?
A. We would like to develop it.
Q. Okay. So you do believe that the land still has value?
A. Well, right now we can't do anything with the land because we don't have the reasonable requests from Berlin Township.
Q. But you haven't attempted to market or sell the property? I mean, you invested $7 million in the property, right, ballpark --
A. Correct.
Q. -- plus or minus? You have not attempted to sell --
A. Plus architecture and engineering and --
Q. Right. You've invested engineering and architecture fees?
A. Legal fees.
Q. Legal fees, et cetera.
But you have not attempted to sell that

property to determine whether or not you could recoup those costs?

A. We have not attempted to sell the property.

Q. Okay. And I think you stated because you want to develop it?

A. Yes.

Q. Okay. All right.

There was some...

A. I have more damages to explain.

Q. That's where I was going to go.

Like what else do you have in your damages?

A. Time value of money of income lost. And the income is determined by what rent levels we will achieve from our tenants on both pieces of the mixed used development of the apartments and the industrial minus our expenses.

Q. Okay. And how has this affected that other than it's not built?

A. It's not built. So, therefore, because it's not built, we can't rent to anybody. And, therefore, because we can't rent to anybody, we can't collect any rent.

All we're doing is losing money by losing that opportunity that we otherwise would have had to

have leased those buildings and collected that rent.

Q. Okay. And as far --

A. And compounded by the time value of money of what the risk free return is right now of if we had that cash on hand and invested it at a rate, a reasonable rate of return, what would we have.

Q. Right. The actual cash value of what you invested in, 7 and something million, over the past several years, how long it's been there, what that would have been returning if it wasn't sitting in the ground?

A. And the developer fee and the income that we would have received from the rent.

Q. Okay. I believe also in your discovery you had put -- and, again, I understand that it may have been partially from your attorneys writing this in there, but I want to know if you know the answer.

You indicate just compensation for the value of the property.

Do you understand what that damage is?

A. I believe that could be in reference to this is a taking of our property. And, therefore, if we're not allowed to use our property, then we should be compensated for the property.

Q. Okay. And I think earlier you said that the property -- you agreed that the FR1 portion, the residential portion, could still be farmed for agricultural; is that right?

A. The industrial portion of the mixed use project has been rezoned as BIO and it is no longer allowed to be farmed.

Q. Right.

A. The apartment portion of the mixed use zoning is FR1 still.

Q. Okay. Well, at least I -- so, yes, the residential portion is FR1. It's still FR1, can be farmed.

The rest -- the industrial portion, it's your position that it can't be farmed because of the change in the zoning; is that right?

A. If we were to -- yes.

Q. The last question I have.

A. The last?

Q. It's never the last, but I like saying that because it gets everybody's attention.

As far as attorneys' fees, again, I don't want to know anything that your attorneys have told you, anything you've discussed with them, I don't want

anything privileged or confidential.

But because of the claims that you've brought and the nature of the claims, you're entitled to and you're seeking recovery of your attorneys' fees.

A. Yes.

Q. What -- can you tell me sitting here today what your -- what you have paid thus far in attorneys' fees for the prosecution of this case? And I'm limiting it to the prosecution of this case, not the prior BZA stuff or anything like that. Just the filing of the case.

MR. ZACKS: I know you're looking at me and I'm looking at him. I don't know what he's going to answer, how he separates it out.

A. I think that we submitted an invoice. I don't know if it's --

Q. I don't have it. It was objected to.

MR. ZACKS: No, it was objected to.

Q. And, again, I don't want the detail. Because in an actual invoice, there's who did the work, what they did, how long it took them and how much it cost. I don't want to know what they did. I don't want to know any detail.

A. You just want to know the total cost?

Q. How much it cost.
A. So like the others of the value of the land, which we already know is 7 million, I guess, unlike that one, we don't know the exact number of the developer fee, but we know that it's in the many millions. We don't know the exact number of the income that we would have received from -- the rent received from the tenants, which we know still is in the many millions. And we don't know the time value of money because we don't know the numbers of those other two. Similar to that, the attorney fees that we've paid, I don't know the exact number, but I would say it's approximately maybe 200 grand.
Q. Okay. And, again, I'm not going to hold you to it. I just want to know if you know it, because at some point we're going to request -- you know, obviously we've requested it in discovery. We didn't receive it. I will want that as we progress because we need to know that and it is discoverable.
A. And increasing.
THE WITNESS: Thanks, Ben.
MR. LA FAYETTE: Well, you saved some money. You didn't have two other people here today.
MR. ZACKS: It ain't only Ben.

BY MR. LA FAYETTE:

Q. So I did have a question for you --

A. I thought that was your last question.

Q. No. I say again, I told you don't -- I told you it's never the last question because I always remember something else.

We were talking before. Vince Curry with the FHA, had you had any prior dealings with Vince Curry and the FHA prior to this project?

A. No.

Q. All right. Do you know how -- did you actually speak with Vince Curry?

A. Yes.

Q. How did you come to speak with him?

A. After the incidents that I've already put into the record pertaining to some of the examples of the discriminatory behavior of Berlin Township, we -- I mean, we know that that's not legal or right, so we determined that -- I mean, we need help. Berlin needs help. How can we help them. And we're looking at advocacy groups to see who may be able to help.

Q. Did your dad have any contact with FHA prior to this development?

A. Fair Housing Advocates Association?

Q. Yeah.

A. It's possible, but not that I'm aware of.

Q. Do you know whether Fair Housing Advocates Association is a nonprofit?

A. I believe it is.

Q. Do you know whether or not T&R Properties donates or contributes funds to the Fair Housing Advocates?

A. It does not.

Q. Has T&R Properties paid Fair Housing Advocates in relation to this case?

A. No.

Q. Do you know if the Fair Housing Advocates -- I think you said that there can be entities that are members of the BIA.

Are the Fair Housing Advocates members of the BIA?

A. No, I don't believe so.

Q. Do you know if the BIA contributes or donates any funds to the Fair Housing Advocates?

A. You would have to ask them. But, no, I don't believe so.

Q. Okay. All right.

So as far as you are aware, prior to the BZA

hearings and your first communication with Vincent Curry, you, neither you nor T&R Properties, had any prior involvement or communications with Fair Housing Advocates?

A. To my knowledge, no.

Q. Okay. All right.

MR. LA FAYETTE: Well, subject to perhaps coming back depending on what the Court does, we're done for today.

MR. ZACKS: Okay. So we stand adjourned on this one just like the rest of them.

MR. LA FAYETTE: Yeah.

MR. ZACKS: And he will read so we do want it ordered, please, at this point even though it's not finished.

THE REPORTER: You want the original?

MR. LA FAYETTE: Sure.

(Pause in proceedings.)

THE REPORTER: So to confirm, Mr. La Fayette, do you want a transcript?

MR. LA FAYETTE: Are you suggesting that I asked for a transcript? Yes.

THE REPORTER: And, sir?

MR. ZACKS: Mr. Zacks would also like a

transcript. Yes.

THE REPORTER: Thank you.

- - -

Thereupon, the testimony of September 10, 2025, was concluded at 3:04 p.m.

- - -

CERTIFICATE

STATE OF OHIO:
SS:
COUNTY OF DELAWARE:

I, Tracy J. Schell, a Notary Public in and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within-named RONALD JOSEPH SABATINO was first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the testimony then given was reduced to stenotypy in the presence of said witness, afterwards transcribed; that the foregoing is a true and correct transcript of the testimony; that this deposition was taken at the time and place in the foregoing caption specified.

I do further certify that I am not a relative, employee or attorney of any of the parties hereto; that I am not a relative or employee of any attorney or counsel employed by the parties hereto; that I am not financially interested in the action; and further, I am not, nor is the court reporting firm with which I am affiliated, under contract as defined in Civil Rule 28(D).

In witness whereof, I have hereunto set my hand and affixed my seal of office at Lewis Center, Ohio, on this 26th day of September, 2025.

Tracy Schell
Tracy J. Schell
Notary Public, State of Ohio.

My commission expires: November 5, 2028



# Magna
## Key Contacts

Schedule a Deposition:
**Scheduling@MagnaLS.com | 866-624-6221**

Order a Transcript:
**CustomerService@MagnaLS.com | 866-624-6221**

General Billing Inquiries:
**ARTeam@MagnaLS.com | 866-624-6221**

Scheduling Operations Manager:
**Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)**

Customer Care:
**Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)**

Director of Production Services:
**Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)**

National Director of Discovery Support Services:
**Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)**

Billing Manager:
**Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)**

Director of Sales Operations:
**Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)**

MAGNA
LEGAL SERVICES

**A**

**ability**
24:16,19 94:2,3 119:23
**able**
24:11 39:2 49:23 54:24 59:6 87:6,10 93:14 125:7 136:8 138:14 140:9 144:6 167:7 177:2 190:21
**about**
8:13 10:17 15:13 22:6 25:22 26:20 27:12 28:18,20,21 29:15,16 30:3,6,12 31:2 32:6 34:13,24 37:20 40:8 43:16 49:21 55:7 56:20 61:11 63:12 71:10 72:13 74:11 80:10 80:12,24 81:1,3 82:10 83:3 87:3 90:1 95:24 114:18 116:21 122:9,16 125:10 128:8 137:5 137:16 142:14 143:15,19 145:15 145:24 146:15 150:1,2,13,14 153:8 155:16 157:24 162:19 164:6 165:12 167:9 169:18 171:18 175:23 182:12
**above**
66:14 137:9 152:23 153:1
**abreast**
31:20 35:13
**absent**
92:7
**abutting**
133:10,12,17
**academic**
7:16
**access**
22:23
**accessible**
136:6
**accommodate**
67:9 72:16 134:18,23
**accommodated**
134:13 161:17,22
**accordance**
70:10
**according**
95:6 96:17 157:3
**accounting**
8:21
**accumulation**
172:2
**accurate**
138:6 153:19
**accurately**
24:20 153:21 154:3 155:7 156:20,21
**achievable**
105:9
**achieve**
185:14
**acknowledge**
92:18
**acknowledged**
70:1 99:22
**acknowledges**
74:10
**acknowledging**
67:22
**acknowledgment**
157:1
**acre**
28:22 29:16 30:6 89:14,15,17,20,24 90:2,4 108:22 113:20,21,24 118:16 119:19,22 120:2 170:8
**acres**
28:17 29:15
**across**
108:20 132:13
**act**
34:15
**acted**
95:18 130:4
**acting**
95:14,17,21
**action**
194:12
**actions**
95:23 145:18
**active**
16:22 17:2,3 145:2 146:5 163:16
**actively**
16:23 144:1
**actual**
19:20 51:3 113:13 156:14 181:9 186:7 188:20
**actually**
29:6 34:4 54:13 56:2 87:21 105:23 123:15 143:22 175:6 190:12
**added**
107:20 127:17
**adding**
95:19 127:2
**additional**
36:22 51:8 119:19 182:18,20 183:17 183:19
**additionally**
11:9 129:5
**address**
6:14,20 24:12 25:11 26:16
**addressed**
24:12 162:4
**adjacent**
133:2,21 135:5
**adjourned**
192:10
**adopted**
59:24 64:10 112:22
**advanced**
57:22 83:2 147:11
**advised**
17:23 162:19
**advocacy**
190:21
**Advocate**
173:7
**Advocates**
171:21 190:24 191:3 191:8,11,13,16,20 192:4
**affected**
185:17
**affiliate**
18:22 26:15 46:12
**affiliated**
17:6 194:13
**affirmed**
130:20 131:4
**affixed**
194:15
**afford**
124:14 174:21
**affordability**
173:22,23 174:2,3,20
**affordable**
172:17 174:24
**aforesaid**
194:6
**after**
32:14 63:6 69:6 74:8 151:2 153:2 159:9 171:24 172:1,1 182:12 190:15
**Afternoon**
125:2
**afterwards**
194:7
**again**
10:23 15:20 16:3 21:22 25:10,15 27:7 27:10 29:10 30:19 33:9 36:4 37:17

40:8,15 41:20 42:23 43:6 51:4 52:18 53:11,22 55:13,15 59:17 65:11 68:1 70:4 75:24 77:7 78:15 79:12 85:16 86:5,10,22 88:6,23 90:6,12,19 91:16 93:12 94:2,22 95:16 99:22 100:9 107:6 112:11 113:11 120:4 122:20 124:9 128:1 129:12,19 130:13 131:13 132:17 133:13 135:13 140:2,11,21 140:21 142:16 143:12 145:20 146:2 149:24 153:5 153:10 155:11 175:15 178:6,7 183:18,23 186:15 187:22 188:19 189:14 190:4

**against**
5:23 43:11 134:6 158:13 173:9

**agents**
10:13

**ago**
16:9 95:12 106:5 116:17 142:22 154:5 155:11 168:7

**agree**
42:18 44:21 60:19 67:24 68:6,10 80:9 85:4 100:9 102:8 111:24 117:2 120:7 125:11,20 127:2,12 129:13 133:9,23 137:23 149:9 156:24 159:7 161:6 161:10,16 162:11 175:5

**agreed**
187:2

**agreement**
39:6 51:3

**agreements**
50:23,24 51:2,13 104:24

**agricultural**
28:16 29:14 30:3,10 39:12,13 89:10 187:4

**agriculturally**
92:8

**ahead**
5:9 42:12,13 63:24 69:12,16 70:22 73:18 78:15,19 84:24 86:5,17 92:11 99:7,12 101:5,14 117:8 129:24 131:7 140:17 141:1 152:7 184:1

**ain't**
189:24

**AL**
1:4,7

**albeit**
92:15

**all**
6:13 8:24 11:3,4 23:11 24:12 25:19 27:4 29:10 33:10,11 39:9,11 40:18 42:7 45:2 47:19 49:11,12 51:16,22 54:18 55:3 56:1 58:17 61:2,4,6 62:10 64:19,24 65:3 69:15 70:7 71:9,24 73:3 84:20 85:20 92:3 95:16 97:17 98:7 101:8 102:8 103:24 104:1,22 107:13,23 110:2 111:23 113:8 114:18 115:24 116:16,20,21 118:10 123:11,12 132:13 133:7 135:15,15 139:9 143:18,22 145:14 146:19 147:12 149:17 150:24 154:11 155:13 158:7,12,23 159:19 161:23 166:18 171:12 176:17 178:4 183:23 184:1 185:7,23 190:11 191:23 192:6

**allegations**
145:17

**allow**
15:6,7,21 40:12 149:7,20,22 150:20

**allowed**
96:2,4 119:20 186:23 187:7

**allowing**
128:16

**allows**
40:4 175:11,12

**almost**
154:5

**along**
52:15 150:18

**already**
17:23 48:16 57:9 63:21 69:11 90:11 105:7,13 114:14 115:13,14 121:16 121:18,18 126:1 128:18,24 142:4 144:11,14 149:11 149:12 159:16 161:19 162:15 189:3 190:15

**also**
10:13 16:14 18:24 21:20 29:12 30:2,8 32:6 36:3 39:3 52:12 54:15 57:24 66:2,9 67:7,22 70:1 75:2 80:5 93:13 97:11 102:10 107:18,20 122:17 131:3 140:6 146:18 148:8,9 155:19 165:1,2 186:14 192:24

**Although**
37:1

**always**
136:24 190:5

**am**
11:10 139:11 194:10 194:11,12,12,13

**Amazon**
35:3

**amended**
90:3 118:15

**amenities**
107:20 121:3,4 122:1 122:2

**among**
3:6 33:21 45:8 73:11 77:8 78:5 83:9 117:15

**amount**
107:20 108:8 176:11 176:11 179:1

**an**
8:20 9:11,12,18 18:22 28:16 29:10 29:13 30:3,10 31:5 36:22 37:3,15,24,24 39:16 41:22 46:12 48:22 56:19 58:9 63:8,19 67:16 68:12 68:21 73:11,24 80:1 88:9 95:21 96:12 98:8,8,18,20 99:2 102:3,5 103:11 104:4,12 105:4 107:19 108:10,13 108:21 112:14 113:13 116:8 119:7

129:4 130:24 138:16,22 139:12 139:16,16,18 140:11,13,15,20 141:16,17 143:8 145:1 146:5 154:6,7 161:12 162:3 168:3 173:13,13,20,22,23 174:2 181:24 182:17 183:17 188:15,20
**anal**
68:21
**analysis**
57:1,2 58:10
**and/or**
50:8
**annexed**
30:8
**annually**
31:23
**another**
11:16,16 13:19 30:5 39:1 72:14 130:22 154:11,12 159:8 167:24 172:11,13 184:3
**answer**
44:14 54:8,10 63:8 70:22 73:18 78:15 84:13,14 86:5,17 91:4 92:11 101:5 111:8 114:12 115:16 116:6,8,9 117:8 126:18 128:21 129:24 131:7 138:20 140:16 141:1 146:6 150:18 175:20 186:17 188:14
**answered**
21:6 31:17 69:11 78:14 84:22 86:4 87:15 90:19 91:10 91:12 105:8 111:5 111:11 114:14 115:5,14,18 119:12 141:18 149:4,4
**answering**
71:22 88:6 90:13 91:2 114:13 151:1
**answers**
96:14 116:2
**anticipate**
55:8 142:18 143:14
**anticipated**
13:15 14:1 36:14 38:3 105:5 108:7
**anticipating**
52:21
**anybody**
106:9 185:20,21
**anyone**
68:13,17,19 75:21 76:5 82:13 122:10 124:13 148:8
**anything**
11:15 23:14,17 26:9 36:19 50:17,18,19 51:15 105:18 108:17 144:23 145:13 149:10 151:2 154:8 166:9 184:10 187:23,24 188:1,10
**anywhere**
134:9
**apartment**
6:1,24 10:9,11,16 12:22 13:9,11,15,19 14:1 18:8 19:10,14 19:20 22:23 26:18 26:22 27:2 30:4 42:21 84:4 85:9 92:5,19 100:2 106:12,14 107:7 108:14,21 118:13 119:15 120:18 121:4,14,19 122:7 122:22 124:4 131:20 138:24 169:3,16 172:15,15 175:4 179:15 187:9
**apartments**
6:20 19:1,5,7,8,17,22 20:2 23:4,22 26:3 26:11 28:18,21 29:15 30:3,12 32:5 35:24 40:8,11,20,24 41:23 46:19 47:24 50:9 51:19 52:20 53:16 54:12,16 60:22 61:8,23 72:9 82:21,21 83:12 84:2 84:9,19 85:5,6 87:4 88:14 91:19 92:12 96:2 106:18,19 107:18 109:3,3,19 109:23 111:13 112:1,3 114:19 120:13 124:4,10 130:15 134:14 138:14,18 140:12 140:12 141:5,7 142:18 170:7 172:18 179:14 181:18 182:1,2 183:4 185:15
**apologize**
153:15
**appeal**
130:22,24
**appealed**
130:12,16
**Appeals**
131:1,3
**appear**
167:10
**APPEARANCES**
2:1
**appliances**
121:2
**applicants**
18:16
**application**
56:19 60:6 63:6,10 82:18 89:23 90:4 92:13 97:10 118:15 118:16 129:14 134:14 156:14 160:4 161:12 162:11,11
**applications**
21:18 22:1,14 85:9 96:23 144:8
**applied**
77:17,19 85:10,22 89:22 97:1 118:7,9 118:11 139:17,18
**apply**
96:9,16 118:4 121:19 141:11
**applying**
120:11
**appraiser**
37:24
**appreciate**
67:10 115:20
**approach**
31:12
**approached**
32:7,15 35:14
**appropriate**
47:2 73:7 80:12
**approval**
33:22 45:9 54:21 56:1 75:15 83:19,21 86:1,14 175:7 176:23
**approvals**
88:20
**approve**
79:16 128:5
**approved**
33:23 39:24 44:2 56:21 70:10 71:24 73:10,11,11 75:22 76:14 77:8,10 78:6 79:8,15 80:1 85:12 85:21,23 86:3,24

88:16 100:24 102:9 102:16 104:1 118:6 119:20 139:21 158:8 162:20 175:6
**approving**
131:19 157:11
**approximately**
161:20 171:24 189:13
**architect**
82:19 98:9 112:3 123:14,17,18 169:2
**architects**
12:7 82:17,21
**architectural**
57:24 58:8 169:7,11
**architecture**
184:19,21
**area**
35:6,17 36:13 40:23 68:7 70:11 78:7 112:14,18 133:7 135:2
**areas**
11:5 134:5
**argue**
116:7 162:7
**Arlington**
7:7
**arms**
180:17
**Army**
29:24 169:24 170:2
**around**
8:18 165:21 166:4 180:18
**article**
4:10 63:1 64:9 67:23 70:5,19 93:18 100:10 128:9
**aside**
12:22 15:6 18:7 21:10 23:8 26:9 27:1 38:17 39:11 98:10 122:21

164:22
**ask**
11:13 13:12 14:10 35:10 39:8 42:23 43:17,18 44:15 45:24 55:5 91:16 106:18 107:1 109:15 110:17 111:8 132:24 142:14 143:10,11 144:9 145:2 165:5 165:19 166:8 178:4 191:21
**asked**
69:10 78:14 84:22 86:4 109:13 110:23 111:3 115:5,14,18 115:24 119:12 141:18 154:19 156:9,18 157:23 165:7 170:16 171:4 171:5,7 192:22
**asking**
25:6 37:17,22 38:10 38:12 68:22 74:23 81:10 86:11 90:20 90:24 91:8 109:21 109:22,22 110:12 141:19 145:20 150:15 153:24 158:17 159:21 162:8 172:11 173:15
**asks**
42:16
**assessing**
39:18 42:8 54:23
**assessment**
47:1 68:12
**assets**
18:12 81:17
**assign**
46:12
**assigned**
46:20 51:18

**assist**
48:18 50:15 51:10 68:24 164:1 168:5,6 168:11 170:13
**assists**
174:19
**associated**
16:17 130:9
**Associates**
82:22
**Association**
14:18 173:7 190:24 191:4
**assume**
11:14,15 40:20 41:10 41:12 88:7 91:20 143:5
**assumed**
87:5,9,13,21,23
**assumes**
79:16 140:22
**assuming**
26:5 33:18 35:2 43:20 55:15 56:3,15
**assumption**
88:3,9,12,15 90:7,15 90:20
**assumptions**
44:7
**as-adopted**
113:3
**attached**
107:15 144:14
**attainable**
108:6,10 174:24
**attempted**
134:23 184:3,13,17 184:24 185:3
**attempting**
31:9 164:4
**attend**
15:4 31:18,18
**attended**
31:22
**attention**

31:16 36:9,12 66:2 187:21
**attorney**
23:9 189:11 194:10 194:11
**attorneys**
23:11 186:16 187:22 187:23 188:4,7
**attract**
31:10
**attributed**
153:17
**authority**
130:2,3
**availability**
47:8 50:7
**aware**
9:14 19:2 20:18 23:20 24:2 47:15 96:2 130:12 139:11 145:1 146:5 154:21 154:23 155:3 156:10 163:5,9,10 164:3 173:1 191:2 191:24
**away**
127:16
**a.m**
1:14 3:2 124:22 149:14,14

**B**

**B**
4:8 7:16 62:20,23 63:3
**back**
40:4,18 41:1 45:13 55:1 56:5 58:6 59:18 63:12,16 68:6 68:11 73:23 75:20 83:23 84:16 91:5,13 96:24 97:23 112:10 120:4 147:5 159:8 159:22 161:8 162:18 168:23

182:11 183:19 192:8
**background**
30:24 131:22 132:8 167:4 168:20 171:11
**backwards**
8:17 21:8
**bad**
9:12 87:7
**ball**
123:8,9
**Ballman**
81:13 82:10 102:7 170:9,11
**ballpark**
184:15
**bank**
53:18 54:22 55:14 56:10 180:11 183:15
**bank's**
56:16
**Barb**
145:15
**baseball**
7:12,15
**based**
25:5 30:17 39:19 40:13 42:4 59:6 88:13 99:9 100:21 101:17 108:18 148:3 179:4
**baseline**
132:17
**basic**
24:14
**basically**
11:3 13:24 45:14 65:18 120:7 182:19 183:16
**Bates**
151:21 153:14
**bath**
107:15
**Bauserman**
146:15,17,23 147:4,8 147:15 162:19
**BCO**
142:2
**became**
50:2
**because**
14:8 17:17 35:1 39:23 40:17 43:1 44:8 45:22,23 53:19 59:7 66:17 69:10 72:4 82:17 87:6 92:16 96:11 97:23 102:2 103:20,21 113:12 120:5,7 122:17 135:12,14 136:5,5,6,8,13 140:4,8,21 141:14 142:3 144:15,17 146:10 148:15 150:12 158:10,15 158:20 159:14 160:18 161:16 173:21 175:13 184:11 185:4,19,21 187:15,21 188:2,19 189:10,15,18 190:5
**become**
171:22
**bed**
107:15
**bedroom**
107:3,5,5,5 111:14 111:14,14
**bedrooms**
107:12
**been**
12:20 13:22 17:18,20 18:24 20:14,16 24:23 27:3,7,10,15 36:14 42:22,24 44:5 45:18 46:11,17 54:19 57:18 64:5 65:13,14 72:11 73:7 77:22 85:12,21 98:6 98:9 106:15 108:4 109:17 138:14,17 142:12 144:4 148:1 149:4 150:7 151:11 153:14 163:5 165:24 166:1,3 168:10,12 172:1 175:8,13 179:24 186:9,10,16 187:6
**before**
5:16,19,20 6:19 50:2 63:4 65:5 68:11,22 69:13 71:11 78:12 78:20 79:17 80:20 83:3 134:21 142:21 151:15 153:11 162:10,23 176:13 190:7
**begin**
48:8 135:15,16
**beginning**
138:10
**begins**
152:17
**behalf**
2:2,7 23:23 50:13 75:21 79:1
**behavior**
190:17
**being**
5:5 30:21 36:4 59:5 75:15,17 81:6 114:6 119:5 121:13 128:16,23 129:4 133:6 140:6,15 157:3 169:5,9 175:18
**believe**
23:18 24:11 28:6 34:9 38:20 39:4 46:10 48:16 69:10 69:18 70:6 78:4 81:14 83:10 85:20 97:11 99:9 101:3 103:7 128:3,13 135:8 146:8 150:5 151:16 163:14 184:8 186:14,21 191:5,18,22
**belong**
14:14
**below**
73:3 157:7
**Ben**
116:7 118:1 189:21 189:24
**beneficial**
102:10 104:2
**Benjamin**
2:3
**Benton**
144:21,22 146:7
**Berkadia**
81:13 170:12
**Berline**
39:16
**Berlin's**
163:7
**besides**
9:14 26:16 82:15 106:12 118:18 140:6 149:11 162:1
**best**
55:11
**better**
35:8 96:16,20 99:4 141:15
**betterment**
135:24 140:10 156:1
**between**
51:14 62:5,5 76:9 138:23 166:10
**BIA**
14:16,17,23 15:1,3,6 15:11 191:15,17,19
**big**
137:7
**biggest**
136:12

**binding**
117:4
**BIO**
67:7 70:18,23 71:1,3 72:13 77:12 85:21 85:22 86:2,7 88:19 95:6,22 96:2,5,8,10 97:20 98:12,17,22 99:8,12,16 100:12 103:17 112:18,19 113:3 114:1,2 117:1 125:21 126:10,14 126:23 127:13,21 134:11 136:13,17 136:19 137:19 139:22 140:19 141:11,14 149:11 155:2 177:24 187:6
**BIOs**
96:15
**BIO's**
141:12
**birth**
6:11
**bit**
25:23 30:24 31:1,4 34:22,24 44:16 71:11 102:24 125:7 128:10 142:23 178:7
**blank**
172:23
**blatant**
172:2,4
**board**
16:14 82:14 151:13 157:9,21 170:15 172:11
**bocce**
123:8,9
**BOI**
126:9,10
**border**
137:19
**borrowed**
183:16,17,18
**both**
21:16 87:3 92:3 107:6 122:11 185:14
**bottom**
42:8 60:15,20 61:12 61:13,14,15 152:9
**bought**
61:23 62:8,8,11 119:8
**branch**
55:16
**Branko**
82:23
**break**
46:2 55:4 63:13 70:14 124:18 178:15
**breaking**
28:12
**Brian**
81:6,9,21 102:5 167:9
**Brian's**
81:18
**bring**
7:15 140:19
**brings**
174:20
**broader**
37:18 44:16 128:18
**broken**
140:4
**broker**
16:4 31:12 32:7,15 32:17 34:14,15 71:18,18 81:7,14 165:1 166:1,7 167:19,23 168:11 168:15 170:12
**brokerage**
16:5 17:7,7,8
**brokers**
35:15 58:23 81:15
**broker's**
16:8 17:2,3,9
**brought**
31:16 150:1 188:2
**bszacks@zlglaw.co...**
2:6
**bucks**
179:20
**buffer**
134:6,17,19,20,24 161:18
**buffers**
134:8
**build**
41:1,24 53:13 54:16 55:24 57:7,15,20 58:3 59:11 95:4 101:9 103:8 138:22 181:10
**building**
2:4 14:18 57:9,11 77:3,4 101:11,12 102:13 103:1,11,12 103:13,20 104:5 107:14 148:20,22 148:23 167:24 168:1,3 182:4
**buildings**
54:16 57:16,23 58:11 59:8 105:2 107:11 107:13,17 148:14 148:16,17,19 167:21 168:12 179:18,19 186:1
**builds**
42:21
**build-out**
40:22 41:22
**built**
23:4 33:19 103:13,20 103:22 168:12 175:3 185:18,19,20
**bullet**
73:3
**business**
7:23 9:19,20 12:20 18:10 31:8 32:2,8 32:12 36:20 42:19 47:22 48:7,9 56:4 65:7 71:13 92:21 93:18 95:7 100:17 104:20 114:6 127:22 135:14 136:2 138:10 140:7 140:8 145:12 156:2 163:6,7,9,10,22 165:3,4 176:5,12,18 176:20,22 177:1,23 182:21
**businesses**
57:8 104:9
**buy**
35:17 61:2,6
**by**
1:19 3:6,8,10 4:4 5:5 5:8 8:6 10:5 13:10 14:13 19:21 21:9 22:11 35:14 37:13 45:15,15 47:23 60:12 63:17 64:10 64:21 66:21 81:21 82:2 83:2 84:1 85:8 91:17 94:23 110:24 111:10 112:1 116:10 117:22 123:14,14 124:10 125:5,19 126:13 127:4,9 128:14 130:4 132:23 134:13,23 136:23 137:18 138:11 141:15,22 144:19 150:13 153:19 154:2 158:4 159:20 161:5,19 162:21 164:15 165:22 166:19 167:18 169:5,9 173:13,24 173:24 174:10 175:22 178:18,23

181:16 182:5 185:13,23 186:3 190:1 194:11
**BZA**
64:7 82:14 112:12 117:5 123:15 127:8 127:20 129:20 130:2,16,20 145:18 148:7 164:21,23,24 165:6,12,21 166:4 166:11,15 167:10 168:19 169:8 170:15,16 171:15 172:1,11 188:10 191:24
**BZA's**
131:4
**B10**
4:10

**C**

**C**
4:10 5:2 63:21,23 64:3,6 69:20 70:5 70:19 71:5 72:1 73:1,12 75:23 76:16 78:3,6 80:2 100:24 102:10,16,20 112:10,14 113:3 133:13,16 134:2,3
**cabinetry**
120:20,23
**calculate**
105:4 111:18,20 179:6
**calculated**
109:20 111:21
**calculations**
107:4
**call**
29:1 47:22 126:24,24 127:15 181:7
**called**
3:8 28:9,24 48:1 52:11 171:20
**calls**
78:8 92:10 117:7 129:22
**came**
86:1 131:11 164:21 165:22
**can**
22:3 23:2 25:20 27:21 29:24 30:7 35:7 36:20 38:20,21 41:1,16 43:14 45:19 46:1,12 54:7 55:24 56:2,4,5,20 57:5 59:15 63:13 65:4 67:15 70:15 73:18 75:8 84:16 86:18 91:5,13,13 95:7 99:19 101:6 102:12 102:22 103:13 104:22 106:7 107:24 108:15 110:2 111:17,18 112:14 113:10 114:11 117:8 118:24 121:12 122:17 124:14 126:18 128:21 131:8 133:17 135:10,11 139:1 140:9,16 141:1 145:13,14 149:13 151:23 159:22 161:20 164:8 174:21 177:3,6,7,22 178:15,23 179:4 180:4,15 183:21 187:12 188:6 190:20 191:14
**cannot**
59:10,10,11 77:4,5 92:16 103:20,20,21 103:22,22 136:3 139:8 148:15 177:14,20,21
**can't**
53:6,8 65:3 81:20 87:17 103:12 109:14 115:9 140:23 149:13 150:8 172:23 177:18,22 178:13 184:10 185:20,21 185:21 187:15
**capability**
89:16 114:21 119:21 130:5 138:22 177:8
**capacity**
42:23 79:2 167:8 169:7
**capital**
54:4 55:17 182:20
**caption**
194:8
**carving**
48:18
**case**
1:6 5:21,23 6:3 13:22 17:19 18:15,21 21:23 22:1 26:2,20 26:21 28:5 31:7,15 32:20,23 33:12 34:1 35:20 43:21 45:4 46:16,17,23 53:17 59:4 65:2 79:24 123:14 143:9 144:24 164:19 170:14 188:8,9,11 191:11
**cash**
54:1,2,9,13 186:5,7
**catch**
93:1
**Cathy**
97:11 115:8
**cause**
194:6
**CCIIR**
14:20
**CE**
16:19
**ceilings**
120:14 121:23
**center**
148:10,11,15 149:21 150:2,14,21 194:15
**centers**
148:16 150:4
**central**
31:21
**certain**
16:15 24:5,5 94:7 179:12
**certainly**
101:7 163:5,9
**CERTIFICATE**
194:1
**certified**
5:5
**certify**
194:5,10
**cetera**
56:1 103:4 106:21 184:23
**Chairwoman**
158:2
**change**
92:7 126:22 127:14 127:15 138:23 156:13 187:15
**changed**
44:8 116:9
**changes**
72:6 94:1,3 116:4
**Chapman**
33:1,12 34:2 37:13 45:4 48:17 70:17 73:22 79:24 83:5
**Chapmans**
46:4
**Chapter**
4:7 59:19 128:9
**character**
3:13
**characterization**
159:15 175:18

**charge**
41:16 105:5 106:3,11 108:15 109:9 111:4
**charged**
40:24 105:24 106:10 108:8 109:23 111:13
**charging**
108:7,24
**chase**
11:1
**check**
131:21,22
**children**
7:4
**chose**
149:6,22 156:6
**Chris**
146:15,17,23 162:19
**circumstance**
44:5 157:4
**circumstances**
37:2 42:22,24 79:22
**City**
7:12 27:17,18 28:2 29:20 30:8 168:3
**civil**
83:2 146:18 147:11 194:13
**claims**
109:16 188:2,3
**clarification**
59:22 61:18 64:15 66:12 149:19
**clarified**
97:24
**clarify**
22:3 35:7 37:7 41:6 64:20 101:15 180:4
**clarifying**
66:16 135:7
**clarity**
152:16
**clean**
68:21
**clear**
19:16 66:18 110:10 111:7
**clients**
64:8 144:17
**close**
43:2,3
**closed**
34:9 84:3 87:21
**clubhouse**
107:20 122:5,13,17 122:22
**clubhouses**
122:6,16
**coaching**
7:12
**code**
59:9 78:5 80:8 86:2 86:14,24 87:10,14 93:9,9 94:15 95:2 95:19 99:13 100:15 103:16 117:21,22 125:10,13,23 126:3 126:15 127:13 136:9 177:9
**coded**
118:18 158:10 162:1
**codes**
69:14,16,19 70:2 71:6,7,19,24 77:9 80:23 85:24 129:5
**COIRR**
15:13,20
**collect**
185:21
**collected**
186:1
**collections**
8:21 10:19 11:5
**collectively**
52:19
**college**
7:18
**Columbus**
1:16 2:5,10
**column**
66:3,23 67:5,17
**combination**
112:2
**come**
31:12 57:8,11 63:12 109:18 120:4 159:8 164:22,23 165:5,8 165:12 167:9 171:4 171:5,7,12 183:15 190:14
**comes**
13:14 95:16 111:16 118:21 182:8
**comfortable**
43:10 157:10
**coming**
49:21 149:13 182:11 192:8
**comments**
153:17,19
**commercial**
10:10 13:2 14:20 18:9 29:19 30:11 80:13 97:4,19 98:13 168:18
**commission**
117:5 144:12,13 156:11 194:22
**commissioned**
194:4
**commissioner**
145:4
**committed**
49:5,7,8
**committee**
14:24
**common**
130:17,19 177:9
**communicate**
58:23 104:8
**communicated**
57:13 99:12 101:18 166:15
**communicating**
23:9
**communication**
97:22 192:1
**communications**
23:10 98:2 144:2,22 145:6,16 146:3 162:24 163:24 164:7 166:9 171:15 192:3
**communities**
10:9,16 13:11 18:11 30:4 106:13,14 108:19 122:14
**community**
10:12 19:11,15 22:23 100:2 107:7 108:21 132:16,18 175:4
**companies**
104:12
**company**
9:17 14:5 17:24 148:1 174:12
**compared**
124:7 125:23 126:5 177:8
**compensated**
170:18 186:24
**compensation**
186:18
**competitive**
109:5
**competitor**
108:22
**complaint**
23:13,16,17 24:9 135:14 144:23 173:18
**completed**
146:24
**completely**
134:12,22
**completion**
182:15
**complex**
13:9 18:8 19:20 92:5

108:14 121:14 122:22
**complexes**
12:22 13:15 14:2 42:21 120:18 121:5 121:19 122:7 131:21
**complied**
156:5 159:1 162:5
**comply**
93:21 125:21 149:12
**complying**
149:17 156:6
**component**
22:20 29:11,11 30:12 39:1 42:10 46:15 48:18 52:8 65:13 72:22 73:19 77:8 82:23 85:7,9 92:4 96:1 98:12 100:3,6 101:8,24 103:7 118:13 119:15 139:2 169:3 170:1 180:14
**components**
9:20 38:24 121:4
**composition**
173:2,19
**compounded**
186:3
**comprehensive**
59:20,23 64:16 154:22 155:4
**compromise**
157:14,16 160:9,11
**con**
39:22
**concept**
131:12
**concepts**
44:8
**concern**
149:1,1,21 150:12
**concerned**
12:10 48:13,22 49:3
88:15 136:11 142:20 144:20
**concerning**
144:23 145:7,17 146:3 166:15 168:17,23 171:15
**concerns**
118:19,20 150:2,14 151:5 157:24 158:16,19,21,24 159:5,6 172:8,9
**concluded**
193:5
**conclusion**
78:9 86:16 92:10 117:7 125:15 129:23 131:6 140:14,24 152:11 171:12
**conduct**
56:23 104:11
**conducting**
56:23
**confidential**
188:1
**confirm**
192:19
**conjunction**
100:1
**connect**
136:17
**connection**
137:20
**Conners**
75:1 163:16,20
**consider**
36:16,18 38:16,18 41:9 78:22 132:10
**consideration**
50:3 114:5
**considerations**
114:18
**considering**
126:2
**consistent**
132:13 148:12,13 155:15
**construct**
41:23 54:15 179:15 179:17,19
**constructed**
29:6 175:8,13
**construction**
48:14 55:9,10,23 56:10 102:23 106:20 179:10 182:16
**consult**
12:16 68:17,19 71:14 106:9 164:17
**consultant**
58:19 70:12 164:17
**consultants**
12:8 68:14,23 70:8 71:15,23 82:16
**consulted**
68:23
**contact**
190:22
**contacted**
171:1
**contemplated**
71:3
**context**
79:7 120:1
**contingencies**
33:18,21 45:5,5,7,8 45:10 83:9
**contingency**
39:22 40:3 43:2,19 43:20 44:5,22 83:4 83:7,8
**contingent**
39:6
**continue**
92:8 177:11
**continued**
162:15,16
**continuing**
16:16,19 168:6
**contract**
33:14,16 34:2 39:22 40:4 43:1,2 44:6,17 45:6,7,8,14 46:4,8 46:11 47:12 65:12 69:8,14,17,20 70:16 71:19 73:22 74:9 76:3,7 79:17 92:2 154:21 194:13
**contractor**
103:11,12
**contractors**
103:1,3,3
**contracts**
33:19 43:18 44:21 45:14 83:5
**contributes**
191:7,19
**conversation**
116:13
**conversations**
143:14 145:7 156:12 166:24 168:16
**convicted**
24:23
**cookie**
57:19
**coordinate**
10:20 97:14
**coordinated**
51:12
**coordinating**
12:4,5 99:21
**coordination**
176:7
**coordinator**
163:2,4
**copy**
151:12
**corner**
137:21
**corporate**
15:7,10,21,23 17:6 34:5
**corporations**

23:23
**correct**
8:7 9:4 11:7 18:21,22 20:1 23:23 43:20 46:5 56:18,18,22 60:22 61:3,8 62:7 62:12,16 63:13 64:17 66:14 67:5,21 75:16 76:11 77:9,18 78:3,7,13 79:4 80:3 80:10,15 81:24 83:12,14,17,19 84:4 84:6,9,11,19 85:13 85:18,21 86:14 87:1 87:10 89:11,15 90:4 90:5 92:8 94:4,15 95:9 100:12 104:6 112:4,11 113:4,20 118:16 119:11,16 120:2 121:12 122:2 124:11 126:15 128:12 129:17,18 130:17,18,20 131:1 131:4 139:8,12 140:13 145:4,5 147:8 158:15 160:14,21,23 167:13 169:2,6 177:16 178:3 184:16 194:7
**correctly**
121:21 157:19
**correlation**
66:22
**cost**
43:11 52:2 179:18,20 180:12,15,19,21 181:9 188:21,24 189:1
**costs**
40:22 41:23 42:5 179:16 181:8,9 185:2
**could**
12:15 31:5,12 39:14 40:14,23 45:1,1,18 45:18 46:23 53:1 55:4,11 58:13,23 61:9 79:10 89:19 92:8 98:9 105:9 106:10 109:11 113:19 134:21 136:17 137:7,24 144:18 145:21,21 148:2 150:10,24 153:11 155:2 158:9 158:17 161:23 164:3 165:11 168:14,15 173:5 181:3,5 185:1 186:21 187:3
**couldn't**
83:4
**counsel**
3:6 145:21 194:11
**count**
82:16
**counted**
28:1
**counteroffer**
37:23
**countertops**
121:1,8
**counting**
52:22,23
**counts**
7:17
**county**
6:7 31:20 33:5 36:15 48:4,21,23 49:8 50:21 51:11,15 53:3 104:19 124:6,7 130:16,19 145:3,10 146:16 162:20,20 163:19 164:4 174:1 176:6,7 194:3
**county's**
163:6
**couple**
7:13 55:2 81:4 142:9 143:23 152:13 178:4 180:4
**courses**
16:13
**court**
1:1 123:8 130:17,19 131:1,3 178:10,14 192:8 194:12
**cover**
62:24
**covered**
100:10
**coy**
40:16
**create**
178:13
**creates**
173:21,22
**credit**
131:21 132:2,5,15
**crime**
24:23
**Criminal**
132:8
**crisis**
173:22,23 174:1,2,3 174:3
**criteria**
132:5,6,17
**Cubberly**
37:13
**current**
18:13
**currently**
8:6 16:22 19:10 141:7,9 163:3
**Curry**
171:18,19,20,22 190:7,8,12 192:2
**Curve**
137:11,11
**cut**
11:1
**cutter**
57:19

**D**

**D**
4:1,11 5:2 142:7,13 162:18
**dad**
9:18 183:6,9 190:22
**damage**
179:22 180:1 186:20
**damaged**
177:12
**damages**
109:17 110:2,4 111:17 178:20,22 179:2,6 185:9,11
**data**
40:21 41:19 58:13,15 58:17 105:19 173:15,16,17,17,18
**date**
6:11
**dated**
60:7
**dates**
33:6
**day**
10:11,11 115:24 194:15
**deal**
48:23 55:17
**dealings**
190:8
**debt**
55:18,20
**decide**
35:1
**decided**
160:3
**decision**
12:13 37:5 79:8 130:16,20,23,24 131:4
**decision-making**
12:10
**dedicated**
39:12 157:3

**defendant**
6:9
**Defendants**
1:8 2:7 3:9
**defined**
117:18,22,23 194:13
**defines**
117:21
**degree**
7:22 108:13,13
**Delaware**
27:17,18 28:2 29:21 30:8,9,14 31:22 33:5 43:8 48:4,21 48:23 49:4,7 50:21 51:11,15 53:3 72:12 74:17 104:13,19 106:15,16,21,21 108:9,9 122:10,10 124:6 130:16,19 174:1 176:6,7 194:3
**Delawares**
43:17 169:19,20
**Del-Co**
48:3,14 49:7
**demand**
37:1
**demanded**
161:14
**denial**
161:12,15
**denied**
63:7 92:13 118:14 119:5 139:24 151:5
**densities**
28:21 40:12 84:9,18 167:5 175:1
**density**
29:15 30:5 84:10 88:21 90:10 93:10 108:21 118:14,18 129:16 130:10 135:18 136:8 138:11,13,16,22 139:1,22 140:1 157:23,24 158:11 158:13 161:19,24 170:7 175:4 177:7
**deny**
153:7 158:11,12 162:10,11
**department**
158:6,22
**depend**
45:1
**dependent**
54:20
**depending**
46:17 192:8
**depends**
41:18 42:6 79:22 122:8 178:8
**deposition**
1:11 3:7 5:15 23:8,12 24:4,10 26:24 59:13 62:20 64:3 110:3 142:7 151:7 155:16 176:13 194:8
**depositions**
64:7 145:21
**describe**
179:5
**describes**
81:9
**description**
4:6 9:24 10:6
**design**
57:20 67:8 72:16 83:2 106:20 147:11 148:5,24 150:20
**designated**
22:19
**desirability**
70:9
**desire**
57:14 148:10 163:6,8 163:22
**despite**
149:6,19 156:6
**detached**
107:16
**detail**
188:19,23
**determination**
57:6 173:8
**determinations**
70:21
**determine**
34:22 35:11 36:24 37:16 38:15,19 68:24 71:12,15,18 72:1 73:6 107:2 172:21 185:1
**determined**
45:16 46:13 48:17 168:14 185:13 190:19
**determining**
38:21
**develop**
12:12,23,23 36:8 53:15 54:4 57:4 65:15 70:9 74:2 76:15,19 93:17 131:11 133:3 138:2 138:14 141:7 163:22 177:18 180:22 181:9 184:7 185:5
**developable**
113:21,24 118:16 120:2
**developed**
21:15 23:4 78:12 121:5 136:3,14,15 137:24 177:15,17
**developer**
35:9 40:17 49:10 117:10 135:9 165:2 167:6 179:12,21 180:7,10 182:20 183:20,20 186:12 189:5
**developers**
170:23
**developer's**
134:8
**developing**
18:7 27:3 36:11 40:19 52:23 124:2 138:17 182:13,22
**development**
4:7 8:22 9:1 11:11 12:2,11 13:15 14:1 14:3 18:14 28:10 29:3 31:6,10,19,23 32:10 35:2,13,23 36:2,18 44:2,18 47:24 50:14,22 51:9 51:23 54:22 57:12 72:12 74:7,18 75:2 75:13 77:17 84:4 85:6 86:8 91:20 93:8 100:1,13 101:9 101:19 104:13,19 107:8 119:11,14,16 127:23 135:13 139:10 141:6 145:8 146:4,9 147:22,24 155:20 156:2 158:8 161:21 163:2,4,7,8 163:15 168:13,18 169:23 170:4,6 176:5,8,9 179:11,11 185:15 190:23
**developments**
26:11,11 32:3 39:20 43:7,16 53:13 80:13 100:14 103:9 106:22 114:8,17 117:12 134:15 164:21
**develops**
121:5
**dictated**
39:13
**dictionary**
117:23
**didn't**
43:23 54:9 56:17

61:2 73:5 91:11 93:1 104:24 105:18 120:7 141:19 154:9 158:16 160:3 161:24 171:2 189:17,23
**difference** 181:7
**different** 8:20 30:4,18 31:19 38:10 41:13 49:18 50:3 55:2 85:9 101:6 106:22 114:15 162:23 179:8
**diligence** 12:6 46:24
**direct** 48:13 98:1 145:7 146:2
**directed** 96:22 141:14
**directly** 27:15 48:24 146:13 146:14 148:9 166:15
**director** 8:9 9:2,22 11:2,10,18 11:19,21,24 17:24 27:12 31:2 75:2 167:15
**disagree** 123:13 124:5 155:13
**disagreement** 153:18
**disclosures** 4:12 142:10,13
**discoverable** 189:19
**discovery** 178:21 186:14 189:17
**discretion** 119:24 126:22 127:4 127:18 129:20
**discrimination** 172:8 173:8,20
**discriminatory** 172:3,4 190:17
**discuss** 147:15,16
**discussed** 18:5 43:7 187:24
**discusses** 100:11
**discussing** 18:1 48:14
**discussion** 124:19 132:22 161:4 171:8
**discussions** 117:3 156:11 159:9 161:13 162:13 163:12,13,20,23
**dishonesty** 24:24
**disproportionately** 172:19 174:4
**dispute** 156:22
**distribution** 148:9,11,15,16 149:21 150:2,4,14 150:21
**district** 1:1,1 10:16,17,18,21 11:4 48:4 89:7 97:4 97:19 98:13,23 112:10 119:7 131:1 131:3 133:11,12,16 133:20
**divergence** 44:20 125:22 126:8,9 126:15,17 127:1,16 130:3
**divergencies** 44:4
**DIVISION** 1:2
**dock** 99:19 148:17,21,22
**document** 24:9 64:6,14,22,24 65:4,19 106:6 151:15
**documentation** 105:11 109:7 111:4 111:12
**documents** 33:9
**does** 9:23 12:12 14:17 15:6,7,21 19:7 21:13,20,23 22:1,18 33:13 36:18 38:3,5 58:19 61:20,21 80:14 81:16 100:12 103:12 122:5 146:10 149:20 154:3 156:10 174:11,23 177:12 178:10 181:15,21 191:9 192:8
**doesn't** 80:11 94:3 110:18 116:5 117:18 126:1 147:3 158:18
**doing** 9:21 21:8 46:7 63:18 68:12 71:14 98:13 98:23 104:12 130:4 134:14 136:1 182:21 185:23
**dollar** 179:1 180:22
**dollars** 114:7 130:9 135:22 181:8
**Donald** 164:6,7
**donates** 191:7,19
**done** 8:3,4 13:21 14:3 26:6 57:22 62:23 83:2,18 84:8 147:18 158:23 161:20 172:24 173:15 182:21 192:9
**Donovan** 30:16 169:24
**Dooley's** 107:9
**doors** 99:19 148:18,22,22
**down** 60:15 61:12 75:15 86:1 90:5 93:21 94:8 95:17 98:12,16 98:22 102:24 105:23 123:18 140:19 141:11 152:2,6 154:13,17 156:6,9 157:7
**draw** 36:9,12 66:2 180:11
**drawing** 61:13,14,15 172:22
**DSI** 82:23
**due** 12:6 46:24 81:18 118:14
**duly** 5:5 194:4,5
**during** 76:1 111:24 155:16
**duties** 10:1

**E**

**e** 2:4 4:1,13 5:2,2 151:7,12
**each** 9:19 10:11 43:5,15 52:2,14 102:15 103:6 132:15,18 134:6 148:20
**earlier**

60:7 63:8 75:20 97:24 105:7 169:19 170:3 187:1
**early**
28:12
**easier**
142:11 165:20
**east**
1:15 2:9 29:1 36:6 62:13,15
**EASTERN**
1:2
**economic**
31:5,19,22 32:10 33:4 35:4,13 36:18 50:14,21 57:12 72:12 74:18 75:1 104:13,19 163:1,4 163:15
**educate**
31:1
**education**
16:16,19
**effectively**
38:9 179:23,24
**effectuate**
100:17
**efficient**
67:9 72:17 73:13
**either**
12:11 26:20 39:11,13 46:18 59:11 77:5 82:13 120:24 138:5
**electric**
49:20,21,22 50:4,6 50:11 52:4,5
**else**
12:14 14:4 23:14 76:5 98:3 108:17 122:24 145:13 162:2 177:22 182:4 185:11 190:6
**Elysian**
139:10,10 140:4,6,11 141:16,23
**Elysian's**
140:2
**email**
97:22 98:18 116:19 116:24,24 166:19
**emails**
166:9 168:22,24 171:14
**employed**
8:6 194:11
**employee**
194:10,11
**employees**
122:21
**employer**
17:14
**EMS**
158:7
**encompassed**
114:8
**encouragement**
101:22
**encourages**
72:15 128:10
**encouraging**
67:8 73:13 75:12 101:18
**end**
7:21 9:1 40:18 41:1 155:5 182:5,6
**engage**
50:14 82:5 170:13
**engaged**
34:16 167:22
**engineer**
98:8 146:16,18,18 147:11 162:20
**engineering**
58:1 83:1 184:19,20
**engineers**
12:7 82:17
**enough**
137:7
**enrolled**
8:1
**ensure**
146:19
**ensuring**
11:4
**enter**
39:5
**entered**
43:1,19 154:20
**entering**
44:17 46:8 47:12 70:16 73:21
**entire**
61:2 62:24 65:19 76:1 146:19 161:17 180:22
**entities**
23:24 24:3 25:18 26:13,15 38:13 51:22 52:19,21 54:4 54:12 69:4 82:13 98:5 164:18 181:24 191:14
**entitled**
188:3
**entitlement**
53:20
**entity**
17:6,10 25:16 26:3 45:16 46:3 180:7
**environmental**
47:4
**environmentally**
72:17
**equate**
173:1
**equates**
172:21
**equity**
55:18,21
**errors**
65:8,9 70:2 77:11 80:7 96:14
**especially**
125:23 168:17
**essential**
103:5
**essentially**
18:7
**establish**
119:10
**established**
49:23 63:5
**estate**
7:23 10:9 16:4,7,22 16:23 17:6,7 34:15 167:19
**estimate**
52:2 109:19
**et**
1:4,7 56:1 103:3 106:21 184:23
**Etna**
27:16 28:6,8,15 29:17 43:7,16 121:22 169:19 170:1
**evaluate**
37:22 68:14 70:8 75:21 76:13,18
**evaluated**
71:24
**evaluating**
38:23 40:10 68:24
**evaluation**
68:13
**Evan**
81:12 102:7 170:9,11
**even**
42:3 56:13 65:5 94:21 102:12 104:18 134:17 135:8,9 143:1 155:16 160:4 192:14
**evening**
157:17 160:12
**eventually**
46:20 49:12 90:3 183:1
**ever**

24:23 135:1 149:24 150:15 165:16 175:3
**every**
10:15 153:12 158:6 159:1 161:17 162:4
**everybody's**
187:21
**everything**
49:13 61:5 67:5 136:2 150:24 153:22 161:20 181:10
**everywhere**
123:5,8
**evidence**
140:22
**exact**
33:6 116:23 179:13 189:4,6,12
**exactly**
50:5
**EXAMINATION**
5:7
**example**
72:14,14 95:21 99:17 99:20 102:5 126:4 129:1 130:6,7,8 173:20
**examples**
41:9 118:22 172:6 190:16
**exams**
16:14
**exceeded**
134:18
**except**
65:19
**excuse**
133:24
**exercise**
128:5
**exhibit**
4:6 59:13,16 62:20 62:23 63:3,19,21,23 64:3,5,7 65:21 69:19 70:5,11,19 71:5 72:1 73:1,12 75:23 76:16 78:3,6 80:2 100:24 102:10 102:16,20 112:10 112:12,13 113:3 132:20 133:13,16 133:21 134:1 135:6 142:7,13 151:7,12 162:18
**exhibits**
33:10
**exist**
103:13
**existing**
38:23 44:3 89:9 108:9 126:3 134:9
**exists**
38:5 173:10,12
**expand**
158:3,9,17,18
**expansion**
51:10
**expectations**
177:5
**expedite**
153:11
**expenses**
185:16
**experience**
9:19 134:7,8
**expert**
59:8 76:22 77:1 80:20,22 81:2,3 86:19 102:4,17 103:8 117:9 126:19 130:1 141:2 147:6,7 147:10,10 170:16 170:18,24 173:4,14
**experts**
58:24 68:23 70:7 71:15,21,23 80:19 149:4 150:20 170:23 171:13
**experts's**
148:12
**expert's**
102:3
**expires**
194:22
**explain**
42:13 46:24 110:20 178:23 180:15 183:21 185:9
**explained**
176:10
**explains**
116:5
**explicitly**
99:14
**explored**
150:10
**extend**
49:10 52:9 54:13 136:7 138:8 140:9
**extended**
136:6
**extending**
49:5,11 50:10 137:10
**extension**
49:16,16 50:15 52:6 135:22 155:23,23 155:24 176:14,15
**extensions**
52:15,16,16
**extent**
11:23 58:14 70:20 86:15,17 92:9 117:6 126:16,18 127:3 128:17,20 129:22 131:7 145:16 146:8 153:10,20
**exterior**
103:1
**extrapolate**
41:5
**extreme**
107:19 129:2 134:21
**extremely**
126:2

**F**

**facility**
35:3 107:22
**fact**
36:17
**factor**
36:22 39:3
**factors**
38:15,18 40:13,24 41:8 42:6,7 79:5 132:9 179:4
**facts**
140:22 154:19 165:15 171:11
**factual**
124:8 150:22
**factually**
174:3,18
**fair**
10:23,24 11:2 12:16 17:13 26:7 35:6 40:1,5 41:4 43:5 54:3 87:2 93:5,15 95:18 108:16 128:6 136:14 138:15 157:4 158:24 165:13 168:10 171:20 173:6 175:16 176:1,2 177:23 190:24 191:3,7,10,13,16,20 192:3
**fake**
5:24
**fall**
141:11
**fallen**
147:24
**falls**
129:20
**familiar**
64:14,22 132:24 133:7 139:9

**familiarize**
152:13
**family**
12:24 32:24 33:2,12 34:3 37:14 48:17 70:17 73:23 83:5
**far**
9:22 12:9 13:17 15:15 28:23 29:20 30:20 36:23 47:1 48:12,21 49:3,20 56:23 58:7 62:3 88:14 105:9 108:1 121:14 122:5 136:11 142:20 144:20 170:24 176:14 183:3 186:2 187:22 188:7 191:24
**farm**
28:16 30:22 39:11,13
**farmed**
187:3,7,13,15
**farming**
89:10
**Farms**
30:16 169:24
**father**
9:5,14 12:13,15,17 12:20 20:9,23 21:11
**father's**
5:12,12
**favor**
165:11,14
**feasible**
72:7 88:20 92:16,23 93:3,4,12,13
**February**
33:13 34:2
**federal**
131:15
**fee**
179:12,21 180:7,10 180:18 181:12 182:8,20 183:20,20 186:12 189:5
**feel**
41:5
**fees**
184:21,22,23 187:22 188:4,8 189:11
**feet**
134:10,11 148:17,21 179:18
**fell**
71:1
**felt**
43:10 94:13
**few**
7:1 95:12 116:16 181:3
**FHA**
190:8,9,22
**field**
145:22
**Fifth**
130:24 131:3
**figure**
41:2 143:13 182:10
**figures**
49:15
**filing**
188:10
**fill**
56:19
**final**
12:9,13 14:3 30:7 90:3 161:11
**finalized**
49:4
**finance**
59:11 77:5 101:11
**financeable**
81:20
**financed**
103:22
**financial**
51:8
**financially**
194:12
**financing**
50:14,16 51:9 52:22 52:24 53:4,12,17 54:20,20,23 55:6,8 56:9 81:16 164:1
**find**
137:7 144:18
**fine**
129:12 164:14
**finish**
68:1 114:11,12
**finished**
192:15
**finishes**
122:3,4
**fire**
158:6,22
**firefighter**
97:16
**firm**
194:12
**first**
5:5 28:3 29:22 48:9 48:11 57:7 65:1,19 68:7 69:6 72:20,22 73:1,5 74:11 75:18 80:5,10 84:13,13 97:10 112:24 118:10 120:16 136:14,15 148:20 154:14 192:1 194:5
**fit**
96:16,19
**fitness**
107:22
**fits**
141:14
**five**
10:15 28:4 91:1 119:19 153:8 168:7
**five-minute**
63:12
**flats**
107:8,12 169:22
**flexibility**
67:8,22 72:5,6,16 74:11 89:8 94:1,3 94:14,18 95:1 96:17 103:15,15,18 114:20 117:19 120:10 128:5,11
**flexible**
36:1 70:1 75:18 80:7 86:21 87:11 88:18 89:4,7 94:20 99:24 104:16 117:14,17 117:18,18,23 119:2 120:3,5,8 126:20 128:16 157:3
**flipping**
96:24
**floor**
2:5 120:16,16
**flooring**
121:2
**Florida**
13:7
**folks**
142:19 144:2
**follow**
100:23
**following**
75:18 183:23
**follows**
5:6
**foot**
58:22 105:5,24 106:3 148:23 179:19,20
**footage**
99:19 107:1,4
**force**
42:5
**foregoing**
194:7,8
**forget**
97:15 136:24 170:9 170:10
**Form**
79:21
**former**

75:1 97:16
**forth**
53:21 104:16 147:18 167:7 168:23
**forum**
33:4
**forums**
35:14,21
**forward**
21:18 43:13 53:5 79:9 140:9
**for-sale**
29:16 172:16,17
**foundation**
22:8 102:24
**four**
10:17 27:21 28:2,3 30:18 39:10 43:6,9 43:15 96:4 113:24 153:8 169:18 170:2
**Fourwinds**
108:20,23 109:5
**framing**
103:2,10,11
**Franklin**
6:7 124:7
**free**
41:5 186:4
**FREEMAN**
1:14 2:9
**from**
8:18 10:7 12:18,22 13:1 15:6 18:7 21:10 23:9 26:1,9 27:1 28:15,16 29:13 30:2,9,10,21 33:8 33:12 37:13 39:11 39:16 42:2 44:4 48:3 53:17 55:10,23 57:12 69:5,22 72:11 73:22 88:23 98:10 98:19 101:15,16,21 101:21 103:24 109:18 112:12 117:11 121:11,12 122:21 125:13,16 126:17 127:4,16 128:19 129:16 130:23 131:16 134:9,9,11,19 139:6 142:4 144:2,5 146:21 149:2 152:8 153:2 158:7 164:22 166:2 179:12 182:24 184:11 185:14 186:13,16 189:7,8
**front**
82:14 89:2 106:4 116:24 133:4
**frontage**
61:20
**fronted**
183:11,12
**fronting**
182:19
**FR1**
85:1 89:10,19 92:3 92:14,17,19,19,21 117:11 119:7 120:1 140:19 141:8,9 187:2,10,12,12
**full**
5:9,13
**fully**
54:4 153:22
**full-time**
8:19,24
**funding**
131:15,15,16
**funds**
191:7,20
**further**
102:24 158:3 159:9 161:13 162:13 172:9 194:10,12
**future**
44:18

**G**

**G**
5:2
**Galloway**
29:1,2
**garage**
107:15,16
**Gary**
1:14 2:9 145:24 146:3
**gas**
126:4 129:1
**gatekeeper**
175:16,18 176:1
**gateway**
47:22 114:6 135:14 138:9 140:7 155:21 175:19,23 176:1
**gather**
154:19
**gave**
32:9 118:17 146:7 171:11
**general**
38:18 41:12 47:19 73:12 81:1 172:14 174:8,9
**generality**
98:11
**generally**
26:19 37:20 38:12 40:9 47:18 99:6,7 106:17 143:20 174:16
**gentleman's**
97:15
**Georgia**
13:7
**geotechnical**
47:6
**get**
6:1 14:11 18:23 27:8 32:19 35:4 39:2 41:18 53:1,12,17 55:5,24 58:14,15 63:13 71:21 87:6,10 87:13 88:8 105:9 110:19 116:1,8 117:19 125:12,16 125:20,21 126:7,14 127:14 137:24 176:23 177:24 180:17 181:10,15 182:13
**gets**
187:21
**getting**
54:19 55:8 74:9 110:20
**get-go**
57:12
**get-occupancy**
29:8
**give**
10:6 13:13 27:4 44:14 55:11 87:24 111:18 138:19 153:12 161:23 162:3
**given**
119:5 150:17 159:7 161:12 162:12 194:6
**gives**
47:5
**giving**
9:18,19 41:9 110:1 172:8
**glass**
103:3
**glazing**
103:3
**gleaned**
72:11
**gleaning**
101:21
**go**
5:9 7:6,18 10:6 31:2 33:16 34:2 36:14 39:21,22 40:11 42:12,13 46:2 49:13

42:12,13 46:2 49:13 53:21 55:14,15 58:11 63:24 65:10 69:12,16 70:22 73:18 78:15,19,21 80:18 84:24 85:8 86:5,17 89:16 91:5 91:13,13 92:11 93:8 99:7,11 101:5,14 103:12 105:15 106:19 107:2 114:21 117:8 119:21 124:17 125:17 129:24 130:6 131:7,21 132:21 136:4 140:17 141:1 142:11 143:3 151:22 152:7 153:5 153:6 154:12,17 156:8 161:1,21 178:2 179:9 184:1 185:10
**goals**
10:21
**goes**
37:21 157:11
**gold**
121:15,17
**golf**
7:11
**gone**
53:5
**good**
7:14,16 35:17 157:23
**Goodale**
6:22
**Google**
6:1
**Gormley**
130:23
**got**
10:17 16:7,8 32:7 51:2 53:20 59:5 103:23 105:10 106:16 115:19 118:21 121:23 124:17 133:3 138:13 151:9 152:4 178:2,19 182:23
**gotten**
105:22
**governmental**
56:1 131:16
**graduate**
7:8,20 8:1
**graduated**
8:18
**Graham**
1:8
**grand**
189:13
**Grandview**
6:15
**granite**
120:24 121:8,9,24
**grant**
88:20 90:8,17 91:21 126:22 127:2 129:21 130:3 131:15 177:8
**granted**
119:4 175:3 177:14
**granting**
138:11
**greater**
133:11
**ground**
28:12 140:4 186:11
**group**
14:20 81:14 171:20
**groups**
190:21
**Grove**
168:3
**guarantee**
94:4 95:8
**guess**
8:16 9:19,23 18:9,14 18:23 25:21 26:18 28:15 32:19 45:12 47:13 48:23 51:8 52:2 53:7,11 58:6 59:15 71:20 96:24 97:17 98:10 101:15 105:14 107:1 109:3 109:9 112:2 120:5 121:11 133:3 142:21 147:7 149:8 150:11 172:21 174:6 189:3
**guessing**
36:5
**guys**
66:17 121:5,18 123:15 124:18 183:11
**gym**
123:6
**gyms**
123:5

**H**

**hadn't**
21:6
**half**
16:9 27:8 107:15
**hand**
53:19 54:9 62:22 63:20 80:18,18 151:9,11 186:5 194:15
**handing**
64:5
**handwritten**
113:10,11
**happen**
35:22 48:9,10,11 74:13 77:6 100:17 127:24 130:11 135:10,11,20,21 136:3 138:11 139:5 145:9,10,12 163:9 176:4,9,12,18,18,20 176:22 177:1
**happened**
50:5 79:17
**happens**
36:19 151:10 177:6 177:11
**hard**
105:19
**has**
12:20 40:21 41:12 46:11 48:2 76:5 80:5 81:2 86:7 88:17 89:16 90:19 94:1 101:2 102:2,3 103:2 119:21,23 120:10 128:13 140:4 148:21 149:4 149:11 158:13 159:4,6 165:16 167:22 172:20,24 173:8,16 175:2,8,12 176:8 177:4 184:9 185:17 187:6 191:10
**hasn't**
60:10
**haven't**
18:5 111:21 116:9 138:19 142:22 144:15 151:16 168:14 184:13
**having**
16:14 49:8 51:2 70:13 98:1 103:14 103:18 113:12 145:6 153:16
**head**
109:1 132:4 173:6
**hear**
115:10,15,16 148:5,6 174:14
**heard**
148:6
**hearing**
81:22 101:16 121:12 154:24 157:22

165:6 166:16 169:8 171:10
**hearings**
82:14 100:19 104:15 107:10 150:18 154:24 163:17 165:21 170:14,17 171:15 172:1 192:1
**height**
121:23
**help**
190:19,20,20,21
**helpful**
153:14
**her**
75:5 145:16 158:11 158:11,19,20 163:21
**here**
39:10 40:16 59:17 62:23 63:13 77:13 78:10 80:4 81:8 95:10 100:8 107:19 123:5,6,9 126:3 128:24 129:7 134:11 135:12,15 135:16 143:13 151:10 152:6 155:16 170:5 172:12 176:14 180:16 188:6 189:23
**hereby**
194:5
**herein**
3:7,8
**hereinafter**
5:5
**hereto**
194:11,11
**hereunto**
194:14
**here's**
31:13 99:3
**hey**
35:17 99:3 165:11
**he's**
14:8 72:24 81:13 91:2 111:8 115:13 145:1,3 146:5,15 163:5,5 165:1,7,15 165:24 166:1 167:12,17,19 170:12,12,22 188:13
**high**
7:6 8:19 106:1 157:23
**higher**
124:2,6 158:11 181:5
**higher-income**
124:3
**highest**
81:14
**Highpoint**
28:9
**him**
14:9 25:6 37:10 78:18 82:3 84:13 90:21,24 110:20,23 111:3,8 114:12 115:16 141:19 143:10,11,15 144:9 145:2,7,7 147:19 153:24 163:13 165:3,4,5,18 166:14 166:15,24 167:22 168:16,23 169:14 170:13,24 171:1,3,4 171:5,7,8,9,11,12 171:15 175:20 176:24 188:13 190:14
**himself**
167:6
**hire**
70:12 71:17
**his**
81:9,11,14 101:4 114:12 115:10 116:5 141:1 166:21 167:8,12,14 169:7 169:10,11 170:10 170:16,18 171:12
**historical**
47:5,6
**history**
14:5 132:8 174:12 175:3
**hold**
11:17 14:22 15:2 16:2,23 151:23 189:14
**holds**
141:6
**home**
25:11 26:16
**homes**
30:13,13 133:18,22 134:7,19
**hope**
144:18
**hopeful**
104:14
**hopefully**
104:20
**Houk**
107:9 169:22
**hours**
16:19,21
**houses**
28:18 29:16,17,18
**housing**
88:21 131:17 133:10 133:11 171:21 172:16,17 173:1,7 173:21 174:1,1,3,7 174:11,13,14,14,15 174:17,19,19,23 190:24 191:3,7,10 191:13,16,20 192:3
**how**
5:18 6:3,17,23 8:12 12:12,19 13:8,9 16:19 25:9 27:2,10 27:13,14 28:20 31:1 31:16 32:20 34:11 34:22,24 35:10 36:24 37:5,16,21 38:14 40:21 42:8 47:15 54:21 55:5,7 58:11,21 105:20 106:19 107:1 108:23 109:8,20,23 111:18,20 118:8 122:9,16 145:24 146:15 158:17 160:4 163:4 164:6 164:22,23 166:18 167:7,9,9 171:18 179:5 180:5 181:15 181:20 182:11 185:17 186:9 188:14,21,21 189:1 190:11,14,20
**however**
11:10 15:1 39:12 51:14 60:8 80:5,17 86:6 92:19 101:8 102:12 117:9 134:12 135:8 138:21 149:6 174:13 175:12
**HR**
10:19
**hundred**
161:19 180:21 181:8
**hundreds**
148:17
**Huntington**
55:14,16
**hypothetical**
36:4,5 181:12 183:18

**I**

**idea**
37:24 79:15
**identical**
30:19
**identified**

17:18,20 18:24 20:14,16 69:19 75:22 143:3 144:21
**identifies** 102:22
**identify** 24:4 35:12,16 100:24
**identifying** 31:3
**Illinois** 13:7
**imagine** 37:2
**impact** 24:19 38:5 79:8 172:19
**impacts** 174:4
**impair** 24:16,16
**implementing** 32:2 65:7 127:22 128:14
**implied** 94:17
**improvement** 52:13
**improvements** 49:15,18 52:6 54:14 116:21 130:9 135:16,21,22,23 136:7 146:20 147:1 147:17 155:23,24 176:11,16,17 177:2 177:3
**inability** 59:6
**inaccurate** 23:18
**inactive** 17:1
**inasmuch** 128:4
**Inc** 9:11,12 15:10 23:21
**incentives** 51:8 176:7
**incentivize** 163:6,8
**incentivized** 176:8
**inception** 144:2
**incidents** 190:15
**include** 33:21 101:23 102:1 126:15
**included** 83:5 86:14,20 97:2 99:13 129:11
**includes** 88:21 155:22
**including** 27:23,24 28:4
**inclusive** 29:17
**income** 109:18 124:2,6 132:8 172:21 174:23 185:12,13 186:12 189:6
**inconsistencies** 65:8,10 96:15 99:18
**inconsistent** 70:3 147:1
**increase** 174:19
**increased** 161:18
**increasing** 179:3 189:20
**increment** 50:16 51:9 52:24 53:4 164:1
**IND** 62:4 66:3,6,9,23 67:4 67:11,13,16,20 68:3 68:7
**independent** 173:5
**Indiana** 13:7
**indicate** 186:18
**indicated** 157:13,14,15 160:9 160:10 178:21
**indicates** 117:13
**indicating** 60:24 62:9 67:12 109:8
**individual** 15:7 74:15 123:22 147:12
**individually** 16:3 25:2,6,8,15,22 26:13
**individuals** 142:15
**individual's** 123:21
**Industrial/Berlin** 26:17,22
**industrial/wareho...** 80:17
**Industry** 14:18
**inflexible** 120:6
**information** 25:20 27:5 110:2 147:19 172:9
**infrastructure** 47:9 50:11,16 51:10 51:22 54:14 116:21 164:1 175:19
**initial** 4:11 142:10,13
**inspector** 75:4 97:7,14 115:3
**instance** 42:12 71:18 108:20 129:6
**instances** 43:6 75:8
**instead** 117:1 141:14
**instructed** 114:4
**Intel** 36:7,7,13,20
**intended** 33:23 44:19 47:3 61:8 92:4 106:11 131:13,14 133:3
**intending** 71:1
**intense** 125:24 126:2 129:2,4
**intent** 79:18
**intention** 182:24
**interaction** 137:21
**interest** 104:12 182:1
**interested** 12:5 31:10 135:2 194:12
**intern** 8:20
**internal** 40:21
**internationally** 81:8
**Internet** 105:16
**internships** 8:21,21,22,23 9:17
**interpreting** 102:1
**into** 8:19 9:2 14:11 18:23 31:8,9 33:14,16,19 34:2 35:20 39:5,21 39:22 41:1 42:7 43:1,19 44:17 47:12

51:12,13 58:11 65:5 65:11 69:13,17,20 70:16 71:19 73:21 74:1,9 76:7 79:17 95:11 96:23 103:12 104:9 153:6 154:21 155:18,19 164:5 175:19 178:24 182:9 190:16
**introductory** 73:16
**invest** 55:21
**invested** 184:14,20 186:5,8
**investing** 76:12
**investment** 93:15 182:24
**investments** 177:4
**investors** 55:17 182:19 183:3
**invoice** 188:15,20
**involve** 9:24 38:22
**involved** 11:11 16:12 18:15,20 21:24 22:13 26:12 27:3,15 28:4 32:22 50:2 97:12 143:22 144:1,5 167:18 171:23
**involvement** 12:1 48:13 192:3
**involving** 31:15 43:7 144:23 145:18
**in-progress** 67:23 75:17 77:19 103:16 112:19
**isn't** 61:1
**issue** 26:21 33:11,12 45:3 46:16,23 47:15,21 53:17 56:8 65:2,12 79:24 83:6 150:1 162:3 164:18
**issued** 130:23
**issues** 49:22 55:13 99:16 162:4
**items** 53:20 157:9,21
**its** 29:3 43:11
**itself** 78:17 150:20
**I'll** 14:11 32:19 44:15 45:23 47:13,21 57:1 66:2 68:1,21 70:14 94:22 127:10 152:13 155:11 156:9 179:8
**I've** 58:13 59:16 62:22,23 62:24 63:2 65:3 81:11 90:11 118:21 124:17 134:20 135:13 148:4 150:17,18 176:13 190:15

**J**

**J** 1:19 194:4,20
**James** 1:8 2:4
**Jeff** 144:21,22 146:7
**JLL** 81:6 82:5 167:13,20
**job** 9:24 10:1,6
**Jonathan** 162:24 163:1,24
**Joseph** 1:11 3:8 4:4 5:4,11 194:5
**Judge** 1:8 130:23
**jumped** 79:15
**June** 157:22 160:17,17,22 160:23
**just** 11:1,13 13:4 14:14 18:11 19:16 22:5 26:22 30:23 34:19 35:10 37:3,20 38:4 38:12,17 40:15,16 41:11 43:9 44:15 46:1 52:18,20 60:13 66:12,16,18 68:17 70:18 74:23 78:16 81:10 93:13 97:3 99:6 105:16 110:20 111:7 113:10 115:12,22 116:16 116:20 119:19 123:16 125:20 126:10 127:10,15 132:24 133:24 134:1,21 139:23 142:11,14 143:13 144:3 145:9 146:5 149:24 150:15 152:9,12,19 159:18 163:22 165:11,15 168:20 173:11 174:9,13,18,24 180:3,3,4 182:17,17 183:6,9,22 186:18 188:10,24 189:15 192:11
**justify** 93:15 104:4

**K**

**Kabat** 162:24 163:1,24
**keep** 52:21 80:20 93:12 112:20 127:10,10 141:3
**killing** 59:17
**kind** 5:21 8:20 9:1 10:20 14:11 26:19 30:11 37:18,20 39:16 40:7 42:7 56:24 58:4 71:15 96:13 121:15 131:16 152:4 163:16 172:12
**knew** 44:3 72:4,5 74:5 80:1 86:2 95:11
**knowing** 40:21,22 93:24 97:2
**knowledge** 23:1 43:4 50:6 142:15 143:9 167:4 192:5
**known** 165:1
**Kontogiannis** 82:22 123:19,20

**L**

**L** 1:8
**labor** 42:5
**lack** 174:16
**Lackey** 52:14
**lacrosse** 7:11
**Lake** 30:1
**land** 12:3 13:14 18:20 26:4 67:9 72:18

73:13 154:20,21,22 155:4 166:2,6 175:24 179:23,24 184:2,8,11 189:2
**landlords**
167:20
**landowner**
21:14 32:18
**landowners**
12:4 32:20
**language**
73:13 118:18 158:10 162:1 172:3,4
**large**
107:20 137:21 149:20 176:11
**largest**
81:7
**last**
27:13 63:18 150:17 152:3,17 157:6,7 160:7,8 166:6 187:18,19,20 190:3 190:5
**later**
46:1 97:13 134:18 178:11
**laterals**
49:12
**Laura**
75:5 97:11 115:6,8 116:11
**law**
2:3 183:23
**lawsuit**
18:13 53:21 109:15 128:18 145:2,17 146:6 163:11 164:9
**lead**
10:24 33:15 163:15
**leadership**
14:22 15:16,17 173:9
**leading**
34:21 166:11
**leasable**
81:19,19
**lease**
59:7,7,10 77:3,4 101:11 131:20 132:11
**leased**
103:21,21 181:10 186:1
**leasing**
10:13 11:6 58:24 71:18 81:7 122:18 167:16,18 168:3,11
**least**
51:20 54:9 79:23 136:12 187:11
**leaving**
5:24
**left**
160:7 162:22
**legal**
70:21 78:8 86:16,19 92:10 117:7,9 125:15 126:17,19 127:4 128:19 129:23 130:1 131:5 140:14,23 141:2 184:22,23 190:18
**lend**
56:16
**lender**
53:18
**less**
129:4 172:17 173:21
**let**
25:22 38:4 39:8 41:10 42:17 45:13 45:24 55:5 58:6 68:1 69:15 72:23,24 73:23 78:18 80:16 83:23 84:13 87:6 97:23 101:15 106:18 112:7 114:12 123:16 143:15 147:5 153:13 160:15 165:19 166:8 171:12 172:6,23 175:20 176:24 179:5 180:3
**letter**
158:7
**let's**
29:21 40:7 53:2 63:12 72:19 98:21 110:10 118:10 132:21,24 141:3 143:3 179:13 180:21 181:7
**level**
106:1 108:11
**levels**
185:13
**Lewis**
145:15 194:15
**license**
16:6,7,8,12,24 17:1,2 17:3,9
**licensee**
34:16
**licenses**
16:2
**lift**
48:4
**like**
27:4 35:17,17 37:18 39:16 40:8 41:2,19 44:13 47:10 52:7 57:10 77:11 82:16 99:2 100:17,18,18 103:15 104:14 108:17 109:13 116:1 117:10,10,12 126:4 127:16 129:1 129:10 132:1 135:13 137:9,22 145:9,10 148:1,9 149:14 154:9,18 156:21 157:19 165:11 166:9 167:6 171:9,12 173:17 176:13 180:18 181:23 184:7 185:11 187:20 188:10 189:2 192:11,24
**likewise**
129:15
**limiting**
188:9
**line**
42:8 44:8 98:19 102:23 174:21
**lines**
49:12
**list**
27:6 97:3
**listed**
37:13 70:10 73:8 78:10 80:4 100:22
**listen**
24:20
**listening**
134:13
**litigation**
22:7,12
**little**
6:18 7:11,11 25:23 30:24 31:1,4 34:22 34:24 44:9,16 48:18 48:19 67:16 71:11 102:24 124:17 125:7 142:23 165:20 178:7
**live**
6:19,23 172:12
**lived**
6:17
**LLC**
2:3 19:1,5,7,8,9,17 19:22 20:2,14,17,21 21:13,20 22:2,18 23:22,22 26:2,3 46:19,19 50:9,9 84:2 85:5,16,17 86:13 87:22 91:19

106:18 109:3 141:5 183:4
**LLP**
1:14 2:9
**loan**
55:9,10 56:5,10,11 81:15
**loans**
55:23 183:16
**local**
55:15
**located**
46:18 68:9 70:18
**location**
42:3,3,4 92:19 114:5
**locations**
123:10
**logical**
150:23
**logistics**
147:24 148:1,6,8 149:9
**long**
6:17,23 7:17 8:12 12:19 27:10 70:13 106:5 115:24 125:6 163:5 186:9 188:21
**longer**
15:1 92:17 163:19 187:6
**look**
35:5 47:9 59:15 60:15 64:8 65:18 67:15 69:14,16 70:4 73:5 80:16 101:5,6 102:19,24 105:16 106:7 107:2 112:24 132:6 133:15,20 137:9 141:19 142:24,24 152:12 153:12,13 160:15
**looked**
65:1,3 76:17 78:12
**looking**
12:3,3 30:24 31:11 33:8 35:1 37:14 38:14,22 39:8,14,17 40:12,19 51:5 56:3 58:20,21 60:9,21 65:1 69:6 71:9 73:4 75:12 79:3 96:3 106:12,17 112:7,10 119:19 124:2,3 125:14 132:19,20 133:6,15 151:21 162:7 165:2 188:12 188:13 190:20
**looks**
35:17 137:22 156:21 157:19
**losing**
185:23,23
**loss**
109:18
**lost**
42:14,14 128:2 134:1 134:4 152:19 185:12
**lot**
5:24 31:19 48:16 96:13,14 107:21
**lots**
59:17 133:18
**love**
53:1,9
**low**
174:23
**lower**
172:21
**low-income**
131:17 173:1 174:7 174:11,13,14,14
**lump**
56:24
**lunch**
124:18
**luncheon**
124:21
**luxury**
112:3 121:1
**LVP**
121:1,24

**M**

**made**
60:10 80:6 88:15 90:7 123:14 146:20 153:19 162:10
**main**
49:12
**maintained**
134:17
**maintenance**
10:13,14 122:18
**major**
150:21
**make**
21:17 33:9 37:5,17 37:23 43:12 45:21 56:4 57:3 66:18 68:18 69:2 72:6,7 74:13 88:19 92:16 93:14 94:1,3 99:24 100:17 111:7 126:1 130:11 135:20,20 139:5 140:23 147:3 151:23 163:8 167:6 172:14 176:12,18 183:17,22
**makes**
28:17
**making**
37:3 42:19 46:8 71:13 73:1 88:3,11 90:14 93:13 109:16 153:5
**manage**
10:8 19:14,18
**management**
8:10,22 9:23 10:8 11:3,10,18,22 18:1 31:2
**manager**
9:1 10:12,17 122:18
**managers**
10:16,17,18,21 11:4
**managing**
10:20 18:11 19:6,6 20:22 26:3 167:15
**Mann**
147:13,14
**many**
13:8,9 16:19 25:9 27:2,13,14 32:20 53:20 99:19 118:21 125:24 128:24 133:22 170:22 173:4 189:5,8
**map**
32:11 60:15 66:7,9 66:13,13,17,18,22 66:23 67:1,5,21 68:7 71:1 112:15 113:13 133:16 136:21,21,22 141:20,23,24
**mark**
63:21 64:1 147:13,14
**marked**
59:13,16 60:20 61:5 62:20,22 63:2,21 64:3,5,6 68:2 112:12 142:7,12 151:7,11
**market**
37:4 38:1,1 58:10 59:6 71:15 108:6,6 108:10,14,17 174:17,19 184:13
**marketing**
10:19
**married**
7:2
**Marsh**
81:6 102:5 167:9 168:10
**masonry**
103:3
**material**
121:10

**materials**
42:5 121:15 122:2
**math**
183:24
**MATHIS**
1:14 2:9
**matters**
172:22
**may**
3:9,11 11:19 37:3 42:2,4 70:2,18 97:24 104:2 125:6,7 143:1 144:4,6 156:13,13 172:11 172:13 178:6,7 179:21 186:15 190:21
**maybe**
10:14 16:8 31:13 44:15 71:4,22 89:3 108:22 120:15 121:17 131:24 132:1 134:9 138:19 165:20 174:6 179:19 180:4 182:7 189:13
**me**
5:5 9:4 10:6,18 12:15 25:22 27:4,5 30:18 31:1,4 34:21 38:4 39:8 41:10 42:17,18 45:13,24 46:11,24 55:5 58:6 60:19 67:24 68:6 69:15,23 70:18 72:20,23 73:23 76:8 78:20 80:9,16 83:23 85:4 87:6 89:3 90:12 91:6 94:5 97:23 98:6 100:9,22 101:15 102:8 106:4 106:18 109:21 110:5 111:24 112:7 116:18,18,24 117:2 118:8 121:12 123:16 128:2 129:13 133:9,24 137:23 143:15 144:4 145:23 146:14 147:5 153:4 153:13 154:10 159:7 160:15 161:6 161:10 162:12 165:19 166:8 172:6 172:23 173:14 175:5 179:5 180:3 188:6,12
**mean**
19:12 23:1 34:5 36:3 37:1 39:7 45:19 47:22 51:5 53:8,8,9 53:20 57:22 58:19 67:19 69:3 77:11,11 82:2,17 95:20 99:14 99:15 100:8 103:10 105:15 107:1,2 119:5 120:6,15 121:10,22 123:5 125:23 134:21 138:22 139:2,19 140:18 143:10,23 149:11 150:11 154:5 155:13 158:4 158:14 161:22 164:3 165:14,15 166:5 167:1,4,18 181:5,20 184:14 190:18,19
**meaning**
55:24 131:13 160:8
**means**
93:13 94:22 124:14 126:17 158:9 171:3
**meant**
113:19 127:4 160:16 172:10 178:23
**medications**
24:15,19
**meet**
44:2 94:8 118:3,4 119:2,3
**meeting**
4:13 12:7 31:23 32:6 32:10,15 33:5 75:3 75:16 109:12 139:24 146:12 151:13,19 152:4,11 154:4 160:2,22,24 162:14,15,16 166:12 168:19
**meetings**
15:4 35:14 74:18 81:23 143:24 148:5
**meets**
78:22
**Meghan**
74:18 75:4 118:22 158:1,2 159:4,5 172:7
**Melissa**
164:11
**member**
9:7 14:6 15:3,11,24 19:6,6,24 20:22,24 21:6 25:14 26:3,13 172:11
**members**
9:8 20:5,11 21:4,7,10 33:13 112:13 144:12,14 147:2 156:11 191:15,16
**membership**
15:7,8,21
**memory**
24:17
**mention**
80:11
**mentioned**
35:11 39:10 80:20 92:23 115:6,6 116:12,16 120:20 124:1 133:1 170:3,9 176:13
**mentioning**
120:22
**mentions**
100:11
**Merrell**
145:24 146:3
**messages**
166:9 168:22
**met**
40:4 50:21 75:3 94:10,12 146:17 147:7,14 155:1 158:22 161:23
**metrics**
43:11 132:1
**middle**
62:3,6,6,11 137:8 149:15
**mid-2023**
34:10
**might**
19:21 27:9 36:10 39:2 45:21 59:16 142:10 143:14,15
**million**
34:13 53:23 76:10,13 114:7 148:17 155:22 176:14 179:16 180:13,21 181:8,13 184:14 186:8 189:3
**millions**
49:18 52:9,12,14 114:7 130:8 135:21 189:6,9
**mind**
118:21 142:3
**minorities**
172:19 173:9 174:4
**minus**
184:17 185:16
**minute**
161:2
**minutes**
112:5 116:16 151:14 155:8
**Mischaracterization**

120:9
**mischaracterized**
94:16
**missing**
70:3
**misunderstanding**
180:5 182:8
**misunderstood**
174:6
**mix**
30:21 47:23
**mixed**
21:17 27:19 28:14,16 29:13,14 30:10,22 32:3 35:23 39:20 47:23 72:9 76:11 77:21 82:20,23 83:1 85:7 88:19 92:12,14 96:22 100:2 107:7 117:12 118:12,13 119:13,17 130:10 131:12 134:15 135:12 136:9 138:24 139:5 146:19 147:16 155:20 161:21 164:20 169:3 170:6 172:15 179:10 181:2 185:14 187:5 187:9
**modifications**
155:2
**money**
56:17 93:14 108:15 145:22 182:10,11 183:11,12 185:12 185:23 186:3 189:9 189:22
**Monica**
75:1 163:15,20,23
**more**
33:9 57:5 71:21 73:9 73:12 75:9 94:5 95:20 97:13 106:16 118:1 125:24,24 126:2 128:7,22,23 128:24 129:2,2 133:14 134:18 163:16 174:20 185:9
**morning**
3:1 149:14
**mortgage**
81:13,15 170:12
**most**
52:5
**mostly**
144:4
**motion**
159:16
**move**
79:8 104:9 140:9
**Moving**
144:12
**much**
34:11 40:21 42:8 58:11,21 70:14 105:20 108:15,23 109:8,23 129:4 166:1 188:21 189:1
**multifamily**
170:6
**multiple**
10:2 33:1 91:23 97:9 150:13
**multiuse**
27:2,14,14 30:20
**municipality**
35:19
**must**
59:9 77:2 102:13
**my**
8:5 9:12 12:15 14:5 16:7,8 17:1,9 23:1 25:11 26:16 31:17 36:12 42:14,14 43:4 46:10 50:1 64:7 67:11 68:12 70:4 75:20 86:23 87:20 88:7 90:13,14,23 96:14 97:17 98:10 109:1 111:11 114:13,22 116:9 118:21 126:20 131:9 132:4 134:7 138:2 139:17 141:13 144:17 148:12 150:17,17 152:19 153:23 158:5 173:6 176:13 180:17 192:5 194:14,15,22
**myself**
31:18 34:18 82:15 165:3
**M-A-N-N**
147:13

**N**

**N**
4:1 5:2
**NAICS**
77:8,9 78:5 86:2,14 125:10
**naive**
55:13
**name**
5:10,12,13 6:9 28:8 29:23 30:14 46:10 75:5 82:24 97:15 115:4 123:17,21 137:1 170:10
**named**
83:15 107:9
**narrow**
145:22
**nationally**
81:8
**natural**
121:10
**nature**
11:6 39:17 42:5 50:17 57:20 188:3
**near**
122:10 168:2
**nearby**
106:13,14 108:18,19 122:9
**nearly**
133:22
**necessarily**
37:4 39:24 43:21 44:24
**necessary**
16:13 57:3 122:21 130:11
**need**
87:18 90:22,23,24 93:10 95:4 99:13 100:15,20,20 101:10 111:16 118:3 127:24 129:3 135:16,19 136:8 139:4 147:17 155:22 167:6 174:23 177:1 189:19 190:19
**needed**
12:8 61:19 85:24 157:9,21 175:19 176:17
**needs**
48:8,9,11 103:11 146:20 174:24 190:19
**negatively**
174:4
**negotiated**
50:19
**negotiating**
113:17
**negotiations**
34:16
**negotiator**
34:16
**neighborhood**
29:19
**neither**
192:2
**net**

113:21
**never**
51:2 59:5 71:17 77:6 118:17 134:20 142:3 149:10 151:2 175:13,13 187:20 190:5
**new**
11:11 12:2,11 31:7
**newer**
169:23
**next**
28:12 33:15 65:19 66:1 67:16 130:7 154:17 156:8 157:11
**night**
149:15 154:4 159:12 160:6,23
**nine**
151:22 152:2
**ninth**
152:3,9
**no**
1:6 7:3,5 8:2 9:15 15:1,4,19 17:10,12 18:6 20:4,12 21:12 23:7,15,19 24:18,19 24:22 25:1,13 26:15 27:24 42:14 51:3 53:3 54:17 56:14,21 78:18,18 82:4,15 88:8 90:14 91:11,18 91:21 92:17 104:10 105:3,13,21 106:12 109:11 111:3,22 115:15 118:1 120:10 131:18 136:4 138:2,4 140:5 144:16,16,16 145:19 148:15 149:16,16 153:1 154:9 156:24 159:17 163:19 165:10 166:5 170:20 175:8,14 176:2 184:5 187:6 188:18 190:4,10 191:12,18,21 192:5
**nobody**
177:22
**nonbinding**
156:12
**nonetheless**
151:5
**nonprofit**
191:4
**nor**
54:3 175:2 192:2 194:12
**north/south**
52:10
**Notary**
3:10,13 194:4,21
**note**
182:18
**notes**
3:11 91:13,16
**nothing**
23:1,2 50:22 80:9 135:10,11 143:12 154:10 163:14 164:8 194:6
**notice**
24:10,12 133:21
**notwithstanding**
73:5 75:11
**November**
6:12 64:11 112:22 113:4 194:22
**now**
8:5 14:14 29:5 38:7 45:20 46:2 53:19 59:15 63:20 95:10 97:23 104:23 107:24 108:3 110:4 111:6,22 114:14 136:5 140:18 141:4 169:1 179:14 180:24 184:10 186:4
**number**
16:15,21 22:13 49:14 55:23 109:16 110:9 110:22 111:2 113:12 128:2 142:5 142:20 143:7 144:12,20 153:16 173:21 178:23,24 189:4,6,12
**numbers**
111:6,17,18,19 179:4 179:14 189:10
**numerous**
90:20

**O**

**O**
5:2
**objected**
188:17,18
**objecting**
79:19
**objection**
9:11 10:2 21:3,5 22:3 22:8 25:5 44:7 54:6 63:5 70:20 73:15,17 78:8,14 79:11,11 82:1 83:20 84:22 86:15 87:15 88:5 90:9,16,18 92:9 94:16 101:3 115:5 115:17,19 117:6,21 119:12 120:9 124:12 125:15 126:16 127:3 128:17 129:22 131:5 139:14 140:14,21 153:20 159:10 175:17
**objections**
118:2
**obstacle**
136:12,13
**obtain**
16:5 52:2 55:22 106:9 179:11
**obtainable**
108:13
**obtained**
56:9 84:18 173:17
**obtaining**
16:12 84:8
**obviously**
37:1 144:10 182:23 189:17
**occupancy**
11:5 182:13
**occur**
155:2
**occurred**
51:20
**off**
13:18 35:8 109:1 114:14 124:19 132:4,21,22 160:7 161:1,4 162:22,23 173:6 180:19
**offer**
37:3,15,16,23 38:2 81:22 82:13 94:14 122:6 144:6 150:2 170:24 171:9 174:11
**offered**
123:1
**offering**
134:24
**offers**
12:4 174:7
**office**
80:13 122:21 194:15
**official**
3:12
**officials**
148:7,7
**often**
5:18
**Oh**
1:16 2:5,10 28:1

60:11 82:15 169:22
**Ohio**
1:1 6:16 7:19 13:4,5 13:6,21 31:21 41:13 173:19 194:2,4,15 194:21
**oil**
126:4 129:1
**Old**
52:14
**once**
5:19,20 8:3 13:18 14:3 28:2
**one**
18:16 27:16,16,17,23 27:24 28:6,8 29:21 30:4,15 35:11 38:24 39:11,21 40:14 43:22 45:10,24 52:8 55:24 59:3 60:2,5,7 61:12 62:3 63:22 72:14 73:9 74:20 76:16 78:21 79:5 81:6,12,14 83:21 84:13,14 89:14,14 89:19 94:5 97:8,10 98:21 102:15 103:6 107:3,5,12 109:16 111:14 112:12,13 115:4 120:1 124:15 124:16 128:7 131:20 133:14 137:3,5,6,9,10,12 139:2,7,14 142:1 154:17 161:18 162:4 169:20,21 170:2 171:1 172:6 175:24 179:9 189:4 192:11
**ones**
28:4 63:13 77:16 108:9 122:9,10
**one-bedroom**
108:2 110:14
**ongoing**
6:5 29:5 179:2
**only**
17:13 24:8 27:19 28:1 45:21 54:13 99:19 103:13 127:3 138:23 153:20 177:2 182:10 189:24
**onto**
113:13
**on-site**
10:13
**open**
36:2 122:23
**opening**
156:1
**operate**
10:9 17:5,8
**operates**
41:14,21 122:7
**operations**
9:3 10:22 11:19,24 122:22
**opinion**
100:21 173:11,13
**opportunities**
35:2,15 156:2
**opportunity**
35:5 153:12 159:8 161:13 162:12 185:24
**opposed**
98:13,23
**option**
99:4
**Orchard**
107:9
**order**
8:17 32:21 53:13,15 54:13 59:7 77:3 84:15 93:20 94:8 95:4 96:15,16 100:14,16 101:9 102:12 103:8 125:21 126:8 127:12 132:2 135:19 137:24 157:10 174:24 176:18 177:24
**ordered**
192:14
**Ordinarily**
181:1
**organizations**
14:7,15,19
**original**
89:9,23 131:12 192:16
**originally**
131:10
**OSU**
8:3
**other**
9:8,13 10:9,22 11:4 12:7,22 13:19 14:19 15:3 17:5 18:1,4,9 20:5,11,24 21:4,6 21:10 22:5 25:12,16 26:5,11 27:2 33:22 35:14,15,16 39:10 43:6,15,22 49:17 51:9 53:20 54:3 57:22 63:21 66:18 69:4 70:22 73:6 75:22 76:16,19 77:11,13,15 80:6 82:12 94:11 98:4 102:9 104:2,22 108:12 115:7 116:21 117:11,15 120:18 121:4,19 122:6 123:1,10 127:5 129:5 132:6 136:13,16 137:9 139:7 140:16 149:4 154:24 156:11 165:17,18,19,23 167:6 169:16 170:22,23 171:13 185:17 189:10,23
**others**
189:2
**otherwise**
145:2 185:24
**our**
5:24 10:20 11:11 19:9,12 49:9 50:6 59:6 60:6 72:9 82:16,16 88:19,21 91:22 96:16,22 97:10 106:12 110:2 122:14 134:14 135:12,17 136:2,15 138:11,24 140:1,5 146:17,18,24 147:11 157:4 158:8 160:4 161:19,21 163:22 165:4 174:12 178:13 179:6,17,24 180:11 185:14,16 186:22 186:23
**out**
3:11 17:20 25:23 28:19 30:5 36:6,8 36:10 40:4 41:2 45:24 48:18 55:4 56:19 105:18 121:17 143:13 144:18 149:13 154:10 155:7 180:11 181:11 182:10,11,17,18 188:14
**outing**
31:6
**outings**
31:19 57:13
**outside**
13:5 26:15
**over**
6:18 12:21 14:4 31:11 170:7 186:8
**overall**
95:23 147:17 149:11

**overlay**
4:10 31:8 32:3,12 35:21 36:17 39:16 60:16 64:9 65:7,14 68:16,20 70:5 72:15 75:15,16,17 77:9,18 77:20 78:1 80:3 81:1 82:8 88:10 93:19,19,20,22 94:7 94:9,12 97:2 101:17 112:9 140:20 155:18,19 175:6
**overlaying**
67:8
**oversee**
11:3
**overview**
9:18 47:5 154:6,7
**own**
10:8 17:5,7 21:20 22:2,18 25:2,10 26:14 106:12 108:14 141:4 173:7 177:14 180:19 184:2
**owned**
13:10 19:21 21:17 32:24
**owner**
13:19 18:20 42:16 44:18 182:5,6
**owners**
33:17 39:23 43:17 83:16 135:2 181:16 181:17
**ownership**
181:24
**owning**
18:11
**owns**
9:5 25:16 122:7 141:5 175:24

**P**

**P**
5:2
**page**
4:3,6 60:15,20 61:12 61:14 62:6,24 64:10 65:19,21 66:13 68:7 102:19,20 112:11 112:24 133:13,16 134:2 152:3,9 154:12,13 157:7,11
**pages**
6:1 65:20 66:1 67:16 68:2 100:23,23 151:21,22 152:2,10 153:8
**paid**
34:11 36:23 38:8 76:10 165:9 169:5,9 181:15 182:4,15 188:7 189:11 191:10
**paper**
105:23
**paragraph**
72:23 73:1,5,16 74:11 75:19 80:6,10 152:3,17,23 153:2 154:14,17 156:8 157:6,8
**parcel**
21:21 22:2,4,5 30:5 37:18,19,19 46:18 57:2 58:20 62:3,6 62:12 75:13 85:6,16 96:1,3,10 104:8 113:9,19 125:9 129:14 147:20
**parcels**
18:20 21:24 22:13,19 26:21 28:19 32:24 33:11 37:17 53:16 55:7 56:8 75:14 83:6,22 84:3 92:3,4 112:18 113:22 135:12 136:3,5 137:21,24 147:20
**parenthetical**
62:4
**park**
31:8 32:2,8,12 36:17 36:20 47:22 48:7,10 65:7 92:21 95:7 100:17 104:21 114:6 135:14 136:2 138:10 140:7,8 145:12 155:21 156:3 163:6,7,9,10 163:22 165:3,4 176:5,12,18,20,22 177:1,23
**Parkway**
48:1,2 52:8 114:9 135:23 155:23 176:14
**parse**
25:22
**part**
15:1 22:4,13 64:16 64:18 107:7 119:13 127:22 131:19 147:23 152:9 153:23 160:8 182:20,22
**partially**
186:16
**participation**
72:12
**particular**
31:15 32:20 34:1 59:3 74:15 75:13 94:4 97:18 98:11 100:5 114:10 120:1
**parties**
3:7 17:19 46:20 194:10,11
**past**
57:23 82:7 167:23 186:8
**paths**
107:21
**Patterns**
4:7
**Paul**
75:24 90:18 133:24
**Paul-Michael**
2:8
**paul.lafayette@fm...**
2:11
**Pause**
192:18
**paused**
126:12
**pay**
37:6,22 38:19 42:9 54:24 56:5 58:12,22 82:3,11 105:20 108:16,18 171:3,3 177:2,3 182:20 183:19,20
**paying**
51:10,22 109:8 181:20 182:7
**pays**
180:10
**PCD**
97:19
**peek**
31:14
**pen**
105:23
**pending**
6:6
**Pennsylvania**
13:6
**people**
58:22 68:23 116:11 142:5 172:12,18 174:21 189:23
**per**
28:22 29:16 30:6 58:22 89:14,14,17 89:19,24 90:1,4 105:5,24 106:3 108:22 110:11,11 113:20,21,24 118:16 119:19,22

120:1 148:21,22 170:8 179:14,18
**percent**
122:14 181:3,4,6,8 181:12 182:14 183:17,19
**percentage**
179:12,21 180:18,23 181:1
**perform**
58:10 68:21
**performed**
46:24 172:20 173:1
**performing**
173:7
**perhaps**
192:7
**permit**
15:6 149:3
**permitted**
65:22 67:13,20 68:2 68:15 125:24 126:3 128:24 129:8
**person**
91:24 98:19 115:2,7 116:19 124:3 151:4 171:17
**personal**
163:12 166:21
**personally**
15:18 17:5 37:10 46:9,11 116:12 166:14
**personnel**
117:4
**persons**
124:3
**perspective**
146:21
**pertaining**
27:5 119:1 163:14 164:8,20 190:16
**pertains**
93:11 120:11 135:17
**pertinence**
156:13
**phase**
47:5 148:20
**Philip**
5:14 143:4
**Phillip**
20:8
**phone**
166:19,21,21
**piece**
31:13 37:6 39:9 139:3 155:20
**pieces**
56:2 185:14
**pipeline**
126:4 129:2
**place**
6:15 31:8,9 35:4,20 50:15,18,22 51:12 51:14 56:2 78:2 93:23 124:7 152:20 155:18,19 164:5 194:8
**Plain**
7:12
**plaintiff**
3:8 5:23
**plaintiffs**
1:5 2:2 4:11 64:7 142:13
**plan**
8:5 56:4 59:20,23 64:16 138:23 147:21 148:3,13,24 149:20 150:19 154:22 155:4 157:23 175:11,12
**plank**
121:1
**planned**
48:6 89:6 97:3,19 98:13,23 106:19 119:11,13,16
**planning**
58:8 109:9 111:4 170:5
**plans**
14:3 48:2 49:4 57:19 57:19,24 58:1,7 162:21
**plant**
36:7,13 138:7
**plants**
138:7
**play**
7:10,16 35:8 42:7
**played**
7:11,13
**Pleas**
130:17,19
**please**
114:11 118:2 128:21 143:1 192:14
**plethora**
99:16
**Plunkett**
52:11,13 114:9,17 137:9 176:16
**plus**
114:7 155:22 179:16 184:17,19
**point**
28:11 32:14 50:20 51:7 56:9 59:5 64:15 76:2 89:6 105:22 108:2 110:1 120:6 136:12 146:12 149:8 182:9 189:16 192:14
**pointed**
66:10
**points**
73:3 157:15 160:10
**pool**
107:22 122:5,13
**pools**
122:6,15
**portion**
22:23 32:13 60:20 61:20 62:1,2,8,11 76:9,10 77:20,23 92:14 138:24 187:2 187:3,5,9,12,14
**portions**
77:14,15
**position**
8:9,12 9:22 11:16 15:17 27:8,10 31:1 93:7 94:13 128:3,6 128:15,18 139:6 162:8 187:15
**positions**
8:14 14:22 15:3
**possible**
98:8 103:10 121:9 191:2
**potential**
39:14,17 57:8 76:15 102:10 104:8 105:1
**potentially**
10:12 50:3 176:8
**practicality**
149:20 150:19
**Prairie**
27:17 28:23 43:8,16 169:19 170:1
**PRD**
22:15,19 39:15 85:5 85:10,12 88:15 89:1 89:2,3,6,8,9,22 90:8 90:17 91:21 92:13 96:19 114:5,20,22 114:24 116:15,22 116:24 119:1 134:14,15 141:15
**PRDs**
88:18
**predicated**
45:9
**preliminary**
105:8,15
**preparation**
24:3
**prepare**
23:12

**prepared**
24:5
**preparing**
174:5
**preplanned**
57:10
**presence**
3:12 194:7
**present**
15:2 32:11 56:4 98:9 179:3
**presentation**
32:9,13
**presented**
148:13,14 150:19 162:21
**presenting**
31:6 32:1 35:21 74:17
**presently**
139:16
**preset**
57:19
**presumably**
158:10
**presume**
151:4 163:10
**pretext**
158:12 172:8,16
**pretty**
12:17
**previous**
31:17 96:14 162:14 163:15
**previously**
63:23 64:6 84:23 112:12 115:6 169:14 170:10,21
**pre-application**
75:3 154:24
**price**
34:23 36:23,24 38:1 43:11 108:1 109:4
**priced**
109:2
**prices**
37:14 42:4
**primary**
149:1
**principals**
181:22,23,23
**print**
62:24 105:18
**printed**
45:24 62:24
**prior**
8:14 26:17 47:12,14 69:8,8,9,17,20 70:16 71:19 76:3,12 78:2 79:13,23 83:18 84:8 104:7 144:7 161:6,10 168:18 188:10 190:8,9,22 191:24 192:3
**private**
163:13
**privileged**
188:1
**probably**
13:12 26:18 41:10 58:14 81:8 134:8
**problem**
149:16,17 178:14
**Proceed**
54:7
**proceeded**
74:8 114:22
**proceedings**
192:18
**process**
13:16 14:2 31:4 32:2 34:22 37:21 40:17 48:6 56:12 63:10 65:5,5,6,10 74:9 76:1 97:13 112:1 131:19 143:23 161:17 182:8,9,9
**produce**
46:1
**profession**
167:12
**professional**
12:8 14:6,15 16:2 82:16 165:7 167:8
**professionals**
14:24
**profit**
42:19 43:12 71:13 180:14
**profitability**
70:8 72:2
**profitable**
41:2 54:24 56:5 57:3 71:16 92:24 93:6,6 93:7,14
**progress**
65:17 74:12 77:12 93:24 96:8,15 99:16 112:21 155:18 189:18
**prohibit**
149:9 150:3
**project**
9:1 18:15 21:17 22:5 22:7 26:18,22 27:2 28:13,17,24 29:4,17 30:11 32:22 48:9,11 53:5 55:6,7 72:7,10 76:11 77:21 82:20 82:23 83:1 85:7 88:19,20 92:16 96:22 98:3 100:2 118:12,13 119:17 130:10,11 135:20 139:5 145:11 146:19,21 147:16 147:17 157:12 164:2 166:24 167:2 167:7 168:17,21 169:4,12 172:15,16 177:4 180:22 182:21 183:12,13 187:6 190:9
**projects**
11:11 18:15 27:2,14 27:15,19 29:21 30:18 31:3 32:22 39:11 52:23 165:17 165:18,19,23 169:16 176:4 181:6
**promises**
103:15
**promote**
67:9 72:16
**proof**
3:12
**properly**
13:13
**property's**
47:6
**proposed**
30:20 50:23,24 76:24 107:7,18 120:13 121:13 131:11 140:12,12 145:8 149:8 150:16
**proposing**
162:1 167:3,5
**prosecution**
188:8,9
**provide**
24:20 82:5 96:18 110:2 111:16,17 114:20 147:19 176:7
**provided**
158:6,15,20 173:16
**providers**
158:7
**providing**
168:20
**provision**
46:11 48:24
**public**
48:1 49:15,15,16,16 49:17 52:6,11 100:19 104:15 109:12 114:8 122:23 130:9 135:15,21,22 136:7

138:8 146:20 147:1 148:4 155:22 163:16 170:14 172:2,4 176:11,15 176:15 194:4,21
**published**
173:24,24
**PUD**
98:17 129:15
**pull**
45:19 93:20 94:8 98:12,16,22 141:11
**pulled**
75:15 85:21
**Pullman**
6:15
**purchase**
19:17 32:21 34:4,17 34:23 35:12 37:14 41:3 43:3,10,13,18 44:18 46:4 47:2 51:6,19 65:1,12 69:1,2,21 70:17 71:1 72:3 73:22 78:2,21 79:9,13,24 83:6 84:21 87:22 92:3 113:17
**purchased**
13:18,24 19:9 33:10 45:11 51:17 53:23 54:1,2 56:7 68:8 74:2 78:12 83:11 84:3,5,6 85:11,16 85:17 86:12,13,23 87:3,8,20,23 89:18 90:7 91:18,19 113:18,23 154:20 166:2
**purchasers**
83:15 105:1
**purchasing**
12:5,11 13:14 26:4 36:11 38:14 39:6 47:14 69:9 71:10 76:13 79:1,3,6 96:4 104:7 166:6
**purple**
137:13
**purpose**
19:8 67:7 73:2 92:20 95:6 100:11 127:21 127:22 164:12
**purposes**
52:22 60:14 76:21
**pursuing**
31:3
**put**
21:18 31:8,9 51:12 51:13 53:2 57:10,21 58:21 60:21 61:8 74:1,4 92:20 155:17 164:4,4 186:15 190:15
**puts**
35:20
**putting**
105:23 155:18
**P-U-L-L-M-A-N**
6:15
**p.m**
125:3 193:5

**Q**

**qualifications**
3:13 124:15,16
**qualified**
124:13,14 194:4
**quality**
121:14
**quantifiable**
110:21 111:2,17 119:6
**quantified**
178:24
**quantify**
110:7
**quantifying**
110:11
**quantities**
99:18
**quartz**
120:24 121:9,24
**question**
13:13 15:14,20 20:13 20:15,15 21:6 22:4 27:19 33:16 37:8,18 38:11 41:7,8 43:14 44:9,10 58:4 67:11 68:18,19 69:5,13 70:4,13,21 71:2,22 73:9 75:20,24 76:6 79:12,16,18,21 86:23 87:7,16,20 88:7 90:13,14,19 91:1,3,4,9,10,13 93:2 94:5 97:17 98:10,15 109:13 110:6,17 111:5,6,8 111:11 114:13 115:13,16,17,23 127:5 128:21 135:12 139:15,17 140:17 141:1 142:3 146:1 153:23 155:10,14 156:23 159:19,23 162:9 174:8 184:3 187:18 190:2,3,5
**questioning**
44:9
**questions**
10:2 14:12 17:17 24:14,20 29:20 55:2 60:14 68:12 84:13 106:8 142:14 151:1 152:14 178:4,19
**quick**
178:15 184:3
**quicker**
125:8
**quite**
128:10
**quote**
155:3,5,6 172:12,12

**R**

**R**
5:2
**racial**
172:19,21,22,22 173:2,9,19,20
**Raehil**
74:18 75:4 118:22 154:18 155:3 156:9 156:18 157:8,20 158:1,2 159:4,5 172:7
**Raehil's**
156:23
**raised**
150:13
**Randall**
6:10 123:23,24 124:1 169:1
**Rankey**
164:6,7
**rate**
41:15 55:11 108:6,6 108:10,14,17 174:17,19 186:5,6
**rates**
40:23
**rather**
62:23 73:10 141:17 152:7
**read**
64:12 84:16,17 91:13 91:15 152:8,9 153:6 153:16 154:8 155:7 156:9,20,21 157:18 157:19 159:22,24 160:7 192:13
**reading**
72:19,21 99:17 152:8 160:8
**reads**
155:9
**ready**
51:6 181:10
**real**

7:23 10:9 16:4,7,22 16:23 17:6,7 34:15 119:5 167:19
**really**
59:5 79:18 151:20
**Realtor**
14:20
**Realtors**
16:14
**reason**
96:13 99:3 109:15 118:17 119:5,6 136:4 145:20 161:24
**reasonable**
72:6 89:5 93:10,11 96:19 117:14 120:10 128:4,23 129:3 135:17,18 138:11 149:17 150:22,22 151:3 175:1,4 177:4,7 184:11 186:6
**reasonably**
30:19 95:14 103:21
**reasons**
39:21 99:3 116:16
**recall**
24:16 33:8 46:23 58:16,18 65:3,4 83:4 97:18,21 98:14 98:18,19 99:5,14 100:8 109:13,14 120:15 154:3 155:10 164:8 166:20 167:14
**receive**
189:18
**received**
97:21 186:13 189:7,7
**recently**
97:13 166:1
**recess**
63:15 124:21 153:2 178:17
**recognize**
59:21
**recommendation**
98:22 134:16
**reconsider**
159:16 160:4
**reconsideration**
160:19
**record**
5:10 19:16 63:16 64:20 66:19 72:24 78:17 84:17 91:5,7 111:7 115:18 124:19 132:21,22 153:6 159:24 161:1 161:4 190:16
**recorded**
153:21,22
**records**
143:24
**recoup**
182:24 185:1
**recovery**
188:4
**redevelopment**
30:1 170:1,2
**reduced**
3:10 161:19 194:6
**Reed**
48:1,1 52:8 114:9 135:22 155:23 176:14
**reference**
66:24 73:1 128:10 129:6 160:22 186:21
**referenced**
129:1
**referencing**
80:21 113:10 133:13 172:5
**referred**
112:1 115:7 148:9
**referring**
22:4 62:10 66:13,14 66:17 127:6 139:15 159:10 160:16
**reflect**
38:5 72:24 154:3
**reflected**
67:4
**reflecting**
106:6
**regard**
12:2,10 17:17 18:13 21:23,24 22:7,12 23:8 40:7 45:3 46:22 47:1 65:12 85:15 125:9 129:13 132:19 164:10,16
**regarding**
21:7 104:11 111:4 143:9 147:20 166:24 171:8 178:19
**regional**
40:22 49:8
**regions**
41:13
**regularly**
12:17 15:4 81:16
**relate**
26:19
**related**
82:12 102:23 154:19 156:12 175:18
**relates**
147:2
**relating**
80:22
**relation**
191:11
**relationship**
26:10
**relative**
56:24 144:7 163:24 194:10,11
**relevance**
156:14
**relevant**
77:16
**reliance**
91:22
**reliant**
52:18 54:19
**relied**
73:12 88:1,17 94:18 117:10,10,12
**rely**
59:2,3 117:15 128:9
**relying**
65:15 73:10 88:9 127:21
**remaining**
156:2
**remember**
6:8 7:15 33:4,6 34:11 45:17 49:20 98:11 99:6 112:13 120:22 143:24 145:3,6 166:18 190:6
**rendered**
173:13
**rent**
41:16 105:5 108:11 110:11 124:11,13 124:15 148:2 185:13,20,21,22 186:1,13 189:7
**rental**
132:8
**rentals**
41:15 109:24
**rented**
181:11
**renter**
107:2
**renting**
124:4,10
**rents**
58:13 105:9
**reopen**
153:7
**rep**
14:8

**repeat**
43:14
**repeating**
91:7 115:13
**reply**
148:12,13
**report**
10:18
**Reported**
1:19
**REPORTER**
192:16,19,23 193:2
**reporting**
194:12
**represent**
32:17
**representation**
60:8,10
**representations**
39:20 69:23
**representative**
17:18,21 19:1 20:17 23:21 24:3 25:6 34:6 38:13 128:20 130:13,15 142:16 166:11
**representatives**
142:17
**representing**
32:1
**represents**
167:19,20
**reputational**
178:22
**request**
107:19,21 135:18 138:11 153:7 160:6 160:17 172:13,14 189:16
**requested**
76:24 84:17 86:7 90:10 101:10 130:10 135:17 136:8,10 157:16 159:24 160:11,23 162:16,17 173:16 177:7 189:17
**requests**
135:18 161:18 184:11
**require**
44:19,20,22
**required**
24:4 72:7 77:3 85:23 88:20 92:15 125:11 127:14 176:12
**requirements**
16:17 75:16 93:21 94:8,10,11,12 129:16
**requires**
49:14 86:16
**research**
105:8,12,15
**reserve**
178:7
**residential**
6:13 12:24 18:8 21:21 22:2,20 25:3 25:10 29:11 58:5 76:9 84:3 89:7,14 91:20 95:24 96:1,4 96:10 98:16 106:8 106:11 109:9 113:20,24 129:14 132:12 133:17 187:3,12
**resolution**
4:9 63:2 64:18 77:10 77:14,16 88:10 91:23 117:13 153:7
**resolve**
6:4
**resolved**
149:5 151:3 157:10 157:21
**resolves**
151:4
**resources**
73:14
**respect**
178:12
**respectfully**
154:14
**respective**
3:7
**respond**
162:3
**responded**
156:23 158:1,1,2
**response**
31:18 146:23 150:17 150:22,23 151:4 155:14 158:5,19
**responses**
24:21 158:21 178:21
**responsibilities**
12:1
**responsible**
50:10
**rest**
12:13 187:14 192:11
**restrict**
150:3,16
**restriction**
149:9
**restrictions**
149:12
**result**
43:12 109:17 140:23
**resulted**
161:11,15
**retail**
28:18 29:19 30:5,11 80:12 170:7
**retain**
34:14 68:13 70:7 71:21,23 82:13 171:2
**retained**
81:21 82:2 123:15 165:16,22,24 169:14
**retaining**
170:24
**return**
186:4,6
**returning**
186:10
**revenue**
182:13
**review**
23:16 47:4,4,7,7 68:20 69:20 70:12
**reviewed**
23:13 24:9 45:14 63:9 76:5 138:19 142:22 151:16
**reviewing**
50:4
**reviews**
5:24 173:18
**rezoned**
28:15,15 29:13 30:2 30:10,21 92:15 117:11 187:6
**rezoning**
117:15 119:1,4
**rights**
180:1
**right-hand**
66:2
**Rippel**
97:11
**risk**
186:4
**RJ**
152:17 154:14
**road**
2:4 48:1 52:10,12 62:13 114:9,17 137:1,2,8,11 176:16
**roadway**
49:16 138:8
**roadways**
47:10 49:18 52:7,7 54:14 114:8
**Robert**
164:10
**role**

17:24 18:4,14 19:4 20:20 25:24
**Roloson**
137:3,3,8
**Ron**
20:6
**Ronald**
1:11 3:8 4:4 5:4,11 5:14 20:8 143:4,4 194:5
**rooms**
122:24
**roughly**
12:19 40:21 41:20,22 42:1
**Route**
176:16
**Rule**
194:13
**run**
7:17
**R10**
112:14,18,19 113:10 113:13,19 130:6,6 133:4,12,20 134:5 135:2,4,5,10,11 136:4,5,5,11,17 138:1,13,16,22 139:12,16,16,18,22 140:3,11 141:17 175:7,8,11,12
**R20**
114:21 130:6
**R4**
60:20 61:5,7 62:5 113:23,23 114:2 133:2,10,15,16,17 133:21 134:5 135:6 140:3,13,15,20 141:12,16
**R4s**
61:9

**S**

**S**
2:3 5:2
**Sabatino**
1:11 3:8 4:4 5:4,11 5:14 20:8 143:4,4 152:17 154:15,20 154:23 155:6 156:17 194:5
**safe**
146:22,24 158:7
**safety**
118:19,20 147:3 158:3,4,9,14,16,21 158:24 159:1,5,6 162:1 172:7,9
**said**
21:5 45:16 53:3 70:23 71:4 74:15,20 74:22,24 75:2,5 79:13 81:2,2,18 88:9,17,23 90:11,21 91:23 92:22 93:3,4 94:17,18,18 96:18 99:15 100:5,18 104:20 105:13 109:12 118:14,20 119:13 120:24 126:10 128:2 135:13 144:13 146:10,11,12 147:2 148:4 149:10,22 150:8,12,18 151:2 153:21,22 154:18 154:23 155:3,4,5,6 156:17,19 157:8,20 157:22 158:16 169:24 184:1 187:1 191:14 194:7
**sake**
66:12
**sales**
16:15,23 17:1
**salesperson's**
16:7
**Salvation**
29:24 169:24 170:2
**same**
15:20 20:13,15,15 26:23 29:20 32:6 58:4 62:3 90:11,24 96:13 98:15 106:8 108:8 115:9,23 132:15,18 136:21 136:22 139:24 151:24 170:23 179:11 183:8
**sanitary**
48:5,24 49:17 52:4 52:15 54:15 176:15
**satisfy**
158:24
**save**
143:1 145:22,23
**saved**
189:22
**say**
9:16 10:23,24,24 11:2 12:16 17:13 19:12 20:15 21:22 31:13 34:5 36:4 43:5 51:5,17 52:18 54:3 55:6 56:20,21 57:8,17 58:20 69:3 73:9 74:14 75:18 78:16 80:14 83:20 87:2 90:12,21 93:5 94:5 98:1 99:3 101:8 105:14,14 107:3,18 109:6 112:5,6 118:18 121:3 122:1,14 123:3 127:5 128:7 130:13 131:13 133:14 143:19,20 144:18 145:9 146:6 148:3,6,8 150:3,20 154:9 155:11 156:10 165:14,24 167:17 168:10 171:2,6 173:3 174:13 179:13
180:21 181:4 189:12 190:4
**saying**
35:22 36:1,5 48:11 52:21 80:20 83:21 86:10 93:12 94:6 99:7 101:22 103:5 105:19 108:12 111:1 112:21 114:14 120:7 138:21 143:21 158:2,21 159:19 174:16,18 187:20
**says**
5:6 59:8 62:4,4 64:10 64:13 66:3,23,23,24 67:1 72:15 77:2 102:17,24 103:8 112:19,23 114:2 116:24 154:14 156:9 159:4,5 162:17
**scale**
149:21
**scarcity**
173:22
**Schell**
1:19 194:4,20
**school**
7:6,16 8:1,19 183:23 183:24
**score**
132:2,5
**Scott**
37:13
**scratch**
87:6
**seal**
194:15
**second**
65:21 72:23 73:23 81:12 84:14 97:23 120:16 134:2 139:14 180:3
**secondary**

22:22
**seconds**
95:12
**Section**
65:20,21 73:2 80:2 89:2,3
**see**
60:17 64:8 65:21,23 65:24 66:4,5,8 67:2 67:3,6,7,11,14,17 67:18,22 68:4 72:23 78:10 80:16 91:5 102:22 106:10 112:8,14,15 113:11 113:14,15 133:17 133:18 135:2 136:24 150:21 153:16 190:21
**seeing**
36:9 60:6 113:12 143:24 182:10
**seek**
125:11 129:15 131:15
**seeking**
55:20,21,22 89:23 119:10,18 129:16 188:4
**seems**
44:13
**seen**
58:13 63:2,4,8 81:11 134:20 142:21 151:15 153:10
**sell**
13:18 184:4,13,18,24 185:3
**seller**
166:1
**selling**
135:3
**semi-annually**
31:24
**Sending**
12:4
**sense**
45:21 69:2 126:1 147:3 177:9
**sensitive**
72:17
**sentence**
72:20,23 157:7
**separate**
17:10 34:14,15 107:16
**separately**
21:17
**separates**
188:14
**September**
1:13 3:1 4:13 60:2 125:1 151:12 159:12 160:1,1 193:4 194:15
**serve**
22:22
**service**
36:20 48:3,5,24 49:24
**serviced**
47:16
**services**
49:5,10 50:10 82:6 169:7,11
**Session**
3:1 125:2
**set**
14:3 194:14
**Setting**
38:17
**several**
152:10 186:9
**sewer**
47:17 48:4,5,24 49:1 49:5,8 52:15 54:15 102:23 114:9,16,16 138:6,7 155:24 176:15,16
**shareholder**
25:14,15
**shareholders**
9:13
**she**
74:20,20,22 91:13 154:18 158:8,16,16 158:18,20 159:4,5 172:9
**she's**
158:17 163:19
**shortly**
180:16
**shot**
13:13
**should**
31:13 38:20,22 78:16 107:1 118:6 119:3 128:13 129:10 151:20 186:23
**shouldn't**
20:14
**show**
56:4 142:12
**showed**
143:23
**showing**
32:11 63:19
**sic**
14:21 15:13 18:8 32:21 93:18 126:9 130:13 155:16 178:13
**side**
13:9 36:6 57:4 58:5 66:3 87:5 99:8 137:2 168:18
**sidetracked**
151:9
**signed**
45:15,15 46:4
**signers**
33:1
**similar**
26:6 28:14 29:12 30:2,9,19 49:2 106:20,23 107:6,8 107:10 108:4 120:17 140:5 146:6 167:11 168:20 170:4 189:11
**similarly**
20:23 170:13
**simple**
127:10 141:3 162:8
**since**
63:21
**single**
12:23 19:8 158:6 159:1 161:17 162:4 179:15
**single-family**
30:13 133:10,11,22 134:7,19
**sir**
192:23
**sit**
95:10
**site**
147:21 148:3,13,24 149:20 150:19
**sites**
43:8
**sitting**
186:10 188:6
**situation**
49:2
**situations**
40:18
**six**
10:15
**size**
122:17
**sizes**
122:19
**skimmed**
70:6,19 71:5
**skip**
47:13 142:3 164:10 164:11
**skipping**
144:17

**sliver**
22:21,21
**soils**
47:7
**sold**
14:4 37:13
**sole**
9:7 19:24
**solicitation**
39:19
**solicited**
176:8
**some**
5:24 13:19 17:16 24:14 28:18,19 29:18,18 30:23 32:14 35:3,4,18 37:2 50:3 51:13 58:8 70:21 103:10 105:8 107:9,16 108:12,13 123:10 142:14 145:23 146:12 151:16 154:19,19 178:19 181:5 185:8 189:16 189:22 190:16
**somebody**
12:13 14:4 37:3 98:3 99:7 105:20 108:15 127:19 131:19 137:23 182:7
**someone**
5:23 108:18 109:13 127:18 182:4
**something**
23:3 26:6 49:21 57:20 78:11 81:19 100:6 108:19 109:12 114:15 119:18 120:6 121:7 121:15 122:20 123:1 129:20 137:7 150:6,9,10 173:5 186:8 190:6
**sometime**
33:7 142:22 166:3
**somewhere**
123:18 129:7
**sorry**
9:12 10:7 11:9 27:11 27:18 28:1 42:12 55:21 63:24 71:17 73:9 78:24 82:15 93:1 125:18 126:11 130:15 157:13 169:22
**sort**
31:17 51:3 149:11 174:17
**sought**
84:10 85:5
**sound**
33:13
**sounds**
83:14,17 180:18
**source**
131:16
**sources**
173:4,5,5
**south**
2:4 61:16 62:12
**SOUTHERN**
1:1
**space**
122:21,23
**speak**
87:17 164:21,23,24 165:5,22 167:8 190:12,14
**speaking**
165:15 169:10
**speaks**
78:17
**spec**
104:4
**specializing**
7:23
**specific**
14:9,11,14 46:22 57:5 61:10 103:9 118:12 157:15
**specifically**
80:16 89:1 128:22,23 158:1 168:17
**specifics**
154:19 160:10
**specified**
194:9
**speculate**
44:13 53:6,8 150:8
**speculating**
135:9
**speculative**
57:14,15,18 59:8 72:8 74:6,7,16 75:12 76:21,23 77:1 86:8 95:4 99:24 101:9,19,23 102:1 102:18 103:8,19 104:5 147:22,23 148:19 179:17
**speculatively**
103:14
**spine**
52:10
**split**
96:23 97:22 181:7
**spoke**
83:3 104:13 105:7 123:15 147:4,6 165:3
**spoken**
17:23 166:14
**sports**
7:10,14
**square**
48:19 58:22 99:19 105:5,24 106:3,24 107:4 148:17,21,23 179:18
**SS**
194:2
**staff**
155:1
**stage**
28:10 99:11
**stainless**
121:2
**stamped**
151:21 153:15
**stand**
14:17 192:10
**standard**
33:24 118:10 121:7 121:16,17,18 134:8 148:21 159:1
**standards**
95:22 96:19 118:3,5 118:6,9 119:3,3,4 120:12 132:15 149:18 156:5,7 161:23 162:5
**standpoint**
69:6 126:17 127:4 128:19
**stands**
121:1
**Stankovic**
82:24
**start**
17:19 29:21,22,24 38:4 41:11 57:1 98:21 104:20 118:10 153:2 182:13
**started**
8:24
**starting**
152:16
**starts**
154:18 157:8
**state**
1:15 2:9 5:9 7:19 41:13 42:2,2,3 52:14 100:12 104:14,15 114:20 173:19 176:16 194:2,4,21
**stated**
23:17 65:6 128:18

157:9,20 185:4
**statement**
94:13,19 95:18 124:5 128:6
**statements**
75:11 80:6 88:1,2 123:13
**states**
1:1 13:4 41:14,21 89:3 100:13
**stating**
154:4 155:14
**station**
48:4
**status**
165:4
**statute**
3:9
**stay**
31:20 127:16
**staying**
35:13
**steel**
103:2 121:2
**stenotypy**
3:10 194:7
**step**
45:13 56:13 59:18 147:5
**sticking**
43:9
**still**
6:5 16:23 53:5 58:17 72:2 75:14 84:18 92:14,19 104:18,18 134:12,17,23 149:6 149:19,22 151:5 156:5 159:4 162:5 180:17 184:8 187:3 187:10,12 189:8
**stipulated**
3:6
**STIPULATIONS**
3:4
**stop**
6:2 153:4 180:3
**storage**
59:10 77:2 80:23 88:22 99:15 100:15 101:7,11 102:14,18 103:19 126:5 129:3 129:7 135:19 136:9 138:12 139:5 149:3 149:7,23 177:10
**storm**
52:4 114:16 176:16
**stormwater**
49:17 52:16
**stream**
47:7
**street**
1:15 2:9 30:1 108:20
**strike**
42:17 123:16 172:23
**structural**
103:2
**structure**
103:1
**stub**
48:1
**stuck**
154:10
**studied**
158:5
**studies**
56:24 57:1,2 58:10 104:11 106:10 158:15,23 162:21 172:20,24
**study**
146:24 147:15,18 158:8 173:10,12
**stuff**
188:10
**style**
107:10
**subarea**
66:6,24
**subject**
75:14,15 117:22 127:18 192:7
**submitted**
37:15 138:24 148:4 188:15
**subsided**
174:15
**substantial**
49:14 114:7
**such**
40:24 51:8 148:5,14 148:24 156:12 173:17
**suffice**
9:16
**sufficient**
103:14 138:17 146:22
**suggested**
100:18
**suggesting**
41:9 54:11 97:22 192:21
**Suite**
1:15 2:10
**summers**
8:20
**supervisor**
10:14
**supply**
174:17,18,20
**support**
128:11
**supports**
146:8
**suppose**
179:9
**supposed**
119:2 120:3
**sure**
16:21 43:21,24 50:5 52:5 68:18 75:9 93:13 109:11 136:18 151:23 161:3 163:4 165:2 178:16 183:22 192:17
**survives**
124:10
**Sweeney**
137:3,14,15,16,19,20
**swimming**
107:22
**sworn**
5:5 194:5
**synonymous**
11:19,24 92:24 93:5

**T**

**T**
45:24
**table**
41:7 65:21,22 66:3 66:22 67:12 73:8,11 75:22 159:8 162:13
**take**
7:24 13:17 16:20 17:16 31:4,13 46:2 55:20 59:15 60:14 63:12 121:17 142:24,24 145:21 152:12 154:11 161:14 178:15 181:11 182:12,17 182:18
**taken**
3:9 5:15 14:2 56:13 63:15 124:22 178:17 179:24 194:8
**takes**
180:7
**taking**
13:16 16:13,13 110:3 161:11 180:18 186:22
**talk**
40:8 100:11 115:9 116:11 135:1 143:19 165:12
**talked**

34:24 43:16 71:10 72:13 78:20 80:19 104:18,19 116:20 125:10 144:10,11 144:14 155:16 162:18 169:18 175:23
**talking**
22:6 25:22 26:20 37:20 40:9 55:7 61:11 80:24 81:1,3 87:3 95:24 118:1 128:8 136:18 137:5 137:16 182:12 190:7
**talks**
80:10,12
**Tamina**
6:10
**tangent**
162:23
**tasks**
10:21
**tax**
50:16 51:8 52:23 53:4 163:24
**TBD**
45:16
**team**
7:16 10:22 122:18
**technically**
140:18
**technician**
10:14
**tell**
45:23 72:20 117:18 118:8 188:6
**telling**
30:17 99:7 100:22 173:14
**template**
73:8
**ten**
66:1 67:16 68:2 100:23 113:19
**tenant**
131:20 132:3,11 148:1
**tenants**
57:8,11 104:8 105:1 167:20 182:12 183:1 185:14 189:8
**tens**
130:8 135:21
**term**
92:23 93:3 117:18,24 120:5
**terms**
55:12 127:16
**testified**
169:8
**testifies**
5:6
**testify**
24:5 91:6 194:5
**testifying**
23:23 91:6
**testimony**
24:8 59:8 76:22 77:1 80:21,22 81:2,9,11 81:18,22 82:13 90:22,24 95:12 101:4,16,22 102:17 103:8,24 115:11 133:2 142:4,18 144:6 170:16,19 171:1,9 193:4 194:6 194:8
**text**
72:15 77:12,12 86:7 95:23 99:17 100:19 103:16 104:15 117:13 138:19 155:5 156:10,15,15 156:15,24 157:1,3 166:9 168:22
**than**
15:3 60:7 62:23 70:22 73:10 95:20 104:22 106:16
119:20 128:19 133:11 140:16 152:7 172:17 181:5 185:18
**Thank**
92:1 134:4 135:7 153:3 193:2
**Thanks**
189:21
**their**
15:4 32:2,9 39:12,20 48:19 56:17 63:6 69:23 74:11 80:8 88:1,10,10,18,19 89:4,5 91:23 94:10 95:22,23 103:15,16 104:14,15 114:20 117:12,13,13,22 119:23 120:10,12 122:23 126:22 129:17 134:15 148:10 149:21 150:13 151:1,4,14 154:24 156:5,6 157:3,4,24 161:18 161:23 162:4,5 172:13 173:7,9 175:3,3,6 176:6 182:23,24
**them**
6:1,21 7:16 27:6 40:14 54:22 55:4 75:17 91:22 95:21 99:6 101:6 106:17 109:4,17 111:20,21 116:3,4,13 122:11 123:11,12 134:6,13 134:18 144:15 149:12 157:10 161:14,22,22 181:20 187:24 188:21 190:20 191:21 192:11
**then**
9:2 10:6,15 13:17
14:2 16:8,14 28:19 30:5,7,12 31:10 49:12 51:18 52:4,10 54:22 56:3 59:10,11 62:2,4 63:1 66:24 67:7 75:3 77:4,5 79:14 81:12 84:14 95:14 96:24 97:11 97:13,22 98:8 103:1 107:11,13 110:17 118:5 120:16 130:22 134:18 136:3,24 137:4,10 137:12 139:1,2,4 140:9 141:11 143:16 154:14 157:11 162:17 182:13,23 186:23 194:6
**there**
6:17 7:10 9:7,13 10:7 11:14 13:16 18:4,9 20:5 21:4,10 22:21 23:16 24:15 26:12 31:11 33:1 35:2,16 36:7,8,10,10 42:22 42:24 44:1 45:4,5,7 49:9 50:1,2,4 55:2 58:21 65:8 70:2,21 72:1,4,5 73:6 74:4 74:15,19,21 75:2,5 75:9 76:1 84:13 94:11,14,17 96:14 97:9 98:18 99:15 100:4 101:1 113:13 120:5,6 123:1 126:8 128:23 129:5 130:8 132:6 134:5 136:16 137:13 138:2,2,4,7 140:4,5 154:8,8 157:14 160:9 162:2 163:5 168:4 173:4 175:13,14 176:10 178:22 185:8 186:9 186:17 191:14

**thereafter**
3:11 19:18 32:14
**therefore**
48:8 77:6 100:16 101:24 103:22 136:4 140:23 150:23 172:18 174:20 185:19,20 186:22
**Thereupon**
124:21 193:4
**there's**
10:16 17:10 22:12 26:5 27:16,16,17 35:3 37:1,2 52:7,10 55:2 61:9 62:3 66:3 66:23 67:16 68:1 84:12 95:20,21 99:18 108:20 109:16 130:6 132:5 133:22 136:4 143:12 154:13 174:2 188:20
**these**
21:16 27:14 37:12 38:13 40:18 47:21 47:23 51:5 52:23 53:13 55:7,13 60:14 60:23 76:17 92:3 93:17 99:3 101:8 102:15 103:9 107:13 111:13 112:1,3 113:17,18 116:11,21 124:4 125:24 131:11 142:9,10,11,15,19 148:19 153:15 158:12 160:16 163:16
**they'll**
36:1 80:7
**they're**
18:22 21:17 37:22 56:21 81:6 83:15 104:3 120:3 124:1 128:15 136:6 140:18 148:8 157:2 182:19
**they've**
31:8 32:7 80:6 88:9 91:23 100:18,18 178:2
**thing**
62:24 63:18 90:11 152:8
**things**
11:6 18:10 33:22 39:16 42:4 70:2 78:22 116:20,22 117:15 122:1 135:19 153:11 158:23 176:17 177:6,13 180:4
**third**
97:14 102:20
**third-party**
173:4
**those**
8:16 11:3 18:11,12 23:23,24 24:3 25:18 27:5 30:18 33:19,21 35:21 39:13,17 42:4 42:7 43:6,9,15,18 44:21 49:10 50:10 51:2,13,21 52:2,14 55:19 57:17 58:11 65:9 67:19,20 70:10 75:8 76:16,19 83:9 103:6 107:8,12 111:18,19 112:18 114:18 121:3,4,24 124:9 132:9,13 133:18 135:19 136:5 137:21,24 140:9 153:18 158:23 164:4,4 176:17 177:2,3,13 179:3,19 185:2 186:1 189:10
**though**
11:22 49:3 192:14
**thought**
37:21 42:14,15 51:1 72:5 86:20 87:11 104:16 125:6 145:11 150:23 151:3 190:3
**three**
107:5,15 111:14 116:3
**three-bedroom**
110:15
**through**
12:6 13:16 14:2 17:16 31:4 34:21 36:14 37:21 39:15 48:6 53:21 60:6 63:9 65:4,9,10 68:1 70:6 74:9 80:7 89:9 93:8,23 97:9 99:17 100:23 103:17 107:10 131:21 139:22 142:11 143:3 161:21 176:6 178:2 183:15
**throughout**
26:23 161:16
**throw**
100:3 142:9
**thus**
188:7
**TIF**
50:24
**till**
153:6
**time**
3:10 12:18,18 13:1,1 23:2 26:1,1 27:22 30:8 32:6 48:2 51:7 51:16,19 53:22 56:7 56:16,17 69:5 73:9 73:21 74:2 75:5,10 76:1 77:13 78:2 79:23 84:20,21 85:11,20 86:11,23 87:8 89:18 90:6 93:24 94:5 106:5 108:11 111:16 113:9,16,18 115:3,9 118:24 128:7 133:14 143:1 144:5 144:5 145:23 151:17 154:10 157:8,20 159:9 161:14 165:21 166:4,6 179:3,9 183:5 185:12 186:3 189:9 194:8
**times**
7:13 13:16 35:14 65:3 90:20 91:1,24 116:3 128:2 150:13 179:16,18,20
**timing**
79:12 136:12
**title**
9:2 11:9,16 47:4 167:14
**today**
23:8,20 24:4 111:21 128:3 188:6 189:23 192:9
**together**
51:12 57:1
**told**
70:18 74:6,14 76:8 85:8 96:11 97:5,6 97:18 98:11,16 99:10,11 114:10,24 115:13 116:15,18 116:18 147:5 149:12 155:1 161:21 165:4 187:23 190:4,4
**too**
153:2 157:23
**took**
130:22,24 188:21
**tools**
50:15 51:9 164:5

**top**
64:8,10 109:1 132:4 173:6
**topic**
164:20
**topics**
24:5,6,10,12
**total**
13:8,9 34:13 179:20 188:24
**tower**
48:3,15,20 138:7
**town**
81:8 165:1 168:2
**townhome**
107:13
**townhomes**
29:18 107:14 111:15
**townships**
36:15 117:11
**township's**
39:19 94:2,19 118:5 118:6 157:1 172:2 172:14
**to-be-developed**
19:10
**Tracy**
1:19 194:4,20
**traffic**
146:17,21,24 147:10 147:15,18 158:6,8 158:14,23 162:21
**train**
42:14
**transcribed**
3:11 194:7
**transcript**
192:20,22 193:1 194:8
**transitioned**
9:2
**transpired**
144:7
**treated**
162:6
**trees**
59:17
**tricky**
143:12
**trouble**
70:13 113:12
**truck**
149:13
**true**
102:15 174:18 194:7
**trustee**
4:13 148:7,7 151:13 156:23 157:22 158:2 159:5 162:14 172:7,14
**trustees**
4:13 64:11 81:23 82:14 117:5 125:13 127:8,19 130:2 144:11 145:18 157:24 160:3 161:6 161:11 170:15
**trusting**
118:22
**truth**
194:5,6,6
**try**
31:20 35:8 70:14 94:22 172:6
**trying**
6:1 10:24 11:1 33:9 40:15,16,16 68:17 71:11,21 107:23 109:19 110:7,19,20 116:8 143:13 145:22 166:5 171:24 173:2 180:17 182:10 183:22
**turn**
59:19 65:20 67:15 135:20 154:11,12
**turned**
14:4
**two**
8:13 27:12,13,18 29:22 30:3 43:8,17 47:23 51:21 54:4 61:9 82:12 83:21 84:12 85:8 96:23 98:4 106:15,16,21 107:5,12,15 108:8 111:14 154:5 155:11 169:19 177:6,13 181:4 189:10,23
**two-bedroom**
108:5 110:15
**two-story**
107:14
**type**
28:13 57:9,11 121:14
**typed**
113:13
**types**
80:12 107:14 179:8
**typically**
13:20 57:21 148:16
**T&R's**
18:14 131:20 139:6 140:12 162:11

**U**

**ultimately**
51:18 84:10 182:6
**unclear**
44:9,11 95:22
**under**
3:9 17:9 65:20 66:24 69:22 76:16 77:10 77:15 78:6 80:1 90:20 93:18,18 96:5 97:20 100:10 102:9 102:22 103:2 104:2 112:18,19 113:23 119:19 194:13
**undergrad**
8:19
**underlying**
89:12,13 119:20 145:17
**understand**
9:4 22:16 25:24 27:7 33:10 40:16 44:10 52:17 67:19 68:18 79:14 86:10,11,22 87:19 93:20 108:12 110:21 112:9 115:12 117:17 126:21 128:1,3 129:19 155:17 159:17 162:8 175:10 178:9,12 180:12 186:15,20
**understanding**
41:13,22 47:20 48:22 50:1 51:20 58:9 69:22 73:24 74:10 89:13 94:24 95:1 96:12 98:20 99:2 103:24 112:17 114:4,18,23 121:11 121:20 126:20 131:9 138:3 141:13 143:8 150:1 156:4,4
**understood**
63:14 67:4 73:20 75:10 92:2 94:7 112:20 113:16 126:6,7,14 141:16 150:11 155:19 158:14
**undeveloped**
19:10
**unfairly**
118:7,8,11
**unheard**
134:12,20
**unit**
89:14,14,19 110:11 119:11 120:1 179:15,15
**UNITED**
1:1
**units**

28:22 29:16 30:4,6 89:17,23 90:1,1,4,5 96:4 106:9,11 108:22 109:10 113:20,24 119:19 119:22 161:19 170:8 173:21

**unjustly**
162:6

**unless**
101:2

**unlike**
189:3

**unreasonable**
120:11 128:16 134:12,22 158:20

**unreasonably**
95:17,19,21 130:5 158:12

**until**
113:18 152:9 153:5 175:15 177:11,13

**untrue**
23:18

**unusual**
122:12

**up**
21:17 28:17 33:15 34:21 45:13 49:21 58:6 59:18 68:21 70:14 73:23 83:23 89:17 97:22,23 105:16 107:3 113:18 114:21 119:21 125:7 130:6 131:12 143:23 147:5 150:1 151:23 166:11 177:9

**upgraded**
120:21,22

**upon**
39:19 40:13 54:20 59:6 88:13 94:18 99:9 108:18 148:3

**Upper**
7:7

**Urbancrest**
168:2

**us**
31:12 32:7 48:11 49:9 51:14 55:11 57:13 58:23 65:9 74:6,13 80:6 82:18 82:18 88:20 96:11 96:18,20 97:5,9 99:10 100:19 114:5 118:7,17 120:12 130:7 138:8 142:11 143:1 149:1,7 156:6 156:6 158:12 161:24 162:2,3,3,6 170:22

**used**
92:8 93:3 102:12 119:17 121:15 135:12 164:20 179:10 185:15

**useful**
101:1

**user**
50:3

**uses**
30:21 47:3,6 67:12 67:20 68:2,14,20 70:10 71:16 73:6,11 75:22 76:14,16,17 76:20 77:8 92:16 93:11 100:24 101:6 102:9,10,16 103:9 103:14 104:1,2 121:16 125:24 126:2 128:12,24 129:2 134:9

**using**
26:23 60:7 172:7 183:18

**usually**
47:5 182:15

**utilities**
47:16 48:7,12 135:15 138:2,4,8 140:5,8 140:10 175:14 177:24

**utility**
47:7 49:20,21,23 52:6

**utilize**
114:1,2

**V**

**vaguely**
155:12 172:7

**value**
38:2,6,8,15 39:18 40:10 179:23 180:15,15 184:1,9 185:12 186:3,7,18 189:2,9

**variance**
44:20 84:10 88:21 125:12,12,21,22 127:1,16 129:16,21

**variances**
39:15 44:4 129:15

**variety**
40:13 42:6 179:4,8

**various**
9:20 11:4 17:19 33:12 36:15 41:21 52:7 67:12 81:23 98:4

**vary**
42:3,4 122:17,19

**vast**
176:11

**verbal**
88:2 97:21

**vernacular**
26:23

**version**
59:23 63:9,19

**versus**
167:5 173:19 180:15

**very**
7:14 26:6 44:15 64:10 103:9 106:1 152:2 162:8

**view**
102:2,3 104:3

**village**
127:19

**Villages**
29:1

**Vince**
190:7,8,12

**Vincent**
171:18,19,20,22 192:1

**voiced**
149:1

**volume**
81:15,15 133:10

**vote**
156:6 157:16 160:6 160:11,17,23 161:11,15 162:10 162:13,16,17

**voted**
160:5

**vs**
1:6

**W**

**wait**
57:11 72:20 84:12 169:22

**waiting**
57:7

**waived**
3:13

**walk**
34:21

**walking**
107:21

**want**
6:20 23:10 27:5 29:22 31:9 35:22,22 35:23,23,24 40:11 41:4,6,23 42:9 46:1 55:23 57:9 66:18

69:1 74:16,24 78:15
84:14 90:12 91:6
92:21 100:18 101:5
110:4,5 112:24
115:10,15,16,23
118:18 119:24
122:1 124:18
126:24 127:15,23
132:10 136:7
142:24 145:9 149:2
152:12 153:4 160:4
161:1,24 176:4,4,9
178:4 185:5 186:17
187:23,24 188:19
188:22,22,24
189:15,18 192:13
192:16,20
**wanted**
32:3,4,4 57:7 64:19
65:15 74:1,1,4,5,6,6
78:21 84:9 98:24
99:10 116:22
141:10,13 145:11
150:9
**wanting**
158:11,11
**wants**
95:5,13 114:19,19
138:10 145:10,11
**warehouse**
74:7 99:24 100:3,5
101:24 102:2
127:23 147:22,23
**warehouses**
57:14 167:21
**warehousing**
21:16 32:4 35:23
36:17 47:24 52:11
59:9 72:8,9 74:8
76:22,23 77:1,2,7
78:6 80:1,10,11,14
80:17,22 81:7,16
86:8,9 94:15 95:5
99:15 100:12,14
101:2,7,10 102:13
102:18 103:5,19
126:5 129:3,6,7,10
135:19 136:9
138:12 139:4 149:3
149:7,23 177:10
179:17
**wasn't**
53:2 74:20 77:13
97:2 164:17 165:9
186:10
**waste**
56:16
**water**
47:7,16 48:3,3,4,14
48:19 49:8,16 52:4
52:15 54:15 102:23
114:9,16 138:6,7
155:24
**waterline**
176:15
**way**
26:19 38:7 39:8
41:11 43:22 45:24
53:3 55:5 132:24
165:20 167:11
176:19 177:3
180:11,14 183:21
**ways**
35:11,16 41:18
124:17
**website**
11:21
**Webster**
117:23
**Wednesday**
3:1 125:2
**weight**
122:24
**Weiler**
164:10,16 165:17
166:10
**welcoming**
35:24
**well**
8:16 10:18 11:12,14
12:7 21:5 22:9
28:18 29:18 30:12
30:21 36:4,18 38:4
38:10 42:13,17 43:8
43:9 44:11,15 45:19
47:9,12 49:7,17
52:15 56:20 58:5
59:16 61:1 66:1
67:24 72:9,19 73:23
74:12,23 75:4,6
81:10 83:20 89:1
90:13 91:2 94:6,11
94:11 96:24 100:3,9
107:3 109:22 110:3
110:18 112:20,24
114:4,17 116:1
119:23 129:6 130:7
130:8 136:1,16
140:7,18 142:20
147:18 148:5
150:11 152:10
153:24 160:3 163:7
164:11,23 165:1
167:2 172:6 174:6
174:16 176:9
177:12 184:10
187:11 189:22
192:7
**Wellington**
7:7,13
**went**
33:14 69:13 76:7
93:17 107:10
162:23 183:23
**weren't**
7:14 104:17 166:5
**west**
136:2 137:13
**westbound**
137:2
**western**
137:19
**westward**
177:24
**we'll**
10:6 18:23 28:12
52:8 126:24 127:15
142:3
**we're**
12:5 13:6,6,6,7 18:16
26:19,23 53:4 57:10
58:20,21 59:17
95:24 99:23 104:14
110:1 124:3 130:7
134:2 136:1,7 140:7
150:16 151:21
154:13 173:23
174:1 185:23
186:22 189:16
190:20 192:8
**we've**
10:17 43:7 53:20
57:22 63:8,21 100:9
106:16 117:10,11
125:10 135:17
136:8,10 142:4
144:10,11,14
148:13,14 150:19
155:15 156:5 158:5
158:6 161:22,23
162:3 165:18 166:2
189:11,17
**whatever**
19:21 43:10,17 68:14
68:24 84:14 119:24
122:24 127:1
178:10 179:21
**what's**
5:12 6:11,13 9:24
15:14 28:8,24 29:23
30:14 31:20 64:5
76:5 110:5 137:2,12
142:12 146:1
151:11 159:15
165:12 180:23
181:1
**where**
6:6,19 7:6,18 13:17
13:21,23,24 29:3
32:11,12 35:1 36:12

36:13 37:2 40:11 41:14 42:22,24 46:18 48:7,19 58:15 60:21,21,23 61:7 66:9 68:8,11 72:13 72:19,20,21 99:11 100:10,11 106:19 112:14 113:10,23 120:4,6 122:18 152:18,24 153:4,6 154:13,18 155:1 160:7,15 162:22 182:8 185:10
**whereof**
194:14
**whether**
22:14 37:22 39:15 47:2,16 50:16 52:19 54:23,24 68:22 69:1 69:2 72:1 73:6 76:14,18 78:22,24 83:4 111:13 122:24 125:22 126:22,24 127:19 129:21 132:10 153:21,22 153:24 170:14 185:1 191:3,6
**which**
7:16 25:7 28:3 39:5 44:22 46:19 47:4,5 48:3 52:8 59:22 63:6 67:8 71:5 76:22,23 77:22 80:2 85:8 88:18,21 92:13 95:3 97:8 102:4,19 108:21 109:17 112:13 115:4 119:1 121:1 133:20 134:1 134:11,19 135:4 142:13 143:4 147:1 147:3 148:22 149:3 149:21 155:21,21 161:15 162:15 168:1,2 169:21 172:4 173:22 179:23 181:12 189:3,8 194:13
**whichever**
29:21
**while**
17:1 21:16
**who**
5:23 20:7 21:7 32:17 46:3 53:17,18 58:10 59:2 74:14,24 75:2 75:2 80:21 81:10,13 86:7 88:23 97:6,18 98:11,16,18,19 100:5 114:10,24 115:2 118:20 123:14 124:3,11 125:16 146:18 147:10,12 170:10 171:18 180:10 181:17,20 183:3 188:20 190:21
**whoever**
54:22 55:11,19,20,22 56:16 74:17 182:18
**whole**
89:6 99:21 152:8 167:2 194:6
**whom**
23:9 55:10
**whose**
3:11
**who's**
81:3 82:19 124:13 170:11
**why**
39:5 79:18 91:5 92:20 96:9,12 97:1 97:3 98:20,21,22 99:4 109:22 110:3 110:19,20 116:22 118:17 119:6 126:1 126:12 134:4 135:11 138:9,9 149:2 158:19 161:24 172:22 176:3 184:6
**will**
39:24 41:23 63:20 74:12 77:6 89:4 104:20 105:20 122:19 128:11 150:3,20 165:20 172:12 175:13 177:17 179:11 185:13 189:18 192:13
**willing**
36:1 38:19 51:6 58:12,22 76:19 108:16,18 150:7,16
**willingness**
117:14
**Wilson**
62:13,15
**wind**
35:4
**wishes**
141:5
**within**
42:3 61:7 67:20 71:1 112:9 113:23 126:21 129:20 141:11 147:24 156:10
**within-named**
194:5
**without**
85:23 92:15 93:8 103:18 119:5 139:7 172:8
**witness**
3:12 4:3 60:5,11 78:16 116:9 178:15 189:21 194:7,14
**won't**
162:3 177:19
**Woodings**
123:23,24 124:1 169:1
**word**
36:7 80:17 117:22 172:23
**work**
17:11 65:9,17 67:23 74:12 100:1,6 167:7 188:20
**worked**
82:17,18 165:18 170:21,22
**working**
51:13 80:7 93:23 98:3
**works**
81:13 167:15 180:5
**work-in-progress**
69:24 99:23 157:2
**worth**
36:10
**worthwhile**
43:12
**wouldn't**
97:3 123:3 165:14,24
**wrap**
125:7
**writing**
3:10 105:23 116:18 176:6 186:16
**written**
88:1 112:14 123:18
**wrong**
9:5 27:9 63:19 121:13 132:20

**X**

**X**
4:1 67:16 81:2 107:3
**Xs**
67:18,19

**Y**

**Y**
81:2
**yeah**
6:21 7:14 14:10 15:5 15:17 16:11 20:3

27:7,21 28:1 34:8 35:19 37:11 41:20 45:12 49:19 53:8,9 54:8 56:18 61:11 62:15 64:17 66:15 66:20 71:4 72:22 79:20,22,22 82:9 85:3 89:18 93:10 94:6,7,12,21 95:11 97:16 99:9 104:22 105:17 107:24 113:2,22 115:8 119:15 121:22 122:3,4 123:24 125:18 128:22 136:20 137:7 141:21 142:1 144:9 152:19 153:1 155:15 174:9 182:22 191:1 192:12

**year**
6:18 16:8 27:8 28:12 59:23

**years**
7:1 8:13 12:21 27:12 27:13 154:5 155:11 168:7 186:9

**yes-or-no**
91:8

**yet**
56:13,17 85:12 100:9 124:18

**young**
14:24

**yourself**
34:19 112:2 152:13 166:10 173:15 183:19

**you'd**
144:9 145:2

**you'll**
26:1 64:8 181:4

**you're**
8:6 9:13 12:12 19:24 20:18 23:20,22 24:2 25:6 28:4 35:1,5 37:2,5 38:14,19 39:6,7,8,14,17,18 40:10,11,19 42:8 54:24 56:15,19 66:13,14 72:21 79:3 79:6 80:21 81:3 83:21 86:10 88:6 90:13,20 94:6 100:21 101:22,24 103:5 108:12 109:16 110:10,11 112:7,11 114:13,14 117:19 120:7 130:12 132:24 136:18 138:21 139:9 140:19 141:19 152:16 154:9 173:14 175:24 176:1 180:18 188:3,4,12

**you've**
13:24 17:17,20,23 18:24 20:14,16 23:10 27:7 39:10 92:23 93:3 111:11 115:19 121:23 128:2 133:3 143:14 150:12 153:10 158:22,22,23 175:23 184:20 187:24 188:2

**Z**

**Z**
81:2

**zero**
38:9 179:24

**zone**
134:20

**zoned**
38:5,7 39:2

**zoning**
4:8 12:6 13:16 14:2 22:14 28:16 30:22 33:22 38:23 39:12 39:14,24 40:3,12 43:2,20 44:1,3,4,19 44:20,23 45:4,9 54:21 56:1,17,20 63:1 64:18 66:6 67:1,21 75:4,14 77:10,14,16 78:22 79:4,7,7,15 83:8,18 83:21 84:21 86:13 88:10 89:4,5,12,14 91:23 94:4 95:23 97:7,14 103:16 104:15 112:1 115:3 117:3,4,13 118:4,5 119:20 120:1 129:17 133:1 142:4 144:2,7,12,13 155:1 155:2,4 156:10,11 156:13,14,15,15 157:4 187:9,16

**$**

**$11**
155:22 176:14

**$180,000**
179:15

**$5**
181:12

**$7**
34:13 184:14

**$7-plus**
76:10,12

**1**

**1**
142:20 143:7 148:21 178:23

**1:11**
125:3

**10**
1:13 3:1 65:19 114:7 120:16 125:1 177:9 193:5

**10,000**
148:21

**11**
4:14 89:2,3 151:12 159:13 160:1

**11:55**
124:22

**12**
4:7 59:19 148:22 160:23

**12th**
157:22 160:17,17,22

**120,000**
148:20,22

**142**
4:11

**151**
4:13

**16-unit**
107:11

**17**
107:11

**170**
29:15

**19**
4:10 63:1 64:9 67:23 70:5,19 93:18 100:10 128:9,9

**19-12**
100:24

**19-2**
66:14 100:23 133:13 133:16

**19-3**
102:19

**19.01**
73:2 100:10

**19.03**
65:20,22 73:12 75:23 76:16 80:2

**1997**
6:12

**2**

**2**

178:24
**2:00**
149:14,14
**2:24-CV-03761**
1:6
**20**
28:21 29:16 30:6 89:17 119:21 122:14 170:7 177:9
**200**
30:13 189:13
**2016**
7:9 8:18
**2019**
7:21 9:1 168:9
**2020**
16:8 64:11 112:22 113:4
**2021**
31:24 33:7
**2022**
33:13
**2023**
4:14 47:14 56:8 60:1 60:2 83:11 84:6 85:12,18 87:23 91:20 151:13 159:13 160:1,24
**2023-ish**
16:10
**2025**
1:13 3:1 125:1 193:5 194:15
**2028**
194:22
**22**
34:2
**220**
28:17 30:12
**23**
64:11 112:22 113:4
**24**
63:6
**240**
29:15
**240,000**
179:18
**25**
13:11 134:9
**250**
134:11
**250-foot**
134:6,17
**2500**
2:10
**252**
30:4
**2550**
1:15
**26**
6:12
**26th**
194:15
**28(D)**
194:13
**296**
90:5 179:16

**3**

**3**
64:7
**3rd**
2:5
**3-minute**
153:2
**3:04**
193:5
**30**
108:22
**30(b)**
14:8,11 17:20 25:5 37:8
**30(b)(5)**
42:23 130:13
**30(b)(6)**
17:18,21 18:24 20:16 23:20 24:2 130:15
**33**
2:4
**336**
30:4
**350-foot**
134:19
**36/27**
62:6
**36/37**
52:13,13 61:16,20 62:12 114:17 130:7 135:23 136:24 137:20 140:6,6 155:24 176:17
**376**
90:1

**4**

**4-unit**
107:13
**40**
12:21
**400**
28:17,18 29:16,18 145:21
**42**
30:1
**43213**
2:5
**43215**
1:16 2:10
**493**
59:9 77:2,8 78:5 86:2 86:14,19,24 87:6,10 87:14,24 88:21 93:8 94:15 95:1,19 97:2 99:13,15 102:13 125:10,23 126:8,15 127:2,13 128:5 129:10 136:9 149:3 149:7,22 177:9

**5**

**5**
4:4 144:20 181:8,12 182:14 183:17,19 194:22
**50**
134:9 180:12
**50-some**
179:16
**59**
4:7 60:15

**6**

**6**
107:13
**6-10**
63:6
**6.97**
90:4 118:16 140:1 177:7
**600**
6:22 30:3
**614.236.8000**
2:6
**614.683.8471**
2:11
**62**
4:8
**64**
4:10
**65**
1:15 2:9

**7**

**7**
53:23 186:8 189:3

**8**

**8**
49:15 181:6
**8-some**
90:1

**9**

**9**
120:16
**9-foot**
120:13
**9:01**
1:14 3:2
**90**
179:20

**925**
6:15

# Chapter 12
# Development Patterns
*Berlin Township*

EXHIBIT
tabbles
A

The Development Pattern information in the County-wide document related to general development approaches that can apply throughout the county. However, in Berlin Township, the Berlin Commercial Overlay and Berlin Industrial Overlays are a significant new feature in the future pattern of the township and will be specifically covered here.

## Creation of the overlays

The two overlays that were established toward the end of 2020 in order to encourage the creation of the Berlin Business Park. The overlays are created pursuant to Section 519.021(C) of the Ohio Revised Code to further the purpose of promoting the general public welfare, encouraging the efficient use of land and resources, promoting public and utility services, and encouraging innovation in the planning and building of appropriate types of retail, office, and commercial development. The overlay encourages flexibility of design to promote and accommodate environmentally sensitive and efficient use of the land, thereby allowing for a unified development that:

- Preserves unique or sensitive natural resources and integrates Open Space within developments;
- Plans the appropriate amount of infrastructure, including paved surfaces and utility easements, necessary for development;
- Reduces erosion and sedimentation by minimizing land disturbance;
- Provides an opportunity for an appropriate mix of uses;
- Enables an extensive review of design characteristics to ensure that projects are properly integrated into surroundings and are compatible with adjacent development;
- Assures compatibility between proposed land uses through appropriate development controls;
- Enhances the welfare and economy of the Township by making available a variety of employment opportunities, providers of goods and services as well as providing a variety of housing options for the Township residents;
- Encourages unified development projects that exhibit creative planning and design in ways that cannot be achieved through a standard zoning district, yet are imaginative in architectural design and are consistent with applicable public plans for the area and are compatible with surrounding land uses.

## How overlays differ from rezoning

In a typical rezoning process, an applicant brings a rezoning request and related development plan to the Zoning Commission and Trustees. This development plan typically follows the regulations of one of the zoning districts within the zoning code. The development plan usually proposes divergences from the written requirements that suit the site or desires of the applicant. The Zoning Commission votes and sends a recommendation to the Township Trustees. Trustees then vote for the rezoning with a majority decision. That decision is subject to referendum.

In an overlay in accordance with ORC 519.021(C), the township adopts a more stringent "district," specifically targeted at the uses it would like to encourage at specific locations. Applicants file Individual projects with a detailed development plan that strictly follows the standards in the code. Additional review steps are put in place since no referendum is available.



### The two Berlin Business Park overlays

The overlays were adopted in two segments, The Berlin Commercial Overlay is located east of Big Run Road (below).




The Berlin Industrial Overlay is located between Sweeny Road and Big Run Road (below).



## Berlin Business Park overlay uses

The following exhibit is intended to show the various uses that are provided in each subarea. It is not part of the adopted overlays but is intended to visually indicate where certain uses can be located.




*Land Use Exhibit provided during original adoption of the overlays.*

| | | |
|---|---|---|
| | R-4 and R-10 | Residential, either at 4 units per acre or 10 units per acre |
| | C/R-10/MU | Commercial or Residential at 10 units per acre |
| | PRO/R-10/MU | Professional/Research/Office and Residential/Mixed Use |
| | PROC | Professional/Research/Office/Commercial |
| | PROC/R-10/MU | Professional/Research/Office/Commercial/Residential/Mixed Use |
| | IND | Professional/Research/Office/Commercial/Light Industrial |

Actual uses are defined within the overlay code through a table of uses. This table references the 5-digit numbering system of the North American Industrial Classification System (NAICS). This system was utilized to specifically define the allowable uses:

| 2017 U.S. NAICS CODE # | PERMITTED USES *Use map reference* | PR OC | PR O | CO M | RES |
|---|---|---|---|---|---|
| | *Subarea on zoning map* | D | B | C | R |
| | | | | | |
| 4234 | Professional and Commercial Equipment and Supplies Merchant Wholesalers | | | | |
| 423410 | Photographic Equipment and Supplies Merchant Wholesalers | X | X | | |
| 423420 | Office Equipment Merchant Wholesalers | X | X | | |
| 423430 | Computer and Computer Peripheral Equipment and Software Merchant Wholesalers | X | X | | |
| 423440 | Other Commercial Equipment Merchant Wholesalers | X | X | | |
| 423450 | Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers | X | X | | |

*(Clipped example—the overlay includes several pages of uses)*

### Tax Increment Financing

Tax Increment Financing (or TIF) is used to redirect the taxes based on an increase in value of a project to a specific set of improvements. More additional general information about TIFs is located in the County Economic Development chapter.




A 20-year/75% TIF was created for the Berlin Business Park on June 28, 2021. It will apply to commercial and industrial uses within the overlay areas noted above. Residential uses are required to be designed in buildings with at least four units, which are taxed at the commercial rate.

Improvements that can be paid for with the funds include improvements to the following roads: Sweeney, Curve, Roloson, Lackey Old State, Big Run, Dunham, Africa, Three B's and K, existing or future interchanges at Interstate Route 71 and US36/SR37, Baker, Plunkett, N. Old State, and other County and Township transportation and sewer public improvements benefiting the TIF district as determined in the Delaware County Board of Commissioners. Improvements can include constructing, reconstructing, extending, opening, widening, grading, draining, curbing, paving, resurfacing, and traffic signage and signalization, bridges or tunnels, public utilities, including water, sanitary sewer, storm sewers, storm water improvements, burial and/or relocation of utility lines, gas, electric and communications service facilities (including fiber optics), street lighting, business signage restoration or improvements, landscaping, aesthetic improvements, sidewalks, bikeways, acquisition of interests in real property, erosion and sediment control measures, and acquisition of related equipment, each together with all other necessary appurtenances thereto, which improvements will benefit the Parcels. With the exception of any public infrastructure improvements made to Interstate 71 and US36/SR37, Improvements shall be made within the jurisdictional boundaries of the Olentangy School District.

Berlin
Township est. 1820

# BERLIN TOWNSHIP ZONING RESOLUTION

*Delaware County, Ohio*
*With amendments approved **06/10/24***

EXHIBIT
tabbies
B

Original Effective Date: JANUARY 1, 1989

Revised: 7/94 & 11/94; 9/95; 12/96; 12/97 & 9/97
11/01; 8/02 & 9/02; 3/24/03 & 11/10/03; 6/28/04; 4/30/05; 2/26/07 & 12/12/07; 5/14/08 & 11/30/08; 3/09/09 & 5/27/09; 6/24/10, 7/14/10 & 8/11/10; 10/12/11; 3/27/12; 06/09/14; 06/26/17; 08/28/19; 11/23/20; 12/14/20; 06/10/24.

Reprinted by the Berlin Township Zoning Office

# ARTICLE 19 BERLIN INDUSTRIAL OVERLAY (BIO)

## SECTION 19.01: PURPOSE

The Berlin Industrial Overlay (the "BIO") is created pursuant to ORC§519.021(C) to further the purpose of promoting the general public welfare, encouraging the efficient use of land and resources, promoting public and utility services, and encouraging innovation in the planning and building of appropriate types of retail, office, commercial, and industrial development. The overlay encourages flexibility of design to promote and accommodate environmentally sensitive and efficient use of the land, thereby allowing for a unified development that:

- Preserves unique or sensitive natural resources and integrates Open Space within developments.
- Plans the appropriate amount of infrastructure, including paved surfaces and utility easements, necessary for development.
- Reduces erosion and sedimentation by minimizing land disturbance.
- Provides an opportunity for an appropriate mix of uses.
- Enables an extensive review of design characteristics to ensure that projects are properly integrated into surroundings and are compatible with adjacent development.
- Assures compatibility between proposed land uses through appropriate development controls.
- Enhances the welfare and economy of the Township by making available a variety of employment opportunities, providers of goods and services as well as providing a variety of housing options for the Township residents.
- Encourages unified development projects that exhibit creative planning and design in ways that cannot be achieved through a standard zoning district, yet are imaginative in architectural design and are consistent with applicable public plans for the area and are compatible with surrounding land uses.

## SECTION 19.02: OVERLAY AREA ESTABLISHED

The BIO encompasses, includes, overlays, and rezones the area shown on the Berlin Industrial Overlay Zoning District Map, which is incorporated herein and is hereby adopted as the official Zoning District Map for the BIO. The zoning regulations and districts in existence at the time of the effective date of the BIO rezoning shall continue to apply to all property within the BIO, unless the Berlin Township Board of Trustees (the "Trustees"), in accordance with Section 19.06, approve an application submitted by a property owner and/or their agent (the "Applicant"), to subject their property to the provisions of the BIO. Such an application shall be made in accordance with the provisions of this Article 19 and all other applicable Articles of the Berlin Township Zoning Resolution (the "Zoning Resolution").

## BERLIN INDUSTRIAL OVERLAY ZONING DISTRICT MAP




Parcels determined by the Delaware County Auditor's Office to be in existence as of September 9, 2020.

## SECTION 19.03: PERMITTED USES

A.) Within the individual Subareas of the Berlin Industrial Overlay (BIO), the following uses, as described by the North American Industrial Classification System (NAICS), shall be permitted within the subarea noted with an "X" when developed in strict compliance with the approved Development Plan and the standards of this Resolution.

The precise use or type of use of the tract shall be specified in the plan as submitted and approved.

| 2017 U.S. NAICS CODE # | PERMITTED USES *Use map reference* | *IND* | *PROC* | *COM* | *RES* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| **Utilities** | | | | | |
| 221310 | Water Supply and Irrigation Systems | X | | | |
| | | | | | |
| **Construction** | | | | | |
| 236115 | New Single-Family Housing Construction (except For-Sale Builders) | X | | | |
| 236116 | New Multifamily Housing (except For-Sale Builders) | X | | | |
| 236117 | New Housing For-Sale Builders | X | | | |
| 236118 | Residential Remodelers | X | | | |
| 236210 | Industrial Building Construction | X | | | |
| 236220 | Commercial and Institutional Building Construction | X | | | |

| 2017 U.S. NAICS CODE # | PERMITTED USES *Use map reference* | *IND* | *PROC* | *COM* | *RES* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 237110 | Water and Sewer Line and Related Structures Construction | X | | | |
| 237120 | Oil and Gas Pipeline and Related Structures Construction | X | | | |
| 237130 | Power and Communication Line and Related Structures Construction | X | | | |
| 237210 | Land Subdivision | X | | | |
| 237310 | Highway, Street, and Bridge Construction | X | | | |
| 238120 | Structural Steel and Precast Concrete Contractors | X | | | |
| 238130 | Framing Contractors | X | | | |
| 238140 | Masonry Contractors | X | | | |
| 238150 | Glass and Glazing Contractors | X | | | |
| 238160 | Roofing Contractors | X | | | |
| 238170 | Siding Contractors | X | | | |
| 238190 | Other Foundation, Structure, and Building Exterior Contractors | X | | | |
| 238210 | Electrical Contractors and Other Wiring Installation Contractors | X | | | |
| 238220 | Plumbing, Heating, and Air-Conditioning Contractors | X | | | |
| 238290 | Other Building Equipment Contractors | X | | | |
| 238310 | Drywall and Insulation Contractors | X | | | |
| 238320 | Painting and Wall Covering Contractors | X | | | |
| 238330 | Flooring Contractors | X | | | |
| 238340 | Tile and Terrazzo Contractors | X | | | |
| 238350 | Finish Carpentry Contractors | X | | | |
| 238390 | Other Building Finishing Contractors | X | | | |
| 238910 | Site Preparation Contractors | X | | | |
| 238990 | All Other Specialty Trade Contractors | X | | | |
| 323111 | Commercial Printing (except Screen and Books) | X | | | |
| 323113 | Commercial Screen Printing | X | | | |
| 323117 | Books Printing | X | | | |
| 323120 | Support Activities for Printing | X | | | |
| | | | | | |
| **Manufacturing** | | | | | |
| 333242 | Semiconductor Machinery Manufacturing | X | | | |
| 334111 | Electronic Computer Manufacturing | X | | | |
| 334112 | Computer Storage Device Manufacturing | X | | | |
| 334118 | Computer Terminal and Other Computer Peripheral Equipment Manufacturing | X | | | |
| 334210 | Telephone Apparatus Manufacturing | X | | | |
| 334220 | Radio and Television | X | | | |
| 334290 | Other Communications Equipment Manufacturing | X | | | |
| 334310 | Audio and Video Equipment Manufacturing | X | | | |
| 334510 | Electromedical and Electrotherapeutic Apparatus Manufacturing | X | | | |
| 334511 | Search, Detection, Navigation, Guidance, Aeronautical, and Nautical System and Instrument Manufacturing | X | | | |
| 334512 | Instruments and Related Products Manufacturing for Measuring, Displaying, and Controlling Industrial Process Variables | X | | | |
| 334514 | Totalizing Fluid Meter and Counting Device Manufacturing | X | | | |
| 334515 | Instrument Manufacturing for Measuring and Testing Electricity and Electrical Signals | X | | | |
| 334516 | Analytical laboratory Instrument Manufacturing | X | | | |
| 334519 | Other Measuring and Controlling Device Manufacturing | X | | | |
| 334613 | Blank Magnetic and Optical Recording Media Manufacturing | X | | | |
| 334614 | Software and Other Prerecorded Compact Disc, Tape, and Record Reproducing | X | | | |
| 339112 | Surgical and Medical Instrument Manufacturing | X | | | |
| 339113 | Surgical Appliance and Supplies Manufacturing | X | | | |
| 339114 | Dental Equipment and Supplies Manufacturing | X | | | |

| 2017 U.S. NAICS CODE # | PERMITTED USES<br>*Use map reference* | *IND* | *PROC* | *COM* | *RES* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 339115 | Ophthalmic Goods Manufacturing | X | | | |
| 339116 | Dental Laboratories | X | | | |
| 339910 | Jewelry and Silverware Manufacturing | X | | | |
| 339920 | Sporting and Athletic Goods Manufacturing | X | | | |
| 339930 | Doll, Toy, and Game Manufacturing | X | | | |
| 339940 | Office Supplies (except Paper) Manufacturing | X | | | |
| 339950 | Sign Manufacturing | X | | | |
| 339991 | Gasket, Packing, and Sealing Device Manufacturing | X | | | |
| 339992 | Musical Instrument Manufacturing | X | | | |
| 339993 | Fastener, Button, Needle, and Pin Manufacturing | X | | | |
| 339994 | Broom, Brush, and Mop Manufacturing | X | | | |
| 339995 | Burial Casket Manufacturing | X | | | |
| 339999 | All Other Miscellaneous Manufacturing | X | | | |
| 423210 | Furniture Merchant Wholesalers | X | | | |
| 423220 | Home Furnishing Merchant Wholesalers | X | | | |
| 423310 | Lumber, Plywood, Millwork, and Wood Panel Merchant Wholesalers | X | | | |
| 423320 | Brick, Stone, and Related Construction Material Merchant Wholesalers | X | | | |
| 423330 | Roofing, Siding, and Insulation Material Merchant Wholesalers | X | | | |
| 423390 | Other Construction Material Merchant Wholesalers | X | | | |
| 423410 | Photographic Equipment and Supplies Merchant Wholesalers | X | X | | |
| 423420 | Office Equipment Merchant Wholesalers | X | X | | |
| 423430 | Computer and Computer Peripheral Equipment and Software Merchant Wholesalers | X | X | | |
| 423440 | Other Commercial Equipment Merchant Wholesalers | X | X | | |
| 423450 | Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers | X | X | | |
| 423460 | Ophthalmic Goods Merchant Wholesalers | X | X | | |
| 423490 | Other Professional Equipment and Supplies Merchant Wholesalers | X | X | | |
| 423610 | Electrical Apparatus and Equipment, Wiring Supplies, and Related Equipment Merchant Wholesalers | X | X | | |
| 423620 | Household Appliances, Electric Housewares, and Consumer Electronics Merchant Wholesalers | X | X | | |
| 423690 | Other Electronic Parts and Equipment Merchant Wholesalers | X | X | | |
| 423710 | Hardware Merchant Wholesalers | X | X | | |
| 423720 | Plumbing and Heating Equipment and Supplies (Hydronics) Merchant Wholesalers | X | X | | |
| 423730 | Warm Air Heating and Air-Conditioning Equipment and Supplies Merchant Wholesalers | X | X | | |
| 423740 | Refrigeration Equipment and Supplies Merchant Wholesalers | X | X | | |
| 423810 | Construction and Mining (except Oil Well) Machinery and Equipment Merchant Wholesalers | X | | | |
| 423820 | Farm and Garden Machinery and Equipment Merchant Wholesalers | X | | | |
| 423830 | Industrial Machinery and Equipment Merchant Wholesalers | X | | | |
| 423840 | Industrial Supplies Merchant Wholesalers | X | | | |
| 423850 | Service Establishment Equipment and Supplies Merchant Wholesalers | X | | | |
| 423860 | Transportation Equipment and Supplies (except Motor Vehicle) Merchant Wholesalers | X | | | |
| 423910 | Sporting and Recreational Goods and Supplies Merchant Wholesalers | X | X | | |
| 423920 | Toy and Hobby Goods and Supplies Merchant Wholesalers | X | X | | |
| 423940 | Jewelry, Watch, Precious Stone, and Precious Metal Merchant Wholesalers | X | X | | |
| 423990 | Other Miscellaneous Durable Goods Merchant Wholesalers | X | X | | |
| 424110 | Printing and Writing Paper Merchant Wholesalers | X | X | | |
| 424120 | Stationery and Office Supplies Merchant Wholesalers | X | X | | |

| 2017 U.S. NAICS CODE # | PERMITTED USES *Use map reference* | *I N D* | *P R OC* | *C O M* | *R E S* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | **A** | **D** | **C** | **R** |
| 424130 | Industrial and Personal Service Paper Merchant Wholesalers | X | X | | |
| 424210 | Drugs and Druggists' Sundries Merchant Wholesalers | X | X | | |
| 424310 | Piece Goods, Notions, and Other Dry Goods Merchant Wholesalers | X | X | | |
| 424320 | Men's and Boys' Clothing and Furnishings Merchant Wholesalers | X | X | | |
| 424330 | Women's, Children's, and Infants' Clothing and Accessories Merchant Wholesalers | X | X | | |
| 424340 | Footwear Merchant Wholesalers | X | X | | |
| 424810 | Beer and Ale Merchant Wholesalers | X | X | | |
| 424820 | Wine and Distilled Alcoholic Beverage Merchant Wholesalers | X | X | | |
| 425110 | Business to Business Electronic Markets | X | X | | |
| 425120 | Wholesale Trade Agents and Brokers | X | X | | |
| | | | | | |
| **Retail Trade** | | | | | |
| 442110 | Furniture Stores | X | X | X | |
| 442210 | Floor Covering Stores | X | X | X | |
| 442291 | Window Treatment Stores | X | X | X | |
| 442299 | All Other Home Furnishings Stores | X | X | X | |
| 443141 | Household Appliance Stores | X | X | X | |
| 443142 | Electronics Stores | X | X | X | |
| 444110 | Home Centers | X | X | X | |
| 444120 | Paint and Wallpaper Stores | X | X | X | |
| 444130 | Hardware Stores | X | X | X | |
| 444190 | Other Building Material Dealers | X | X | X | |
| 444210 | Outdoor Power Equipment Stores | X | X | X | |
| 444220 | Nursery, Garden Center, and Farm Supply Stores | X | X | X | |
| 445110 | Supermarkets and Other Grocery (except Convenience) Stores | X | X | X | |
| 445120 | Convenience Stores | X | X | X | |
| 445220 | Fish and Seafood Markets | X | X | X | |
| 445230 | Fruit and Vegetable Markets | X | X | X | |
| 445291 | Baked Goods Stores | X | X | X | |
| 445292 | Confectionery and Nut Stores | X | X | X | |
| 445299 | All Other Specialty Food Stores | X | X | X | |
| 445310 | Beer, Wine, and Liquor Stores | X | X | X | |
| 446110 | Pharmacies and Drug Stores | X | X | X | |
| 446120 | Cosmetics, Beauty Supplies, and Perfume Stores | X | X | X | |
| 446130 | Optical Goods Stores | X | X | X | |
| 446191 | Food (Health) Supplement Stores | X | X | X | |
| 446199 | All Other Health and Personal Care Stores | X | X | X | |
| 448110 | Men's Clothing Stores | X | X | X | |
| 448120 | Women's Clothing Stores | X | X | X | |
| 448130 | Children's and Infants' Clothing Stores | X | X | X | |
| 448140 | Family Clothing Stores | X | X | X | |
| 448150 | Clothing Accessories Stores | X | X | X | |
| 448190 | Other Clothing Stores | X | X | X | |
| 448210 | Shoe Stores | X | X | X | |
| 448310 | Jewelry Stores | X | X | X | |
| 448320 | Luggage and Leather Goods Stores | X | X | X | |
| 449110 | Furniture Retailers | X | X | X | |
| 449210 | Electronic and Appliance Retailers | | | | |
| 451110 | Sporting Goods Stores | X | X | X | |
| 451120 | Hobby, Toy, and Game Stores | X | X | X | |
| 451130 | Sewing, Needlework, and Piece Goods Stores | X | X | X | |

| 2017 U.S. NAICS CODE # | PERMITTED USES *Use map reference* | *I N D* | *P R OC* | *C O M* | *R E S* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 451140 | Musical Instrument and Supplies Stores | X | X | X | |
| 451211 | Book Stores | X | X | X | |
| 451212 | News Dealers and Newsstands | X | X | X | |
| 452210 | Department Stores | X | | | |
| 452311 | Warehouse Clubs and Supercenters | X | | | |
| 452319 | All Other General Merchandise Stores | X | | | |
| 453110 | Florists | X | X | X | |
| 453210 | Office Supplies and Stationery Stores | X | X | X | |
| 453220 | Gift, Novelty, and Souvenir Stores | X | X | X | |
| 453310 | Used Merchandise Stores | X | X | X | |
| 453910 | Pet and Pet Supplies Stores | X | X | X | |
| 453920 | Art Dealers | X | X | X | |
| 454110 | Electronic Shopping and Mail-Order Houses | X | X | X | |
| | | | | | |
| **Information (except those including adult entertainment)** | | | | | |
| 511110 | Newspaper Publishers | X | X | | |
| 511120 | Periodical Publishers | X | X | | |
| 511130 | Book Publishers | X | X | | |
| 511140 | Directory and Mailing List Publishers | X | X | | |
| 511191 | Greeting Card Publishers | X | X | | |
| 511199 | All Other Publishers | X | X | | |
| 511210 | Software Publishers | X | X | | |
| 517311 | Wired Telecommunications Carriers | X | X | | |
| 517312 | Wireless Telecommunications Carriers (except Satellite) | X | X | | |
| 518210 | Data Processing, Hosting, and Related Services | X | X | | |
| 519110 | News Syndicates | X | X | | |
| 519120 | Libraries and Archives | X | X | | |
| 519130 | Internet Publishing and Broadcasting and Web Search Portals | X | X | | |
| 519190 | All Other Information Services | X | X | | |
| | | | | | |
| **Finance and Insurance** | | | | | |
| 521110 | Monetary Authorities-Central Bank | X | X | X | |
| 522110 | Commercial Banking | X | X | X | |
| 522120 | Savings Institutions | X | X | X | |
| 522130 | Credit Unions | X | X | X | |
| 522190 | Other Depository Credit Intermediation | X | X | X | |
| 522210 | Credit Card Issuing | X | X | X | |
| 522220 | Sales Financing | X | X | X | |
| 522291 | Consumer Lending | X | X | X | |
| 522292 | Real Estate Credit | X | X | X | |
| 522293 | International Trade Financing | X | X | X | |
| 522294 | Secondary Market Financing | X | X | X | |
| 522298 | All Other Non-depository Credit Intermediation | X | X | X | |
| 522310 | Mortgage and Nonmortgage Loan Brokers | X | X | X | |
| 522320 | Financial Transactions Processing. Reserve, and Clearinghouse Activities | X | X | X | |
| 522390 | Other Activities Related to Credit Intermediation | X | X | X | |
| 523110 | Investment Banking and Securities Dealing | X | X | X | |
| 523120 | Securities Brokerage | X | X | X | |
| 523130 | Commodity Contracts Dealing | X | X | X | |
| 523140 | Commodity Contracts Brokerage | X | X | X | |
| 523210 | Securities and Commodity Exchanges | X | X | X | |
| 523910 | Miscellaneous Intermediation | X | X | X | |

| **2017 U.S. NAICS CODE #** | **PERMITTED USES** *Use map reference* | ***IND*** | ***PROC*** | ***COM*** | ***RES*** |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | **A** | **D** | **C** | **R** |
| 523920 | Portfolio Management | X | X | X | |
| 523930 | Investment Advice | X | X | X | |
| 523991 | Trust, Fiduciary, and Custody Activities | X | X | X | |
| 523999 | Miscellaneous Financial Investment Activities | X | X | X | |
| 524113 | Direct Life Insurance Carriers | X | X | X | |
| 524114 | Direct Health and Medical Insurance Carriers | X | X | X | |
| 524126 | Direct Property and Casualty Insurance Carriers | X | X | X | |
| 524127 | Direct Title Insurance Carriers | X | X | X | |
| 524128 | Other Direct Insurance (except Life, Health, and Medical) Carriers | X | X | X | |
| 524130 | Reinsurance Carriers | X | X | X | |
| 524210 | Insurance Agencies and Brokerages | X | X | X | |
| 524291 | Claims Adjusting | X | X | X | |
| 524292 | Third Party Administration of Insurance and Pension Funds | X | X | X | |
| 524298 | All Other Insurance Related Activities | X | X | X | |
| 525110 | Pension Funds | X | X | X | |
| 525120 | Health and Welfare Funds | X | X | X | |
| 525190 | Other Insurance Funds | X | X | X | |
| 525910 | Open-End Investment Funds | X | X | X | |
| 525920 | Trusts, Estates, and Agency Accounts | X | X | X | |
| 525990 | Other Financial Vehicles | X | X | X | |
| | | | | | |
| **Real Estate Rental and Leasing** | | | | | |
| 531110 | Lessors of Residential Buildings and Dwellings | X | X | X | |
| 531120 | Lessors of Nonresidential Buildings (except Mini-warehouses) | X | X | X | |
| 531130 | Lessors of Mini-warehouses and Self-Storage Units | X | X | X | |
| 531190 | Lessors of Other Real Estate Property | X | X | X | |
| 531210 | Offices of Real Estate Agents and Brokers | X | X | X | |
| 531311 | Residential Property Managers | X | X | X | |
| 531312 | Nonresidential Property Managers | X | X | X | |
| 531320 | Offices of Real Estate Appraisers | X | X | X | |
| 531390 | Other Activities Related to Real Estate | X | X | X | |
| 532111 | Passenger Car Rental | X | X | X | |
| 532112 | Passenger Car Leasing | X | X | X | |
| 532120 | Truck, Utility Trailer, and RV (Recreational Vehicle) Rental and Leasing | X | X | X | |
| 532210 | Consumer Electronics and Appliances Rental | X | X | X | |
| 532281 | Formal Wear and Costume Rental | X | X | X | |
| 532282 | Video Tape and Disc Rental | X | X | X | |
| 532283 | Home Health Equipment Rental | X | X | X | |
| 532284 | Recreational Goods Rental | X | X | X | |
| 532289 | All Other Consumer Goods Rental | X | X | X | |
| 532310 | General Rental Centers | X | X | X | |
| 532411 | Commercial Air, Rail, and Water Transportation Equipment Rental and Leasing | X | X | X | |
| 532412 | Construction, Mining, and Forestry Machinery and Equipment Rental and Leasing | X | X | X | |
| 532420 | Office Machinery and Equipment Rental and Leasing | X | X | X | |
| 532490 | Other Commercial and Industrial Machinery and Equipment Rental and Leasing | X | X | X | |
| 533110 | Lessors of Nonfinancial Intangible Assets (except Copyrighted Works) | X | X | X | |
| | | | | | |
| **Professional, Scientific, and Technical Services** | | | | | |
| 541110 | Offices of Lawyers | X | X | X | |
| 541120 | Offices of Notaries | X | X | X | |
| 541191 | Title Abstract and Settlement Offices | X | X | X | |
| 541199 | All Other Legal Services | X | X | X | |

| 2017 U.S. NAICS CODE # | PERMITTED USES *Use map reference* | *I N D* | *P R OC* | *C O M* | *R E S* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 541211 | Offices of Certified Public Accountants | X | X | X | |
| 541213 | Tax Preparation Services | X | X | X | |
| 541214 | Payroll Services | X | X | X | |
| 541219 | Other Accounting Services | X | X | X | |
| 541310 | Architectural Services | X | X | X | |
| 541320 | Landscape Architectural Services | X | X | X | |
| 541330 | Engineering Services | X | X | X | |
| 541340 | Drafting Services | X | X | X | |
| 541350 | Building Inspection Services | X | X | X | |
| 541360 | Geophysical Surveying and Mapping Services | X | X | X | |
| 541370 | Surveying and Mapping (except Geophysical) Services | X | X | X | |
| 541380 | Testing Laboratories | X | X | X | |
| 541410 | Interior Design Services | X | X | X | |
| 541420 | Industrial Design Services | X | X | X | |
| 541430 | Graphic Design Services | X | X | X | |
| 541490 | Other Specialized Design Services | X | X | X | |
| 541511 | Custom Computer Programming Services | X | X | X | |
| 541512 | Computer Systems Design Services | X | X | X | |
| 541513 | Computer Facilities Management Services | X | X | X | |
| 541519 | Other Computer Related Services | X | X | X | |
| 541611 | Administrative Management and General Management Consulting Services | X | X | X | |
| 541612 | Human Resources Consulting Services | X | X | X | |
| 541613 | Marketing Consulting Services | X | X | X | |
| 541614 | Process, Physical Distribution, and Logistics Consulting Services | X | X | X | |
| 541618 | Other Management Consulting Services | X | X | X | |
| 541620 | Environmental Consulting Services | X | X | X | |
| 541690 | Other Scientific and Technical Consulting Services | X | X | X | |
| 541715 | Research and Development in Physical, Engineering, and Life Sciences | X | X | X | |
| 541810 | Advertising Agencies | X | X | X | |
| 541820 | Public Relations Agencies | X | X | X | |
| 541830 | Media Buying Agencies | X | X | X | |
| 541840 | Media Representatives | X | X | X | |
| 541850 | Outdoor Advertising | X | X | X | |
| 541860 | Direct Mail Advertising | X | X | X | |
| 541870 | Advertising Material Distribution Services | X | X | X | |
| 541890 | Other Services Related to Advertising | X | X | X | |
| 541910 | Marketing Research and Public Opinion Polling | X | X | X | |
| 541921 | Photography Studios, Portrait | X | X | X | |
| 541922 | Commercial Photography | X | X | X | |
| 541930 | Translation and Interpretation Services | X | X | X | |
| 541940 | Veterinary Services | X | X | X | |
| 541990 | All Other Professional, Scientific, and Technical Services | X | X | X | |
| | | | | | |
| **Management of Companies and Enterprises** | | | | | |
| 551111 | Offices of Bank Holding Companies | X | X | X | |
| 551112 | Offices of Other Holding Companies | X | X | X | |
| 551114 | Corporate, Subsidiary, and Regional Managing Offices | X | X | X | |
| | | | | | |
| **Administrative and Support Services** | | | | | |
| 561110 | Office Administrative Services | X | X | X | |
| 561210 | Facilities Support Services | X | X | X | |
| 561311 | Employment Placement Agencies | X | X | X | |

| 2017 U.S. NAICS CODE # | PERMITTED USES *Use map reference* | *IND* | *PROCD* | *COM* | *RES* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 561312 | Executive Search Services | X | X | X | |
| 561320 | Temporary Help Services | X | X | X | |
| 561330 | Professional Employer Organizations | X | X | X | |
| 561410 | Document Preparation Services | X | X | X | |
| 561421 | Telephone Answering Services | X | X | X | |
| 561422 | Telemarketing Bureaus and Other Contact Centers | X | X | X | |
| 561431 | Private Mail Centers | X | X | X | |
| 561439 | Other Business Service Centers (including Copy Shops) | X | X | X | |
| 561440 | Collection Agencies | X | X | X | |
| 561450 | Credit Bureaus | X | X | X | |
| 561491 | Repossession Services | X | X | X | |
| 561492 | Court Reporting and Stenotype Services | X | X | X | |
| 561499 | All Other Business Support Services | X | X | X | |
| 561510 | Travel Agencies | X | X | X | |
| 561520 | Tour Operators | X | X | X | |
| 561591 | Convention and Visitors Bureaus | X | X | X | |
| 561599 | All Other Travel Arrangement and Reservation Services | X | X | X | |
| 561611 | Investigation Services | X | X | X | |
| 561612 | Security Guards and Patrol Services | X | X | X | |
| 561613 | Armored Car Services | X | X | X | |
| 561621 | Security Systems Services (except Locksmiths) | X | X | X | |
| 561622 | Locksmiths | X | X | X | |
| 561910 | Packaging and Labeling Services | X | X | X | |
| 561920 | Convention and Trade Show Organizers | X | X | X | |
| 561990 | All Other Support Services | X | X | X | |
| | | | | | |
| **Educational Services** | | | | | |
| 611110 | Elementary and Secondary Schools | X | X | X | |
| 611210 | Junior Colleges | X | X | X | |
| 611310 | Colleges, Universities, and Professional Schools | X | X | X | |
| 611410 | Business and Secretarial Schools | X | X | X | |
| 611420 | Computer Training | X | X | X | |
| 611430 | Professional and Management Development Training | X | X | X | |
| 611511 | Cosmetology and Barber Schools | X | X | X | |
| 611512 | Flight Training | X | X | X | |
| 611513 | Apprenticeship Training | X | X | X | |
| 611519 | Other Technical and Trade Schools | X | X | X | |
| 611610 | Fine Arts Schools | X | X | X | |
| 611620 | Sports and Recreation Instruction | X | X | X | |
| 611630 | Language Schools | X | X | X | |
| 611691 | Exam Preparation and Tutoring | X | X | X | |
| 611692 | Automobile Driving Schools | X | X | X | |
| 611699 | All Other Miscellaneous Schools and Instruction | X | X | X | |
| 611710 | Educational Support Services | X | X | X | |
| | | | | | |
| **Health Care and Social Assistance** | | | | | |
| 621111 | Offices of Physicians (except Mental Health Specialists) | X | X | X | |
| 621112 | Offices of Physicians, Mental Health Specialists | X | X | X | |
| 621210 | Offices of Dentists | X | X | X | |
| 621310 | Offices of Chiropractors | X | X | X | |
| 621320 | Offices of Optometrists | X | X | X | |
| 621330 | Offices of Mental Health Practitioners (except Physicians) | X | X | X | |

Case: 2:24-cv-03761-JLG-KAJ Doc #: 103 Filed: 08/28/26 Page: 256 of 338 PAGEID #: 3708



| 2017 U.S. NAICS CODE # | PERMITTED USES *Use map reference* | *IND* | *PROC* | *COM* | *RES* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 621340 | Offices of Physical, Occupational and Speech Therapists, and Audiologists | X | X | X | |
| 621391 | Offices of Podiatrists | X | X | X | |
| 621399 | Offices of All Other Miscellaneous Health Practitioners | X | X | X | |
| 621410 | Family Planning Centers | X | X | X | |
| 621420 | Outpatient Mental Health and Substance Abuse Centers | X | X | X | |
| 621491 | HMO Medical Centers | X | X | X | |
| 621492 | Kidney Dialysis Centers | X | X | X | |
| 621493 | Freestanding Ambulatory Surgical and Emergency Centers | X | X | X | |
| 621498 | All Other Outpatient Care Centers | | | | |
| 621511 | Medical Laboratories | X | X | X | |
| 621512 | Diagnostic Imaging Centers | X | X | X | |
| 621610 | Home Health Care Services | X | X | X | |
| 621910 | Ambulance Services | X | X | X | |
| 621991 | Blood and Organ Banks | X | X | X | |
| 621999 | All Other Miscellaneous Ambulatory Health Care Services | X | X | X | |
| 622110 | General Medical and Surgical Hospitals | X | X | X | |
| 622310 | Specialty (except Psychiatric and Substance Abuse) Hospitals | X | X | X | |
| 623110 | Nursing Care Facilities (Skilled Nursing Facilities) | X | X | X | |
| 623311 | Continuing Care Retirement Communities | X | X | X | |
| 623312 | Assisted Living Facilities for the Elderly | X | X | X | |
| 623990 | Other Residential Care Facilities | X | X | X | |
| 624110 | Child and Youth Services | | | X | |
| 624120 | Services for the Elderly and Persons with Disabilities | | | | |
| 624190 | Other Individual and Family Services | | | | |
| 624310 | Vocational Rehabilitation Services | | | | |
| 624410 | Child Day Care Services | | X | X | |
| | | | | | |
| **Arts, Entertainment, and Recreation** | | | | | |
| 712110 | Museums | X | X | X | |
| 712120 | Historical Sites | X | | | |
| 712130 | Zoos and Botanical Gardens | X | | | |
| 712190 | Nature Parks and Other Similar Institutions | X | | | |
| 713910 | Golf Courses and Country Clubs | X | | | |
| 713920 | Skiing Facilities | X | X | X | |
| 713930 | Marinas | X | X | X | |
| 713940 | Fitness and Recreational Sports Centers | X | X | X | |
| 713950 | Bowling Centers | X | X | X | |
| 713990 | All Other Amusement and Recreation Industries | X | X | X | |
| | | | | | |
| **Accommodation and Food Services** | | | | | |
| 721110 | Transient Hotels (except Casino Hotels) and Motels (ORC§3731.01(A)(2)) | X | X | X | |
| 721191 | Bed-and-Breakfast Inns | X | X | X | |
| 721199 | All Other Traveler Accommodation | X | X | X | |
| 721211 | RV (Recreational Vehicle) Parks and Campgrounds | X | | | |
| 721214 | Recreational and Vacation Camps (except Campgrounds) | X | | | |
| 722310 | Food Service Contractors | X | X | X | |
| 722320 | Caterers | X | X | X | |
| 722330 | Mobile Food Services | X | X | X | |
| 722511 | Full-Service Restaurants | X | X | X | |
| 722513 | Limited-Service Restaurants | X | X | X | |
| 722514 | Cafeterias, Grill Buffets, and Buffets | X | X | X | |
| 722515 | Snack and Nonalcoholic Beverage Bars | X | X | X | |

| 2017 U.S. NAICS CODE # | PERMITTED USES<br>*Use map reference* | *IND* | *PROC* | *COM* | *RES* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| | | | | | |
| **Repair and Maintenance** | | | | | |
| 811310 | Commercial and Industrial Machinery and Equipment Repair Maintenance | X | | | |
| 811490 | Personal and Household Goods Repair and Maintenance | X | | | |
| 811212 | Computer and Office Machine Repair and Maintenance | X | | | |
| | | | | | |
| **Other Services (except Public Administration)** | | | | | |
| 812111 | Barber Shops | | X | X | |
| 812112 | Beauty Salons | | X | X | |
| 812113 | Nail Salons | | X | X | |
| 812191 | Diet and Weight Reducing Centers | | X | X | |
| 812199 | Other Personal Care Services | | X | X | |
| 812210 | Funeral Homes and Funeral Services | | X | X | |
| 812220 | Cemeteries and Crematories | | X | X | |
| 812310 | Coin-Operated Laundries and Dry-cleaners | | X | X | |
| 812320 | Dry-cleaning and Laundry Services (except Coin-Operated) | | X | X | |
| 812331 | Linen Supply | | X | X | |
| 812332 | Industrial Launderers | | X | X | |
| 812910 | Pet Care (except Veterinary) Services | | X | X | |
| 812921 | Photofinishing Laboratories (except One-Hour) | | X | X | |
| 812922 | One-Hour Photofinishing | | X | X | |
| 812930 | Parking Lots and Garages | | X | X | |
| 812990 | All Other Personal Services | | X | X | |
| 813110 | Religious Organizations | | X | X | |
| 813211 | Grantmaking Foundations | | X | X | |
| 813212 | Voluntary Health Organizations | | X | X | |
| 813219 | Other Grantmaking and Giving Services | | X | X | |
| 813311 | Human Rights Organizations | | X | X | |
| 813312 | Environment, Conservation and Wildlife Organizations | | X | X | |
| 813319 | Other Social Advocacy Organizations | | X | X | |
| 813410 | Civic and Social Organizations | | X | X | |
| 813910 | Business Associations | | X | X | |
| 813920 | Professional Organizations | | X | X | |
| 813930 | Labor Unions and Similar Labor Organizations | | X | X | |
| 813940 | Political Organizations | | X | X | |
| 813990 | Other Similar Organizations (except Business, Professional, Labor, and Political Organizations) | | X | X | |
| | | | | | |
| **Public Administration** | | | | | |
| 9211 | Executive, Legislative, and Other General Government Support | | | | |
| 921110 | Executive Offices | | X | X | |
| 921120 | Legislative Bodies | | X | X | |
| 921130 | Public Finance Activities | | X | X | |
| 921140 | Executive and Legislative Offices, Combined | | X | X | |
| 921150 | American Indian and Alaska Native Tribal Governments | | X | X | |
| 921190 | Other General Government Support | | X | X | |
| 923110 | Administration of Education Programs | | X | X | |
| 923120 | Administration of Public Health Programs | | X | X | |
| 923130 | Administration of Human Resource Programs (except Education, Public Health, and Veterans' Affairs Programs) | | X | X | |
| 923140 | Administration of Veterans' Affairs | | X | X | |
| 924110 | Administration of Air and Water Resource and Solid Waste Management | X | X | X | |

| 2017 U.S. NAICS CODE # | PERMITTED USES *Use map reference* | *IND* | *PROC* | *COM* | *RES* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| | Programs | | | | |
| 924120 | Administration of Conservation Programs | X | X | X | |
| 925110 | Administration of Housing Programs | X | X | X | |
| 925120 | Administration of Urban Planning and Community and Rural Development | X | X | X | |
| 926110 | Administration of General Economic Programs | X | X | X | |
| 926120 | Regulation and Administration of Transportation Programs | X | X | X | |
| 926130 | Regulation and Administration of Communications, Electric, Gas, and Other Utilities | X | X | X | |
| 926140 | Regulation of Agricultural Marketing and Commodities | X | X | X | |
| 926150 | Regulation, Licensing, and Inspection of Miscellaneous Commercial Sectors | X | X | X | |
| 927110 | Space Research and Technology | | X | X | |
| 928110 | National Security | | X | X | |
| 928120 | International Affairs | | X | X | |
| | | | | | |
| N/A | Residential Uses in accordance with the limitations and regulations defined in ***19.03(C) and 19.05(B)***. | | | | X |

B.) **Temporary structures** such as manufactured/mobile offices and temporary buildings may be used incidental to construction work on the premises or on adjacent public projects or during a period while the permanent structure is being constructed. The user of said structure shall obtain a permit for such temporary use, which permit shall be valid for one (1) year. The Zoning Inspector may require provisions for sanitary waste disposal, solid waste disposal and water supply, as deemed necessary. The fees for such permit and renewals thereof shall be established by the Board of Township Trustees. Said temporary structure shall be removed not later than ten (10) days after expiration of said permit.

C.) **Commercial Residential:** Within the areas labeled "R-4" or "R-10" on the BIO Overlay Map, the residential uses shall be permitted when developed in strict compliance with the approved Development Plan, including the development standards set forth in Section 19.05, and all other applicable Articles of the Zoning Resolution. Map and Text references to "R-4" within this Article only refer to the BIO and do not refer in any way to other Articles within this Resolution.

D.) Non-residential uses of a religious, cultural, education or recreational nature or character to the extent that they are designed and intended to serve the residents of the surrounding area. Said facilities may be designed to serve adjoining neighborhoods or residents if they are located in such proximity to the major thoroughfares as to permit access without burdening residential streets.

## SECTION 19.04: PROHIBITED USES

A.) Uses not specifically authorized by the express terms of this Article of the Zoning Resolution are prohibited. Such uses, if included in another District(s) in the Berlin Township Zoning Resolution, shall only be approved as a part of a rezoning procedure as permitted by the Zoning Resolution. The granting of a conditional use permit on one parcel shall not be construed to automatically permit that conditional use on any other parcel.

B.) The outdoor storage of inoperable, unlicensed or unused vehicles, including trailers detached from semi- tractors, for a period exceeding fourteen (14) days is prohibited.

C.) No trailer of any type, no boats, no motor homes, nor equipment of any type shall be parked in front of the front building line on any lot within this district. If a structure is located on said lot, the building line shall be considered to be the front wall of the structure, even if said structure is located behind the minimum building line established by this code, the restrictions in the plat or deed or the development plan.

D.) Except as specifically permitted in 19.03(B), no mobile home or mobile office structure shall be placed or occupied in this district.

E.) No trash, debris, unused property, or discarded materials shall be permitted to accumulate on any lot or parcel which creates an eyesore, hazard, or nuisance to the neighborhood or general public, as determined by the Board of Township Trustees. The Board of Township Trustees shall also retain any and all statutory authority that it may be afforded regarding nuisances, including but not limited to the authorities provided in ORC§505.

F.) No outside storage of any kind shall be permitted. All permitted uses shall be conducted completely within an enclosed building.

## SECTION 19.05: DEVELOPMENT AND DESIGN STANDARDS

A.) **PROC/COM/IND Subareas**

1.) **Minimum Tract Size per application:** five (5) acres.

2.) **Minimum Lot Width:** Shall equal at least one-half (1/2) the lot depth.

3.) **Right-of-Way Setbacks:** This overlay establishes **maximum** building setbacks from the right-of-way in an effort to create a sense of place, strengthen the image of the area and enhance the overall streetscape. The maximum building setback requirements from established or proposed public rights-of-way shall be determined by the street classification for said right-of-way as designated by the Delaware County Thoroughfare Plan. Unless otherwise noted, parking, loading spaces, and services docks are prohibited within the Right-of-Way setback. The setback may include any required utility easements and any required landscape zone.

a.) **PROC/COM:** The following **maximum** building setbacks shall apply to all buildings or structures within the PROC/COM subareas within the BIO.

i.) US 36/SR 37: maximum 60 feet

- A 10-foot right-of-way landscape zone that complies with the requirements of Section 19.05(C)(4)(g) shall be provided within this setback.
- One twenty-four (24) foot wide drive aisle is permitted within this setback, provided it is located between the building and required right-of-way landscape zone.
- Example Cross Section:




ii.) Collector and Local Roads: Maximum 30 feet

- A 10-foot building landscape zone that complies with the requirements in Section 19.09(C)(4)(g) shall be provided within this setback.
- Example Cross Sections:




b.) **IND:** The following **maximum** building setbacks shall apply to buildings or structures located within the IND subarea within the BIO:

i.) US 36/SR 37 and Collector Roads: 120 feet

- A drive aisle with one row of parking on each side (for a total 60 foot width of pavement) shall be permitted within this setback to provide convenience parking to the proposed use(s). All other parking is prohibited in this setback. If convenience parking is provided, then an eight (8) foot sidewalk must be constructed parallel to the building and connect to said parking area. An eight (8) foot building landscape zone, which complies with the minimum standards in Section 19.05(C)(4)(h) of these Design Standards, must be located between the sidewalk and the building.
- There shall be a minimum forty-foot area between the AEP easement/right-of-way line and any permitted parking (or building if no convenience parking is provided) to allow for any required utility easements and a required minimum 10-foot right-of-way landscape zone, which shall comply with requirements Section 19.05(C)(4)(g).

- Example Cross Sections:

**Industrial Use along US 36/ SR 37 Cross Section**




**Industrial Use on Collector Road Cross Section**




4.) **Minimum Side and Rear Yards:**

a.) The minimum side and rear yard setbacks shall equal one-third (1/3) the sum of the height and depth of the structure, but in no case, per Section 19.05(C)(8), shall a building or parking be constructed within two hundred and fifty feet of a lot line of an existing parcel utilized for residential purposes at the time of adoption of this overlay and as identified and defined by the list in Appendix A of this Article.

5.) **Building Height Limits**: The maximum height shall be as follows:

a.) Any building or structure constructed within PROC/COM and adjacent to an existing parcel used for residential purposes at the time of the adoption of this Resolution as defined in Section 19.05(C)(8) shall be subject to the following height requirements. All distances shall be measured from the property line adjacent to the parcel with the existing residential use. Height shall be measured from the front door threshold to the highest point on the roof:

i.) Within two-hundred and fifty (250) feet – no buildings are permitted per 19.05(C)(8).

ii.) More than two-hundred and fifty (250) feet but less than three hundred and fifty (350) feet – the maximum building height shall be twenty-five (25) feet and no more than one story.

iii.) Between three hundred and fifty (350) feet and four hundred and fifty (450) feet – the maximum building height shall be thirty-five (35) feet and no more than two stories.

iv.) More than four hundred and fifty (450) feet – the maximum building height shall be forty-five (45) feet and no more than three stories.

b.) Unless otherwise limited by Section 19.05(A)(5)(a), any building or structure in the PROC/COM shall be limited to forty-five (45) feet in height.

c.) Any building or structure constructed on a property within the subarea denoted as IND in Section 19.03(A) that is located within four hundred (400) feet of the US 36/SR 37 right-of-way line shall be limited to forty-five (45) feet in height.

d.) Unless otherwise limited by 19.05(A)(5)(c), the height for buildings and structures constructed for uses as permitted in the Subarea denoted as IND in Section 19.03 (A) shall not exceed sixty (60) feet.

e.) Any building that is subject to a forty-five (45) foot maximum height, may extend up to 47 feet for a maximum of 10 percent of the building length to allow for architectural variations, features, and designs. In no such case shall a building exceed three stories. The building length shall be measured from the furthest edges of each elevation regardless of varying recesses and projections (see example). If a development plan is phased, each building within each phase must still meet the requirement of having no more than ten percent (10%) of its building length at a maximum height of forty-seven (47) feet. The remaining ninety percent (90%) of each building's length shall have a maximum height of forty-five (45) feet. The phasing plan required in Section 19.06(C)(13) must clearly reflect the timing of construction to ensure these percentages are met.




f.) Any building located on a parcel adjacent to a School Parcel, as defined in Section 19.07, shall be limited to thirty-five (35) feet in height when said building is located within five hundred (500) feet of the school parcel line.

6.) **Rooftop Mechanical Units:** Rooftop mechanical units, antennas, and other similar apparatuses are permitted, provided they:

a.) Do not exceed eight (8) feet in height;

b.) Are clustered in one area of the roof that does not exceed twenty five percent of the total rooftop area.

i.) Upon the recommendation of the Zoning Commission, the Board of Township Trustees may approve a height and location of the mechanical units that differs from the requirements of 19.05(A)(6)(a) and (b), if it is determined that these requirements cannot be met due to engineering and/or fire department purposes. All mechanical units shall comply with the height and location requirements approved by the Board of Trustees and as shown on the approved development plan;

c.) Said mechanical units shall be screened on all sides by a wall, parapet or other similar architectural feature that does not extend more than ten (10) feet above the building height. Such screening shall be limited to the permitted area for said mechanical units, antennas or other similar apparatuses and shall not extend the entire length and/or width of the building.

B.) **Residential uses**

1.) **Minimum Tract Size:** 10 acres

2.) **Building Type and Density:** "R-4" and "R-10" residential uses shall be permitted in areas defined by the Overlay Map established in Section 19.04, provided they include multi-family residential structures that qualify as "commercial residential" by having at least four dwelling units. These types of commercial residential units include but are not limited to attached, modular, townhouse, patio, or common wall units. For the purposes of this Article, Extended Stay Hotels (ORC§3731.01(A)(3)) and Residential Hotels (ORC§3731.01(A)(4)) shall be subject to the density and maximum unit limitations defined herein.

a.) Areas designated as "R-4" are limited to multi-family residential structures that contain no more than four dwelling units per building and the density shall not exceed four (4) dwelling units per net developable acre, as defined by Article 4 of the Berlin Township Zoning Resolution.

b.) Areas designated as "R-10" may include apartment style buildings with more than four (4) dwelling units per building provided the overall density of the development does not exceed ten (10) dwelling units per net developable acre, as defined in Article 4 of the Berlin Township Zoning Resolution.

3.) **Arrangement of Structures:**

a.) **Right-of-Way Setbacks.** This overlay establishes **maximum** building setbacks from the right-of-way in an effort to create a sense of place, strengthen the image of the area and enhance the overall streetscape. The maximum building setback requirements from established or proposed public rights-of-way shall be determined by the street classification for said right-of-way as designated by the Delaware County Thoroughfare Plan. Unless otherwise noted, parking, loading spaces, and services docks are prohibited within the Right-of-Way setback. The setback may include any required utility easements and any required landscape zone.

i.) **R-10 Uses – All Roads**: 100 feet

- A drive aisle with one row of parking on each side (for a total 60-foot width of pavement) may be permitted within this setback to provide convenience parking to the proposed use(s). If such parking is provided, an eight (8) foot sidewalk must be constructed parallel to the building and connected to said parking area. An eight (8) foot building landscape zone, which complies with the requirements in Section 19.05 (C)(4)(h) must be located between the required sidewalk and the building.

- A right-of-way landscape zone that complies with the requirements in Section 19.05 (C)(4)(g) shall be provided.

- Example Cross Section:




ii.) **R-4 Uses – All Roads**: 70 feet

- Private access roads parallel to the public right-of-way and any connecting private driveways may be permitted within this setback.

- Low shrubbery landscaping is encouraged between any private, parallel access road and the public right-of-way.

- Example Cross Section:




b.) **Minimum Side and Rear Setbacks**: Shall equal one-third (1/3) the sum of the height and depth of the structure., but in no case, per Section 19.05(C)(8), shall a building or parking be constructed within two hundred and fifty feet of a lot line of an existing parcel that is used for residential purposes at the time of the adoption of this overlay.

c.) **Building Height Limits:** The following height limits shall apply as follows:

i.) R-10 Subareas: No buildings developed for residential uses within sub-areas labeled R-10 shall exceed forty-five (45) feet, or three stories, in height.

ii.) R-4 Subareas: No buildings developed for residential uses within sub-areas labeled R-4 shall exceed twenty- five (25) feet, or one story, in height

iii.) For purposes of this section, height is measured from the threshold plate at the front door to the highest point of the roof.

d.) **Rooftop Mechanical Units:** Rooftop mechanical units, antennas and other similar apparatuses, are permitted for the R-10 uses provided they:

i.) Do not exceed eight (8) feet in height; and

ii.) Are clustered in the center of the roof in an area that does not exceed twenty five percent of the total rooftop area.

Upon the recommendation of the Zoning Commission, the Board of Township Trustees may approve a height and location of the mechanical units that differs from the requirements of 19.05(B)(3)(d)(i) and (ii), if it is determined that these requirements cannot be met due to engineering and/or fire department purposes. In no such case, shall the sum of the building height and mechanical unit height exceed fifty-three (53) feet. All mechanical units shall comply with the height and location requirements approved by Board of Trustees and as shown on the approved development plan.

iii.) Said mechanical units shall be screened on all sides by a wall, parapet or other similar architectural feature that does not extend more than ten (10) feet above the building height. Such screening shall be limited to the permitted area for said mechanical units, antennas or other similar apparatuses and shall not extend the entire length and/or width of the building.

iv.) Details above shall be provided with a visual exhibit with the Development Plan.

4.) **Living Area Dimensions:** All structures constructed within this district shall contain the following minimum living area:

a.) One (1) bedroom unit: 800 square feet

b.) Two (2) bedroom unit: 900 square feet

c.) Three or more bedroom units: 1000 square feet

C.) **General Design Standards:** The purpose of the design standards is to create a unified development and design approach to the Berlin Industrial Overlay area. Due to the unique nature of the overlay, these standards, (and submission requirements defined in 19.06(C)) unless otherwise noted will supersede any general design standards including but not limited to lighting, landscaping, and sign standards found within the Berlin Zoning Resolution. The following standards shall apply to all uses and developments within the BIO.

1.) **Architectural Requirements.** Unless otherwise noted, the following requirements apply to all uses:

a.) **Site Design:** The bulk, height, and surface materials of buildings within the proposed development shall be compatible with the surrounding area. Buildings, structures, and parking areas shall be designed and located within the development in ways that conserve environmentally sensitive or unique natural, historic, or cultural features and minimize environmental impacts. An elevation of a building that fronts on US 36/SR 37 shall be designed to appear as the front façade of the building.

b.) **Building Design:** The intent of the Building Design Requirements is to create an Artisan Design theme that is unique to the Berlin Business Park by focusing on materials and colors that transcends design fads while simultaneously allowing a unique design approach for individual projects through the review and guidance from the Architectural Review Board. Buildings and structures shall be designed to enhance both areas within and surrounding the development, giving due regard to building footprints, building orientation, massing, roof shape, pitch, and exterior materials. The following material and design element requirements have been established to achieve the Artisan Design theme.

i.) **Building Materials and Design Elements:** Buildings for all uses shall be designed to be seen from three hundred sixty degrees (360°) and have the same caliber of finish on all elevations. Building additions and accessory structures, whether attached or detached, shall be of similar design, materials, and construction to that of the existing principal structure. Additionally, the following standards shall apply to the specific uses:

1.) **Commercial and Office Uses:**

a.) **Building Materials:** All exterior elevations shall be comprised of eighty (80) percent of wood, fiber cement, EFIS, Hardie Plank, and native or cultured stone. Foundations must be clad with the same natural material utilized on the building to blend with the overall architecture of the structure. Exposed cement block or split face block foundations shall be prohibited. Brick or natural materials may be utilized as an accent material provided it does not exceed twenty (20) percent of the gross exterior building wall square footage. Vinyl and/or aluminum shall be prohibited except when used for trim details such as downspouts, soffits, gutters and shutters. The use of black, gold, green, silver, opaque or any other reflective or colored glass on a building is prohibited. Frosted glass may be permitted in some cases, subject to review and recommendation of the Architectural Review Board with final approval of the Board of Trustees.

b.) **Building Colors:** Building colors shall consist of earth tones limited to browns, tans, and grays. Leaf greens, gray sky blues, and whites may be utilized as an accent and shall not be the predominant building color.



Example Cupola – media.myworshiptimes22.com

c.) **Design Elements:** Blank walls shall not be permitted. Where expanses of solid walls are necessary, they may not exceed twenty (20) feet in length. There shall be a minimum of three (3) unique design elements for every one hundred (100) feet of elevation facing a public right-of-way and a minimum of two (2) unique design elements for every one hundred (100) feet of each side and rear elevation that does not front on a public right-of-way. Design elements shall be consistent with Artisan Design theme and shall include:

- Wood columns of sufficient width as determined by the ARB;
- A door at least twenty (20) square feet in area with portico/covered entry;
- A window of at least six (6) square feet in area. Windows closer than ten (10) square feet shall be considered one (1) element;
- A cupola;
- Masonry water table;
- Trellis containing plants;
- Patio, deck or other similar features;
- Balconies that project no more than two feet into the minimum setback and have a minimum clearance of ten (10) feet from grade;
- Works of art, fountains and pools, street furniture, landscaping and garden areas that are properly integrated into the streetscape and other similar significant permanent architectural features consistent with the Artisan Design theme may be permitted, subject to a recommendation by the Architectural Review Board and approved by the Board of Township Trustees.



Example Covered Porch – ruralbuilding.com/au



Example Portico/Covered Entry with Wood Columns - Kennedvtimber.com/au



Example Trellis with Plants – decorfortheoutdoors.com



Example Wood Column - Kennedytimber.com/au



Side and rear elevations of an in-line retail development may be exempt from these design elements standards, if such elevations are not visible to customer traffic, a public right-of-way, or if a future phase of the in-line retail development is forthcoming adjacent to the elevation. Such exempt elevations shall use materials complimentary to the primary elevation and screened by the landscaping, mounding, fencing, or combination thereof, as deemed appropriate by the Architectural Review Board and approved by the Board of Township Trustees.

Example Balcony – dowmet.com



Example landscape feature – landscapingnetwork.com



Example patio – thejunkmap.com/au

d.) **Roofing:** For any building with a sloped roof, the roof shall have a minimum of 6:12 pitch. Pitched roofs must be constructed of dimensional shingles, standing seam metal, slate or simulated slate. Upon recommendation of the Zoning Commission, the Board of Township Trustees may approve flat roofs when it is determined that said roofs will blend with the overall architectural styles.

e.) **Drive Thrus:** For commercial buildings only: A drive thru, if deemed appropriate for the site, shall be designed as an integral part of the structure it serves. Features incorporated with a drive thru including, but not limited to, canopies, awning and support posts shall match the material and color scheme within this Artisan Design theme. Drive thru features shall not have any pickup window, ordering areas, signage or other related items located on the front elevation of a building or located between the building and a street right-of-way.

2.) **Industrial Uses:**

a.) All exterior elevations shall include a minimum twenty percent (20%) architectural features utilizing materials such as brick, wood, EFIS, Fiber Cement Board, Hardie Plank, stone, or other natural materials. Foundations must be clad with the same natural material utilized on the building to blend with the overall architecture of the structure. Any building elevation that is visible from a public right-of-way shall be broken up with architectural design elements, landscaping or a combination thereof.

b.) Earth tones, muted hues, and natural tones are permitted as a structure's base color. Brighter hues are permitted only as an accent feature on building elements such as awnings, doors, and trim. A mixed color palette on a single building should be carefully selected so all colors harmonize with each other.

c.) The use of black, gold, green, silver, opaque or any other reflective or colored glass on a building is prohibited. Frosted glass may be permitted in some cases, subject to the review and recommendation from the Architectural Review Board and approved by the Board of Township Trustees. Considerations shall be made for privacy and for light-sensitive operations.



on

d.) Pole Building Prohibited. All buildings shall be constructed on a continuous, permanent foundation. Pole buildings shall not be permitted.

3.) **R-4 and R-10 Uses:**

Example – R-4 Design – Houseplans.pro

a.) **Building Materials:** The exterior cladding material for all R-4 and R-10 uses shall be wood, EIFS, fiber cement, and native or cultured stone to keep consistent with the Artisan Design theme of the Berlin Business Park. Brick may be utilized as an accent but not as a predominant material. Vinyl and aluminum shall be prohibited except for downspouts, soffits, gutters, shutters. Exposed foundation material shall be stone, stamped concrete, or a textured concrete block compatible with the structure. Exposed chimneys shall have a brick or stone appearance and shall extend from the ground elevation to elevation above the roof line of the location of the chimney.



Example R-10 Design – aberfence.com/au

b.) **Design Elements:** Each elevation of a Multi-Family Building (i.e. R-10 use) must include design elements per Section 19.05(C)(1)(b)(i)(1)(c) For all townhome or common wall units (i.e. R-4 uses), there shall be a minimum of three (3) unique design elements for every forty (40) feet of elevation width for an elevation facing a public right-of-way. Each side or rear elevation that does not front on a public right-of-way must contain at least two (2) unique design elements. Typical design elements are listed below, but this is not an all-inclusive list:

- A door of at least twenty (20) square feet in area
- A window of at least six (6) square feet in area. Windows with a horizontal separation of less than ten (10) feet shall be considered as one (1) design element. Sets of adjacent windows shall be considered as one (1) design element.
- A chimney
- A Portico
- Dormer
- A gable vent of at least four (4) square feet in area
- Porches, decks or similar structures
- Balconies (may project up to two (2) feet into the minimum setback and must have a minimum clearance of ten (10) feet from grade.
- A similar significant permanent architectural feature consistent with the style of the building may be permitted, subject to a recommendation by the Architectural Review Board and approved by the Board of Township Trustees.

c.) **Garages:** Rear garages are encouraged. If front garages are provided, they shall not comprise more than thirty percent (30%) of the front elevation of the building, measured from the ground level to the lower edge of the roof. All front facing garages must not extend beyond the front plane of the building. For the purposes of this section, the front plane shall include a covered porch and a garage may be flush with the covered porch. All other off-street parking, including other garages or unenclosed parking spaces must be located behind the building's front façade.

2.) **Ground Coverage:** No more than seventy five percent (75%) of the total tract coverage of a development, exclusive of the public street rights-of-way, shall be covered by impervious surfaces. Land underneath the overhead high voltage electric transmission lines may be utilized as open space, landscaping, parking, and roads with permission from the electric company.

3.) **Open Space:**

a.) **For all uses:** Not less than twenty-five percent (25%) of the total tract acreage must be set aside as useable common open space. Open spaces may be used for retention, detention, and disposal of storm water drainage. Features which are likely to cause erosion or flooding shall not be permitted. The total tract acreage of open space shall be broken down as follows:

i.) **Central Green Space:**

1.) A minimum of fifteen percent (15%) of the total tract acreage shall be devoted to a Central Green Space that shall serve as usable green space and shall not include detention, retention or other stormwater purposes. Decorative and usable ponds are permitted and encouraged within the Central Green Space, in accordance with Section 24.08. The Central Green Space shall be easily and conveniently accessible by a paved five (5) foot walkway or eight (8) foot bikeway from all dwelling units within the tract.

2.) When streets abut the Central Green Space, the front façade of the buildings on the opposite side of the street shall face the Central Green Space rather than the rear building elevations, stormwater basins or parking lots.

ii.) **Other Open Spaces:** The remaining ten percent (10%) of required open space may be distributed throughout the tract and may be utilized for retention, detention or other stormwater purposes.

iii.) **All Open Spaces:** Open spaces for all uses shall be permanently deed restricted or platted as open space parcel to prevent future subdivision and development.

Example of Central Green Space:



4.) **Landscaping:**

a.) **Landscaping Material:** All landscaping required by the Overlay Design Standards shall meet the following requirements:

i.) Minimum tree sizes at the time of planting: Tree Type Minimum Size at the time of planting.

1.) Deciduous Trees: <u>Canopy</u> - minimum eight (8) feet in height or more, and two-inch caliper, or more, at planting. <u>Understory</u> – minimum four (4) feet in height or more, and one-and-one-half inch caliper or more, at planting.

2.) Evergreen Trees: minimum five (5) feet in height.

3.) Shrubs minimum 3 gallon, 18" spread. Decorative Grasses may be proposed as substitute for shrubs, but must meet screening purposes and be approved as part of the Development Plan.

Unless otherwise provided, landscaping material shall be installed to provide a minimum of fifty percent (50%) winter opacity and a seventy percent (70%) summer opacity, between one foot above finished grade level to the top of the required planting or hedge within four years after installation, unless the opacity requirement is met with a fence, wall, or earth mound.

ii.) All plants and trees listed on the Berlin Township Prohibited/Overused Plant and Tree List shall not be utilized. Preference will be given to plants and trees on the Berlin Township Native Plant and Tree List.

iii.) All plants shall meet or exceed American Standards for nursery stock as set forth by the American Association of Nurserymen.

iv.) All trees and landscaping shall be well maintained. Dead trees, shrubs and other landscaping material shall be promptly removed and, when required,

shall be replaced within three (3) months. Developer shall warranty any landscape material for a minimum of one (1) year.

v.) Existing landscape material to be shown on the required plan, and any material in satisfactory condition may be used to satisfy these requirements in whole or in part when such material meets the requirements and achieves the objectives of these Design Standards as recommended by the Architectural Review Board and approved by the Board of Township Trustees.

b.) **Vehicular Overhang:** Parked vehicles may hang over any required landscaping area no more than two and one-half (2-1/2) feet as long as concrete or other wheel stops are provided to insure no greater overhang or penetration of the landscape area.

c.) **Landscaping at Driveway and Street Intersections:** To ensure that landscape materials do not constitute a driving hazard, a sight triangle shall be observed at all street intersections or intersections of driveways with streets. Within this sight triangle, neither landscape material nor parked vehicles, except for required grass or ground cover, shall be permitted. Within this sight triangle, trees shall be permitted as long as, except during the early growth stages, only the tree trunk is visible between the ground and eight (8) feet above the ground, or otherwise does not present a traffic hazard. The sight triangle is defined in the following sections.

i.) Driveway Intersection Triangle: At intersections of driveways with streets, the sight triangle shall be established by locating the intersection of the street curb or edge with the driveway edge, and by measuring from this point and a distance of ten (10) feet along the driveway to a point and a distance of twenty (20) feet along the street curb to a point connecting these points.

ii.) Street Intersection Sight Triangle: At the street intersections, the sight triangle shall be formed by measuring at least fifty (50) feet along curb lines or edge of pavement and connecting these points.

d.) **Street Trees.** Deciduous street trees shall be provided outside of and immediately adjacent to all public rights-of-way and shall be spaced at a maximum of thirty (30) feet on center.

e.) **Screening Between Uses:** A fifteen (15) foot deep buffer with a continuous hedge and tree planting to provide screening between non-residential and an abutting residential use shall be installed. The required planting hedge and tree combination shall follow the minimum plant and tree size requirements as provided in Section 19.05(C)(4)(a)(i). Mounding may be used to achieve the required height and fencing may be incorporated to provide additional screening.

f.) **Perimeter Area Buffer:** When a perimeter area buffer is required per Section 19.05 (C)(7), it shall be landscaped with five (5) deciduous trees, five (5) evergreen trees, and twenty-five (25) shrubs per one hundred (100) lineal feet.

g.) **Right-of-Way Landscape Zone:** Whenever a right-of-way landscape zone is required in Section B of these Design Regulations, it shall be a minimum of ten (10) feet deep

Case: 2:24-cv-03761-JLG-KAJ Doc #: 103 Filed: 08/28/26 Page: 273 of 338 PAGEID #: 3725



and contain three (3) deciduous trees and five (5) shrubs for every 100 linear feet of right-of-way frontage.

h.) **Building Landscape Zone:** Whenever a building landscape zone is required in Section B of these Design Regulations, it shall be a minimum of eight (8) feet in depth located immediately adjacent to the building and shall contain one (1) shrub planted every five (5) linear feet.

i.) **Screening of Vehicular Use Areas:** All Vehicular Use Areas (VUA) regardless of size shall be screened with a three (3) foot average height continuous planting, hedge, fence, wall or earth mound located within a minimum four (4) foot deep area around the VUA.

j.) **Vehicular Use Area Island Landscaping:** Landscaped islands shall be provided in accordance with Section 19.05(C)(7)(c). Each landscape island shall have a minimum of one shade tree with a minimum of 2" in caliper at installation and include a minimum of fifty (50) square feet of other plant material. The remaining area of the island shall be covered with a weed mat of 3"-4" river rock. The use of mulch shall be prohibited within the landscaped islands.



k.) **Landscaping for Service Structures:** Any service structure, or accessory use structure, shall be screened whenever located in any residential zone, commercial zone, or when located on property abutting any residential zone, freeway or arterial street prohibiting driveway access. Structures may be grouped together; however, screening height requirements shall be based upon the tallest of the structures.

i.) Location of Screening: A continuous (having ninety percent (90%) opacity year-round) planting, hedge, fence, wall of earth, which would enclose any service structure on all sides unless such structure must be frequently moved, in which case screening on all but one side is required. The average height of the screening material shall be one (1) foot more than the height of the enclosed structure, but shall not be required to exceed ten (10) feet in height. Whenever a service structure is located next to a building wall, perimeter landscaping material or vehicular use area landscaping material, such walls or screening material may fulfill the screening requirements for that side of the service structure if that wall or screening material is of an average height, sufficient to meet the height requirement set out in this section. Whenever service structures are screened by plant material, such material may count towards the fulfillment of required interior or perimeter landscaping. No interior landscaping shall be required within an area screened for service structures.

ii.) Curbs to Protect Screening Material: Whenever screening material is placed around any trash disposal unit or waste collection unit that is emptied or removed mechanically on a regular occurring basis, a curb to contain the

placement of the container shall be provided within the screening material on those sides where there is such material. The curbing shall be at least one (1) foot from the material and shall be designed to prevent possible damage to the screening when the container is moved.

l.) **Tree Preservation**

i.) All trees having a trunk diameter of six (6) inches or greater as measured twenty-four (24) inches from ground level shall be preserved unless such trees are exempted as follows:

1.) Trees within public rights-of-way or utility easements, or a temporary construction easement approved by the County Engineer.

2.) Trees within the ground coverage of proposed structures or within twelve (12) feet of the perimeter of such structure.

3.) Trees that in the judgment of the township authority are damaged, disease, over mature, which interfere with utility lines or are an inappropriate or undesirable species for that specific location. It is encouraged that exempted trees subject to destruction be preserved by relocating and replanting of such trees.

ii.) Preservation of Wooded Areas: It is encouraged that efforts be made to preserve natural vegetation areas. Consideration shall be given to laying out streets, lots, structures and parking areas to avoid unnecessary destruction of heavily wooded areas or outstanding tree specimens. It is further encouraged that whenever possible, heavily wooded areas be designated as park reserves.

4.) **Access and Connectivity**

a.) **Access:** All lots shall have direct access to a public road or to a proposed access road that runs parallel to a public road. Access to US 36/SR 37 shall be limited to those locations approved by ODOT. All other access points shall be approved by the applicable permitting authority. Driveways shall also comply with Section 24.09 of the Berlin Zoning Resolution.

b.) **Vehicular Connectivity (Access Roads and/or Parking Lot Connections):** The overall design within the Development Plan must provide for vehicular connectivity between properties within the Development Plan as well as future connections to adjacent properties outside of the Development Plan boundaries. This requirement could be achieved through access roads and/or through the use of cross access easements between parking lots. This requirement has been established to reduce traffic movements on mainline roads to improve the public health and safety of those utilizing the public rights-of-way. The township may rely upon recommendations from the Delaware County Engineer or other consulting engineers to determine that the proposed method for providing connectivity is the most suitable in each particular development.

c.) If access roads are utilized to comply with this connectivity requirement, there shall be a minimum distance of 200 feet between intersections. A greater distance may be required upon recommendation by the Delaware County Engineer or a consulting engineer to avoid safety concerns.

5.) **Pavement Standards:** All private streets, roads and driveways shall be constructed to a pavement width and cross section that meets the Average Daily Traffic and weights anticipated in the Delaware County Engineer's Location and Design Manual, or shall have a design life of 20 years. Parking lot pavement with heavy truck use, as determined by the Board of Township Trustees, shall have a minimum pavement depth that includes eight (8) inches of aggregate base with two (inches) of pavement. For all other uses, parking lot drive aisles that connect to the public streets shall be constructed to public street cross sectional and design life standards within 50 feet of the edge of the public paved road.

6.) **Parking:** Parking lot areas shall be designed and constructed to minimize the visual impact of the parking area from U.S. 36/S.R. 37 (preventing a "sea of asphalt"), minimize production of excess heat and prohibit any adverse effects on drainage. Appropriately sized landscaped areas shall be provided within each parking lot area allowing for a variety of shade trees to be planted. (See 19.05(C)(4)(j) for plant materials.) In order to accomplish these goals, all off-street parking lot areas shall be designed and constructed using the "Parking Bay" concept, which consists of parking spaces grouped together, with each Parking Bay separated by landscaped tree islands as further defined in the following sections.

a.) **Vehicular Use Area Location:** All Vehicular Use Areas (VUAs) shall be located behind or to the side of the principal building and shall not encroach into the minimum Right-of-Way Setback requirements, except as otherwise noted in Section 19.05 (A) and (B). Driveways running perpendicular to a public or private street, which are used to connect the parking lot to the public or private street, are exempt from this requirement.

Vehicular Use Areas may encroach into a required internal side or rear setback but in no case shall the parking be closer than five (5) feet to internal lot lines, except in cases where the Board of Township Trustees, upon recommendation of the Architectural Review Board determines that parking lots need to straddle internal lot lines in order to comply with the connectivity requirements of Section 19.05(B). In such cases, appropriate cross access easements must be established.

b.) **Vehicular Use Area Size:** No VUA shall contain more than twenty-four (24) parking spaces, with a maximum of twelve (12) spaces in a single row for all uses, except industrial. For industrial uses, no parking bay shall contain more than forty-eight (48) parking spaces, with a maximum of twenty-four (24) spaces in a single row.

c.) **Vehicular Use Area Islands:** Each landscape island in a single loaded parking stall design shall have a minimum area of one hundred sixty-two (162) square feet with a minimum width of nine (9) feet. See 19.05(C)(4)(j) for plant materials.



d.) **Vehicular Use Area Screening:** All VUA shall be screened in accordance with Section 19.05(C)(4)(i).

e.) **Number of Parking Spaces:** Every Development Plan within the BIO shall include a detailed Parking and Loading Space Plan, which shall comply with these Design Standards. Due to the unique nature of the US 36/SR 37 Corridor, parking requirements for all development within the BIO are being established to encourage efficient use of parking areas by establishing a maximum number of spaces required and permitting sensible shared parking to reduce Impervious Surfaces and increase green space. The Total Number of Required Parking Spaces shall be calculated for each separate use within the proposed Development Plan. In no case shall the total number of parking spaces for a particular use be less than the Minimum nor more than the Maximum Number of Required Parking Spaces for said use based upon the below chart. When calculating the required number of spaces, fractional numbers shall be increased to the next whole number.

| **Use** | **Minimum Number of Required Parking Spaces** | **Maximum Number of Required Parking Spaces** |
|---|---|---|
| **Residential** | 1 space per dwelling unit | 3 spaces per dwelling unit |
| **Hotels/Motels** | 1 space per room | 2 spaces per room |
| **Warehousing within an enclosed building** | 0.50 parking spaces per 1,000 gross square feet of storage portion of the building and parking for all other uses, including the rental and management office shall be in accordance with the BIO standards | 1.25 parking spaces per 1,000 gross square feet of storage portion of the building and parking for all other uses, including the rental and management office shall be in accordance with the BIO standards |
| **All Other Uses** | 1 space per 600 gross square feet | 1 space per 365 gross square feet |
| *utilize gross square footage whenever there is a reference to square feet | | |

f.) Handicap accessible parking spaces shall be provided in accordance with the Americans with Disabilities Act requirements.

g.) All parking spaces shall be a minimum of 9 feet in width and 20 feet in length measured rectangularly and shall be served by aisleways of a minimum of 24 feet in width to permit easy and smooth access to all spaces.

h.) All VUAs and adjacent driveways shall be paved with asphalt material or cement and parking spaces shall be striped.

i.) **Loading Spaces:**

i.) All loading spaces must be located to the side or rear of the principal structure and are prohibited within any Right-of-Way Setback. Furthermore, buildings must be designed so that loading spaces are oriented away from areas designated for single family uses. In all cases, loading spaces must be screened in accordance with Section 19.05(C)(4)(i).

ii.) A loading space shall consist of a rectangular area adequate for loading and unloading and be accessible from a maneuvering area.

iii.) All loading spaces and maneuvering areas shall be located on the same lot as the use they are intended to serve.

iv.) A required loading space shall have a clearance height of not less than 15 feet and shall have minimum dimensions of not less than twelve (12) feet in width and fifty-five (55) feet in length, exclusive of any driveway, aisle, or other circulation area.

v.) The number of off-street loading spaces required for various types of uses shall be no less than as set forth in the following:

1.) **Commercial – Office subarea:** Each use in this subarea shall provide loading spaces based on gross floor area as follows:

Less than 250,000 square feet = two spaces

Over 250,000 square feet = two spaces for each 250,000 square feet or portion thereof.

2.) **Industrial:** Each use in this subarea shall provide loading spaces based on gross floor area as follows:

Under 10,000 square feet = none.

10,000 square feet or more but less than 75,000 square feet = one space.

75,000 square feet or more but less than 150,000 square feet = two spaces.

150,000 square feet or more but less than 300,000 square feet = three spaces

Over 300,000 square feet = one space for each 100,000 square feet or portion thereof.

The loading space requirements for buildings with multiple uses or tenants shall be determined based on the aggregate total of gross floor area of all uses or tenants.

j.) **Cluster Mailbox Units:** When Cluster Mailbox Units (CBUs) are utilized, an appropriate amount of off-street parking spaces shall be provided to ensure proper traffic circulation throughout the development. Final unit and parking locations and number of off-street parking spaces shall be determined and controlled by the development plan approved by the Board of Township Trustees, upon recommendations from the ARB and Zoning Commission.

7.) **Perimeter Area:**

a.) No buildings or parking shall be constructed within two hundred and fifty feet (250') of the lot line of an existing parcel utilized for residential purposes at the time of adoption of this overlay and as identified and defined by the list in Appendix A of this Article. See Section 19.05(A)(5)(a)(i-iv) and 19.05(A)(5)(c) for additional building height versus distances to lot lines. This buffer shall include a minimum eight (8) foot tall mound running parallel to the lot line abutting the existing residential use and shall be landscaped in accordance with Section 19.05(C)(4)(f). The slope of each side of the mound shall be a maximum of 3:1, and the mound shall have a minimum ten (10) foot wide crest. Existing trees, streams, and other significant natural resources shall be preserved and taken into consideration when determining mound placement. The center of the mound crest should generally be within fifty (50) feet from the lot line abutting the existing residential use with the final mound location being determined and controlled by the development plan approved by the Board of Township Trustees, upon review and recommendations by the ARB and Zoning Commission.

b.) Any new parcel, created after the adoption of this overlay from a parcel subject to the mounding requirements in Section 19.05(C)(8)(a) at the time of adoption of this overlay, shall be required to construct a mound that complies with the requirements of 19.05(C)(8)(a). Said mound shall run parallel to the existing parcel utilized for residential purposes as defined herein. Upon the recommendation of the Zoning Commission, the Township Trustees may waive or modify this mound requirement for newly created parcels, if it is determined that the intent of the mound requirements in Section 19.05(C)(8)(a) have been met.

8.) **Signs:** Signs shall be permitted and developed in accordance with Article 25 of the Berlin Township Zoning Resolution.

9.) **Lighting:**

a.) All Exterior Lighting shall comply with these standards unless specifically exempted.

b.) Exemptions:

i.) All exterior lighting fixtures producing light directly by the combustion of fossil fuels, such as kerosene lanterns or gas lamps are exempt from the requirements of this section.

ii.) Federal holiday lighting shall be exempt from the requirements of this section.

iii.) All temporary emergency lighting needed by the police, fire department, other emergency service vehicles, and public service vehicles, as well as all vehicular luminaries, shall be exempt from the requirements of this section including flashing or blinking lights.

iv.) Street lights shall be exempt from the provisions of this section.

c.) **Prohibited Lighting:**

i.) Search lights, beacons, laser source lights, or any similar high-intensity or flashing lights are prohibited, except in emergencies by police and/or fire department personnel.

d.) **Types of Fixtures:** All light fixtures shall be full cut-off type fixtures except for decorative light fixtures.

e.) **Fixture Height:**

i.) The Fixture Height in parking lots for R-4 and R-10 uses shall not exceed twelve (12) feet.

ii.) The Fixture Height in parking lots for all other uses shall not exceed twenty (20) feet.

iii.) In no case shall the Fixture Height exceed the height of the proposed building.

iv.) Lighting located under canopies shall be flush mounted or recessed within the canopy.

v.) Fixture height shall be measured from the finished grade adjacent to the base of the light fixture to the top most point of the fixture.

f.) Brightness: Exterior lighting shall use not greater than 250 watt metal-halide lamps or equivalent (32 watt) LED fixtures. Lighting shall be designed and located to have the following maximum illumination levels. The levels shall be measured at the finished grade at the Lot Line as demonstrated by a lighting plan:

i.) The maximum illumination at a Lot Line that abuts a lot zoned or used for R-4 or R-10 purposes shall be 0.3 foot-candles.

ii.) The maximum illumination at a Lot Line that abuts any other use shall be 1.0 foot-candles.

iii.) The maximum illumination at a Lot Line for properties used for outdoor sports and recreation shall be reviewed for compliance with regard to the intent of these guidelines to minimize the impact of light trespass and glare on all surrounding properties and public rights-of-way.

iv.) The illumination across any property shall be designed so as to not create excessively dark spots that may create safety issues.

g.) All lighting shall be directed toward the ground and the interior of the parcel. Uplighting shall be prohibited.

h.) All non-essential outdoor lighting fixtures for non-residential uses, including lighting for parking areas, signs, displays and aesthetic lighting, shall be turned off after business hours. Only lighting needed for safety or security may remain lit after close of business, in which case the lighting shall be reduced to the minimum level necessary. Automatic shut-off fixtures, auto-dimming to adjust lighting based on ambient lighting and the use of as little lighting as necessary without creating safety issues is encouraged.

11.) **Sidewalks and Multi-Use Paths:**

a.) **Multi-Use Path (MUP) and Sidewalks:** The roadway along 36/37 and along Roloson-Piatt Road shall have a ten (10) foot multi-use path along both sides of the road. All Arterial and Collector Roads in all subareas including residential shall have a ten (10) foot multi-use path along one side of the road and a minimum five (5) foot sidewalk on the other side of the road. All local roads shall have a minimum five (5) foot sidewalk on both sides of the road. All sidewalks, curb ramps and crosswalks shall be installed per the then local, state and federal regulations, including but not limited to the Americans with Disabilities Act requirements. MUPs and sidewalks shall be placed outside of the right-of-way and within an easement designated for such public use. Street trees shall be planted in accordance with Section 19.05(C)(4)(d) of these design regulations.

b.) Sidewalks shall connect to the building entrances and to existing sidewalks on adjacent abutting Tracts and to nearby pedestrian destination points including any transit stops.

12.) **Environmentally Sensitive Areas:** Jurisdictional wetlands, slopes greater than 20% and 100-year floodplains shall be preserved to the greatest extent possible. No structures shall be constructed within the 100-year floodplain of any stream or river. To the maximum extent possible, all-natural drainage courses, vegetation and contours in excess of 6% shall be maintained.

13.) **Utilities:**

a.) All utility lines constructed to service the proposed uses shall be located underground.

b.) All developments shall be served by central water and sewer systems. Applicant shall indicate feasibility of water supply and wastewater disposal systems from the appropriate state and/or county agencies with jurisdiction at the time of the Development Plan review.

c.) Dry detention basins are prohibited in all subareas. All stormwater basins shall be wet basins and aeration devices may be required. Bioretention basins, or rain gardens, may be used only when approved by Berlin Township. All stormwater requirements must also comply with the Ohio Department of Natural Resources Rainwater and Land Development Handbook and any applicable requirements of the Delaware County Engineer.

14.) **Noise:** There shall be quiet hours between the hours of 10:00 p.m. and 6 a.m. every day of the week in accordance with all parameters of Resolution 17-05-02.

15.) **Mailboxes:** When cluster mailbox units (CBUs) are required by the U.S.P.S., said units shall be located outside the public right-of-way and appropriately distributed throughout the development. All CBUs and associated off-street parking areas shall be privately maintained.

16.) **Supplemental Conditions and Safeguards:** The Zoning Commission and Board of Township Trustees may require additional conditions be met with regard to the type and extent of the public improvements to be installed; landscaping; improvements and maintenance of open space areas; and other development characteristics.

## SECTION 19.06: PROCESS FOR PLAN APPROVAL IN THE BERLIN INDUSTRIAL OVERLAY (BIO)

A.) **Pre-Application Meeting.** The Applicant shall engage in informal consultations with the Township Zoning Inspector and any other township staff as determined by the Board of Township Trustees at each year's organizational meeting. Such consultations may also include the Delaware County Regional Planning Commission, ODOT, the Delaware County Engineer, and other departments prior to submission of an application for approval of a Development Plan. No statement or action by Township or County officials in the course of these informal consultations shall be construed to be a waiver of any legal obligation of the Applicant or of any procedure or formal approval required by Township or County statutes or rules. Ohio's Open Meetings Law (Section 121.22 of the Ohio Revised Code) is required to be observed at all meetings involving a quorum of members of the Zoning Commission or Board of Township Trustees.

The application should provide a conceptual layout of the proposed development to allow discussion of the existing features of the site, environmental limitations of the site, and any utility and transportation- related issues.

At the conclusion of the pre-application meeting, the applicant may submit three copies of a "draft" application for the Zoning Inspector to review for completeness. Once the application is determined by the Zoning Inspector to be complete, then the applicant may move forward with a formal application per 19.06(B) below.

B.) **Application and Development Plan**: Applicant shall prepare and submit a formal application including a Development Plan, with sixteen (16) copies and one pdf digital copy along with the required fees, to the Zoning Inspector. Upon the submission of a completed application, the Zoning Inspector shall forward the application and Development Plan to the Architectural Review Board (ARB) who shall serve in an advisory capacity to the Zoning Commission and Board of Township Trustees. The application and development plan will be reviewed in accordance with the process identified in Section 19.06(D) below. The Zoning Commission shall request the DCRPC and may request other entities as it deems necessary to review and provide comments regarding the proposed Development Plan.

The Development Plan shall include in text and map form the following:

1.) A survey plat and legal description signed by a registered Ohio surveyor showing the size and location of the proposed development.

2.) A finished grading plan drawn at a scale of 1"=100' or other scale acceptable to the Zoning Inspector, showing all information pertaining to surface drainage.

3.) An exhibit demonstrating environmentally-sensitive areas such as the 100-year floodplain, wetlands, and slopes greater than 20%.

4.) A Development Plan drawn to a scale of at least 1"=100' or other scale acceptable to the Zoning Inspector demonstrating the details listed herein.

C.) **Development Plan Contents:** The Development Plan shall include in text and map form the following

1.) The general development character and all permitted uses, identified by NAICS code, and accessory uses to be located on the tract including the limitations or controls to be placed on all uses, densities if applicable, proposed lot sizes, and minimum setback requirements. Other development features, including landscaping, entrance features, signage, pathways, sidewalks,

recreational facilities, common open space areas, and all commonly owned structures shall be shown in detail identifying the quantity and type and typical section of each.

2.) Architectural design criteria including materials, colors, and renderings for all structures including proposed signs that comply with the architectural requirements of this code.

3.) Building heights and dimensions.

4.) Off-street parking.

5.) Landscape Plan identifying each plant, shrub, or tree by name, its size at planting, and rendering of how that area of the development would look in elevation.

6.) Signage plan, showing all proposed signage and dimensions.

7.) Exterior Lighting Plan to show how exterior lighting fixtures will be shaded whenever necessary to avoid casting direct light upon any adjoining property.

8.) The proposed provisions for water, fire hydrants, sanitary sewer, and surface drainage with engineering feasibility studies or other evidence of reasonableness. Line sizes and locations, detention basins and drainage structures shall be drawn. A copy of letters from the County Engineer and Sanitary Engineer stating general feasibility road geometries, surface drainage, and the provision of sewer shall be included.

9.) A Traffic Impact Analysis by a competent traffic engineer, based upon new trip generation as estimated by the Delaware County Engineer's standards and showing the proposed traffic patterns, public and private streets, and other transportation facilities, including their relationship to existing conditions, topographical and otherwise. An internal traffic flow diagram showing the vehicle movements and circulations internal to the site (including any private roads) shall also be submitted.

10.) The relationship of the proposed development to existing and probable uses of surrounding areas during the development timetable.

11.) Location of all uses within the site and the location of schools, parks and other public facility sites within or adjacent to the site.

12.) The proposed time schedule for development of the site including streets, buildings, utilities and other facilities.

13.) If the proposed timetable for development includes developing the land (including open space) in phases, all phases developed after the first, which in no event shall be less than five (5) acres or the whole tract (whichever is smaller), shall be fully described in textual form in a manner calculated to give township officials definitive guidelines for approval of future phases. This schedule shall include a detailed list of all items to be constructed in each phase of the development, including but not limited to any amenities such as fountains, tot lots, etc. This information must also include a set of documents for establishing any proposed Homeowners' Association including the proposed time frames for turning said association over to the residents. The phasing plan must also include information to clearly indicate that the requirements of Section 19.05(A)(5)(e) are being met.

14.) The ability of the applicant to carry forth this plan by control of the land and the engineering feasibility of the plan.

15.) Evidence of the applicant's ability to post a bond or an irrevocable letter of credit if the plan is approved assuring completion of public service facilities to be constructed within the project by the developer.

16) All drawings that are a part of the Development Plan shall respectively bear the seals of the preparing architect, landscape architect, and/or professional engineer. The respective professional attaching his or her seal to the drawings must be licensed to practice in the state of Ohio.

17.) The manner and method to be utilized in order to achieve and maintain compliance with the general criteria for the BIO district.

18.) Performance Standards: No use shall be conducted within this district which fails to maintain the standards defined in Section 24.17.

19.) The proposed locations of any proposed cluster mailbox units (CBUs), associated off-street parking spaces, and proposed methods for maintaining said units and parking spaces.

20.) The Township Zoning Commission and Board of Township Trustees may impose special additional conditions relating to the development with regard to type and extent of public improvements to be installed. This includes but is not limited to, landscaping, development, improvement, and maintenance of common open space as well as any other pertinent development characteristics.

D.) **Architectural Review Board, Zoning Commission, and Trustee Action:**

1.) **The Architectural Review Board (ARB)** shall, upon receipt from the Zoning Inspector of a completed Application and Development Plan, schedule and hold a public hearing within thirty (30) days and shall give the applicant and all owners of property within, contiguous to, and directly across the street from the area subject to the Application written notice at least ten (10) days before the date of the ARB hearing. Notice shall be sent by regular, first class mail to the addresses of those owners as they appear on the County Auditor's then current tax list. The failure of delivery of that notice shall not invalidate any action of the ARB. The ARB shall render a recommendation to the Zoning Commission at the conclusion of the ARB hearing and shall forward the recommendation to the Zoning Commission.

2.) **The Zoning Commission** shall, within thirty (30) days of the conclusion of the ARB meeting, schedule and hold a public hearing and shall give the applicant and all owners of property within, contiguous to, and directly across the street from the area subject to the Application written notice of the hearing at least ten (10) days before the date of the Zoning Commission hearing. Notice shall be sent by regular, first class mail to the addresses of those owners as they appear on the County Auditor's then current tax list. The failure of delivery of that notice shall not invalidate any action the Zoning Commission may take on the Application. The Zoning Commission shall render a recommendation to the Board of Trustees at the conclusion of the Zoning Commission hearing and shall forward the recommendation to the Board of Trustees.

3.) **The Board of Trustees** shall, within thirty (30) days of the receipt of the recommendation from the Zoning Commission, schedule and hold a public hearing to consider approval of the application and Development Plan, and shall give the applicant and all owners of property within, contiguous to, and directly across the street from the area subject to the Application written notice of the hearing at least ten (10) days before the date of the hearing. Notice shall be sent by regular, first class mail to the addresses of those owners as they appear on the then County Auditor's current tax list. The failure of delivery of that notice shall not invalidate any action the Board of Trustees may take on the Application. The Board of Trustees shall render a decision on the Application and Development Plan at the conclusion of the hearing, unless the applicant requests a delay of action (tabling) for a specific period of time.

E.) **Basis of Approval**. In determining whether or not to approve an Application and Development Plan, the reviewing authorities shall consider the following:

1.) That the proposed development is consistent in all aspects with the intent, and general standards of this zoning resolution.

2.) That the proposed development is in conformity with the comprehensive plan or portion thereof as it may apply.

3.) That the proposed development advances the health, safety and morals of the township and the immediate vicinity.

4.) That the proposed development is in keeping with the existing land use character and physical development potential of the area.

5.) That the proposed development will be compatible in appearance with the remainder of the district; and

6.) That the minimum open space as required herein has been provided.

7.) That the proposed development is in the interest of public health, safety, welfare and morals of the township.

F.) **Effect of Approval.**

1.) The Trustee determination on said application shall not be considered to be an amendment to the Township Zoning Resolution for purposes of Section 519.12 of the Revised Code, but may be appealed pursuant to Chapter 2506 of the Revised Code. If the Board of Trustees make a final determination that the Development Plan included in the Application complies with this Article (or if the Board of Trustees' final determination is one of noncompliance and a court of competent jurisdiction makes a final non-appealable order finding compliance) the Board of Trustees shall approve the Application and upon approval shall cause the Zoning Map to be changed so that any other zoning district that applied to the property that is the subject of the Application no longer applies to that property. The removal of the prior zoning district from the Zoning Map is a ministerial act and shall not be considered to be an amendment to the Township Zoning Resolution for the purposes of Section 519.12 of the Revised Code and may not be appealed pursuant to Chapter 2506 of the Revised Code.

2.) **Approval Period**: The approval of the Development Plan shall be effective for a period of five (5) years (or for such other time period as may be approved as part of the Development Plan)

in order to allow for the preparation and recording of a subdivision plat (if required under applicable law) and the commencement of construction following the issuance of a zoning permit(s). If no plat has been recorded within this approval period (or, if platting is not required, if construction has not commenced) and unless the Board of Trustees approve an extension of this time limit, the Development Plan shall expire. Upon the expiration of the Development Plan, the subject parcel(s) shall remain zoned Berlin Industrial Overlay (BIO), but no use shall be established or changed and no building, structure or improvement shall be constructed until a new Application accompanied by a new Development Plan have been filed with and approved by the Zoning Commission and Board of Trustees using the procedures and approval process for an initial Development Plan.

3.) **Plat Required.** The Development Plan as approved by the Board of Trustees shall be the subject of a subdivision plat to be approved by the Delaware County Regional Planning Commission if required by the Ohio Revised Code or county subdivision regulations. Where the land is to be developed in phases, plans for phases subsequent to the first phase shall be submitted in accordance with the timetable in the approved Development Plan. If required by applicable law, no use shall be established or changed, and no structure shall be constructed or altered until the required subdivision plat has been prepared and recorded in accordance with the Subdivision Regulations for Delaware County, Ohio, and this Zoning Resolution. The subdivision plan and plat shall be in accordance with the approved Development Plan.

4.) **Zoning Certificate**: No zoning certificate shall be issued for any structure in any portion of the Berlin Industrial Overlay (BIO) for which a plat is required by the Delaware County Regional Planning Commission unless the subdivision plat for that portion has been approved by the applicable platting authorities and recorded with the Delaware County Recorder in accordance with the approved Development Plan and with the Subdivision Regulations of Delaware County, Ohio.

5.) **Changes in Approved Development Plan:** If any changes to the approved Development Plan are required and/or desired for any reason, said changes must be approved in accordance with Section 19.06(F)(7). These reasons include but are not limited to unforeseen site conditions, meeting the requirements of other review agencies, including but not limited to the Delaware County Regional Planning Commission, Delaware County Engineer's office, ODOT or other regulatory agency, and other similar reasons.

6.) **Extension:** An extension of the time limit for either recording the approved subdivision plat or the commencement of construction may be granted by the Board of Trustees upon Application of the owner(s), provided the Board of Trustees determines that such an extension is not in conflict with the public interest, that there is a legitimate purpose and necessity for such extension, and that the applicant shows evidence of a reasonable effort toward the accomplishment of the recordation of the plat and the completion of the development of the project. The length of time permitted for an extension shall be determined based upon the Application submitted and at the discretion of the Board of Trustees. A request for extension shall be filed prior to the expiration of the established approval period.

7.) **Modifications:** Upon submittal of a written application specifically detailing the changes requested to an Approved Development Plan and the justification(s) for the modification request, the Zoning Inspector shall refer the application to the Township Zoning Commission.

Within thirty (30) days of receiving an application, the Zoning Commission shall schedule and conduct a public meeting to consider whether the owner(s) has made reasonable and diligent efforts toward the accomplishment of the original Development Plan, and that such modification is not in conflict with the intent and purpose of the Berlin Industrial Overlay (BIO). The Zoning Commission shall give the applicant and all owners of property within, contiguous to, and directly across the street from the area subject to the Application written notice at least ten (10) days before the date of the Zoning Commission hearing. Notice shall be sent by regular, first class mail to the addresses of those owners as they appear on the County Auditor's then current tax list. The failure of delivery of that notice shall not invalidate any action of the Zoning Commission.

The Zoning Commission shall render a recommendation to the Board of Trustees for the approval, modification, or the denial of the application at the conclusion of its meeting.

Within thirty (30) days of receiving the Zoning Commission's recommendation, the Board of Trustees shall schedule and conduct a public meeting to consider the request, along with the recommendations of the Zoning Commission. The Board of Trustees shall give the applicant and all owners of property within, contiguous to, and directly across the street from the area subject to the Application written notice at least ten (10) days before the date of the Board of Trustees hearing. Notice shall be sent by regular, first class mail to the addresses of those owners as they appear on the County Auditor's then current tax list. The failure of delivery of that notice shall not invalidate any action of the Board of Trustees. The Board of Trustees shall render a decision at the conclusion of its meeting.

G.) **Fees**. A fee in an amount established by the Board of Trustees shall accompany an Application requesting approval of the Development Plan, as well as any request for extension or modification. In addition, the applicant shall also be responsible for all reasonable and necessary expenses incurred by Berlin Township in using professional consulting services to review the Development Plan. These expenses may include, without limitation, costs for professional consultants such as attorneys, architects, landscape architects, planners and engineers utilized by the Township in connection with reviewing the Development Plan and related Application materials. As soon as reasonably practicable following the submission of an Application for approval of a Development Plan, the Zoning Commission shall decide if it needs a professional consultant(s) to assist it in reviewing the application. If the Zoning Commission decides it needs professional consulting services, it shall, in its sole discretion, designate the person(s) to be consulted and make an initial estimate of the expenses anticipated to be incurred in reviewing the Application materials. The Zoning Commission shall provide the applicant with notice of its initial estimate of such expenses.

This initial estimate will be reviewed, and may be revised, from time to time during the review process, and, if such review results in an increase in the estimated professional consulting fees and charges which will be incurred in the Township's review of the Application materials, the Zoning Commission shall send the applicant written notice of the revised estimate of fees and charges. Within fourteen (14) days of the date of the notice of the initial estimate of fees and charges (and, if applicable, within fourteen (14) days of the date of the notice of any revised estimate), the applicant shall deposit in the office of the Township Fiscal Officer or the Fiscal Officer's designee, an amount equal to the estimated cost of the Township's expenses. In making the estimate of the professional consulting fees and charges anticipated to be incurred, the Zoning Commission shall consider the reasonable commercial rates of qualified professionals. Upon request, the Township shall provide the Applicant with an itemized copy of any consultant(s) bill paid for in accordance with this Section. Notwithstanding the

foregoing, bills for legal services shall only disclose the costs incurred and narrative descriptions shall not be disclosed, in that these are privileged communications and protected from disclosure under attorney-client privilege.

H.) **Failure to Maintain.** If the approved Development Plan is not adhered to, or the open space is not properly maintained, the Township Zoning Inspector may serve written notice of the deficiencies and demand that corrective action be taken. The Township may pursue noncompliance with the plan as a zoning violation which will be dealt with under Penalties for Violation within this Zoning Resolution.

I.) **Administrative Review.** All plats, construction drawings, restrictive covenants and other necessary documents shall be submitted to the Zoning Inspector, Zoning Commission, and/or their designated technical advisors for an administrative review to ensure substantial compliance with the Development Plan as approved, prior to issuance of a zoning certificate. The Board of Trustees may establish a fee to be deposited with each administrative review in order to defray the costs associated with such a review.

## APPENDIX 19.A: LIST OF EXISTING PARCELS UTILIZED FOR RESIDENTIAL PURPOSES

The following list and map indicates parcels that are considered to be existing parcels utilized for residential purposes at the time of the adoption of this Overlay.




Photo Credit: Unless otherwise noted, all pictures within this Article are from Google Maps.

41821001006003 - PLUNKETT RD
41821001028003 - 3139 CURVE RD
41821001029000 - 3046 CURVE RD
41821001036000 - 3350 CURVE RD
41821002012002 - 3503 CURVE RD
41821002017000 - 3895 CURVE RD
41821002019000 - 4001 CURVE RD
41821002036000 - 130 LACKEY OLD STATE RD
41821002037000 - 90 LACKEY OLD STATE RD
41821003001000 - 420 LACKEY OLD STATE RD
41821001010000 - 345 PLUNKETT RD
41821002001000 - 28 LACKEY OLD STATE RD
41821002001000 - 28 LACKEY OLD STATE RD
41821002014001 - 3755 CURVE RD
41821002015001 - 3781 CURVE RD
41821002016000 - 3855 CURVE RD
41821002035000 - 160 LACKEY OLD STATE RD
41822001038000 - 2826 CURVE RD
41822001041000 - 2631 CURVE RD
41822001041000 - 2631 CURVE RD
41824001006001 - 3626 CURVE RD
41824001008000 - CURVE RD
41824001010006 - 3400 CURVE RD
41824001010007 - 990 DALE FORD RD
41821001030000 - CURVE RD

41821001031000 - 3240 CURVE RD
41821001032000 - 3270 CURVE RD
41821001035000 - 3322 CURVE RD
41821002014000 - 3699 CURVE RD
41821002034000 - 192 LACKEY OLD STATE RD
41821003003000 - 436 LACKEY OLD STATE RD
41822001038001 - 2870 CURVE RD
41822001041009 - 759 SWEENEY RD
41821001006002 - 259 PLUNKETT RD
41821001008000 - 291 PLUNKETT RD
41821001014000 - 4026 BAKER RD
41821001026000 - 3041 CURVE RD
41821001027000 - 2995 CURVE RD
41821001033000 - 3298 CURVE RD
41821002013000 - 3659 CURVE RD
41821002015000 - 3779 CURVE RD
41821002018000 - 3945 CURVE RD
41821002020000 - CURVE RD
41821002021000 - 4071 CURVE RD
41821002033000 - 220 LACKEY OLD STATE RD
41821002038000 - LACKEY OLD STATE RD
41821003002000 - 428 LACKEY OLD STATE RD
41822001039000 - 2831 CURVE RD
41822001041001 - 721 SWEENEY RD
41824001007000 - 3560 CURVE RD
51830001134000 - JUMPER RD
51830001085000 - BAKER RD
51830001129000 - 2849 BAKER RD
41821001005001 - 4059 STATE ROUTE 37 E
41821001006000 - 141 PLUNKETT RD

End of Article

This page intentionally blank.

# ARTICLE 19 Berlin Industrial Overlay (BIO)

## SECTION 19.01: PURPOSE

The Berlin Industrial Overlay (the "BIO") is created pursuant to Section 519.021(C) of the Ohio Revised Code to further the purpose of promoting the general public welfare, encouraging the efficient use of land and resources, promoting public and utility services, and encouraging innovation in the planning and building of appropriate types of retail, office, commercial, and industrial development. The overlay encourages flexibility of design to promote and accommodate environmentally sensitive and efficient use of the land, thereby allowing for a unified development that:

- Preserves unique or sensitive natural resources and integrates Open Space within developments.
- Plans the appropriate amount of infrastructure, including paved surfaces and utility easements, necessary for development.
- Reduces erosion and sedimentation by minimizing land disturbance.
- Provides an opportunity for an appropriate mix of uses.
- Enables an extensive review of design characteristics to ensure that projects are properly integrated into surroundings and are compatible with adjacent development.
- Assures compatibility between proposed land uses through appropriate development controls.
- Enhances the welfare and economy of the Township by making available a variety of employment opportunities, providers of goods and services as well as providing a variety of housing options for the Township residents.
- Encourages unified development projects that exhibit creative planning and design in ways that cannot be achieved through a standard zoning district, yet are imaginative in architectural design and are consistent with applicable public plans for the area and are compatible with surrounding land uses.

## SECTION 19.02 – OVERLAY AREA ESTABLISHED

The BIO encompasses, includes, overlays, and rezones the area shown on the Berlin Industrial Overlay Zoning District Map, which is incorporated herein and is hereby adopted as the official Zoning District Map for the BIO. The zoning regulations and districts in existence at the time of the effective date of the BIO rezoning shall continue to apply to all property within the BIO, unless the Berlin Township Board of Trustees (the "Trustees"), in accordance with Section 19.06, approve an application submitted by a property owner and/or their agent (the "Applicant"), to subject their property to the provisions of the BIO. Such an application shall be made in accordance with the provisions of this Article 19 and all other applicable Articles of the Berlin Township Zoning Resolution (the "Zoning Resolution").

EXHIBIT
C

TT BZA
3

## Berlin Industrial Overlay Zoning District Map




Parcels determined by the Delaware County Auditor's Office to be in existence as of September 9, 2020.

### SECTION 19.03: PERMITTED USE TABLE

A.) Within the individual Subareas of the Berlin Industrial Overlay (BIO), the following uses, as described by the North American Industrial Classification System (NAICS), shall be permitted within the subarea noted with an "X" when developed in strict compliance with the approved Development Plan and the standards of this Resolution.

The precise use or type of use of the tract shall be specified in the plan as submitted and approved.

| 2017 U.S. NAICS CODE # | PERMITTED USES<br>*Use map reference* | *IND* | *PROC* | *COM* | *RES* |
|---|---|---|---|---|---|
| | *Subarea on zoning map* | A | D | C | R |
| Construction | | | | | |
| 2361 | Residential Building Construction | | | | |
| 236115 | New Single-Family Housing Construction (except For-Sale Builders) | X | | | |
| 236116 | New Multifamily Housing (except For-Sale Builders) | X | | | |
| 236117 | New Housing For-Sale Builders | X | | | |
| 236118 | Residential Remodelers | X | | | |
| | | | | | |

| 2017 U.S. NAICS CODE # | PERMITTED USES *Use map reference* | I N D | P R OC | C O M | R E S |
|---|---|---|---|---|---|
| | *Subarea on zoning map* | A | D | C | R |
| 2362 | Non-Residential Building Construction | | | | |
| 236210 | Industrial Building Construction | X | | | |
| 236220 | Commercial and Institutional Building Construction | X | | | |
| | | | | | |
| 2371 | Utility System Construction | | | | |
| 237110 | Water and Sewer Line and Related Structures Construction | X | | | |
| 237120 | Oil and Gas Pipeline and Related Structures Construction | X | | | |
| 237130 | Power and Communication Line and Related Structures Construction | X | | | |
| | | | | | |
| 2372 | Land Subdivision | | | | |
| 237210 | Land Subdivision | X | | | |
| | | | | | |
| 2373 | Highway, Street, and Bridge Construction | | | | |
| 237310 | Highway, Street, and Bridge Construction | X | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| 2381 | Foundation, Structure, and Building Exterior Contractors | | | | |
| 238120 | Structural Steel and Precast Concrete Contractors | X | | | |
| 238130 | Framing Contractors | X | | | |
| 238140 | Masonry Contractors | X | | | |
| 238150 | Glass and Glazing Contractors | X | | | |
| 238160 | Roofing Contractors | X | | | |
| 238170 | Siding Contractors | X | | | |
| 238190 | Other Foundation, Structure, and Building Exterior Contractors | X | | | |
| | | | | | |
| 2382 | Building Equipment Contractors | | | | |
| 238210 | Electrical Contractors and Other Wiring Installation Contractors | X | | | |
| 238220 | Plumbing, Heating, and Air-Conditioning Contractors | X | | | |
| 238290 | Other Building Equipment Contractors | X | | | |
| | | | | | |
| 2383 | Building Finishing Contractors | | | | |
| 238310 | Drywall and Insulation Contractors | X | | | |
| 238320 | Painting and Wall Covering Contractors | X | | | |
| 238330 | Flooring Contractors | X | | | |
| 238340 | Tile and Terrazzo Contractors | X | | | |
| 238350 | Finish Carpentry Contractors | X | | | |
| 238390 | Other Building Finishing Contractors | X | | | |
| | | | | | |
| 2389 | Other Specialty Trade Contractors | | | | |
| 238910 | Site Preparation Contractors | X | | | |
| 238990 | All Other Specialty Trade Contractors | X | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| 3231 | Printing and Related Support Activities | | | | |
| 323111 | Commercial Printing (except Screen and Books) | X | | | |
| 323113 | Commercial Screen Printing | X | | | |
| 323117 | Books Printing | X | | | |
| 323120 | Support Activities for Printing | X | | | |
| | | | | | |

| 2017 U.S. NAICS CODE # | PERMITTED USES<br>*Use map reference* | *IND* | *PROCD* | *COM* | *RES* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | **A** | **D** | **C** | **R** |
| 33 Manufacturing | | | | | |
| | | | | | |
| | | | | | |
| 3341 | Computer and Peripheral Equipment Manufacturing | | | | |
| 334111 | Electronic Computer Manufacturing | X | | | |
| 334112 | Computer Storage Device Manufacturing | X | | | |
| 334118 | Computer Terminal and Other Computer Peripheral Equipment Manufacturing | X | | | |
| | | | | | |
| 3342 | Communications Equipment Manufacturing | | | | |
| 334210 | Telephone Apparatus Manufacturing | X | | | |
| 334220 | Radio and Television | X | | | |
| 334290 | Other Communications Equipment Manufacturing | X | | | |
| | | | | | |
| 3343 | Audio and Video Equipment Manufacturing | | | | |
| 334310 | Audio and Video Equipment Manufacturing | X | | | |
| | | | | | |
| 3345 | Measuring and Controlling Device Manufacturing | | | | |
| 334510 | Electromedical and Electrotherapeutic Apparatus Manufacturing | X | | | |
| 334511 | Search, Detection, Navigation, Guidance, Aeronautical, and Nautical System and Instrument Manufacturing | X | | | |
| 334512 | Instruments and Related Products Manufacturing for Measuring, Displaying, and Controlling Industrial Process Variables | X | | | |
| 334514 | Totalizing Fluid Meter and Counting Device Manufacturing | X | | | |
| 334515 | Instrument Manufacturing for Measuring and Testing Electricity and Electrical Signals | X | | | |
| 334516 | Analytical laboratory Instrument Manufacturing | X | | | |
| | | | | | |
| 334519 | Other Measuring and Controlling Device Manufacturing | X | | | |
| | | | | | |
| 3346 | Manufacturing and Reproduction Magnetics and Optical Media | | | | |
| 334613 | Blank Magnetic and Optical Recording Media Manufacturing | X | | | |
| 334614 | Software and Other Prerecorded Compact Disc, Tape, and Record Reproducing | X | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| 3391 | Medical Equipment and Supplies Manufacturing | | | | |
| 339112 | Surgical and Medical Instrument Manufacturing | X | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| 2017 U.S. NAICS CODE # | PERMITTED USES *Use map reference* | *I N D* | *P R OC* | *C O M* | *R E S* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 339113 | Surgical Appliance and Supplies Manufacturing | X | | | |
| 339114 | Dental Equipment and Supplies Manufacturing | X | | | |
| 339115 | Ophthalmic Goods Manufacturing | X | | | |
| 339116 | Dental Laboratories | X | | | |
| | | | | | |
| 3399 | Other Miscellaneous Manufacturing | | | | |
| 339910 | Jewelry and Silverware Manufacturing | X | | | |
| 339920 | Sporting and Athletic Goods Manufacturing | X | | | |
| 339930 | Doll, Toy, and Game Manufacturing | X | | | |
| 339940 | Office Supplies (except Paper) Manufacturing | X | | | |
| 339950 | Sign Manufacturing | X | | | |
| 339991 | Gasket, Packing, and Sealing Device Manufacturing | X | | | |
| 339992 | Musical Instrument Manufacturing | X | | | |
| 339993 | Fastener, Button, Needle, and Pin Manufacturing | X | | | |
| 339994 | Broom, Brush, and Mop Manufacturing | X | | | |
| 339995 | Burial Casket Manufacturing | X | | | |
| 339999 | All Other Miscellaneous Manufacturing | X | | | |
| | | | | | |
| 4232 | Furniture and Home Furnishing Merchant Wholesalers | | | | |
| 423210 | Furniture Merchant Wholesalers | X | | | |
| 423220 | Home Furnishing Merchant Wholesalers | X | | | |
| | | | | | |
| 4233 | Lumber and Other Construction Materials Merchant Wholesalers | | | | |
| 423310 | Lumber, Plywood, Millwork, and Wood Panel Merchant Wholesalers | X | | | |
| 423320 | Brick, Stone, and Related Construction Material Merchant Wholesalers | X | | | |
| 423330 | Roofing, Siding, and Insulation Material Merchant Wholesalers | X | | | |
| 423390 | Other Construction Material Merchant Wholesalers | X | | | |
| | | | | | |
| 4234 | Professional and Commercial Equipment and Supplies Merchant Wholesalers | | | | |
| 423410 | Photographic Equipment and Supplies Merchant Wholesalers | X | X | | |
| 423420 | Office Equipment Merchant Wholesalers | X | X | | |
| 423430 | Computer and Computer Peripheral Equipment and Software Merchant Wholesalers | X | X | | |
| 423440 | Other Commercial Equipment Merchant Wholesalers | X | X | | |
| 423450 | Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers | X | X | | |
| 423460 | Ophthalmic Goods Merchant Wholesalers | X | X | | |
| 423490 | Other Professional Equipment and Supplies Merchant Wholesalers | X | X | | |
| | | | | | |
| 4236 | Household Appliances and Electrical and Electronic Goods Merchant Wholesalers | | | | |
| 423610 | Electrical Apparatus and Equipment, Wiring Supplies, and Related Equipment Merchant Wholesalers | X | X | | |
| 423620 | Household Appliances, Electric Housewares, and Consumer Electronics Merchant Wholesalers | X | X | | |
| 423690 | Other Electronic Parts and Equipment Merchant Wholesalers | X | X | | |
| | | | | | |

| 2017 U.S. NAICS CODE # | PERMITTED USES<br>*Use map reference* | *I N D* | *P R OC* | *C O M* | *R E S* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 4237 | Hardware, and Plumbing and Heating Equipment and Supplies Merchant Wholesalers | | | | |
| 423710 | Hardware Merchant Wholesalers | X | X | | |
| 423720 | Plumbing and Heating Equipment and Supplies (Hydronics) Merchant Wholesalers | X | X | | |
| 423730 | Warm Air Heating and Air-Conditioning Equipment and Supplies Merchant Wholesalers | X | X | | |
| 423740 | Refrigeration Equipment and Supplies Merchant Wholesalers | X | X | | |
| | | | | | |
| 4238 | Machinery, Equipment, and Supplies Merchant Wholesalers | | | | |
| 423810 | Construction and Mining (except Oil Well) Machinery and Equipment Merchant Wholesalers | X | | | |
| 423820 | Farm and Garden Machinery and Equipment Merchant Wholesalers | X | | | |
| 423830 | Industrial Machinery and Equipment Merchant Wholesalers | X | | | |
| 423840 | Industrial Supplies Merchant Wholesalers | X | | | |
| 423850 | Service Establishment Equipment and Supplies Merchant Wholesalers | X | | | |
| 423860 | Transportation Equipment and Supplies (except Motor Vehicle) Merchant Wholesalers | X | | | |
| | | | | | |
| 4239 | Miscellaneous Durable Goods Merchant Wholesalers | | | | |
| 423910 | Sporting and Recreational Goods and Supplies Merchant Wholesalers | X | X | | |
| 423920 | Toy and Hobby Goods and Supplies Merchant Wholesalers | X | X | | |
| 423940 | Jewelry, Watch, Precious Stone, and Precious Metal Merchant Wholesalers | X | X | | |
| 423990 | Other Miscellaneous Durable Goods Merchant Wholesalers | X | X | | |
| | | | | | |
| 4241 | Paper and Paper Product Merchant Wholesalers | | | | |
| 424110 | Printing and Writing Paper Merchant Wholesalers | X | X | | |
| 424120 | Stationery and Office Supplies Merchant Wholesalers | X | X | | |
| 424130 | Industrial and Personal Service Paper Merchant Wholesalers | X | X | | |
| | | | | | |
| 4242 | Drugs and Druggists' Sundries Merchant Wholesalers | | | | |
| 424210 | Drugs and Druggists' Sundries Merchant Wholesalers | X | X | | |
| | | | | | |
| 4243 | Apparel, Piece Goods, and Notions Merchant Wholesalers | | | | |
| 424310 | Piece Goods, Notions, and Other Dry Goods Merchant Wholesalers | X | X | | |
| 424320 | Men's and Boys' Clothing and Furnishings Merchant Wholesalers | X | X | | |
| 424330 | Women's, Children's, and Infants' Clothing and Accessories Merchant Wholesalers | X | X | | |
| 424340 | Footwear Merchant Wholesalers | X | X | | |
| | | | | | |
| | | | | | |
| 4248 | Beer, Wine, and Distilled Alcoholic Beverage Merchant Wholesalers | | | | |
| 424810 | Beer and Ale Merchant Wholesalers | X | X | | |
| 424820 | Wine and Distilled Alcoholic Beverage Merchant Wholesalers | X | X | | |
| | | | | | |
| | | | | | |
| 4251 | Wholesale Electronic Markets and Agents and Brokers | | | | |
| 425110 | Business to Business Electronic Markets | X | X | | |
| 425120 | Wholesale Trade Agents and Brokers | X | X | | |
| | | | | | |
| | | | | | |

| 2017 U.S. NAICS CODE # | PERMITTED USES *Use map reference* | *IND* | *PROC* | *COM* | *RES* |
|---|---|---|---|---|---|
| | *Subarea on zoning map* | A | D | C | R |
| | | | | | |
| | | | | | |
| Retail Trade | | | | | |
| 4421 | Furniture Stores | | | | |
| 442110 | Furniture Stores | X | X | X | |
| | | | | | |
| 4422 | Home Furnishings Stores | | | | |
| 442210 | Floor Covering Stores | X | X | X | |
| 442291 | Window Treatment Stores | X | X | X | |
| 442299 | All Other Home Furnishings Stores | X | X | X | |
| | | | | | |
| 4431 | Electronics and Appliances Stores | | | | |
| 443141 | Household Appliance Stores | X | X | X | |
| 443142 | Electronics Stores | X | X | X | |
| | | | | | |
| 4441 | Building Material and Supplies Dealers | | | | |
| 444110 | Home Centers | X | X | X | |
| 444120 | Paint and Wallpaper Stores | X | X | X | |
| 444130 | Hardware Stores | X | X | X | |
| 444190 | Other Building Material Dealers | X | X | X | |
| | | | | | |
| 4442 | Lawn and Garden Equipment and Supplies Stores | | | | |
| 444210 | Outdoor Power Equipment Stores | X | X | X | |
| 444220 | Nursery, Garden Center, and Farm Supply Stores | X | X | X | |
| | | | | | |
| 4451 | Grocery Stores | | | | |
| 445110 | Supermarkets and Other Grocery (except Convenience) Stores | X | X | X | |
| 445120 | Convenience Stores | X | X | X | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| 2017 U.S. NAICS CODE # | PERMITTED USES<br>*Use map reference* | *I N D* | *P R OC* | *C O M* | *R E S* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | **A** | **D** | **C** | **R** |
| 4452 | Specialty Food Stores | | | | |
| | | | | | |
| 445220 | Fish and Seafood Markets | X | X | X | |
| 445230 | Fruit and Vegetable Markets | X | X | X | |
| 445291 | Baked Goods Stores | X | X | X | |
| 445292 | Confectionery and Nut Stores | X | X | X | |
| 445299 | All Other Specialty Food Stores | X | X | X | |
| | | | | | |
| 4453 | Beer, Wine, and Liquor Stores | | | | |
| 445310 | Beer, Wine, and Liquor Stores | X | X | X | |
| | | | | | |
| 4461 | Health and Personal Care Stores | | | | |
| 446110 | Pharmacies and Drug Stores | X | X | X | |
| 446120 | Cosmetics, Beauty Supplies, and Perfume Stores | X | X | X | |
| 446130 | Optical Goods Stores | X | X | X | |
| 446191 | Food (Health) Supplement Stores | X | X | X | |
| 446199 | All Other Health and Personal Care Stores | X | X | X | |
| | | | | | |
| 4481 | Clothing Stores | | | | |
| 448110 | Men's Clothing Stores | X | X | X | |
| 448120 | Women's Clothing Stores | X | X | X | |
| 448130 | Children's and Infants' Clothing Stores | X | X | X | |
| 448140 | Family Clothing Stores | X | X | X | |
| 448150 | Clothing Accessories Stores | X | X | X | |
| 448190 | Other Clothing Stores | X | X | X | |
| | | | | | |
| 4482 | Shoe Stores | | | | |
| 448210 | Shoe Stores | X | X | X | |
| | | | | | |
| 4483 | Jewelry, Luggage, and Leather Goods Stores | | | | |
| 448310 | Jewelry Stores | X | X | X | |
| 448320 | Luggage and Leather Goods Stores | X | X | X | |
| | | | | | |
| Retail Trade | | | | | |
| 4511 | Sporting Goods, Hobby, and Musical Instrument Stores | | | | |
| 451110 | Sporting Goods Stores | X | X | X | |
| 451120 | Hobby, Toy, and Game Stores | X | X | X | |
| 451130 | Sewing, Needlework, and Piece Goods Stores | X | X | X | |
| 451140 | Musical Instrument and Supplies Stores | X | X | X | |
| 4512 | Book Stores and News Dealers | X | X | X | |
| 451211 | Book Stores | X | X | X | |
| 451212 | News Dealers and Newsstands | X | X | X | |
| | | | | | |
| 4522 | Department Stores | | | | |
| 452210 | Department Stores | X | | | |
| | | | | | |
| 4523 | General Merchandise Stores, including Warehouse Clubs and Supercenters | | | | |
| 452311 | Warehouse Clubs and Supercenters | X | | | |

| 2017 U.S. NAICS CODE # | PERMITTED USES *Use map reference* | *I N D* | *P R OC* | *C O M* | *R E S* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 452319 | All Other General Merchandise Stores | X | | | |
| | | | | | |
| 4531 | Florists | | | | |
| 453110 | Florists | X | X | X | |
| | | | | | |
| 4532 | Office Supplies, Stationery, and Gift Stores | | | | |
| 453210 | Office Supplies and Stationery Stores | X | X | X | |
| 453220 | Gift, Novelty, and Souvenir Stores | X | X | X | |
| | | | | | |
| 4533 | Used Merchandise Stores | | | | |
| 453310 | Used Merchandise Stores | X | X | X | |
| | | | | | |
| 4539 | Other Miscellaneous Store Retailers | | | | |
| 453910 | Pet and Pet Supplies Stores | X | X | X | |
| 453920 | Art Dealers | X | X | X | |
| | | | | | |
| 4541 | Electronic Shopping and Mail-Order Houses | | | | |
| 454110 | Electronic Shopping and Mail-Order Houses | X | X | X | |
| | | | | | |
| | | | | | |
| Information (except those including adult entertainment) | | | | | |
| 5111 | Newspaper, Periodical, Book, and Directory Publishers | | | | |
| 511110 | Newspaper Publishers | X | X | | |
| 511120 | Periodical Publishers | X | X | | |
| 511130 | Book Publishers | X | X | | |
| 511140 | Directory and Mailing List Publishers | X | X | | |
| 511191 | Greeting Card Publishers | X | X | | |
| 511199 | All Other Publishers | X | X | | |
| | | | | | |
| 5112 | Software Publishers | | | | |
| 511210 | Software Publishers | X | X | | |
| | | | | | |
| 5173 | Wired and Wireless Telecommunications Carriers | | | | |
| 517311 | Wired Telecommunications Carriers | X | X | | |
| 517312 | Wireless Telecommunications Carriers (except Satellite) | X | X | | |
| | | | | | |
| 5182 | Data Processing, Hosting, and Related Services | | | | |
| 518210 | Data Processing, Hosting, and Related Services | X | X | | |
| | | | | | |
| 5191 | Other Information Services | | | | |
| 519110 | News Syndicates | X | X | | |
| 519120 | Libraries and Archives | X | X | | |
| 519130 | Internet Publishing and Broadcasting and Web Search Portals | X | X | | |

| 2017 U.S. NAICS CODE # | PERMITTED USES<br>*Use map reference* | *IND* | *PROC* | *COM* | *RES* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 519190 | All Other Information Services | X | X | | |
| | | | | | |
| Finance and Insurance | | | | | |
| 5211 | Monetary Authorities-Central Bank | | | | |
| 521110 | Monetary Authorities-Central Bank | X | X | X | |
| | | | | | |
| 5221 | Depository Credit Intermediation | | | | |
| 522110 | Commercial Banking | X | X | X | |
| 522120 | Savings Institutions | X | X | X | |
| 522130 | Credit Unions | X | X | X | |
| 522190 | Other Depository Credit Intermediation | X | X | X | |
| | | | | | |
| 5222 | Nondepository Credit Intermediation | | | | |
| 522210 | Credit Card Issuing | X | X | X | |
| 522220 | Sales Financing | X | X | X | |
| 522291 | Consumer Lending | X | X | X | |
| 522292 | Real Estate Credit | X | X | X | |
| 522293 | International Trade Financing | X | X | X | |
| 522294 | Secondary Market Financing | X | X | X | |
| 522298 | All Other Nondepository Credit Intermediation | X | X | X | |
| | | | | | |
| 5223 | Activities Related to Credit Intermediation | | | | |
| 522310 | Mortgage and Nonmortgage Loan Brokers | X | X | X | |
| 522320 | Financial Transactions Processing. Reserve, and Clearinghouse Activities | X | X | X | |
| 522390 | Other Activities Related to Credit Intermediation | X | X | X | |
| | | | | | |
| 5231 | Securities and Commodity Contracts Intermediation and Brokerage | | | | |
| 523110 | Investment Banking and Securities Dealing | X | X | X | |
| 523120 | Securities Brokerage | X | X | X | |
| 523130 | Commodity Contracts Dealing | X | X | X | |
| 523140 | Commodity Contracts Brokerage | X | X | X | |
| | | | | | |
| 5232 | Securities and Commodity Exchanges | | | | |
| 523210 | Securities and Commodity Exchanges | X | X | X | |
| | | | | | |
| 5239 | Other Financial Investment Activities | | | | |
| 523910 | Miscellaneous Intermediation | X | X | X | |
| 523920 | Portfolio Management | X | X | X | |
| 523930 | Investment Advice | X | X | X | |
| 523991 | Trust, Fiduciary, and Custody Activities | X | X | X | |
| 523999 | Miscellaneous Financial Investment Activities | X | X | X | |
| | | | | | |
| 5241 | Insurance Carriers | | | | |
| 524113 | Direct Life Insurance Carriers | X | X | X | |
| 524114 | Direct Health and Medical Insurance Carriers | X | X | X | |
| 524126 | Direct Property and Casualty Insurance Carriers | X | X | X | |
| 524127 | Direct Title Insurance Carriers | X | X | X | |
| 524128 | Other Direct Insurance (except Life, Health, and Medical) Carriers | X | X | X | |

| 2017 U.S. NAICS CODE # | PERMITTED USES<br>*Use map reference* | *I N D* | *P R OC* | *C O M* | *R E S* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | **A** | **D** | **C** | **R** |
| 524130 | Reinsurance Carriers | X | X | X | |
| | | | | | |
| 5242 | Agencies, Brokerages, and Other Insurance Related Activities | | | | |
| 524210 | Insurance Agencies and Brokerages | X | X | X | |
| 524291 | Claims Adjusting | X | X | X | |
| 524292 | Third Party Administration of Insurance and Pension Funds | X | X | X | |
| 524298 | All Other Insurance Related Activities | X | X | X | |
| | | | | | |
| 5251 | Insurance and Employee Benefit Funds | | | | |
| 525110 | Pension Funds | X | X | X | |
| 525120 | Health and Welfare Funds | X | X | X | |
| 525190 | Other Insurance Funds | X | X | X | |
| | | | | | |
| 5259 | Other Investment Pools and Funds | | | | |
| 525910 | Open-End Investment Funds | X | X | X | |
| 525920 | Trusts, Estates, and Agency Accounts | X | X | X | |
| 525990 | Other Financial Vehicles | X | X | X | |
| | | | | | |
| Real Estate Rental and Leasing | | | | | |
| 5311 | Lessors of Real Estate | | | | |
| 531110 | Lessors of Residential Buildings and Dwellings | X | X | X | |
| 531120 | Lessors of Nonresidential Buildings (except Mini-warehouses) | X | X | X | |
| 531130 | Lessors of Mini-warehouses and Self-Storage Units | X | X | X | |
| 531190 | Lessors of Other Real Estate Property | X | X | X | |
| | | | | | |
| 5312 | Offices of Real Estate Agents and Brokers | | | | |
| 531210 | Offices of Real Estate Agents and Brokers | X | X | X | |
| | | | | | |
| 5313 | Activities Related to Real Estate | | | | |
| 531311 | Residential Property Managers | X | X | X | |
| 531312 | Nonresidential Property Managers | X | X | X | |
| 531320 | Offices of Real Estate Appraisers | X | X | X | |
| 531390 | Other Activities Related to Real Estate | X | X | X | |
| | | | | | |
| 5321 | Automotive Equipment Rental and Leasing | | | | |
| 532111 | Passenger Car Rental | X | X | X | |
| 532112 | Passenger Car Leasing | X | X | X | |
| 532120 | Truck, Utility Trailer, and RV (Recreational Vehicle) Rental and Leasing | X | X | X | |
| | | | | | |
| 5322 | Consumer Goods Rental | | | | |
| 532210 | Consumer Electronics and Appliances Rental | X | X | X | |
| 532281 | Formal Wear and Costume Rental | X | X | X | |
| 532282 | Video Tape and Disc Rental | X | X | X | |
| 532283 | Home Health Equipment Rental | X | X | X | |
| 532284 | Recreational Goods Rental | X | X | X | |
| 532289 | All Other Consumer Goods Rental | X | X | X | |
| | | | | | |
| 5323 | General Rental Centers | | | | |
| 532310 | General Rental Centers | X | X | X | |
| | | | | | |
| 5324 | Commercial and Industrial Machinery and Equipment Rental and Leasing | | | | |

| 2017 U.S. NAICS CODE # | PERMITTED USES<br>*Use map reference* | *I N D* | *P R OC* | *C O M* | *R E S* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 532411 | Commercial Air, Rail, and Water Transportation Equipment Rental and Leasing | X | X | X | |
| 532412 | Construction, Mining, and Forestry Machinery and Equipment Rental and Leasing | X | X | X | |
| 532420 | Office Machinery and Equipment Rental and Leasing | X | X | X | |
| 532490 | Other Commercial and Industrial Machinery and Equipment Rental and Leasing | X | X | X | |
| | | | | | |
| 5331 | Lessors of Nonfinancial Intangible Assets (except Copyrighted Works) | | | | |
| 533110 | Lessors of Nonfinancial Intangible Assets (except Copyrighted Works) | X | X | X | |
| | | | | | |
| Professional, Scientific, and Technical Services | | | | | |
| 5411 | Legal Services | | | | |
| 541110 | Offices of Lawyers | X | X | X | |
| 541120 | Offices of Notaries | X | X | X | |
| 541191 | Title Abstract and Settlement Offices | X | X | X | |
| 541199 | All Other Legal Services | X | X | X | |
| | | | | | |
| 5412 | Accounting, Tax Preparation, Bookkeeping, and Payroll Services | | | | |
| 541211 | Offices of Certified Public Accountants | X | X | X | |
| 541213 | Tax Preparation Services | X | X | X | |
| 541214 | Payroll Services | X | X | X | |
| 541219 | Other Accounting Services | X | X | X | |
| | | | | | |
| 5413 | Architectural, Engineering, and Related Services | | | | |
| 541310 | Architectural Services | X | X | X | |
| 541320 | Landscape Architectural Services | X | X | X | |
| 541330 | Engineering Services | X | X | X | |
| 541340 | Drafting Services | X | X | X | |
| 541350 | Building Inspection Services | X | X | X | |
| 541360 | Geophysical Surveying and Mapping Services | X | X | X | |
| 541370 | Surveying and Mapping (except Geophysical) Services | X | X | X | |
| 541380 | Testing Laboratories | X | X | X | |
| | | | | | |
| 5414 | Specialized Design Services | | | | |
| 541410 | Interior Design Services | X | X | X | |
| 541420 | Industrial Design Services | X | X | X | |
| 541430 | Graphic Design Services | X | X | X | |
| 541490 | Other Specialized Design Services | X | X | X | |
| | | | | | |
| 5415 | Computer Systems Design and Related Services | | | | |
| 541511 | Custom Computer Programming Services | X | X | X | |
| 541512 | Computer Systems Design Services | X | X | X | |
| 541513 | Computer Facilities Management Services | X | X | X | |
| 541519 | Other Computer Related Services | X | X | X | |
| | | | | | |
| 5416 | Management, Scientific, and Technical Consulting Services | | | | |
| 541611 | Administrative Management and General Management Consulting Services | X | X | X | |
| 541612 | Human Resources Consulting Services | X | X | X | |
| 541613 | Marketing Consulting Services | X | X | X | |
| 541614 | Process, Physical Distribution, and Logistics Consulting Services | X | X | X | |
| 541618 | Other Management Consulting Services | X | X | X | |
| 541620 | Environmental Consulting Services | X | X | X | |
| 541690 | Other Scientific and Technical Consulting Services | X | X | X | |
| | | | | | |

| 2017 U.S. NAICS CODE # | PERMITTED USES<br>*Use map reference* | *IND* | *PROC* | *COM* | *RES* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 5418 | Advertising, Public Relations, and Related Services | | | | |
| 541810 | Advertising Agencies | X | X | X | |
| 541820 | Public Relations Agencies | X | X | X | |
| 541830 | Media Buying Agencies | X | X | X | |
| 541840 | Media Representatives | X | X | X | |
| 541850 | Outdoor Advertising | X | X | X | |
| 541860 | Direct Mail Advertising | X | X | X | |
| 541870 | Advertising Material Distribution Services | X | X | X | |
| 541890 | Other Services Related to Advertising | X | X | X | |
| | | | | | |
| 5419 | Other Professional, Scientific, and Technical Services | | | | |
| 541910 | Marketing Research and Public Opinion Polling | X | X | X | |
| 541921 | Photography Studios, Portrait | X | X | X | |
| 541922 | Commercial Photography | X | X | X | |
| 541930 | Translation and Interpretation Services | X | X | X | |
| 541940 | Veterinary Services | X | X | X | |
| 541990 | All Other Professional, Scientific, and Technical Services | X | X | X | |
| | | | | | |
| Management of Companies and Enterprises | | | | | |
| 5511 | Management of Companies | | | | |
| 551111 | Offices of Bank Holding Companies | X | X | X | |
| 551112 | Offices of Other Holding Companies | X | X | X | |
| 551114 | Corporate, Subsidiary, and Regional Managing Offices | X | X | X | |
| | | | | | |
| Administrative and Support Services | | | | | |
| 5611 | Office Administrative Services | | | | |
| 561110 | Office Administrative Services | X | X | X | |
| | | | | | |
| 5612 | Facilities Support Services | | | | |
| 561210 | Facilities Support Services | X | X | X | |
| | | | | | |
| 5613 | Employment Services | | | | |
| 561311 | Employment Placement Agencies | X | X | X | |
| 561312 | Executive Search Services | X | X | X | |
| 561320 | Temporary Help Services | X | X | X | |
| 561330 | Professional Employer Organizations | X | X | X | |
| | | | | | |
| 5614 | Business Support Services | | | | |
| 561410 | Document Preparation Services | X | X | X | |
| 561421 | Telephone Answering Services | X | X | X | |
| 561422 | Telemarketing Bureaus and Other Contact Centers | X | X | X | |
| 561431 | Private Mail Centers | X | X | X | |
| 561439 | Other Business Service Centers (including Copy Shops) | X | X | X | |
| 561440 | Collection Agencies | X | X | X | |
| 561450 | Credit Bureaus | X | X | X | |

| 2017 U.S. NAICS CODE # | PERMITTED USES<br>*Use map reference* | *IND* | *PROCD* | *COM* | *RES* |
|---|---|---|---|---|---|
| | *Subarea on zoning map* | A | D | C | R |
| 561491 | Repossession Services | X | X | X | |
| 561492 | Court Reporting and Stenotype Services | X | X | X | |
| 561499 | All Other Business Support Services | X | X | X | |
| | | | | | |
| 5615 | Travel Arrangement and Reservation Services | | | | |
| 561510 | Travel Agencies | X | X | X | |
| 561520 | Tour Operators | X | X | X | |
| 561591 | Convention and Visitors Bureaus | X | X | X | |
| 561599 | All Other Travel Arrangement and Reservation Services | X | X | X | |
| | | | | | |
| 5616 | Investigation and Security Services | | | | |
| 561611 | Investigation Services | X | X | X | |
| 561612 | Security Guards and Patrol Services | X | X | X | |
| 561613 | Armored Car Services | X | X | X | |
| 561621 | Security Systems Services (except Locksmiths) | X | X | X | |
| 561622 | Locksmiths | X | X | X | |
| | | | | | |
| 5619 | Other Support Services | | | | |
| 561910 | Packaging and Labeling Services | X | X | X | |
| 561920 | Convention and Trade Show Organizers | X | X | X | |
| 561990 | All Other Support Services | X | X | X | |
| | | | | | |
| Educational Services | | | | | |
| 6111 | Elementary and Secondary Schools | | | | |
| 611110 | Elementary and Secondary Schools | X | X | X | |
| | | | | | |
| 6112 | Junior Colleges | | | | |
| 611210 | Junior Colleges | X | X | X | |
| | | | | | |
| 6113 | Colleges, Universities, and Professional Schools | | | | |
| 611310 | Colleges, Universities, and Professional Schools | X | X | X | |
| | | | | | |
| 6114 | Business Schools and Computer and Management Training | | | | |
| 611410 | Business and Secretarial Schools | X | X | X | |
| 611420 | Computer Training | X | X | X | |
| 611430 | Professional and Management Development Training | X | X | X | |
| | | | | | |
| 6115 | Technical and Trade Schools | | | | |
| 611511 | Cosmetology and Barber Schools | X | X | X | |
| 611512 | Flight Training | X | X | X | |
| 611513 | Apprenticeship Training | X | X | X | |
| 611519 | Other Technical and Trade Schools | X | X | X | |
| | | | | | |
| 6116 | Other Schools and Instruction | | | | |
| 611610 | Fine Arts Schools | X | X | X | |

| 2017 U.S. NAICS CODE # | PERMITTED USES<br>*Use map reference* | *IND* | *PROC* | *COM* | *RES* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 611620 | Sports and Recreation Instruction | X | X | X | |
| 611630 | Language Schools | X | X | X | |
| 611691 | Exam Preparation and Tutoring | X | X | X | |
| 611692 | Automobile Driving Schools | X | X | X | |
| 611699 | All Other Miscellaneous Schools and Instruction | X | X | X | |
| | | | | | |
| 6117 | Educational Support Services | | | | |
| 611710 | Educational Support Services | X | X | X | |
| | | | | | |
| Health Care and Social Assistance | | | | | |
| 6211 | Offices of Physicians | | | | |
| 621111 | Offices of Physicians (except Mental Health Specialists) | X | X | X | |
| 621112 | Offices of Physicians, Mental Health Specialists | X | X | X | |
| | | | | | |
| 6212 | Offices of Dentists | | | | |
| 621210 | Offices of Dentists | X | X | X | |
| | | | | | |
| 6213 | Offices of Other Health Practitioners | | | | |
| 621310 | Offices of Chiropractors | X | X | X | |
| 621320 | Offices of Optometrists | X | X | X | |
| 621330 | Offices of Mental Health Practitioners (except Physicians) | X | X | X | |
| 621340 | Offices of Physical, Occupational and Speech Therapists, and Audiologists | X | X | X | |
| 621391 | Offices of Podiatrists | X | X | X | |
| 621399 | Offices of All Other Miscellaneous Health Practitioners | X | X | X | |
| | | | | | |
| 6214 | Outpatient Care Centers | | | | |
| 621410 | Family Planning Centers | X | X | X | |
| 621420 | Outpatient Mental Health and Substance Abuse Centers | X | X | X | |
| 621491 | HMO Medical Centers | X | X | X | |
| 621492 | Kidney Dialysis Centers | X | X | X | |
| 621493 | Freestanding Ambulatory Surgical and Emergency Centers | X | X | X | |
| 621498 | All Other Outpatient Care Centers | | | | |
| | | | | | |
| 6215 | Medical and Diagnostic Laboratories | | | | |
| 621511 | Medical Laboratories | X | X | X | |
| 621512 | Diagnostic Imaging Centers | X | X | X | |
| | | | | | |
| 6216 | Home Health Care Services | | | | |
| 621610 | Home Health Care Services | X | X | X | |
| | | | | | |
| 6219 | Other Ambulatory Health Care Services | | | | |
| 621910 | Ambulance Services | X | X | X | |
| 621991 | Blood and Organ Banks | X | X | X | |
| 621999 | All Other Miscellaneous Ambulatory Health Care Services | X | X | X | |
| | | | | | |
| 6221 | General Medical and Surgical Hospitals | | | | |
| 622110 | General Medical and Surgical Hospitals | X | X | X | |
| | | | | | |
| | | | | | |
| 6223 | Specialty (except Psychiatric and Substance Abuse) Hospitals | | | | |
| 622310 | Specialty (except Psychiatric and Substance Abuse) Hospitals | X | X | X | |
| | | | | | |

| 2017 U.S. NAICS CODE # | PERMITTED USES<br>*Use map reference* | *I N D* | *P R OC* | *C O M* | *R E S* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 6231 | Nursing Care Facilities (Skilled Nursing Facilities) | | | | |
| 623110 | Nursing Care Facilities (Skilled Nursing Facilities) | X | X | X | |
| | | | | | |
| | | | | | |
| 6233 | Continuing Care Retirement Communities and Assisted Living Facilities for the Elderly | | | | |
| 623311 | Continuing Care Retirement Communities | X | X | X | |
| 623312 | Assisted Living Facilities for the Elderly | X | X | X | |
| | | | | | |
| 6239 | Other Residential Care Facilities | | | | |
| 623990 | Other Residential Care Facilities | X | X | X | |
| | | | | | |
| 6241 | Individual and Family Services | | | | |
| 624110 | Child and Youth Services | | | X | |
| 624120 | Services for the Elderly and Persons with Disabilities | | | | |
| 624190 | Other Individual and Family Services | | | | |
| | | | | | |
| | | | | | |
| 6243 | Vocational Rehabilitation Services | | | | |
| 624310 | Vocational Rehabilitation Services | | | | |
| | | | | | |
| 6244 | Child Day Care Services | | | | |
| 624410 | Child Day Care Services | | X | X | |
| | | | | | |
| Arts, Entertainment, and Recreation | | | | | |
| 7121 | Museums, Historical Sites, and Similar Institutions | | | | |
| 712110 | Museums | X | X | X | |
| 712120 | Historical Sites | X | | | |
| 712130 | Zoos and Botanical Gardens | X | | | |
| 712190 | Nature Parks and Other Similar Institutions | X | | | |
| | | | | | |
| 7139 | Other Amusement and Recreation Industries | | | | |
| 713910 | Golf Courses and Country Clubs | X | | | |
| 713920 | Skiing Facilities | X | X | X | |
| 713930 | Marinas | X | X | X | |
| 713940 | Fitness and Recreational Sports Centers | X | X | X | |
| 713950 | Bowling Centers | X | X | X | |
| 713990 | All Other Amusement and Recreation Industries | X | X | X | |
| | | | | | |
| Accommodation and Food Services | | | | | |
| 7211 | Traveler Accommodation | | | | |
| 721110 | Hotels (except Casino Hotels) and Motels | X | X | X | |
| 721191 | Bed-and-Breakfast Inns | X | X | X | |

| 2017 U.S. NAICS CODE # | PERMITTED USES<br>*Use map reference* | *I N D* | *P R OC D* | *C O M* | *R E S* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | A | D | C | R |
| 813212 | Voluntary Health Organizations | | X | X | |
| 813219 | Other Grantmaking and Giving Services | | X | X | |
| | | | | | |
| 8133 | Social Advocacy Organizations | | | | |
| 813311 | Human Rights Organizations | | X | X | |
| 813312 | Environment, Conservation and Wildlife Organizations | | X | X | |
| 813319 | Other Social Advocacy Organizations | | X | X | |
| | | | | | |
| 8134 | Civic and Social Organizations | | | | |
| 813410 | Civic and Social Organizations | | X | X | |
| | | | | | |
| 8139 | Business, Professional, Labor, Political, and Similar Organizations | | | | |
| 813910 | Business Associations | | X | X | |
| 813920 | Professional Organizations | | X | X | |
| 813930 | Labor Unions and Similar Labor Organizations | | X | X | |
| 813940 | Political Organizations | | X | X | |
| 813990 | Other Similar Organizations (except Business, Professional, Labor, and Political Organizations) | | X | X | |
| | | | | | |
| Public Administration | | | | | |
| | | | | | |
| | | | | | |
| 9211 | Executive, Legislative, and Other General Government Support | | | | |
| 921110 | Executive Offices | | X | X | |
| 921120 | Legislative Bodies | | X | X | |
| 921130 | Public Finance Activities | | X | X | |
| 921140 | Executive and Legislative Offices, Combined | | X | X | |
| 921150 | American Indian and Alaska Native Tribal Governments | | X | X | |
| 921190 | Other General Government Support | | X | X | |
| | | | | | |
| | | | | | |
| 9231 | Administration of Human Resource Programs | | | | |
| 923110 | Administration of Education Programs | | X | X | |
| 923120 | Administration of Public Health Programs | | X | X | |
| 923130 | Administration of Human Resource Programs (except Education, Public Health, and Veterans' Affairs Programs) | | X | X | |
| 923140 | Administration of Veterans' Affairs | | X | X | |
| | | | | | |
| 9241 | Administration of Environmental Quality Programs | | | | |
| 924110 | Administration of Air and Water Resource and Solid Waste Management Programs | X | X | X | |
| 924120 | Administration of Conservation Programs | X | X | X | |
| | | | X | | |
| 9251 | Administration of Housing Programs, Urban Planning, and Community Development | | | | |
| 925110 | Administration of Housing Programs | X | X | X | |

| 2017 U.S. NAICS CODE # | PERMITTED USES *Use map reference* | *I N D* | *P R OC* | *C O M* | *R E S* |
|---|---|---|---|---|---|
| | ***Subarea on zoning map*** | **A** | **D** | **C** | **R** |
| 925120 | Administration of Urban Planning and Community and Rural Development | X | X | X | |
| | | | | | |
| 9261 | Administration of Economic Programs | | | | |
| 926110 | Administration of General Economic Programs | X | X | X | |
| 926120 | Regulation and Administration of Transportation Programs | X | X | X | |
| 926130 | Regulation and Administration of Communications, Electric, Gas, and Other Utilities | X | X | X | |
| 926140 | Regulation of Agricultural Marketing and Commodities | X | X | X | |
| 926150 | Regulation, Licensing, and Inspection of Miscellaneous Commercial Sectors | X | X | X | |
| | | | | | |
| 9271 | Space Research and Technology | | | | |
| 927110 | Space Research and Technology | | X | X | |
| | | | | | |
| 9281 | National Security and International Affairs | | | | |
| 928110 | National Security | | X | X | |
| 928120 | International Affairs | | X | X | |
| | | | | | |
| N/A | Residential Uses in accordance with the limitations and regulations defined in ***19.03(C) and 19.05(B).*** | | | | X |

B.) **Temporary Structures**:

Temporary structures such as manufactured/mobile offices and temporary buildings may be used incidental to construction work on the premises or on adjacent public projects or during a period while the permanent structure is being constructed. The user of said structure shall obtain a permit for such temporary use, which permit shall be valid for twelve (12) months and may be renewed not more than once for a total combined period of time under all issued permits not exceeding twenty-four (24) months. Renewal of the permit shall be at the discretion of the Zoning Inspector on finding of reasonable progress toward completion of the permanent structure or project. The Zoning Inspector shall require provisions for sanitary waste disposal, solid waste disposal, and water supply, as he/she deems necessary. The fees for such permit and renewals thereof shall be established by the Board of Township Trustees. Said temporary structure shall be removed not later than ten (10) days after expiration of said permit.

Within the areas labeled "R-4" or "R-10" on the BIO Overlay Map, the following uses shall be permitted when developed in strict compliance with the approved Development Plan, including the development standards set forth in Section 19.05, and all other applicable Articles of the Zoning Resolution. Map and Text references to "R-4" within this Article only refer to the BIO and do not refer in any way to Article 10, Multi- Type Residential District.

1.) "R-4" and "R-10" residential uses shall be permitted provided they include multi-family residential structures that qualify as "commercial residential" by having at least four dwelling units. These types of commercial residential units include but are not limited to attached, modular, townhouse, patio or common wall units, usually of a condominium nature. Such uses shall further comply with the building size and density requirements in 19.03(C)(1)(a) and (b) below
   a. Areas designated as "R-4" are limited to multi-family residential structures that contain no more than four dwelling units per building and the density shall not exceed four (4) dwelling units per net developable acre, as defined by Article 4 of the Berlin Township Zoning Resolution.
   b. Areas designated as "R-10" may include apartment style buildings with more than four (4) dwelling units per building provided the overall density does not exceed ten (10) dwelling units

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

T & R PROPERTIES, et al.,

Plaintiffs,

v.

BERLIN TOWNSHIP, et al.,

Defendants.

Case No. 2:23-cv-3761
Judge Graham
Magistrate Judge Jolson

**PLAINTIFFS'**
**INITIAL DISCLOSURES**

Pursuant to Rule 26(a)(1)(A), Federal Rules of Civil Procedure, Plaintiffs, by and through counsel, hereby make the following Initial Disclosures. These Initial Disclosures are based upon information reasonably available to Plaintiffs as of the date of this Disclosure. Plaintiffs reserve the right to amend and supplement these Disclosures as circumstances warrant.

Plaintiffs believe the following witnesses are likely to have discoverable information.

**Individuals Likely to Have Discoverable Information Pursuant to Fed. R.Civ. Pro. 26(a)(1)(A)(i) That Plaintiffs May Use In Support of Its Position**

1. Plaintiff Ronald Sabatino, c/o counsel, has knowledge regarding any and all matters raised in the Complaint and Answer thereto.

2. Plaintiff R.J. Sabatino, c/o counsel, has knowledge regarding any and all matters raised in the Complaint and Answer thereto.



EXHIBIT
tabbies
D

3. As if on cross-examination, Berlin Trustees, Ron Bullard, Meghan B. Raehll and Ken O'Brien, and any respective successors thereto. Upon information and belief, these individuals have knowledge regarding any and all matters raised in the Complaint and Answer thereto.

4. As if on cross-examination, members of the Berlin Township Zoning Commission, Jerry Valentine, Angela Brown, Darcy Kapla, Jenny Sloas and Keith Goshia, and their respective successors. Upon information and belief, these individuals have knowledge regarding any and all matters raised in the Complaint and Answer thereto.

5. As if on cross-examination, Delaware County individuals and officials, George Kaitsa, Auditor, Delaware County Commissioners Jeff Benton, Barb Lewis and Gary Merrell, Delaware County Engineer Chris Bauserman, PE, PS, Jonathan Kabat, Economic Development Coordinator for Delaware County Ohio Finance Authority, Melissa A. Schiffel, Delaware County Prosecutor and Donald E. Rankey, Jr., Delaware County Treasurer, and their respective successors. Upon information and belief, these individuals have knowledge regarding any and all matters raised in the Complaint and Answer thereto.

6. Representatives and members of the Delaware County Regional Planning Commission. 1610 State Route 521, P.O. Box 8006 Delaware, OH 43015. Upon information and belief, these persons have knowledge regarding any and all matters raised in the Complaint and Answer thereto.

7. Robert "Skip" Weiler. Robert Weiler Company. 10 N. High St. Suite 401. Columbus, OH 43215. 614.221.4286. This person has knowledge regarding any and all

matters raised in the Complaint and Answer thereto including experience with commercial property, land uses, and multi-family apartments.

8. Brian Marsh. JLL. Columbus, OH 43215. 614.460.4421. This person has knowledge regarding any and all matters raised in the Complaint and Answer thereto including experience with industrial and warehouse development and real estate in general in the State of Ohio.

9. Randall Woodings. Kontogiannis & Associates. 400 South 5th St. Columbus, OH 43215. This person has knowledge regarding any and all matters raised in the Complaint and Answer thereto including experience in apartment and other planning.

10. Evan Ballman. Berkadia Commercial. Columbus, OH. 614.468.5818. This person has knowledge regarding any and all matters raised in the Complaint and Answer thereto including experience financing expertise as to commercial real estate.

11. Vincent Curry. Executive Director-Fair Housing Advocates Association. 520 S. Main Street #2459, Akron, OH 44311. This person has knowledge regarding any and all matters raised in the Complaint and Answer thereto including matters related federal and state funded programs as well as fair housing matters.

12. Agents, representatives, and/or employees of the Ohio Department of Development and Office of Community Development. Upon information and belief, these persons have knowledge regarding any and all matters raised in the Complaint and Answer thereto including matters related to federal and state funded programs and grants received by Delaware County and Defendants.

13. Any and all witnesses that may be identified on behalf of any other party who may have information relating to this matter.

14. Any and all expert witnesses that may be identified by Defendants, as on cross examination.

15. Any person necessary to authenticate documents produced in discovery and used as Exhibits at a trial of this matter.

16. Any person necessary to rebut any testimony or evidence proffered by any other party in this matter at a trial of this matter.

Plaintiffs reserve the right to supplement this Initial Disclosure list with any and all persons who have knowledge or information in any way related to the allegations contained within the Complaint and Answer, or who may be identified during the course of discovery in this matter. Plaintiffs will supplement and provide the name, address and subject matter of the testimony of any such person to opposing counsel and to the Court as is necessary.

**Documents in Plaintiffs' Possession, Custody or Control That Plaintiffs May Use in Support of Their Position Pursuant to Fed. R. C.P. 26(a)(1)(A)(ii)**

| | **Title** |
|---|---|
| A | Overview of Area – Delaware County & Townships – Red star is subject property *Source:* DC Economic Development Strategic Plan Dec 2023 *showing an overview of the location of the Township, the City, Route 36/37 and the subject development land as a "red star" added in its approximate location in the business park.* |
| B | *Delaware County Land Use Exhibit of projected uses 2020 - illustrating no such uses having been zoned*). Shows no BBP – no multi-family, no density allowed, business & residential uses (denied & granted lip service) |

| | |
|---|---|
| C | *BIO zoning district map and table of permitted uses based on NAICS codes many of which are more impactful, intense and possibly disruptive to residents, neighbors and the public, from Berlin Zoning Resolution Adopted 11-23-2020*). All BIO uses granted and all lawful uses denied by not including in appropriate warehouse missing |
| D | Illustration of lack of affordable housing in Delaware County and the Township despite the overlays showing the density need and that Berlin's owning planning contemplates 10 units per acre density and more – www.Ohiohome.org/hna-20/executive summary - Shows need and lack of affordable housing below industry standard – R-12-15 multi-family, Apartments at 6.79 0 - as shown in overlay area planned for R-4 and R-10 |
| E | Chapter 6 DCRP Review of Berlin Housing Comprehensive Land Use Plan 2023, pgs. 25-27 - illustrating approvals of single-family high-priced housing and no multi-family apartments for low income or retirees along Route 36/37 in the BPP or otherwise since 2000). Shows predominantly single-family housing & notably zero multi in Township and none on 36/37 at BPP |
| F | Graph township all white show in "caption" purpose. - illustrated below and fully documented in the US Census 2020 statistics for Berlin Township |
| G | DRPC Executive Summary, pgs. 14-16 - showing the County's and Berlin's own review of Berlin's comprehensive plan revision as adopted in 2023. |
| H | *Comprehensive Land Use Plan* |
| I | Public articles attached as Exhibit I to Complaint announcing the Berlin Business Park and its economic development, and Berlin Land Use Map adopted 9-25-23. Historical relevant articles showing 1,000 acres – create expectation of cooperation & flexibility in decision making based on evidence, not bias.<br>(1) "Delaware County's Berlin Business Park to span three developments on 1,800 acres". Columbus Business First, August 14, 2023, by John Bush, Staff Reporter<br>(2) "Central Ohio developers say interest rates, costs and zoning keeping projects from happening". Columbus Business First, December 26, 2023 by Bonnie Meibers, Staff Reporter<br>(3) "Delaware County coalition focuses on "complex" issue of affordable housing". The Columbus Dispatch, August 21, 2020, by Paul Comstock.<br>(4) "Number of cost-burdened rental households jumps to record high". National Business Observer, Real Estate Edition, The Business Journals, January 29, 2024 by Ashley Fahey. |

| | |
|---|---|
| | (5) "Reed Parkway: First road to long-planned Berlin Business Park is on its way". The Columbus Dispatch, October 28, 2021 by Scott Hummel |
| J | Economic Incentive Agreement - Berlin and County adopted by Berlin June 28, 2021 |
| K | Berlin Zoning Districts Map- pg. 60 – DRP Review of Berlin Comprehensive Land Use Plan 2023. |
| L | *Berlin Resolution Article 19 - Berlin Industrial Overlay (BIO), adopted 11/23/2020* |
| M | Berlin's PRD developments map from historical applications by private property owners overlaid on the Berlin use and area planning map by DRP 2017. Historical map showing PRD's and residential developments – no real multi-family – bias - Note this used to be on Berlin's website and within last year it was removed, or link was not active - Delaware Reginal Planning send the colorized map showing created in 10/26/2017 but one on Berlin website was update through 2020. |
| N | Business Park Overlay Density or greater than 5 is clearly adopted and allowed; see DRPC Review of Comprehensive Plan 2023 pg. 60 showing R-10 plus numerous other maps and data which is part of the Resolution. |
| O | Showing the single Project in the Business Park, Warehouse in Green and Apartments in Yellow plus planned Reed Road and Delco water tower & pump station utilities. |
| P | Email to split applications - Email from Sherry Graham, Berlin Zoning Inspecter to Randall Woodings - T & R site planning expert & Cathy Rippel - Berlin Zoning Secretary, dated August 31, 2022 and T&R Meeting Minutes with site plan. |
| Q | Preliminary rezoning application *for the Apartments* which were modified multiple times. |
| R | Application for the Warehouse which were modified multiple times. |
| S | January 26, 2023, Delaware County Regional Planning Commission held a hearing, where conditional approval was granted to Plaintiffs for the rezonings of the Project. *Minutes from the hearing* |
| T | February 8, 2023, Architectural Review Board's minutes hearing of the rezoning of the Warehouse after a conditional approval by Trustees and DRPC. |
| U | February 28, 2023 minutes – BZC denial even with revisions and all concerns addressed. |
| V | April 24, 2023 Trustee Minutes – conditional – part appeal – industrial |
| W | February 14, 2023 ARC BZC Minutes |

| | |
|---|---|
| X | March 21, 2023 BZC Minutes |
| Y | April 24, 2023 Trustee Minutes |
| Z | September 11, 2023 Trustee minutes and the Transcript of the reconsideration hearing followed by Trustees granting approval of the Elysian Apartments at R-10, at ten units per acre with deviations far more expansive than any request of T&R for the Project. These approved Elysian Apartments have never been built. |
| AA | ORC 519.14(A) zoning code |
| AB | February 6, 2024 BZA Hearing Transcript |
| AC | Actions at hearing after accepting fees for the appeal of the Trustee's denials & fees for the variances requested regarding the Apartments & the Warehouse and after voting multiple times regarding those variances to be denied, the BZA stated it had no jurisdiction under its Resolution or Revised Code 519 to hear an appeal of the Trustees. |
| AD | February 20, 2024 minutes approved April 1 and certified on the Berlin Township website on April 12, 2024. |
| AE | Population Density from DCRP review of Berlin Comprehensive Plan 2023 |
| AF | Financial documents of Plaintiffs demonstrating investments, costs, interest, expense and attorney fees in buying, holding and retaining respective property and its development. |
| AG | Any and all responses to public records request received by Plaintiffs from various state and local government agencies. |
| AH | Any and all documents provided by Defendants in this matter through discovery or otherwise. |
| AI | Any and all documents received by any party in response to subpoenas issued in this matter. |
| AJ | Any and all documents attached by the parties to pleadings in this matter |

These Disclosures will be supplemented after discovery has been completed, as applicable.

**Calculation of Damages**
**Fed. R. C.P. 26(a)(1)(A)(ii)**

Will supplement as damages are ongoing. Damages will be, in part, calculated based on documents disclosed above. Plaintiffs reserve the right to supplement this disclosure as the matter progresses.

Respectfully submitted,
ZACKS LAW LLC

***/s/ Benjamin S. Zacks***
Benjamin S. Zacks (0040878)
33 S. James Road, 3rd Floor
Columbus, OH 43213
(614) 236-1000
(614) 236-3236 Fax
bszacks@zlglaw.com

***/s/ Nathan D. Painter***
Nathan D. Painter (0076274)
PAINTER & ASSOCIATES LLC
5029 Cemetery Road
Hilliard, OH 43026
(614) 319-3306
(614) 594-7170 (fax)
nathan@painterandassociates.com

***/s/ Joshua S. Nagy***
Joshua S. Nagy (0097099)
WESP BARWELL
475 Metro Place South, Suite 350
Dublin, Ohio 43017
(614) 204-2904)
jnagy@wesplaw.com

Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served upon Paul-Michael LaFayette and Cara M. Wright, FREEMAN MATHIS & GARY, LLP, 65 E. State Street, Suite 2550, Columbus, OH 43215, Attorneys for Defendants, by email transmission, this 19th day of September, 2024.

***/s/ Benjamin S. Zacks***
Benjamin S. Zacks (0040878)
Attorney for Plaintiff

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m.** **Trustee Meeting** **September 11, 2023**

**HELD AT:** This meeting was held at 3271 Cheshire Rd, Delaware, OH

**CALL TO ORDER:** Meghan Raehll, Trustee Chairman

**PLEDGE OF ALLEGIANCE:** Meghan Raehll led the Pledge of Allegiance

**ROLL CALL:** Meghan Raehll, Ken O'Brien, Ron Bullard and Claudia Smith, Fiscal Officer

**ATTENDANCE:** Adam Miller, Jeffrey Jordan, Jasper DeChristopher, Larry Buell, Eric & Debbie Rickabaugh, Ron Sabatino, Darcy Kaplan, Jeff & Edie Parker, David Stuckey, Check & Sandy Roddy, Nicki Ackers, RJ Newell, Anne Marchiondo, Sarah Sanders, Terry Al, Todd Faris and Chris Paykoff

**Public Comment-** Raehll opened up for public comment not related to the hearings on T & R Properties the request to reopen BZC 23-003 The Residences of Berlin Township and BBP 23-003 The Elysian at Alum Creek as the public will have the opportunity to provide comments specific to these developments in question.

RJ Sabatino wanted clarification as he knows they are up at 7:00 p.m. and asked if he was able to present at that time as well. Raehll said for public comments he board does not typically does not go back and forth with questions but they were going to allow him to make a presentation. Sabatino thank them.

**Approval of Minutes–**O'Brien said the first one he thought they were not going to do until the end of the meeting. Raehll asked if he was referencing the meeting minutes from June 12, 2023 and O'Brien said yes.

**RESOLUTION 23-09-05** **APPROVE THE 7/24/23 AND 8/14/23 REGULAR MEETING MINUTES, THE 8/28/23 SPECIAL AND 8/29/23 EMERGENCY MEETING MINUTS AND DISPENSE WITH THE READING**

Motion: O'Brien
Discussion: Smith said they did not have the minutes from the special meeting of August 28, 2023 yet and they were just given the minutes from the July meeting today. She asked if anyone had looked them over and the August 14, 2023 minutes had questions on them that she had not received responses to yet. O'Brien asked if she was recommending that they wait on them and Smith said if they read them, have reviewed them and are okay with approving them then she is too but there were questions on some of them. O'Brien withdrew the motion.

**Motion Withdrawn**

Raehll asked if there were any meetings that did not need reviewed and could be approved at this time. Smith said she did the minutes for the August 29th emergency meeting minutes and feels they are ready but the August 14th had red markings and since she was not at that meeting she could not verify what was to be corrected. The minutes from July 24th just came today and she has not had time to review them.

**RESOLUTION 23-09-06** **APPROVE THE 8/29/23 EMERGENCY MEETING MINUTES AND DISPENSE WITH THE READING**

EXHIBIT
tabbies
E

Motion: O'Brien
Second: Raehll
Vote: Raehll yes, Bullard yes and O'Brien yes

Raehll said she will make certain to get any feedback to her for the ability to approve the next cycle.

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m.** **Trustee Meeting** **September 11, 2023**

takes time. O'Brien said he did not like the sandstone sign. Bullard said what he like about it was the cost but it should last 100 years and they are also looking at granite which should last a lot longer. O'Brien said he likes those. Bullard said they need to be very careful with the placement of the sign and the trees along Route 23 for visibility and safety because a lot of people go in and out of the cemetery. Bullard read an update from Peden: The phone company is running a new fiber optic cable in the front of the cemetery on ODOT right of way, they also OUPS the front of property and there is a gas line behind the current right of way behind the flags I placed. I think it would be beneficial if we could get Stucco to move faster on easement search cause we now know there are utilities behind ODOT right of way where the board wants the trees and depending on utility easement we may not have ability to install trees, just something to consider with existing utilities. Bullard said they found a way to place trees and that is by taking any area were plots have not sold and placing them there. Raehll asked that they discuss the sign first and said Foor received a quote from Snyder for $12,000 carved on one side and Jahn Monuments quoted the same stone at $50,000 without the request for legs to be added. They liked the dark granite with light writing that they saw. She said Foor had issues with using sandstone because it has a shorter life expectancy than granite. Bullard said they are still waiting on quotes and Raehll said they like the dark color with light writing and if that dictates the type of stone, they use then so be it. Raehll asked Bullard if they could have the quotes by the September 24th meeting and Bullard said he will have any update at that time.

Raehll said the landscaping is super problematic because where Peden placed the white flags there isn't even eight feet between it and the next headstone and only the furthest south portion did not have headstones right there so they could put a batch of trees there, although it would take up plots that are probably there. She said there is a portion that is in Liberty Township that we need to get resolution on. O'Brien said it makes more sense for us to have an agreement and have them to pay us to take care of it. Raehll asked Bullard to have Peden work with Liberty on this. Bullard will go with Peden and walk the cemetery to check into the tree plantings.

**Lot Transfer Forms–** Bullard said they received the form from the prosecutor's office. O'Brien wants it clear that the transfer has to be with a family member only. Raehll said they received a request asking if the trustees would buy back a plot in Cheshire Cemetery, trade one for one near the center of the cemetery or if they could list the lot and sell it and then have the deed transferred. Bullard said we do not buy back plots. Bullard said they have in the past allowed the transfer of plots in Cheshire. Raehll asked what principal we have to reject allowing this plot to be transferred. O'Brien said if there is a row of empty plots he would not object but he doesn't want to sell just one plot that could leave one plot by itself as most people want two or more plots together. Bullard will follow up on the request after discussing this with Buell and bring back to the board.

Raehll wants to make explicit how we will accept the transfer form, we will allow the owner to come in with the person they want to transfer it to come in in person at the township hall and verify their identity. We will allow notarization of the form. Bullard said rules will be put in place who can make these transfers. Raehll asked who can and said the owner can do it for a non-family member because it is via marriage for the current request.

| | |
|---|---|
| **RESOLUTION 23-09-07** | **MOTION TO ADOPT THE TWO PAGE CEMETERY BURIAL RIGHTS TRANSFER FORM DATED 9/11/23 FOR EVERGREEN MEMORIAL** |

**BERLIN TOWNSHIP**
**3271 Cheshire Road**
**Delaware, Ohio 43015**
**(740) 548-5217**

**BURIAL RIGHTS TRANSFER FORM**

______________________________________________
City State Zip Code

______________________________________________,
County Phone Number

do hereby agree to transfer ownership of/burial rights in the following cemetery

lot(s)/gravesite(s) in Berlin Township, Evergreen Memorial Cemetery (fka Fairview Memorial

Park), located at 5035 Columbus Pike, Lewis Center, Ohio 43035: Lot(s) __________

Section(s) __________ Grave(s) __________ to ____________________________________,
Name(s)

residing at ____________________________________________________________
Address

______________________________________________
City State Zip Code

______________________________________________
County Phone Number

Signed this _____ day of __________, 20__.

______________________________ ______________________________
Printed Name: ______________________ Printed Name: ________________

Witnessed by ________________________
Signature of Berlin Township Official/Representative

**BERLIN TOWNSHIP**
**BURIAL RIGHTS TRANSFER FORM**
**(Page 2)**

I/We, ______________________, residing at __________________________________
Name(s) Address

______________________________________________
City State Zip Code

______________________________________________
County Phone Number

do hereby wish to accept the transfer of the ownership of/burial rights in the following

gravesite(s) in Berlin Township, Evergreen Memorial Cemetery (fka Fairview Memorial Park):

Lot(s) __________ Section(s) __________ Grave(s) _______

from ______________________________.
Name(s)

Signed this _____ day of __________, 20__.

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m.** **Trustee Meeting** **September 11, 2023**

Approval of transfer of cemetery lot/cemetery grave space(s) on behalf of Berlin Township

_______________________________ Date: _________

Name: ____________________________

Position: __________________________

All transfers must comply with Berlin Township Board of Trustees Rules and Regulations Governing Evergreen Memorial Cemetery (fka Fairview Cemetery)

Berlin Township will issue a cemetery lot deed(s) to the transferee(s) for the lot(s)/gravesite(s) in Evergreen Cemetery (fka Fairview Memorial Park) indicated above.

Motion: Bullard
Second: O'Brien
Vote: Raehll yes, Bullard yes and O'Brien yes

**Cheshire Tree Trimming Quote-**

**RESOLUTION 23-09-08** **APPROVE $9,775 TO ADAMS TREE SERVICE FOR TREE TRIMMING IN CHESHIRE CEMETERY**

Motion: Bullard
Second: O'Brien
Vote: Bullard yes, O'Brien yes and Raehll yes

**JEDD-**Raehll said for our partners they have resolved all the issues between the different parties.

**Cheshire Road Widening Easement & Fiber-** O'Brien said it's still in the county engineer's ball court whether or not there is sufficient room for a conduit. He said the county did not want to own the fiber because there are costs associated with it. He said it should be in the road right-of-way, done in concert with the county's project but be our project. He feels the cost will be low enough that we can do it by quotes. We would also need to have someone consult for us regarding the fiber. O'Brien said he is waiting on Tiffany Jenkins. Bullard asked about the water and O'Brien said it will solve itself if the county works with us and if they don't then the county is going to have to deal with the water because the need for the water easement is solely because the county wants to take the easement that Del-Co has. If the county won't pay for the Del-Co easement they can pay for us for damages for not having water.

**Collective Bargaining-** O'Brien said he would like to discuss this in executive session later.

**Assistant Road Supervisor-** Bullard said he wants to promote Jeff Evans to assistant road supervisor that would be able to fill in for when the supervisor is not here. O'Brien asked if he would be on probation for 6-months. Bullard said we can do that and Raehll said we can discuss it further in executive session and it has nothing to do with Evans it's more about the organizational structure as we will not have any road laborers if we make this move and it feels very top heavy to her. She wonders if it would be better to wait until we have back-filled positions of the road laborer and then move Evans. Bullard said he's thinking of it as supervising the roads more than supervising the crews. O'Brien said he doesn't have a problem with it as long as there is a 6-month probation because everyone should have that.

**RESOLUTION 23-09-09** **MOTION TO PROMOTE JEFF EVANS TO ASSISTANT ROAD SUPERVISOR AT A PROBATIONARY RATE OF $26.42 AN HOUR WITH A SIX-MONTH PROBATIONARY PERIOD, EFFECTIVE SEPTEMBER 18, 2023, WITH THE EXPECTATION THAT HE WILL GO TO THE ASSISTANT ROAD SUPERVISOR POSITION AT THAT**

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m.** **Trustee Meeting** **September 11, 2023**

Discussion: Raehll made a friendly amendment that the title is technically road superintendent and asked Bullard which he would prefer. Bullard said he likes supervisor. Raehll said no amendment to the resolution at this point but there will be an amendment to the job description at this point. Bullard made a friendly amendment to have it start the next pay period which starts September 18, 2023, which has been added to the resolution.
Vote: Bullard yes, O'Brien yes and Raehll yes

**Electronic Financial Devices-** Raehll said the resolution that they passed last had some errors in it so they need to rescind it. They had the fire department listed and they should not be. There was also confusion on the ways and means of paying and it was significant enough that they want to correct it. O'Brien asked how it was different from what they passed. Raehll said they thought it was the method by payment instead of the actual form of payment such as credit care payments accepted online payments and we said it was related to things that we would accept payment for like administrative duties, permits, etc. Raehll said she worked with the prosecutor's office on it and would send it to Smith.

**RESOLUTION 23-09-10** **MOTION TO REPEAL RESOLUTION 23-08-15 AUTHORIZING ACCEPTANCE OF PAYMENT BY FINANCIAL TRANSACTION DEVICES FOR TOWNSHIP EXPENSES AND DESIGNATING THE TOWNSHIP FISCAL OFFICER AS AN ADMINISTRATIVE AGENT TO SOLICIT PROPOSALS FROM FINANCIAL INSTITUTIONS, ISSUERS OF FINANCIAL TRANSACTION DEVICES, AND PROCESSERS OF FINANCIAL TRANSACTIONS AND REPLACE WITH RESOLUTION 23-09-10 WHICH IS THE ACCEPTANCE OF THE REDLINE VERSION PROVIDED VIA EMAIL TO THE FISCAL OFFICER ON SEPTEMBER 11, 2023 AT 6:30 P.M.**

**BERLIN TOWNSHIP BOARD OF TRUSTEES**
**DELAWARE COUNTY, OHIO**

**DATE: September 11, 2023**

**RESOLUTION NO. 23-09-10**

**RESOLUTION AUTHORIZING THE ACCEPTANCE OF PAYMENTS BY FINANCIAL TRANSACTION DEVICES FOR TOWNSHIP EXPENSES AND DESIGNATING THE TOWNSHIP FISCAL OFFICER AS AN ADMINISTRATIVE AGENT TO SOLICIT PROPOSALS FROM FINANCIAL INSTITUTIONS, ISSUERS OF FINANCIAL TRANSACTION DEVICES, AND PROCESSORS OF FINANCIAL TRANSACTION DEVICES**

The Board of Trustees of Berlin Township, Delaware County, Ohio ("Board") met in public session on September 11, 2023 at 5:30 PM at the Berlin Township Hall located at 3271 Cheshire Road, Delaware, Ohio 43015, with the following members present:

Trustee Bullard Trustee O'Brien Trustee Raehll

Raehll moved the adoption of the following Resolution:

**PREAMBLE**

**WHEREAS,** the Board adopted Resolution Number 23-08-15 on August 14, 2023; and, for the purpose of clarifying certain terms and provisions contained therein, the Board wishes to repeal and replace the same with the Resolution adopted herein.

**WHEREAS**, Berlin Township Zoning Department and Administrative Office accept payments

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting September 11, 2023**

**WHEREAS,** the Board has determined that the acceptance of payment for Berlin Township ("Township") expenses by financial transaction devices will contribute to the health, safety, and welfare of the Township and its residents; and,

**WHEREAS,** the Board has determined that the acceptance of the payment of fees and expenses, in addition to the acceptance of cash and checks, will increase the efficiency of Township operations and inure to the benefit of Township residents; and,

**WHEREAS,** Berlin Township Zoning Department and Administrative Office fees are established, published, and will be reviewed to ensure that they are both correct and appropriate; and,

**WHEREAS,** R.C. § 503.55 authorizes the Township to accept payments of Township fees and expenses by financial transaction devices; and,

**WHEREAS,** pursuant to R.C. § 503.55(A)(1), financial transaction devices include credit cards, debit cards, charge cards, or prepaid or stored value cards, or automated clearinghouse network credit, debit, or e-check entries that includes, but is not limited to, accounts receivable and internet-initiated, point of purchase, and telephone-initiated applications or any other device or method for making an electronic payment or transfer of funds; and,

**WHEREAS,** pursuant to R.C. § 503.55(A)(2), township expenses includes fees, costs, assessments, fines, penalties, or any other expense a person owes or otherwise pays to the Township; and,

**WHEREAS,** pursuant to R.C. § 503.55(B), the Board shall designate the Township Fiscal Officer as an administrative agent to solicit proposals from financial institutions, issuers of financial transaction devices, and processors of financial transaction devices, to make recommendations about those proposals to the Board, and to assist Township offices in implementing the Township's financial transaction device program.

**RESOLUTION**

**NOW, THEREFORE, BE IT RESOLVED:**

A. That Resolution Number 23-08/15 is hereby repealed and replaced with this Resolution.

B. That the Board authorizes, pursuant to R.C. § 503.55, payments by "financial transaction devices," as defined in R.C. § 503.55(A)(1), for Township expenses.

C. That the Board authorizes the following Township offices to accept payments by financial transaction devices: Berlin Township Zoning Department and Administrative Office.

D. That the Board authorizes any expense considered to be a "township expense" under R.C. § 503.55, including, but not limited to, the following: Fees; costs; assessments; fines; penalties; payments; or any other expense a person owes or otherwise pays to the Township.

E. That the Board authorizes the following types of financial transaction devices to be accepted, upon the condition that an agreement setting forth the terms and conditions for payment using such financial transaction device is entered into with the issuing financial

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting September 11, 2023**

F. That the acceptance of financial transaction devices need not be uniform among different types of Township expenses.

G. That the Board authorizes a surcharge or convenience fee for use of a financial transaction device to be paid by the user of the financial transaction device; and, that the amount authorized as a surcharge or convenience fee shall be determined by the Board after selection of a financial institution(s), issuer(s) of financial transaction devices, or processor(s) of financial transaction devices to facilitate the Board's financial transaction devices program.

H. That every Township office accepting payment by a financial transaction device shall comply with the requirements of R.C. § 503.55(E) notice; namely, that each Township office accepting payment by a financial transaction device shall clearly post a notice in that office and online, if payments are accepted online, that each person making a payment by such a device shall be notified about the surcharge or fee, and that notice to each person making a payment shall be provided regardless of the medium used to make the payment and in a manner appropriate to that medium.

I. That each notice required by R.C. § 503.55(E) shall include all of the following: A statement that there is a surcharge or convenience fee for using a financial transaction device; the total amount of the charge or fee expressed in dollars and cents for each transaction, or the rate of the charge or fee expressed as a percentage of the total amount of the transaction, whichever is applicable; and, a clear statement that the surcharge or convenience fee is nonrefundable.

J. That if a payment by financial transaction device is returned or dishonored for any reason, the person making payment by the financial transaction device shall pay the amount necessary to reimburse the Township for banking charges, legal fees or other expenses incurred by the Township in collecting the returned or dishonored payment; and, that these remedies and procedures are in addition to any other available civil or criminal remedies provided by law.

K. That the Township Fiscal Officer is designated as an administrative agent to solicit proposals, within the guidelines established by the Board in this Resolution and in compliance with the procedures provided by R.C. § 503.55(C), from financial institutions, issuers of financial transaction devices, and processors of financial transaction devices, to review the proposals and to make recommendations about those proposals to the Board, and to assist Township offices in implementing the Township's financial transaction device program.

L. That the Board shall consider the Township Fiscal Officer's recommendation and review all proposals submitted.

M. That the Board may choose to contract with any or all of the entities submitting proposals, as appropriate.

N. That the Board shall provide any financial institution, issuer, or processor that submitted a proposal, but with which the Board does not enter into a contract, notice that its proposal is rejected; and, that such notice shall state the reasons for the rejection, indicate whose proposals were accepted, and provide a copy of the terms and conditions of the successful bids.

P. That all formal actions of the Board concerning and relating to the passage of this Resolution were adopted in an open meeting(s) of the Board, and all deliberations of the Board and of any of its committees that resulted in such formal action were in a meeting(s) open to the public in compliance with all legal requirements, including R.C. § 121.22.

Q. That this Resolution shall be in full force and effect immediately upon adoption.

Bullard seconded the Motion.

The roll being called upon its adoption, the vote resulted as follows:

| | | | |
|---|---|---|---|
| YES | O'Brien ____________ | Raehll _________ | Bullard ____________ |
| NO | __________________ | __________________ | __________________ |
| ABSTAIN | __________________ | __________________ | __________________ |

Signed this September 11, 2023 in Berlin Township, Delaware County, Ohio.

**BOARD OF TRUSTEES OF BERLIN TOWNSHIP**

**DELAWARE COUNTY, OHIO**

____________________
Trustee Meghan Raehll

____________________
Trustee Ron Bullard

____________________
Trustee Ken O'Brien

Attest:

____________________
Claudia Smith, Township Fiscal Officer
Berlin Township, Delaware County, Ohio

**CERTIFICATE**

State of Ohio, County of Delaware County

I, the undersigned Township Fiscal Officer of Berlin Township, Delaware County, Ohio, certify that the foregoing Resolution No. 23-09-10 is taken and copied from the record of proceedings of the Board, and that it has been compared by me with the Resolution on the record and is a true and accurate copy. Further, I certify that the adoption of such Resolution occurred in an open meeting held in compliance with R.C. § 121.22.

Date: September 11, 2023

____________________
Claudia Smith, Township Fiscal Officer
Berlin Township, Delaware County, Ohio

Motion: Raehll
Second: Bullard
Vote: O'Brien yes, Raehll yes and Bullard yes

**Fire Department-**
**Requisitions-** Chief Miller said they received three estimates to replace the aging tile at the

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting September 11, 2023**

**FIRE STATION WITH LDT CONDITIONALLY THAT IT IS CONFIRMED THAT IT IS A SHAW COMMERICAL GRADE PRODUCT AND THAT THE REMOVAL INCLUDES HAWLING IT AWAY**

Motion: O'Brien
Second: Bullard
Vote: O'Brien yes, Raehll yes and Bullard yes

**RESOLUTION 23-09-12** **APPROVE $15,004 WITH AN EXPECTED COST OF $12,902 TO R & T YODER FOR THE PURPOSE OF REPLACING EXISTING BAY LIGHT FIXTURES WITH LED AND INSTALLING TWO SEVENTY-TWO INCH HUNTER CEILING FANS AND PROCURING THE COUNTY PERMIT AND THIS AMOUNT INCLUDES UPTO $2,500 FOR THE REDRAWING OF THE PLAN AT THE FIRE STATION**

Motion: O'Brien
Second: Bullard
Vote: Raehll yes, Bullard yes and O'Brien yes

**Step Increase-RESOLUTION 23-09-13** **MOTION UPON THE RECOMMEDATION OF CHIEF MILLER THAT CAPTIAIN MALACHAI SWANSON HAVING MET ALL THE GOALS SET FORTH BY THE CHIEF, BE GRANTED STEP 5 PAY WITH AN HOURLY RATE OF $22.24 EFFECTIVE SEPTEMBER 3, 2023**

Motion: O'Brien
Second: Bullard
Vote: Raehll yes, Bullard yes and O'Brien yes

Chief Miller said he received quotes for mulch but would like to do river rock, so they don't have to mulch every year. Raehll said bring a quote to the next meeting.

**Fiscal Officer Items –**
**August Bank Statement and Electronic Payments–** Smith said the bank statement balanced.

**Cemetery–**
**Transfer of Cemetery Plot in Cheshire-** Raehll said we have the Cheshire Cemetery sexton here and asked Buell if we had an issue and Raehll said we discussed the letter that was submitted. Bullard asked Buell what his recommendation was and Buell said the person bought the grave space and was not mislead to think that there would be houses around here sometime. Regardless of where you buy a grave space there will be houses around you. Personally, he is not in favor of transfers a gravel space as you will be setting a precedence. Raehll told Buell that we did discuss this and that getting away from a house is not a good reason for requesting a transfer. After a lengthy discussion it was decided that they could transfer it to a family member or he can keep the site and purchase another one in a different spot in the cemetery. Buell said the rule books need to be updated to include Evergreen and he is almost out of books.

3 Minute recess.

Raehll stated that we have a date, time, place, certain for consideration of T&R Properties request to re-open BZC 23-003 The Residences of Berlin Township. This is a consideration of a request to re-open not a consideration of the application itself. She gave the applicant time for a brief presentation.

RJ Sabatino with T&R Properties and Berlin Apartments LLC, applicant and owner said he

national level in the United States they find no community using such contradictory instructions for zoning permits and allowances for density, setbacks and restrictions when creating overlays and multiuse planning and allowances for density for commercial, industrial and multifamily zones. The township appears under an approved comprehensive plan and the boarder overlay zonings that this area is to be developed to meet it's citizens needs for multifamily housing based upon economic realities so the township can increase its tax base, encourage developments and planning. We have pointed out that the problem remains that causing developers to create amenities and non-usable spaces for open space results in disincentiving developments that meets reasonable expectations for risking capital and obtaining project funding. He said they had expected to have the trustees address this on the county but the meeting scheduled August 18, 2023 was unexpectedly cancelled. After the unexpected cancellation of this open forum to review the issues with the Berlin industrial overlay the depth of the discussion impacting this application have stalled the final decisions and negotiations for approval. They have sent several letters which he would like to enter into the record as he referenced dated July 5, 2023 and August 10, 2023. He said these letters in tonight's presentation raise the discussion of the following issues that pivots investment backed expectations by any property owner. These restrictions are all very unreasonable and infringe upon our land use rights as it pertains to a PUD and TPUD.

1. R4 density. He said 4 units to net developable acre of 3.4 units/acre are taking away property rights to develop the property in an economic manner resulting in denying the land owner and applicants its constitutional rights to develop with reasonable restrictions consistent with the township's adopted zoning code and the needs of it's citizens. The denial of this application is opposite of what the township and the county stated their objective in these areas' of the township. We are requesting for 6.97 units per net developable acre which is far lower density, half or less, than any recent zoning in adjacent and nearby townships and municipalities.

2. Parking. He said 3 spaces per dwelling unit as per the Berlin code is not reasonable in today's economic realities in this area and is not standard in any other municipality or township where proper economic development occurs and has been approved. The applicant is providing 624 total spaces inclusive of sufficient guest parking, which is in far excess of typical residential parking standards in adjacent and nearby townships and municipalities.

3. Rental Units. He said this relates directly to TPUD and said there is a severe limitation on the quantity of units that are allowed to be rented under a TPUD which is irrational and counterintuitive to any viable multifamily development considering the ownership problems and housing needs in the township and county. We are requesting 100% of our units in this application and in this project, be rental units to address this real, current and projected affordable housing deficit situation.

He stated the specific issues for multifamily development with BIO Article 19 as applied in the conditions being imposed, some of which may also overlap with the above PRD and TPUD issues are as follows:

1. Setback from existing residential: a 250' setback from existing residential homes is taking of our property rights and is as if the township is taking our property without allowing investment recoupment and is a taking forbidden by townships, municipalities and government entities under the US and Ohio constitution because the restriction has no rational basis and unduly curtails investment backed expectations. This is why we are bringing these issues to your attention and the county because we have spoken with representative of numerous landowners and prospective developers who have walked away from projects in Berlin Township and the park, because of these real-life problems. We would be the first developer to go through this process under these economic disincentives and this is what called 'economic condemnation'.
2. R-4 Density. As seen in the BIO Section 19.03 C.a. A: Areas designated R-4 density shall not exceed four (4) dwelling units per net developable acre.

he hopes to set for October. He also would like to conclude by adding, as it relates to their application that they were told by zoning staff that the BIO and zoning is subject to minor modifications and that includes density. Again, they respectfully request approval of our multifamily rezoning which is a portion of our mixed-use developments which includes this application BZC 23-003 and their industrial application which they hope to have before them in October.

Respectfully, RJ Sabatino

O'Brien asked if they were doing a new application for the industrial and Sabatino said they are requesting modification of the NAICS codes which is what had been sent previously in other emails and letters to the township. O'Brien asked if this was a new application. Sabatino said if that is what they have to do but it was their understanding that they could modify the NAICS codes. Raehll said the request related to the industrial does not pertain to what we said we would be considering in this particular date, time, place. She understands that he has it in the record so it is duly noted, but that is a separate issue that has already been approved by the board related to that case that application as far as they are concerned has been approved and is complete. She said if he has another issued related to it, it will have to stand outside of the consideration to reopen the case that you are requesting to reopen tonight which relates specifically to the apartments. O'Brien said what he heard was a new application. Raehll said even if it was a revision to the prior application that has already been approved it still isn't pertinent to BZC 23-003. Raehll said what we are here to consider specific to the request to reopen BZC 23-003.

Raehll said she would like to gather some specifics related to some facts and asked Sabatino if when he purchased the land, when he entered into the contract for the land if he was aware of the Berlin Comprehensive Land Use Plan. Sabatino said they were and they were aware of their preapplication hearing and other hearings where they meet with zoning staff and where told that modifications could occur to the BIO and to the zoning. Raehll said "But you were aware of what the comprehensive land use plan said, and the zoning text said." Sabatino said "yes". Raehll said the zoning text indicated that that area was currently zoned as FR1, correct, and that there was a potential for the overlay related to R4 and when he purchased the land that was his understanding of what the zoning code said at that time. Sabatino said with it's inaccuracies and functional flaws, that's correct. Raehll said so the answer was yes, you knew what the zoning was when you purchased the land. Sabatino said with it's inaccuracies, error. Raehll said she wasn't asking about inaccuracies and errors she was asking if he was aware that the overlay had R4 and that the land he purchased was FR1 at the time that he entered into the contract. Sabatino said correct with all the other meeting and representations yes.

Raehll asked if he was aware that within that zoning text it does say that any discussions with zoning commission or other members is non-binding and that any such conversations related to zoning changes may or may not have any pertinence or relevance to the actual zoning application and that the zoning text is what the text is. Sabatino said okay. Raehll asked if that was a yes and he said yes.

Raehll asked what was different about his request to reopen related to his application that the board did not have knowledge of or was not privy to at the time it voted on this application. Sabatino said what they were hoping for and he said in his introduction was to have had this meeting after the August 18th open forum to discuss all the errors and flaws an functional inadequacies that exist in the BIO and your standard zoning resolution. Unfortunately, that hearing was cancelled with no follow up on rescheduling. In addition to that perhaps letting the facts settle as it relates to the substantial JEDD revenue that the township would generate as a result of this project and reiterating the substantial flaws that make proper development not work and economically condemns our property and others. Raehll said he is referencing a hearing on August 18th and said there was no hearing ever scheduled for August 18th. She said there was special meeting that they wanted to call as a

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting September 11, 2023**

approving a project, he indicated that there would not be a compromise on the specific points they indicated they would have to have compromise on and he requested a vote for that evening. He got his vote on June 12th and on June 12th they were aware of JEDD revenues, they were aware of the different facts that he brough up related to R4 and they were aware of these difference considerations he put forward. She asked if there was any new information since June 12th that this board needs to have before them that you think would substantively change or alter the outcome of that case because they have already voted on it. Sabatino said whether you call it a special meeting or a hearing that's okay, the meeting/special hearing that was to occur on August 18th did not occur. Raehll said there is a difference between a meeting and a hearing, there is a very substantial difference. Sabatino said okay, as it relates to us coming before you June 12th and you acknowledging the facts as we presented them to you that is our substantial evidence and reasoning for our request for an approval with whatever variances may need be. He said as it relates to density they have already reduced density by 100 units. He asked if they had any comments as it relates to what density, what you are looking for. Raehll said if they would have had any comments, which they did, they were heard at the June 12th hearing related to the application that he requested a vote on. So their comments on reflected in those meeting minutes from the consideration which was a public hearing in consideration of an application that you requested we voted on and she believes there were a number of comments made there and are already on the record that can speak for itself in terms of where we were at, at that time. Sabatino said again he is reiterating the letter that he spoke into the record, that is their position.

Raehll said factually there is nothing new that you're bringing forward for our boards consideration that we didn't have at the time of the vote. Sabatino said only what is in this letter and the prior two letters that they put into the record. Raehll thanked Sabatino and asked the board if they had any comments before they open it up to public comments. Bullard said he had none. Raehll opened it up for public comment.

Jasper DeChristopher said the BIOI and BCO were adopted in late 2021 which was a major effort between the township, the trustees, zoning, the economic development office of Delaware and its directors, the county commissioners, a large multifaceted group of Delaware County organizations. His question is everything that is in the overlay was known at that time, how can two years later it be so out of date, so that it needs to be completely different to allow this property change. The density of 7 versus 4 is being pushed from regional planning, to zoning, to the trustees, it's been voices on by residents. The developer purchased the land knowing the land use expectations and knowing what the zoning was at the time. They had contingency in their purchase that they communicated was dependent upon zoning approval for both their industrial and their residential development. They did not have residential zoning approval when they purchased the property, so they choose to make an investment with the risk of not having that zoning even though they had a contingency to back out of that agreement. The development and the risk of their investment. An investment is not a guarantee. Just because I buy something doesn't mean I get to call the shots on what next. So an investment whether it be land, an automobile, a security, it's a risk, there is a risk to it. They choose to move forward knowing the risk now they don't like the end result. He's sorry, that was their risk and if he made the same risk, he may not like the outcome, but he made the decision. So if they make the decision, it's their decision to live with.

Erik Rickabaugh said he has been there many times and doesn't think he has missed a meeting since 2019. He said he thinks he speaks for his fellow residents that he is getting very frustrated that we have a developer that wants to push something down their throats that is not what they want and not what they approved. Back in 2019, there has been talk about it only being 7 people, 7 homes but it's not, In 2019 he would say that at least 75 to 100 people went to zoning meetings as was just mentioned trying to decide what this property should be and through a lot of hard work the zoning commission, the trustees and

That's their problem, that's their fault. It's not the trustee's fault, it's not the townships' fault. He said we have been all through these meetings, architectural, zoning, trustees and they have either been rejected or been told that this isn't going to be approved every time and they continue to push forward. And what they are trying to do is bully yourselves and the township into accepting something that we don't want. He said it is time to stop this. If they are not going to comply with the zoning, we need to stop listening to them. They are wasting the townships' time and our ability to move forward with a development that is what we want. It's going to be a corn field forever if we keep talking to them, so he appreciates their continued support in doing the right thing. Thank you.

Edie Parker said like her neighbors have said they are not the only ones impacted. Those that live directly on Old State would be the most impacted by it. She said one thing that is upsetting to her is that she doesn't have any trust in this developer. When they first started coming to the meetings they claimed they would have it 250 foot back from their house and they are happy to do that, that they are to be great neighbors and it was going to be awesome and they were going to have all these amenities in there. Now before anyone has let them do this they come before us like petulant children, we're not going to get what we want so guess what, you're going to loose out on all this revenue money. So she wants to let them know that Berlin Township is not for sale and that's the purpose of these public involvement meetings, is to listen to the residents and they want the no go option as far as thing goes, not this deal. She said like her neighbor said they appreciate the trustees as this is a lot, it's a lot for all of us but we have a lot of time and money invested in their homes and T&R Properties has a habit of not maintaining what they build and while she feels for lower income people she doesn't want that in her backyard, so doesn't want it for Berlin Township and thinks we can do better than that and thinks we are better than that. Thank you.

Nicki Acker thanked the board for doing this again and again and she truly appreciates them going through this. She said Berlin Township is a wonderful place to live. We have wonderful schools, wonderful neighborhoods, wonderful people that are moving in to all the new developments that are high dollar developments and it's sad when a developer comes in and gets to do what they want to with revisions and wanting to change codes and all and then they leave, and the residents are stuck with whatever they provide or put in. She believes that T&R Properties also own Dooley Orchards and you can go to the website of the Better Business Bureau and see some of the comments that people have put in with the Better Business Bureau and one that really stood out to her was one of the residents wanted bullet holes fixed in their door. She can't see Berlin Township with something in our area where we would have to worry about our safety. There are also two other comments from the Better Business Bureau link where one of the residents from Dooley Orchard said, "This is just not a safe place to live." There was another one that said, "I feel unsafe in my own apartment." So, if the residents don't feel safe then I don't think the neighbors would feel safe either. Thank you very kindly.

Raehll asked if there were any other public comments, hearing none she closed the time for public comments. O'Brien said he thinks we should provide rebuttal. Raehll said but for public comments are there any here in favor of related to public comments. Hearing none she closed public comments and provided the applicant an opportunity to briefly respond to any questions or statements made if they so choose.

RJ Sabatino thanked the trustees and said he would be quick. It's true nothing has happened in the Berlin Industrial Park, and nothing will with the flaws, the inaccuracies and the economic condemnation that exists. He is happy to answer any questions as it relates to the letter that he spoke into the record and he is hopeful for their vote this evening.

O'Brien asked if he verified that all the things that he stated are true. Sabatino said correct.

Raehll asked if it's the applicants request that the board considers the request to re-open the application for BZC 23-003 and is asking for a vote this evening. Sabatino said yes.

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting September 11, 2023**

very intentionally a variety and diversity of housing across our township and at least from her perspective the issue of providing that type of diversity and affordable housing is an important priority for anyone that has to make zoning considerations. She said that work was intentionally built into the business park and so there are different areas, there are different parcels, different types of housing. She has said time and time again that we will have a significant deficit and shortage of housing particularly for aging populations and young professionals if we don't do something now. For her the issue is completely irrelevant to that and is contingent on the fact that we built a design, we have a plan, those things are in place, you were aware of it, you have had the application, we have done ever procedure and in fact this is rather a unique situation in and of itself that we are even having a re-consideration to re-open a case in which the trustees have already voted on and she does question first of all whether or not a request pursuant to 519.12 that has already been denied by a board can even be reconsidered but they have been advised that there may be a possibility. She has yet to see any case law on something that the board has denied and then brough back to re-consideration in this way. With that said she does think that they provided them with ample opportunity to bring something forward in hopes that they could have a conversation about something different. About information that may have a significant impact on their decision making at the time on June 12th.

Sabatino said as it relates to your earlier comment for housing diversity the facts of his letter indicate the exact opposite of what you said and that Berlin is absolutely not in favor of any diversity in housing or proper developments. Raehll said that is the statement that you made but the facts are that if you look at our zoning code we do have and have provided a variety and diversity of housing so the facts are stated within our zoning code which you have stated your are familiar with and if you look in there you will find a variety of different amendments, housing types, options. Sabatino said if you will allow me to respond without being interrupted, he supposes beside the facts in his letter, the facts are also how Berlin has consistently passed up opportunities to Orange Township, to the City of Delaware, to Berkshire Township, to elsewhere in the county, housing and industrial due to the deficiencies and economic condemnation in your zoning code both zoning resolution and Berlin Industrial Overlay we provided more than anyone else as it relates to giving up density, 100 units, and here we are restating the facts in our letter and that is all that he has to so thank you. Raehll asked if he was finished, and he said yes. Raehll thanked him.

O'Brien said he has a brief comment and said so you are saying you gave up 100 units, but you didn't have 100 units to give up. When you look at the zoning resolution in the area there is an overlay that provides for 4 units at this location, but you didn't choose to do that you chose to do something else so, you site a variety of restrictions that were imposed on you which are in fact not imposed on you because you didn't do the overlay. The other point that he has is that you are saying there isn't a diversity of zoning available, yet your 6.97 units would be available a few properties over so it's not that Berlin Township doesn't provide a place that would suit what you are request is, there is in fact in our zoning resolution a place where your plan would be welcomed, in his opinion. O'Brien said he also sites that all the adjacent entities provide for the density in which you are requesting and have a history of that and you have testified that you have verified the accuracy of this, he questioned the accuracy of it in particular in the adjacent and closest adjacent township, Brown, he doesn't know a single place in Brown that has this density and you may have it and can provide it to me and he may be wrong but he is not aware of Brown's 6.97 units per acre. Raehll said even in the references provided it's not the case that that density is permissible in every parcel in those areas either. Just like with us there are areas that will allow for more, there are areas that allow for less based on what is written the zoning resolution of those respective entities.

Sabatino asked if he could respond and Raehll said no and asked trustee Bullard if he had anything to say and he said that he can't figure any place in our zoning text that would allows this. He can find it in the overlay, and he can find it in areas other than this particular

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting September 11, 2023**

**23-09-14 THE ZONING APPLICATION FOR BZC 23-003 T & R PROPERTIES**

**BERLIN TOWNSHIP BOARD OF TRUSTEES**
**DELAWARE COUNTY, OHIO**

**DATE: 09-11-2023**

**RESOLUTION NO. 23-09-14**

**RESOLUTION DENYING APPLICANT'S REQUEST TO RE-OPEN THE ZONING APPLICATION FOR BZC 23-003**

The Board of Trustees of Berlin Township, Delaware County, Ohio ("Board") met in regular session on September 11, 2023, at 7:00 PM at the Berlin Township Hall located at 3271 Cheshire Road, Delaware, Ohio 43015, with the following members present:

Trustee Raehll __________

Trustee Bullard _____

Trustee O'Brien _____.

**Trustee O'Brien** moved the adoption of the following Resolution:

**PREAMBLE**

**WHEREAS,** Randall Allan Woodings, AIA, as Agent/Applicant, filed an Application For Preliminary Development Zoning Plan (Resolution To Amend Berlin Township Zoning Text) on January 11, 2023 seeking to amend certain property from FR-1 to PRD (Multi-Family Development); and,

**WHEREAS,** an amended Application was submitted by T&R Properties on March 7, 2023 seeking Density Divergences, Setback Divergences, Parking Divergences, and a Divergence from the per unit minimum square footage requirement; and,

**WHEREAS,** the Berlin Township Zoning Commission (BZC) held hearings on February 14, 2023 and March 21, 2023; and,

**WHEREAS,** the BZC recommended denial of the Application; and,

**WHEREAS,** the Board held hearings on April 24, 2023 and June 12, 2023; and,

**WHEREAS,** on June 12, 2023, the Board voted to deny the Application; and,

**WHEREAS,** on July 5, 2023, T&R Properties requested that the Board re-open and table the Application; and,

**WHEREAS,** on July 10, 2023, the Board continued the matter until September 11, 2023 in order to provide notice of the request to re-open; and,

**WHEREAS,** on September 11, 2023, the Board afforded T&R Properties an opportunity to provide support for and/or to argue the merits of its request to re-open; and

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting September 11, 2023**

## RESOLUTION

**NOW, THEREFORE, BE IT RESOLVED:**

A. That the Board has considered the request to re-open, does not find the same to be well-taken, and, therefore, denies Applicant's request.

B. That all formal actions of this Board concerning and relating to the passage of this Resolution were adopted in an open meetings of the Board, and all deliberations of this Board and of any of its committees that resulted in such formal action were in meetings open to the public in compliance with all legal requirements, including R.C. § 121.22.

C. That this Resolution shall be in full force and effect immediately upon adoption.

**Trustee Bullard** seconded the motion.

The roll being called upon its adoption, the vote resulted as follows:

YES: Bullard_____ O'Brien_____ Raehll_______

NO: ____________ ____________ ____________

ABSTAIN: ____________ ____________ ____________

Signed this September 11, 2023, in Berlin Township, Delaware County, Ohio.

**BOARD OF TRUSTEES OF BERLIN TOWNSHIP,**

**DELAWARE COUNTY, OHIO**

______________________________

Trustee Meghan Raehll

______________________________

Trustee Ron Bullard

______________________________

Trustee Ken O'Brien

Attest:______________________________

Claudia Smith, Township Fiscal Officer

Berlin Township, Delaware County, Ohio

## CERTIFICATE

State of Ohio, Delaware County

I, the undersigned Township Fiscal Officer of Berlin Township, Delaware County, Ohio, certify that the foregoing Resolution No. 23-09-14 is taken and copied from the record of proceedings of the Board, and that it has been compared by me with the Resolution on the record and is a true and accurate copy. Further, I certify that the adoption of such Resolution occurred in an open meeting held in compliance with R.C. § 121.22.

Date: September 11, 2023

______________________________

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting September 11, 2023**

Discussion: O'Brien said he thinks we have covered it and Bullard said he was hoping that there would be substantial changes that they could live with.
Vote: Bullard yes, O'Brien yes and Raehll yes
Raehll called for a 10-minute recess.

*******8:00 PM TIME CERTAIN***BBP 23-003 The Elysian at Alum Creek********

Jordan Yates applicant for Elysian at Alum Creek said he was excited to be here as the first two meetings on this project were met with resounding endorsements both from township members and the public. He reviewed changes that came up at the last meeting which was adding a gazebo by the pond and to continue the walking trail and also to review the exterior materials and lighting. He said there are three parcels that total 31.68 acres with a new density of 10 units per developable acre and complies with the zoning that they are requesting pulling down from the cloud. He reviewed the plans and said the heart of the community would be the 7,000 square foot resort style clubhouse with a pool, fitness center and golf simulator. Todd Faris said one of the items for discussion was the lighting as the code has two different lighting standards for the commercial verses residential and they are unable to find anyone that carries them after checking with twenty-one different vendors and none of them had 1,600 lumens or less. They are asking for 2,800 lumen fixtures at 12-foot height and anything less than that will be too dark and too dangerous. Raehll said this is listed in the overlay as a commercial/residential project.

Yates said their second concern was the use of EIFS which is mostly used on commercial uses and office buildings, and they are asking to use hardy plank. He pointed to the areas where they wanted to make this change. O'Brien asked if this request was given to the ARB and Yates said it was. O'Brien asked what they said, and Yates said they felt it was an omission of the code. O'Brien asked if they approved the change and Yates said no, they passed the buck. Raehll said she read in the meeting minutes that they said it wasn't an omission, their job was to compare it to what the overlay explicitly states, and it's not explicitly stated in the overlay. Then they went to the zoning commission, and they had additional follow up and feedback and they thought there was some potential inconsistencies between the commercial and the residential. O'Brien asked that they be indicate the quantity of EIFS they wanted to do. Yates showed him where on their plans they would change it. Faris said EIFS is not durable. Raehll read from the code the materials that were allowable and it was determined that they could use other building materials to replace the EIFS except vinyl or aluminum, which is prohibited.

There was a lengthy discussion on the color of the buildings as Raehll said there was too much white and Yates said they could look into replacing some of the white with a taupe color so it wasn't so prominent. O'Brien questioned if the fountains in the pond go 10 feet and they said they would add it as a condition. O'Brien said the hill on the property is not complaint and Faris said it was. Raehll read the code that addressed this. O'Brien said he could see if they could extend it so it doesn't go into wet lands. Raehll said there was a conflict with the environmentally sensitive area. Sanders said the mound was created under the perimeter area, section 8. Raehll said she very much appreciates the knowledge and the attempt to be compliant in accordance with the code and their familiarity with it. They decided that the hill should be curved.

There was a lengthy discussion about the landscaping and placement of the hedges to shield headlights from shining into residents' windows. Raehll asked where the multi-use path was located, and they showed her on the plans. Raehll said she was not happy about the lack of walkability in the area. She said it was disappointing that they will not have key connectors for their own residents. Yates said he doesn't believe it is required in the code. For their residents he said the overlay ends at the northern boundary of their property and no one is walking across 36/37. Raehll said they will be walking to the north because the overlay was designed for walkability. Yates said if it is required it will require significant adjustments to their plan but that is on them to make the adjustment and if it is not required, he would request that they make slight adjustments and add a five-foot path. Raehll and O'Brien said they could live with that.

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting September 11, 2023**

Raehll opened for public comment, hearing none she closed public comment and stated that the application will be making some adjustments at their request.

| | |
|---|---|
| **RESOLUTION 23-09-15** | **MOTION TO RECESS AND CONTINUE HEARING ON BBP 23-003 TILL 10:20 P.M. ON SEPTEMBER 11, 2023, AT 3271 CHESHIRE RD** |
| Motion: | Raehll |
| Second: | Bullard |
| Vote: | Bullard yes, O'Brien yes and Raehll yes |

5 Minute Recess

**Road Department-** Bullard said they have talked about moving the diesel fuel tank down to the fire station and they are getting quotes together. Raehll asked about the storage building and Bullard said he is working with the prosecutor. O'Brien asked if they could work quicker so they could get the concrete pad done before winter.

Raehll said they also have the zoning signs, and they discussed the colors and the size.

| | |
|---|---|
| **RESOLUTION 23-09-16** | **APPROVE $2,800 WITH ANTICIPATED COST BEING $2,249.49 TO KLEEM FOR WELCOME TO BERLIN TOWNSHIP SIGNS AND TO BE EXECUTED BY TRUSTEE BULLARD** |
| Motion: | Raehll |
| Second: | O'Brien |
| Vote: | O'Brien yes, Raehll yes and Bullard yes |

Paykoff asked if he comment on the storage building and said according to the fire inspector, they needed 25 feet between the two buildings which will take them to 3 feet from the ditch and they will need to move the cemetery sign. Raehll said she was not aware of this and said they were talking about connecting it to this building. Paykoff said if you do that you need to bring it up to code.

Raehll called the public hearing back to order at 10:20 and said the applicant has few requests to amend the current plan as we see it today. They reviewed the list of conditions and decided on the following:

1. Fountains in ponds will have a ten (10) foot spray height minimum.
2. Head walls and end walls at pond inlets will have stone veneer, including stucco stone.
3. If the code requires a ten (10) foot multi-use pathway along SR 36-US 37 it will be added. If it is not required a five (5) foot sidewalk will be added along the southern perimeter.
4. Documentation will be provided to the township within 30 days, showing that N. Old State is classified as a local road and therefore, only requires a five (5) foot sidewalk. If it is found to require a ten (10) foot multi-use path to be code compliant, the plans will be modified to include.
5. Mounding along the northwest perimeter, above dog park, shall be extended by twenty (20) feet to the northeast.
6. Omit perennials along the foundations of residential units facing parking lots and adding screening plants of an average of three (3) foot height within four (4) feet of the parking lot/sidewalk. Refer to redlined plans attached. Applicant will provide a final landscape plan to the township within 30 days.
7. Cement board will be used where EIFS is shown on building elevation renderings as submitted. The amount of white will be reduced by at least 50% and replaced with muted natural colors. A new set of final plans shall be submitted to the township by October 11, 2023 to address these conditions.

| | |
|---|---|
| **RESOLUTION 23-09-17** | **MOTION TO ACCEPT DOCUMENTS PROVIDED WITHIN THE BINDER AS WELL AS THE DOCUMENTS PROVIDED AS SUPPLEMEN FOR CONSDIERATION OF THE HEARING ON SEPTEMBER 11, 2023, WITH THE LATTER DATED DOCUMENTS** |

O'Brien asked if she could state how many pages and Raehll asked that the motion be withdrawn as she is not in favor of counting the number of pages for this because they are replacing exhibits from the previous so if she says the number of pages is fifteen that could be irrelevant to the fact that these latter dated documents take precedence over the former. O'Brien said but if he pulls out the first ten pages, he doesn't know that that not the whole exhibit. Raehll said they could title them.
**Motion Withdrawn**

**RESOLUTION 23-09-18** **MOTION TO ACCEPT EXHIBIT 2 THE FIFTEEN PAGE DOCUMENT PROVIDED FOR THE SEPTEMBER 11, 2023, HEARING WITH ALL LATTER DOCUMENTS TAKING PRECEDENCE OVER FORMER**

Motion: Raehll
Second: O'Brien
Discussion: Bullard asked if she counted them and Raehll said she did, she will count them again. For clarity there were fifteen.
Vote: O'Brien yes, Raehll yes and Bullard yes

Raehll said they have accepted all the documents and Faris gave her the exhibits that show what they are adding and what they are removing.

**RESOLUTION 23-09-19** **MOTION TO ACCEPT APPLICANTS REQUEST FOR AMENDMENTS THREE PAGE DOCUMENT AND THE PROPOSED LANDSCAPE ADJUSTEMENTS AS EXHIBIT 3 WITH THE LATTER DOCUMENTS TAKING PRECEDENCE OVER THE FORMER**

Motion: Raehll
Second: O'Brien
Discussion: O'Brien wanted to note in the record that they did sign the request and agreed to provide a typed-up copy of their requested changes.
Vote: Raehll yes, Bullard yes and O'Brien yes

**RESOLUTION 23-09-20** **APPROVE ACCEPTING BBP 23-003 THE ELYSIAN AT ALUM CREEK ALONG WITH EXHIBITS THROUGH THREE WITH THE LATTER EXHIBITS TAKING PRECIDENCE OVER THE EARLIER EXHIBITS**

Motion: Bullard
**MOTION WAS WITHDRAWN**

**RESOLUTION 23-09-21** **APPROVE BBP 23-003 THE ELYSIAN AT ALUM CREEK WITH ACCEPTANCE OF ALL THE EXHIBITS WITH THE LATER NUMBERED EXHIBITS TAKING PRECIDENCE OVER THE FORMER**

Motion: O'Brien

O'Brien said he wasn't ready to accept this. He said he thinks it's technically okay but asked if Bullard would mind adding that the fact is that the applicant has made the request in exhibit three of the request that it's part of it. He knows it is redundant, but he would feel more comfortable with that. Raehll said a friendly amendment to the motion. Bullard said go ahead and word it however you want to word it.
**MOTION WAS WITHDRAWN**

**RESOLUTION 23-09-22** **APPROVE BBP 23-003 THE ELYSIAN AT ALUM CREEK WITH EXHIBITS 1 THROUGH 3 NOTING THAT THE APPLICANT HAS REQUESTED SEVEN CHANGES TO THE APPLICATION AND THOSE ARE INCORPORATED IN THE REZONING**

Motion: O'Brien
**MOTION WAS WITHDRAWN**

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting September 11, 2023**

**THIS TIME**

Motion: Raehll
Second: O'Brien
Discussion: Raehll said she would like to reiterate thanking them for working with them but this type of product is exactly what the township needs and appreciates that living in this area so it is worth putting in the detail and effort to get the output of what they are going to see and the kind of diversity of housing and they type of things we need to keep pace with the growth. Bullard said they really recognized the community and support the community and its placement. O'Brien concurred and also said they discussed at length issues that were problematic but in general the application was very well put together. He said the variances with divergences are ones that are appropriate and are not, not in keeping with the intent and the letter of the zoning resolution, so he appreciates them working with the trustees to accommodate some of the requests that they had and that they requested, and he hopes they have success.
Vote: Raehll yes, O'Brien yes and Bullard yes

**RESOLUTION 23-09-24** **ADJOURN HEARING FOR BBP 23-003 AT 11:20 P.M.**

Motion: Bullard
Second: O'Brien
Vote: Bullard yes, O'Brien yes and Raehll yes

**Trustee Items –**
**Assistant Zoning Inspector –** Raehll said we received two applications and would like to discuss this in executive session.

**Township Operations Specialist-** Raehll said one application was received and she would like to discuss this in executive session also.

**Temporary Cemetery Assistant-** Raehll said no application has been received for this.

**Fiscal Officer Succession-** Raehll asked if there was a write in candidate for the fiscal officer position and was told there was. Raehll asked Smith if she wanted to expand her staff and Smith said she hadn't thought about it because she didn't want to hire people and then the new fiscal officer may not want those same people. She would rather have them hire who they want to hire. O'Brien said he thought we needed to be more precise in our appropriations and Raehll asked in what way. O'Brien said he believed that the zoning payroll should come from zoning as there was a time that it came from the general fund as the zoning fund was under funded. Smith said she has been taking it from the zoning fund for the last few years. Raehll asked how they are to get rid of things in the trustee's office regarding inventory and Smith said they just need to complete an inventory sheet when they are getting rid of anything, and she will remove from the list. Smith said she would be having a recycling company come in the next month or two.

**OTA Leadership Academy Training Workshop-**

**RESOLUTION 23-09-25** **APPROVE UPTO $100 FOR TRUSTEE RAEHLL TO ATTEND OTA LEADERSHIP ACADAMY TRAINING WORKSHOPS**

Motion: Bullard
Second: O'Brien
Vote: Bullard yes, O'Brien yes and Raehll yes

**Zoning Department –**
**August Zoning Report –** There were 8 new home permits for August with a YTD total of 89.

**Future Meetings –**

**BERLIN TOWNSHIP TRUSTEES**

**5:30 p.m. Trustee Meeting September 11, 2023**

| | |
|---|---|
| **23-09-26** | **121.22 (G)(4) PREPARING FOR, CONDUCTING, OR REVIEWING NEGOTIATIONS OR BARGAINING SESSIONS WITH PUBLIC EMPLOYEES CONCERNING THEIR COMPENSATION OR OTHER TERMS AND CONDITIONS OF THEIR EMPLOYEMENT AND 121.22 (G)(1) FOR CONSIDERATION OF APPOINTMENT, EMPLOYMENT, DISMISSAL, DISCIPLINE, PROMOTION, DEMOTION, COMPENSATION OF A PUBLIC EMPLOYEE OR OFFICIAL, - THREE TRUSTEES, FISCAL OFFICER AT-11:45 P.M.** |
| Motion: | Raehll |
| Second: | O'Brien |
| Vote: | O'Brien yes, Raehll yes and Bullard yes |
| **RESOLUTION 23-09-27** | **MOTION TO RETURN TO REGULAR SESSION AT 12:14 P.M.** |
| Motion: | Bullard |
| Second: | Raehll |
| Vote: | O'Brien yes, Raehll yes and Bullard yes |

Raehll said "We met in executive session and no decisions were made and no actions were taken."

| | |
|---|---|
| **RESOLUTION 23-09-28** | **MOTION TO APPOINT JERRY VALENTINE TO THE ASSISTANT ZONING INSPECTOR POSITION AT THE RATE OF $20.70 AN HOUR WITH UPTO SIXTEEN HOURS A WEEK EFFECTIVE SEPTEMBER 14, 2023** |
| Motion: | Raehll |
| Second: | Bullard |
| Vote: | Raehll yes, Bullard yes and O'Brien yes |
| **Late Items – Adjourn- RESOLUTION 23-09-29** | **MOTION TO ADJOURN** |
| Motion: | Bullard |
| Second: | O'Brien |
| Vote: | Raehll yes, Bullard yes and O'Brien yes |

Meeting adjourned by Chairman Raehll at 12:22 p.m.

________________________
Meghan Raehll, Chair

ATTEST:

________________________
Ron Bullard, Vice-Chair

________________________
Claudia Smith, Fiscal Office

________________________
Ken O'Brien, Trustee

*****Notice: A video recording of this meeting can be found on YouTube or Berlin Townships Facebook page.***