IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

T&R PROPERTIES, et al., :
Plaintiffs, :
vs. : Case No. 2:24-cv-3761
BERLIN TOWNSHIP, et al., :
Defendants, :

- - -

March 5, 2026

Deposition of

RJ SABATINO

a Plaintiff herein, called by the Defendants for cross-examination under the applicable Rules of Ohio Civil Court Procedure, taken before me, Jeanine Fansler, a Professional Reporter and Notary Public in and for the State of Ohio, taken pursuant to notice, at the offices of Freeman, Mathis & Gary, LLP, 65 East State Street, Columbus, Ohio on Thursday, March 5, 2026, commencing at approximately 3:00 p.m., and concluding at approximately 3:50 p.m.

- - -



MAGNA LEGAL SERVICES

APPEARANCES:

JOSHUA NAGY, Esquire
SOPHIA SAVASTANO, Esquire
Wesp Barwell
475 Metro Place, Suite 430
Dublin, Ohio 3017
Email: jnagy@wesplaw.com
(614) 204-2904

On behalf of the Plaintiffs.

ASHLEY B. HETZEL, Esquire
Freeman, Mathis & Gary, LLP
65 East State Street
Columbus, Ohio 43215
Email: Ashley.hetzel@fmglaw.com
(614) 683-8498

On behalf of the Defendants.

\- - -



MAGNA LEGAL SERVICES

Thursday Afternoon Session
March 5, 2026
3:00 p.m.

\- - -

STIPULATIONS

It is hereby stipulated by and between counsel for the respective parties herein that this deposition of RJ Sabatino may be taken at this time by the Notary; that said deposition is being taken pursuant to notice; that said deposition may be reduced to writing in stenotypy by the Notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualifications of the Notary, the time and place of the taking of said deposition are hereby waived; that the examination, reading and signature of the said RJ Sabatino to the transcript of his deposition is not waived.

\- - -



MAGNA LEGAL SERVICES

I N D E X

\- - -


| RJ Sabatino | PAGE |
|---|---|
| Cross-examination by Ms. Hetzel | 5 |


\- - -

E X H I B I T S


| DEPOSITION EXHIBITS | MARKED/REFERRED |
|---|---|
| Exhibit D - Real Estate Purchase Agreement | 6 |


\- - -



MAGNA LEGAL SERVICES

P R O C E E D I N G S

- - -

RJ SABATINO,

being by me first duly sworn, as hereinafter certified, deposes and says as follows:

CROSS-EXAMINATION

BY MS. HETZEL:

Q. Okay. We are here today for the continued deposition. So all of the same rules apply as before.

Please try not to talk over me. Our court reporter here can only take down one person at a time.

Please try to use verbal responses. Don't shake your head or nod your head, and also try to not say uh-huh because when we read the transcript back, we don't know whether it's uh-huh, yes, or uh-huh, no; then Josh and I have to fight about it.

Do you understand those rules?

A. Yes.

Q. At some point today, I may remind you of those rules. I'm not trying to be rude. I'm just trying to make sure that we get everything



MAGNA LEGAL SERVICES

down for the record. Is that okay?
A. Okay.
Q. And is it okay if I call you RJ today, or do you have another preferred name that you use?
A. RJ is good.
Q. Okay. I think at your beginning part of your deposition, we left off with Exhibit C. So this next one is going to be Exhibit D.
(Exhibit D was marked for identification.)
BY MS. HETZEL:
Q. RJ, if you would just take a second or a minute or however long you need to look over that document; and when you've done that, can you tell me if you recognize that document?
A. I recognize the document.
Q. And can you tell me what this document is?
A. This would appear to be a purchase agreement that we entered into with the Reed family for the industrial component of our mixed-use project.
Q. And can you please turn to -- it will be marked at the bottom with T&R March 2026



MAGNA LEGAL SERVICES

Supp 000241.

A. Is that page 14?

Q. Yes. That is page 14.

A. Okay.

Q. And do you see at the top where it says buyer TBD?

A. Yes.

Q. And can you tell me whose signature that is?

A. That looks to be my signature for Ron. Ron being P. Ronald Sabatino.

Q. And who is P. Ronald Sabatino?

A. P. Ronald Sabatino is a member of Berlin Industrial, LLC.

Q. And it's your testimony that you signed this document?

A. I signed this document with the permission of P. Ronald Sabatino, in his name, yes.

Q. Why did you sign this document using P. Ronald Sabatino?

A. I don't recall at the time, but it was determined that P. Ronald Sabatino wanted to sign, and P. Ronald Sabatino gave me the permission to sign for him for the purchase agreement.



MAGNA LEGAL SERVICES

Q. Have you signed for your father before?
A. With his expressed permission.
Q. Is that something that is the normal occurrence?
A. I don't believe so.
Q. How many times do you think you've signed for P. Ronald Sabatino? Would it be more than five? More than 10? More than 50?
A. I really don't know.
Q. And can you turn to -- it will be the contract, page 2. It will be marked at the bottom with 003229.
And under Article 3, closing and possession, there is a Section B. Do you see that?
A. Article 3, B, possession.
Q. Where it says "Buyer shall be entitled to possession of the property at the closing subject to one or more farm leases for 2022, and annually renewed thereafter."
Is that accurate as to what the document says?
A. That's what it says.
Q. Do you know if the property had a



MAGNA LEGAL SERVICES

farm lease at the time that you closed on it?
A. I believe it did.
Q. And do you know how much that farm lease was for annually?
A. I don't know off the top of my head.
Q. Do you know if that farm lease was renewed annually?
A. I don't know off the top of my head. I mean, the property was previously being farmed; and we wanted to develop the property; but due to Berlin's actions and so forth, that condemned our property -- prohibited us from developing it. So I believe we likely did --
Q. Do you know --
A. -- attempt to resume farming.
Q. Sorry. That was my bad. I interrupted you. I'm breaking my own rules.
Do you know if the property is still being farmed today?
A. Well, it's not the season right now. So I think there's no crops there.
Q. Do you know if there was crops during 2025?
A. I believe so, yes.



MAGNA LEGAL SERVICES

Q. Do you know if it was under a farm lease for 2025?
A. Yes, I believe so.
Q. Do you know how much money you received as part of that lease?
A. I don't know off the top of my head.
Q. Do you have the farm lease in writing?
A. We would, yes.
Q. Is that something that you can give to Mr. Nagy to give to me?
A. I can provide it, yeah.
Q. Does that have the amount of the farm lease denoted in it?
A. It would.
MS. HETZEL: Josh, can you get that for me?
BY MS. HETZEL:
Q. I understand that there were amendments to this purchase agreement, and then there was a -- did you ultimately close on the property?
A. We purchased the property.
Q. Did you perform any due diligence



MAGNA LEGAL SERVICES

before closing on the property?
A. Yes.
Q. What due diligence was that?
A. We performed soil borings to ensure that the property could adequately be developed for the uses of industrial warehousing, and/or multifamily apartments.
We also did what's called a Phase 1 environmental assessment which provides historical environmental background on the property to ensure that there are no environmental issues. There were not, and the soils were determined to be satisfactory as well for what Berlin asked for upon their initial request for it to be developed, which is one of the reasons -- which is the reason why we decided to purchase the property, and -- I'm trying to think. Yeah. That's all I can think of at this time. We did some -- I'm sorry.
We did some financial analysis as well through the course of the -- through the course of the project, and I believe I presented a spreadsheet with your discovery requests.
Q. Did you know what the property was zoned at the time you entered into the purchase



MAGNA LEGAL SERVICES

contract?

MR. NAGY: Objection.

THE WITNESS: Both pieces -- we had two contracts for our mixed-use project. One was for the industrial, which is this Exhibit D of the mixed-use project, and then we had the apartments. It's my understanding that both were zoned as FR-1. However, in their -- in Berlin Township's comprehensive plan in their zoning resolution, it is their desire for housing and for industrial warehousing. So that's what we sought to obtain with a rezoning.

Q. Have you attempted to sell these properties?

A. No.

Q. Have you attempted to market the properties for sale?

A. No.

Q. Have you spoken to anyone about potentially buying the properties?

A. No.

Q. Have you gotten an appraisal on the properties?

A. No.



MAGNA LEGAL SERVICES

Q. And have you pursued developing the residential property at its current density?

MR. NAGY: Objection.

THE WITNESS: We can't develop the residential property at its density -- at its current density.

Q. How do you know that?

A. The financial analysis that we performed and expert testimony.

Q. Who is that expert testimony?

A. Some that I think of off the top of my head would be Skip Weiler as well as Randall Woodings as well as Brian Marsh and Evan Ballman.

Q. And when you say testimony, are you talking about various hearings that occurred at Berlin Township, the meetings at Berlin Township BZA?

A. That would be an example.

Q. Have any of them prepared any reports for you regarding this testimony?

A. Their testimony in the hearings that you described them at the BZA is based upon their experience as experts in their respective fields. They have not provided any written reports, to my



MAGNA LEGAL SERVICES

knowledge.

Q. And have you pursued developing the industrial property as it relates to any of the permitted uses in the BIO?

MR. NAGY: Objection.

THE WITNESS: We can't.

BY MS. HETZEL:

Q. Why not?

A. It's impossible.

Q. Why do you say it's impossible?

A. Berlin has condemned our property by restricting required uses as it pertains to the industrial. We cannot build industrial warehousing, which is what Berlin Township enticed us with; and without the use, 493 Warehousing Storage because it is not leasable, you cannot build a building that is not leasable, and because it is not leasable, it is not financeable.

Q. But you would agree with me that there are permitted uses on the industrial property? That's my question. You would agree with me that there are permitted uses on the industrial property?

A. The permitted uses do not include



MAGNA LEGAL SERVICES

enough, particularly 493 uses to build successfully industrial warehousing.

Q. That's your opinion?

A. That's expert fact.

Q. And what experts are those?

A. I named them already.

Q. It's the same ones from before?

A. Yes. Those are some examples, and you will find in any industrial business park, warehouse park, warehousing and storage 493 are required and permitted uses even so as well in Berlin Township's own industrial zoning resolution they allow 493 warehousing and storage.

Q. Did you conduct any studies regarding companies that would have interest in purchasing units or serving as tenants of the industrial development?

A. What do you mean by conduct studies?

Q. Any market studies? Did you have brokers put out any, I guess, feelers for lack of a better word?

A. We -- based upon Berlin Township's representations and their written documentation of their zoning resolution and their comprehensive



MAGNA LEGAL SERVICES

plan and their presence in public meetings, thought that Berlin was going to be flexible, and they were not, among other things.

We thought that they were going to be flexible among other things, and we purchased steel thinking that this property was going to be built. Around the same time that we purchased steel, we were considering, hoping that we could come to resolution, which we have not; and I believe I put up a sign of my own on the property to attempt to see what kind of interest was there.

Other than that, I can't think of anything.

Q. When did you put up that sign?

A. I don't recall.

Q. Did you take any pictures of that sign?

A. It's visible from the property still.

Q. So it's still there today?

A. I believe it's still there, yeah.

Q. Can you get a picture of it and send it to Mr. Nagy to send to me?

A. Sure.



MAGNA LEGAL SERVICES

MR. NAGY: You want him to create the document?

MS. HETZEL: I can drive there myself.

MR. NAGY: If one exists, we can get it to you.

BY MS. HETZEL:

Q. Do you have any agreements with potential purchasers for tenants of the industrial development?

A. No.

Q. Did you do any studies or analysis as to what rents you intended to charge for the industrial units?

A. No. We had an idea based upon some other work that we've done of maybe what could have been achieved as far as rent per foot.

