IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO EASTERN DIVISION

T&R PROPERTIES, et al., CASE NO. 2:24-cv-3761

Plaintiffs,

v. JUDGE: Graham Magistrate Judge Jolson

BERLIN TOWNSHIP, et al.,

Defendants.

_____________________/

- - -

DEPOSITION OF ALLAN J. LICHTMAN

MONDAY, JULY 27, 2026

- - -

Deposition of ALLAN J. LICHTMAN, taken via Zoom videoconference with the witness and all parties appearing remotely, before REILLY MCCONNELL, a Court Reporter.

- - -

MAGNA LEGAL SERVICES

(866) 624-6221

WWW.MAGNALS.COM

APPEARANCES:

On behalf of the Plaintiffs:
ANDREW MARGOLIUS, ESQUIRE
MARGOLIUS, MARGOLIUS AND ASSOCIATES
55 Public Square
Suite 1770
Cleveland, OH 44113
andrew@margoliuslaw.com

On behalf of the Plaintiffs:
JOSHUA NAGY, ESQUIRE
WESP BARWELL BERARDINO, LLC
465 Metro Place
Suite 430
Dublin, OH 43017
jnagy@wesplaw.com

On behalf of the Defendants:
PAUL-MICHAEL LA FAYETTE, ESQUIRE
FREEMAN MATHIS & GARY, LLP
65 East State Street
Suite 2550
Columbus, OH 43215
paul.lafayette@fmglaw.com

ALSO PRESENT,
LORE CRAWFORD-HINES, Notary
RJ SABITONO, Rep. for Plaintiff
RON SABITONO, Rep. for Plaintiff

\- - -

I N D E X

\- - -


| WITNESS: | ALLAN J. LICHTMAN | PAGE |
|---|---|---|
| | BY MR. LA FAYETTE | 04, 134 |
| | BY MR. MARGOLIUS | 132 |


\- - -

E X H I B I T S

\- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|

P R O C E E D I N G S

THE REPORTER: On the record. Will the notary please swear in the witness.

MS. CRAWFORD-HINES: Okay.

THE REPORTER: The time is 10:10. Well, 10:10.

THE NOTARY: All right. Allan, can you please raise your right hand?

ALLAN J. LICHTMAN, after having been duly sworn, was examined and testified as follows:

THE WITNESS: I do.

THE NOTARY: Perfect.

You all have a great day.

MR. LA FAYETTE: Thank you.

MR. MARGOLIUS: Thank you.

\- - -

EXAMINATION

\- - -

BY MR. LA FAYETTE:

Q. All right. Good morning, Mr. Lichtman. My name is Paul La Fayette. I represent Berlin Township and the other named defendants in this case. I'm here to take your deposition today. You've been identified by T&R Properties as their expert. We've received your report. I take it you've had your deposition taken

before?

A. Yes.

Q. All right.

A. More than once.

Q. Okay. I think I can probably dispense with the ground rules. You understand that, obviously, if I ask you a question at any point. And you don't understand what I'm asking, just tell me, like, "Hey, restate it or rephrase the question." I'm happy to do that, okay?

A. All right. Let me just say I'm a little hard of hearing. I'm old. So please speak slowly and loudly. I can hear you pretty much just fine. I also have a medical condition, so unpredictably, I may need a break. I may not. But I just want to let you know.

Q. Okay. That's fine.

A. And also, I'll need a lunch break if we're going much past 12:30.

Q. Okay. Hopefully, we don't go that long, but we'll -- I never know where it's going to lead us.

A. Fully understood.

Q. All right. If you could, go ahead and state your name for the record.

A. Alan J. Lichtman, A-L-L-A-N, J. L-I-C-H-T-M-A-N.

Q. Okay. And what's your address?
A. 9219 Villa Drive, Bethesda, Maryland, 20817.
Q. Okay. And as I understand it -- well, I've got your CV that I think was at the back of your report, but if you could just briefly take me through your educational background as far as your -- let's talk about undergrad first.
A. Yes. I went to undergrad at Brandeis University. I hate to admit it, but in the 1960s. I graduated in 1967 with a BA in history, but that needs a little bit of a gloss because for three years I was a science major, premed, and only switched to history in my senior year, which helps explain my expertise and my interest in quantitative and social science methodologies.
Q. Okay. And did you have a minor? I mean, did you end up graduating with a minor in some form of science?
A. No. I don't recall that.
Q. Okay. And as I understand it, you then went on to -- for a doctoral program at Harvard, I guess.
A. Yes. I went directly to a doctoral degree at Harvard, received my PhD there in 1973 with a specialty in American political history and quantitative and social science methods. And my dissertation combined historical

analysis with quantitative and social science methodologies.

Q. Okay. And when you say quantitative and social science, what do you mean by that? What does that mean to a layperson?

THE WITNESS: Hello?

MR. LA FAYETTE: Oh, it looks like you froze. Reilly, are you still with me?

THE WITNESS: Yeah. You just froze.

MR. LA FAYETTE: Okay. You froze up my screen and everybody else was still there. So I'll go back and ask the question again.

THE WITNESS: Yes. I didn't -- I didn't hear it.

MR. LA FAYETTE: Okay. That's fine.

BY MR. LA FAYETTE:

Q. When you say quantitative, what do you mean by that?

A. Yes. Very simply, it means the mathematical analysis of trends and patterns, in my case in history and also in contemporary life. So it means the mathematical analysis of any information that could be put in quantitative form: election results, demographic information, survey data, and that, of course, is illustrated in my report.

Q. Okay. Have you any other education beyond the doctoral program?

A. Not formally, no.

Q. Okay. All right. And --

A. I did sit in -- let me finish. I did sit in on classes on econometrics at American University, but no, I didn't take another formal degree.

Q. Okay. What are econometrics?

A. It's the mathematical analysis of economic data.

Q. Okay.

A. It was just a brush-up on my quantitative expertise. Also, I should mention, prior to getting my degree while I was at Harvard, I taught a course on quantitative methods in history at my alma mater, Brandeis University.

Q. Okay. Where are you from originally? Where did you grow up?

A. Brooklyn, New York.

Q. All right.

MR. MARGOLIUS: You knew that, Paul.

MR. LA FAYETTE: Yeah. I could pick it up. I don't know if I remember it. I grew up in South Boston, so.

THE WITNESS: Oh yeah, sure. My family moved

to the Bronx eventually, but I was already in school.

MR. LA FAYETTE: Okay.

BY MR. LA FAYETTE:

Q. When did you teach -- or when did you take the -- or I guess you were auditing classes or just kind of brushing up, you know, with the econometrics. When was that?

A. In the '70s. I don't remember the exact date.

Q. Okay. That's fine.

A. 50 years ago. When you get to be my age things, you know, tend to be from a long time ago at times.

Q. Right. Where are you currently employed?

A. I'm sorry, what? I didn't hear that.

Q. Where are you currently employed?

A. American University in Washington, DC.

Q. Okay. And what's your position?

A. I am a distinguished professor of history. That's not something I made up. That's -- it's an official university, not department title. It is the highest academic rank. Above that, a full professor. Out of many, many faculty members at American University, only a handful of us have attained the rank of distinguished professor, as I point out in my report.

That means you had to make major recognized national and international contributions. And I've been a distinguished professor since 2011.

Q. Okay. And again, distinguished is their term, not yours. You didn't have that adjective.

A. I did not add it. That's an official university title. You got to go through a very extended review process to be awarded distinguished professor, all the way up to the president of the university, and I presume perhaps even the board.

Q. And are you a full professor? Is that what you said?

A. I'm above full -- I'm above full professor.

Q. Okay. Got it.

A. I've been a full professor since about -- I don't remember exactly, 1979 or thereabouts. So I've been a full professor for decades and then was elevated above that in 2011 to be distinguished professor.

Q. Okay. And have you -- as I -- did you have a prior employer? Who were you employed by prior to American University?

A. I worked at Harvard University as the director of forensics. That is, I was the director of their debate program at Harvard. And I also mentioned to you that while in grad school, I was employed by Brandeis

University, my alma mater, as an instructor in quantitative methods and history. I want to go back even further than that. When I was a kid, I worked in a department store, and my favorite job was I worked for a plumber breaking up bathrooms so they could be renovated.

Q. That sounds like fun. So most of your professional life or pretty much most of your professional career has always -- has been in academics; is that correct?

A. That's fair to say.

Q. Okay.

A. But, you know, I've done lots more than just academics. I've also been an expert witness, which is part of my employment, obviously, in some 110 state and federal cases. I'm also a speaker and a writer, so I don't know if you call those employment, but I certainly have remunerative activities outside of the university.

Q. Okay. And as far as your speaking, lecturing, expert witness, do you have separate entities, LLCs that you've set up to manage that, or how does that work?

A. Just -- I just have my own personal, you know, company, Schedule C.

Q. Okay. How long have you been serving as an expert witness? When did you first start doing that?

A. 1980. I did a report for the plaintiffs in

the landmark Supreme Court case of Anderson v. Celebrezze on third-party access to the ballot, and then I became involved directly as an expert. That was just a report. I didn't testify or anything like that. In the 1980s.

Q. Okay. And so I know that -- you know, so obviously you have ballot-related issues. I know that you've testified in redistricting issues. What other topics do you cover as far as an expert witness?

A. I cover a lot of different topics. Just -- I have testified extensively in a major education case in the state of Maryland, actually a long time ago. It never went to trial, but was an expert in a racial steering case involving real estate. I've been an expert in cases involving employment, and in one extraordinary case, a couple of them, actually, I was an expert witness in death penalty cases. So I've covered a pretty broad gamut of cases. I'm not sure that's exhaustive, but it's certainly illustrative --

Q. Right.

A. -- beyond voting civil rights cases.

Q. Okay. As far as relevant to this particular case, we're dealing with Fair Housing Act discrimination claims. Have you offered expert testimony in other Fair Housing Act cases?

MR. LA FAYETTE: You froze again.

THE WITNESS: You froze again there.

MR. LA FAYETTE: All right. You did too. You and I are the two that are freezing. Everybody else seems to be moving when I look up.

THE WITNESS: I know it's -- it's -- and I can't help you with anything technical. I'm an old dinosaur.

MR. LA FAYETTE: Me too.

BY MR. LA FAYETTE:

Q. As far as in cases similar to what we have here, have you offered expert testimony in other Fair Housing Act cases?

A. I'm not sure what the sourest case was. I think it was a racial steering case, and whether it involved the fair -- it was many, many years ago. I don't recall.

Q. Okay. As far as real estate-related discrimination, disparate impact cases, not on the political side, but just dealing with real estate development or development things of that nature. Any cases where you've offered testimony?

A. Well, I'm not sure this exactly answers your question, but I'm a co-owner of a real estate business for over 20 years, and I have several times gone into court and offered testimony on real estate-related

issues. Not as an expert, of course, but as either a plaintiff or a defendant.
Q. Okay. In this real estate business, what type of business is that?
A. My wife and I own the business. We've owned it for over 20 years, and we deal mostly in the rental of homes and also the buying and selling of homes.
Q. Okay. How many homes do you own?
A. Let me see. Probably four or five at the moment.
Q. Okay. How long ago did you start doing that?
A. I think it was 2005, approximately.
Q. Okay.
A. And I've owned my own home long before that.
Q. Right.
A. I bought my first home in the late '70s.
Q. Where are the homes that you own -- where are they located?
A. Bethesda, Maryland; Westminster, Maryland; Allegheny County, Maryland; Germantown, Maryland.
Q. And how many, I guess -- so, do you also do renovations of homes and flip them, selling like that, or --
A. We have not flipped, no.
Q. Okay.

A. We don't do renovations and flipping. We do rentals and sales, and in one case, we did -- we took back the mortgage of one of the houses that we sold.
Q. Okay. And have you, I guess the number of homes you owned, has that been consistent since 2005, four or five at a time, or have you owned a (indiscernible).
A. No. We've acquired some homes since then, and this number at the moment, since we've sold some, also includes a couple of homes that we don't rent. Our primary residence and a vacation home.
Q. Okay.
A. But I think at the peak we were renting four or five homes, if I remember correctly, maybe four.
Q. All right. You don't own any, like, multifamily? Do you own ever -- I should -- let me back up an asset.
Any of these properties multifamily?
A. No. They're all townhomes or single-family detached homes.
Q. Okay. Do you operate -- do you have a specific name for that business that your wife and I -- that you and your wife own relative to these rentals?
A. No. We don't have a specific name for it.
Q. Okay. So is it just as far as the -- is there

an entity that owns the homes, or is it?
A. Just in you and your wife and myself.
Q. Okay. Do you know how much each of these properties rent for monthly?
A. They vary a great deal. $2,000 to $3,000 range, roughly.
Q. Okay.
A. But some -- some of them I think at some time were under 2,000. Remember, this is over more than a twenty-year period.
Q. Right. At present, what are they? Do you know?
A. As I said, probably in the 2,000 to 3,000 range, but I don't know exactly. My wife would know exactly.
Q. Right. As far as -- I guess this is a little bit different. A lot of times we, you know, as attorneys, we ask questions, "How many times do you offer testimony for the plaintiff versus the defendant?" And I understand that in the world of redistricting, it depends on who's filing the lawsuit, I guess. You know, one group or another, or one party or another. So I guess, let me ask it this way.
In instances where you've offered testimony, are there times where you have offered testimony and --

opinions and testimony that there is not a discriminatory -- that there is not discrimination taking place?
A. Yes. In fact, fairly recently.
Q. Okay. What's -- what case would that be?
A. That would be the Illinois post-2020 redistricting case in which I was the expert defending the Illinois state legislative redistricting plan with respect to issues both of discriminatory intent and discriminatory effect, and we prevailed in those cases.
Q. Right. And then who -- in the Illinois case, who retained you?
A. The attorney was Michael Kasper, on behalf --
Q. And who --
A. I'm not sure exactly, but on behalf of the legislature, maybe one of the heads of the legislature. I don't really concern myself much with that.
Q. Okay.
A. I work with the lawyers. I -- you know, I do not work with whoever hired the lawyer.
Q. Right. Right. And --
A. But I'm pretty sure it was the legislature or some leadership in the legislature.
Q. Okay. And a lot of times we ask questions on whether you've been retained, you know, how often are you retained by the plaintiff versus retained by the

defendant? Do you know the answer to that?
A. I don't. But in recent years I've done a lot of defendant cases. Probably over the long stretch, particularly given that I was involved early on with a lot of the landmark Section 2 cases for the Department of Justice, I would say probably more plaintiff, but quite a bit of defense as well --
Q. Okay.
A. -- particularly recently. Two of my most recent cases were defense.
Q. Okay. As far as your overall income is concerned -- and I don't need to get into the specific details, but do you have -- would you have an understanding of what your overall income -- where your income is derived from primarily from American University, primarily from your books, primarily from rental properties --
A. Oh, man.
Q. -- forensics?
A. It's all -- all of the above.
Q. Okay.
A. All of the above, but the bedrock is, of course, the university employment because all the rest of that varies tremendously, you know?
Q. Okay.

A. There could be times where I have no speaking engagements or no expert witness, or, you know, right up to the census, there could be a ballooning of that or in an election year. So it varies.

Q. Okay. As of right now, how many expert cases are you handling that are current right now?

A. As far as I know, this is the only one.

Q. Okay.

A. I don't think I'm scheduled to testify at the moment in any other.

Q. Okay. And who retained you in this case?

A. Attorney Margolius, I guess, on behalf of T&R Properties.

Q. Okay. And do you remember when you were retained?

A. Many months ago. I don't remember exactly.

Q. Okay. Sometime in 2026?

A. Yes.

Q. And looking at your report, did you -- I'm trying to look for it -- what materials did you review?

A. It's all outlined in my report. I have a whole section there of evidence and methodology. And as I say in my report, I used standard sources in my field, nothing --

Q. Okay.

A. -- surprising: books, articles, journals, in this case, transcripts of decision-maker meetings, depositions, census data, survey data, things of that nature.
Q. Okay.
A. Both quantitative and documentary.
Q. Okay. And I'll take you through a list of some things just so I can know what you've read and what you haven't. As far as discussions that you had with counsel -- I'm not going to get into any details of, you know, kind of strategy-related issues. But I do want to ask you, were you asked to make any factual assumptions --
A. No.
Q. -- by legal count?
A. No.
Q. Okay.
A. I never go in with factual assumptions. I wouldn't have been hired in 110 cases if I did that.
Q. Okay. All right. And have you ever worked with Mr. Margolius before?
A. No. I didn't know him.
Q. Okay. Have you ever worked with Mr. Nagy who --
A. No. I didn't know him.

Q. As far as the report that you prepared in this case, did you prepare it all yourself or did you have other folks assist you with it?
A. I prepared it myself.
Q. Okay. 100 percent by you?
A. Yeah, I may have had my proofreader do a little bit of proofreading, but nothing substantive.
Q. Okay.
A. All the substance is solely my own.
Q. Okay. All right. I didn't know if, you know, if you had somebody that you -- you know, a former, you know, faculty member or student or whatever that helps, you know -- does any work like that, that you know --
A. No. I didn't consult any --
Q. Okay.
A. -- current or former faculty or students in the substance of this report.
Q. Okay. Now, as I understand it, your rate on this is $500 an hour for review and preparation of the report.
A. That is correct.
Q. Okay. Is there are other rates for review of materials, or is it just flat $500 an hour and that's it?
A. Flat.
Q. Okay. Do you know how many hours you spent on

the case thus far?
A. All the reports, and all the consultations, and the research, maybe north of 100 hours.
Q. Okay. And have you issued invoices to Counsel?
A. Correct.
Q. Okay. How many invoices do you know?
A. Maybe three.
Q. Okay.
A. It's possible more. I -- I do monthly invoices.
Q. Okay. And do you know how much you have been paid to date?
A. I don't exactly. Maybe something in the vicinity of 80,000, something along those lines, but I think less than that. I don't remember exactly.
Q. Okay. And we can always request a copy of the invoices --
A. Sure.
Q. (Indiscernible) --
A. Yeah. I have no problem with that.
Q. Okay. Okay. Let's talk a little bit about what you reviewed, and then -- kind of once we get through this, then we can dive into the details of your opinions to kind of go through things.

Did you review the Berlin Township Comprehensive Plan?

A. Yes.

Q. All right. Did you review the Berlin Township zoning resolution?

A. Yes.

Q. Did you review the minutes from the board of trustee meetings relative to their T&R's applications?

A. Yes.

Q. All right. And did you review their applications for rezoning?

A. Yes.

Q. And applications for variances?

A. Yes. You're talking about the presentations to the various boards. Yes. The minutes --

Q. Yes.

A. -- that are recorded, yes.

Q. Okay. And -- but did you actually review the actual applications that were submitted by T&R Properties to the board?

A. Unless they were in the minutes, I did not see any separate documents to that effect, but I saw all the claims, and arguments, and presentations in the minutes.

Q. Okay. And actually, there was one thing -- it might make things a little quicker. As I understand it,

you know -- or maybe you understand it, did you understand that T&R Properties had basically two applications? There is one for the residential multi-family apartment units, and then there was another one for the industrial parcel?

A. For the warehouse parcel, absolutely --

Q. Yeah.

A. -- understood that. And I believe I did review. They had a very long initial presentation which I did see.

Q. Okay. Do any of your opinions in this case deal with the industrial parcel? Do you have any opinions regarding the industrial parcel?

A. Indirectly, yes.

Q. Okay. And what do you mean by that?

A. What I mean by that is there is discussion, and it's -- I believe, presented in my rebuttal report about a synergy between the industrial development and the residential development. That the residential development, of course, would not be limited to workers at the commercial development, but would provide affordable and convenient housing for workers, and that was relevant to the argument that T&R's apartment dwellings, contrary to what your expert implied, are open to people of modest income.

And I actually was able to come up with statistics for Delaware County of the kinds of incomes that would be afforded to warehouse workers, and that they were quite modest. So, in that sense, I did review information relevant to the commercial side of the proposal.

Q. Okay. But as to the -- so that -- I understand what you're saying, that there's kind of a back and forth between the residential and the industrialists to the effect of where the folks from the residential could work, among other places, but this would be satisfactory if the industrial parcel would be acceptable employment for folks that would live in the residential.

A. I think you got it reversed. That is, I think you said the apartments would be -- it's those who work in the commercial would, according to the testimony, also have availability nearby to dwell in the apartment complex.

Q. Okay. But as I understand it, you're not offering opinions as to whether or not the -- the -- the denial of the zoning for the industrial portion was discriminatory?

A. Not directly, no.

Q. Okay. And when you say not directly, do

you -- is there an indirect opinion you got?
A. Well, you know, in the sense that there was a synergy between the two. That's the only --
Q. Okay.
A. -- sense I meant it.
Q. Okay. Okay. So you reviewed the hearing transcripts, right?
A. I reviewed the transcripts, I believe, of all the hearings.
Q. Okay.
A. Zoning commission, board of trustees, board of zoning appeals.
Q. Excellent. Thank you. And that knocked them out, so I didn't have to ask three questions. You answered in one. How about deposition transcripts? Did you read Ron Sabatino, the senior -- the father?
A. I don't recall. I did read the depositions of all those involved in decision-making.
Q. Okay. On the township side. But did you review the representatives of T&R Properties, Mr. Sabatino -- Ron Sabatino, and then RJ Sabatino. Did you read their --
A. I don't believe that I did yeah.
Q. Okay. So you reviewed the depositions -- and I guess I'll take you through it. Megan Raehll, who is a

trustee?
A. Two depositions.
Q. That's right. You read both of those, right?
A. Correct.
Q. And Mr. O'Brien also, two depositions.
A. Correct.
Q. And Ron Bullard?
A. Yes.
Q. Jason Acevedo (ph)?
A. I'm not --
Q. He's a DGA member.
A. Not certain. I may have, but it doesn't ring a bell like the others do.
Q. Okay. So I'll just, for the purposes of the deposition, Megan Raehll, Kevin O'Brien, and Ron Bullard. Those are the three township trustees.
A. Yes. I also --
Q. The other -- go ahead.
A. I also read the deposition of Mr. De Christopher.
Q. Okay. How about Christopher Acker?
A. I think I did.
Q. All right. How about Nicole Acker?
A. I think I did. I did make reference to the Ackers, yeah.

Q. Okay. How about Darcy Kaplan (ph)?
A. That doesn't ring a bell.
Q. Larry Harmon (ph).
A. That doesn't ring a bell. I know who he is, but I don't recall a deposition from him.
Q. Okay. Don Sutton (ph).
A. I may have.
Q. Michelle Cook.
A. I don't think so.
Q. Brad Cook.
A. I don't think so, but you know, you're asking me all of these names from memory. The ones that stick, of course, are the critical decision makers.
Q. Robert Weiler?
A. I know who he is, and I believe I reviewed his testimony, but I don't recall a deposition from him.
Q. Okay. So you might have read a summary or something of his testimony.
A. His testimony was recorded because he presented it before decision-making bodies.
Q. Okay. I see what you're saying. When he came to speak at the township, that's where you would have read his testimony or his comments?
A. Correct.
Q. Okay. But you did not read his deposition?

A. Not that I recall.
Q. Okay. How about with Vincent Curry (ph), is that the same?
A. Same.
Q. And Evan Ballman (ph).
A. Same.
Q. Okay. All right, let's dive a little bit into your opinions -- and I guess, let me ask you this. If we can -- because again, there's a lot of information obviously that you go through in your deposition or in your report, and we could spend a month discussing all of it.
A. Indeed.
Q. I want to kind of cut to the chase here as far as -- and then we can kind of dive into it in a little bit more detail, but as far as -- what opinions do you have that you would offer in this case as far as kind of an overarching opinions that you would offer.
A. Yes. First, with respect to discriminatory effect. I have offered opinions both about discriminatory effect and about discriminatory intent. They're not totally watertight separated from one another. There is a relationship, but they are two separate issues that I reviewed. So let me first deal with discriminatory intent.

What I found in this case, that there was a very significant, robust relationship between the policies adopted by the township and the discrimination against Blacks and Hispanics and less affluent families with children. And I found that there were conspicuous elements of this situation that led to this extremely robust situation.

Q. Okay.

A. First of all -- and I'm not going to go into detail. I'm just going to give you an overview. But what is really significant here is the very high-priced homeownership market in Berlin Township. The almost total unavailability of rental units, and that ties in directly to discrimination against Blacks and Hispanics as compared to Whites, who have much less resources to buy into such an expensive homeownership township.

And by resources, I mean, both income and wealth, and it also ties into less affluent families with children. All of these relationships that are statistical are outlined in my report, and this ties directly into the policies adopted by Berlin Township without going into great detail, which we can do if you want.

They relied on, as a central policy, zoning restrictions, which, as I point out in my report with

multiple sources, is the classic form of discrimination against Blacks and Hispanics after things like restrictive covenants that directly discriminate were abolished.

And it wasn't just the restrictive zoning in this case, it was also how they applied the restrictive zoning that ties directly into a policy that resulted in the denial of T&R properties, apartment development, and it would have greatly expanded that availability and opened up opportunities for Blacks and Hispanics and low-income families with children. That is a very brief overview of one side of my report.

The other side -- and as I said, they're not separated in a watertight way -- is intentional discrimination. And there, very importantly, I relied on the Arlington Heights framework for assessing intentional discrimination, as I point out in my report.

And the reason we rely on the Arlington Heights framework, which is consistent with scholarship in my field and my own writings, is that, you know, it was developed even back in the '70s. But in this day and age, you're not going to find decision makers openly coming out and saying, "Yes, we are adopting this policy to discriminate against Blacks and Hispanics." That's why I have used the Arlington Heights framework.

As I point out in my report as well, I have been guided by the Justice Department's analysis and explanation of the Arlington Heights framework. Two points are particularly relevant. One, that the Arlington Heights framework is especially pertinent to the situation we're facing here. We're dealing with discrimination against groups, not against a particular individual, though of course, individuals are affected.

And secondly, they point out that you don't have to present a lot of evidence on intent in the Arlington Heights framework, at least to get the case to the jury, but there is a mountain of evidence here on intent, starting with, of course, the discriminatory effect, which is part of but not totally inclusive of the Arlington Heights framework.

Secondly, how the decision-making of the Berlin Township decision makers was tied into historical means of discrimination against Blacks and Hispanics that keep them confined to relatively segregated areas with all kinds of socioeconomic disabilities associated with that.

In other words, what Berlin Township has done did not come out of nowhere, but is deeply implicated and tied into historical discrimination, which of course, is why the Arlington Heights framework includes that as part

of their framework. Without going into --

Q. Okay.

A. Well, there are many other elements here. I'll just give you a couple of examples. For example, they claimed that they were bound by this R4 density. So they had no choice. That they were stuck with this. They even said they liked the project. It was a good project. They couldn't substantially distinguish it from another project that they approved, but they said they were stuck with the R4.

That was not true, as they admitted. Mr. O'Brien, finally in his second deposition, admitted, no, they were not stuck with the R4. That was just a guideline. It was not yet officially adopted at the time the board of trustees rejected T&R's proposal.

Another example, and there are so many, and I'll stop here because I'm just giving you illustrations, is this whole issue of issuing variances. They are absolutely empowered to issue variances. They have issued variances routinely for single-family developments, including what they admit was a major modification.

They have issued variances for a bike shop and an auto and marine repair shop in what had been residential property, commercial operations that could

bring traffic and bring noise to a supposed rural setting. They obfuscated their ability to issue a variance in this particular instance.

That's just illustrative, and of course, there are all the statements by residents and how the decision makers dealt with those statements, and also the many, many disingenuous statements by decision makers. That's just an overview of the two components of what I looked at.

Q. Okay. So let's unpack a little bit.

A. Sure.

Q. Let's start kind of at -- let's go back to kind of the baseline. So in discriminatory intent -- and I understand what you're saying, discriminatory effect, they're not completely -- you viewed them as being somewhat intertwined; is that fair?

A. That's fair. They're not, you know, inclusive of one another, but they are intertwined. One element, and only one element, of the Arlington Heights factors is discriminatory effect.

Q. Right.

A. They've got to show some harm.

Q. Okay. So, as far as discriminatory intent, starting there and using it in the most literal of senses. Intent meaning, is there any overt statement by

a township official that said, I do not want any Black people here, and I do not want any Hispanic people. Is there any --

A. That's the whole -- no. That's the whole point of the Arlington Heights analysis. You're not expecting in this day and age, even 50 years ago, decision makers are going to make statements like that. And that's a big mistake your own expert makes, who seems to believe that's the only way you can prove intent, which of course is not true.

But there are certainly a lot of statements that indicate -- if we're talking about statements that are not directly discriminatory. But as I point out and I cite scholarship to this effect, which your expert ignores, that there are many indirect ways that are clearly, or, you know, maybe not absolutely the same way as an overt statement, but certainly are indicia of discriminatory intent, particularly when combined with all the other factors.

Q. Okay. And that's why --

A. And I could give you plenty -- plenty of examples of that if you like.

Q. No. I appreciate that.

A. They're all in my report.

Q. I appreciate that, and that's why I wanted to

start off with that as a baseline. So there's no overt intentional discriminatory statement made by any member of the township, any official that was so overt or to -- you know, intentional.

A. Only indirectly, not directly saying, "We're discriminating."

Q. Right. Okay. So we can kind of clear that one. There's no direct evidence of any discrimination. Now we want to talk about indirect.

A. Now you've misstated.

Q. Okay.

A. I didn't say there wasn't direct evidence of discrimination. There's plenty of direct evidence of discrimination. What I am saying is there's no overt statement where a decision maker actually, in so many words, says we are discriminating against Blacks and Hispanics.

Q. Okay.

A. There's a distinction there.

Q. Yeah. So when I say direct, direct intent, direct overt, but I understand what you're saying. That's -- I just hear what you're saying. I get it.

A. Yeah. Plenty of direct evidence, although not overt statements --

Q. Got it.

A. -- saying we're discriminating.
Q. Okay. All right. As far as talking about the groups of individuals involved here, if you talk principally and almost exclusively about the relationships of Blacks and Hispanics, is that fair --
A. And less affluent families with children.
Q. Okay. Do you understand less affluent families are not -- affluents and poverty are not protected classifications, right?
A. That's something for the lawyers to hash out.
MR. MARGOLIUS: Objection.
BY MR. LA FAYETTE:
Q. Okay. Okay. So going back to black and Hispanic individuals, there are other races, correct?
A. Of course.
Q. All right. And there are other people of different colors, you know, Indian, Middle Eastern, Chinese, Japanese, White, Caucasian, right?
A. Of course.
Q. Okay. So I guess my question is why is it that you are focused on Black and Hispanic, because that's really all -- I mean, I didn't see you mention anybody else other than Blacks and Hispanics in your report.
A. Because these are the groups that historically

have been subject to discrimination, both in terms of its effect and its intent, and they are groups that are underrepresented in Berlin Township. And groups because of their history of discrimination, at least closely tied to that, as I mentioned, have substantially less resources both in terms of income and wealth than Whites, and therefore are subject to the discrimination from the decisions made in Berlin Township.

Q. Okay. And as far as T&R Properties is concerned, you would agree with me that they are not a minority-owned or black-or Hispanic-owned entity. Is that right?

A. I don't know. I would assume not, but I haven't probed into the ownership of T&R Properties. As far as I know, the two people I know about, I think are white, but you know --

Q. Okay.

A. -- I can only tell from looking at -- looking at -- looking at the pictures.

Q. Right.

A. And that's not always reliable.

Q. So let's talk a little bit about, as far as some of the data that you reviewed or some of the data that exists out there. I guess in looking at US Census data, it showed in 2010 the population of the US was 89

percent white, and then in 2020 it's 84 percent white.
A. I don't remember those exact numbers, and I didn't quite catch -- can you repeat the numbers? I didn't -- kind of got garbled there.
Q. Sure. No problem. 89 percent white or Caucasian in 2010 and 84 percent white or Caucasian in 2020.
MR. MARGOLIUS: Pardon me, Paul, is this for Berlin or Delaware, or Ohio?
MR. LA FAYETTE: I said the country for the US census.
MR. MARGOLIUS: For the US, sorry.
THE WITNESS: Run that by me again. This is the US? I thought you were talking about Berlin Township. We're talking about the United States?
MR. LA FAYETTE: Yes.
THE WITNESS: And what were those numbers? Let me --
MR. LA FAYETTE: Let me --
THE WITNESS: First clarify. Stop. Are we talking about white alone, or white in combination with some other race? Those are very different numbers.
BY MR. LA FAYETTE:
Q. White alone, 89 percent in 2010.

A. All right. So what was the number for the US in 2010?

Q. 89 percent white.

A. I don't believe that -- I don't believe that's possible.

Q. Okay.

A. That white alone could be 89 percent of the US population. We know that African-Americans are somewhere around 14 percent. We know that Hispanic-Americans are somewhere around 20 percent. We know that Asian-Americans account for at least a few more. There is no way the United States in 2010 was 89 percent white alone. I don't know where you came up with that figure, but it doesn't sound plausible to me.

Q. Okay. Let me ask this. As far as the census data shows, you know, of the census data between 2010 and 2020, was there an increase or decrease in the white alone population?

A. I haven't reviewed that specifically because that's part of my analysis.

Q. Okay.

A. But I would imagine there would be a decrease.

Q. Okay.

A. Because the white alone population has been steadily decreasing over time, particularly given the

rapidly growing Hispanic and Asian populations in this country.

Q. Okay. And is there a reason why you didn't include Asian populations in your analysis or in your report?

A. I explained that in great length in my reply report. Do you want me to go over it from memory, or do you want to just look at my report?