MR. NAGY: Can we go off the record for just a minute?

MS. HETZEL: Sure.

MR. NAGY: Can I have, like, two minutes with my client?

(Recess taken.)

BY MS. HETZEL:



MAGNA LEGAL SERVICES

Q. RJ, do you know how many times you've been at the township office -- the Berlin Township Office?

A. I would have to guess, but 20, yeah. I don't know the exact number. If you count all of the hearings, more, yeah.

Q. Can you recall who at the township you've spoken to about this development, and when I say "at the township," I don't mean, like, physically at the building. I mean, like, which township officials, which township staff members you've talked to?

Understanding that this has been over the course of many years, there's probably been many faces. So to the best of your recollection, do you know?

A. Cathy Ripple, one of the former zoning inspectors, Laura -- I forget her last name. It's escaping me right now, maybe the last name begins with a B.

There was a zoning inspector as well that was a former firefighter. His name was Jacob. I believe, it began with a J. Trustee Meghan Raehll, of course. Ken O'Brien. Ron Bullard. On



MAGNA LEGAL SERVICES

the zoning commission, Darcy Kaplan. Those are what I can think of off the top of my head.

Q. Have you ever run into and spoken with Ron Bullard outside of a township meeting?

A. I don't recall.

Q. Have you ever called Mr. Bullard on the phone?

A. I don't believe so.

Q. And have you ever run into and spoken in person with Ken O'Brien outside of a township meeting?

A. Yes, I believe so.

Q. Can you remember how many times?

A. No. A couple.

Q. Did you talk to him about this development when you saw him?

A. I don't recall.

Q. Have you ever run into and spoken with Meghan Raehll in person outside of a township meeting?

A. Yes.

Q. Do you know how many times?

A. I would say more than five. The ones that stick out to me the most are economic

development meetings and outings where Berlin Township was presenting the BIO and their willingness and flexibility of implementing industrial warehousing and rental housing and mix of uses and so forth. Those are what stick out to me the most.

Q. Can you recall the most recent time you saw Ms. Raehll outside of a township meeting?

A. Her deposition.

Q. Was it -- like you, I think she had two depositions. So was it the first part or the second part?

A. I think it was virtual for the second part, listening in.

Q. Did you see her in between those two depositions?

A. There might have been in some sort of outing or event. I don't recall. I don't recall.

Q. And did you talk to Mrs. Raehll about this development when you saw her?

A. When I saw her when?

Q. At the random outing or event?

A. I don't remember.



MAGNA LEGAL SERVICES

Q. Have you ever called her on the phone?
A. Yes.
Q. When was that?
A. During our application process while we were first submitting applications for our mixed-use project.
Q. Is it just one time you called her on the phone?
A. I don't think it was a lot.
Q. I asked the questions backwards. I should have asked how many times. I'm sorry about that.
Have you ever spoken with any Delaware County employees or elected officials about this development?
A. Yes.
Q. Who would those be?
A. Monica Conners, who's no longer with the county, was the head of economic development at the county.
I've also been in public places with some of the commissioners, for example, Gary Merrell. I've spoken to him about it. I've spoken



MAGNA LEGAL SERVICES

to Jeff Benton about it. Those are who I can think of right now.

Q. Have you ever spoken with anyone at the City of Delaware about this development?

A. Maybe in passing. I don't recall.

Q. I might get this wrong because the most recent census, they go back and forth between city and village, but the Village of Sunbury, have you ever spoken with anyone there about this development?

A. I have.

Q. Who would that be?

A. The city manager, Daryl Hennessy, I believe is his name. And Mayor Joe St. John are who I can think of.

Q. And do you recall what you specifically spoke with the city manager about?

A. I check in with them -- Sunbury or -- from time to time to see if there's any development changes or what have you; and I believe I gave them an update on the lack of anything happening in the Berlin Industrial Overlay.

I'm also aware of Sunbury annexing Berlin Township's property because Sunbury is



MAGNA LEGAL SERVICES

willing to grow and properly incentivize developments and follow the law as opposed to Berlin. So some landowners have chosen to annex into the city of Sunbury.

Q. Did you speak with Sunbury officials about annexing these properties in particular?

A. Yes.

Q. And what were the contents of those conversations?

A. Just if they would -- Sunbury would be interested in continuing to annex similar to how they already annexed in Berlin.

Q. What was their response to that?

A. I don't recall. It didn't end up advancing.

Q. Have you ever spoken with any state of Ohio employees about this development?

A. Yes. Yeah.

Q. Can you recall who those were?

A. We were awarded a Jobs Ohio -- I don't know if this counts as -- I think it does. It should.

Q. There's a lot of hoopla about that, so...



MAGNA LEGAL SERVICES

A. Yeah. Jobs Ohio OSIP grants, and I spoke to first name Hailey. I forget the last name off the top of my head. Hailey with Jobs Ohio for that development -- for this development, mixed-use development.

Q. And the best of your recollection, that's the only one you think?

A. The best I can think of right now. The particular importance of Jobs Ohio and the OSIP grant is because this mixed-use project can't happen without, one, the industrial warehousing storage; two, without the adequate density for the apartments in part as well, because we've got tens of millions of dollars of public improvements that are a component to making this project happening, to making the Berlin Business Park happen; and in order to be able to eat those costs, we need to have reasonable investment backed expectations.

Q. Have you ever spoken with any state legislators about this development?

A. What does a state legislator mean? Like, an elected official?

Q. Like, a house or senate representative?



MAGNA LEGAL SERVICES

A. Yes.

Q. Do you know who those are?

A. Brian Lorenz.

Q. And can you recall when you spoke to Mr. Lorenz?

A. When last?

Q. About this development.

A. I spoke to him about it relatively recently, a month or so ago I think, just updating him, letting him know there's still nothing happening in Berlin due to Berlin's actions. It's his district.

Q. In any of your times of speaking to Mr. Lorenz about this development, did you request that he make any calls or do any action on T&R's behalf or your behalf?

A. I can't recall. I think that Brian -- well, I know that Brian wants the business park to happen. Again, I can't speak for Brian, right? But I believe from what Brian said to me, that he wants the business park to happen. He knows that Berlin is prohibiting it from happening. So if he spoke to anybody, I'm not -- I don't recall any of that as a result of those



MAGNA LEGAL SERVICES

conversations.

Q. And have you spoken with any federal employees about this development?

A. No. I don't believe so.

Q. Have you spoken with any federal legislators, like, federal house of reps, congressmen?

A. No.

Q. Do you know in total how much T&R Properties has paid in attorney fees for this lawsuit?

A. I believe this question was asked in my prior deposition, and I gave an estimate. I think that's still my same answer.

Q. Okay.

A. Plus, plus whatever has accrued in the past five months since my deposition, which I'm not sure of the exact amounts.

MS. HETZEL: Can we just take a five-minute break?

THE WITNESS: Okay.

MR. NAGY: Off the record.

(Recess taken.)

MS. HETZEL: We can go back on the



MAGNA LEGAL SERVICES

record. I don't have any more questions for you today.

THE WITNESS: What a treat. Okay.

MR. NAGY: So I do want to stay on the record. Are we -- I know this seven-hour thing, are we closing the deposition?

MS. HETZEL: We're closing the 30(B)(6) deposition.

MR. NAGY: Uh-oh.

MS. HETZEL: We've never taken the dep -- RJ's individual deposition.

THE WITNESS: Are we on the record here still?

MR. NAGY: We are on the record, yeah.

So I do believe there was discussion between Paul and Ben -- I wasn't there -- former plaintiff's counsel about it being a dual depo of RJ. We can hash this out later, but I don't know if that's entirely clear. But it also, I guess, if the time comes where that's something you want to pursue.

THE WITNESS: My notice of deposition, I think it says my name personally and



MAGNA LEGAL SERVICES

then me as 30(B).

MR. NAGY: I guess maybe the question, do you intend on deposing him individually?

MS. HETZEL: I don't. I was under the impression that this was a 30(B)(6) deposition.

MR. NAGY: It wasn't RJ's individual deposition. So I was just --

MR. NAGY: If you don't intend on deposing him individually, separately down the road, which I think the window is closing, then I think we're fine.

MS. HETZEL: Yeah.

MR. NAGY: Okay. I think we're on the same page then. So 30(B) is going to be closed after today.

MS. HETZEL: The other thing I would ask is you take a picture of that sign and send it to Josh. Just thought I would get that on the record.

THE WITNESS: I thought you were going to drive.

MS. HETZEL: I'm asking someone on your side to do it.



MAGNA LEGAL SERVICES

MR. NAGY: We will see what we can do.

MS. HETZEL: Okay.

MR. NAGY: I think that's pretty minor in terms of requests.

So you have the right to read your testimony. I would recommend you read.

THE WITNESS: Yes, please.

MR. NAGY: I think we will order just so we have a complete version of the previous one.

(Signature not waived.)

\- - -

Thereupon, the deposition concluded at approximately 3:50 p.m.

\- - -



MAGNA LEGAL SERVICES

AFFIDAVIT/ERRATA SHEET

STATE OF OHIO:

SS:

COUNTY OF FRANKLIN:

I, RJ Sabatino, do hereby certify that I have read the foregoing transcript of my deposition given on March 5, 2026, and wish to make the following additions, corrections, amendments, or deletions:

PAGE NO. LINE NO. CHANGE AND REASON FOR CHANGE:

In all other respects, the transcript is true and correct.

________________________

RJ Sabatino

C E R T I F I C A T E

\- - -

THE STATE OF OHIO:
SS:
COUNTY OF FRANKLIN:

I, Jeanine Fansler, a Professional Reporter and Notary Public in and for the State of Ohio, do hereby certify that before the taking of his said deposition, the said RJ Sabatino was first duly sworn by me to tell the truth, the whole truth, and nothing but the truth;

That said deposition was taken in all respects pursuant to the stipulations of counsel heretofore set forth; that the foregoing is the deposition given at the said time and place by the said RJ Sabatino;

That I am not an attorney for or relative of either party and have no interest whatsoever in the event of this litigation.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal of office at Columbus, Ohio, this 27th day of March, 2026.

/s/Jeanine Fansler_________________________
Notary Public, State of Ohio

My Commission Expires: November 28, 2028.