Q. Yeah. I get your report, but maybe give me a -- give me your snapshot of it.

A. Yeah. The snapshot is, A, they don't have the same history as Hispanics and Blacks, but most critically, they don't have the same disabilities when it comes to income and wealth. In fact, their income is as high or higher than the white population, and so they would not be impacted in the same way as would Blacks and Hispanics. And they're not underrepresented in Berlin Township the same way Blacks and Hispanics are. It's just a --

Q. Okay.

A. -- you know, a 108-degree overview of --

Q. Okay. And so, as I understand it from what you're telling me, this is -- you know, it's -- Blacks and Hispanics have a disability, which is based on their history and their economic status?

A. I don't mean disability in the sense of a physical or mental disability. I meant socioeconomic disparities.

Q. Okay.

A. Which are tied to a history of discrimination, as the scholarship cited in my report. And this is very much tied to housing because, as the scholarship in my report indicates, discriminatory housing policies have had the effect of confining, of course, not every, but generally, these groups into segregated communities characterized by poor educational opportunities, high crime, or services.

And this is then tied to their income, their education, their involvement with law enforcement. So this history of discrimination -- and I've studied this myself, written about it, but the sources I cite tie it directly to housing, which then ties right back directly to what's going on in Berlin Township.

Q. Okay. So when we're talking about race discrimination, we're talking about not really necessarily color of skin or race. We're talking more about a historical background of a particular group of people and their socioeconomic status.

A. Who are also distinguished by race and ethnicity.

Q. Yeah. But I guess, based on what you're telling me, is that Blacks and Hispanics have a history of, you know, of socio -- you know, negative history of socioeconomic status and, you know, some of the other factors that you talked about that other Asians, Middle Easterners do not have.
A. I don't know about Middle Easterners.
Q. Let's say Asian.
A. I was not -- yes, that's correct.
Q. Okay. All right.
A. I'm not lumping all those groups together.
Q. Right. But again, the -- I guess the part that separates them from your view is that the Asian groups versus the Blacks and the Hispanics, you know, separate putting Blacks and Hispanics together and Asians together, the distinction to you is that the Asians have had economic success. Blacks and Hispanics have not had economic success. And there is not, in your opinion, a history of discrimination in there as much with the Asians as there is with Blacks and Hispanics; is that fair?
A. As a 180-degree overview. There's more detail in my report, but yes.
Q. Right. Okay.
A. Those are, those are two factors.

Q. Okay. But that's a distinguishing characteristic of why you're not including Asians in this group is --
A. Yes.
Q. -- because they're not -- it's an economic basis because they are an economically -- you know, based on --
A. Well, that's -- that's one reason, not the only one.
Q. Okay. But they have had economic success, whereas Blacks and Hispanics have not, so that's one reason you don't include them, right?
A. I don't use the word success. I just look at the hard numbers.
Q. Okay.
A. Success is kind of loaded.
Q. Right.
A. Term that I don't use.
Q. Yeah. But economically, they -- how would you characterize it then? How would you characterize an Asian versus a black or Hispanic from an economic standpoint?
A. Economically, Asians are substantially ahead of Blacks and Hispanics. And again, when I say ahead, I just mean in terms of the hard numbers that outline

resources.

Q. Okay. Would you agree that the -- well, let me back up.

You looked at the population data for Berlin Township, correct?

A. I did.

Q. Okay. And you would agree that from 2010 to 2020, it had been diversifying; is that fair?

A. Not with respect to Blacks and Hispanics, no.

Q. Okay. As far as trying to understand a little bit, is there a -- is there an empirical or at least in your view, a number of a percentage of population for Blacks and Hispanics that would indicate that there is diversity, let's say in Berlin Township?

A. I don't think --

Q. Like how would you determine that?

A. Yeah. I don't think there's an absolute number, but you can look at percentage points and percentages. And in 2020, Blacks and Hispanics remained in the low single digits.

Q. Okay.

A. So, whatever standard you may want to use, it doesn't show any substantial diversity. And that's also borne out by additional information presented in my rebuttal report.

Q. Okay. And is it your opinion that the -- the -- I guess, the percentage of population, let's say in Berlin Township, of Blacks and Hispanics, would it be, I guess, an acceptable percentage if it would -- if it mirrored what the United States' overall population was for Blacks and Hispanics?
A. That's kind of a loaded question, but I would say, yeah, if, in fact, it had increased from low single digits to, say, 14 percent, 20 percent, that would certainly indicate substantial change, but that doesn't apply here.
Q. Okay. Why doesn't it apply?
A. Why doesn't it apply?
Q. Yeah.
A. Well, first of all, it's the pure numbers.
Q. Okay.
A. You know, when I say it doesn't apply -- but it goes beyond that. It directly ties into the policies of Berlin Township, which have not approved apartment dwellings which would be accessible to Blacks and Hispanics who, as compared to Whites, are overwhelming apartment dwellers. In fact, as I point out in my report, over time, based on complete enumeration of census data, rental units have gone down, not up.
And they're only at 5.6 percent, and that

doesn't mean that it's 5.6 percent are apartments, you know, most of that could well be people renting townhouses or single-family dwellings. So, in fact, the policies of Berlin Township are directly tied into the lack of the kinds of housing that Blacks and Hispanics find accessible.

Q. Okay. So let me back it up a step then. What -- and I forget what the numbers. What was the percentage? I think you said single digits for Blacks and Hispanics in Berlin Township. I think Hispanics, I think in your report it's 3.5 percent, and Blacks were 3.6 percent.

A. Something along those lines. I don't think those are exactly right. Do you want me to try to find the point in my report?

Q. Okay. I'm looking at page --

A. So we can look at. Those are close. Those are close.

Q. I'm looking at page 23 of your report.

A. Yeah. You got it right. 3.5, 3.6.

Q. Okay.

A. Low single digits.

Q. Okay. And nationally, what is the populations?

A. I think I already told you roughly 14 percent

and about 20 percent. But that's from memory. I did not -- I wouldn't bank on those exact figures.
Q. No. No.
A. -- but they're way higher than Berlin Township.
Q. You're right. All right. And would you agree with me that if Berlin had a percentage of, you know, 14 percent Black community and a 20 percent Hispanic community, would that change your opinions on whether or not there's discrimination -- discriminatory zoning in Berlin Township?
A. Well, you're asking me to speculate about a counterfactual, and that certainly would be one factor if it were true, and it's not even close to being true, that I would take into account absolutely in my analysis.
Q. Okay. And would that weigh heavy --
A. That's not the only factor.
Q. Right. But would that --
A. It would weight heavy.
Q. Okay.
A. You know, if the percentages were five, six times higher, yes, but you know, that's pure speculation. When I say five, six times, I mean five, six times higher --
Q. Right.

A. -- not five, six percent higher.

Q. Right. Understood. In this particular case, do you know -- as far as the apartments are concerned, how much were they being rented for, or was the intention to rent them for?

A. I think somewhere around $1,700 if I remember correctly. I think that was --

Q. Where did you get that from?

A. From reading the transcripts and reading -- I think your expert agreed on that figure as well. I don't think there was any dispute.

Q. And that's what you -- your understanding is that's what T&R was going to rent the apartments for?

A. Well, obviously it wasn't firmly established since the proposal was rejected, but my understanding was that was approximately the rental area of T&R's. Yes.

Q. Okay. They had --

A. And as I said, I don't think there was any dispute over that.

Q. They had other rental properties that they had, correct? That was discussed in their depositions?

A. Not in Berlin Township.

Q. No. But nearby in Delaware?

A. I'm not sure where they were located. I know they had other rental properties.

Q. Okay. Did you look into any of those other rental properties to see what their rents are?

A. I think in my reply report, I did look into -- I forget the name of it, another property that was being rented in around the approximate same amount.

Q. Okay. And looking at that amount, let's say it's $1,700 a month. Is that a number that you believe to be affordable for Blacks and Hispanics in Berlin Township?

A. Yes. And the testimony bears that out. As I said, the testimony is that that would be affordable for warehouse workers whose income is somewhere, as I documented, in the $40,000 range.

Q. Okay. And as far as T&R property is concerned -- I mean, where the rubber meets the road in this case as far as the zoning is concerned, is that they were proposing -- the zoning that they had proposed was 6.97 units per acre was the one that was denied. And the township zoning was an R4 or 4 units per acre. Does that sound right to you?

A. No. I mean, it's not entirely wrong, but again, I need to make it more precise. They originally came in at something over seven.

Q. Okay.

A. And to try to accommodate to the, you know,

considerations that they seem to be facing, the headwinds from Berlin Township. They reduced it down to 6.97 and also reduced the number of units. And when you say the zoning was R4, again, I have to remind that that was a guideline. It was not a requirement at the time the zoning commission and the board of trustees rejected the proposal strictly on the basis of what they claimed had tied their hands at the R4 density requirement.

Q. Right. Because actually what was -- the R4 comes with part of the overlay district. That was approved for the overlay district, this zoning application for the residential, the multi-family units was on -- was just a straight rezoning of agricultural land, is that right?

A. That was a guideline, not a requirement. Eventually it was, but not at the time that the commission and the trustees rejected T&R Properties. In fact, they claimed that they were stuck, that they had no choice, but in his second deposition, and I cited in my report, O'Brien -- Ken O'Brien, probably the most experienced person there, been involved in real estate matters for decades, admitted that it was not a requirement, only a guideline, only long after, you know, they had been insisting that this was a requirement.

Q. Right. And you also understood that that R4

as a guideline comes from the overlay district to which -- that if they want to use the overlay, they would have to use the R4; is that right?

A. They wouldn't have to. Again, it's a guideline. It's not something they have to do. And on top of that, as I pointed out, whatever the zoning requirements may be, the decision makers in Berlin Township routinely created variance as exceptions to the zoning. Including not just for single-family homes routinely, but also for commercial development, rezoning residential zones to let in a bike shop and a marine and auto repair shop, which as I said, you know, obviously going to attract traffic and noise.

Q. Okay. And so your understanding is that as far as their application is concerned, this R4 was a guideline only, correct?

A. That's what Mr. O'Brien testified to.

Q. Okay.

A. And I also presented the dates at which these guidelines became formal and they post dated the rejection by the zoning commission and the board of trustees. So, you know, that was double documented.

Q. Okay. Are you aware of other property in the township where -- for whatever you want to call it, you can call it a guideline, or you can call it a zoning

requirement of R10?

A. I believe I discussed that in my report, that there was an R10 outside of the bio that supposedly they approved for apartment dwellings by some outfit called N Old State. But as I pointed out, that was really a sham development that never took place, in violation of a host of Berlin Township regulations. I have the pictures in my report. I documented as late as April, nearly three years after approval, they haven't even flattered the land.

These were just unflattered, vacant lands, no development, no progress, no attempt by decision makers to enforce any of their rules to make sure that this development would take place. And (indiscernible) state even testified that they would start in 2023, 2024, and finish in about a year and a half, and they haven't even flattered the land, in violation of all the regulations, almost three years later.

So I'm not aware of any apartment development by the township. In fact, as I also point out in my report, this so-called lesion development wasn't even listed by Delaware County as one of the developments in progress. So there has been no apartment development anywhere in Berlin Township, regardless of what the guidelines on zoning may be.

And as I also point out, the documents adopted by the county for diversifying the housing opportunities in the county point to the importance of rezoning as part of that process.

Q. Right. And as far as -- you know obviously the township doesn't own that Elysian property, the one that wasn't developed. They don't own it, right?

A. Of course not.

Q. Okay. And it hasn't developed, and you don't have any evidence or knowledge of why it hasn't developed yet, do you?

A. It really doesn't matter. I mean, I could speculate, but it hasn't been developed, and that violates, as I point out in my report, multiple county guideline rules, as well as the testimony of the developers. And the decision makers seem unconcerned, made no effort to make sure that development would take place, or they would award that parcel to some other developer. And even the principal of N North (sic) State left the state entirely and apparently, according to records, is now living in Arizona.

Q. Okay. And as far as that density at Elysian, the one that's not developed yet, the ten units per acre, do you believe that that -- looking at it in and of itself, the approval of that, was something that would be

beneficial for Blacks and Hispanics in the area, if it were developed?

A. Had it been real, it certainly would have been a move to that effect. But what's really -- another -- another very important consideration here that I pointed out in my report is that while they approved the sham project of Elysian and rejected T&R, a vastly more qualified outfit with a history of development in Berlin Township, they could not substantively distinguish between the two projects.

You know, why was the Elysian project okay substantively in terms of what the project represented, but T&R was not? They could not make that distinction, as I pointed out in my report.

Q. Right. But again, had a lesion been developed as it was written on the development plan and approved by the trustees, that would have been beneficial for Blacks and Hispanics; is that fair?

A. Depending on exactly how it came down, what they put in there, and what they were charging. Hypothetically, but of course we'll never know.

Q. Okay. But it's your position, I guess. Are you offering an opinion that they should revoke that zoning for the R10 -- the ten units per acre?

A. I'm not directly offering that opinion, but I

am saying --

Q. Okay.

A. Let me finish. What I am saying is, number one, you know, they disingenuously presented this as though it were an advance in apartment development. And the developer who absconded to not -- left for Arizona, violated all kinds of county rules. And decision makers in Berlin Township, who were so strict when it came to T&R, seemed utterly indifferent to the fact that what was supposed to be 10 apartments, 250 dwellers, years afterwards were vacant lots.

Q. What is the basis for your opinion that Elysian was a sham?

A. I admitted to that in great depth in my report, that they violated county regulations. They violated their own testimony that they would start building in '23, '24, and finish in a year and a half. They haven't even flattered the land. That's just a minimal first step toward development.

That they had no track record of development. They weren't even listed in one of the journals that went through, I think, you know, the top developers in the Columbus metropolitan area. They weren't even listed on that. No track record. I can go on and on. It's all in my report, but that gives you some idea of what I'm

talking about.

Q. Okay. So that information concerning Elysian, that was independent research that you performed?

A. As opposed to? I'm not sure I understand your question.

Q. Well --

A. I mean, I relied on lots of other sources, including depositions, minutes. Of the meetings, but it was my own research. It didn't just come out of my head.

Q. Right. And I guess maybe I'm misunderstanding what you mean when you say sham. It's not the township that committed a sham, right?

A. Well, yes and no. I think the township was deeply implicated in the sham because, number one, they cited this non-existent project as though it represented diversity. And number two, they did nothing to enforce their own rules.

Q. Okay. So, if I'm understanding what you're saying is, the township approved the R10 density units in the Elysian project with the full knowledge that it wasn't going to be developed and did it only so that they could say that there was going to be racial diversity.

A. I didn't say that at all. I didn't say they have --

Q. Well, that's --

A. Let me finish. I didn't say they had the full knowledge at that moment. I don't know what was in their heads at that moment, but I do know that they were disingenuous in claiming that this was later an indication of apartment dwelling, and they had many indications that North State was not living up to its obligations under township rules with their own affirmations and did nothing about it. Just let the vacant lots sit for years.

Q. What's your understanding of what they should do?

A. Well, I think they should have investigated at the very minimum. They should have figured out why there was no plotting, why the developer moved to Arizona, and either made sure that development would immediately take place or revoke it. Again, I'm obviously speculating, but, you know, there are many things they could have done, and they did none of them.

Q. Okay. Are you -- but I -- if I'm understanding you correctly, you're not saying at the inception of this proposal by Elysian and the developer that the township was somehow in cahoots to say we're just going to allow you to do this sham project?

A. I don't know that. There's no way to know that one way or the other from the record, but I do know,

even at the time that they approved this Elysian proposal, they did not vet the company. Mr. O'Brien even admitted that. Why would we vet the company?

Of course you want to vet the company. You're the trustees. You're the governing body. You know, you're responsible for what goes on in Berlin Township. And had they vetted the company, they would have immediately seen some very serious red flags, and they didn't do it.

Q. What would it be vetting in your opinion?

A. Well, look at whether they have a track record of development. What their financial situation was? Do they have an office? Do they have a website? Do they have a bond that they put up? When did the company get started? That's just a few of the obvious things that experienced people dealing with housing issues could have looked at.

Q. Okay. Listen, I'm going to share my screen real quick.

A. Okay.

Q. All right. Can you see -- I'm scrolling down. This is the Berlin Industrial Overlay Zoning District map. Do you see that?

A. I see half of it, but all right.

Q. Okay. Yeah. I'm scrolling down.

A. Yeah.
Q. I just want to make sure it's all there.
A. All right. Now -- now you've scrolled up too far.
Q. Yeah. Yeah. But that's because I'm trying to get to the page so we don't lose it in the record.
A. Okay.
Q. So down at the bottom right-hand corner it says BerlinTWP 003966. Do you see that?
A. No. I -- I don't have the map up. I have some table up.
Q. Yeah. Yeah. Down at the bottom right-hand corner of that page. See where it says Berlin, TWP 00 --
A. Oh. I do see that. Yes. Got you.
Q. -- 003966. Okay. That's just so we can identify a page later on.
A. Okay.
Q. So this is the -- that's the page that has the map for the Berlin overlay zoning district map. And this would have been the one -- if you look down here, you see updated 11/23/2020, Article 19. Do you see that?
A. Yes. Where did you get this from the comprehensive plan? I need to know where it's from.
Q. This is their zoning resolution.
A. This is the zoning resolution. Got you.

Q. Right. Okay. So this is the Berlin Overlay district, and if you look at this map, on this map the proposed development, do you know where their proposed development is on this map?
A. I think --
Q. With T&R?
MR. MARGOLIUS: Hold on. When you say there, are we talking about Elysian or T&R?
MR. LA FAYETTE: No. No. I was just about to clarify that, Andrew, sorry.
MR. MARGOLIUS: No, problem.
BY MR. LA FAYETTE:
Q. Where on this map is T&R proposing their residential development?
A. Hard to tell just from this map, but I think in the northern part of it, but I -- I'd have to do this from memory, so I'll be much better off if you would show me.
Q. Okay. Well, you see that there's an R4 at the top up here, right?
A. Yes.
Q. You see my -- can you see my cursor moving around?
A. Yes.
Q. I might try to -- let me see if I can do

something here.
A. I do say that, as I said, in the northern part, yeah.
Q. Yeah. Let me see if I can zoom this. Well, that's no good. It's got smaller. There we go. Maybe this is a little -- I'm trying to zoom in a little bit more and make it easier for you to look at. So anyway, up here we see R4. Down here is R4 as well. Can you see that?
A. Not exactly, but I'll take your word.
Q. Okay. Well, this is the area down in here which is where they're proposing the multifamily. Down where it says R4 in that area.
A. If you say so. As I said, I don't remember exactly where it is, but I'll take your word.
Q. Okay. And over here, adjacent to and kind of connected to that R4 is another area that's an R10. Do you see that?
A. I don't. But I'll take your word for it.
Q. Okay. Well, let me ask you this. Have you looked at this map before?
A. I don't think so, but I don't remember.
Q. Okay.
A. I might have at some point. I don't remember.
Q. Okay. Well, let me ask this: Were you aware

that 10 unit density was available in Berlin Township and other areas besides the Elysian project?

A. I saw a testimony to that effect, yes.

Q. Okay. So you're aware that other 10 units per acre density was something that was available in Berlin Township for developers?

A. Yes. But I did not see testimony saying that those other areas were appropriate for the particular development that T&R was proposing. But yes, I did see general testimony to that effect.

Q. Okay. So if you're looking at this map, you see the R4, and I'm telling you this is where they're proposing it. If the property was over here, if their proposed development was over here in the R10, they could actually increase their development units by almost three, a little more than three. Do you have that understanding?

A. Of course.

Q. Okay. Stop sharing. All right. Can you -- do you still see that map, or did I take it down?

A. It's gone.

Q. Okay. That's what I was trying to do.

A. I got it. I got you.

Q. Are you familiar with this area? Have you ever been in this area, Berlin Township?

A. No. Not that I know of.
Q. Have you been to Columbus?
A. I think I have been, but I'm not -- I'm not sure. I mean, it was a long time ago if I was.
Q. Right. So based on your --
A. So I'm not basing my report on personal, you know --
Q. Yes.
A. -- I'm not a -- I'm not a fact witness.
Q. Yeah. No. I understand that. You're not familiar with the area, and you're basing it on other matters, data, things of that nature; correct?
A. I am not basing my report or opinions on personal observations of the area. No.
Q. Okay.
A. And that's consistent with my practice.
Q. Okay. One of the things I meant to ask you before is you've never served -- or I shouldn't say you've never. Have you ever served in the capacity of like, a zoning appeals board member or township trustee or any kind of political position like that?
A. No. I've never held political office.
Q. Okay. And as far as like, zoning commissions, things like that, you've never served on them?
A. No.

Q. Never served on like, a board of zoning appeals.
A. No.
Q. Okay. What about like, an HOA board?
A. No. But obviously I would have dealt with those issues --
Q. Okay.
A. -- in my real estate business, but I've not served on any -- any public position.
Q. Okay. Let me ask kind of a broader question. If this development were approved, and again approved at the 6.97 that T&R Properties is requesting in their application that was denied, do you have data or evidentiary support of what the mix of individuals would be that would rent those apartments?
A. Not particular individuals, but both the statistics and testimonial evidence from, for example, Mark O'Connors, Mr. Ringle (ph), and others indicate that this would be broadly available to starter families and people of more modest income who are priced out of the very expensive market for homes in Berlin Township. Mr. Ringle was even quite specific that we need to do something about that, but of course they haven't.
Q. And who is Mr. Ringle?
MR. MARGOLIUS: Think we might have been

frozen there for a sec. You want to re-ask that?

MR. LA FAYETTE: Oh, I'm sorry.

THE WITNESS: You froze there.

MR. LA FAYETTE: Yeah. No -- no problem.

BY MR. LA FAYETTE:

Q. Who is Mr. Ringle?

A. I believe he's an official in nearby Orange Township, and he was talking about the Olentangy School District, which encompasses Berlin Township.

Q. Okay. Did you look at any of the data regarding the rent rolls or the availability of apartments in any neighboring townships or municipalities?

A. Yes.

Q. Okay. And you would be aware that there are apartment complexes and multi-family as well as rental properties available in Sunbury, Delaware. Those are areas that are adjacent to and near Berlin Township, correct?

A. I discussed that in my rebuttal report, and I made two points there. Number one, that shows that the rejection of the apartment proposal by T&R. It's not routine, and not common to the area, but unique to the discriminatory decision making in Berlin Township.

Secondly, that helps explain why Delaware

County overall has a higher black percentage than does Berlin Township in particular. So, indeed that information, I believe, reinforces what I originally stated in my report and I discussed it in my rebuttal report.

Q. Okay. Would you agree with me that where people live -- I mean, it's somewhat -- you know, again, we have -- let me back up and say this.

We're Berlin Township. Do you have an understanding of kind of what type of township it is? Is it rural? Is it industrial? Is it commercial? Is it growing? Declining? How would you characterize it?

A. It's suburban. It's -- it's a suburb of the Columbus Metropolitan region in which it is included.

Q. Okay. Do you know how far it is from Berlin Township, particularly from these parcels that are at issue in this case, to downtown Columbus?

A. I'm not sure exactly it's not right there, and it's not far away, somewhere in between.

Q. Right.

A. But if you put up a map, we can check that.

Q. Right. As far as you --

MR. MARGOLIUS: And, Paul, remember, he lives in Washington, where 1 mile takes about 45 minutes to traverse it.

MR. LA FAYETTE: Yeah. That's what I'm getting at. That's what I'm getting at.

BY MR. LA FAYETTE:

Q. So, do you agree with me that there are differing -- you know, depending on where you live in the country, there are differing norms on what is considered reasonable or unreasonable to travel to work?

A. I'm sure that's true.

Q. Yeah. I mean --

A. And in the abstract different areas have different traffic flows.

Q. Yeah. I mean, I lived in Rockville for a little while, and --

A. Yes.

Q. -- I get it. And I also -- you know, growing up in Boston, you know, it was a 45-minute drive to get to high school -- to get to school.

A. I hear you.

Q. But Ohio, 45 minutes it gets you to Dayton from Columbus, almost in the morning. So they're -- again, I think you've already agreed with me that there's generally a big difference --

A. I'm not talking about commuting between Columbus and Berlin Township.

Q. Okay.

A. I'm not sure what you're driving at, but that's not part of my report.

Q. Okay. But you would agree with me that like for people to live somewhere, they got to --, typically they want to work somewhere, right? They want to live and work somewhere in close proximity to one another.

A. That's why I said, while I'm not directly dealing with the rejection of the commercial. There was a synergy between the two. That is that the commercial part of the development would provide jobs and then the residential part of the development would provide convenient housing for those working there.

Q. Okay. Would you agree with me that there -- right now or what their application was on the industrial was for -- that was zoned for warehousing, correct?

A. That was warehousing that they were proposing. Yes.

Q. Did you look at the other approved or permitted uses as part of that overlay for the industrial use for that parcel?

A. Beyond warehousing, no.

Q. Okay.

A. I just saw generally that, you know, it had the industrial categories included.

Q. Right.

A. I didn't look at particular other commercial -- I do -- I did point out, though, in my report that decision makers in Berlin Township did make a major zoning change to convert from residential to commercial for a bike shop -- shop.

Q. Okay. And as far as the industrial component of this property, as far as other uses, you'd agree with me, I think in general, that there's, you know, different -- depending on what you're doing on that property from a commercial standpoint, would dictate how many people can be employed there?

A. As a general matter, yes, that would be true, of course.

Q. Yes. And again, if you have a higher employee requirement for running whatever businesses there, then that would correspondingly, I think from what you're saying, impact the availability of housing nearby to have more people that need to have housing, because there's more people working on the property.

A. More people working there, the more demand for housing. If that's what you're asking me in a convoluted way, yes.

Q. Okay. Good. Well, you said it better than me. I appreciate that. I'm good at convoluting things because I just kind of rattle off as I try to think of

them.

A. Look, you've been very fair, and your questions have been very clear. I've not had a problem.

Q. Okay. I appreciate that.

MR. MARGOLIUS: Yeah.

MR. LA FAYETTE: Yeah. Yeah.

THE WITNESS: Yeah. Well, we won't be going almost two hours.

MR. LA FAYETTE: Yeah. By the way, speaking of which, do you want to take a break for a couple minutes?

THE WITNESS: I'm good if we're going past 12:30. I do want to take a lunch break at that point, but --

MR. LA FAYETTE: Okay.

THE WITNESS: -- I don't know how much more you have, but, you know, let's push on.

MR. LA FAYETTE: Okay.

BY MR. LA FAYETTE:

Q. All right. Do you have any opinions regarding what the role of the township would be in reviewing development plans and what they should be doing?

A. I don't understand the question.

Q. All right.

A. I do -- I do -- just as far as I gather what

you're asking, I do have a section about alternatives.
Q. Okay. But obviously a township is not itself a developer, right?
A. I'm sorry, the township is not what?
Q. A developer?
A. It deals directly with development issues, but is not itself, as far as I know, a developer.
Q. Right. And it doesn't create the plans that are submitted by the developers for the property?
A. It works with the developers. T&R pointed out that before they submitted their plan, they worked extensively with decision makers to try to conform to what was desired, but no, they do not themselves, as far as I know, (indiscernible) the properties.
Q. Okay. And it's your understanding from what -- I'm assuming -- well, I don't know, trying to remember now. You did not review the Sabatino's depositions, did you?
A. I don't recall having reviewed it, no.
Q. Okay.
A. Just extensive testimony that he provided, and I don't recall your expert either looking at that depo --
Q. Okay.
A. -- with anything relevant to my report.
Q. Okay. If you did review it, it didn't come up

as being relevant to you.

A. It's kind of a double negative affair.

Q. Yeah.

A. Obviously, if I didn't review it, it's not in my report, and it's not in your expert's report, so I didn't need to reply to anything.

Q. Okay. As far as the hearing testimony is concerned, do you recall RJ Sabatino discussing that this was going to be high-end and luxury apartments?

A. I do, and I talk about that in my reply report because that was cited and cited incorrectly by your expert.

Q. Okay. What was incorrect about it?

A. Couple of things. One, he -- by the way, it's the only thing he cited from all of the testimony were two alleged statements by RJ Sabatino, not one statement from a decision maker. But one of the things I found that he attributed to RJ was in fact not from RJ at all. As far as I could tell, it was from Robert Weiler.

And when you looked at the full accounting of what Robert Weiler had to say, it contradicted what your expert was concluding that he was saying when you had some very high-rise apartments with elevators and things that would substantially raise the cost and raise rent, but we don't have that here.

We don't have that drivers of a high rent. The other thing I pointed out -- of course RJ is going to say we're attracting high-end people. He's dealing with Berlin Township decision makers who are so concerned about other types of people coming in. It's just typical boilerplate. The bottom line is what it actually costs to rent as opposed to buying into the extremely expensive homeownership market of Berlin Township.

Q. Okay. So it -- do you have -- and again, I understand that, if you're not a developer, you haven't done this before yourself, right?

A. I reviewed developments. I bought into developments, but I haven't myself been a developer. Although I've engaged in renovations, although not original development.

Q. Right. But you're not going out there -- you haven't in your experience gone out there and bought undeveloped ground, gone through a zoning process, come up with a development plan for what you're going to build there. You haven't done that?

A. I have not built on undeveloped ground, no.

Q. Okay. And in this particular case, if I'm understanding it, and I guess maybe let me ask it this way. What is your understanding of the economics problem of this property with regard to the density issue? Like

explain your understanding of that to me. What the problem is.

A. I don't see a problem. In fact, the testimony indicates there would be great financial benefits. Monica Connor has talked about that. The other experts talked about it, that it would bring in jobs, bring in tax revenue. And that moreover, it would bring in JEDD revenue.

And if the county -- if the township like the county and several other units within the county tied into the CDBG federal program, it would bring federal monies into Berlin Township. And all this was presented to the decision maker, and they said, "We don't care" basically about these money.

So, in fact, this development would have been quite economically advantageous. Monica Connor has called it a once in a lifetime opportunity for Berlin Township.

Q. And so I guess -- and I inartfully asked the question there. The question I'm asking is: Economically, what is the problem -- or what is your understanding of the problem of having four units per acre.

A. I didn't. As I said --

MR. MARGOLIUS: I'm sorry. Wait a second. If

I may, I think there's a disconnect. You mean the problem towards T&R, Paul?

MR. LA FAYETTE: Yeah. Yeah.

MR. MARGOLIUS: Okay.

MR. LA FAYETTE: Yeah. Let me clarify this. Mr. Lichtman, let me say it this way.

MR. MARGOLIUS: Oh forgive me, Paul. Forgive me, Paul.

MR. LA FAYETTE: Yeah.

THE WITNESS: No. No. That's fine.

MR. LA FAYETTE: Yeah, that's okay. No. No. Every now and then I get like that.

BY MR. LA FAYETTE:

Q. All right, so in this particular case, TNR properties submits an application for multi-family apartments. And they, they reduce it down from where they originally were of over 7 down to 6.97, right?

A. Little over 7 to 6.97.

Q. Okay. And the township says, no, we want four units per acre there.

A. That's not quite what they said. They said "It's a good project, we like the project, but we're stuck. We can't deviate from the R4," which is just not true on multiple levels.

Q. Okay. But let's back up and just say that R4

was all they could do. Let's do it this way.
A. That's incorrect.
Q. Okay. Let me ask you this: if T&R Properties went back and said, okay, we've redone this development at R4, is it your understanding that the township would still reject it?
A. Well, that's pure speculation, but what T&R and the experts they brought in, including Mr. Weiler, said was an apartment complex project is not feasible at R4. So there was no question that this development could have been undertaken at a density of four units per acre.
In fact, the testimony not just of the T&R people, but the experts they brought in, which was not contradicted by any other experts or analysis, was that the 6.97 was the minimum that an economically feasible project like this one could take place.
Q. Okay. And do you know how much they purchased that property for?
A. I do not.
Q. Okay. Do you know whether or not they purchased the property on any form of a contingency?
A. I don't know.
Q. Okay.
A. You'd have to ask them.

Q. Do you -- have you dealt with any situations or any other cases or matters, or even in your own personal life, purchased property contingent upon zoning?

A. I don't recall any of my purchases contingent upon zoning, but it's possible.

Q. Are you familiar with --

A. But I don't recall that.

Q. Are you familiar with that concept?

A. Yes. And that's why the official policy of Berlin Township was, "It's very important to rezone if we want to fulfill our official stated objective of diversifying housing opportunities, including multifamily." You were dealing with a situation at the time when there was incredibly minimal diversity of housing opportunities, 5.6 percent according to the census, rental units, which would not necessarily mean apartments even.

Q. Right. Well, as we showed on that map next door, there is availability of ten units per acre density next door to this property, the T&R one.

A. Yes. But that doesn't mean --

Q. Okay.

A. -- that was suitable for what they wanted to do.

Q. Okay. But it was available.

A. Maybe. I don't know if it was available or not.

Q. Okay.

A. I just know it was on the map.

Q. Okay. Do you understand what Mr. Weiler or what any of these witnesses meant when they said economically feasible or --

A. Yes.

Q. -- not economically -- what did that mean?

A. That they could get a return on their investment in building on the property that would justify the investment. Mr. O'Brien, who's not someone that was brought in, but a trustee with extensive real estate experience, said, you know, he supported the policy of diversification and said we should universally go to ten, so that a developer would have no question about whether their development would be economically feasible. And T&R has brought that all the way down to 6.97, the minimum density on which they could build these apartment units.

Q. Okay. But as far as the actual dollars that go into it, you don't -- you wouldn't know what the costs and expenses are or anything like that for developing the actual apartments?

A. I could just go with what the unrefuted

testimony was that, you know, below the 6.97 was not economically feasible, and the 6.97 was the minimum. There was extensive testimony on that. None of it refuted. The board never said --

Q. Well, that was --

A. Let me finish. No one on the board, in listening to that testimony, ever said, "Oh, you can develop apartments that are for," nor did they bring in any expert opinion or analysis to show that.

Q. Right. And as far as the rate of return, are you -- is it your understanding that at 6.97 -- if it was approved at 6.97 percent, there would be no profit to the owners?