\- - -



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)

MAGNA
LEGAL SERVICES

**A**

**able**
24:17
**about**
5:19 12:19 13:15 18:8 19:15 20:21 21:12,16,24 22:1,4 22:9,17 23:6,17,23 24:20 25:7,8,14 26:3 27:18
**accrued**
26:16
**accurate**
8:21
**achieved**
17:17
**action**
25:15
**actions**
9:11 25:11
**additions**
30:7
**adequate**
24:12
**adequately**
11:5
**advancing**
23:15
**AFFIDAVIT/ERR...**
30:1
**after**
28:16
**Afternoon**
3:1
**Again**
25:19
**ago**
25:9
**agree**
14:19,21
**agreement**
4:9 6:20 7:24 10:20
**agreements**
17:8
**al**
1:5,8
**all**
5:9 11:17 18:5 30:21 31:9
**allow**
15:13
**already**
15:6 23:12
**also**
5:15 11:8 21:22 22:23 27:20
**am**
31:12
**amendments**
10:20 30:7
**among**
16:3,5
**amount**
10:13
**amounts**
26:18
**an**
12:22 13:18 17:15 22:21 24:22 26:13 31:12
**analysis**
11:19 13:8 17:12
**and**
1:16,16,18 3:5,13,14 3:16 5:5,15,18 6:3 6:14,17,23 7:5,8,12 7:15,23 8:11,14,14 8:20 9:3,10,11 10:20 11:12,16,21 12:6,10 13:1,9,13 13:14 14:2,15,17 15:5,8,10,11,13,23 15:24 16:1,2,5,9,22 18:8 19:3,9,9,18 20:1,2,3,4,4,5,20 22:7,8,14,16,20 23:1,2,8 24:1,6,9,16 25:4 26:2,13 27:17 27:24 28:18 30:6,9 30:21 31:7,7,9,11 31:12,14
**and/or**
11:6
**annex**
23:3,11
**annexed**
23:12
**annexing**
22:23 23:6
**annually**
8:20 9:4,7
**another**
6:4
**answer**
26:14
**any**
10:24 13:19,19,24 14:3 15:9,14,19,20 16:16 17:8,12 21:14 22:19 23:16 24:19 25:13,15,15,24 26:2 26:5 27:1
**anybody**
25:23
**anyone**
12:19 22:3,9
**anything**
16:13 22:21
**apartments**
11:7 12:6 24:13
**appear**
6:19
**APPEARANCES**
2:1
**applicable**
1:15
**application**
21:5
**applications**
21:6
**apply**
5:10
**appraisal**
12:22
**approximately**
1:18,18 29:14
**are**
3:15 5:8 11:11 13:14 14:20,22 15:5,8,10 19:1,24 20:5 22:1 22:14 24:15 25:2 27:5,6,12,14
**Around**
16:7
**Article**
8:14,16
**as**
5:4,5,10 8:21 10:5 11:13,19 12:7 13:12 13:12,13,13,23 14:3 14:12 15:11,16 17:13,17,17 18:21 23:2,21 24:13 25:24 28:1
**ASHLEY**
2:7
**Ashley.hetzel@fm...**
2:9
**ask**
28:18
**asked**
11:13 21:11,12 26:12
**asking**
28:23
**assessment**
11:9
**at**
1:16,18,18 3:7 5:13 5:22 6:7,24 7:5,21 8:12,18 9:1 11:17 11:24 13:2,5,5,15 13:16,22 18:2,7,9 18:10 20:23 21:20 22:3 29:13 31:11,14
**attempt**
9:15 16:11
**attempted**
12:13,16
**attorney**
26:10 31:12
**awarded**
23:20
**aware**

22:23

**B**

**B**
2:7 4:7 8:15,16 18:20
**back**
5:17 22:7 26:24
**backed**
24:18
**background**
11:10
**backwards**
21:11
**bad**
9:16
**Ballman**
13:13
**Barwell**
2:3
**based**
13:22 15:22 17:15
**be**
3:7,9,11 5:23 6:9,19 6:24 7:10 8:8,11,12 8:17 11:5,12,14 13:12,18 16:2,5,6 21:18 22:12 23:11 24:17 28:15
**because**
5:16 14:16,17 22:6 22:24 24:10,13
**been**
17:17 18:2,13,15 20:17 21:22
**before**
1:15 5:10 8:2 11:1 15:7 31:7
**began**
18:23
**beginning**
6:7
**begins**
18:20
**behalf**
2:6,10 25:16,16
**being**
3:8 5:4 7:11 9:9,19 27:18
**believe**
8:6 9:2,13,24 10:3 11:21 16:10,21 18:23 19:8,12 22:14 22:20 25:20 26:4,12 27:16
**Ben**
27:17
**Benton**
22:1
**Berlin**
1:8 7:14 11:13 12:8 13:16,16 14:11,14 15:12,22 16:2 18:2 20:1 22:22,24 23:3 23:12 24:16 25:11 25:22
**Berlin's**
9:11 25:11
**best**
18:15 24:6,8
**better**
15:21
**between**
3:5 20:15 22:7 27:17
**BIO**
14:4 20:2
**borings**
11:4
**both**
12:3,7
**bottom**
6:24 8:13
**break**
26:20
**breaking**
9:17
**Brian**
13:13 25:3,18,18,19 25:20
**brokers**
15:20
**build**
14:13,17 15:1
**building**
14:17 18:10
**built**
16:7
**Bullard**
18:24 19:4,6
**business**
15:9 24:16 25:18,21
**but**
7:21 9:10 14:19 18:4 22:8 25:20 27:19,20 31:9
**buyer**
7:6 8:17
**buying**
12:20
**by**
1:14 3:5,8,10 4:4 5:4 5:7 6:11 10:18 14:7 14:11 15:18 17:7,24 31:8,11
**BZA**
13:17,22

**C**

**C**
5:1 6:9 31:1,1
**call**
6:3
**called**
1:14 11:8 19:6 21:1,8
**calls**
25:15
**can**
5:12 6:14,17,23 7:8 8:11 10:10,12,16 11:17 16:22 17:3,5 17:18,21 18:7 19:2 19:13 20:7 22:1,15 23:19 24:8 25:4 26:19,24 27:19 29:1
**cannot**
14:13,16
**can't**
13:4 14:6 16:12 24:10 25:17,19
**Case**
1:7
**Cathy**
18:17
**census**
22:7
**certified**
5:5
**certify**
30:5 31:7
**CHANGE**
30:9,9
**changes**
22:20
**character**
3:13
**charge**
17:13
**check**
22:18
**chosen**
23:3
**city**
22:4,8,13,17 23:4
**Civil**
1:15
**clear**
27:20
**client**
17:22
**close**
10:21
**closed**
9:1 28:15
**closing**
8:14,19 11:1 27:6,7 28:11
**Columbus**
1:17 2:8 31:14
**come**
16:9
**comes**
27:21
**commencing**
1:18
**commission**

**commission** 19:1 31:23
**commissioners** 21:23
**companies** 15:15
**complete** 29:10
**component** 6:21 24:15
**comprehensive** 12:9 15:24
**concluded** 29:13
**concluding** 1:18
**condemned** 9:11 14:11
**conduct** 15:14,18
**congressmen** 26:7
**Conners** 21:19
**considering** 16:8
**contents** 23:8
**continued** 5:9
**continuing** 23:11
**contract** 8:12 12:1
**contracts** 12:4
**conversations** 23:9 26:1
**correct** 30:22
**corrections** 30:7
**costs** 24:17
**could** 11:5 16:8 17:16
**counsel** 3:5 27:18 31:10
**count** 18:5
**counts** 23:21
**county** 21:15,20,21 30:3 31:4
**couple** 19:14
**course** 11:20,21 18:14,24
**court** 1:1,15 5:12
**create** 17:1
**crops** 9:21,22
**cross-examination** 1:14 4:4 5:6
**current** 13:2,6

**D**

**D** 4:1,9 5:1 6:9,10 12:5
**Darcy** 19:1
**Daryl** 22:13
**day** 31:14
**decided** 11:16
**Defendants** 1:9,14 2:10
**Delaware** 21:15 22:4
**deletions** 30:7
**denoted** 10:14
**density** 13:2,5,6 24:12
**dep** 27:11
**depo** 27:18
**deposes** 5:5
**deposing** 28:3,10
**deposition** 1:12 3:7,8,9,15,17 4:8 5:9 6:8 20:9 26:13,17 27:6,8,11 27:24 28:6,8 29:13 30:6 31:8,9,11
**depositions** 20:11,16
**described** 13:22
**desire** 12:10
**determined** 7:22 11:12
**develop** 9:10 13:4
**developed** 11:5,14
**developing** 9:12 13:1 14:2
**development** 15:17 17:10 18:8 19:16 20:1,21 21:16 21:20 22:4,10,20 23:17 24:4,4,5,20 25:7,14 26:3
**developments** 23:2
**did** 7:19 9:2,13 10:21,24 11:8,18,19,23 15:14 15:19 16:14,16 17:12 19:15 20:15 20:20 23:5 25:14
**didn't** 23:14
**diligence** 10:24 11:3
**discovery** 11:22
**discussion** 27:16
**district** 1:1,2 25:12
**DIVISION** 1:3
**do** 5:20 6:4 7:5 8:7,15 8:24 9:3,6,14,18,22 10:1,4,7 13:7 14:10 14:24 15:18 17:8,12 18:1,16 19:22 22:16 25:2,15 26:9 27:4 27:16 28:3,24 29:2 30:5 31:7
**document** 6:14,15,16,18 7:16 7:17,19 8:22 17:2
**documentation** 15:23
**does** 10:13 23:21 24:21
**dollars** 24:14
**done** 6:14 17:16
**don't** 5:15,17 7:21 8:6,10 9:5,8 10:6 16:15 18:5,9 19:5,8,17 20:18,18,24 21:10 22:5 23:14,21 25:23 26:4 27:1,19 28:5,9
**down** 5:12 6:1 28:10
**drive** 17:3 28:22
**dual** 27:18
**Dublin** 2:4
**due** 9:10 10:24 11:3 25:11
**duly**

5:4 31:8
**during**
9:23 21:5

**E**

**E**
4:1,7 5:1,1 31:1,1
**East**
1:17 2:8
**EASTERN**
1:3
**eat**
24:17
**economic**
19:24 21:20
**either**
31:12
**elected**
21:15 24:22
**Email**
2:4,9
**employees**
21:15 23:17 26:3
**end**
23:14
**enough**
15:1
**ensure**
11:4,10
**entered**
6:20 11:24
**enticed**
14:14
**entirely**
27:20
**entitled**
8:18
**environmental**
11:9,10,11
**escaping**
18:19
**Esquire**
2:2,2,7
**Estate**
4:9
**estimate**
26:13
**et**
1:5,8
**Evan**
13:13
**even**
15:11
**event**
20:18,23 31:13
**ever**
19:3,6,9,18 21:1,14 22:3,9 23:16 24:19
**everything**
5:24
**exact**
18:5 26:18
**examination**
3:15
**example**
13:18 21:23
**examples**
15:8
**Exhibit**
4:9 6:8,9,10 12:5
**EXHIBITS**
4:8
**exists**
17:5
**expectations**
24:18
**experience**
13:23
**expert**
13:9,10 15:4
**experts**
13:23 15:5
**Expires**
31:23
**expressed**
8:3

**F**

**F**
31:1
**faces**
18:15
**fact**
15:4
**family**
6:20
**Fansler**
1:15 31:6,21
**far**
17:17
**farm**
8:19 9:1,3,6 10:1,7 10:14
**farmed**
9:9,19
**farming**
9:15
**father**
8:1
**federal**
26:2,5,6
**feelers**
15:20
**fees**
26:10
**fields**
13:23
**fight**
5:18
**financeable**
14:18
**financial**
11:19 13:8
**find**
15:9
**fine**
28:12
**firefighter**
18:22
**first**
5:4 20:11 21:6 24:2 31:8
**five**
8:9 19:23 26:17
**five-minute**
26:20
**flexibility**
20:3
**flexible**
16:2,5
**follow**
23:2
**following**
30:7
**follows**
5:5
**foot**
17:17
**for**
1:14,16 3:6 5:8 6:1 6:10,21 7:10,24,24 8:1,8,19 9:4 10:2,17 11:5,13,13,14 12:4 12:5,10,10,17 13:20 15:20 17:9,13,19 20:13 21:6,23 24:3 24:4,12 25:19 26:10 27:1 30:9 31:7,12
**foregoing**
30:6 31:10
**forget**
18:18 24:2
**former**
18:17,22 27:17
**forth**
9:11 20:5 22:7 31:10
**FRANKLIN**
30:3 31:4
**Freeman**
1:17 2:7
**from**
9:12 15:7 16:18 22:19 25:20,22
**FR-1**
12:7