A. I never said anything like that. I just said that the owners and the experts said you need amenable of that density to build multi-family apartment units. You can't do it at a lower density.

Q. Okay. And that was based on their testimony alone; correct?

A. No. It was based on also statements by decision makers, notably by perhaps the most experienced decision maker, Ken O'Brien, who said, "We want to go to ten for diversification."

Q. Well, have you seen anything supporting the data on what it actually costs, aside from just

testimony? Have you seen data or have you asked for data regarding what it costs per acre to develop an acceptable or profitable apartment complex?

A. I didn't see cost per acre, but I did see testimony which made sense that with only four units per acre, you cannot build multi-family units. Aside from my experience in real estate, that's just plain common sense.

Q. Okay. But it's not based on any actual data that you've seen or that you're relying on?

A. Yes. Of course, it is. It's based on what R4 represents in terms of how much you can build. It's quite clear that we'd limit it to units that are not multi-family units that require a much greater density.

And the expert testimony, the testimony of Ken O'Brien, this was not a disputed issue. No one on the board said, or any of these boards that reviewed it," Oh, you can do this at R4." They all agreed that the R4 density precluded approval of T&R's project.

Q. Because T&R wanted 6.97?

A. They would have preferred higher, quite frankly, but 6.97 was the minimum.

Q. Right. But again, the costs that are determining whether or not it's economically feasible go more than just the acreage and the units, right? And it

goes, what you put in them, right?
A. Of course, and that's -- you know, it was all covered in T&R's proposal.
Q. Right.
A. You know, T&R has been in the business for a long time. They've got close to 3000 rental units. They know what they need to develop an economically feasible project.
Q. Right.
A. And nothing that they said was ever contested.
Q. Right. And they were going to build it like their other apartment complexes; correct?
A. I don't know that for certain, whether -- to what extent it would just mirror what they had built elsewhere.
Q. And you don't have an understanding of what they were -- how they were building these apartments, do you?
A. Of what they were what?
Q. What they were putting in the apartments. Amenities, things of that nature.
A. Yes. They did talk about some very significant amenities that they were adding. And that was also not only discussed in the context of this particular project but also discussed in the context of

density. Mr. Weiler extensively talked about density not being a detriment but being an advantage, both in terms of creating vibrant communities, bringing in tax dollars, and you could also put in various amenities that would not be available just in detached single-family home developments.

Q. Right. But as far as the actual costs of building the apartments, the cost of building the apartment is something that goes into whether or not it's economically feasible to have 6.97 or 7 or 10, right?

A. Well, the cost of building the apartments goes into the entire calculation of the development. The 6.97 only indicates that you can't build the apartment complexes at a density below that. If you're only allowing four units per acre, you multiply that out by, you know, say 20 acres, that's only 80 units.

Q. Right. And also it's dependent upon how you build them, though, what you put into it, what materials you build them with, what amenities you put in each apartment, things of that nature. They drive costs up.

A. That's not dependent on the density, but that is obviously part of the proposal, and as I said, T&R was very careful to meet with people from the county and the township to make sure they conformed to things like amenities, buffer space, parking. They were very

accommodating, and the Delaware board gave tentative approval of their project. And as I said, Monica Connor, who is an experienced person in economic development in Delaware County, not only praised the project but called it a once-in-a-lifetime opportunity for Berlin Township.

Q. Right. So if T&R Properties wanted to reduce costs in order to build this apartment complex, they could have decided not to put in granite countertops, right? That's something that would reduce the cost.

A. Look, anything that you do to reduce amenities or structures reduces the cost, but that has nothing to do with the density problem, which precludes any apartment complex regardless of how you build it or what you put in it. You can't do it on a density of only four units per acre.

Q. But isn't that based on economic feasibility, how much money in return that they get? I think that was your testimony earlier?

A. It's based on physics, sheer physics. You can't fit apartment complexes into only four units per acre. As I said, if you crammed it all in, max it out, you know, you're talking about maybe 80 units.

Q. Okay.

A. Not the 296 units that they proposed, so it's sheer physics.

MR. LA FAYETTE: Let's talk a little bit more and go back into -- and actually, I'm going to need a bathroom break at this moment. Can we take out like a five or ten-minute break, or do you want to take a lunch break? You want to take a lunch break --

THE WITNESS: How much more do you have?

MR. LA FAYETTE: I probably have another 45 minutes to an hour.

THE WITNESS: Can we take like --

MR. MARGOLIUS: And we all say that, and it doesn't always work out that way.

THE WITNESS: I'm well aware of that. Can we take like a -- no more than half-hour lunch break?

MR. LA FAYETTE: Sure. That's fine.

THE WITNESS: So we can -- what time is it now? Two -- 12:10.

MR. LA FAYETTE: 12:04, so 12:35 or 40,

THE WITNESS: That's works for me. Yes.

MR. MARGOLIUS: Okay. That sounds good.

MR. LA FAYETTE: Okay. All right.

THE WITNESS: All right.

MR. LA FAYETTE: Let's go ahead and do that.

THE REPORTER: Off the record.

- - -

(A recess was taken.)

- - -

THE REPORTER: On the record.

BY MR. LA FAYETTE:

Q. Okay. I'm going to switch gears a little bit here. Okay. There you are. All right? Did you perform any modeling to determine the need for apartments in Berlin Township?

A. I don't understand the -- what do you mean need for with modeling?

Q. Did you do any, did you perform any studies of your own where you compiled the data, then ran some kind of modeling of your own to determine whether or not there is a need or demand for apartments in Berlin?

A. I don't know what you mean. Whose need or whose demand? I certainly looked at the availability of apartments, which is essentially non-existent, compared it to elsewhere, compared it to the fact that Blacks and Hispanics, even in the vastly, vastly less expensive Ohio market, are overwhelmingly renters, so I didn't actually do a formal modeling, but I looked at the relevant information.

Q. Okay. And I'm assuming that you didn't do any modeling to determine who would actually move into the apartments if they were built?

A. I did an analysis of the availability to Blacks, Hispanics, and low-income, less affluent families with children, and I did an analysis of why these groups would be attracted to move into Berlin Township. And those reasons are all extensively outlined in my report: schools, safety, lead poisoning.

Q. Okay. Those would be equally attractive to just about anybody though, right?

A. Well, to those of more modest means who couldn't afford to buy into the expense of home ownership market in Berlin Township, then the availability of the apartments would be much less relevant.

Q. Okay. And did you review any data regarding, I guess, market demand for apartments in Berlin Township? I mean, what demand there would be or is?

A. I'm not sure what that means, but I did point out it was a very rapidly growing area. One of the fastest growing areas in the state, maybe even in the country. So yes, there certainly was a demand to move into Berlin Township, but it's all ownership units. As I said, the number of rental units actually went down slightly, not up.

Q. Okay. And as far --

A. Let me add one thing to finish that off. And as I point out in my rebuttal report, the median house

prices went up substantially from the reports for the 2020 census, and even the starter homes were priced in the $500,000 range.

Q. And with those increases, and again, maybe not the specific number as far as the actual $500,000 or whatever the actual dollar value is, but as far as the percentage increases, was that something also nationwide?

A. Nationwide prices do go up, but I don't believe they went up by the same magnitude, certainly not dollar-wise, as they did in the township. I didn't compare prices in the township to the whole nation, but I did compare it to Ohio.

Q. Okay.

A. Okay.

Q. Obviously, T&R Properties is a business, right?

A. What's that?

Q. T&R Properties is a business. They operate a business for profit. They're not a nonprofit.

A. As far as I know, that's true.

Q. Okay. And they're in the business of developing and operating apartment complexes; is that your understanding?

A. Yes. Although I'm not sure they're just limited to apartment complexes. I believe in 2001, they

developed a complex in Berlin Township that wasn't apartments.

Q. Okay. As far as the apartment complex side of their business is concerned, you would agree that as a business owner operating an apartment complex, that you want to have full occupancy?

A. That would be most desirable, but doesn't necessarily mean that that's a necessary condition.

Q. Right. But obviously, if you're running a business for profit, and you want to make as much profit as you can, you want to have full occupancy?

A. That's just what I said. That would be the most desirable, but not necessarily an essential condition. And again, when looking at the rapidly growing residential increases in Berlin Township, that would not be an unreasonable analysis for a developer.

Q. Right. And as far as the developer is concerned and operating apartment complexes, they don't care what the race of their tenants are. A matter of fact, they're legally not allowed to care about the race of their tenants, right?

MR. MARGOLIUS: Objection.

THE WITNESS: Certainly --

MR. MARGOLIUS: Go ahead and answer.

THE WITNESS: Yeah. They certainly can't

discriminate on the basis of race. That doesn't mean that they might not be interested in diversifying their properties.

BY MR. LA FAYETTE:

Q. But at the end of the day, in operating the business, who's writing the checks to pay for the rent, it doesn't matter to them if the person's Asian or Black or Hispanic or White?

MR. MARGOLIUS: Objection.

THE WITNESS: Well, it might in terms of their social awareness. Obviously, people are, you know, to quote, are not driven by bread alone.

BY MR. LA FAYETTE:

Q. Have you evaluated any of the other apartment complexes to determine the diversity of other apartment complexes owned and operated by T&R Properties?

A. No. It's very difficult to get racial data on a particular apartment complex, and they're not in Berlin Township, so I'm not sure that would be relevant anyway.

Q. Okay. And as far as how much they charge for their rent, operating a business, they're going to charge as much as they can to get full occupancy and maintain full occupancy. That would be the goal, wouldn't it?

A. I can't definitively determine what's in the heads of the developers, but that could certainly be a

reasonable goal, but may not be the only one.

Q. Right. Well, with respect to -- I mean, you own four or five properties, right? And if you're charging $10,000 for each one in a month's rent.

A. Nowhere near $10,000, not even close.

Q. No. No. I understand that, but if you were charging $10,000 a month, you probably wouldn't have any renters?

A. I could not charge $10,000 a month for my properties.

Q. Right. Because nobody would move into them?

A. Except on the most amazing windfall, that's right.

Q. Right. And again, you don't have any data -- actual data, as to who the potential renters would be other than just all of the population in general or who the potential renters are?

A. I don't have information on individual renters, but, you know, as the justice points out -- justice Department, their guidelines on the Arlington Heights factors. We're dealing with discrimination against groups of people, not against any particular individual, although of course individuals are implicated.

Q. Are you familiar with the term ecological

fallacy?
A. I am.
Q. And what is that?
A. That is a belief that you need to be cautious in drawing inferences from aggregate data down to the individuals.
Q. Okay. And that would -- you'd agree that that -- part of that analysis would be as far as the ecological fallacy is it's a logical error in data interpretation where you would assume that group-level statistics apply to individuals?
A. No. That's -- that's not what the ecological fallacy is about. If you have a statistical relationship to a group, obviously, while you can't pinpoint individuals, and to that extent the ecological fallacy holds, obviously it would implicate individual members of the group. But I cannot pinpoint a particular individual.
Q. Right. And again, you know, just -- I guess there's a couple -- I want to call them assumptions, but a couple points that seemed to be made here as far as that the belief is that apartment -- people that live in apartments have less money than people that own homes?
A. That's not an assumption. I proved that in my report. I specifically looked at the resources available

to apartment dwellers as opposed to homeowners and showed statistically there is a significant gap and a substantial gap.

Q. Okay. And as far as -- I guess it seems to be, and you can correct me, and you can explain it to me, but based on what I'm hearing is that you need to have apartments so that poor people can live in apartments and a lot of poor people are black.

A. No. I didn't say that at all. First of all, I never used the term poor people. I'm talking about inferential differences, although as I point out in my rebuttal report, if you want to deal with the poor, there's still a major gap between minorities and Whites.

And as I went over, and I can go over it again, but we went over this a lot at the very beginning of the deposition, about all the statistical relationships and all the ties to the policies and the application of the policies within Berlin Township.

Q. Right, and I guess what I'm trying to figure out -- because it seems to be an assumption that all black people are poor. Is that true or not --

A. I made no such assumption. We are dealing with group statistics, and I never made the assumption that all Blacks were poor. I made no assumptions, in fact, about the resources available to Blacks and

Whites. I documented it. First of all, I documented it with census data showing that the income of Whites' substantial -- median incomes substantially exceeds that of Blacks.

Second, I looked at renters versus homeowners and showed that homeowners have substantially higher, whether looking at median incomes or the distribution of incomes. And in addition, I looked at resources showing that Blacks and Hispanics, as compared to Whites, have much higher loan-to-value ratios, which is a measure of the resources available to them to make home purchases.

Let's not forget, and this is a fallacy of your expert report, home purchases are not limited to mortgages. You also have to put down a down payment, and given the high prices in Berlin Township, that down payment could be very substantial. Then, of course, add in insurance, property taxes, upkeep, and all of the rest. But the availability of resources, as well as income, both show the differentials between Whites and Blacks and Hispanics.

Q. I think you'd agree with me that apartments -- apartment dwellers are not solely minorities, not solely black or Hispanic, right?

A. No. But disproportionately so.

Q. Okay.

A. We never deal with absolutes like that.
Q. Right. Did you look at any data with regard to what tenant screening would be performed by T&R Properties?
A. I don't know what you'd be referring to there.
Q. Who, when somebody comes to rent an apartment, or let me ask from your perspective, obviously you rent out houses, you have four or five homes that you rent out. Do you ask for, you know, do you ask for where they work, how much they make, things of that nature to make sure that they can pay their rent?
A. That's correct. And that is also true in home purchases. When I've done home purchases, they've scrutinized everything about me, you can imagine.
Q. Right. And do you know what T&R Properties was going to do as far as part of their screening process to determine who could move into their apartments?
A. That didn't come up in the testimony. That wasn't asked, but you can ask them about that.
Q. Right. Obviously, that would be significant because that kind of mirrors, like, what you're talking about when it comes to rent -- to buying a house. There's going to be certain criteria, depending on the bank you go with, depending on who you're dealing with. They could scrutinize you and, you know, tear your

financial history inside out to make sure that you have the money to pay for your home, right?
A. It's much more extensive for homes because we're not just dealing with rental. We're dealing with extensive down payments, dealing with property taxes. We're dealing with insurance. So that would be much more of a barrier to home purchasing than to rental.
Q. Right. And again, you don't know what criteria T&R Properties would place on their threshold to rent any of these apartments?
A. No. But given the differentials between what rental involves and what homeownership involves, there'd be a very substantial difference.
Q. Right. You just don't know what they would look for though, right?
A. I can only speculate, but you can ask them.
Q. Right. I mean, you didn't ask them for what they charge at their other apartment or what they -- sorry, not charge. You didn't ask them what they screened for or their applications and their other rental properties, did you?
A. That's correct.
Q. Their other apartments?
A. That's correct.
Q. Okay. And this -- your understanding is that

these apartments would not have been low-income subsidized housing, any kind of governmental subsidies, right?

A. I don't know that. I mean, we get applications all the time from people with government subsidies, and our rent in some of our houses is higher than what would be anticipated for T&R. We're in a very expensive housing market as well. So, no, I don't think that's necessarily true at all.

Q. Okay. Do you know if T&R -- well, are you familiar with what's required to get subsidies from the government for apartments?

A. I'm not sure you --

Q. Like what the owner --

A. -- get the subsidies from the government. I believe it goes to the renter. That the renter has certain vouchers from the government and then applies that voucher to the rent.

Q. Right. But the actual landowner, the apartment owner, the developer, you know, whatever, T&R Property is in this case, they would have to go through a screening process with the government in order to be able to allow or subsidize renters.

A. I don't know what the rules are --

Q. Okay.

A. -- in Ohio. I recall that when we've dealt with Section 8 people with vouchers, the only thing that we had to do was make sure our apartment was up to code.
Q. Right.
A. You know, there would be an inspection, but beyond that, I don't recall, you know, them scrutinizing my personal information.
Q. Right. You'd agree that nothing in the record of this case, meaning the depositions, the meeting minutes, or anything like that, the applications even, would suggest that T&R Properties was seeking to provide public housing, government-subsidized housing.
A. You're again confusing two things.
Q. Okay.
A. Public housing is not an issue here. This is not a public housing project --
Q. Right.
A. -- developed by government, this is a private. And as my understanding -- and I've been in this business a long time, you cannot discriminate against people on the basis of their sources of rent.
Q. Okay.
A. That's not unique to T&R.
Q. That was not something that came up in the zoning process or in their applications or anything like

that that you saw, correct?

A. I saw no questions, no issues raised by decision makers about that. Except I may say -- well, it wasn't raised directly. It certainly was raised indirectly by the kinds of comments we heard from the residents and the responses to those comments by decision makers. They seem to be very worried about the kinds of people that would be moving into these apartments, which could at least indirectly impinge upon Section 8 applicants.

Q. Did you perform any analysis of any comparable or even local apartment complexes to determine the racial makeup of those hard complexes?

A. We've already been through that. Very difficult because it's, you know, private protected information --

Q. Okay.

A. -- to get the racial composition of an apartment. And they're in different places anyway.

Q. Okay. But you don't have that, right?

MR. LA FAYETTE: Oh, he froze.

MR. MARGOLIUS: Frozen?

MR. LA FAYETTE: Yeah. He's unfrozen. There we go, I guess.

BY MR. LA FAYETTE:

Q. Mr. Lichtman, I followed up with that, but basically, you don't have that information as to what the racial makeup of the other -- any comparable apartments would be?

A. We do have some information anecdotally from decision makers about the racial composition of the Worthington Arms Apartments. You know, it's a relatively singular area. I'm not sure they're all just apartments. It's kind of a manufactured development.

And O'Brien testified that that is a relatively vastly more affordable area to live in than the high-priced single-family homes, and he said that's where people on the lower end of the median income would be living. He didn't explicitly say race, but obviously, people on the lower end of the median income tend to be correlated with race.

Q. Okay. And again, I think that's what I was trying to get to before, and I don't know if we didn't agree or what, but as far as in your view, you correlate lower income with race, specifically Black or Hispanic?

A. I don't correlate with it. That's what the data shows, and that directly impinges upon the situation in Berlin Township with very high-priced homes and virtually almost no availability of rental units for people. Even in Ohio, as I point out, where the median

home value is less than half. In Berlin Township, there is a vastly disproportionate representation of Blacks and Hispanics as compared to Whites in rental rather than homeownership properties.

Q. Okay. And as far as this Worthington Arms is concerned, all you know is that it is more affordable, but you don't know the racial makeup of who lives at the Worthington Arms?

A. As I said, you know, that's private information, but, you know, I do know Ken O'Brien, who knows a lot about what's going on in that area, has had to say.

Q. Right. Ken O'Brien said it was more affordable. He didn't mention anything about any particular race, right?

A. He didn't say it was more affordable. He said specifically that's where people on the lower end of the median income tend to live. And my only point was -- since you obviously can't parse out the racial composition, is that there is certainly a correlation between race and being at the lower end of the median income.

Q. Okay. But again, as far as Worthington Arms is concerned, you don't know what the racial makeup is, right?

A. I've already explained that. I'm just making inferential analysis.

Q. Right. Is it your opinion that T&R could not develop this property, this apartment -- this particular property at issue here, at four units per acre?

A. That's not my assumption. That's what they said. That's what all the experts said, and there was no questioning or contradicting of that.

Q. Okay. Well, I mean, we know they don't want to. I mean, clearly they don't want to develop it at four units per acre. But could they? Do you have any ability to say whether they could or could not?

A. Absolutely. That's what all of the experts had to say uncontradicted. Not that they want to develop at a higher density, but that they could not develop at the R4 density. It was not a matter of what they wanted. It was a matter of what was feasible, and that was not only attested to by T&R itself, but by the experts that they brought in.

It was attested to by Mr. O'Brien, a trustee who said, you know, "We should have ten, even in the BIO to make it available for developers so they wouldn't have to worry about the feasibility of their project." So there's multiple sources establishing that it's not an assumption on my part.

Q. And that in fact there is R10 in the BIO, right?

A. So you say, I'm, you know, I haven't verified any of that information or whether it's available or suitable for what they want to do. I did not see any testimony or any statement in multiple hearings and multiple bodies by any decision maker that they could have built on some other R10.

Q. But it -- and maybe I'm misunderstanding your opinions in this case. Is it your opinion that the zoning -- that Berlin Township's zoning is discriminatory?

A. As it is applied and utilized by Berlin Township decision makers. Absolutely. That's what the entire Arlington Heights analysis was all about. And it had to do with things like the history of zoning restrictions and their present use, their use in suburban communities. It had to do with the sequence leading up to the rejection. It had to do with the serious substantive and procedural deviations, and it had to do with the many disingenuous statements and indirect racial indicating statements by decision makers themselves.

THE REPORTER: And I am sorry to interrupt, but the witness cut out for me at the beginning, if he could possibly restate

THE WITNESS: Oh, my god, you got to be kidding.

MR. MARGOLIUS: I don't remember what my question was.

THE WITNESS: I'll -- I'll -- restate it.

MR. MARGOLIUS: I think I can summarize it. You -- your question was the zoning of Berlin discriminatory and the deponent said yes it was.

THE WITNESS: Yes.

MR. MARGOLIUS: Okay.

THE WITNESS: And all right. Let me repeat my answer. Absolutely it was. That's what the Arlington Heights criteria are all about to assess that.

MR. LA FAYETTE: Right. I got that part.

THE WITNESS: I got to give you the whole thing. I don't know where she stopped or where she didn't stop. I can --

MR. MARGOLIUS: Allan, it's okay. I think we just missed like about a three-second interim there, but I think we got the gist of it.

MR. LA FAYETTE: Yeah.

THE REPORTER: It was just the beginning section -- sentence.

MR. LA FAYETTE: It's the very first part

where you said just the --

THE WITNESS: But the gist was multiple indicators in terms of history, sequence of events, what they did with respect to the substantive deviations, the procedural deviations, statements that the project was desirable, but they were stuck at R4 when that was only a guideline. All kinds of indirect, if not direct, evidences of a racial intent, rail campaigning on restricted zoning. It's all in my report in all pieces together to show discriminatory intent.

BY MR. LA FAYETTE:

Q. Okay. And so in this particular case, their application was for 6.97 units per acre. If the township had given it to them, do you think that that would, if they had given it to them, and they had approved it, would you think that their zoning was discriminatory?

A. Again, you're asking me to speculate. If, in fact, they had given T&R everything they needed, then I would not say in this particular instance that they were discriminating. But that doesn't mean more generally that they were not discriminating.

Q. But again, the goal for T&R is to build apartments. And I think your testimony is that apartments are good because it helps in the diversity and

it allows affordable housing or more affordable housing for Blacks and Hispanics. Is that generally fair?

A. No. Generally, but I don't use the word good. I use the word discriminatory and revening that discrimination, and I talk and cite sources about establishing an exit strategy, which is so critical for Blacks and Hispanics who are also stuck in these neighborhoods that create all kinds of socioeconomic problems.

Q. Okay. And so, if T&R was okay, and they were accepting of 6.97 as their last application was, and they were able to build their apartments, then there wouldn't be discrimination. Isn't that fair?

A. We wouldn't be here. We wouldn't be here --

Q. Right.

A. -- if they got everything, they finished, they got everything they want. It doesn't absolve, you know, Berlin Township generally of discrimination. It just means that, in this particular instance, we would not be here disputing.

Q. Okay. And so as far as I mean, have you done any analysis on what or whether broadly, you know, Berlin Township should allow a certain density requirement?

A. I've not prescribed to Berlin Township what density requirement they should or should not have. I've

looked at this particular project and their discriminating decision-making on this particular project, but I wasn't stopping there. I also looked at their one example of all these many years of where they can present affordable apartment development, and it was essentially the sham project of Elysian.

Q. Okay. If I'm understanding that you're not suggesting that Berlin Township that every remaining piece of developable ground should be high-density apartment complexes.

A. I have never said every piece of ground should be, but their goals were diversification. In fact, a rail even made quite an extensive statement about, you know, we need diversification and, you know, that's what our goal is, that's what we're doing, and in fact, she later had to admit they weren't doing that at all.

And in fact, you know, in terms of her testimony in depo, she had no idea what the housing stock was in Berlin Township. She claims she didn't even know what an apartment was. She's been chair of the board of trustees for two terms, and she doesn't know what an apartment was? And then she incorrectly said that the T&R project was for townhomes when in fact, when you look at the record, they presented for apartments and she herself talks about the apartment project, so there's a

lot here.

Q. As far as -- are you familiar with how much developable land there remains in Berlin Township?

A. Developing -- developer by whom?

Q. I cant even tell.

A. All kinds of different developments.

Q. Well, I guess I'm asking more broadly. You know, there are -- you're aware that there are commercial -- there is commercial development where there are actually fixed buildings on property. There's --

A. There's commercial development in Berlin Township, yes.

Q. And there's --

A. Per -- I signed the bike shop and the marine and water, for example, where they rezoned from residential to let that happen.

Q. Okay. And as far as the residential that exists, I guess what I'm getting at, is the only land that can be developed is that which is agricultural at this point, that is open, that can be sold and developed into something else, unless we're knocking down existing businesses.

A. Yeah. Exactly. You know, plenty of developments are knocked down. I see that all the time in my neighborhood.

Q. Well, you know what, I don't think I need to get to all that because I think it just becomes convoluted.

A. Yes.

Q. As far as where they where -- in looking at where they were developing, I mean, obviously it's your opinion that there was discriminatory behavior things. And that, we'll get into some of the -- I think, nuanced, maybe not over-the-top, just direct overt statements of discrimination, but you obviously are offering opinions that there are more nuanced, more subtleties of the discrimination. I'm going to ask you about that.

But I just want to flip it a little bit to more of a question of, do you agree that there were discussions that involved nondiscriminatory reasons for why they wanted this development to be, you know, limited to four units per acre?

A. Quite the opposite.

Q. And --

A. Quite the opposite. They never gave a substantive reason why this needs to be limited to four units per acre. In fact, I quote from the transcript that all agreed it was a good project. There was nothing wrong with the project. They couldn't distinguish between this project and the failed project of Elysian in

any way. So absolutely not. It was an arbitrary focus on R4, not any substantive reasons why this project was deficient.

Q. Okay. So, when they talked about the location of the existing neighborhood, that wasn't a substantive legitimate reason for concern, for having this as a reduced density?

A. Some of the neighbors who didn't want it near them talked about that, but in response to concerns about that, they expanded the buffer from 250 feet to 350 feet, and none of the decision-makers in any of the transcript said that was inadequate, that doesn't work for us.

Q. And again, you're not familiar with the ten-unit density that is located adjacent to the T&R property?

A. So you say. I mean, I haven't verified any of that and don't know what it represents, and it wasn't in your expert's report or any commentary at the meeting. So it's the first I've heard of it.

Q. Okay. It is in the evidence, though. I mean, it's in the zoning district, zoning resolution. Do you remember seeing that? Do you remember seeing the residential ten-unit density anywhere in the zoning resolution?

A. I don't recall. It's a very long resolution.

Q. Okay.
A. So you'd have to show me something. It's, you know, scores of pages long.
Q. As far as the motives, do you believe that motive plays a role in discrimination?
A. Do I believe that what?
Q. Motive, would be.
A. Oh, it need not be the only motive, but you know, it is an element of intentional discrimination, which I, as I don't want to repeat everything I said, which is thoroughly documented by the Arlington Heights factors, which your expert doesn't even mention except to say I was once involved in an Arlington Heights case.
Q. As far as the motives of my clients, you know, let's just stick with the trustees because they're the ones that made the decision on the zoning. Megan Raehll, Mr. Bullard, and Mr. O'Brien, do you have -- have you offered or do you have an opinion whether -- what their motives were?
A. I think their motives were they didn't want different kinds of people, particularly minorities, moving into an area which had very few minorities and did not open up opportunities in the rental market for minorities to move in.
Q. Okay.

A. Particularly Blacks, and I'm not, let me say Blacks and Hispanics.

Q. Okay. And aside, because obviously there's a large Indian population, you saw that, right?

A. I did not see a large Indian population. You'd have to give me the numbers. I saw a generally an Asian population.

Q. Okay.

A. I don't see it broken down by components.

Q. Did you find that the Asian population is -- was greater than the black and Hispanic population?

A. Absolutely, yes.

Q. Okay. As far as your opinion that they didn't want different types of people, aside from denying the zoning or aside from allowing the increased density, what else do you rely on to support that assumption or that conclusion?

A. All right. I'm going to have to repeat my whole report to answer that question. I rely on all kinds of things, and I'll go over them. It might take half an hour.

Q. No.

A. But that's such a broad question. I'm going to have to go over my report to answer it. First of all, the Arlington Heights --

MR. MARGOLIUS: Oh, hold on. Paul, hold on, Paul, do you want him to go to his report or just incorporate it?

MR. LA FAYETTE: No. You can incorporate your report. I don't need to hear the whole thing, but let me ask if maybe, let me strike that question. Well, let me ask you: You're just relying on

MR. MARGOLIUS: Yeah. I want him to include in the answer that he's incorporating his report, but you want to ask a follow-up and that's fair.

MR. LA FAYETTE: Yeah.

THE WITNESS: I am incorporating my whole report in that and my rebuttal report, which looks at multiple factors. It looks at five Arlington Heights factors and many subpoints within those five factors establishing intentional discrimination.

BY MR. LA FAYETTE:

Q. Okay. And maybe let me ask it this way: And I'm just going to go by each one of the three. Aside from the decision not to increase the density or to improve the zoning, is there a specific thing that Megan Raehll said or did that makes you assume that she didn't want different types of people there?

A. Many things. Number one, they were disingenuous about the R4. They said it was a

requirement and they were stuck with it. In fact, they had to later admit it wasn't a requirement. It was only a guideline. Second, they contradicted the official planning, going all the way back to 2014, where the township committed itself to diversifying housing options, including multi-family options. They did nothing to achieve that. Third, while they made variances for single-family homes, they would not issue a variance for the apartment complex in the T&R proposal.

They disingenuously talked about turning down federal grant programs you know, saying, oh, maybe some other communities rejected it, when in fact, the county as a whole accepted it, as well as several jurisdictions within the county accepted it. They had completely evasive and disingenuous answers to the racially -- tinged objections from, I'll give you one striking example, and that is their response to the claim that this would create a ghetto.

Obviously, you know, that's not even indirect. That's a very direct racial claim because obviously both for scholars and for the general public, ghettos are associated with enclaves for Blacks and Hispanics, and how did Raehll respond to that? Instead of dealing with it, she said, oh, ghetto is something like the Warsaw ghetto, you know, more than 80 years ago during World War

II, totally sidestepping the racial implications and the real meaning.

Trustee O'Brien wouldn't even say what a ghetto was. Neither one of them had any understanding of what the housing availability was and how that implicated race. Raehll campaigned on restrictive zoning, lauded that as the reason why people should vote for her. Those are just a few of the things they did and the things they said that are indicia of discrimination. There are many more in my report.

Q. Okay. What variances for single-family properties did you look at?

A. I looked at about half a dozen that were in my report, including one that was -- they themselves labeled as a major deviation.

Q. Okay. Do you consider density concerns to be legitimate, in general, like if a zoning commission or a board of trustees like these folks, are density concerns legitimate?

A. In general, the testimony, unrefuted. From the experts, was that density was a positive, not a negative. It increased availability of public transit. It increased walkability. It increased tax revenue, as you know, the trustees, and we don't care about tax revenue increases tax revenue. It provides for amenities

that are not otherwise available in single-family home development. So to the extent that there was testimony on this issue, unrefuted. No expert was called to challenge it. No trustee challenged it. Density was a positive, not a negative.

Q. In general and again, in general, not specifically as to this case, is density a legitimate concern for a governmental entity?

A. I think what the expert said was, in general, it's a good thing. Obviously, you could have too much of a good thing. You wouldn't want every project to have a certain density. But here we're talking about one project with a 350 foot buffer, and clearly, the density here, according to the testimony, was a very good thing.

Q. But it's certainly a consideration, both the good and the bad of density, right, before zoning gets approved?

A. It could be, but I saw no indication from anything that any decision-maker said or any expert that they called, and they didn't call any, that in this particular instance the project was a problem. They all liked the project. And they never explained why because there was in R4, a good project shouldn't come in. As I said, they couldn't even say substantively what distinguished this project from another one, the sham

project that they approved.

Q. You're aware that residents raised concerns regarding density as well, right?

A. Yes. And a lot of them were quite, I would say, beyond just inferential, quite explicitly racial.

Q. Okay. And I know one of the residents is the one that used the term ghetto, correct?

A. Correct.

Q. You read his testimony?

A. Is it a him? I don't remember. It might have been a her, but yes, I read the testimony.

Q. And did you have an understanding of why the person said ghetto?

A. I don't care what their post facto justification was. When you are worried about a ghetto, whether you're a scholar like me, or just a common-sense person, it's clear what they are talking about. Even Merriam-Webster, as I point out, defines ghetto as a place that is generally confined to Blacks and Hispanics and is low income. And has other problems of the ghetto. This is not something that refers to the Warsaw Ghetto in the 1940s. That's totally disingenuous and misleading. It is not even inferentially racial. It is directly racial.

Q. And so the person that said ghetto, he was not

a board member or a public official, correct?
A. Well, that's my whole point -- two points that I made about that. Number one, these are elected officials, in the board of trustees. And I cited scholarships saying as such, they are responsive to the views of residents too. I also pointed to the completely disingenuous way in which both O'Brien and Raehll responded to this charge of ghetto, totally trying to dodge the whole question. You don't dodge like that if you have nothing to hide.
Q. And as far as the person that said the word ghetto though was not a public official, correct?
A. We just went over that, yes.
Q. Well, I don't think you answered it.
A. Okay. I thought I did.
Q. No. So he wasn't a public official.
A. Yes. That's correct. But I explained why it was important.
Q. Yeah.
A. And also, no one objected at the time. No one said, oh, you know, we're not considering race, this is not right. No one at the time, and then you have these unbelievably disingenuous responses later on in depo.
Q. Now you talked a little bit in your report about coded language.