**G**

**G**
5:1
**Gary**
1:17 2:7 21:23
**gave**
7:23 22:21 26:13
**get**

5:24 10:16 16:22 17:5 22:6 28:19
**give**
10:10,11
**given**
30:6 31:11
**go**
17:18 22:7 26:24
**going**
6:9 16:2,4,6 28:15,22
**good**
6:6
**got**
24:13
**gotten**
12:22
**grant**
24:10
**grants**
24:1
**grow**
23:1
**guess**
15:20 18:4 27:20 28:2

**H**

**H**
4:7
**had**
8:24 12:3,6 17:15 20:10
**Hailey**
24:2,3
**hand**
31:14
**happen**
24:11,16 25:19,21
**happening**
22:22 24:15 25:11,22
**has**
14:11 18:13 26:10,16
**hash**
27:19
**have**
5:18 6:4 8:1 10:7,13 12:13,16,19,22 13:1 13:19,24 14:2 15:15 15:19 16:9 17:8,16 17:21 18:4 19:3,6,9 19:18 20:17 21:1,12 21:14 22:3,8,11,20 23:3,16 24:18,19 26:2,5 27:1 29:6,10 30:6 31:12,13
**he**
25:15,21,21,23
**head**
5:15,15 9:5,8 10:6 13:12 19:2 21:20 24:3
**hearings**
13:15,21 18:6
**Hennessy**
22:13
**her**
18:18 20:9,15,21,22 21:1,8
**here**
5:8,12 27:13
**hereby**
3:5,15 30:5 31:7
**herein**
1:14 3:6
**hereinafter**
5:4
**heretofore**
31:10
**hereunto**
31:13
**Hetzel**
2:7 4:4 5:7 6:11 10:16,18 14:7 17:3 17:7,20,24 26:19,24 27:7,10 28:5,13,17 28:23 29:3
**him**
7:24 17:1 19:15,16 21:24 25:8,10,10 28:3,10
**his**
3:17 7:18 8:3 18:22 22:14 25:12 31:8
**historical**
11:9
**hoopla**
23:23
**hoping**
16:8
**house**
24:23 26:6
**housing**
12:10 20:4
**how**
8:7 9:3 10:4 13:7 18:1 19:13,22 21:12 23:11 26:9
**however**
6:13 12:8

**I**

**idea**
17:15
**identification**
6:10
**if**
6:3,12,15 8:24 9:6,18 9:22 10:1 17:5 18:5 22:19 23:10,21 25:23 27:20,20 28:9
**implementing**
20:3
**importance**
24:9
**impossible**
14:9,10
**impression**
28:6
**improvements**
24:14
**in**
1:1,16 3:10 7:18 10:7 10:14 12:8,8,9 13:21,23 14:4 15:9 15:11,15 16:1 19:10 19:19 20:14,15,17 21:22 22:5,18,22 23:6,11,12 24:13,16 25:11,13 26:9,10,12 26:16 29:5 30:21 31:7,9,13,13
**incentivize**
23:1
**include**
14:24
**individual**
27:11 28:7
**individually**
28:4,10
**industrial**
6:21 7:14 11:6 12:5 12:10 14:3,13,13,20 14:23 15:2,9,12,17 17:9,14 20:4 22:22 24:11
**initial**
11:14
**inspector**
18:21
**inspectors**
18:18
**intend**
28:3,9
**intended**
17:13
**interest**
15:15 16:11 31:12
**interested**
23:11
**interrupted**
9:17
**into**
6:20 11:24 19:3,9,18 23:4
**investment**
24:18
**is**
3:5,8,17 6:1,3,6,9,18 7:2,3,9,12,13 8:4,4 8:15,21 9:18 10:10 11:15,15 12:5,10 13:10,22 14:14,16 14:17,18,18 21:8 22:14,24 24:10

25:22 28:11,15,18 30:21 31:10
**issues**
11:11
**it**
3:5 5:19 6:3,23 7:5 7:21 8:8,11,12,17 8:23 9:1,2,12 10:1 10:12,14,15 11:14 12:9 14:3,12,16,18 14:18 16:22,23 17:6 18:23 20:10,11,13 21:8,10,24 22:1 23:14,21,22 25:8,22 27:18,20,24 28:7,18 28:24
**its**
13:2,5,5
**it's**
5:17 7:15 9:20 12:7 14:9,10 15:7 16:18 16:20,21 18:19 25:11
**I'm**
5:23,24 9:17 11:16 11:18 21:12 22:23 25:23 26:17 28:23
**I've**
21:22,24,24

**J**

**J**
18:23
**Jacob**
18:22
**Jeanine**
1:15 31:6
**Jeff**
22:1
**jnagy@wesplaw.co...**
2:4
**Jobs**
23:20 24:1,3,9
**Joe**
22:14
**John**
22:14
**Josh**
5:18 10:16 28:19
**JOSHUA**
2:2
**just**
5:24 6:12 17:19 21:8 23:10 25:9 26:19 28:8,19 29:10

**K**

**Kaplan**
19:1
**Ken**
18:24 19:10
**kind**
16:11
**know**
5:17 8:10,24 9:3,5,6 9:8,14,18,22 10:1,4 10:6 11:23 13:7 18:1,5,16 19:22 23:21 25:2,10,18 26:9 27:5,19
**knowledge**
14:1
**knows**
25:22

**L**

**lack**
15:20 22:21
**landowners**
23:3
**last**
18:18,19 24:2 25:6
**later**
27:19
**Laura**
18:18
**law**
23:2
**lawsuit**
26:11
**leasable**
14:16,17,18
**lease**
9:1,4,6 10:2,5,7,14
**leases**
8:19
**left**
6:8
**legislator**
24:21
**legislators**
24:20 26:6
**letting**
25:10
**like**
17:21 18:9,10 20:10 24:22,23 26:6
**likely**
9:13
**LINE**
30:9
**listening**
20:14
**litigation**
31:13
**LLC**
7:14
**LLP**
1:17 2:7
**long**
6:13
**longer**
21:19
**look**
6:13
**looks**
7:10
**Lorenz**
25:3,5,14
**lot**
21:10 23:23

**M**

**make**
5:24 25:15 30:6
**making**
24:15,16
**manager**
22:13,17
**many**
8:7 18:1,14,15 19:13 19:22 21:12
**March**
1:11,17 3:1 6:24 30:6 31:14
**marked**
6:10,24 8:12
**MARKED/REFE...**
4:8
**market**
12:16 15:19
**Marsh**
13:13
**Mathis**
1:17 2:7
**may**
3:7,9,11 5:22
**maybe**
17:16 18:19 22:5 28:2
**Mayor**
22:14
**me**
1:15 5:4,11 6:15,17 7:8,23 10:11,17 14:19,22 16:23 18:19 19:24 20:6 25:20 28:1 31:8
**mean**
9:9 15:18 18:9,10 24:21
**meeting**
19:4,11,20 20:8
**meetings**
13:16 16:1 20:1
**Meghan**
18:23 19:19
**member**
7:13
**members**
18:11
**Merrell**
21:24
**Metro**

2:3
**might**
20:17 22:6
**millions**
24:14
**minor**
29:5
**minute**
6:13 17:19
**minutes**
17:22
**mix**
20:4
**mixed-use**
6:21 12:4,6 21:7 24:4 24:10
**money**
10:4
**Monica**
21:19
**month**
25:9
**months**
26:17
**more**
8:8,9,9,19 18:6 19:23 27:1
**most**
19:24 20:6,7 22:7
**Mr**
10:11 12:2 13:3 14:5 16:23 17:1,5,18,21 19:6 25:5,14 26:22 27:4,9,14 28:2,7,9 28:14 29:1,4,9
**Mrs**
20:20
**Ms**
4:4 5:7 6:11 10:16,18 14:7 17:3,7,20,24 20:8 26:19,24 27:7 27:10 28:5,13,17,23 29:3
**much**
9:3 10:4 26:9
**multifamily**
11:7
**my**
7:10 9:5,8,16,17 10:6 12:7 13:12,24 14:21 16:10 17:22 19:2 24:3 26:13,14,17 27:23,24 30:6 31:14 31:23
**myself**
17:4

**N**

**N**
4:1 5:1
**Nagy**
2:2 10:11 12:2 13:3 14:5 16:23 17:1,5 17:18,21 26:22 27:4 27:9,14 28:2,7,9,14 29:1,4,9
**name**
6:4 7:18 18:18,19,22 22:14 24:2,2 27:24
**named**
15:6
**need**
6:13 24:17
**never**
27:10
**next**
6:9
**no**
1:7 5:18 9:21 11:11 12:15,18,21,24 17:11,15 19:14 21:19 26:4,8 30:9,9 31:12
**nod**
5:15
**normal**
8:4
**not**
3:17 5:11,16,23 9:20 11:12 13:24 14:8,16 14:17,18,18,24 16:3 16:9 25:23 26:18 29:11 31:12
**Notary**
1:16 3:8,10,14 31:7 31:21
**notes**
3:11
**nothing**
25:10 31:9
**notice**
1:16 3:9 27:23
**November**
31:23
**now**
9:20 18:19 22:2 24:8
**number**
18:5

**O**

**O**
5:1
**Objection**
12:2 13:3 14:5
**obtain**
12:11
**occurred**
13:15
**occurrence**
8:5
**off**
6:8 9:5,8 10:6 13:11 17:18 19:2 24:3 26:22
**office**
18:2,3 31:14
**offices**
1:16
**official**
3:13 24:22 31:14
**officials**
18:11 21:15 23:5
**Ohio**
1:2,15,16,17 2:4,8 23:17,20 24:1,3,9 30:2 31:3,7,14,21
**okay**
5:8 6:1,2,3,7 7:4 26:15,21 27:3 28:14 29:3
**on**
1:17 2:6,10 9:1 10:21 11:1,10 12:22 14:20 14:22 16:10 18:24 19:6 21:1,9 22:21 25:15 26:24 27:4,12 27:14 28:3,9,14,19 28:23 30:6
**one**
5:12 6:9 8:19 11:15 12:4 17:5 18:17 21:8 24:7,11 29:11
**ones**
15:7 19:24
**only**
5:12 24:7
**opinion**
15:3
**opposed**
23:2
**or**
5:15,18 6:4,13,13 8:19 15:16 17:12 20:11,18,23 21:15 22:19,20 24:23 25:9 25:15,16 30:7 31:12
**order**
24:17 29:9
**OSIP**
24:1,9
**other**
16:3,5,12 17:16 28:17 30:21
**our**
5:11 6:21 9:11 12:4 14:11 21:5,6
**out**
3:11 15:20 19:24 20:5 27:19
**outing**
20:18,23
**outings**
20:1
**outside**

19:4,10,19 20:8
**over**
5:11 6:13 18:14
**Overlay**
22:22
**own**
9:17 15:12 16:10
**O'Brien**
18:24 19:10