A. Yes.
Q. Or at least you allude to that, and obviously we've talked about ghetto. What other coded language was there?
A. A feel for persons like us. Pointing to another project, I think it was called Dooley Orchard (sic), where they incorrectly said it was unsafe, filled with bullet holes. We know, of course, that there is an association in the popular mind between crime and race. Those are just three others that come to mind immediately, but there are probably others that I cite in my report as well.
Q. Did you look to determine who lives at Dooley Orchard, like what the racial composition is there?
A. As I said, you cannot determine because it's privately-held information, but again, it's not a big leap of inference when you're talking about worries, about crime, that that's related to race.
Q. But if Dooley Orchard is in fact, you know, 90 percent, 99 percent white or Caucasian, and they're talking about filled with bullet holes, then they could be just talking about poorly managed, poorly run, or even economically poor property.
A. I'd like to see your data showing it's 99 percent white.

Q. Well, yeah. I'm --
A. I haven't seen that data. And I don't believe that's true.
Q. Right. But you're making an assumption that it isn't that, right?
A. I'm not making an assumption about the racial composition of Dooley Orchard. I am not making an assumption at all. I am, as a scholar of race and just as a person living in this country, it is not much of a leap to associate safety and crime with black people.
Q. Okay. So you associate safety and crime with black people?
A. I'm not saying I associate safety and crime with black people. I'm pointing to scholarship on coded language, and I'm pointing to common sense understandings, and these are things I've studied in the scholarship I cite in my report. None of which was touched by your expert, by the way.
Q. But again, you're making the assumption that that's what these people are, that, when negative references were made regarding Dooley's orchard, that that was code by the trustees that they're talking about ethnic or racial minorities, not --
A. I'm not -- I'm not making an assumption. I am basing my opinion on scholarship in the field, on the

context of those comments, in the context of all of the comments by the residents, and frankly, a common sense understanding. But I rest on the scholarship, on the scholarship of coded language, which, as I said, was never challenged by your expert.

Q. Well, let me ask you this: If again, you're an expert, I'm going to ask you a hypothetical. If there were no Black people or Hispanics that lived at Dooley Orchard, is that a racial comment to be -- to basically be critical of how Dooley Orchard is run and the fact that there are bullet holes or whatever you're referencing?

A. Absolutely not. I'm sure this person did not know the detailed racial composition of Dooley Orchard. That she was playing, according to the scholarship on coded language, on the association between safety and race, that did not depend on her knowing what the racial composition of Dooley Orchard was.

Q. Okay. So her basically raising the issue of safety that it triggers the assumption that safety equals Blacks or Hispanics.

A. No. First of all, I don't want to keep repeating. I'm not making assumptions. I'm grounding this on the scholarship in the field. Second, she didn't just say safety. She was much more explicit than just

saying safety. In fact, safety was never brought up at the meetings, never brought up until ex post facto in deposition. It was raised with respect to the fact that it would attract a lot of children, and there could be safety concerns. It was never made by -- at the time. So she's not just generically talking about safety. She's talking in a very lurid fashion about the dangers of crime in this development.

Q. Weren't the safety quite -- weren't those actually in response to the question raised by T&R's counsel in the depositions about safety?

A. Any -- challenged any of this.

Q. Weren't the questions concerning safety? Didn't they have to do with quite, they were actually questions that were made or brought to Trustee Raehll's that she was asked those questions about safety. She didn't bring that up on her own.

A. I'm not sure. I mean --

MR. MARGOLIUS: Objection.

THE WITNESS: Obviously, this was after the rejection, and I studied, and I report in detail about the actual transcripts when there was no issue raised about safety. And moreover, when they were pressed, I believe both O'Brien and Raehll about this, they could not cite specific information or

specific authorities. They talk generally, yes, this would attract children and there might be some issue with safety. But never documented, never raised at any of the hearings.

BY MR. LA FAYETTE:

Q. Okay. So, you don't remember any discussions regarding the traffic patterns on 36, 37, and the potential impact that it would have on the residents of this area?

A. I don't recall -- you have to show it to me. I don't recall any decision-maker saying that this would create an unsafe situation, but you know, so I've read hundreds and hundreds of pages of transcripts --

Q. Okay.

A. -- but I did not see the word safety raised except once with respect to some signage.

Q. Okay. And again, I know we keep going around on this, but it's hard for me to get past it. Maybe there's a better way you could explain it to me. I understand that you are not making assumptions that a comment was made being racist, but you're saying that it is a coded word that learned folks have attributed to code word for racial discrimination, in short.

A. Code word for race, not a code word for --

Q. Race.

A. -- the association between crime and race is well established, and in the context of the comments, including the ghetto comment, this doesn't come out of just nowhere and randomly in the context of comments about the kind of people and the kind of feel they have. It wasn't just a random singular comment, and the clincher is how the decision-makers responded.

Q. You agree that the decision-makers here don't have the ability to throw somebody out of the meeting because they say the word ghetto?

A. Of course not, and I'm never saying they should have thrown them out of the community. That's nothing that I've implied or said.

Q. And again, the language that was used, that you identify as coded, is susceptible to more than one meaning, isn't it?

A. Barely coded. I think based on the scholarship, the best analysis and on the whole context of when it was made, the best analysis indicates it's barely coded that there is this association between crime and race. And again, it wasn't, you know, a generic comment about safety. It was very lurid, bullet holes, you know, suggesting gangs. All of this is not particularly subtle coding for race, and it's not the only one.

Q. Okay. And in this particular case, I guess maybe the easiest way to ask this is, do you believe that Trustee Raehll, Trustee Bullard, and Trustee O'Brien are racist?

A. I never said one was a racist. It's not the basis of my report.

Q. You're saying that they're racially discriminatory?

A. That's correct. And that doesn't mean you're a racist.

Q. What's the distinction there?

A. I'm sorry, what?

Q. What is the distinction? I guess what's your view of that distinction? How can you be racially discriminatory and not be a racist?

A. There's lots of racially discriminatory decisions being made by people who are not racist. They may like the white Asian feel of the community, and they don't want to see that undermined. They may falsely associate race with crime. There may be a host of reasons why they're racially discriminatory, but I wouldn't necessarily brand them as racist, nor would I exclude their being racist.

Q. So their actions are racist, but they're not racist?

A. Their actions are racially discriminatory. They may be motivated by racism. I'm not saying they were, I'm not saying they weren't. But I am saying what they did intentionally was discriminatory with respect to Blacks and Hispanics. I'm not saying they're racist, I'm not excluding their being racist.

Q. All right. I'm almost done here. Do you have -- did you perform any affordability studies or anything like that?

A. Yes, of course.

Q. What were the affordability studies?

A. I looked at the affordability of rental properties, as compared to the very high-priced home availability in Berlin Township. I looked at the distribution by race of renting as opposed to homeownership, even in the vastly less expensive homeownership market of Ohio. I looked at the income differentials between renters and homeowners. I looked at how income and rental impacts families with children. I looked at the difficulty by race that Blacks and Hispanics would have in resources needed to make down payments. I mean, that may not be everything, but that's a lot.

Q. And that affordability, was it based on data from the Columbus area, central Ohio, or Ohio in general?

A. I think I looked at both the areas. I looked pretty extensively at affordability, but the critical thing on affordability is Berlin Township itself. It's not all of the surrounding communities. So the critical thing was the high prices in Berlin Township.

Q. Okay. Oh, let me ask this: As far as you indicated historical discrimination, did you determine or evaluate the historical discrimination with regard to Berlin Township?

A. I did.

Q. All right. And what did you rely on to support, or I guess what was your conclusion that there was historical discrimination?

A. That they had -- you know, I didn't need to -- particular acts because we're talking about this act, but I did point out it was in the context of using zoning restrictions to, in fact, entirely exclude the development of apartments. I looked at statistics over time showing the only thing that they approved were town houses, condos, and single-family dwellings, not apartments. And --

Q. So --

A. -- they utilized the classic methods that were being used throughout the country to limit the diversification, and they continued to do that even after

supposedly the policy was to diversify.

Q. So, in this particular case, and -- the Berlin Industrial Overlay that was adopted as part of the Berlin Township zoning resolution, actually approved R10 density in multiple areas in the Elysian area and in this property that's adjacent to T&R's property. And then there are also two other properties that are all four. Would you agree with me that those are affirmative efforts to permit apartments?

A. I admit that the comprehensive planning wanted to diversify. But in practice, the decision-makers used zoning restrictions and very specifically, how they applied those zoning restrictions to keep out the development of apartments. So one of my big points, not, I wouldn't say big point. One of many points was that they contradicted the decision-makers, the policies for diversification that went all the way back to 2014 for the township.

MR. MARGOLIUS: Excuse me.

MR. LA FAYETTE: Give me just a second.

THE WITNESS: Take your time.

MR. LA FAYETTE: I think I am done. But give me just a sec.

MR. MARGOLIUS: Always a good time when the lawyer is quiet a little bit and gathering their

thoughts. That might mean the end is near.

MR. LA FAYETTE: Yeah. Trying to read my scribble.

THE WITNESS: I can't read mine either.

MR. LA FAYETTE: Okay. Let me ask a couple of questions.

THE WITNESS: All right.

BY MR. LA FAYETTE:

Q. As far as, because I know we're talking a lot, this has to do with economic impact. And I guess one of the questions I have is, is the economics of it, in your opinion, part of the coding of racial discrimination?

A. As I said, the economics of this is very positive, that this would bring in a lot of revenue, open up as well to federal grants. So to the extent economics was involved, it sustains my point that there isn't, you know, these impartial, non-racial factors like economics that would explain the rejection.

Q. If I were to ask you to offer an opinion favorable of Berlin Township in this case, as far as the considerations that they put in for nondiscriminatory reasons for denying T&R zoning requests, what would you say?

A. I didn't see any substantive reasons for denying it. As the transcript said, all three trustees

admitted it was a good project. Monica Connor called it a once-in-a-lifetime opportunity. O'Brien said it was a good project, but he's stuck on density. So, no, they rested on this density, which wasn't a requirement. You know, it was only a guideline, so they only admitted later, and they could have issued variances. They did it even to convert residential into commercial properties, but they did not.

Q. At a density of four units per acre, could Black and Hispanic people still move in? If there are four apartments per acre, is there anything that says a Black person or Hispanic person couldn't rent an apartment if it was four units per acre?

A. That's not the point. The point was made by all the experts, unrefuted. You can't build apartments on an R4; it's just not feasible, not possible. The 6.97 is even below what Trustee O'Brien said was most desirable. So, no, that's not an issue because it's a non-starter.

Q. Okay. So economically, they couldn't afford to build the project at four apartments per acre.

A. I think not just economically but physically. I don't see how you can build apartments that only have four units per acre. I find that, you know, hard to even conceive of, just on the pure physics of it.

Q. Well, wouldn't the physics be more difficult building ten units per acre?

A. Much easier because you would then have enough density per acre to build your apartment complexes. That's the whole point of all the expert testimony. That was the point of O'Brien's testimony, one of the decision-makers who turned the project down.

Q. But physically, they could build four units per acre? I mean --

A. I don't see how -- I don't see how. But we don't even need to get there because there was no disagreement that you could not build apartment complexes on a density of R4. That was not just Sabatino's; it was their experts. It was all the decision-makers. No one was saying, oh, you can build your apartment complexes on R4.

Q. Because it wasn't economically feasible to do that?

A. I'm not sure it's feasible in any sense, to do that.

MR. LA FAYETTE: All right. I don't have any other questions. I appreciate your time.

THE WITNESS: Thank you.

MR. MARGOLIUS: Hold on one sec, folks, I do have a little bit of follow-up if you don't mind.

I don't think it will interfere. Just a couple of questions, all right, Paul?

MR. LA FAYETTE: Sure.

- - -

EXAMINATION

- - -

BY MR. MARGOLIUS:

Q. Doctor, at the beginning of your testimony, there might have been a little bit of confusion, and I want to clear that up. I think you said your report was sort of divided into two aspects, one on effect and one on intent. Is that --

A. Right. But they were centered -- they were related to one another.

Q. And it's your opinion that there's a robust statistical analysis that supports an effect on Blacks and Hispanics with the policies of Berlin with regard to zoning, right?

A. Absolutely. There's a very robust statistical relationship here, which is very specifically tied to the policies and their application. So that establishes both discriminatory effect and is part of the Arlington Heights analysis of discriminatory intent.

Q. And I think there were a couple of questions about safety and families and so forth. And I wanted to

clarify that because I wasn't sure what the questions and answers were. Did you see any evidence or testimony, including deposition testimony, where the trustees tried to justify the 4.0 density requirement based off of issues concerning safety regarding children?

A. Yes, absolutely. They indicated that this project was likely to attract children, which ties into our families' issue with children. And that they had some concern about safety. That was important for their admission that the project would attract children, but their safety claims fell apart. One, they were post facto, not raised at the time. And two, they had no expert support, no documentation behind it.

Q. Okay. And then finally, I think there was some talk towards the second half of your deposition about some R10 areas, which Berlin had designated. Do you know whether those R10 areas might have been utilized or designated for schools or whether or not those R10 areas had utilities sufficient for development?

A. That was exactly the point I made. While I wasn't intimately familiar with what goes beyond the R10, because R10, you know, as you said, could mean schools, could mean, you know, commercial, could mean all kinds of things, but I made my point. I didn't see any proof that another area was suitable for what T&R wanted to do.

Q. Okay.

MR. MARGOLIUS: And that's it. Thank you, Paul.

MR. LA FAYETTE: All right. I'll just have a quick follow-up on that.

- - -

EXAMINATION

- - -

BY MR. LA FAYETTE:

Q. As far as the safety and families issue, you would mentioned that, and I think you brought it up, and I think we've discussed it, that the safety issue was something that you said came up post facto in the depositions in this case, right?

A. That's what I saw it talking about --

Q. Okay.

A. -- the project attracting children and safety concerns. I did not see that in the transcripts.

Q. All right. And the -- when you say in the transcripts, you mean of the meetings?

A. Correct.

Q. Okay. And in the meeting transcripts, did you see anything about the fact that it was likely to attract children?

A. I think the -- I'm not sure if it was a

transcript or a statement. I think it might have been a statement by both Connors, and I forget the guy's name now, Ringle, about attracting families -- young families.

Q. All right. Ringle is not from Berlin Township, though, right?

A. No. We went through this before, but he was talking, he's familiar with the old Olentangy School District, which would include Berlin Township.

Q. And as far as the R10 areas, I think previously you didn't know where they were on the map. I think that was your testimony, but as far as R10 is concerned, he would allow for R10 density for apartments.

A. I don't know. It might have been other restrictions on that R10, it might not have been suitable for what T&R was doing, and there was no testimony of any kind. Oh, we've got this other R10 where you can build there. Nothing like that.

Q. But you don't know. You don't know one way or the other. It could have been apartments for 10 density -- R10 density.

A. I do know, or it did not come up in any of the deliberations, you know, over many, many months over many different bodies.

Q. Right. And that would be because the property at issue was R4 or was the agricultural land with the

overlay of R4 that T&R properties chose to purchase?

A. But they certainly could have brought up the availability of R10 next door.

Q. Well, I guess they'll leave that to T&R properties. I'm pretty sure they were aware of what the map looked like. All right, that's all --

A. And as I said, I -- I can't -- I can't verify anything that you showed me.

Q. Okay.

A. All right.

Q. And you just don't know. You just don't know on that, right?

A. I didn't say that. I just said I couldn't verify what you told me.

MR. MARGOLIUS: He knows what he knows, and he's testified what he knows.

THE WITNESS: Exactly.

BY MR. LA FAYETTE:

Q. Let just make sure I clarify this. As far as the R10 is concerned, you didn't see it being brought up, and you didn't explore whether it was available or not.

A. It was never -- it was never brought up, and I only explored it to the extent I didn't look at the R10 with respect to Elysian.

Q. Okay. But you didn't look at the R10 that's

adjacent to T&R.

A. I don't recall having done that, no.

MR. LA FAYETTE: Okay. Good enough. All right, thank you, sir, I appreciate your time.

MR. MARGOLIUS: And just real quick thing in terms of depositions. Allan, you have the opportunity to review this, or you can waive that. I'm not your attorney, but I always suggest that you not waive, you can always waive later. Maybe you should read this transcript, maybe not, but why don't you decide that laters --

THE WITNESS: Yeah. I -- I don't usually waive

MR. MARGOLIUS: Okay. So no waiver. Thank you for your time. Thank you, Paul.

THE WITNESS: Thank you guys.

MR. LA FAYETTE: Hey, you guys still going forward? We're off the record?

THE WITNESS: Okay.

THE REPORTER: No. Just quickly while we're still on the record, can I get transcript orders down?

MR. LA FAYETTE: Yeah. I'll take it.

THE REPORTER: A standard e-copy?

MR. LA FAYETTE: Yeah. E is fine

THE REPORTER: Standard delivery time?

MR. LA FAYETTE: Yeah. I think so

THE REPORTER: Mr -- sorry, Andrew a copy?

MR. MARGOLIUS: You're not going to even bother trying to pronounce last names.

MR. LA FAYETTE: Caught her.

MR. MARGOLIUS: Yeah. We'll take a copy, please.

THE REPORTER: Any electronic copy?

MR. MARGOLIUS: Yeah. Electronic is good for me.

THE REPORTER: All right. Mr. Nagy a copy?

MR. MARGOLIUS: Yeah, he won't.

MR. NAGY: Yeah. I don't need my own.

THE REPORTER: All right. And then I just want to confirm, so the witness will be reading the transcript.

MR. MARGOLIUS: That's right.

THE REPORTER: Okay. Perfect. I am ready to go off the record. The time is 1:57 Eastern.

\- - -

(Whereupon, the Witness was excused.)

\- - -

(Whereupon, the deposition concluded at approximately 1:57 P.M.)

- - -

CERTIFICATE OF OATH

STATE OF FLORIDA

I, LORE CRAWFORD-HINES, Notary Public, State of Florida, certify that ALLAN J. LICHTMAN, appeared before me on this 27th day of July, 2026, and was duly sworn.

Signed this 27th day of July, 2026

LORE CRAWFORD-HINES
_____________________________
LORE CRAWFORD-HINES,
Notary Public, State of Florida
Commission No.: HH 801337
Expires : May 10, 2030

CERTIFICATE OF REPORTER

I, REILLY MCCONNELL, Court Reporter, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location stated on Page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing deposition as typed is a true, accurate, and complete record of objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

LORE CRAWFORD-HANES
________________________________

REILLY MCCONNELL, a

Court Reporter and Notary Public

Date: 07/27/2026

ERRATA SHEET

IN RE : T&R PROPERTIES ET AL. V. BERLIN TOWNSHIP ET AL.

DEPONENT: ALLAN J. LICHTMAN

TAKEN : JULY 27, 2026

*****************************************************

DO NOT make any marks or changes on the transcript itself. Enter any changes here.

Page/Line Change Reason for change

_________ _____________________ ___________________

_________ _____________________ ___________________

_________ _____________________ ___________________

_________ _____________________ ___________________

_________ _____________________ ___________________

_________ _____________________ ___________________

_________ _____________________ ___________________

_________ _____________________ ___________________

_________ _____________________ ___________________

_________ _____________________ ___________________

_________ _____________________ ___________________

_________ _____________________ ___________________

_________ _____________________ ___________________

_________ _____________________ ___________________

_________ _____________________ ___________________

_________ _____________________ ___________________

ACKNOWLEDGMENT OF DEPONENT

I, ALLAN J. LICHTMAN, do hereby certify that I have read the foregoing pages, 04 - 139, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

________________________ ________________

ALLAN J. LICHTMAN DATE

Subscribed and sworn to before me this

________ day of ____________, 20_____.

My commission expires: ____________

______________________________________

Notary Public

LAWYER'S NOTES

PAGE LINE

___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________
___ ____ ________________________________________



# Magna Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Kendra Suggs (E: KSuggs@MagnaLS.com | C: 407-716-6624)

**Director of Production Services:**
Ron Hickman (E: RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)

MAGNA
LEGAL SERVICES

**A**

**ability**
34:2 102:12 124:9 141:13
**able**
25:1 97:22 106:12
**abolished**
31:4
**above**
9:22 10:13,13,18 18:20,22
**absconded**
56:6
**absolute**
45:17
**absolutely**
24:6 33:19 35:16 48:15 102:13 103:14 104:12 110:1 112:12 121:13 132:19 133:6
**absolutes**
95:1
**absolve**
106:17
**abstract**
68:10
**academic**
9:22
**academics**
11:8,13
**acceptable**
25:13 46:4 81:2
**accepted**
114:13,14
**accepting**
106:11
**access**
12:2
**accessible**
46:20 47:6
**accommodate**
50:25
**accommodating**
84:1
**according**
25:17 54:20 78:15 116:14 121:15
**account**
40:11 48:15
**accounting**
73:20
**accurate**
141:11
**Acevedo**
27:9
**achieve**
114:7
**Acker**
27:21,23
**Ackers**
27:25
**ACKNOWLEDG...**
143:1
**acquired**
15:8
**acre**
50:18,19 54:23 55:24 63:5 75:23 76:20 77:12 78:19 81:2,4 81:6 83:15 84:15,21 102:5,11 105:14 109:17,22 130:9,11 130:13,21,24 131:2 131:4,9
**acreage**
81:25
**acres**
83:16
**act**
12:22,24 13:12 127:15
**actions**
125:24 126:1
**activities**
11:17
**acts**
127:15
**actual**
23:19 79:21,24 81:9 83:7 88:5,6 91:15 97:19 122:22
**actually**
12:11,15 23:18,24 25:1 36:15 51:9 63:15 74:6 80:25 85:2 86:20,24 87:21 108:10 122:10,14 128:4
**add**
10:6 87:24 94:16
**adding**
82:23
**addition**
94:8
**additional**
45:24
**address**
6:1
**adjacent**
62:16 66:18 110:14 128:6 137:1
**adjective**
10:5
**admission**
133:10
**admit**
6:9 33:21 107:16 114:2 128:10
**admitted**
33:11,12 51:22 56:14 59:3 130:1,5
**adopted**
30:3,21 33:14 54:1 128:3
**adopting**
31:23
**advance**
56:5
**advantage**
83:2
**advantageous**
75:16
**affair**
73:2
**affected**
32:8
**affirmations**
58:8
**affirmative**
128:8
**affluent**
30:4,18 37:6,7 87:2
**affluents**
37:8
**afford**
87:10 130:20
**affordability**
126:8,11,12,24 127:2 127:3
**affordable**
24:22 50:8,11 100:11 101:6,14,16 106:1,1 107:5
**afforded**
25:3
**African-Americans**
40:8
**after**
4:9 31:2 51:23 53:9 122:20 127:25
**afterwards**
56:11
**again**
7:12 10:4 12:25 13:1 29:9 39:13 43:12 44:24 50:22 51:4 52:4 55:15 58:16 65:11 67:7 68:21 70:14 74:9 81:23 88:4 89:14 91:14 92:19 93:15 96:8 98:13 100:17 101:23 105:18,23 110:13 116:6 119:16 120:19 121:6 123:17 124:14,21
**against**
30:4,14 31:2,24 32:7 32:7,18 36:16 91:22 91:22 98:21

**age**
9:11 31:22 35:6
**aggregate**
92:5
**ago**
9:11,12 12:11 13:15 14:11 19:16 35:6 64:4 114:25
**agree**
38:10 45:2,7 48:6 67:6 68:4 69:3,13 70:7 89:4 92:7 94:21 98:8 100:19 109:14 124:8 128:8
**agreed**
49:10 68:21 81:18 109:23
**agricultural**
51:13 108:19 135:25
**ahead**
5:22 27:18 44:23,24 85:23 89:24
**al**
1:4,7 142:2,3
**Alan**
5:24
**Allan**
1:12,17 3:4 4:7,9 104:19 137:6 140:7 142:4 143:3,11
**alleged**
73:16
**Allegheny**
14:20
**allow**
58:23 97:23 106:23 135:12
**allowed**
89:20
**allowing**
83:15 112:15
**allows**
106:1
**allude**
119:2
**alma**
8:15 11:1
**almost**
30:12 37:4 53:18 63:15 68:20 71:8 100:24 126:7
**alone**
39:21,25 40:7,13,18 40:24 80:19 90:12
**along**
22:15 47:13
**already**
9:1 47:25 68:21 99:14 102:1
**also**
2:19 5:13,17 7:21 8:13 10:24 11:13,15 14:7,21 15:9 25:17 27:5,17,19 30:18 31:6 34:6 42:24 45:23 51:3,25 52:10 52:19 53:20 54:1 68:15 80:20 82:24 82:25 83:4,17 88:7 94:14 95:12 106:7 107:3 118:6,20 128:7
**alternatives**
72:1
**although**
36:23 74:14,14 88:24 91:23 93:11
**always**
11:8 22:17 38:21 85:12 128:24 137:8 137:9
**am**
9:19 36:14 56:1,3 64:13 92:2 103:23 113:12 120:7,8,24 126:3 128:22 138:19 141:15
**amazing**
91:12
**amenable**
80:15
**amenities**
82:21,23 83:4,19,25 84:10 115:25
**American**
6:24 8:6 9:17,23 10:21 18:15
**among**
25:11
**amount**
50:5,6
**an**
9:20 10:6 11:1,13,23 12:3,8,12,13,15 13:6 14:1 15:17 16:1 18:13 19:4 21:19,23 26:1 29:18 30:10,16 33:24 34:8 35:17 40:17 44:5,6 44:20,21 45:11,17 46:4 50:19 53:3 55:23 56:5 58:4 59:13 61:19 62:17 65:4 66:7 67:9 76:15 77:9,16 81:2 82:7,16 83:2 84:3 85:9 87:1,3 89:5,13 89:16 92:24 93:20 95:6 98:5,15 99:18 102:24 106:6 107:13,20,21 110:1 111:9,13,18,22 112:6,21 117:12 119:8 120:4,6,7,24 121:6 123:12 129:19 130:12,16 130:18 132:16
**analysis**
7:1,20,22 8:9 32:2 35:5 40:20 41:4 48:15 77:15 80:9 87:1,3 89:16 92:8 99:11 102:2 103:15 106:22 124:18,19 132:16,23
**Anderson**
12:1
**Andrew**
2:4 61:10 138:3
**andrew@margoliu...**
2:6
**anecdotally**
100:5
**another**
8:7 16:22,22 24:4 29:23 33:9,16 34:18 50:4 55:4,5 62:17 69:6 85:8 116:25 119:6 132:14 133:25
**answer**
18:1 89:24 104:12 112:19,24 113:9
**answered**
26:15 118:14
**answers**
13:22 114:15 133:2 143:5
**anticipated**
97:7
**any**
5:7 7:22 8:1 13:20 15:15,18 19:10 20:10,12 21:13,14 23:22 24:11,12 34:25 35:1,2,3 36:2 36:3,8 45:23 49:11 49:18 50:1 53:13,19 54:10 64:21 65:9,9 66:10,12 71:20 77:15,22 78:1,2,4 79:6 80:9 81:9,17 84:12 86:7,11,11,23 87:13 90:14 91:7,14 91:22 95:2 96:10 97:2 99:11,11 100:3 101:14 102:11 103:4,5,6,7 106:22 110:1,2,11,16,18 115:4 116:19,19,20 122:12,12 123:4,6 123:11 126:8 129:24 131:19,21 133:2,24 135:15,21

138:9 141:16 142:7
142:8 143:7
**anybody**
37:23 87:8
**anything**
12:4 13:6 72:24 73:6
79:23 80:14,24
84:10 98:10,25
101:14 116:19
126:9 130:11
134:23 136:8
**anyway**
62:7 90:19 99:19
**anywhere**
53:24 110:23
**apart**
133:11
**apartment**
24:4,23 25:18 31:8
46:19,22 53:4,19,23
56:5 58:5 66:16,22
77:9 79:19 80:16
81:3 82:12 83:9,13
83:20 84:7,13,20
88:22,25 89:3,5,18
90:14,15,18 92:22
93:1 94:22 95:6
96:18 97:20 98:3
99:12,19 102:4
107:5,10,20,22,25
114:9 130:13 131:4
131:12,15
**apartments**
25:16 47:1 49:3,13
56:10 65:15 66:12
73:9,23 76:16 78:17
79:24 80:8 82:17,20
83:8,11 86:7,14,17
86:25 87:12,14 89:2
92:23 93:7,7 94:21
95:17 96:10,23 97:1
97:12 99:8 100:3,7
100:9 105:24,25
106:12 107:24
127:18,21 128:9,14
130:11,15,21,23
135:12,19
**apparently**
54:20
**appeals**
26:12 64:20 65:2
**APPEARANCES**
2:1
**appeared**
140:8
**appearing**
1:19
**applicants**
99:10
**application**
51:12 52:15 65:13
69:14 76:15 93:18
105:14 106:11
132:21
**applications**
23:8,11,13,19 24:3
96:20 97:5 98:10,25
**applied**
31:6 103:13 128:13
**applies**
97:17
**apply**
46:11,12,13,17 92:11
**appreciate**
35:23,25 70:24 71:4
131:22 137:4
**appropriate**
63:8
**approval**
53:9 54:25 81:19
84:2
**approved**
33:9 46:19 51:11
53:4 55:6,16 57:19
59:1 65:11,11 69:18
80:12 105:16
116:17 117:1
127:19 128:4
**approximate**
50:5
**approximately**
14:12 49:16 138:25
**April**
53:8
**arbitrary**
110:1
**area**
49:16 55:1 56:23
62:11,13,17 63:24
63:25 64:11,14
66:23 87:17 100:8
100:11 101:11
111:22 123:9
126:25 128:5
133:25
**areas**
32:19 63:2,8 66:18
68:10 87:18 127:1
128:5 133:16,17,19
135:9
**argument**
24:23
**arguments**
23:23
**Arizona**
54:21 56:6 58:14
**Arlington**
31:16,18,25 32:3,5
32:11,15,25 34:19
35:5 91:20 103:15
104:13 111:11,13
112:25 113:14
132:22
**Arms**
100:7 101:5,8,23
**around**
40:9,10 49:6 50:5
61:23 123:17
**Article**
60:21
**articles**
20:1
**Asian**
41:1,4 43:8,13 44:21
90:7 112:7,10
125:18
**Asians**
43:5,15,16,20 44:2
44:23
**Asian-Americans**
40:11
**aside**
80:25 81:6 112:3,14
112:15 113:19
**ask**
5:7 7:12 16:18,23
17:23 20:12 26:14
29:8 40:15 62:20,25
64:17 65:10 74:23
77:3,25 95:7,9,9,19
96:16,17,19 109:12
113:6,7,10,18 121:6
121:7 125:2 127:6
129:5,19
**asked**
20:12 75:19 81:1
95:19 122:16
**asking**
5:8 28:11 48:12
70:21 72:1 75:20
105:18 108:7
**aspects**
132:11
**assess**
104:13
**assessing**
31:16
**asset**
15:17
**assist**
21:3
**associate**
120:10,11,13 125:20
**associated**
32:20 114:22
**ASSOCIATES**
2:4
**association**
119:9 121:16 124:1
124:20
**assume**
38:13 92:10 113:22
**assuming**
72:16 86:23

**assumption**
92:24 93:20,22,23 102:6,25 112:16 120:4,6,8,19,24 121:20
**assumptions**
20:13,18 92:20 93:24 121:23 123:20
**attached**
143:8
**attained**
9:24
**attempt**
53:12
**attested**
102:18,20
**attorney**
17:12 19:12 137:8
**attorneys**
16:18
**attract**
52:13 122:4 123:2 133:7,10 134:23
**attracted**
87:4
**attracting**
74:3 134:17 135:3
**attractive**
87:7
**attributed**
73:18 123:22
**auditing**
9:6
**authorities**
123:1
**auto**
33:24 52:12
**availability**
25:18 31:9 66:11 70:17 78:19 86:16 87:1,11 94:18 100:24 115:5,22 126:14 136:3
**available**
63:1,5 65:19 66:17 78:25 79:1 83:5 92:25 93:25 94:11 102:22 103:4 116:1 136:21
**award**
54:18
**awarded**
10:8
**aware**
52:23 53:19 62:25 63:4 66:15 85:13 108:8 117:2 136:5
**awareness**
90:11
**away**
67:19
**A-L-L-A-N**
5:24

**B**

**B**
3:13
**BA**
6:10
**back**
6:4 7:11 11:2 15:3,16 25:9 31:21 34:12 37:13 42:17 45:3 47:7 67:8 76:25 77:4 85:2 114:4 128:17
**background**
6:6 42:22
**bad**
116:16
**Ballman**
29:5
**ballooning**
19:3
**ballot**
12:2
**ballot-related**
12:6
**bank**
48:2 95:24
**barely**
124:17,20
**barrier**
96:7
**BARWELL**
2:9
**based**
41:24 43:1 44:6 46:23 64:5 80:18,20 81:9,11 84:16,19 93:6 124:17 126:24 133:4
**baseline**
34:13 36:1
**basically**
24:2 75:14 100:2 121:9,19
**basing**
64:6,11,13 120:25
**basis**
44:6 51:7 56:12 90:1 98:21 125:6
**bathroom**
85:3
**bathrooms**
11:5
**bears**
50:10
**became**
12:2 52:20
**because**
6:11 18:23 28:19 29:9 33:17 37:21,25 38:3 40:19,24 42:7 44:5,6 51:9 57:14 60:5 70:18,25 73:11 81:20 91:11 93:20 95:21 96:3 99:15 105:25 109:2 111:15 112:3 114:20 116:22 119:15 124:10 127:15 129:9 130:18 131:3,11,17 133:1,22 135:24
**becomes**
109:2
**bedrock**
18:22
**been**
4:9,23 10:2,15,17 11:8,13,23 12:13 15:5 17:24 20:19 22:12 32:2 33:24 38:1 40:24 45:8 51:21,24 53:23 54:13 55:3,3,15,17 60:20 63:25 64:2,3 65:25 71:2,3 74:13 75:15 77:11 82:5 97:1 98:19 99:14 107:20 117:11 132:9 133:17 135:1 135:13,14,19
**before**
1:19 5:1 14:14 20:21 28:20 62:21 64:18 72:11 74:11 100:18 116:16 135:6 140:8 141:6 143:13
**beginning**
93:15 103:24 104:23 132:8
**behalf**
2:3,8,13 17:12,14 19:12
**behavior**
109:7
**behind**
133:13
**being**
34:15 48:14 49:4 50:4 73:1 83:2,2 101:21 123:21 125:17,23 126:6 127:24 136:20
**belief**
92:4,22
**believe**
24:8,17 26:8,23 28:15 35:9 40:4,4 50:7 53:2 54:24 66:7 67:3 88:9,25 97:16 111:4,6 120:2