**P**

**P**
5:1 7:11,12,13,18,20 7:22,23 8:8
**page**
4:3 7:2,3 8:12 28:15 30:9
**paid**
26:10
**park**
15:9,10 24:16 25:19 25:21
**part**
6:8 10:5 20:11,12,14 24:13
**particular**
23:6 24:9
**particularly**
15:1
**parties**
3:6
**party**
31:12
**passing**
22:5
**past**
26:17
**Paul**
27:17
**per**
17:17
**perform**
10:24
**performed**
11:4 13:9
**permission**
7:18,23 8:3
**permitted**
14:4,20,22,24 15:11
**person**
5:12 19:10,19
**personally**
27:24
**pertains**
14:12
**Phase**
11:8
**phone**
19:7 21:2,9
**physically**
18:10
**picture**
16:22 28:18
**pictures**
16:16
**pieces**
12:3
**place**
2:3 3:14 31:11
**places**
21:22
**Plaintiff**
1:14
**Plaintiffs**
1:6 2:6
**plaintiff's**
27:18
**plan**
12:9 16:1
**please**
5:11,14 6:23 29:8
**plus**
26:16,16
**point**
5:22
**possession**
8:15,16,18
**potential**
17:9
**potentially**
12:20
**preferred**
6:4
**prepared**
13:19
**presence**
3:12 16:1
**presented**
11:21
**presenting**
20:2
**pretty**
29:4
**previous**
29:10
**previously**
9:9
**prior**
26:13
**probably**
18:14
**Procedure**
1:15
**process**
21:5
**Professional**
1:15 31:6
**prohibited**
9:12
**prohibiting**
25:22
**project**
6:22 11:21 12:4,6 21:7 24:10,15
**proof**
3:12
**properly**
23:1
**properties**
1:5 12:14,17,20,23 23:6 26:10
**property**
8:18,24 9:9,10,12,18 10:22,23 11:1,5,10 11:16,23 13:2,5 14:3,11,21,23 16:6 16:10,18 22:24
**provide**
10:12
**provided**
13:24
**provides**
11:9
**public**
1:16 16:1 21:22 24:14 31:7,21
**purchase**
4:9 6:19 7:24 10:20 11:16,24
**purchased**
10:23 16:5,7
**purchasers**
17:9
**purchasing**
15:16
**pursuant**
1:16 3:9 31:10
**pursue**
27:22
**pursued**
13:1 14:2
**put**
15:20 16:10,14
**p.m**
1:18,18 3:2 29:14

**Q**

**Q**
5:8,22 6:3,7,12,17,23 7:3,5,8,12,15,19 8:1 8:4,7,11,17,24 9:3,6 9:14,16,22 10:1,4,7 10:10,13,19,24 11:3 11:23 12:13,16,19 12:22 13:1,7,10,14 13:19 14:2,8,10,19 15:3,5,7,14,19 16:14,16,20,22 17:8 17:12 18:1,7 19:3,6 19:9,13,15,18,22 20:7,10,15,20,23 21:1,4,8,11,18 22:3 22:6,12,16 23:5,8 23:13,16,19,23 24:6

24:19,23 25:2,4,7 25:13 26:2,5,9,15
**qualifications** 3:13
**question** 14:21 26:12 28:3
**questions** 21:11 27:1

**R**

**R** 5:1 31:1
**Raehll** 18:24 19:19 20:8,20
**Randall** 13:12
**random** 20:23
**read** 5:16 29:6,7 30:6
**reading** 3:16
**Real** 4:9
**really** 8:10
**reason** 11:15 30:9
**reasonable** 24:18
**reasons** 11:15
**recall** 7:21 16:15 18:7 19:5 19:17 20:7,18,19 22:5,16 23:14,19 25:4,17,24
**received** 10:5
**recent** 20:7 22:7
**recently** 25:9
**Recess** 17:23 26:23
**recognize** 6:15,16
**recollection** 18:16 24:6
**recommend** 29:7
**record** 6:1 17:18 26:22 27:1 27:5,12,14 28:20
**reduced** 3:10
**Reed** 6:20
**regarding** 13:20 15:15
**relates** 14:3
**relative** 31:12
**relatively** 25:8
**remember** 19:13 20:24
**remind** 5:22
**renewed** 8:20 9:7
**rent** 17:17
**rental** 20:4
**rents** 17:13
**reporter** 1:16 5:12 31:7
**reports** 13:20,24
**representations** 15:23
**representative** 24:24
**reps** 26:6
**request** 11:14 25:14
**requests** 11:22 29:5
**required** 14:12 15:11
**residential** 13:2,5
**resolution** 12:9 15:12,24 16:9
**respective** 3:6 13:23
**respects** 30:21 31:10
**response** 23:13
**responses** 5:14
**restricting** 14:12
**result** 25:24
**resume** 9:15
**rezoning** 12:12
**right** 9:20 18:19 22:2 24:8 25:20 29:6
**Ripple** 18:17
**RJ** 1:13 3:7,16 4:3 5:3 6:3,6,12 18:1 27:19 30:5,24 31:8,11
**RJ's** 27:11 28:7
**road** 28:11
**Ron** 7:11,11 18:24 19:4
**Ronald** 7:11,12,13,18,20,22 7:23 8:8
**rude** 5:23
**rules** 1:15 5:9,20,23 9:17
**run** 19:3,9,18

**S**

**S** 4:7 5:1
**Sabatino** 1:13 3:7,16 4:3 5:3 7:11,12,13,18,20,22 7:23 8:8 30:5,24 31:8,11
**said** 3:8,9,14,16 25:20 31:8,8,9,11,11
**sale** 12:17
**same** 5:9 15:7 16:7 26:14 28:15
**satisfactory** 11:13
**SAVASTANO** 2:2
**saw** 19:16 20:8,21,22
**say** 5:16 13:14 14:10 18:9 19:23
**says** 5:5 7:6 8:17,22,23 27:24
**seal** 31:14
**season** 9:20
**second** 6:12 20:12,14
**Section** 8:15
**see** 7:5 8:15 16:11 20:15 22:19 29:1
**sell** 12:13
**senate** 24:23
**send** 16:22,23 28:18

**separately**
28:10
**serving**
15:16
**Session**
3:1
**set**
31:10,13
**seven-hour**
27:5
**shake**
5:15
**shall**
8:17
**she**
20:10
**SHEET**
30:1
**should**
21:12 23:22
**side**
28:24
**sign**
7:19,23,24 16:10,14 16:17 28:18
**signature**
3:16 7:8,10 29:11
**signed**
7:16,17 8:1,8
**similar**
23:11
**since**
26:17
**Skip**
13:12
**so**
5:9 6:9 8:6 9:11,12 9:21,24 10:3 12:11 15:11 16:20 18:15 19:8,12 20:5,11 23:3,24 25:9,23 26:4 27:4,16 28:8 28:15 29:6,10
**soil**
11:4
**soils**
11:12
**some**
5:22 11:18,19 13:11 15:8 17:15 20:17 21:23 23:3
**someone**
28:23
**something**
8:4 10:10 27:21
**SOPHIA**
2:2
**sorry**
9:16 11:18 21:12
**sort**
20:17
**sought**
12:11
**SOUTHERN**
1:2
**speak**
23:5 25:19
**speaking**
25:13
**specifically**
22:17
**spoke**
22:17 24:2 25:4,8,23
**spoken**
12:19 18:8 19:3,10 19:18 21:14,24,24 22:3,9 23:16 24:19 26:2,5
**spreadsheet**
11:22
**SS**
30:2 31:4
**St**
22:14
**staff**
18:11
**state**
1:16,17 2:8 23:16 24:19,21 30:2 31:3 31:7,21
**STATES**
1:1
**stay**
27:4
**steel**
16:6,8
**stenotypy**
3:10
**stick**
19:24 20:5
**still**
9:18 16:19,20,21 25:10 26:14 27:13
**stipulated**
3:5
**stipulations**
3:4 31:10
**storage**
14:16 15:10,13 24:12
**Street**
1:17 2:8
**studies**
15:14,18,19 17:12
**subject**
8:19
**submitting**
21:6
**successfully**
15:1
**Suite**
2:3
**Sunbury**
22:8,18,23,24 23:4,5 23:10
**Supp**
7:1
**sure**
5:24 16:24 17:20 26:18
**sworn**
5:4 31:8
**s/Jeanine**
31:21

**T**

**T**
4:7 31:1,1
**take**
5:12 6:12 16:16 26:19 28:18
**taken**
1:15,16 3:7,8 17:23 26:23 27:10 31:9
**taking**
3:14 31:7
**talk**
5:11 19:15 20:20
**talked**
18:12
**talking**
13:15
**TBD**
7:6
**tell**
6:15,17 7:8 31:8
**tenants**
15:16 17:9
**tens**
24:13
**terms**
29:5
**testimony**
7:15 13:9,10,14,20 13:21 29:7
**than**
8:9,9,9 16:12 19:23
**that**
3:6,8,9,12,15 5:24 6:1,4,14,14,15,20 7:2,3,9,10,15,22 8:4 8:4,15,21 9:1,3,6,11 9:16 10:5,10,10,13 10:16,19 11:3,5,11 12:7 13:7,8,10,11 13:15,18,21 14:17 14:19,22 15:15 16:2 16:4,6,7,8,12,14,16 17:16 18:13,22 19:24 21:4,13 22:12 23:13,23 24:4,14 25:15,17,18,21,22 25:24 28:6,18,19 30:5 31:7,9,10,12
**that's**

8:23 11:17 12:11 14:21 15:3,4 24:7 26:14 27:20,21 29:4
**their**
11:14 12:8,9,10 13:21,22,23 15:23 15:24,24 16:1 20:2 23:13
**them**
13:19,22 15:6 22:18 22:21
**then**
5:18 10:20 12:6 28:1 28:11,15
**there**
8:15 9:21,22 10:19 10:21 11:11,11 14:20,22 16:11,20 16:21 17:3 18:21 20:17 22:9 27:16,17
**thereafter**
3:11 8:20
**Thereupon**
29:13
**there's**
9:21 18:14 22:19 23:23 25:10
**these**
12:13 23:6
**they**
13:24 15:13 16:2,4 22:7 23:10,12
**thing**
27:6 28:17
**things**
16:3,5
**think**
6:7 8:7 9:21 11:17,17 13:11 16:12 19:2 20:10,13 21:10 22:1 22:15 23:21 24:7,8 25:9,17 26:14 27:24 28:11,12,14 29:4,9
**thinking**
16:6
**this**
3:6,7 6:9,17,19 7:16 7:17,19 10:20 11:17 12:5 13:20 16:6 18:8,13 19:15 20:21 21:16 22:4,6,9 23:17,21 24:4,10,15 24:20 25:7,14 26:3 26:10,12 27:5,19 28:6 31:13,14
**those**
5:20,23 15:5,8 19:1 20:5,15 21:18 22:1 23:8,19 24:17 25:2 25:24
**thought**
16:1,4 28:19,21
**through**
11:20,20
**Thursday**
1:17 3:1
**time**
3:7,14 5:13 7:21 9:1 11:18,24 16:7 20:7 21:8 22:19,19 27:21 31:11
**times**
8:7 18:1 19:13,22 21:12 25:13
**to**
1:16 3:9,10,16 5:11 5:14,16,18,23,24 6:9,13,19,23 7:10 7:22,24 8:11,18,19 8:21 9:10,10,15 10:11,11,11,20 11:4 11:10,12,14,16,17 12:11,13,16,19 13:24 14:3,12 15:1 16:2,4,6,9,11,11,23 16:23,23 17:1,6,13 17:13 18:4,8,12,15 19:15,24 20:5,20 21:24 22:1,19,19 23:1,2,3,11,11,13 24:2,15,16,17,17,17 25:4,8,11,13,19,20 25:21,23 27:4,21 28:15,19,22,24 29:6 30:6 31:8,10
**today**
5:8,22 6:4 9:19 16:20 27:2 28:16
**top**
7:5 9:5,8 10:6 13:11 19:2 24:3
**total**
26:9
**township**
1:8 13:16,16 14:14 18:2,3,7,9,11,11 19:4,11,19 20:2,8
**Township's**
12:8 15:12,22 22:24
**transcribed**
3:11
**transcript**
3:17 5:17 30:6,21
**treat**
27:3
**true**
30:21
**Trustee**
18:23
**truth**
31:8,9,9
**try**
5:11,14,16
**trying**
5:23,24 11:16
**turn**
6:23 8:11
**two**
12:4 17:21 20:11,15 24:12
**T&R**
1:5 6:24 26:9
**T&R's**
25:15