122:24 125:2
**bell**
27:13 28:2,4
**below**
80:1 83:14 130:17
**beneficial**
55:1,17
**benefits**
75:4
**BERARDINO**
2:9
**Berlin**
1:7 4:21 23:1,4 30:12 30:21 32:17,22 38:3 38:8 39:9,14 41:17 42:18 45:4,14 46:3 46:19 47:4,10 48:4 48:7,11 49:22 50:8 51:2 52:7 53:7,24 55:8 56:8 59:6,22 60:13,19 61:1 63:1 63:5,25 65:21 66:9 66:18,24 67:2,9,15 68:24 70:3 74:4,8 75:12,17 78:10 84:5 86:8,14 87:4,11,14 87:20 89:1,15 90:18 93:18 94:15 100:23 101:1 103:11,13 104:7 106:18,22,24 107:8,19 108:3,11 126:14 127:3,5,9 128:2,3 129:20 132:17 133:16 135:4,8 142:2
**BerlinTWP**
60:9
**besides**
63:2
**best**
124:18,19 141:13
**Bethesda**
6:2 14:19
**better**
61:17 70:23 123:19
**between**
24:18 25:9 26:3 30:2 40:16 55:10 67:19 68:23 69:9 93:13 94:19 96:11 101:21 109:25 119:9 121:16 124:1,20 126:18
**beyond**
8:1 12:20 46:18 69:21 98:6 117:5 133:21
**big**
35:8 68:22 119:16 128:14,15
**bike**
33:23 52:11 70:5 108:14
**bio**
53:3 102:21 103:1
**bit**
6:11 16:17 18:7 21:7 22:22 29:7,16 34:10 38:22 45:11 62:6 85:1 86:5 109:13 118:24 128:25 131:25 132:9
**black**
35:1 37:13,21 44:21 48:8 67:1 90:7 93:8 93:21 94:23 100:20 112:11 120:10,12 120:14 121:8 130:10,12
**Blacks**
30:4,14 31:2,10,24 32:18 36:16 37:5,23 41:12,16,18,23 43:2 43:14,15,17,20 44:11,24 45:9,13,19 46:3,6,20 47:5,9,11 50:8 55:1,17 86:18 87:2 93:24,25 94:4 94:9,20 101:2 106:2 106:7 112:1,2 114:22 117:19 121:21 126:5,20
132:16
**black-or**
38:11
**board**
10:10 23:7,20 26:11 26:11 33:15 51:6 52:21 64:20 65:1,4 80:4,6 81:17 84:1 107:20 115:18 118:1,4
**boards**
23:15 81:17
**bodies**
28:20 103:7 135:23
**body**
59:5
**boilerplate**
74:6
**bond**
59:14
**books**
18:16 20:1
**borne**
45:24
**Boston**
8:24 68:16
**both**
17:8 20:6 27:3 29:20 30:17 38:1,6 65:16 83:2 94:19 114:20 116:15 118:7 122:24 127:1 132:21 135:2
**bother**
138:5
**bottom**
60:8,12 74:6
**bought**
14:16 74:12,17
**bound**
33:5
**Brad**
28:10
**brand**
125:22
**Brandeis**
6:8 8:16 10:25
**bread**
90:12
**break**
5:15,17 71:10,13 85:3,4,5,6,14
**breaking**
11:5
**brief**
31:11
**briefly**
6:5
**bring**
34:1,1 75:6,6,7,11 80:8 122:17 129:14
**bringing**
83:3
**broad**
12:16 112:23
**broader**
65:10
**broadly**
65:19 106:22 108:7
**broken**
112:9
**Bronx**
9:1
**Brooklyn**
8:19
**brought**
77:8,14 79:13,18 102:19 122:1,2,15 134:11 136:2,20,22
**brushing**
9:7
**brush-up**
8:12
**buffer**
83:25 110:10 116:13
**build**
74:19 79:19 80:16 81:6,12 82:11 83:13 83:18,19 84:7,13 105:23 106:12 130:15,21,23 131:4 131:8,12,15 135:16

**building**
56:17 79:11 82:17 83:8,8,11 131:2
**buildings**
108:10
**built**
74:21 82:14 86:25 103:8
**Bullard**
27:7,16 111:17 125:3
**bullet**
119:8,21 121:11 124:22
**business**
13:23 14:3,4,5 15:22 65:8 82:5 88:15,18 88:19,21 89:4,5,10 90:6,21 98:20
**businesses**
70:15 108:22
**buy**
30:16 87:10
**buying**
14:7 74:7 95:22
**by**
3:5,6 4:19,23 7:4,16 7:17 9:4 10:20,25 13:9 17:25,25 20:15 21:5 23:19 24:15,16 30:3,17,21 32:2 33:5 34:5,7,25 36:2 37:12 39:13,24 42:11,24 45:24 52:21 53:4,12,20,22 54:2 55:16 58:21 61:12 63:15 66:5,22 68:3 71:9,19 72:9 73:11,14,16 76:13 77:15 80:20,21 83:15 86:4 88:9 90:4,12,13,16 95:3 98:18 99:2,5,6,25 102:18,18,20 103:7 103:13,22 105:12 108:4 111:11 112:9 113:17,19 120:18 120:18,22 121:2,5 122:5,10 123:5 125:17 126:2,15,20 129:8 130:14 132:7 134:9 135:2 136:18 143:6

**C**

**C**
4:1 11:22
**cahoots**
58:22
**calculation**
83:12
**call**
11:16 52:24,25,25 92:20 116:20
**called**
53:4 75:17 84:4 116:3,20 119:6 130:1
**came**
28:21 40:13 50:23 55:19 56:8 98:24 134:13
**campaigned**
115:6
**campaigning**
105:9
**can**
4:7 5:5,13 20:8 22:17 22:24 29:9,15 30:22 35:9 36:7 38:18 39:3 45:18 47:17 52:25,25 56:24 59:21 60:15 61:22 61:25 62:4,8 63:19 67:21 70:10 80:7 81:12,18 85:3,10,13 85:16 89:11 90:22 93:5,5,7,14 95:11 95:14,19 96:16,16 104:6,18 107:5 108:19,20 113:4 125:14 130:23 131:15 135:16 137:7,9,21
**cannot**
81:6 92:17 98:20 119:15
**cant**
108:5
**can't**
13:6 76:23 80:17 83:13 84:14,20 89:25 90:24 92:14 101:19 129:4 130:15 136:7,7
**capacity**
64:19
**care**
75:13 89:19,20 115:24 117:14
**career**
11:8
**careful**
83:23
**case**
1:4 4:22 7:20 12:1,10 12:13,15,22 13:13 13:14 15:2 17:4,6 17:10 19:11 20:2 21:2 22:1 24:11 29:17 30:1 31:6 32:11 49:2 50:16 67:17 74:22 76:14 97:21 98:9 103:10 105:13 111:13 116:7 125:1 128:2 129:20 134:14
**cases**
11:15 12:14,16,17,20 12:24 13:10,12,18 13:21 17:9 18:3,5 18:10 19:5 20:19 78:2
**catch**
39:3
**categories**
69:24
**Caucasian**
37:18 39:6,6 119:20
**Caught**
138:6
**cause**
141:16
**cautious**
92:4
**CDBG**
75:11
**Celebrezze**
12:1
**census**
19:3 20:3 38:24 39:11 40:15,16 46:24 78:16 88:2 94:2
**centered**
132:13
**central**
30:24 126:25
**certain**
27:12 82:13 95:23 97:17 106:23 116:12
**certainly**
11:16 12:18 35:11,17 46:10 48:13 55:3 86:16 87:19 88:9 89:23,25 90:25 99:4 101:20 116:15 136:2
**CERTIFICATE**
140:1 141:1
**certify**
140:7 141:4,15 143:3
**chair**
107:20
**challenge**
116:4
**challenged**
116:4 121:5 122:12
**change**
46:10 48:9 70:4 142:9,9
**changes**
142:7,8 143:7
**characteristic**

44:2
**characterize**
44:20,20 67:12
**characterized**
42:11
**charge**
90:20,21 91:9 96:18
96:19 118:8
**charging**
55:20 91:4,7
**chase**
29:14
**check**
67:21
**checks**
90:6
**children**
30:5,19 31:11 37:6
87:3 122:4 123:2
126:19 133:5,7,8,10
134:17,24
**Chinese**
37:18
**choice**
33:6 51:19
**chose**
136:1
**Christopher**
27:20,21
**cite**
35:14 42:16 106:5
119:11 120:17
122:25
**cited**
42:6 51:19 57:15
73:11,11,15 118:4
**civil**
12:20
**claim**
114:17,20
**claimed**
33:5 51:7,18
**claiming**
58:4
**claims**
12:23 23:23 107:19
133:11
**clarify**
39:20 61:10 76:5
133:1 136:19
**classes**
8:6 9:6
**classic**
31:1 127:23
**classifications**
37:9
**clear**
36:7 71:3 81:13
117:17 132:10
**clearly**
35:16 102:10 116:13
**Cleveland**
2:6
**clients**
111:14
**clincher**
124:7
**close**
47:17,18 48:14 69:6
82:6 91:5
**closely**
38:4
**code**
98:3 120:22 123:23
123:24,24
**coded**
118:25 119:3 120:14
121:4,16 123:22
124:15,17,20
**coding**
124:24 129:12
**color**
42:21
**colors**
37:17
**Columbus**
2:16 56:23 64:2
67:14,17 68:20,24
126:25
**combination**
39:21
**combined**
6:25 35:18
**come**
25:1 32:23 57:9
72:25 74:18 95:18
116:23 119:10
124:3 135:21
**comes**
41:14 51:10 52:1
95:6,22
**coming**
31:23 74:5
**comment**
121:9 123:21 124:3,6
124:22
**commentary**
110:18
**comments**
28:23 99:5,6 121:1,2
124:2,4
**commercial**
24:21 25:5,17 33:25
52:10 67:11 69:8,9
70:2,5,10 108:9,9
108:11 130:7
133:23
**commission**
26:11 51:6,17 52:21
115:17 140:18
143:15
**commissions**
64:23
**committed**
57:12 114:5
**common**
66:23 81:7 120:15
121:2
**common-sense**
117:16
**communities**
42:10 83:3 103:18
114:12 127:4
**community**
48:8,9 124:12 125:18
**commuting**
68:23
**company**
11:22 59:2,3,4,7,14
**comparable**
99:11 100:3
**compare**
88:11,12
**compared**
30:15 46:21 86:17,18
94:9 101:3 126:13
**compiled**
86:12
**complete**
46:23 141:12
**completely**
34:15 114:14 118:6
**complex**
25:19 77:9 81:3 84:7
84:13 89:1,3,5
90:18 114:9
**complexes**
66:16 82:12 83:14
84:20 88:22,25
89:18 90:15,16
99:12,13 107:10
131:4,12,15
**component**
70:6
**components**
34:8 112:9
**composition**
99:18 100:6 101:20
119:14 120:7
121:14,18
**comprehensive**
23:2 60:23 128:10
**conceive**
130:25
**concept**
78:8
**concern**
17:16 110:6 116:8
133:9
**concerned**
18:12 38:10 49:3
50:15,16 52:15 73:8
74:4 89:4,18 101:6
101:24 135:12

136:20
**concerning**
57:2 122:13 133:5
**concerns**
110:9 115:16,18 117:2 122:5 134:18
**concluded**
138:24
**concluding**
73:22
**conclusion**
112:17 127:12
**condition**
5:14 89:8,14
**condos**
127:20
**confined**
32:19 117:19
**confining**
42:9
**confirm**
138:16
**conform**
72:12
**conformed**
83:24
**confusing**
98:13
**confusion**
132:9
**connected**
62:17
**Connor**
75:5,16 84:2 130:1
**Connors**
135:2
**consider**
115:16
**consideration**
55:5 116:15
**considerations**
51:1 129:21
**considered**
68:6
**considering**
118:21
**consistent**
15:5 31:19 64:16
**conspicuous**
30:5
**consult**
21:14
**consultations**
22:2
**contemporary**
7:21
**contested**
82:10
**context**
82:24,25 121:1,1 124:2,4,18 127:16
**contingency**
77:22
**contingent**
78:3,4
**continued**
127:25
**contradicted**
73:21 77:15 114:3 128:16
**contradicting**
102:8
**contrary**
24:24
**contributions**
10:2
**convenient**
24:22 69:12
**convert**
70:4 130:7
**convoluted**
70:21 109:3
**convoluting**
70:24
**Cook**
28:8,10
**copy**
22:17 138:3,7,9,12
**corner**
60:8,13
**correct**
11:9 21:21 22:6 27:4 27:6 28:24 37:14 43:9 45:5 49:21 52:16 64:12 66:19 69:15 80:19 82:12 93:5 95:12 96:22,24 99:1 117:7,8 118:1 118:12,17 125:9 134:21 143:5
**corrections**
143:7
**correctly**
15:14 49:7 58:20
**correlate**
100:19,21
**correlated**
100:16
**correlation**
101:20
**correspondingly**
70:16
**cost**
73:24 81:4 83:8,11 84:9,11
**costs**
74:6 79:22 80:25 81:2,23 83:7,20 84:7
**could**
5:22 6:5 7:22 8:22 11:5 19:1,3 25:11 29:11 33:25 35:21 40:7 47:2 54:12 55:9,13 57:22 58:17 59:16 63:14 73:19 77:1,10,17 79:10,19 79:25 83:4 84:8 90:25 91:9 94:16 95:17,25 99:9 102:3 102:11,12,12,15 103:7,25 116:10,18 119:21 122:4,25 123:19 130:6,9 131:8,12 133:22,23 133:23 135:19 136:2
**couldn't**
33:8 87:10 109:24 116:24 130:12,20 136:13
**counsel**
20:10 22:5 122:11 141:16
**count**
20:15
**counterfactual**
48:13
**countertops**
84:8
**country**
39:10 41:2 68:6 87:19 120:9 127:24
**county**
14:20 25:2 53:22 54:2,3,14 56:7,15 67:1 75:9,10,10 83:23 84:4 114:12 114:14
**couple**
12:15 15:10 33:4 71:10 73:14 92:20 92:21 129:5 132:2 132:24
**course**
7:24 8:14 14:1 18:23 24:20 28:13 32:8,13 32:24 34:4 35:10 37:15,19 42:9 54:8 55:21 59:4 63:18 65:23 70:13 74:2 81:11 82:2 91:23 94:16 119:8 124:11 126:10
**court**
1:1,19 12:1 13:25 141:3,22
**covenants**
31:3
**cover**
12:8,9
**covered**
12:16 82:3
**co-owner**

13:23
**crammed**
84:21
**CRAWFORD-HI...**
2:20 4:4 140:6,16
**create**
72:8 106:8 114:18 123:12
**created**
52:8
**creating**
83:3
**crime**
42:12 119:9,18 120:10,11,13 122:8 124:1,20 125:20
**criteria**
95:23 96:9 104:13
**critical**
28:13 106:6 121:10 127:2,4
**critically**
41:13
**current**
19:6 21:16
**currently**
9:14,16
**Curry**
29:2
**cursor**
61:22
**cut**
29:14 103:24
**CV**
6:4

**D**

**D**
3:2 4:1
**dangers**
122:7
**Darcy**
28:1
**data**
7:24 8:10 20:3,3 38:23,23,25 40:16 40:16 45:4 46:24 64:12 65:13 66:10 80:25 81:1,1,9 86:12 87:13 90:17 91:14,15 92:5,9 94:2 95:2 100:22 119:24 120:2 126:24
**date**
9:9 22:13 141:7,23 143:11
**dated**
52:20
**dates**
52:19
**day**
4:13 31:21 35:6 90:5 140:8,12 143:14
**Dayton**
68:19
**DC**
9:17
**De**
27:19
**deal**
14:6 16:5 24:12 29:24 93:12 95:1
**dealing**
12:22 13:19 32:6 59:16 69:8 74:3 78:13 91:21 93:22 95:24 96:4,4,5,6 114:23
**deals**
72:6
**dealt**
34:6 65:5 78:1 98:1
**death**
12:16
**debate**
10:24
**decades**
10:17 51:22
**decide**
137:11
**decided**
84:8
**decision**
28:13 31:22 32:17 34:5,7 35:7 36:15 52:7 53:12 54:16 56:7 66:24 70:3 72:12 73:17 74:4 75:13 80:21,22 99:3 99:6 100:6 103:7,14 103:22 111:16 113:20
**decisions**
38:8 125:17
**decision-maker**
20:2 116:19 123:11
**decision-makers**
110:11 124:7,8 128:11,16 131:7,14
**decision-making**
26:18 28:20 32:16 107:2
**Declining**
67:12
**decrease**
40:17,22
**decreasing**
40:25
**deeply**
32:23 57:14
**defendant**
14:2 16:19 18:1,3
**defendants**
1:8 2:13 4:22
**defending**
17:6
**defense**
18:7,10
**deficient**
110:3
**defines**
117:18
**definitively**
90:24
**degree**
6:22 8:7,14
**Delaware**
25:2 39:9 49:23 53:22 66:17,25 84:1 84:4
**deliberations**
135:22
**delivery**
138:1
**demand**
70:20 86:14,16 87:14 87:15,19
**demographic**
7:23
**denial**
25:22 31:8
**denied**
50:18 65:13
**density**
33:5 51:8 54:22 57:19 63:1,5 74:25 77:11 78:19 79:19 80:16,17 81:14,19 83:1,1,14,21 84:12 84:14 102:15,16 106:23,25 110:7,14 110:23 112:15 113:20 115:16,18 115:21 116:4,7,12 116:13,16 117:3 128:4 130:3,4,9 131:4,13 133:4 135:12,20,20
**denying**
112:14 129:22,25
**department**
9:21 11:4 18:5 91:20
**Department's**
32:2
**depend**
121:17
**dependent**
83:17,21
**depending**
55:19 68:5 70:9 95:23,24
**depends**
16:20

**depo**
72:22 107:18 118:23
**deponent**
104:8 141:8 142:4 143:1
**deposition**
1:12,17 4:23,25 26:15 27:15,19 28:5 28:16,25 29:10 33:12 51:19 93:16 122:3 133:3,15 138:24 141:6,11
**depositions**
20:3 26:17,24 27:2,5 49:21 57:8 72:18 98:9 122:11 134:14 137:6
**depth**
56:14
**derived**
18:15
**DESCRIPTION**
3:15
**designated**
133:16,18
**desirable**
89:7,13 105:6 130:18
**desired**
72:13
**detached**
15:20 83:5
**detail**
29:16 30:10,22 43:22 122:21
**detailed**
121:14
**details**
18:13 20:10 22:24
**determine**
45:16 86:7,13,24 90:15,24 95:17 99:12 119:13,15 127:7
**determining**
81:24
**detriment**
83:2
**develop**
80:8 81:2 82:7 102:4 102:10,14,15
**developable**
107:9 108:3
**developed**
31:21 54:7,9,10,13 54:23 55:2,15 57:21 89:1 98:18 108:19 108:20
**developer**
54:19 56:6 58:14,21 72:3,5,7 74:10,13 79:16 89:16,17 97:20 108:4
**developers**
54:16 56:22 63:6 72:9,10 90:25 102:22
**developing**
79:23 88:22 108:4 109:6
**development**
13:20,20 24:18,19,20 24:21 31:8 52:10 53:6,12,14,19,21,23 54:17 55:8,16 56:5 56:19,20 58:15 59:12 61:3,4,14 63:9,14,15 65:11 69:10,11 71:22 72:6 74:15,19 75:15 77:4 77:10 79:17 83:12 84:3 100:9 107:5 108:9,11 109:16 116:2 122:8 127:18 128:14 133:19
**developments**
33:21 53:22 74:12,13 83:6 108:6,24
**deviate**
76:23
**deviation**
115:15
**deviations**
103:20 105:5,5
**DGA**
27:11
**dictate**
70:10
**didn't**
7:13,13 8:7 9:15 10:5 12:4 20:22,25 21:10 21:14 26:14 36:12 37:22 39:3,4 41:3 57:9,23,23 58:1 59:9 70:1 72:25 73:4,6 75:24 81:4 86:20,23 88:10 93:9 95:18 96:17,19 100:14,18 101:14 101:16 104:18 107:19 110:8 111:20 112:13 113:22 116:20 121:24 122:14,17 127:14 129:24 133:24 135:10 136:13,20,21,23,25
**difference**
68:22 96:13
**differences**
93:11
**different**
12:9 16:17 37:17 39:22 68:10,11 70:8 99:19 108:6 111:21 112:14 113:23 135:23
**differentials**
94:19 96:11 126:18
**differing**
68:5,6
**difficult**
90:17 99:15 131:1
**difficulty**
126:20
**digits**
45:20 46:9 47:9,22
**dinosaur**
13:7
**direct**
36:8,12,13,20,20,21 36:23 105:8 109:9 114:20
**directly**
6:22 12:3 25:24,25 30:14,21 31:3,7 35:13 36:5 42:17,17 46:18 47:4 55:25 69:7 72:6 99:4 100:22 117:24
**director**
10:22,23
**disabilities**
32:20 41:13
**disability**
41:24 42:1,2
**disagreement**
131:12
**disconnect**
76:1
**discriminate**
31:3,24 90:1 98:20
**discriminating**
36:6,16 37:1 105:21 105:22 107:2
**discrimination**
12:22 13:18 17:2 30:3,14 31:1,15,17 32:7,18,24 36:8,13 36:14 38:1,4,7 42:5 42:15,20 43:19 48:10 91:21 106:5 106:13,18 109:10 109:12 111:5,9 113:16 115:9 123:23 127:7,8,13 129:12
**discriminatory**
17:1,8,9 25:23 29:19 29:21,21,25 32:13 34:13,14,20,23 35:13,18 36:2 42:8 48:10 66:24 103:12 104:8 105:11,17 106:4 109:7 125:8

125:15,16,21 126:1 126:4 132:22,23
**discussed**
49:21 53:2 66:20 67:4 82:24,25 134:12
**discussing**
29:11 73:8
**discussion**
24:16
**discussions**
20:9 109:15 123:6
**disingenuous**
34:7 58:4 103:21 113:25 114:15 117:22 118:7,23
**disingenuously**
56:4 114:10
**disparate**
13:18
**disparities**
42:3
**dispense**
5:5
**disproportionate**
101:2
**disproportionately**
94:24
**dispute**
49:11,19
**disputed**
81:16
**disputing**
106:20
**dissertation**
6:25
**distinction**
36:19 43:16 55:13 125:11,13,14
**distinguish**
33:8 55:9 109:24
**distinguished**
9:19,25 10:3,4,8,18 42:24 116:25
**distinguishing**
44:1
**distribution**
94:7 126:15
**district**
1:1,2 51:10,11 52:1 59:23 60:19 61:2 66:9 110:21 135:8
**dive**
22:24 29:7,15
**diversification**
79:15 80:23 107:12 107:14 127:25 128:17
**diversify**
128:1,11
**diversifying**
45:8 54:2 78:12 90:3 114:5
**diversity**
45:14,23 57:16,22 78:14 90:15 105:25
**divided**
132:11
**DIVISION**
1:2
**Doctor**
132:8
**doctoral**
6:21,22 8:2
**documentary**
20:6
**documentation**
133:13
**documented**
50:13 52:22 53:8 94:1,1 111:11 123:3
**documents**
23:22 54:1
**dodge**
118:9,9
**does**
7:4 11:20 21:13 50:19 67:1
**doesn't**
27:12 28:2,4 40:14 45:23 46:10,12,13 46:17 47:1 54:6,12 72:8 78:21 85:12 89:7 90:1,7 105:21 106:17 107:21 110:12 111:12 124:3 125:9
**doing**
11:24 14:11 70:9 71:22 107:15,16 135:15
**dollar**
88:6
**dollars**
79:21 83:3
**dollar-wise**
88:10
**Don**
28:6
**done**
11:12 18:2 32:22 58:18 74:11,20 95:13 106:21 126:7 128:22 137:2
**Dooley**
119:6,13,19 120:7 121:8,10,14,18
**Dooley's**
120:21
**door**
78:19,20 136:3
**double**
52:22 73:2
**down**
46:24 51:2 55:19 59:22,25 60:8,12,20 62:8,11,12 63:20 76:16,17 79:18 87:21 92:5 94:14,14 94:15 96:5 108:21 108:24 112:9 114:10 126:21 131:7 137:22
**downtown**
67:17
**dozen**
115:13
**drawing**
92:5
**drive**
6:2 68:16 83:20
**driven**
90:12
**drivers**
74:1
**driving**
69:1
**Dublin**
2:11
**duly**
4:9 140:9 141:9
**during**
114:25
**dwell**
25:18
**dwellers**
46:22 56:10 93:1 94:22
**dwelling**
58:5
**dwellings**
24:24 46:20 47:3 53:4 127:20

**E**

**E**
3:2,13 4:1,1 137:25
**each**
16:3 83:19 91:4 113:19
**earlier**
84:18
**early**
18:4
**easier**
62:7 131:3
**easiest**
125:2
**East**
2:15
**Eastern**
1:2 37:17 138:20
**Easterners**
43:6,7

**ecological**
91:25 92:9,12,15
**econometrics**
8:6,8 9:7
**economic**
8:9 41:25 43:17,18 44:5,10,21 84:3,16 129:10
**economically**
44:6,19,23 75:16,21 77:16 79:7,9,17 80:2 81:24 82:7 83:10 119:23 130:20,22 131:17
**economics**
74:24 129:11,13,15 129:17
**education**
8:1 12:10 42:14
**educational**
6:6 42:11
**effect**
17:9 23:22 25:10 29:20,21 32:14 34:14,20 35:14 38:2 42:9 55:4 63:3,10 132:11,16,22
**effort**
54:17
**efforts**
128:9
**either**
14:1 58:15 72:22 129:4
**elected**
118:3
**election**
7:23 19:4
**electronic**
138:9,10
**element**
34:18,19 111:9
**elements**
30:6 33:3
**elevated**
10:17
**elevators**
73:23
**else**
7:11 13:3 37:23 108:21 112:16
**elsewhere**
82:15 86:18
**Elysian**
54:6,22 55:7,11 56:13 57:2,20 58:21 59:1 61:8 63:2 107:6 109:25 128:5 136:24
**empirical**
45:11
**employed**
9:14,16 10:20,25 70:11
**employee**
70:14
**employer**
10:20
**employment**
11:14,16 12:14 18:23 25:13
**empowered**
33:19
**enclaves**
114:22
**encompasses**
66:9
**end**
6:17 90:5 100:13,15 101:17,21 129:1
**enforce**
53:13 57:16
**enforcement**
42:14
**engaged**
74:14
**engagements**
19:2
**enough**
131:3 137:3
**Enter**
142:8
**entire**
83:12 103:15
**entirely**
50:21 54:20 127:17
**entities**
11:19
**entity**
16:1 38:11 116:8
**enumeration**
46:23
**equally**
87:7
**equals**
121:20
**Errata**
142:1 143:8
**error**
92:9
**especially**
32:5
**ESQUIRE**
2:4,9,14
**essential**
89:13
**essentially**
86:17 107:6
**established**
49:14 124:2
**establishes**
132:21
**establishing**
102:24 106:6 113:16
**estate**
12:13 13:19,23 14:3 51:21 65:8 79:13 81:7
**estate-related**
13:17,25
**et**
1:4,7 142:2,2
**ethnic**
120:23
**ethnicity**
42:25
**evaluate**
127:8
**evaluated**
90:14
**Evan**
29:5
**evasive**
114:15
**even**
10:10 11:2 31:21 33:7 35:6 48:14 53:9,15,16,21 54:19 56:18,21,23 59:1,2 65:22 78:2,17 86:19 87:18 88:2 91:5 98:10 99:12 100:25 102:21 107:13,19 108:5 111:12 114:19 115:3 116:24 117:17,23 119:22 126:16 127:25 130:7,17,24 131:11 138:4
**events**
105:3 141:17
**eventually**
9:1 51:16
**ever**
15:16 20:20,23 63:25 64:19 80:7 82:10
**every**
42:9 76:12 107:8,11 116:11
**everybody**
7:11 13:3
**everything**
95:14 105:19 106:16 106:17 111:10 126:22
**evidence**
19:22 32:10,12 36:8 36:12,13,23 54:10 65:17 110:20 133:2
**evidences**
105:8
**evidentiary**
65:14
**ex**

122:2
**exact**
9:9 39:2 48:2
**exactly**
10:16 13:22 16:14,15 17:14 19:16 22:14 22:16 47:14 55:19 62:10,15 67:18 108:23 133:20 136:17
**examination**
4:17 132:5 134:7 141:13
**examined**
4:10
**example**
33:4,16 65:17 107:4 108:15 114:17
**examples**
33:4 35:22
**exceeds**
94:3
**Excellent**
26:13
**except**
91:12 99:3 111:12 123:16 143:6
**exceptions**
52:8
**exclude**
125:23 127:17
**excluding**
126:6
**exclusively**
37:4
**Excuse**
128:19
**excused**
138:22
**exhaustive**
12:17
**existing**
108:21 110:5
**exists**
38:24 108:18
**exit**
106:6
**expanded**
31:9 110:10
**expecting**
35:6
**expense**
87:10
**expenses**
79:23
**expensive**
30:16 65:21 74:7 86:19 97:8 126:16
**experience**
74:17 79:14 81:7
**experienced**
51:21 59:16 80:21 84:3
**expert**
4:24 11:13,19,24 12:3,8,12,13,15,23 13:11 14:1 17:6 19:2,5 24:24 35:8 35:14 49:10 72:22 73:12,22 80:9 81:15 94:13 111:12 116:3 116:9,19 120:18 121:5,7 131:5 133:13
**expertise**
6:13 8:13
**experts**
75:5 77:8,14,15 80:15 102:7,13,19 115:21 130:15 131:14
**expert's**
73:5 110:18
**expires**
140:19 143:15
**explain**
6:13 66:25 75:1 93:5 123:19 129:18
**explained**
41:6 102:1 116:22 118:17
**explanation**
32:3
**explicit**
121:25
**explicitly**
100:14 117:5
**explore**
136:21
**explored**
136:23
**extended**
10:7
**extensive**
72:21 79:13 80:3 96:3,5 107:13
**extensively**
12:10 72:12 83:1 87:5 127:2
**extent**
82:14 92:15 116:2 129:15 136:23
**extraordinary**
12:14
**extremely**
30:6 74:7
**e-copy**
137:24

**F**

**facing**
32:6 51:1
**fact**
17:3 41:14 46:8,22 47:3 51:18 53:20 56:9 64:9 73:18 75:3,15 77:13 86:18 89:20 93:25 103:1 105:19 107:12,15 107:17,23 109:22 114:1,12 119:19 121:10 122:1,3 127:17 134:23
**facto**
117:14 122:2 133:12 134:13
**factor**
48:13,17
**factors**
34:19 35:19 43:5,25 91:21 111:12 113:14,15,16 129:17
**factual**
20:12,18
**faculty**
9:23 21:12,16
**failed**
109:25
**fair**
11:10 12:22,23 13:11 13:15 34:16,17 37:5 43:21 45:8 55:18 71:2 106:2,13 113:10
**fairly**
17:3
**fallacy**
92:1,9,13,15 94:12
**falsely**
125:19
**familiar**
63:24 64:11 78:6,8 91:25 97:11 108:2 110:13 133:21 135:7
**families**
30:4,18 31:11 37:6,8 65:19 87:2 126:19 132:25 133:8 134:10 135:3,3
**family**
8:25
**far**
6:6 11:18 12:8,21 13:10,17 15:25 16:16 18:11 19:7 20:9 21:1 22:1 29:14,16,17 34:23 37:2 38:9,15,22 40:15 45:10 49:3 50:14,16 52:15 54:5 54:22 60:4 64:23 67:15,19,22 70:6,7