**U**

**uh-huh**
5:16,17,18
**Uh-oh**
27:9
**ultimately**
10:21
**under**
1:14 8:14 10:1 28:5
**understand**
5:20 10:19
**understanding**
12:7 18:13
**UNITED**
1:1
**units**
15:16 17:14
**up**
16:10,14 23:14
**update**
22:21
**updating**
25:9
**upon**
11:13 13:22 15:22 17:15
**us**
9:12 14:15
**use**
5:14 6:5 14:15
**uses**
11:6 14:4,12,20,22 14:24 15:1,11 20:5
**using**
7:19

**V**

**various**
13:15
**verbal**
5:14
**version**
29:10
**village**
22:8,8
**virtual**
20:13
**visible**
16:18

**vs**
1:7

**W**

**waived**
3:15,17 29:11
**want**
17:1 27:4,21
**wanted**
7:22 9:10
**wants**
25:18,21
**warehouse**
15:10
**warehousing**
11:6 12:11 14:14,15 15:2,10,13 20:4 24:11
**was**
6:10 7:22 9:4,6,9,16 9:22 10:1,21 11:3 11:23 12:4 16:2,6 16:11 18:21,22,22 20:2,10,11,13 21:4 21:10,20 23:13 26:12 27:16 28:5,6 28:8 31:8,9
**wasn't**
27:17 28:7
**we**
5:8,16,17,24 6:8,20 9:10,13 10:9,23 11:4,8,15,18,19 12:3,6,11 13:4,8 14:6,13 15:22 16:4 16:5,7,8,8,9 17:5,15 17:18 21:6 23:20 24:17 26:19,24 27:5 27:6,12,14,19 29:1 29:1,9,10
**Weiler**
13:12
**well**
9:20 11:13,20 13:12 13:13 15:11 18:21 24:13 25:18
**were**
10:19 11:11,12 12:7 16:2,4,8 21:6 23:8 23:19,20 28:21
**Wesp**
2:3
**we're**
27:7 28:12,14
**we've**
17:16 24:13 27:10
**what**
6:17 8:21,23 11:3,13 11:23 12:11 14:14 15:5,18 16:11 17:13 17:16 19:2 20:5 22:16,20 23:8,13 24:21 25:20 27:3 29:1
**whatever**
26:16
**whatsoever**
31:13
**what's**
11:8
**when**
5:16 6:14 13:14 16:14 18:8 19:16 20:21,22,22 21:4 25:4,6
**where**
7:5 8:17 20:1 27:21
**WHEREOF**
31:13
**whether**
5:17
**which**
11:9,14,15 12:5 14:14 16:9 18:10,11 26:17 28:11
**while**
21:5
**who**
7:12 13:10 18:7 21:18 22:1,12,15 23:19 25:2
**whole**
31:8
**whose**
3:11 7:8
**who's**
21:19
**why**
7:19 11:15 14:8,10
**will**
6:24 8:11,12 15:9 29:1,9
**willing**
23:1
**willingness**
20:3
**window**
28:11
**wish**
30:6
**with**
6:8,20,24 7:17 8:3,13 11:22 12:12 14:15 14:19,22 17:8,22 18:20,23 19:4,10,19 21:14,19,22 22:3,9 22:17,18 23:5,16 24:3,19 26:2,5
**without**
14:15 24:11,12
**witness**
3:12 12:3 13:4 14:6 26:21 27:3,12,23 28:21 29:8 31:13
**Woodings**
13:13
**word**
15:21
**work**
17:16
**would**
6:12,19 8:8 10:9,15 13:12,18 14:19,21 15:15 18:4 19:23 21:18 22:12 23:10 23:10 28:17,19 29:7
**writing**
3:10 10:8
**written**
13:24 15:23
**wrong**
22:6

**X**

**X**
4:1,7

**Y**

**yeah**
10:12 11:17 16:21 18:4,6 23:18 24:1 27:15 28:13
**years**
18:14
**yes**
5:18,21 7:3,7,18 9:24 10:3,9 11:2 15:8 19:12,21 21:3,17 23:7,18 25:1 29:8
**your**
5:15,15 6:7,8 7:15 8:1 11:22 15:3 18:15 24:6 25:13,16 28:24 29:6
**you've**
6:14 8:7 18:2,8,12

**Z**

**zoned**
11:24 12:7
**zoning**
12:9 15:12,24 18:18 18:21 19:1

**0**

**000241**
7:1
**003229**
8:13

**1**

**1**
11:8
**10**

8:9
**14**
7:2,3

**2**

**2**
8:12
**2:24-cv-3761**
1:7
**20**
18:4
**2022**
8:20
**2025**
9:23 10:2
**2026**
1:11,17 3:1 6:24 30:6 31:14
**2028**
31:23
**204-2904**
2:5
**27th**
31:14
**28**
31:23

**3**

**3**
8:14,16
**3:00**
1:18 3:2
**3:50**
1:18 29:14
**30(B)**
28:1,15
**30(B)(6)**
27:8 28:6
**3017**
2:4

**4**

**430**
2:3
**43215**
2:8
**475**
2:3
**493**
14:15 15:1,10,13

**5**

**5**
1:11,17 3:1 4:4 30:6
**50**
8:9

**6**

**6**
4:9
**614**
2:5,9
**65**
1:17 2:8
**683-8498**
2:9

DEFENDANT'S EXHIBIT D 3-5-2026

# REAL ESTATE PURCHASE CONTRACT

**THIS REAL ESTATE PURCHASE CONTRACT** (the "Contract") is executed, delivered and made effective as of the Effective Date (as defined in Article 12(g)) by and between (i) **[TBD]**, an Ohio limited liability company ("Buyer") and (ii) **Patty Lynn Chapman, David John Reed, James Edward Reed,** and **William Patrick Reed** ("Seller"; Buyer and Seller sometimes referred to individually as a "Party" or collectively as the "Parties").

## Preliminary Statements

A. Seller is the owner of:

(i) Delaware County Parcel Number 41821002004000 being approximately 56.3 acres of land (as shown on Exhibit A, attached hereto and incorporated herein) together with all improvements thereon, and all easements, and other rights and privileges appurtenant thereto (hereinafter, the "Land");

(ii) all of Seller's right, title and interest in and to all assignable contracts and agreements relating to the upkeep, repair, maintenance or operation of the Land which will extend beyond the date of Closing, if any.

B. The Land is hereinafter sometimes referred to collectively as the "Property."

C. Seller desires to sell and convey the Property to Buyer upon the terms and conditions hereinafter set forth.

D. The Parties desire to set forth in this Contract their respective rights, obligations and conditions with respect to the aforementioned transaction.

## Statement of the Contract

In consideration of the foregoing Preliminary Statements, which are hereby incorporated herein, and of the mutual promises herein set forth, the Parties do hereby make this Contract on the following terms and conditions, intending to be bound hereby:

Article 1: Purchase Price.

The purchase price (the "Purchase Price") to be paid by Buyer to Seller for the Property shall be Seventy-Two Thousand Five Hundred and 00/100 Dollars ($72,500.00) per gross acre contained in the Property. For purposes hereof, gross acreage shall be determined by a certified survey and legal description prepared at Buyer's expense. The Purchase Price shall be due and payable in immediately available funds at the Closing (as hereinafter defined), subject to adjustments for certain charges and credits as provided hereinafter.

Article 2: Defaults and Remedies.

a. Default by Seller. If Seller fails to fulfill any of its obligations hereunder, and such failure continues for more than ten (10) days following written notice thereof from Buyer, then Seller will be in default under this Contract, the Earnest Money Deposit and any Extension Period Deposit shall be returned to Buyer, and Buyer may bring any action against Seller for legal or equitable relief, including specific performance, provided that any monetary damages shall be limited to $100,000.

b. Default by Buyer. If Buyer fails to fulfill any of its obligations hereunder and does not cure such failure within ten (10) days after receipt of written notice thereof from Seller (provided that no such notice shall be necessary if Seller fails to close by the Closing date), then Buyer will be in default under this Contract and Seller may terminate this Agreement and receive or retain the Earnest Money Deposit and Extension Period Deposit, and Seller shall have any other remedies available at law or equity.

c. Attorneys' Fees. If Buyer and Seller litigate any provision of this Contract, the unsuccessful litigant will pay to the successful litigant all costs and expenses, including reasonable attorneys' fees and court costs, incurred by the successful litigant at trial and on any appeal. If, without fault, either Buyer or Seller is made a party to any litigation instituted by or against the other, the other will indemnify the faultless one against all loss, liability, and expense, including reasonable attorneys' fees and court costs, incurred by it in connection with such litigation.

Article 3: Closing & Possession.

a. Closing. The transaction for the sale and purchase of the Property shall be closed as provided below by the delivery of the deed and other Closing instruments specified for the Property as provided in Article 8 and by the payment of the Purchase Price for the Property as provided in Article 1 on or before the fifteenth (15th) day after the earlier of: (i) the expiration of the Contingency Period (as may be extended), and (ii) the satisfaction or waiver of the Contingencies (the "Closing"). The specific date of Closing shall be determined by Buyer, provided that Buyer gives Seller at least fifteen (15) days prior written notice to Seller.

b. Possession. Buyer shall be entitled to possession of the Property at the Closing, subject to one or more farm leases for 2022, and annually renewed thereafter. Buyer shall assume any such farm lease affecting the Property at Closing and shall be responsible for any crop damages occurring after Closing, where such crop damages shall be equal to the market price at the time of harvest in the county where the Property is located (the "Market Rate").

Article 4: Inspection of the Property; Marketing Signage.

a. Inspection of Property. For a period beginning on the Effective Date and ending ninety (90) days thereafter (the "Due Diligence Period"), Buyer and its representatives, agents, and contractors shall have the right to enter upon and have reasonable access to the Property in order to conduct such examinations, inspections, studies and tests thereof as Buyer may deem necessary or desirable in Buyer's sole discretion including, without limitation, surveys, soil tests, environmental examinations, audits and tests, feasibility studies and appraisals; and after conducting the same, Buyer shall restore the Property to substantially the same condition as it was prior to Buyer's undertaking of tests and examinations described in this Article 4. Buyer agrees to indemnify and hold Seller harmless from any and all third-party liabilities, claims, causes of action, penalties, demands, and expenses of any kind or nature whatsoever arising from Buyer or Buyer's representative's actions while inspecting the Property. Buyer shall promptly upon demand from Seller reimburse Seller for any damages to any crops located on the Property as a result of Buyer's examination, testing, or other entry onto the Property at the Market Rate. Prior to any time that Buyer or any of Buyer's representatives enter the Property (including, without limitation, pursuant to Section 4(a) hereof), Buyer shall (i) have policies of general liability insurance which insure Buyer and its representatives with liability insurance limits of not less than One Million and No/100 Dollars ($1,000,000) combined single limit for personal injury and property damage and name Seller as additional insureds, and (ii) provide Seller with certificates of insurance evidencing that Buyer has obtained the aforementioned policies. Representatives of Seller shall have the right to accompany Buyer or any Buyer representatives during each visit to the Property. Buyer's obligations under this Section 4(a) shall survive termination of this Contract. If, within the Due Diligence Period, Buyer shall notify Seller in writing that this Contract is terminated for any reason, then thereafter neither party shall have any further obligation hereunder, except for return of the Earnest Money Deposit to Buyer as provided in Section 4(b). If Buyer fails to notify Seller in writing that this Contract shall be terminated prior to the expiration of the Due Diligence Period, Buyer shall waive its right to terminate this Contract pursuant to this Section 4(a).

b. Earnest Money Deposit. Within two (2) business days after the Effective Date, Buyer shall deposit the sum of $50,000.00 (the "Earnest Money Deposit") with Stewart Title Company, c/o Mark Bachman, 259 Schrock Road, Westerville, Ohio 43081 (the "Title Company"), to secure Buyer's obligations hereunder. The Earnest Money Deposit shall be returned to Buyer if Buyer terminates this Contract prior to expiration of the Due Diligence Period. Upon expiration of the Due Diligence Period, $10,000 of the Earnest Money Deposit shall become non-refundable to Buyer (except upon a default by Seller after the applicable notice and cure period) and disbursed to Seller; provided, however, if construction of a lift station to serve the Property has not commenced on or before the date that is 120 days after the Effective Date, and Buyer terminates this Agreement on or before the date that is ten (10) days after such 120-day period, the entire Earnest

Money Deposit shall be returned to Buyer. If this Contract is terminated after the expiration of the Due Diligence Period but prior to expiration of the Contingency Period (prior to any extension), the remaining $40,000 of the Earnest Money Deposit shall be returned to Buyer. Upon expiration of the Contingency Period (prior to any extension), the remaining $40,000 of the Earnest Money Deposit shall become non-refundable to Buyer (except upon a default by Seller after the applicable notice and cure period) and disbursed to Seller. The Earnest Money Deposit will be credited against the purchase price at Closing.