71:25 72:7,13 73:7 73:19 79:21 80:10 83:7 87:23 88:5,6 88:20 89:3,17 90:20 92:8,21 93:4 95:16 100:19 101:5,23 106:21 108:2,17 109:5 111:4,14 112:13 118:11 127:6 129:9,20 134:10 135:9,11 136:19
**fashion**
122:7
**fastest**
87:18
**father**
26:16
**favorable**
129:20
**favorite**
11:4
**Fayette**
2:14 3:5 4:14,19,21 7:7,10,15,16 8:22 9:3,4 12:25 13:2,8,9 37:12 39:10,16,19 39:24 61:9,12 66:2 66:4,5 68:1,3 71:6,9 71:15,18,19 76:3,5 76:9,11,13 85:1,8 85:15,18,21,23 86:4 90:4,13 99:21,23,25 104:15,22,25 105:12 113:4,11,17 123:5 128:20,22 129:2,5,8 131:21 132:3 134:4,9 136:18 137:3,17,23 137:25 138:2,6
**feasibility**
84:16 102:23
**feasible**
77:9,16 79:7,17 80:2 81:24 82:7 83:10 102:17 130:16
131:17,19
**federal**
11:15 75:11,11 114:11 129:15
**feel**
119:5 124:5 125:18
**feet**
110:10,10
**fell**
133:11
**few**
40:11 59:15 111:22 115:8
**field**
19:23 31:20 120:25 121:24
**figure**
40:13 49:10 93:19
**figured**
58:13
**figures**
48:2
**filing**
16:21
**filled**
119:7,21
**finally**
33:12 133:14
**financial**
59:12 75:4 96:1
**find**
31:22 47:6,14 112:10 130:24
**fine**
5:13,16 7:15 9:10 76:10 85:15 137:25
**finish**
8:5 53:16 56:3,17 58:1 80:6 87:24
**finished**
106:16
**firmly**
49:14
**first**
6:7 11:24 14:16 29:19,24 30:9 39:20
46:15 56:19 93:9 94:1 104:25 110:19 112:24 121:22
**fit**
84:20
**five**
14:9 15:6,14 48:21 48:23,23 49:1 85:4 91:3 95:8 113:14,15
**fixed**
108:10
**flags**
59:8
**flat**
21:23,24
**flattered**
53:9,17 56:18
**flip**
14:22 109:13
**flipped**
14:24
**flipping**
15:1
**Florida**
140:3,7,17
**flows**
68:11
**focus**
110:1
**focused**
37:21
**folks**
21:3 25:10,13 115:18 123:22 131:24
**followed**
100:1
**follows**
4:10
**follow-up**
113:10 131:25 134:5
**foot**
116:13
**foregoing**
141:6,10 143:4
**forensics**
10:23 18:19
**forget**
47:8 50:4 94:12 135:2
**forgive**
76:7,7
**form**
6:17 7:23 31:1 77:22 143:7
**formal**
8:7 52:20 86:21
**formally**
8:3
**former**
21:11,16
**forth**
25:9 132:25
**forward**
137:18
**found**
30:1,5 73:17
**four**
14:9 15:6,13,14 75:22 76:19 77:11 81:5 83:15 84:14,20 91:3 95:8 102:5,11 109:17,21 128:7 130:9,11,13,21,24 131:8
**framework**
31:16,19,25 32:3,5 32:11,15,25 33:1
**frankly**
81:22 121:2
**FREEMAN**
2:14
**freezing**
13:3
**from**
8:17 9:12 18:15,15 18:16,16 23:7 25:10 28:5,12,16 29:22 33:8 38:7,18 41:7 41:22 43:13 44:21 45:7 46:8 48:1 49:8 49:9 51:2 52:1 58:25 60:22,23

61:15,17 65:17 67:15,16 68:20 70:4 70:9,16 72:15 73:15 73:17,18,19 76:16 76:23 80:25 81:6 83:23 88:1 92:5 95:7 97:5,11,15,17 99:5 100:5 108:15 109:22 110:10 112:14,15 113:20 114:16 115:20 116:18,25 126:25 135:4

**froze**
7:7,9,10 12:25 13:1 66:3 99:21

**frozen**
66:1 99:22

**fulfill**
78:11

**full**
9:22 10:11,13,13,15 10:17 57:20 58:1 73:20 89:6,11 90:22 90:23

**Fully**
5:21

**fun**
11:6

**further**
11:3 141:15

**G**

**G**
4:1

**gamut**
12:17

**gangs**
124:23

**gap**
93:2,3,13

**garbled**
39:4

**GARY**
2:14

**gather**
71:25

**gathering**
128:25

**gave**
84:1 109:20

**gears**
86:5

**general**
63:10 70:8,12 91:16 114:21 115:17,20 116:6,6,9 126:25

**generally**
42:10 68:22 69:23 105:21 106:2,3,18 112:6 117:19 123:1

**generic**
124:21

**generically**
122:6

**Germantown**
14:20

**get**
9:11 18:12 20:10 22:23 32:11 36:22 41:9 49:8 59:14 60:6,22 68:15,16,17 76:12 79:10 84:17 90:17,22 97:4,11,15 99:18 100:18 109:2 109:8 123:18 131:11 137:21

**gets**
68:19 116:16

**getting**
8:13 68:2,2 108:18

**ghetto**
114:18,24,25 115:4 117:7,13,15,18,21 117:22,25 118:8,12 119:3 124:3,10

**ghettos**
114:21

**gist**
104:21 105:2

**give**
30:10 33:4 35:21 41:9,10 104:16 112:6 114:16 128:20,22

**given**
18:4 40:25 94:15 96:11 105:15,16,19 143:5

**gives**
56:25

**giving**
33:17

**gloss**
6:11

**go**
5:19,22 7:11 10:7 11:2 20:18 22:25 27:18 29:10 30:9 34:12 41:7 56:24 62:5 79:15,22,25 80:22 81:24 85:2,23 88:8 89:24 93:14 95:24 97:21 99:24 112:20,24 113:2,19 138:20

**goal**
90:23 91:1 105:23 107:15

**goals**
107:12

**god**
104:1

**goes**
46:18 59:6 82:1 83:9 83:11 97:16 133:21

**going**
5:18,20 20:10 30:9 30:10,22 31:22 33:1 35:7 37:13 42:18 49:13 52:13 57:21 57:22 58:23 59:18 71:7,12 73:9 74:2 74:16,19 82:11 85:2 86:5 90:21 95:16,23 101:11 109:12 112:18,23 113:19 114:4 121:7 123:17 137:17 138:4

**gone**
13:24 46:24 63:21 74:17,18

**good**
4:20 33:7 62:5 70:23 70:24 71:12 76:22 85:20 105:25 106:4 109:23 116:10,11 116:14,16,23 128:24 130:1,3 137:3 138:10

**got**
6:4 10:7,14 25:15 26:1 34:22 36:25 39:4 47:20 60:14,25 62:5 63:23,23 69:4 82:6 104:1,15,16,21 106:16,17 135:16

**governing**
59:5

**government**
97:5,12,15,17,22 98:18

**governmental**
97:2 116:8

**government-subsi...**
98:12

**grad**
10:25

**graduated**
6:10

**graduating**
6:17

**Graham**
1:6

**granite**
84:8

**grant**
114:11

**grants**
129:15

**great**
4:13 16:5 30:22 41:6 56:14 75:4

**greater**

81:14 112:11
**greatly**
31:9
**grew**
8:23
**ground**
5:6 74:18,21 107:9 107:11
**grounding**
121:23
**group**
16:22 42:22 44:3 92:14,17 93:23
**groups**
32:7 37:3,25 38:2,3 42:10 43:11,14 87:3 91:22
**group-level**
92:10
**grow**
8:18
**growing**
41:1 67:12 68:15 87:17,18 89:15
**guess**
6:21 9:6 14:21 15:4 16:16,21,22 19:12 26:25 29:8 37:20 38:24 43:1,12 46:2 46:4 55:22 57:10 74:23 75:19 87:14 92:19 93:4,19 99:24 108:7,18 125:1,13 127:12 129:10 136:4
**guided**
32:2
**guideline**
33:14 51:5,15,23 52:1,5,16,25 54:15 105:7 114:3 130:5
**guidelines**
52:20 53:25 91:20
**guys**
137:16,17
**guy's**
135:2

**H**

**H**
3:13
**had**
4:25 10:1 20:9 21:6 21:11 24:2,9 33:6 33:24 42:9 43:17,17 44:10 45:8 46:8 48:7 49:17,20,21,25 50:17 51:7,18,24 55:3,15 56:20 58:1 58:5 59:7 69:23 71:3 73:21,22 82:14 98:3 101:11 102:14 103:16,18,19,20 105:15,16,16,19 107:16,18 111:22 114:2,14 115:4 127:14 133:8,12,16 133:19
**half**
53:16 56:17 59:24 101:1 112:21 115:13 133:15
**half-hour**
85:14
**hand**
4:8
**handful**
9:24
**handling**
19:6
**hands**
51:8
**happen**
108:16
**happy**
5:9
**hard**
5:11 44:14,25 61:15 99:13 123:18 130:24
**harm**
34:22
**Harmon**
28:3
**Harvard**
6:21,23 8:14 10:22 10:24
**has**
11:8,8 15:5 32:22 40:24 53:23 60:18 67:1 75:5,16 79:18 82:5 84:11 97:16 101:11 117:20 129:10
**hash**
37:10
**hasn't**
54:9,10,13
**hate**
6:9
**haven't**
20:9 38:14 40:19 53:9,16 56:18 65:23 74:10,13,17,20 103:3 110:16 120:2
**having**
4:9 72:19 75:22 110:6 137:2
**he**
28:4,15,19,21 66:8 67:23 72:21 73:14 73:15,18,22 79:14 99:21 100:12,14 101:14,16,16 103:25 117:25 118:16 135:6,12 136:15,15,16 138:13
**head**
57:9
**heads**
17:15 58:3 90:25
**headwinds**
51:1
**hear**
5:13 7:13 9:15 36:22 68:18 113:5
**heard**
99:5 110:19
**hearing**
5:12 26:6 73:7 93:6
**hearings**
26:9 103:6 123:4
**heavy**
48:16,19
**Heights**
31:16,19,25 32:3,5 32:11,15,25 34:19 35:5 91:21 103:15 104:13 111:11,13 112:25 113:15 132:23
**held**
64:22
**Hello**
7:6
**help**
13:6
**helps**
6:13 21:12 66:25 105:25
**her**
107:17 115:7 117:11 121:17,19 122:17 138:6
**here**
4:22 13:11 29:14 30:11 32:6,12 33:3 33:17 35:2 37:3 46:11 55:5 60:20 61:20 62:1,8,8,11 62:16 63:13,14 73:25 86:6 92:21 98:15 102:5 106:14 106:14,20 108:1 116:12,14 124:8 126:7 132:20 142:8
**hereby**
141:3 143:3
**herself**
107:25
**Hey**
5:8 137:17
**he's**

27:11 66:7 74:3 99:23 113:9 130:3 135:7 136:16
**HH**
140:18
**hide**
118:10
**high**
41:15 42:11 68:17 74:1 94:15 127:5
**higher**
41:15 48:4,22,24 49:1 67:1 70:14 81:21 94:6,10 97:6 102:15
**highest**
9:22
**high-density**
107:9
**high-end**
73:9 74:3
**high-priced**
30:11 100:12,23 126:13
**high-rise**
73:23
**him**
20:22,25 28:5,16 113:2,8 117:10
**hired**
17:19 20:19
**his**
28:15,18,19,23,23,25 33:12 51:19 113:2,9 117:9
**Hispanic**
35:2 37:14,21 41:1 44:21 48:8 90:8 94:23 100:20 112:11 130:10,12
**Hispanics**
30:4,14 31:2,10,24 32:18 36:17 37:5,23 41:12,17,18,24 43:2 43:14,15,17,20 44:11,24 45:9,13,19 46:3,6,21 47:5,10 47:10 50:8 55:1,18 86:19 87:2 94:9,20 101:3 106:2,7 112:2 114:22 117:19 121:8,21 126:5,21 132:17
**Hispanic-Americans**
40:9
**Hispanic-owned**
38:11
**historical**
6:25 32:17,24 42:22 127:7,8,13
**historically**
37:25
**history**
6:10,12,24 7:20 8:15 9:19 11:2 38:4 41:12,25 42:5,15 43:2,3,19 55:8 96:1 103:16 105:3
**HOA**
65:4
**hold**
61:7 113:1,1 131:24
**holds**
92:16
**holes**
119:8,21 121:11 124:22
**home**
14:14,16 15:11 83:5 87:10 94:11,13 95:12,13 96:2,7 101:1 116:1 126:13
**homeowners**
93:1 94:5,6 126:18
**homeownership**
30:12,16 74:8 96:12 101:4 126:16,17
**homes**
14:7,7,8,17,22 15:5,8 15:10,14,20 16:1 52:9 65:21 88:2 92:23 95:8 96:3 100:12,23 114:8
**Hopefully**
5:19
**host**
53:6 125:20
**hour**
21:19,23 85:9 112:21
**hours**
21:25 22:3 71:8
**house**
87:25 95:22
**houses**
15:3 95:8 97:6 127:20
**housing**
12:22,24 13:12 24:22 42:7,8,17 47:5 54:2 59:16 69:12 70:17 70:18,21 78:12,15 97:2,8 98:12,12,15 98:16 106:1,1 107:18 114:5 115:5
**how**
11:20,23 14:8,11,21 16:3,18 17:24 19:5 21:25 22:7,12 26:15 27:21,23 28:1 29:2 31:6 32:16 34:5 44:19,20 45:16 49:4 55:19 67:12,15 70:10 71:16 77:18 81:12 82:17 83:17 84:13,17 85:7 90:20 95:10 108:2 114:23 115:5 121:10 124:7 125:14 126:19 128:12 130:23 131:10,10
**hundreds**
123:13,13
**hypothetical**
121:7
**Hypothetically**
55:21

**I**

**idea**
56:25 107:18
**identified**
4:23
**identify**
60:16 124:15
**if**
5:6,17,22 6:5 8:23 11:16 15:14 20:19 21:10,11 25:12 29:8 30:22 35:12,22 37:3 46:4,4,8 48:7,13,21 49:6 52:2 55:1 57:18 58:19 60:20 61:2,17,25 62:4,14 63:11,13,13 64:4 65:11 67:21 70:14 70:21 71:12 72:25 73:4 74:10,22 75:9 75:9,25 77:3 78:10 79:1 80:11 83:14 84:6,21 86:25 89:9 90:7 91:3,6 92:13 93:12 97:10 100:18 103:24 105:8,14,15 105:18 106:10,16 107:7 113:6 115:17 118:9 119:19 121:6 121:7 129:19 130:10,13 131:25 134:25 143:7
**ignores**
35:15
**II**
115:1
**Illinois**
17:5,7,10
**illustrated**
7:25
**illustrations**
33:17
**illustrative**
12:18 34:4
**imagine**
40:22 95:14
**immediately**

58:15 59:8 119:11
**impact**
13:18 70:17 123:8 129:10
**impacted**
41:16
**impacts**
126:19
**impartial**
129:17
**impinge**
99:9
**impinges**
100:22
**implicate**
92:16
**implicated**
32:23 57:14 91:24 115:5
**implications**
115:1
**implied**
24:24 124:13
**importance**
54:3
**important**
55:5 78:10 118:18 133:9
**importantly**
31:15
**improve**
113:21
**inadequate**
110:12
**inartfully**
75:19
**inception**
58:21
**include**
41:4 44:12 113:8 135:8
**included**
67:14 69:24
**includes**
15:10 32:25
**including**
33:21 44:2 52:9 57:8 77:8 78:12 114:6 115:14 124:3 133:3
**inclusive**
32:14 34:17
**income**
18:11,14,15 24:25 30:17 38:6 41:14,14 42:13 50:12 65:20 94:2,19 100:13,15 100:20 101:18,22 117:20 126:17,19
**incomes**
25:2 94:3,7,8
**incorporate**
113:3,4
**incorporating**
113:9,12
**incorrect**
73:13 77:2
**incorrectly**
73:11 107:22 119:7
**increase**
40:17 63:15 113:20
**increased**
46:8 112:15 115:22 115:23,23
**increases**
88:4,7 89:15 115:25
**incredibly**
78:14
**indeed**
29:13 67:2
**independent**
57:3
**Indian**
37:17 112:4,5
**indicate**
35:12 45:13 46:10 65:18
**indicated**
127:7 133:6
**indicates**
42:8 75:4 83:13 124:19
**indicating**
103:22
**indication**
58:5 116:18
**indications**
58:6
**indicators**
105:3
**indicia**
35:17 115:9
**indifferent**
56:9
**indirect**
26:1 35:15 36:9 103:21 105:8 114:19
**indirectly**
24:14 36:5 99:5,9
**indiscernible**
15:7 22:20 53:14 72:14
**individual**
32:8 91:18,23 92:16 92:18
**individuals**
32:8 37:3,14 65:14 65:16 91:23 92:6,11 92:15
**industrial**
24:5,12,13,18 25:12 25:22 59:22 67:11 69:14,19,24 70:6 128:3
**industrialists**
25:10
**inference**
119:17
**inferences**
92:5
**inferential**
93:11 102:2 117:5
**inferentially**
117:23
**information**
7:22,24 25:5 29:9 45:24 57:2 67:3 86:22 91:18 98:7 99:16 100:2,5 101:10 103:4 119:16 122:25
**initial**
24:9
**inside**
96:1
**insisting**
51:24
**inspection**
98:5
**instance**
34:3 105:20 106:19 116:21
**instances**
16:24
**Instead**
114:23
**instructor**
11:1
**insurance**
94:17 96:6
**intent**
17:8 29:21,25 32:10 32:13 34:13,23,25 35:9,18 36:20 38:2 105:9,11 132:12,23
**intention**
49:4
**intentional**
31:14,16 36:2,4 111:9 113:16
**intentionally**
126:4
**interest**
6:14
**interested**
90:2 141:17
**interfere**
132:1
**interim**
104:20
**international**
10:2
**interpretation**
92:10

**interrupt**
103:23
**intertwined**
34:16,18
**intimately**
133:21
**into**
13:24 18:12 20:10 22:24 29:7,15 30:9 30:16,18,21,22 31:7 32:17,24 33:1 38:14 42:10 46:18 47:4 48:15 50:1,3 74:7 74:12 75:11,12 79:22 83:9,12,18 84:20 85:2 86:24 87:4,10,20 91:11 95:17 99:8 108:21 109:8 111:22 130:7 132:11 133:7
**investigated**
58:12
**investment**
79:11,12
**invoices**
22:4,7,11,18
**involved**
12:3 13:15 18:4 26:18 37:3 51:21 109:15 111:13 129:16
**involvement**
42:14
**involves**
96:12,12
**involving**
12:13,14
**isn't**
84:16 106:13 120:5 124:16 129:16
**issue**
33:18,19 34:2 67:17 74:25 81:16 98:15 102:5 114:8 116:3 121:19 122:22 123:3 130:18 133:8 134:10,12 135:25
**issued**
22:4 33:20,23 130:6
**issues**
12:6,7 14:1 17:8 20:11 29:24 59:16 65:6 72:6 99:2 133:5
**issuing**
33:18
**its**
38:1,2 58:6
**itself**
54:25 72:2,7 102:18 114:5 127:3 142:8
**it's**
5:20 8:9 9:20 12:17 13:5,5 18:20 19:21 22:10 24:17 25:16 39:1 41:18,23 44:5 46:15 47:1,11 48:14 50:7,21 52:4,5 55:22 56:24 57:11 60:2,23 62:5 63:21 66:22 67:7,13,13,13 67:18,19 72:15 73:2 73:4,5,14 74:5 76:22 78:5,10 81:9 81:11,12,24 83:9,17 84:19,24 87:20 90:17 92:9 96:3 99:15 100:7,9 102:24 103:4 104:19,25 105:9 109:6 110:19,21,25 111:2 116:10,15 117:17 119:15,16 119:24 123:18 124:19,24 125:5 127:3 130:16,18 131:19 132:15
**I'd**
61:16 119:24
**I'll**
5:17 7:11 20:7 26:25 27:14 33:4,17 61:17 62:10,15,19 104:5,5 112:20 114:16 134:4 137:23
**I've**
6:3 10:2,15,16 11:12 11:13 12:13,16 14:14 18:2 42:15 64:22 65:8 71:3 74:14 95:13 98:19 102:1 106:24,25 110:19 120:16 123:12 124:13

**J**

**J**
1:12,17 3:4 4:9 5:24 5:24 140:7 142:4 143:3,11
**Japanese**
37:18
**Jason**
27:9
**JEDD**
75:7
**jnagy@wesplaw.co...**
2:11
**job**
11:4
**jobs**
69:10 75:6
**Jolson**
1:6
**JOSHUA**
2:9
**journals**
20:1 56:21
**Judge**
1:6,6
**July**
1:13 140:8,12 142:5
**jurisdictions**
114:13
**jury**
32:12
**justice**
18:6 32:2 91:19,20
**justification**
117:15
**justify**
79:11 133:4

**K**

**Kaplan**
28:1
**Kasper**
17:12
**keep**
32:19 121:22 123:17 128:13
**Ken**
51:20 80:22 81:15 101:10,13
**Kevin**
27:15
**kid**
11:3
**kidding**
104:2
**kind**
9:6 20:11 22:23,25 25:8 29:14,15,17 34:12,13 36:7 39:4 44:16 46:7 62:16 64:21 65:10 67:10 70:25 73:2 86:12 95:21 97:2 100:9 124:5,5 135:16
**kinds**
25:2 32:20 47:5 56:7 99:5,7 105:7 106:8 108:6 111:21 112:20 133:23
**knew**
8:21
**knocked**
26:13 108:24
**knocking**
108:21
**knowing**
121:17
**knowledge**
54:10 57:20 58:2

**knows**
101:11 136:15,15,16

**L**

**La**
2:14 3:5 4:14,19,21 7:7,10,15,16 8:22 9:3,4 12:25 13:2,8,9 37:12 39:10,16,19 39:24 61:9,12 66:2 66:4,5 68:1,3 71:6,9 71:15,18,19 76:3,5 76:9,11,13 85:1,8 85:15,18,21,23 86:4 90:4,13 99:21,23,25 104:15,22,25 105:12 113:4,11,17 123:5 128:20,22 129:2,5,8 131:21 132:3 134:4,9 136:18 137:3,17,23 137:25 138:2,6
**labeled**
115:14
**lack**
47:5
**land**
51:14 53:10,17 56:18 108:3,18 135:25
**landmark**
12:1 18:5
**landowner**
97:19
**lands**
53:11
**language**
118:25 119:3 120:15 121:4,16 124:14
**large**
112:4,5
**Larry**
28:3
**last**
106:11 138:5
**late**
14:16 53:8
**later**
53:18 58:4 60:16 107:16 114:2 118:23 130:6 137:9
**laters**
137:11
**lauded**
115:6
**law**
42:14
**lawsuit**
16:21
**lawyer**
17:19 128:25
**lawyers**
17:18 37:10
**LAWYER'S**
144:1
**layperson**
7:5
**lead**
5:20 87:6
**leadership**
17:22
**leading**
103:18
**leap**
119:17 120:10
**learned**
123:22
**least**
32:11 38:4 40:11 45:11 99:9 119:2
**leave**
136:4
**lecturing**
11:18
**led**
30:6
**left**
54:20 56:6
**legal**
1:24 20:15
**legally**
89:20
**legislative**
17:7
**legislature**
17:15,15,21,22
**legitimate**
110:6 115:17,19 116:7
**length**
41:6
**lesion**
53:21 55:15
**less**
22:16 30:4,15,18 37:6,7 38:5 86:19 87:2,12 92:23 101:1 126:16
**let**
5:11,15 8:5 14:9 15:16 16:23 29:8,24 39:18,19 40:15 45:2 47:7 52:11 56:3 58:1,8 61:25 62:4 62:20,25 65:10 67:8 74:23 76:5,6 77:3 80:6 87:24 95:7 104:11 108:16 112:1 113:6,6,7,18 121:6 127:6 129:5 136:19
**let's**
6:6 22:22 29:7 34:10 34:12,12 38:22 43:8 45:14 46:2 50:6 71:17 76:25 77:1 85:1,23 94:12 111:15
**levels**
76:24
**Lichtman**
1:12,17 3:4 4:9,20 5:24 76:6 100:1 140:7 142:4 143:3 143:11
**life**
7:21 11:7 78:3
**lifetime**
75:17
**like**
5:8 7:7 11:6 12:4 14:22 15:15 21:13 27:13 31:2 35:7,22 45:16 64:20,21,23 64:24 65:1,4 69:3 74:25 75:9 76:12,22 77:17 79:23 80:14 82:11 83:24 85:4,10 85:14 95:1,21 97:14 98:10,25 103:16 104:20 114:24 115:17,18 117:16 118:9 119:5,14,24 125:18 126:9 129:17 135:17 136:6
**liked**
33:7 116:22
**likely**
133:7 134:23
**limit**
81:13 127:24
**limited**
24:20 88:25 94:13 109:16,21
**line**
74:6 144:2
**lines**
22:15 47:13
**list**
20:7
**listed**
53:22 56:21,23
**Listen**
59:18
**listening**
80:7
**literal**
34:24
**little**
5:11 6:11 16:16 21:7 22:22 23:25 29:7,15 34:10 38:22 45:10 62:6,6 63:16 68:13 76:18 85:1 86:5

109:13 118:24 128:25 131:25 132:9
**live**
25:13 67:7 68:5 69:4 69:5 92:22 93:7 100:11 101:18
**lived**
68:12 121:8
**lives**
67:23 101:7 119:13
**living**
54:21 58:6 100:14 120:9
**LLC**
2:9
**LLCs**
11:19
**LLP**
2:14
**loaded**
44:16 46:7
**loan-to-value**
94:10
**local**
99:12
**located**
14:18 49:24 110:14
**location**
110:4 141:7
**logical**
92:9
**long**
5:19 9:12 11:23 12:11 14:11,14 18:3 24:9 51:23 64:4 82:6 98:20 110:25 111:3
**look**
13:4 19:20 41:8 44:13 45:18 47:17 50:1,3 59:11 60:20 61:2 62:7 66:10 69:18 70:1 71:2 84:10 95:2 96:15 107:23 115:12 119:13 136:23,25
**looked**
34:8 45:4 59:17 62:21 73:20 86:16 86:21 92:25 94:5,8 107:1,3 115:13 126:12,14,17,18,20 127:1,1,18 136:6
**looking**
19:19 38:18,18,19,24 47:16,19 50:6 54:24 63:11 72:22 89:14 94:7 109:5
**looks**
7:7 113:13,14
**LORE**
2:20 140:6,16
**lose**
60:6
**lot**
12:9 16:17 17:23 18:2,5 29:9 32:10 35:11 93:8,15 101:11 108:1 117:4 122:4 126:23 129:9 129:14
**lots**
11:12 56:11 57:7 58:9 125:16
**loudly**
5:13
**low**
45:20 46:8 47:22 117:20
**lower**
80:17 100:13,15,20 101:17,21
**low-income**
31:11 87:2 97:1
**lumping**
43:11
**lunch**
5:17 71:13 85:5,5,14
**lurid**
122:7 124:22
**luxury**
73:9
**L-I-C-H-T-M-A-N**
5:25

**M**

**made**
9:20 36:2 38:8 54:17 58:15 66:21 81:5 92:21 93:22,23,24 107:13 111:16 114:7 118:3 120:21 122:5,15 123:21 124:19 125:17 130:14 133:20,24 141:12
**Magistrate**
1:6
**MAGNA**
1:24
**magnitude**
88:9
**maintain**
90:22
**major**
6:12 10:1 12:10 33:21 70:4 93:13 115:15
**make**
10:1 20:12 23:25 27:24 35:7 50:22 53:13 54:17 55:13 60:2 62:7 70:3 83:24 89:10 94:11 95:10,10 96:1 98:3 102:22 126:21 136:19 142:7
**maker**
36:15 73:17 75:13 80:22 103:7
**makers**
28:13 31:22 32:17 34:6,7 35:7 52:7 53:12 54:16 56:7 70:3 72:12 74:4 80:21 99:3,7 100:6 103:14,22
**makes**
35:8 113:22
**makeup**
99:13 100:3 101:7,24
**making**
66:24 102:1 120:4,6 120:7,19,24 121:23 123:20
**man**
18:18
**manage**
11:20
**managed**
119:22
**manufactured**
100:9
**many**
9:23,23 13:15,15 14:8,21 16:18 19:5 19:16 21:25 22:7 33:3,16 34:6,7 35:15 36:15 58:5,17 70:10 103:21 107:4 113:15,24 115:9 128:15 135:22,22 135:22
**map**
59:23 60:10,19,19 61:2,2,4,13,15 62:21 63:11,20 67:21 78:18 79:4 135:10 136:6
**Margolius**
2:4,4,4 3:6 4:15 8:21 19:12 20:21 37:11 39:8,12 61:7,11 65:25 67:23 71:5 75:25 76:4,7 85:11 85:20 89:22,24 90:9 99:22 104:3,6,10,19 113:1,8 122:19 128:19,24 131:24 132:7 134:2 136:15 137:5,14 138:4,7,10 138:13,18
**marine**

33:24 52:11 108:14
**Mark**
65:18
**market**
30:12 65:21 74:8 86:20 87:11,14 97:8 111:23 126:17
**marks**
142:7
**Maryland**
6:2 12:11 14:19,19 14:20,20
**mater**
8:15 11:1
**materials**
19:20 21:23 83:18
**mathematical**
7:19,22 8:9
**MATHIS**
2:14
**matter**
54:12 70:12 89:19 90:7 102:16,17
**matters**
51:22 64:12 78:2
**max**
84:21
**may**
5:14,15 21:6 27:12 28:7 45:22 52:7 53:25 76:1 91:1 99:3 125:18,19,20 126:2,22 140:19
**maybe**
15:14 17:15 22:3,8 22:14 24:1 35:16 41:9 57:10 62:5 74:23 79:1 84:22 87:18 88:4 103:9 109:9 113:6,18 114:11 123:18 125:2 137:9,10
**MCCONNELL**
1:19 141:3,21
**me**
5:8,11 6:5 7:8 8:5 13:8 14:9 15:16 16:23 28:12 29:8,24 38:10 39:8,13,18,19 40:14,15 41:7,9,10 41:23 43:2 45:3 47:7,14 48:7,12 56:3 58:1 61:18,25 62:4,20,25 65:10 67:6,8 68:4,21 69:3 69:13 70:8,21,24 74:23 75:1 76:5,6,7 76:8 77:3 80:6 85:19 87:24 93:5,5 94:21 95:7,14 103:24 104:11 105:18 111:2 112:1 112:6 113:6,6,7,18 117:16 121:6 123:10,18,19 127:6 128:8,19,20,23 129:5 136:8,14 138:11 140:8 141:7 143:6,13
**mean**
6:16 7:4,5,17 24:15 24:16 30:17 37:22 42:1 44:25 47:1 48:23 50:15,21 54:12 57:7,11 64:4 67:7 68:9,12 76:1 78:16,21 79:9 86:9 86:15 87:15 89:8 90:2 91:2 96:17 97:4 102:9,10 105:21 106:21 109:6 110:16,20 122:18 125:9 126:22 129:1 131:9 133:22,23,23 134:20
**meaning**
34:25 98:9 115:2 124:16
**means**
7:19,21 10:1 32:18 87:9,16 106:19
**meant**
26:5 42:2 64:17 79:6
**measure**
94:10
**median**
87:25 94:3,7 100:13 100:15,25 101:18 101:21
**medical**
5:14
**meet**
83:23
**meeting**
98:9 110:18 124:9 134:22
**meetings**
20:2 23:8 57:8 122:2 134:20
**meets**
50:15
**Megan**
26:25 27:15 111:16 113:21
**member**
21:12 27:11 36:2 64:20 118:1
**members**
9:23 92:16
**memory**
28:12 41:7 48:1 61:17
**mental**
42:2
**mention**
8:13 37:22 101:14 111:12
**mentioned**
10:24 38:5 134:11
**Merriam-Webster**
117:18
**methodologies**
6:15 7:2
**methodology**
19:22
**methods**
6:25 8:15 11:2 127:23
**Metro**
2:10
**metropolitan**
56:23 67:14
**Michael**
17:12
**Michelle**
28:8
**Middle**
37:17 43:5,7
**might**
23:25 28:17 61:25 62:24 65:25 90:2,10 112:20 117:10 123:2 129:1 132:9 133:17 135:1,13,14
**mile**
67:24
**mind**
119:9,10 131:25
**mine**
129:4
**minimal**
56:19 78:14
**minimum**
58:13 77:16 79:19 80:2 81:22
**minor**
6:16,17
**minorities**
93:13 94:22 111:21 111:22,24 120:23
**minority-owned**
38:11
**minutes**
23:7,15,21,23 57:8 67:24 68:19 71:11 85:9 98:10
**mirror**
82:14
**mirrored**
46:5
**mirrors**
95:21
**misleading**

117:23
**missed**
104:20
**misstated**
36:10
**mistake**
35:8
**misunderstanding**
57:10 103:9
**mix**
65:14
**modeling**
86:7,10,13,21,24
**modest**
24:25 25:4 65:20 87:9
**modification**
33:22
**moment**
14:10 15:9 19:10 58:2,3 85:3
**MONDAY**
1:13
**money**
75:14 84:17 92:23 96:2
**Monica**
75:5,16 84:2 130:1
**monies**
75:12
**month**
29:11 50:7 91:7,9
**monthly**
16:4 22:10
**months**
19:16 135:22
**month's**
91:4
**more**
5:4 11:12 16:9 18:6 22:10 29:16 40:11 42:21 43:22 50:22 55:7 62:7 63:16 65:20 70:18,19,20 70:20 71:16 81:25 85:1,7,14 87:9 96:3 96:6 100:11 101:6 101:13,16 105:21 106:1 108:7 109:11 109:11,14 114:25 115:10 121:25 124:15 131:1
**moreover**
75:7 122:23
**morning**
4:20 68:20
**mortgage**
15:3
**mortgages**
94:14
**most**
11:6,7 18:9 34:24 41:12 47:2 51:20 80:21 89:7,13 91:12 130:17
**mostly**
14:6
**motivated**
126:2
**motive**
111:5,7,8
**motives**
111:4,14,19,20
**mountain**
32:12
**move**
55:4 86:24 87:4,19 91:11 95:17 111:24 130:10
**moved**
8:25 58:14
**moving**
13:4 61:22 99:8 111:22
**MS**
4:4
**much**
5:13,18 11:7 16:3 17:16 22:12 30:15 42:7 43:19 49:4 61:17 71:16 77:18 81:12,14 84:17 85:7 87:12 89:10 90:20 90:22 94:10 95:10 96:3,6 108:2 116:10 120:9 121:25 131:3
**multifamily**
15:16,18 62:12 78:13
**multiple**
31:1 54:14 76:24 102:24 103:6,7 105:2 113:14 128:5
**multiply**
83:15
**multi-family**
24:4 51:12 66:16 76:15 80:16 81:6,14 114:6
**municipalities**
66:13
**myself**
16:2 17:16 21:4 42:16 74:13