Article 5: Delivery of Seller's Information.

Within ten (10) days after the Effective Date, Seller shall deliver to Buyer the following to the extent in Buyer's possession: copies of any title insurance policies; surveys; soils analysis; environmental studies and audits, and related materials. The Parties agree, in good faith, to continue to share other relevant information on the Property throughout the term of this Contract reasonably requested by the other Party.

Article 6: Buyer's Contingencies.

a. Buyer's Contingencies. Buyer shall have one hundred fifty (150) days following the Effective Date (the "Contingency Period") to satisfy the following contingencies (the "Contingencies"), subject to extension pursuant to Section 6(b) below:

(i) Survey and Title. Buyer shall have approved the Survey and Title to the Property.

(ii) Plan Approval. Buyer shall obtain development plan approval for Buyer's development of the Property from all required local authorities in Buyer's sole discretion.

(iii) Incentives. Buyer shall confirm from Delaware County and Berlin Township that all incentives necessary for Buyer's proposed development will apply to Buyer's project, at Buyers sole discretion.

(iv) Lift Station. Buyer shall confirm that Berlin Township and any other applicable local authority will complete construction of a Lift Station and any other sanitary sewer improvements necessary to service Buyer's proposed development of the Property in a time frame acceptable to Buyer.

b. Contingency Period Extension. On or before the expiration of the Contingency Period, Buyer shall have the right to extend the Contingency Period for one (1) additional sixty (60) day period (the "Extension Period") by: (i) giving Seller written notice of its exercise of the extension option, and (ii) depositing with Seller the amount of $25,000 (the "Extension Period Deposit"). The Extension Period Deposit shall be non-refundable to Buyer when made except upon a

default of Seller (beyond any notice and cure period), and shall be credited against the purchase price at closing.

c. Effect of Failure to Satisfy Buyer's Contingencies. If any of Buyer's Contingencies are not satisfied or waived within the Contingency Period (as may be extended), then Buyer shall have the right, in its sole discretion, to terminate this Contract by giving to Seller written notice of such termination prior to the expiration of the Contingency Period, at which time any portion of the Earnest Money Deposit that is not non-refundable shall be returned to Buyer, and any portion of the Earnest Money Deposit that is non-refundable and the Extension Period Deposit (if made) shall be disbursed to or retained by Seller. If Buyer should fail to give to Seller such notice on or before the expiration of the Contingency Period, then Buyer shall be deemed to have satisfied or waived the Contingencies.

Article 7: Title and Survey.

a. Issuance of the Title Commitment. Within ten (10) days following the Effective Date, Seller, at Seller's sole expense, shall order and obtain from the Title Company and deliver to Buyer its commitment for the issuance of an owner's policy of title insurance with respect to the Property on the then current ALTA form authorized for use within the State of Ohio (the "Title Commitment"). The Title Commitment shall show fee simple title to the Property in Seller free and clear of all liens and encumbrances except: (i) the standard exceptions for an owner's policy, unless one or more of such exceptions are waived by the Title Company, (ii) real estate taxes and assessments affecting the Property, and (iii) easements, conditions, restrictions, covenants, reservations, encumbrances, liens and other matters of record or affecting the Property. The Title Commitment shall be issued in favor of Buyer as the proposed insured and lender, if requested by Buyer, in the aggregate dollar amount of the Purchase Price for the Property or in a higher dollar amount if requested by Buyer.

b. Survey. Buyer, at Buyer's sole expense, may order and obtain a current ALTA Survey of the Property, in form and content acceptable to Buyer (the "Survey").

c. Objections to Title & Survey. Buyer shall have until the date that is thirty (30) days after the Effective Date to review the Title Commitment and, if applicable, the Survey. If the Title Commitment or Survey shows any defect, covenant, agreement, encroachment, easement, encumbrance, lien, restriction, reservation, condition or other title matter or condition which unreasonably interferes with Buyer's proposed use of the Property, as Buyer may determine in its sole and absolute discretion, Buyer shall, within said period, give Seller written notice specifying the specific objection (the "Buyer's Objection").

In the event Buyer should timely notify Seller of any such Buyer's Objection, Seller shall have twenty (20) days following receipt of any such notice from Buyer to remedy said Buyer's Objection. The parties agree in good faith to

attempt to resolve any and all of Buyer's Objections provided that such are reasonable. In the event Seller does not remedy or obtain title insurance against any such Buyer's Objection prior to the expiration of the aforementioned twenty (20) day period, Buyer, at Buyer's option, shall have until the expiration of the Due Diligence Period to (i) waive such Buyer's Objection and proceed with the Closing, or (ii) terminate this Contract, whereupon the Earnest Money Deposit shall be returned to Buyer all Seller's and Buyer's obligations hereunder shall terminate and neither Party shall have any further obligation or liability hereunder to the other Party thereafter, except those that expressly survive termination. If Buyer fails to respond prior to the expiration of such 10-day period, Buyer shall be deemed to have proceeded under (i) above. If the Buyer's Objection is one which can be removed by the payment of money, to secure the release of a lien or monetary encumbrance not in excess of the Purchase Price (such as a tax lien certificate of judgment or mortgage), Seller shall be required to and hereby agrees to satisfy any such encumbrance from the net proceeds due and payable to Seller at the Closing in order to remove the lien or encumbrance from title to the Property.

d. Permitted Exceptions. All of the matters set forth on the Survey and Title Commitment, if not constituting a Buyer's Objection (or a Buyer's Objection that has been waived, or deemed waived, by Buyer), shall be a permitted exception to title to the Property (collectively, the "Permitted Exceptions").

e. Title Commitment, Title Policy and Survey Premium and Fees. Seller shall pay all search, commitment or similar fees for the issuance of the Title Commitment and the premium attributable to the base title insurance policy for the owner insuring an amount not in excess of the Purchase Price.

Article 8: Closing Costs.

a. Conveyance, Recording and Escrow Fees. Seller shall pay the real property conveyance fee applicable to the sale and conveyance of the Property and any recording fees associated with Seller's mortgage or similar lien releases attributable to the Property. Buyer shall pay all other recording fees.

b. Real Estate Taxes and Assessments. At Closing, Seller shall pay or credit against the Purchase Price all delinquent taxes, including penalty and interest, all assessments that are a lien on the date of Closing. At Closing, Seller also shall pay or credit on the Purchase Price all other unpaid real estate taxes and assessments that are a lien for years prior to Closing and a portion of such taxes for year of Closing, prorated through date of Closing and based on a 365-day year and, if undetermined, on most recent available tax rate and valuation. The tax proration determined at Closing shall be final and neither Party shall have the right to contest said amount unless predicated on fraud or intentional misrepresentation. At Closing, Buyer shall pay all agricultural recoupment charges (CAUV) with respect to the Property.

c. Other Expenses. Each Party shall be responsible for all other fees, costs and expenses incurred by it in connection with this transaction, including any such expenses for services rendered by accountants, appraisers, architects, attorneys, contractors, engineers and other persons not otherwise expressly provided for herein. All escrow and other title fees shall be split equally between the parties.

Article 9: Closing Instruments.

a. Instruments to be delivered by Seller. At the Closing, Seller shall execute and deliver to Buyer and/or the Title Company the following instruments:

(i) Deed. A recordable limited warranty deed (the "Deed") which conveys to Buyer good and marketable title in fee simple to the Property free and clear of all liens, conditions, restrictions, easements, reservations, encumbrances and rights of third parties except the Permitted Exceptions.

(ii) Seller's Affidavit. A seller's affidavit given by Seller to Buyer and the Title Company with respect to the payment of bills for work performed or materials furnished to the Property within ninety (90) days prior to the Closing and with respect to any other off-record matter which is required for the issuance of the owner's policy of title insurance and specifically incorporating the Seller's Representations and Warranties contained in Article 11 herein.

(iii) Authority. One or more certificates of Seller regarding the authority of the Person or Persons who sign this Contract and the other Closing instruments on behalf of Seller.

(iv) Documents. Originals, as available, or copies of all contracts relating to the Property.

(v) Other Instruments. A Closing and disbursement statement, an IRS Form 1099-S report of proceeds from a real estate transaction [§6045(e), IRC], and a non-foreign person certificate [§1445, IRC, FIRPTA], if required.

b. Instruments to be Delivered by Buyer. At the Closing, Buyer shall execute and deliver to Seller and/or the Title Company the following instruments:

(i) Authority. One or more certificates of the Buyer regarding the authority of the Person or Persons who sign this Contract and the other Closing instruments on behalf of Buyer.

(ii) Other Instruments. A Closing and disbursement statement and a real property conveyance fee statement.

(iii) Purchase Price. The Purchase Price, subject to the adjustments set forth herein.

Article 10: Appropriation.

a. Appropriation. If appropriation proceedings should be commenced against the Property or if any governmental authority should notify Seller of its intention to acquire the same pursuant to the power of eminent domain prior to the Closing, then Seller shall notify Buyer thereof. In such event, Buyer shall have the right, at its option: (i) to proceed with the transaction by giving to Seller written notice that all contingencies of the transaction to be released such as those outlined in Article 4, Article 7 and Article 9 have been removed subject only to the contingencies which are typically required at Closing, in which event Buyer shall be entitled to all proceeds thereof, up to the amount of the Purchase Price with all excess being the property of the Seller and Seller shall convey the Property subject to such proceedings and shall receive the Purchase Price specified in this Contract at the Closing; or (ii) to terminate this Contract by giving to Seller written notice of such termination. The election of Buyer shall be exercised by written notice given to Seller within twenty (20) days after Seller has given to Buyer written notice of such governmental action. The failure by Buyer to so notify Seller shall constitute an election to proceed with the transaction.