**N**

**N**
3:2 4:1 53:4 54:19
**Nagy**
2:9 20:23 138:12,14
**name**
4:21 5:23 15:22,24 50:4 135:2
**named**
4:22
**names**
28:12 138:5
**nation**
88:11
**national**
10:1
**nationally**
47:23
**nationwide**
88:7,8
**nature**
13:20 20:4 64:12 82:21 83:20 95:10
**near**
66:18 91:5 110:8 129:1
**nearby**
25:18 49:23 66:7 70:17
**nearly**
53:8
**necessarily**
42:21 78:16 89:8,13 97:9 125:22
**necessary**
89:8
**need**
5:14,17 18:12 50:22 60:23 65:22 70:18 73:6 80:15 82:7 85:2 86:7,10,14,15 92:4 93:6 107:14 109:1 111:8 113:5 127:14 131:11 138:14
**needed**
105:19 126:21
**needs**
6:10 109:21
**negative**
43:3 73:2 115:22 116:5 120:20
**neighborhood**
108:25 110:5
**neighborhoods**
106:8
**neighboring**
66:12
**neighbors**
110:8
**neither**
115:4 141:15
**never**
5:20 12:12 20:18 53:6 55:21 64:18,19 64:22,24 65:1 80:4 80:14 93:10,23 95:1 107:11 109:20 116:22 121:5 122:1 122:2,5 123:3,3

124:11 125:5
136:22,22
**New**
8:19
**next**
78:18,20 136:3
**Nicole**
27:23
**nobody**
91:11
**noise**
34:1 52:13
**nondiscriminatory**
109:15 129:21
**none**
58:18 80:3 110:11
120:17
**nonprofit**
88:19
**non-existent**
57:15 86:17
**non-racial**
129:17
**non-starter**
130:19
**nor**
80:8 125:22 141:16
**norms**
68:6
**north**
22:3 54:19 58:6
**northern**
61:16 62:2
**notably**
80:21
**notary**
2:20 4:2,7,12 140:6
140:17 141:22
143:18
**noted**
143:8
**NOTES**
144:1
**nothing**
19:24 21:7 57:16
58:8 82:10 84:11
98:8 109:23 114:7
118:10 124:13
135:17 141:10
**now**
19:5,6 21:18 36:9,10
54:21 60:3,3 69:14
72:17 76:12 85:17
118:24 135:3
**nowhere**
32:23 91:5 124:4
**nuanced**
109:8,11
**number**
15:4,9 40:1 45:12,18
50:7 51:3 56:3
57:14,16 66:21
87:21 88:5 113:24
118:3
**numbers**
39:2,3,17,23 44:14
44:25 46:15 47:8
112:6

**O**

**O**
4:1
**OATH**
140:1
**obfuscated**
34:2
**objected**
118:20
**Objection**
37:11 89:22 90:9
122:19
**objections**
114:16 141:12
**objective**
78:11
**obligations**
58:7
**observations**
64:14
**obvious**
59:15
**obviously**
5:6 11:14 12:6 29:10
49:14 52:12 54:5
58:16 65:5 72:2
73:4 83:22 88:15
89:9 90:11 92:14,16
95:7,20 100:14
101:19 109:6,10
112:3 114:19,20
116:10 119:2
122:20
**occupancy**
89:6,11 90:22,23
**off**
36:1 61:17 70:25
85:24 87:24 133:4
137:18 138:20
**offer**
16:18 29:17,18
129:19
**offered**
12:23 13:11,21,25
16:24,25 29:20
111:18
**offering**
25:21 55:23,25
109:10
**office**
59:13 64:22
**official**
9:21 10:6 35:1 36:3
66:7 78:9,11 114:3
118:1,12,16
**officially**
33:14
**officials**
118:4
**often**
17:24
**oh**
2:6,11,16 7:7 8:25
18:18 60:14 66:2
76:7 80:7 81:17
99:21 104:1 111:8
113:1 114:11,24
118:21 127:6
131:15 135:16
**Ohio**
1:2 39:9 68:19 86:19
88:12 98:1 100:25
126:17,25,25
**old**
5:12 13:6 53:5 135:7
**Olentangy**
66:8 135:7
**once**
5:4 22:23 75:17
111:13 123:16
**once-in-a-lifetime**
84:5 130:2
**one**
12:14 15:2,3 16:21
16:22 17:15 19:7
23:24 24:3,5 26:15
29:22 31:12 32:4
34:18,18,19 36:8
44:8,9,11 48:13
50:18 53:22 54:6,23
56:4,21 57:14 58:25
60:20 64:17 66:21
69:6 73:14,16,17
77:17 78:20 80:6
81:16 87:17,24 91:1
91:4 107:4 113:19
113:24 114:16
115:4,14 116:12,25
117:6,7 118:3,20,20
118:22 124:15,25
125:5 128:14,15
129:10 131:6,14,24
132:11,11,14
133:11 135:18
**ones**
28:12 111:16
**only**
6:12 9:24 19:7 26:3
34:19 35:9 36:5
38:18 44:9 46:25
48:17 51:23,23
52:16 57:21 73:15
81:5 82:24 83:13,14
83:16 84:4,14,20
91:1 96:16 98:2

101:18 102:18 105:7 108:18 111:8 114:2 124:25 127:19 130:5,5,23 136:23
**open**
24:24 108:20 111:23 129:14
**opened**
31:10
**openly**
31:22
**operate**
15:21 88:18
**operated**
90:16
**operating**
88:22 89:5,18 90:5 90:21
**operations**
33:25
**opinion**
26:1 43:18 46:1 55:23,25 56:12 59:10 80:9 102:3 103:10 109:7 111:18 112:13 120:25 129:12,19 132:15
**opinions**
17:1 22:25 24:11,13 25:21 29:8,16,18,20 48:9 64:13 71:20 103:10 109:10
**opportunities**
31:10 42:11 54:2 78:12,15 111:23
**opportunity**
75:17 84:5 130:2 137:7
**opposed**
57:4 74:7 93:1 126:15
**opposite**
109:18,20
**options**
114:6,6
**Orange**
66:7
**orchard**
119:6,14,19 120:7,21 121:9,10,14,18
**order**
84:7 97:22
**orders**
137:21
**original**
74:15
**originally**
8:17 50:22 67:3 76:17
**other**
4:22 8:1 12:7,23 13:11 19:10 21:3,22 25:11 27:18 31:13 32:22 33:3 35:19 37:14,16,23 39:22 43:4,5 49:20,25 50:1 52:23 54:18 57:7 58:25 63:2,4,8 64:11 69:18 70:1,7 74:2,5 75:5,10 77:15 78:2 82:12 90:14,15 91:16 96:18,20,23 100:3 103:8 114:12 117:20 119:3 128:7 131:22 135:13,16 135:19
**others**
27:13 65:18 119:10 119:11
**otherwise**
116:1
**our**
15:10 78:11 97:6,6 98:3 107:15 133:8
**out**
9:23,25 26:14 30:25 31:17,23 32:1,9,23 35:13 37:10 38:24 45:24 46:22 50:10 52:6 53:5,20 54:1 54:14 55:6,14 57:9 58:13 65:20 70:2 72:10 74:2,16,17 83:15 84:21 85:3,12 87:17,25 91:19 93:11,20 95:8,9 96:1 100:25 101:19 103:24 117:18 124:3,9,12 127:16 128:13
**outfit**
53:4 55:8
**outline**
44:25
**outlined**
19:21 30:20 87:5
**outside**
11:17 53:3
**over**
13:24 14:6 16:9 18:3 40:25 41:7 46:23 49:19 50:23 62:16 63:13,14 76:17,18 93:14,14,15 112:20 112:24 118:13 127:18 135:22,22
**overall**
18:11,14 46:5 67:1
**overarching**
29:18
**overlay**
51:10,11 52:1,2 59:22 60:19 61:1 69:19 128:3 136:1
**overt**
34:25 35:17 36:1,3 36:14,21,24 109:9
**overview**
30:10 31:12 34:8 41:21 43:22
**overwhelming**
46:21
**overwhelmingly**
86:20
**over-the-top**
109:9
**own**
11:21 14:5,8,14,17 15:15,16,23 21:9 31:20 35:8 54:6,7 56:16 57:9,17 58:7 78:2 86:12,13 91:3 92:23 122:17 138:14
**owned**
14:5,14 15:5,6 90:16
**owner**
89:5 97:14,20
**owners**
80:13,15
**ownership**
38:14 87:10,20
**owns**
16:1
**O'Brien**
27:5,15 33:12 51:20 51:20 52:17 59:2 79:12 80:22 81:16 100:10 101:10,13 102:20 111:17 115:3 118:7 122:24 125:3 130:2,17
**O'Brien's**
131:6
**O'Connors**
65:18

**P**

**P**
4:1
**page**
3:4,15 47:16,19 60:6 60:13,16,18 141:8 144:2
**pages**
111:3 123:13 143:4
**Page/Line**
142:9
**paid**
22:13
**parcel**

24:5,6,12,13 25:12 54:18 69:20
**parcels** 67:16
**Pardon** 39:8
**parking** 83:25
**parse** 101:19
**part** 11:14 32:14,25 40:20 43:12 51:10 54:3 61:16 62:3 69:2,10 69:11,19 83:22 92:8 95:16 102:25 104:15,25 128:3 129:12 132:22
**particular** 12:21 32:7 34:3 42:22 49:2 63:8 65:16 67:2 70:1 74:22 76:14 82:25 90:18 91:22 92:17 101:15 102:4 105:13,20 106:19 107:1,2 116:21 125:1 127:15 128:2
**particularly** 18:4,9 32:4 35:18 40:25 67:16 111:21 112:1 124:24
**parties** 1:18
**party** 16:22 141:16
**past** 5:18 71:12 123:18
**patterns** 7:20 123:7
**Paul** 4:21 8:21 39:8 67:23 76:2,7,8 113:1,2 132:2 134:3 137:15
**PAUL-MICHAEL** 2:14
**paul.lafayette@fm...** 2:16
**pay** 90:6 95:11 96:2
**payment** 94:14,16
**payments** 96:5 126:22
**peak** 15:13
**penalty** 12:16
**pending** 141:16
**people** 24:25 35:2,2 37:16 38:15 42:23 47:2 59:16 65:20 67:7 69:4 70:10,18,19,20 74:3,5 77:14 83:23 90:11 91:22 92:22 92:23 93:7,8,10,21 97:5 98:2,21 99:8 100:13,15,25 101:17 111:21 112:14 113:23 115:7 120:10,12,14 120:20 121:8 124:5 125:17 130:10
**per** 50:18,19 54:23 55:24 63:4 75:22 76:20 77:11 78:19 81:2,4 81:5 83:15 84:15,20 102:5,11 105:14 108:14 109:17,22 130:9,11,13,21,24 131:2,4,9
**percent** 21:5 39:1,1,5,6,25 40:3,7,9,10,12 46:9 46:9,25 47:1,11,12 47:25 48:1,8,8 49:1 78:15 80:12 119:20 119:20,25
**percentage** 45:12,18 46:2,4 47:9 48:7 67:1 88:7
**percentages** 45:19 48:21
**Perfect** 4:12 138:19
**perform** 86:6,11 99:11 126:8
**performed** 57:3 95:3
**perhaps** 10:10 80:21
**period** 16:10
**permit** 128:9
**permitted** 69:19
**person** 51:21 84:3 117:13,17 117:25 118:11 120:9 121:13 130:12,12
**personal** 11:21 64:6,14 78:3 98:7
**persons** 119:5
**person's** 90:7
**perspective** 95:7
**pertinent** 32:5
**ph** 27:9 28:1,3,6 29:2,5 65:18
**PhD** 6:23
**physical** 42:2
**physically** 130:22 131:8
**physics** 84:19,19,25 130:25 131:1
**pick** 8:22
**pictures** 38:19 53:7
**piece** 107:9,11
**pieces** 105:10
**pinpoint** 92:14,17
**place** 2:10 17:2 53:6,14 54:18 58:16 77:17 96:9 117:19
**places** 25:11 99:19
**plain** 81:7
**plaintiff** 2:21,22 14:2 16:19 17:25 18:6
**plaintiffs** 1:5 2:3,8 11:25
**plan** 17:7 23:2 55:16 60:23 72:11 74:19
**planning** 114:4 128:10
**plans** 71:22 72:8
**plausible** 40:14
**playing** 121:15
**plays** 111:5
**please** 4:3,8 5:12 138:8
**plenty** 35:21,21 36:13,23 108:23
**plotting** 58:14
**plumber** 11:5
**point**

5:7 9:25 30:25 31:17 32:1,9 35:5 35:13 46:22 47:15 53:20 54:1,3,14 62:24 70:2 71:14 87:16,25 93:11 100:25 101:18 108:20 117:18 118:2 127:16 128:15 129:16 130:14,14 131:5,6 133:20,24
**pointed**
52:6 53:5 55:5,14 72:10 74:2 118:6
**pointing**
119:5 120:14,15
**points**
32:4 45:18 66:21 91:19 92:21 118:2 128:14,15
**poisoning**
87:6
**policies**
30:3,21 42:8 46:18 47:4 93:17,18 128:16 132:17,21
**policy**
30:24 31:7,23 78:9 79:14 128:1
**political**
6:24 13:19 64:21,22
**poor**
42:11 93:7,8,10,12 93:21,24 119:23
**poorly**
119:22,22
**popular**
119:9
**population**
38:25 40:8,18,24 41:15 45:4,12 46:2 46:5 91:16 112:4,5 112:7,10,11
**populations**
41:1,4 47:24
**portion**
25:22
**position**
9:18 55:22 64:21 65:9
**positive**
115:21 116:5 129:14
**possible**
22:10 40:5 78:5 130:16
**possibly**
103:25
**post**
52:20 117:14 122:2 133:11 134:13
**post-2020**
17:5
**potential**
91:15,17 123:8
**poverty**
37:8
**practice**
64:16 128:11
**praised**
84:4
**precise**
50:22
**precluded**
81:19
**precludes**
84:12
**preferred**
81:21
**premed**
6:12
**preparation**
21:19
**prepare**
21:2
**prepared**
21:1,4
**prescribed**
106:24
**present**
2:19 16:11 32:10 103:17 107:5
**presentation**
24:9
**presentations**
23:14,23
**presented**
24:17 28:20 45:24 52:19 56:4 75:12 107:24
**president**
10:9
**pressed**
122:24
**presume**
10:10
**pretty**
5:13 11:7 12:16 17:21 127:2 136:5
**prevailed**
17:9
**previously**
135:10
**priced**
65:20 88:2
**prices**
88:1,8,11 94:15 127:5
**primarily**
18:15,16,16
**primary**
15:11
**principal**
54:19
**principally**
37:4
**prior**
8:13 10:20,20
**private**
98:19 99:15 101:9
**privately-held**
119:16
**probably**
5:5 14:9 16:13 18:3,6 51:20 85:8 91:7 119:11
**probed**
38:14
**problem**
22:21 39:5 61:11 66:4 71:3 74:24 75:2,3,21,22 76:2 84:12 116:21
**problems**
106:9 117:20
**procedural**
103:20 105:5
**process**
10:8 54:4 74:18 95:16 97:22 98:25
**professional**
11:7,8
**professor**
9:19,22,25 10:3,8,11 10:13,15,17,18
**profit**
80:12 88:19 89:10,10
**profitable**
81:3
**program**
6:21 8:2 10:24 75:11
**programs**
114:11
**progress**
53:12,23
**project**
33:7,8,9 55:7,11,12 57:15,20 58:23 63:2 76:22,22 77:9,17 81:19 82:8,25 84:2 84:4 98:16 102:23 105:6 107:1,3,6,23 107:25 109:23,24 109:25,25 110:2 116:11,13,21,22,23 116:25 117:1 119:6 130:1,3,21 131:7 133:7,10 134:17
**projects**
55:10
**pronounce**
138:5
**proof**
133:24

21:6
**proofreading**
21:7
**properties**
1:4 4:24 15:18 16:4 18:17 19:13 23:19 24:2 26:20 31:8 38:9,14 49:20,25 50:2 51:17 65:12 66:17 72:14 76:15 77:3 84:6 88:15,18 90:3,16 91:3,10 95:4,15 96:9,21 98:11 101:4 115:12 126:13 128:7 130:7 136:1,5 142:2
**property**
33:25 50:4,14 52:23 54:6 63:13 70:7,9 70:19 72:9 74:25 77:19,22 78:3,20 79:11 94:17 96:5 97:21 102:4,5 108:10 110:15 119:23 128:6,6 135:24
**proposal**
25:6 33:15 49:15 51:7 58:21 59:2 66:22 82:3 83:22 114:9
**proposed**
50:17 61:3,3 63:14 84:24
**proposing**
50:17 61:13 62:12 63:9,13 69:17
**propounded**
143:6
**protected**
37:9 99:15
**prove**
35:9
**proved**
92:24
**provide**
24:21 69:10,11 98:11
**provided**
72:21
**provides**
115:25
**proximity**
69:6
**public**
2:5 65:9 98:12,15,16 114:21 115:22 118:1,12,16 140:6 140:17 141:22 143:18
**purchase**
136:1
**purchased**
77:18,22 78:3
**purchases**
78:4 94:11,13 95:13 95:13
**purchasing**
96:7
**pure**
46:15 48:22 77:7 130:25
**purposes**
27:14
**push**
71:17
**put**
7:23 55:20 59:14 67:21 82:1 83:4,18 83:19 84:8,14 94:14 129:21
**putting**
43:15 82:20
**P.M**
138:25

**Q**

**qualified**
55:8
**quantitative**
6:14,24 7:1,3,17,23 8:12,15 11:2 20:6
**question**
5:7,9 7:12 13:23 37:20 46:7 57:5 65:10 71:23 75:20 75:20 77:10 79:16 104:4,7 109:14 112:19,23 113:6 118:9 122:10
**questioning**
102:8
**questions**
16:18 17:23 26:14 71:3 99:2 122:13,15 122:16 129:6,11 131:22 132:2,24 133:1 143:6
**quick**
59:19 134:5 137:5
**quicker**
23:25
**quickly**
137:20
**quiet**
128:25
**quite**
18:6 25:4 39:3 65:22 75:16 76:21 81:13 81:21 107:13 109:18,20 117:4,5 122:9,14
**quote**
90:12 109:22

**R**

**R**
4:1
**race**
39:22 42:19,21,24 89:19,20 90:1 100:14,16,20 101:15,21 115:6 118:21 119:9,18 120:8 121:17 123:24,25 124:1,21 124:24 125:20 126:15,20
**races**
37:14
**racial**
12:12 13:14 57:22 90:17 99:12,18 100:3,6 101:7,19,24 103:21 105:8 114:20 115:1 117:5 117:23,24 119:14 120:6,23 121:9,14 121:17 123:23 129:12
**racially**
114:15 125:7,14,16 125:21 126:1
**racism**
126:2
**racist**
123:21 125:4,5,10,15 125:17,22,23,24,25 126:5,6
**Raehll**
26:25 27:15 111:16 113:22 114:23 115:6 118:7 122:24 125:3
**Raehll's**
122:15
**rail**
105:9 107:13
**raise**
4:8 73:24,24
**raised**
99:2,4,4 117:2 122:3 122:10,23 123:4,15 133:12
**raising**
121:19
**ran**
86:12
**random**
124:6
**randomly**
124:4
**range**
16:6,14 50:13 88:3
**rank**

9:22,24
**rapidly**
41:1 87:17 89:14
**rate**
21:18 80:10
**rates**
21:22
**rather**
101:3
**ratios**
94:10
**rattle**
70:25
**RE**
142:2
**read**
20:8 26:16,17,22 27:3,19 28:17,23,25 117:9,11 123:12 129:2,4 137:10 143:4
**reading**
49:9,9 138:16
**ready**
138:19
**real**
12:13 13:17,19,23,25 14:3 51:21 55:3 59:19 65:8 79:13 81:7 115:2 137:5
**really**
17:16 30:11 37:22 42:20 53:5 54:12 55:4
**reason**
31:18 41:3 44:8,12 109:21 110:6 115:7 142:9
**reasonable**
68:7 91:1
**reasons**
87:5 109:15 110:2 125:21 129:22,24
**rebuttal**
24:17 45:25 66:20 67:4 87:25 93:12
113:13
**recall**
6:19 13:16 26:17 28:5,16 29:1 72:19 72:22 73:8 78:4,7 98:1,6 110:25 123:10,11 137:2
**received**
4:24 6:23
**recent**
18:2,10
**recently**
17:3 18:9
**recess**
86:1
**recognized**
10:1
**record**
4:2 5:23 56:20,24 58:25 59:11 60:6 85:24 86:3 98:8 107:24 137:18,21 138:20 141:12
**recorded**
23:17 28:19
**records**
54:21
**red**
59:8
**redistricting**
12:7 16:20 17:6,7
**redone**
77:4
**reduce**
76:16 84:6,9,10
**reduced**
51:2,3 110:7
**reduces**
84:11
**reference**
27:24
**references**
120:21
**referencing**
121:12
**referring**
95:5
**refers**
117:21
**refuted**
80:4
**regard**
74:25 95:2 127:8 132:17
**regarding**
24:13 66:11 71:20 81:2 87:13 117:3 120:21 123:7 133:5
**regardless**
53:24 84:13
**region**
67:14
**regulations**
53:7,17 56:15
**Reilly**
1:19 7:8 141:3,21
**reinforces**
67:3
**reject**
77:6
**rejected**
33:15 49:15 51:6,17 55:7 114:12
**rejection**
52:21 66:22 69:8 103:19 122:21 129:18
**related**
119:18 132:14 141:15
**relationship**
29:23 30:2 92:13 132:20
**relationships**
30:19 37:5 93:17
**relative**
15:23 23:8
**relatively**
32:19 100:7,11
**relevant**
12:21 24:23 25:5 32:4 72:24 73:1
86:21 87:12 90:19
**reliable**
38:21
**relied**
30:24 31:15 57:7
**rely**
31:18 112:16,19 127:11
**relying**
81:10 113:7
**remained**
45:19
**remaining**
107:8
**remains**
108:3
**remember**
8:23 9:9 10:16 15:14 16:9 19:14,16 22:16 39:2 49:6 62:14,22 62:24 67:23 72:17 104:3 110:22,22 117:10 123:6
**remind**
51:4
**remotely**
1:19
**remunerative**
11:17
**renovated**
11:5
**renovations**
14:22 15:1 74:14
**rent**
15:10 16:4 49:5,13 65:15 66:11 73:24 74:1,7 90:6,21 91:4 95:6,7,8,11,22 96:10 97:6,18 98:21 130:12
**rental**
14:6 18:17 30:13 46:24 49:16,20,25 50:2 66:16 78:16 82:6 87:21 96:4,7 96:12,20 100:24

101:3 111:23 126:12,19
**rentals** 15:2,23
**rented** 49:4 50:5
**renter** 97:16,16
**renters** 86:20 91:8,15,17,19 94:5 97:23 126:18
**renting** 15:13 47:2 126:15
**rents** 50:2
**Rep** 2:21,22
**repair** 33:24 52:12
**repeat** 39:3 104:11 111:10 112:18
**repeating** 121:23
**rephrase** 5:9
**reply** 41:6 50:3 73:6,10
**report** 4:25 6:4 7:25 9:25 11:25 12:3 19:19,21 19:23 21:1,17,20 24:17 29:11 30:20 30:25 31:12,17 32:1 35:24 37:24 41:5,7 41:8,9 42:6,8 43:23 45:25 46:23 47:11 47:15,19 50:3 51:20 53:2,8,21 54:14 55:6,14 56:15,25 64:6,13 66:20 67:4 67:5 69:2 70:3 72:24 73:5,5,10 87:5,25 92:25 93:12 94:13 105:10 110:18 112:19,24 113:2,5,9,13,13 115:10,14 118:24 119:12 120:17 122:21 125:6 132:10
**Reporter** 1:20 4:2,5 85:24 86:3 103:23 104:23 137:20,24 138:1,3,9 138:12,15,19 141:1 141:3,22
**reports** 22:2 88:1
**represent** 4:21
**representation** 101:2
**representatives** 26:20
**represented** 55:12 57:15
**represents** 81:12 110:17
**request** 22:17
**requesting** 65:12
**requests** 129:22
**require** 81:14
**required** 97:11
**requirement** 51:5,8,15,23,24 53:1 70:15 106:23,25 114:1,2 130:4 133:4
**requirements** 52:7
**research** 22:3 57:3,9
**residence** 15:11
**residential** 24:3,19,19 25:9,11 25:14 33:25 51:12 52:11 61:14 69:11 70:4 89:15 108:16 108:17 110:23 130:7
**residents** 34:5 99:6 117:2,6 118:6 121:2 123:8
**resolution** 23:5 60:24,25 110:21 110:24,25 128:4
**resources** 30:15,17 38:6 45:1 92:25 93:25 94:8,11 94:18 126:21
**respect** 17:8 29:19 45:9 91:2 105:4 122:3 123:16 126:4 136:24
**respond** 114:23
**responded** 118:8 124:7
**response** 110:9 114:17 122:10
**responses** 99:6 118:23
**responsible** 59:6
**responsive** 118:5
**rest** 18:23 94:18 121:3
**restate** 5:9 103:25 104:5
**rested** 130:4
**restricted** 105:9
**restrictions** 30:25 103:17 127:17 128:12,13 135:14
**restrictive** 31:3,5,6 115:6
**resulted** 31:7
**results** 7:23
**retained** 17:11,24,25,25 19:11 19:15
**return** 79:10 80:10 84:17
**revening** 106:4
**revenue** 75:7,8 115:23,25,25 129:14
**reversed** 25:15
**review** 10:8 19:20 21:19,22 23:1,4,7,10,18 24:9 25:4 26:20 72:17,25 73:4 87:13 137:7
**reviewed** 22:23 26:6,8,24 28:15 29:24 38:23 40:19 72:19 74:12 81:17
**reviewing** 71:21
**revoke** 55:23 58:16
**rezone** 78:10
**rezoned** 108:15
**rezoning** 23:11 51:13 52:10 54:3
**re-ask** 66:1
**rights** 12:20
**right-hand** 60:8,12
**ring** 27:12 28:2,4
**Ringle** 65:18,22,24 66:6 135:3,4
**RJ**

2:21 26:21 73:8,16 73:18,18 74:2
**road**
50:15
**Robert**
28:14 73:19,21
**robust**
30:2,7 132:15,19
**Rockville**
68:12
**role**
71:21 111:5
**rolls**
66:11
**Ron**
2:22 26:16,21 27:7 27:15
**roughly**
16:6 47:25
**routine**
66:23
**routinely**
33:20 52:8,10
**rubber**
50:15
**rules**
5:6 53:13 54:15 56:7 57:17 58:7 97:24
**run**
39:13 119:22 121:10
**running**
70:15 89:9
**rural**
34:1 67:11
**R10**
53:1,3 55:24 57:19 62:17 63:14 103:1,8 128:4 133:16,17,18 133:21,22 135:9,11 135:12,14,16,20 136:3,20,23,25
**R4**
33:5,10,13 50:19 51:4,8,9,25 52:3,15 61:19 62:8,8,13,17 63:12 76:23,25 77:5 77:10 81:11,18,18 102:16 105:7 110:2 113:25 116:23 130:16 131:13,16 135:25 136:1

## S

**S**
3:13 4:1
**Sabatino**
26:16,21,21,21 73:8 73:16
**Sabatino's**
72:17 131:13
**SABITONO**
2:21,22
**safety**
87:6 120:10,11,13 121:16,20,20,25 122:1,1,5,6,9,11,13 122:16,23 123:3,15 124:22 132:25 133:5,9,11 134:10 134:12,17
**said**
10:12 16:13 25:16 31:13 33:7,9 35:1 39:10 47:9 49:18 50:11 52:12 62:2,14 69:7 70:23 75:13,24 76:21,21 77:4,9 79:6,14,15 80:4,7 80:14,14,15,22 81:17 82:10 83:22 84:2,21 87:21 89:12 100:12 101:9,13,16 102:7,7,21 104:8 105:1 107:11,22 110:12 111:10 113:22,25 114:24 115:9 116:9,19,24 117:13,25 118:11 118:21 119:7,15 121:4 124:13 125:5 129:13,25 130:2,17 132:10 133:22 134:13 136:7,13
**sales**
15:2
**same**
29:3,4,6 35:16 41:12 41:13,16,18 50:5 88:9 143:5
**satisfactory**
25:12
**saw**
23:22 63:3 69:23 99:1,2 112:4,6 116:18 134:15
**say**
5:11 7:3,17 11:10 18:6 19:23 25:25 36:12,20 43:8 44:24 45:14 46:2,8,9,17 48:23 50:6 51:3 57:11,22,23,23 58:1 58:22 61:7 62:2,14 64:18 67:8 73:21 74:3 76:6,25 83:16 85:11 93:9 99:3 100:14 101:12,16 102:12,14 103:3 105:20 110:16 111:13 112:1 115:3 116:24 117:5 121:25 124:10 128:15 129:23 134:19 136:13
**saying**
25:8 28:21 31:23 34:14 36:5,14,21,22 37:1 56:1,3 57:19 58:20 63:7 70:17 73:22 114:11 118:5 120:13 122:1 123:11,21 124:11 125:7 126:2,3,3,5 131:15
**says**
36:16 60:9,13 62:13 76:19 130:11
**Schedule**
11:22
**scheduled**
19:9
**scholar**
117:16 120:8
**scholars**
114:21
**scholarship**
31:19 35:14 42:6,7 120:14,17,25 121:3 121:4,15,24 124:18
**scholarships**
118:5
**school**
9:2 10:25 66:8 68:17 68:17 135:7
**schools**
87:6 133:18,22
**science**
6:12,14,18,25 7:1,4
**scores**
111:3
**screen**
7:10 59:18
**screened**
96:20
**screening**
95:3,16 97:22
**scribble**
129:3
**scrolled**
60:3
**scrolling**
59:21,25
**scrutinize**
95:25
**scrutinized**
95:14
**scrutinizing**
98:6
**sec**
66:1 128:23 131:24
**second**
33:12 51:19 75:25 94:5 114:3 121:24 128:20 133:15

**secondly**
32:9,16 66:25
**section**
18:5 19:22 72:1 98:2 99:9 104:24
**see**
14:9 23:21 24:10 28:21 37:22 50:2 59:21,23,24 60:9,13 60:14,20,21 61:19 61:22,22,25 62:4,8 62:8,18 63:7,9,12 63:20 75:3 81:4,4 103:5 108:24 112:5 112:9 119:24 123:15 125:19 129:24 130:23 131:10,10 133:2,24 134:18,23 136:20
**seeing**
110:22,22
**seeking**
98:11
**seem**
51:1 54:16 99:7
**seemed**
56:9 92:21
**seems**
13:4 35:8 93:4,20
**seen**
59:8 80:24 81:1,10 120:2
**segregated**
32:19 42:10
**selling**
14:7,22
**senior**
6:13 26:16
**sense**
25:4 26:2,5 42:1 81:5 81:8 120:15 121:2 131:19
**senses**
34:25
**sentence**
104:24
**separate**
11:19 23:22 29:24 43:15
**separated**
29:22 31:14
**separates**
43:13
**sequence**
103:18 105:3
**serious**
59:8 103:19
**served**
64:18,19,24 65:1,9
**services**
1:24 42:12
**serving**
11:23
**set**
11:20
**setting**
34:2
**seven**
50:23
**several**
13:24 75:10 114:13
**sham**
53:5 55:6 56:13 57:11,12,14 58:23 107:6 116:25
**share**
59:18
**sharing**
63:19
**she**
104:17,17 107:15,18 107:19,19,21,22,24 113:22 114:24 121:15,24,25 122:16,16
**sheer**
84:19,25
**Sheet**
142:1 143:8
**she's**
107:20 122:6,6
**shop**
33:23,24 52:11,12 70:5,5 108:14
**short**
123:23
**should**
8:13 15:16 55:23 58:10,12,13 71:22 79:15 102:21 106:23,25,25 107:9 107:11 115:7 124:12 137:10
**shouldn't**
64:18 116:23
**show**
34:22 45:23 61:17 80:9 94:19 105:10 111:2 123:10
**showed**
38:25 78:18 93:1 94:6 136:8
**showing**
94:2,8 119:24 127:19
**shows**
40:16 66:21 100:22
**sic**
54:19 119:7
**side**
13:19 25:5 26:19 31:12,13 89:3
**sidestepping**
115:1
**signage**
123:16
**signed**
108:14 140:12
**significant**
30:2,11 82:23 93:2 95:20
**similar**
13:10
**simply**
7:19
**since**
10:3,15 15:5,8,9 49:15 101:19
**single**
45:20 46:8 47:9,22
**single-family**
15:19 33:20 47:3 52:9 83:5 100:12 114:8 115:11 116:1 127:20
**singular**
100:8 124:6
**sir**
137:4
**sit**
8:5,5 58:9
**situation**
30:6,7 32:6 59:12 78:13 100:22 123:12
**situations**
78:1
**six**
48:21,23,24 49:1
**skin**
42:21
**slightly**
87:22
**slowly**
5:12
**smaller**
62:5
**snapshot**
41:10,11
**social**
6:14,24 7:1,4 90:11
**socio**
43:3
**socioeconomic**
32:20 42:2,23 43:4 106:8
**sold**
15:3,9 108:20
**solely**
21:9 94:22,22
**some**
6:17 11:14 15:8,9 16:8,8,8 17:22 20:8 34:22 38:23,23 39:22 43:4 53:4