Article 11: Representations.

a. Seller's Representations. Seller represents and warrants the following as of the date of this Contract; said representations and warranties shall survive the Closing for one (1) year and remain in full force and effect except to the extent Seller has disclosed matters relating to the Property in this Contract herein:

(i) There is no action, proceeding, or investigation pending or, to Seller's knowledge threatened against Seller relating to the Property or against the Property, or any part thereof before any court or governmental department, commission, ward, agency or instrumentality;

(ii) There are no adverse or other parties in possession of the Property and no other party has been granted any license, lease or other right relating to the use or possession of the Property, or any part thereof, except with respect to the farm lease described in this Contract;

(iii) Seller has not received written notice from any governmental or quasi-governmental agency requiring correction of any condition with respect to the Property or any part thereof;

(iv) Seller has not received any written notice of any pending or contemplated condemnation with respect to the Property, or any part thereof;

(v) Seller has not received written notice of, or has no other knowledge or information of, any pending or contemplated change in any governmental regulation or private restriction applicable to the Property, any pending or threatened judicial action or pending or threatened action by adjoining landowners or other persons, parties or entities;

(vi) There will be no unpaid improvements related to the Property within ninety (90) days immediately preceding the Closing which might constitute the basis of a mechanics' lien;

(vii) Seller has full power and authority to enter into and fully perform and comply with the terms of this Contract. Neither the execution and delivery of this Contract nor its performance by Seller will conflict with or result in the breach of any mortgage, note, indenture, contract, agreement, law, rule or regulation to which Seller is a party or by which Seller is bound;

(viii) To the best of Seller's knowledge, the Property is free from any toxic or hazardous material or substance or other pollutant of nature as defined or regulated by applicable federal, state, or local laws and is free from any environmental condition that could give rise to a governmental clean-up. Seller has not received written notification from any governmental or quasi-governmental entity pertaining to toxic or hazardous material or substance or other pollutant of nature related to the Property;

(ix) Seller will not take or omit to take any action that would have the effect of violating any of the representations, warranties or agreements of Seller contained herein nor will Seller enter into any leases which will effect the Property;

(x) Neither the execution and delivery of this Contract nor its performance by Seller will conflict with or result in the breach of any mortgage, note, indenture, contract, agreement, law, rule or regulation to which Seller is a party or by which Seller is bound;

(xi) To Seller's knowledge, Seller is not under any legal disability which would impede or void any of Seller's contractual obligations nor is Seller a debtor in any proceeding under the bankruptcy laws of the United States;

(xii) Seller has not entered into any verbal or written agreements, contracts or letters of intent with any third-party pertaining to the Property which have not been disclosed in writing to Buyer in this Contract. Seller shall not enter into any verbal or written agreements, contracts or letters of intent with any third-party pertaining to the Property prior to the Closing or earlier termination of this Contract without Buyer's permission; and

(xiii) At Closing, Seller shall give a certificate to Buyer stating that these representations and warranties are true and accurate as of Closing.

b. Knowledge. The term "Seller's knowledge" or "to the best of Seller's knowledge" or similar means the actual knowledge (as opposed to imputed or constructive knowledge) of Patty Lynn Chapman as of the date of the representation without the duty of inquiry or investigation of such fact or condition pertaining to such applicable representation.

c. Duty to Disclose – Change of Circumstances. Seller shall disclose to Buyer in writing any facts, conditions or events that become known to Seller after the Effective Date that make any representation or warranty contained in Section 11(a) herein untrue or inaccurate or that otherwise have a material effect upon the Property or its use. Such written disclosure shall be made within the earlier of ten (10) days after obtaining such knowledge or prior to Closing. The disclosure after the Effective Date of information that makes a representation or warranty contained in Section 11(a) herein untrue or inaccurate is not a breach of this Contract if such disclosed information was not known to Seller at the Effective Date and provided Seller was not a cause in making the representation or warranty untrue or inaccurate.

d. AS-IS CONDITION. AS A MATERIAL INDUCEMENT TO SELLER TO CONVEY THE PROPERTY, BUYER HEREBY ACKNOWLEDGES AND AGREES THAT BUYER IS ACQUIRING THE PROPERTY ON AN "AS-IS, WHERE IS" AND "WITH ALL FAULTS" BASIS, EXCEPT AS EXPRESSLY SET FORTH IN THIS CONTRACT AND EXCEPT FOR THE WARRANTY OF TITLE IN THE DEED. IN ADDITION, BUYER HEREBY ACKNOWLEDGES AND AGREES THAT EXCEPT AS EXPRESSLY SET FORTH IN THIS CONTRACT AND EXCEPT FOR THE WARRANTY OF TITLE IN THE DEED, SELLER HAS NOT MADE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS OR AGREEMENTS OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, REGARDING THE PROPERTY, EXCEPT TO THE EXTENT SET FORTH IN THIS CONTRACT.

e. Buyer's Representations. Buyer is an Ohio limited liability company and has full power and authority to enter into and fully perform and comply with the terms of this Contract. Neither the execution nor delivery of this Contract nor its performance by Buyer will conflict with or result in the breach of any mortgage, note, indenture, contract, agreement, law, rule or regulation to which Buyer is a party or by which Buyer is bound.

Article 12: General and Miscellaneous Provisions.

a. Notice. Any notice or other communication required or permitted to be given to a Party under this Contract shall be in writing, unless otherwise specified in this Contract, and shall be given by: (i) registered or certified United States mail, return receipt requested and postage prepaid, (ii) a nationally recognized overnight courier

service (costs prepaid), or (iii) transmitted electronically to the following email addresses, in each case marked to the attention of the person (by name or title) designated below. Notice shall be effective upon receipt of the receiving Party or if the receiving Party refuses service, the date placed in the United States mail system. Either Party may change its address for notice by giving written notice thereof to the other Party. The address of each Party for notice initially is as follows:

| Seller: | Buyer: |
| --- | --- |
| Patty Lynn Chapman<br>5609 Champion Creek Blvd.<br>Medina, OH 44256<br>Email: jimchapman@zoominternet.net<br>and pchapman@zoominternet.net | Philip Ronald Sabatino<br>3895 Stoneridge Lane<br>Dublin, OH 43017<br>Email: rjsabatino@trprop.com and<br>rsabatino@trprop.com |

With a copy to:

David G. Gentry
Gentry Law Group, LLC
2000 Henderson Road, Suite 355
Columbus, OH 43220
Email: david@gentrylawgroup.com

b. Complete Agreement, Amendment, Waiver; Counterparts. This Contract, including all exhibits, constitutes the complete agreement between the parties with respect to the subject matter hereof, all previous understandings, if any, between the parties; no oral or implied understandings, representations or warranties shall vary the terms of this Contract; and neither this Contract nor any of its provisions may be amended or waived other than by a written instrument executed by Seller and Buyer. This Contract or any such amendment or waiver may be executed in several counterparts, each of which shall be considered a duplicate original and the same instrument.

c. Governing Law; Severability. This Contract shall be governed by and construed in accordance with the laws of the State of Ohio. The invalidity or unenforceability of any provision of this Contract in any particular respect shall not affect the validity and enforceability of any other provision of this Contract or of the same provision in any other respect.

d. Successor and Assigns; Assignment. This Contract shall inure to the benefit of and be binding upon the Parties hereto and their respective heirs, personal representatives, successors and permitted assigns. Notwithstanding the foregoing, Buyer may assign this Contract to any third-party individual or entity, with Seller's prior written consent not to be unreasonably withheld, provided, however, that Buyer may assign this Contract to an entity affiliated with Buyer without Seller's consent (but with notice to Seller). Seller may not assign its rights in this

Contract without the approval of Buyer, which approval may be withheld in Buyer's sole discretion.

e. Survival of the Contract; Survival of Certain Terms. The promises, terms, conditions, representations, warranties and provisions of this Contract shall survive the Closing of the transactions and the delivery and recording of the deed and any other instrument for the conveyance of the Property; and if the deed or any other recorded instrument is or may be construed to be inconsistent with any provision of this Contract, then the applicable provisions of this Contract shall control and shall not be deemed to have been merged into such deed or other recorded instrument, unless otherwise expressly provided in any such instrument.

f. Real Estate Brokerage Commission. The Parties represent that they have not engaged the services of any broker or finder in connection with this Contract or the transaction contemplated hereby, except that: (a) Buyer engaged or utilized the services of TR Properties, through its agent RJ Sabatino, representing Buyer ("Buyer's Broker"), and at Closing Seller will pay a commission to Buyer's Broker equal to two percent (2%) of the purchase price pursuant to a separate agreement between Seller and Buyer's Broker; and (b) Seller engaged or utilized the services of Equity Inc., through its agent Scott Cubberly, representing Seller ("Seller's Broker"), and at Closing Seller will pay a commission to Seller's Broker pursuant to a separate agreement between Seller and Seller's Broker. Each Party hereby represents and warrants to the other Party that, except as provided above, it has no knowledge of any agreement, understanding or fact which would entitle any real estate broker, finder or other Person, to any commission, fee or other compensation as a result of the transaction which is the subject of this Contract. Each Party hereby agrees to indemnify, defend and hold harmless the other Party from and against any liability, cost or expense, including attorneys' fees, as a result of any claim for a commission, fee or other compensation made by any real estate broker, finder or other Person and asserted against the other Party by reason of an arrangement made or alleged to have been made by the indemnifying Party.

g. Certain Defined Terms. For purposes of this Contract, the term: (i) "Person" means a corporation, association, partnership (general or limited), limited liability company, trust, estate, government, governmental agency or other entity as well as an individual or natural person, unless the context otherwise requires, (ii) "Day" or "day" shall mean a calendar day and (iii) "Effective Date" means the date that the last Party to execute this Contract delivers this executed Contract to the other Party.

h. Time. Time is of the essence with respect to the performance of each provision of this Contract. Whenever a date specified herein shall fall on a weekend or legal holiday, the date shall be extended to the next business day.

i. Ownership of Plans. In the event this transaction does not close, all plans, surveys, reports, studies, tests, audits, investigations, designs, drawings and

related information and materials (collectively, the "Plans") prepared for or at the request of Buyer and relating to the Property shall, upon the reasonable request of Seller, be promptly delivered to Seller.

j. Schedule of Exhibits. Attached hereto and incorporated herein by this reference are the following exhibits:

Exhibit A The Property

k. Like-Kind Exchange. The Parties acknowledge that either may elect to purchase or sell the Property as part of a tax-free exchange under Section 1031 of the Internal Revenue Code of 1986, as amended ("Code"). As such, the Parties agree to reasonably cooperate in connection therewith. If requested by Buyer or Seller, each will participate in the exchange contemplated by this Article as an accommodation to the other with the express understanding and agreement that: (i) Seller or Buyer shall not be required to take title to any property in order to effectuate such exchange, (ii) under no circumstance shall Seller be required to postpone or refrain from receiving any of the Purchase Proceeds due Seller hereunder, (iii) neither Party is making any representation or warranty regarding such exchange or whether such exchange qualifies as such under the Code, (iv) each Party shall indemnify and hold the other harmless from and against any cost, expense or liability, including attorneys' fees, incurred by Buyer and/or Seller as the case may be, in connection with the provisions of this §12(k) or any such exchange and (v) Buyer and/or Seller as the case may be, shall not be required to incur any additional costs, fees or expenses (including, without limitation, attorney fees) to accommodate any proposed like-kind exchange.

l. Recording. Neither Party may record this Contract.

**Signatures Appear on the Following Page**

**IN WITNESS WHEREOF**, each Party has executed and delivered this Contract to the other Party to be effective as of the Effective Date.

**BUYER**:
[TBD],
an Ohio limited liability company

By: P. Ronald Sabatino
(signature)

P. Ronald Sabatino
(printed name)

Its: ______________________
(title)

Date: 2-18-2022

**SELLER**:

______________________
Patty Lynn Chapman
Date:______________________

______________________
David John Reed
Date:______________________

______________________
James Edward Reed
Date:______________________

______________________
William Patrick Reed
Date:______________________