54:18 56:25 59:8 60:11 62:24 73:23 82:22 86:12 97:6 100:5 103:8 109:8 110:8 114:11 123:2 123:16 133:9,15,16
**somebody** 21:11 95:6 124:9
**somehow** 58:22
**someone** 79:12
**something** 9:20 22:14,15 28:18 37:10 47:13 50:23 52:5 54:25 62:1 63:5 65:23 83:9 84:9 88:7 98:24 108:21 111:2 114:24 117:21 134:13
**Sometime** 19:17
**somewhat** 34:16 67:7
**somewhere** 40:8,10 49:6 50:12 67:19 69:4,5,6
**sorry** 9:15 39:12 61:10 66:2 72:4 75:25 96:19 103:23 125:12 138:3
**sort** 132:11
**sound** 40:14 50:20
**sounds** 11:6 85:20
**sources** 19:23 31:1 42:16 57:7 98:21 102:24 106:5
**sourest** 13:13
**South** 8:23
**SOUTHERN** 1:2
**so-called** 53:21
**space** 83:25
**speak** 5:12 28:22
**speaker** 11:15
**speaking** 11:18 19:1 71:9
**specialty** 6:23
**specific** 15:22,24 18:12 65:22 88:5 113:21 122:25 123:1
**specifically** 40:19 92:25 100:20 101:17 116:7 128:12 132:20
**speculate** 48:12 54:13 96:16 105:18
**speculating** 58:16
**speculation** 48:23 77:7
**spend** 29:11
**spent** 21:25
**Square** 2:5
**standard** 19:23 45:22 137:24 138:1
**standpoint** 44:22 70:10
**start** 11:24 14:11 34:12 36:1 53:15 56:16
**started** 59:15
**starter** 65:19 88:2
**starting** 32:13 34:24
**state** 2:15 5:22 11:14 12:11 17:7 53:5,14 54:19,20 58:6 87:18 140:3,7,17
**stated** 67:4 78:11 141:7
**statement** 34:25 35:17 36:2,15 73:16 103:6 107:13 135:1,2
**statements** 34:5,6,7 35:7,11,12 36:24 73:16 80:20 103:21,22 105:5 109:9
**States** 1:1 39:15 40:12 46:5
**statistical** 30:20 92:13 93:16 132:16,19
**statistically** 93:2
**statistics** 25:2 65:17 92:11 93:23 127:18
**status** 41:25 42:23 43:4
**steadily** 40:25
**steering** 12:13 13:14
**step** 47:7 56:19
**stick** 28:12 111:15
**still** 7:8,11 63:20 77:6 93:13 130:10 137:17,21
**stock** 107:18
**stop** 33:17 39:20 63:19 104:18
**stopped** 104:17
**stopping** 107:3
**store** 11:4
**straight** 51:13
**strategy** 106:6
**strategy-related** 20:11
**Street** 2:15
**stretch** 18:3
**strict** 56:8
**strictly** 51:7
**strike** 113:6
**striking** 114:16
**structures** 84:11
**stuck** 33:6,10,13 51:18 76:23 105:6 106:7 114:1 130:3
**student** 21:12
**students** 21:16
**studied** 42:15 120:16 122:21
**studies** 86:11 126:8,11
**subject** 38:1,7
**submits** 76:15
**submitted**

23:19 72:9,11
**subpoints** 113:15
**Subscribed** 143:13
**subsidies** 97:2,6,11,15
**subsidize** 97:23
**subsidized** 97:2
**substance** 21:9,17 143:7
**substantial** 45:23 46:10 93:3 94:3,16 96:13
**substantially** 33:8 38:5 44:23 73:24 88:1 94:3,6
**substantive** 21:7 103:20 105:4 109:21 110:2,5 129:24
**substantively** 55:9,12 116:24
**subtle** 124:24
**subtleties** 109:11
**suburb** 67:13
**suburban** 67:13 103:17
**success** 43:17,18 44:10,13,16
**such** 30:16 93:22 112:23 118:5
**sufficient** 133:19
**suggest** 98:11 137:8
**suggesting** 107:8 124:23
**suitable** 78:23 103:5 133:25
135:14
**Suite** 2:5,10,15
**summarize** 104:6
**summary** 28:17
**Sunbury** 66:17
**support** 65:14 112:16 127:12 133:13
**supported** 79:14
**supporting** 80:24
**supports** 132:16
**supposed** 34:1 56:10
**supposedly** 53:3 128:1
**Supreme** 12:1
**sure** 8:25 12:17 13:13,22 17:14,21 22:19 34:11 39:5 49:24 53:13 54:17 57:4 58:15 60:2 64:4 67:18 68:8 69:1 83:24 85:15 87:16 88:24 90:19 95:11 96:1 97:13 98:3 100:8 121:13 122:18 131:19 132:3 133:1 134:25 136:5,19
**surprising** 20:1
**surrounding** 127:4
**survey** 7:24 20:3
**susceptible** 124:15
**sustains** 129:16
**Sutton** 28:6
**swear** 4:3
**switch** 86:5
**switched** 6:12
**sworn** 4:10 140:9 141:9 143:13
**synergy** 24:18 26:3 69:9

**T**

**T** 3:13
**table** 60:11
**take** 4:23,25 6:5 8:7 9:5 20:7 26:25 48:15 53:14 54:17 58:15 62:10,15,19 63:20 71:10,13 77:17 85:3 85:5,5,10,14 112:20 128:21 137:23 138:7
**taken** 1:17 4:25 86:1 141:6 142:5
**takes** 67:24
**taking** 17:2
**talk** 6:6 22:22 36:9 37:3 38:22 73:10 82:22 85:1 106:5 123:1 133:15
**talked** 43:5 75:5,6 83:1 110:4,9 114:10 118:24 119:3
**talking** 23:14 35:12 37:2 39:14,15,21 42:19 42:20,21 57:1 61:8 66:8 68:23 84:22 93:10 95:21 116:12 117:17 119:17,21 119:22 120:22 122:6,7 127:15 129:9 134:15 135:7
**talks** 107:25
**taught** 8:14
**tax** 75:7 83:3 115:23,24 115:25
**taxes** 94:17 96:5
**teach** 9:5
**tear** 95:25
**technical** 13:6
**tell** 5:8 38:18 61:15 73:19 108:5
**telling** 41:23 43:2 63:12
**ten** 54:23 55:24 78:19 79:15 80:23 102:21 131:2
**tenant** 95:3
**tenants** 89:19,21
**tend** 9:12 100:15 101:18
**tentative** 84:1
**ten-minute** 85:4
**ten-unit** 110:14,23

**term**
10:4 44:18 91:25 93:10 117:7
**terms**
38:1,6 44:25 55:12 81:12 83:2 90:10 105:3 107:17,21 137:6
**testified**
4:10 12:7,10 52:17 53:15 100:10 136:16
**testify**
12:4 19:9 141:9
**testimonial**
65:17
**testimony**
12:23 13:11,21,25 16:19,24,25 17:1 25:17 28:16,18,19 28:23 50:10,11 54:15 56:16 63:3,7 63:10 72:21 73:7,15 75:3 77:13 80:1,3,7 80:18 81:1,5,15,15 84:18 95:18 103:6 105:24 107:18 115:20 116:2,14 117:9,11 131:5,6 132:8 133:2,3 135:11,15
**than**
5:4 11:3,12 16:9 22:16 37:23 38:6 41:15 48:4 63:16 67:1 70:23 81:25 85:14 91:16 92:23 96:7 97:7 100:11 101:1,3 112:11 114:25 121:25 124:15
**thank**
4:14,15 26:13 131:23 134:2 137:4,14,15 137:16
**their**
4:24 10:4,23 23:8,10 26:22 33:1 34:2 38:4 41:14,24,25 42:13,13,14,23 49:21 50:2 51:8 52:15 53:13 56:16 57:17 58:2,7 59:12 60:24 61:3,13 63:13 63:15 65:12 69:14 72:11 79:10,17 80:18 82:12 84:2 89:4,19,21 90:3,10 90:21 91:20 95:11 95:16,17 96:9,18,20 96:20,23 98:21,25 102:23 103:17,17 105:13,17 106:11 106:12 107:1,4,12 111:18,20 114:17 117:14 125:23,24 126:1,6 128:25 131:14 132:21 133:9,11
**them**
12:15 14:22 16:8 26:13 32:19 34:15 43:13 44:12 49:5 58:18 64:24 71:1 77:25 82:1 83:18,19 90:7 91:11 92:20 94:11 95:19 96:16 96:17,19 98:6 105:15,16 110:9 112:20 115:4 117:4 124:12 125:22
**themselves**
72:13 103:22 115:14
**then**
6:20 10:17 12:2 15:8 17:10 22:23,24 24:4 26:21 29:15 39:1 42:13,17 44:20 47:7 69:10 70:15 76:12 86:12 87:11 94:16 97:17 105:19 106:12 107:22 118:22 119:21 128:6 131:3 133:14 138:15
**thereabouts**
10:16
**therefore**
38:7
**therein**
143:6
**thereof**
141:17
**there'd**
96:12
**there's**
25:8 29:9 36:1,8,13 36:14,19 43:22 45:17 48:10 58:24 61:19 68:21 70:8,18 76:1 92:20 93:13 95:23 102:24 107:25 108:10,11 108:13 112:3 123:19 125:16 132:15,19
**these**
15:18,23 16:3 28:12 30:19 37:25 42:10 52:19 53:11 67:16 75:14 79:6,19 81:17 82:17 87:3 96:10 97:1 99:8 106:7 107:4 115:18 118:3 118:22 120:16,20 129:17
**they'll**
136:4
**they're**
15:19 29:22 31:13 34:15,17 35:24 41:17 44:5 46:25 48:4 62:12 63:12 68:20 88:19,21,24 89:20 90:18,21 99:19 100:8 111:15 119:20 120:22 125:7,21,24 126:5
**they've**
34:22 82:6 95:13
**thing**
23:24 73:15 74:2 87:24 98:2 104:17 113:5,21 116:10,11 116:14 127:3,5,19 137:5
**things**
9:12 13:20 20:3,8 22:25 23:25 31:2 58:17 59:15 64:12 64:17,24 70:24 73:14,17,23 82:21 83:20,24 95:10 98:13 103:16 109:7 112:20 113:24 115:8,8 120:16 133:24
**think**
5:5 6:4 13:14 14:12 15:13 16:8 19:9 22:16 25:15,15 27:22,24 28:9,11 38:15 45:15,17 47:9 47:10,11,13,25 49:6 49:7,10,11,18 50:3 56:22 57:13 58:12 61:5,15 62:22 64:3 65:25 68:21 70:8,16 70:25 76:1 84:17 94:21 97:8 100:17 104:6,19,21 105:15 105:17,24 109:1,2,8 111:20 116:9 118:14 119:6 124:17 127:1 128:22 130:22 132:1,10,24 133:14 134:11,12,25 135:1 135:9,11 138:2
**Third**
114:7
**third-party**
12:2
**thoroughly**

111:11
**those**
11:16 17:9 22:15 25:16 26:18 27:3,16 34:6 39:2,17,22 43:11,25,25 47:13 47:14,17,17 48:2 50:1 63:8 65:6,15 66:17 69:12 87:5,7 87:9 88:4 99:6,13 113:15 115:7 119:10 121:1 122:9 122:16 128:8,13 133:17,18
**though**
32:8 56:5 57:15 70:2 83:18 87:8 96:15 110:20 118:12 135:5
**thought**
39:14 118:15
**thoughts**
129:1
**three**
6:11 22:8 26:14 27:16 53:8,18 63:16 63:16 113:19 119:10 129:25
**three-second**
104:20
**threshold**
96:9
**through**
6:5 10:7 20:7 22:24 22:25 26:25 29:10 56:22 74:18 97:21 99:14 135:6
**throughout**
127:24
**throw**
124:9
**thrown**
124:12
**thus**
22:1
**tie**
42:16
**tied**
32:17,24 38:4 42:5,7 42:13 47:4 51:8 75:10 132:20
**ties**
30:13,18,20 31:7 42:17 46:18 93:17 133:7
**time**
4:5 9:12 12:11 15:6 16:8 33:14 40:25 46:23 51:5,16 59:1 64:4 78:14 82:6 85:16 97:5 98:20 108:24 118:20,22 122:5 127:19 128:21,24 131:22 133:12 137:4,15 138:1,20 141:7,12
**times**
9:13 13:24 16:17,18 16:25 17:23 19:1 48:22,23,24
**tinged**
114:16
**title**
9:21 10:7
**TNR**
76:14
**today**
4:23
**together**
43:11,15,16 105:10
**told**
47:25 136:14
**too**
13:2,8 60:3 116:10 118:6
**took**
15:2 53:6
**top**
52:6 56:22 61:20
**topics**
12:8,9
**total**
30:13
**totally**
29:22 32:14 115:1 117:22 118:8
**touched**
120:18
**toward**
56:19
**towards**
76:2 133:15
**town**
127:19
**townhomes**
15:19 107:23
**townhouses**
47:3
**townships**
66:12
**Township's**
103:11
**track**
56:20,24 59:11
**traffic**
34:1 52:13 68:11 123:7
**transcript**
109:22 110:11 129:25 135:1 137:10,21 138:17 141:8 142:7
**transcription**
143:5
**transcripts**
20:2 26:7,8,15 49:9 122:22 123:13 134:18,20,22
**transit**
115:22
**travel**
68:7
**traverse**
67:25
**tremendously**
18:24
**trends**
7:20
**trial**
12:12
**tried**
133:3
**triggers**
121:20
**true**
33:11 35:10 48:14,14 68:8 70:12 76:24 88:20 93:21 95:12 97:9 120:3 141:11
**trustee**
23:8 27:1 64:20 79:13 102:20 115:3 116:4 122:15 125:3 125:3,3 130:17
**trustees**
26:11 27:16 33:15 51:6,17 52:22 55:17 59:5 107:21 111:15 115:18,24 118:4 120:22 129:25 133:3
**truth**
141:9,9,10
**try**
47:14 50:25 61:25 70:25 72:12
**trying**
19:20 45:10 60:5 62:6 63:22 72:16 93:19 100:18 118:8 129:2 138:5
**turned**
131:7
**turning**
114:10
**twenty-year**
16:10
**two**
13:3 18:9 24:2 26:3 27:2,5 29:23 32:3 34:8 38:15 43:25 55:10 57:16 66:21 69:9 71:8 73:16 85:17 98:13 107:21

118:2 128:7 132:11 133:12
**TWP**
60:13
**type**
14:3 67:10
**typed**
141:11
**types**
74:5 112:14 113:23
**typical**
74:5
**typically**
69:4
**T&R**
1:4 4:24 19:12 23:19 24:2 26:20 31:8 38:9,14 49:13 50:14 51:17 55:7,13 56:9 61:6,8,13 63:9 65:12 66:22 72:10 76:2 77:3,7,13 78:20 79:18 81:20 82:5 83:22 84:6 88:15,18 90:16 95:3 95:15 96:9 97:7,10 97:20 98:11,23 102:3,18 105:19,23 106:10 107:23 110:14 114:9 129:22 133:25 135:15 136:1,4 137:1 142:2
**T&R's**
23:8 24:23 33:15 49:16 81:19 82:3 122:10 128:6

**U**

**unavailability**
30:13
**unbelievably**
118:23
**unconcerned**
54:16
**uncontradicted**
102:14
**under**
16:9 58:7
**undergrad**
6:7,8
**undermined**
125:19
**underrepresented**
38:3 41:17
**understand**
5:6,8 6:3,20 16:20 21:18 23:25 24:1,2 25:8,20 34:14 36:21 37:7 41:22 45:10 57:4 64:10 71:23 74:10 79:5 86:9 91:6 123:20
**understanding**
18:14 49:12,15 52:14 57:18 58:10,20 63:17 67:10 72:15 74:23,24 75:1,22 77:5 80:11 82:16 88:23 96:25 98:19 107:7 115:4 117:12 121:3
**understandings**
120:16
**understood**
5:21 24:8 49:2 51:25
**undertaken**
77:11
**undeveloped**
74:18,21
**unflattered**
53:11
**unfrozen**
99:23
**unique**
66:23 98:23
**unit**
63:1
**United**
1:1 39:15 40:12 46:5
**units**
24:4 30:13 46:24 50:18,19 51:3,12 54:23 55:24 57:19 63:4,15 75:10,22 76:20 77:11 78:16 78:19 79:20 80:16 81:5,6,13,14,25 82:6 83:15,16 84:15 84:20,22,24 87:20 87:21 100:24 102:5 102:11 105:14 109:17,22 130:9,13 130:24 131:2,8
**universally**
79:15
**university**
6:9 8:6,16 9:17,21,23 10:7,9,21,22 11:1 11:17 18:16,23
**unless**
23:21 108:21
**unpack**
34:10
**unpredictably**
5:14
**unreasonable**
68:7 89:16
**unrefuted**
79:25 115:20 116:3 130:15
**unsafe**
119:7 123:12
**until**
122:2
**up**
6:17 7:10 8:18,22,23 9:7,20 10:9 11:5,20 13:4 15:17 19:2 25:1 31:10 40:13 45:3 46:24 47:7 58:6 59:14 60:3,10 60:11 61:20 62:8 67:8,21 68:16 72:25 74:19 76:25 83:20 87:22 88:1,8,9 95:18 98:3,24 100:1 103:18 111:23 122:1,2,17 129:15 132:10 134:11,13 135:21 136:2,20,22
**updated**
60:21
**upkeep**
94:17
**upon**
78:3,5 83:17 99:9 100:22
**us**
5:20 9:24 38:24,25 39:10,12,14 40:1,7 110:12 119:5
**use**
44:13,18 45:22 52:2 52:3 69:20 103:17 103:17 106:3,4
**used**
19:23 31:25 93:10 117:7 124:14 127:24 128:11
**uses**
69:19 70:7
**using**
34:24 127:16
**usually**
137:12
**utilities**
133:19
**utilized**
103:13 127:23 133:17
**utterly**
56:9

**V**

**v**
1:6 12:1 142:2
**vacant**
53:11 56:11 58:9
**vacation**
15:11
**value**
88:6 101:1
**variance**

34:3 52:8 114:9
**variances**
23:13 33:18,19,20,23 114:8 115:11 130:6
**varies**
18:24 19:4
**various**
23:15 83:4
**vary**
16:5
**vastly**
55:7 86:19,19 100:11 101:2 126:16
**verified**
103:3 110:16
**verify**
136:7,14
**versus**
16:19 17:25 43:14 44:21 94:5
**very**
7:19 10:7 24:9 30:2 30:11 31:11,15 39:22 42:6 55:5 58:13 59:8 65:21 71:2,3 73:23 78:10 82:22 83:23,25 87:17 90:17 93:15 94:16 96:13 97:7 99:7,14 100:23 104:25 110:25 111:22 114:20 116:14 122:7 124:22 126:13 128:12 129:13 132:19,20
**vet**
59:2,3,4
**vetted**
59:7
**vetting**
59:10
**via**
1:17
**vibrant**
83:3
**vicinity**
22:15
**videoconference**
1:18
**view**
43:13 45:12 100:19 125:14
**viewed**
34:15
**views**
118:6
**Villa**
6:2
**Vincent**
29:2
**violated**
56:7,15,16
**violates**
54:14
**violation**
53:6,17
**virtually**
100:24
**vote**
115:7
**voting**
12:20
**voucher**
97:18
**vouchers**
97:17 98:2

**W**

**Wait**
75:25
**waive**
137:7,9,9,13
**waiver**
137:14
**walkability**
115:23
**want**
5:15 11:2 20:11 29:14 30:23 35:1,2 36:9 41:7,8 45:22 47:14 52:2,24 59:4 60:2 66:1 69:5,5 71:10,13 76:19 78:11 80:22 85:4,5 89:6,10,11 92:20 93:12 102:9,10,14 103:5 106:17 109:13 110:8 111:10,20 112:14 113:2,8,10,23 116:11 121:22 125:19 132:10 138:16
**wanted**
35:25 78:23 81:20 84:6 102:17 109:16 128:10 132:25 133:25
**War**
114:25
**warehouse**
24:6 25:3 50:12
**warehousing**
69:15,16,21
**Warsaw**
114:24 117:21
**Washington**
9:17 67:24
**wasn't**
31:5 36:12 49:14 53:21 54:7 57:21 89:1 95:19 99:4 107:3 110:5,17 114:2 118:16 124:6 124:21 130:4 131:17 133:1,21
**water**
108:15
**watertight**
29:22 31:14
**way**
10:9 16:23 31:14 35:9,16 40:12 41:16 41:18 48:4 58:24,25 70:22 71:9 73:14 74:24 76:6 77:1 79:18 85:12 110:1 113:18 114:4 118:7 120:18 123:19 125:2 128:17 135:18
**ways**
35:15
**we**
5:19 13:10 14:6,24 15:1,1,2,2,3,10,13 15:24 16:17,18 17:9 17:23 22:17,23,24 29:8,11,15 30:22 31:18,23 36:7,9,16 39:20 40:8,9,10 47:17 59:3 60:6,15 61:8 62:5,8 65:22 65:25 67:8,21 71:7 73:25 74:1 75:13 76:19,22,23 78:10 78:18 79:15 80:22 85:3,10,11,13,16 93:15,22 95:1 97:4 98:3 99:5,24 100:5 100:18 102:9,21 104:19,21 106:14 106:14,19 107:14 115:24 118:13 119:8 123:17 131:10 135:6
**wealth**
30:18 38:6 41:14
**website**
59:13
**weigh**
48:16
**weight**
48:19
**Weiler**
28:14 73:19,21 77:8 79:5 83:1
**well**
4:5 6:3 13:22 18:7 26:2 32:1 33:3 44:8 45:2 46:15 47:2 48:12 49:10,14 54:15 57:6,13,25

54:15 57:6,13,25 58:12 59:11 61:19 62:4,8,11,20,25 66:16 70:23 71:7 72:16 77:7 78:18 80:5,24 83:11 85:13 87:9 90:10 91:2 94:18 97:8,10 99:3 102:9 108:7 109:1 113:7 114:13 117:3 118:2,14 119:12 120:1 121:6 124:2 129:15 131:1 136:4
**went**
6:8,20,22 12:12 56:21 77:4 87:21 88:1,9 93:14,15 118:13 128:17 135:6
**were**
9:6 10:20 15:13 16:9 18:10 19:14 20:12 23:19,21 25:4 30:5 31:3 33:5,6,10,13 39:14,17 47:11 48:14,21 49:4,24 50:17 51:18 53:11 55:2,20 56:5,8,11 58:3 62:25 63:8 65:11 69:16 73:15 76:17 78:13 82:11 82:17,17,19,20,23 83:25 86:25 88:2 91:6 93:24 105:6,20 105:22 106:10,12 107:12 109:6,14 111:19,20 113:24 114:1 115:13 117:4 120:21 121:8 122:14,15,23 126:3 126:11 127:19,23 129:19 132:13,13 132:24 133:2,11 135:10 136:5
**weren't**
56:21,23 107:16
122:9,9,13 126:3
**WESP**
2:9
**Westminster**
14:19
**we'd**
81:13
**we'll**
5:20 55:21 109:8 138:7
**we're**
5:17 12:22 32:6,6 35:12 36:5 37:1 39:15 42:19,20,21 58:22 67:9 71:12 74:3 76:22 91:21 96:4,4,6 97:7 107:15 108:21 116:12 118:21 127:15 129:9 137:18,20
**we've**
4:24 14:5 15:8,9 77:4 98:1 99:14 119:3 134:12 135:16
**whatever**
21:12 45:22 52:6,24 70:15 88:6 97:20 121:11
**what's**
6:1 9:18 17:4 42:18 55:4 58:10 88:17 90:24 97:11 101:11 125:11,13
**when**
7:3,17 9:5,5,7,11 11:3,24 13:4 19:14 25:25 28:21 35:18 36:20 41:13 42:19 44:24 46:17 48:23 51:3 56:8 57:11 59:14 61:7 73:20,22 78:14 79:6 89:14 95:6,13,22 98:1 105:7 107:23,23 110:4 114:12
117:15 119:17 120:20 122:22,23 124:19 128:24 134:19
**where**
5:20 8:17,17 9:14,16 13:21 14:17,17 16:24,25 18:14 19:1 25:10 28:22 36:15 40:13 49:8,24 50:15 52:24 60:13,22,23 61:3,13 62:12,13,15 63:12 67:6,24 68:5 76:16 86:12 92:10 95:9 100:13,25 101:17 104:17,17 105:1 107:4 108:9 108:15 109:5,5,6 114:4 119:7 133:3 135:10,16
**whereas**
44:11
**Whereupon**
138:22,24
**whether**
13:14 17:24 25:21 48:9 59:11 77:21 79:16 81:24 82:13 83:9 86:13 94:7 102:12 103:4 106:22 111:18 117:16 133:17,18 136:21
**which**
6:13 11:13 17:6 24:9 30:22,25 31:19 32:14,24 35:10,14 41:24 42:5,17 46:19 46:20 52:2,12,19 62:12 66:9 67:14 71:10 76:23 77:14 78:16 79:19 81:5 84:12 86:17 94:10 99:8 106:6 108:19 111:10,11,12,22 113:13 118:7
120:17 121:4 130:4 132:20 133:7,16 135:8
**while**
8:14 10:25 55:6 68:13 69:7 92:14 114:7 133:20 137:20
**white**
37:18 38:16 39:1,1,5 39:6,21,21,25 40:3 40:7,12,17,24 41:15 90:8 119:20,25 125:18
**Whites**
30:15 38:6 46:21 93:13 94:1,2,9,19 101:3
**who**
10:20 17:10,11,13 19:11 20:24 25:16 26:25 28:4,15 30:15 35:8 42:24 46:21 56:6,8 65:20,24 66:6 74:4 80:22 84:3 86:24 87:9 91:15,16 95:6,17,24 101:7,10 102:21 106:7 110:8 119:13 125:17 131:7
**whoever**
17:19
**whole**
19:22 33:18 35:4,4 88:11 104:16 112:19 113:5,12 114:13 118:2,9 124:18 131:5 141:9
**whom**
108:4
**whose**
50:12 86:15,16
**who's**
16:21 79:12 90:6
**why**
31:25 32:25 35:20,25

37:20 41:3 44:2 46:12,13 54:10 55:11 58:13,14 59:3 66:25 69:7 78:9 87:3 109:16,21 110:2 115:7 116:22 117:12 118:17 125:21 137:10
**wife**
14:5 15:22,23 16:2 16:14
**will**
4:2 132:1 138:16
**windfall**
91:12
**within**
75:10 93:18 113:15 114:14
**without**
30:22 33:1
**witness**
1:18 3:4 4:3,11 7:6,9 7:13 8:25 11:13,19 11:24 12:8,15 13:1 13:5 19:2 39:13,17 39:20 64:9 66:3 71:7,12,16 76:10 85:7,10,13,16,19,22 89:23,25 90:10 103:24 104:1,5,9,11 104:16 105:2 113:12 122:20 128:21 129:4,7 131:23 136:17 137:12,16,19 138:16,22
**witnesses**
79:6
**won't**
71:7 138:13
**word**
44:13 62:10,15,19 106:3,4 118:11 123:15,22,23,24,24 124:10
**words**
32:22 36:16
**work**
11:20 17:18,19 21:13 25:11,16 68:7 69:5 69:6 85:12 95:10 110:12
**worked**
10:22 11:3,4 20:20 20:23 72:11
**workers**
24:20,22 25:3 50:12
**working**
69:12 70:19,20
**works**
72:10 85:19
**world**
16:20 114:25
**worried**
99:7 117:15
**worries**
119:17
**worry**
102:23
**Worthington**
100:7 101:5,8,23
**wouldn't**
20:19 48:2 52:4 79:22 90:23 91:7 102:22 106:12,14 106:14 115:3 116:11 125:22 128:15 131:1
**writer**
11:15
**writing**
90:6
**writings**
31:20
**written**
42:16 55:16
**wrong**
50:21 109:24
**WWW.MAGNAL...**
1:25

**X**

**X**
3:2,13

**Y**

**yeah**
7:9 8:22,25 21:6 22:21 24:7 26:23 27:25 36:20,23 41:9 41:11 43:1 44:19 45:17 46:8,14 47:20 59:25 60:1,5,5,12 60:12 62:3,4 64:10 66:4 68:1,9,12 71:5 71:6,6,7,9 73:3 76:3 76:3,5,9,11 89:25 99:23 104:22 108:23 113:8,11 118:19 120:1 129:2 137:12,23,25 138:2 138:7,10,13,14
**year**
6:13 19:4 53:16 56:17
**years**
6:11 9:11 13:15,24 14:6 18:2 35:6 53:9 53:18 56:10 58:9 107:4 114:25
**yes**
5:2 6:8,22 7:13,19 17:3 19:18 23:3,6,9 23:12,14,15,16,17 24:14 27:8,17 29:19 31:23 39:16 43:9,23 44:4 48:22 49:16 50:10 57:13 60:14 60:22 61:21,24 63:3 63:7,9 64:8 66:14 68:14 69:17 70:12 70:14,22 78:9,21 79:8 81:11 82:22 85:19 87:19 88:24 104:8,9 108:12 109:4 112:12 117:4 117:11 118:13,17 119:1 123:1 126:10 133:6
**yet**
33:14 54:11,23
**York**
8:19
**young**
135:3
**yours**
10:5
**yourself**
21:2 74:11
**you'd**
70:7 77:25 92:7 94:21 95:5 98:8 111:2 112:6
**you're**
23:14 25:8,20 28:11 28:21 31:22 34:14 35:5 36:21,22 41:23 43:1 44:2 48:6,12 57:18 58:20 59:4,5 59:6 63:4,11 64:10 64:11 69:1 70:9,16 70:21 72:1 74:10,16 74:19 81:10 83:14 84:22 89:9 91:3 95:21,24 98:13 105:18 107:7 108:8 110:13 113:7 117:2 117:16 119:17 120:4,19 121:6,11 123:21 125:7,9 138:4
**you've**
4:23,25 11:20 12:7 13:21 16:24 17:24 20:8 36:10 60:3 64:18,19,24 68:21 71:2 81:10

**Z**

**zoned**
69:15
**zones**
52:11
**zoning**

23:5 25:22 26:11,12 30:24 31:5,7 48:10 50:16,17,19 51:4,6 51:11 52:6,9,21,25 53:25 55:24 59:22 60:19,24,25 64:20 64:23 65:1 70:4 74:18 78:3,5 98:25 103:11,11,16 104:7 105:9,17 110:21,21 110:23 111:16 112:15 113:21 115:6,17 116:16 127:16 128:4,12,13 129:22 132:18
**zoom** 1:17 62:4,6

**$**

**$1,700** 49:6 50:7
**$10,000** 91:4,5,7,9
**$2,000** 16:5
**$3,000** 16:5
**$40,000** 50:13
**$500** 21:19,23
**$500,000** 88:3,5

**0**

**00** 60:13
**003966** 60:9,15
**04** 3:5 143:4
**07/27/2026** 141:23

**1**

**1** 67:24 141:8
**1:57** 138:20,25
**10** 56:10 63:1,4 83:10 135:19 140:19
**10:10** 4:5,6
**100** 21:5 22:3
**108-degree** 41:21
**11/23/2020** 60:21
**110** 11:14 20:19
**12:04** 85:18
**12:10** 85:17
**12:30** 5:18 71:13
**12:35** 85:18
**132** 3:6
**134** 3:5
**139** 143:4
**14** 40:9 46:9 47:25 48:7
**1770** 2:5
**180-degree** 43:22
**19** 60:21
**1940s** 117:22
**1960s** 6:9
**1967** 6:10
**1973** 6:23
**1979** 10:16
**1980** 11:25
**1980s** 12:4

**2**

**2** 18:5
**2,000** 16:9,13
**2:24-cv-3761** 1:4
**20** 13:24 14:6 40:10 46:9 48:1,8 83:16 143:14
**2001** 88:25
**2005** 14:12 15:5
**2010** 38:25 39:6,25 40:2 40:12,16 45:7
**2011** 10:3,18
**2014** 114:4 128:17
**2020** 39:1,7 40:17 45:8,19 88:2
**2023** 53:15
**2024** 53:15
**2026** 1:13 19:17 140:8,12 142:5
**2030** 140:19
**20817** 6:2
**23** 47:19 56:17
**24** 56:17
**250** 56:10 110:10
**2550** 2:15
**27** 1:13 142:5
**27th** 140:8,12
**296** 84:24

**3**

**3,000** 16:13
**3.5** 47:11,20
**3.6** 47:12,20
**3000** 82:6
**350** 110:10 116:13
**36** 123:7
**37** 123:7

**4**

**4** 50:19
**4.0** 133:4
**40** 85:18
**430** 2:10
**43017** 2:11
**43215** 2:16
**44113** 2:6
**45** 67:24 68:19 85:8
**45-minute**

68:16
**465**
2:10

**5**

**5.6**
46:25 47:1 78:15
**50**
9:11 35:6
**55**
2:5

**6**

**6.97**
50:18 51:2 65:12
76:17,18 77:16
79:18 80:1,2,11,12
81:20,22 83:10,12
105:14 106:11
130:16
**624-6221**
1:24
**65**
2:15

**7**

**7**
76:17,18 83:10
**70s**
9:9 14:16 31:21

**8**

**8**
98:2 99:9
**80**
83:16 84:22 114:25
**80,000**
22:15
**801337**
140:18
**84**
39:1,6
**866**
1:24
**89**
38:25 39:5,25 40:3,7
40:12

**9**

**90**
119:19
**9219**
6:2
**99**
119:20,24