UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

T&R PROPERTIES, INC.,
et al.

Plaintiffs

-vs-                CASE NO. 2:24-cv-03761
                    VOLUME II

BERLIN TOWNSHIP, et al.

Defendants

Zoom deposition of MEGHAN RAEHLL taken by the Plaintiffs as upon cross examination and pursuant to the Federal Rules of Civil Procedure as to the time and place and stipulations hereinafter set forth, at 8:00 a.m., on Friday, January 9, 2026, before Heather M. Lunsford, a Certified Court Reporter and Notary Public within and for the State of Ohio.

* * * * * *

Page 242

**QUICK REFERENCE INDEX**

**WITNESS: MEGHAN RAEHLL**

**APPEARANCES: PAGE 243**

| | DX | CX | RDX | RCX |
|---|---|---|---|---|
| BY: MR. MARGOLIUS | | 244 | | |

**EXHIBITS**

| | MARKED | PAGE |
|---|---|---|
| EXHIBIT: | A-6 | 308 |

**INFORMATION REQUESTED**

| | PAGES |
|---|---|
| BY: MR. MARGOLIUS | 291, 292, 326 |

* * * * *

Page 243

APPEARANCES:

ON BEHALF OF PLAINTIFFS

Joshua Nagy, Esq.
Attorney at Law
Wesp Barwell Berardino
475 Metro Place South, Suite 350
Dublin, Ohio 43017
jnagy@wesplaw.com

Andrew Margolius, Esq.
Attorney at Law
Margolius, Margolius & Associates
1900 Polaris Parkway
Suite 450
Columbus, Ohio 43240
andrew@margoliuslaw.com

ON BEHALF OF DEFENDANTS

Cara M. Wright, Esq.
Attorney at Law
Freeman Mathis & Gary
65 East State Street, Suite 2550
Columbus, Ohio 43215
cara.wright@fmglaw.com

ALSO PRESENT

Ronald Joseph Sabatino

* * * * * *

Page 244

{The deposition started 8:02 a.m.}

MEGHAN RAEHLL,

of lawful age, a Defendant herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

CROSS EXAMINATION

BY MR. MARGOLIUS:

Q. As I said, my name is Andrew Margolius. I'm going to be conducting the deposition today on behalf of the Plaintiffs.

We're conducting this deposition consistent with some conversations we've had between the attorneys and by agreement and consistent with the court order. Is that right, Meghan?

A. That's my understanding, yes, sir.

MS. WRIGHT: And I will put on the record that this is a continued deposition. We are in agreement to continue the deposition for the seven hours permitted by the rules. I believe we've calculated there's one hour and 57 or one hour and 58 minutes, and we would object to any duplicative questions that are duplicative of questions that were asked during the original

Page 245

iteration of the deposition.

MR. MARGOLIUS: Okay. That sounds good. We're getting a little bit of feedback from you there, Cara, but we'll see if that interferes. No big deal. And we'll try to be efficient today.

BY MR. MARGOLIUS:

Q. And am I pronouncing this right, Ms. Raehll?

A. It's Trustee Raehll, like railroad or Dr. Rail.

Q. Okay. I didn't mean to be insulting when I said Ms. Raehll.

A. No offense.

Q. I'm writing it down to remind me.

Okay. Ms. Raehll, this is the continuation of your deposition. We'll try and be efficient here today.

A couple ground rules. If I ask you a question, please do listen to it. I won't trample on your answer and speak over you, and please don't try and interrupt one of my questions.

You are welcome to take a break, if you need it at any point. Just please try

Page 246

not to do it in the middle of a question or a series of questions on the same topic.

If I ask you a question, we'll assume that you understand it. If you don't understand the question, please let me know, okay?

A. Yes.

Q. All right. Thank you. Of course, we're here today in the lawsuit of T&R versus Berlin, et al. And you are a trustee of Berlin Township, and you were a trustee during the T&R application for commercial and residential development within Berlin Township, right?

A. That's correct.

Q. And there were some hearings in 2023, I believe, a couple in April and then one in June and one in September. Do you recall that?

A. I do.

Q. And have you reviewed those minutes any time recently?

A. No. Not really recently. The last time I reviewed them was at the prior component of this deposition.

Page 247

Q. Okay. That was a couple months ago or so? I don't know exactly when. I'll need your answers out loud rather than a nod of the head, Trustee.
A. I'm sorry. I wasn't aware you asked a question.
Q. Your original deposition was a couple months back, maybe?
A. Yes.
Q. Three months ago?
A. Yes.
Q. Okay.
A. I think it was August. I don't know.
Q. How time flies. By the way, Happy Holidays. I hope you had nice holidays and all that good stuff, okay?
A. Thank you. You, too.
Q. Thank you.
So you haven't reviewed the meetings lately, but you had reviewed them at one point as a function of being a trustee, and the trustees had approved those meetings, right?
A. Yes.

Page 248

Q. And the meeting minutes are pretty accurate?
A. To my understanding, when I reviewed them, they appeared accurate to me.
Q. Okay. If I recall correctly, there was some public comments at, at least the April meetings, maybe the June meetings as well. Do you recall?
A. I recall public comments at the meetings. I don't recall which ones.
Q. Did those public comments influence your decision-making at all?
A. No.
Q. Well, then what was the purpose of the public comments if, in fact, they influenced you?
MS. WRIGHT: Objection.
THE WITNESS: The general purpose of public comments is to explore and allow residents to state their feedback. Whether or not that influences a zoning decision would depend on if it complies with the zoning code or not.
BY MR. MARGOLIUS:
Q. And you're saying that because none

Page 249

of those comments influenced your decision-making, none of them affected the code, is that it?

A. I'm a little confused by your question. Are you asking about my internal thought process, or are you asking about the zoning compliance?

Q. Well, they sort of go hand-in-hand. What I asked, and I'll rephrase it, was did the public comments at the T&R hearings influence your decision-making regarding this project?

A. No.

Q. Excuse me. I've got a bit of a cold.

Prior to 2023 and these hearings that we're talking about, were you familiar at all with the Sabatinos?

A. Prior to the hearings in 2023 was I familiar with the Sabatinos? Is that the question?

Q. Yes.

A. Yes.

Q. How so?

A. The Sabatinos had initiated

Page 250

discussions with our township regarding these projects in 2022.

Q. Is that the only familiarity you had with them before these hearings in 2023?

A. Yes.

Q. Were you aware that the Sabatinos had previously filed a lawsuit against the city of Berlin?

A. I was not until the time that they engaged after we met.

Q. Were you familiar with a project of the Sabatinos called Dooley's Orchard?

A. No.

Q. Are you now?

A. I'm familiar with the Dooley's Orchard. I was not familiar that it was a Sabatino project, for clarity.

Q. When did you learn that Dooley's Orchard was a Sabatino project?

A. I can't recall the exact date, but it was after the Sabatinos had initiated with our township regarding their current projects.

Q. So sometime in 2022 and 2023?

A. Yeah.

Q. The hearings, just for our

Page 251

reference, were all in 2023, correct?
A. Correct.
Q. The Dooley's Orchard area was housing for low income or minorities, right?
MS. WRIGHT: Objection.
THE WITNESS: I can't speak to that.
MR. MARGOLIUS: I'm sorry. The objection sort of came at the same time as your answer.
THE WITNESS: I can't say what the intent of that project was.
BY MR. MARGOLIUS:
Q. Well, do you regard the Dooley's Orchard area as one involving or having residents that are low income or minorities?
MS. WRIGHT: Objection.
THE WITNESS: I don't have an opinion about who lives at Dooley's Orchard.
BY MR. MARGOLIUS:
Q. Well, have you noticed that the people in Dooley's Orchard are perhaps African American or might be more low income?
MS. WRIGHT: Objection.
THE WITNESS: I've never been --

Page 252

I've never driven through Dooley's Orchard. I have no opinion on their residents who live there or knowledge.

BY MR. MARGOLIUS:

Q. Okay. So you don't know?

A. I do not know.

Q. This might be redundant, but did the fact that the Sabatinos had a Dooley's Orchard project that was, perhaps, low income or minority dominated, did that ever come up in the discussions with your fellow trustees about the project that came up in 2023?

MS. WRIGHT: Objection.

THE WITNESS: I can't recall if it did.

MR. MARGOLIUS: Cara, some of the objections are starting to become a little cumbersome. Do you want to note a continuing objection or is there any way we can cure what you think is objectable?

MS. WRIGHT: In that last question you asked her whether or not there were discussions about low income. She had already testified she has no personal knowledge of that, so I was objecting to your

Page 253

foundation. I can certainly put a standing objection to lack of foundation, if you want.

MR. MARGOLIUS: Okay. Yeah, that might be helpful. I understand, but I was asking if she had any knowledge of it and she's free to say yes or no.

MS. WRIGHT: You're free to ask your question. I'm free to object. I don't think you have proper foundation for that question.

MR. MARGOLIUS: Okay. Well, that's your prerogative.

BY MR. MARGOLIUS:

Q. Did any constituents compare the Dooley's Orchard housing area to the project that T&R was proposing in 2023, if you know?

A. I, I seem to recall learning that Dooley's Orchard was a Sabatino project at some point in 2023, and I believe it was a resident who informed me of it initially. I can't recall exactly how I came to know that, learn that information in 2023.

Q. Do you recall which resident informed you of that, perhaps?

A. No, I don't recall the name.

Page 254

Q. I sort of knew that was coming because you barely remembered the basis of it very well.

But you do remember someone talking to you about it, but you just don't remember the circumstances or the person's name?

A. Correct.

Q. Okay. And you voted against T&R's application to develop the commercial and residential property, right?

A. Could you be specific about the application that we -- that you're asking? I approved one and I, I denied one.

Q. Well, why don't you explain that, if you would.

A. I approved the -- there were two applicants -- applications. One was for an industrial/commercial area and one was for a what we call commercial/residential area but it, it's residential and was intended to be multi-family. And one I approved and one I denied.

Q. Okay. So you, you denied the one regarding residential or the apartments,

Page 255

right?
A. I would object to the fact that they were being referenced as apartments, but I denied the residential, yeah.
Q. If, if there is an issue regarding whether they're referenced as apartments, could you explain what your concern is?
A. Yeah. I believe I mentioned this in my prior deposition but the way that it was brought to our township, it was my understanding they were considered townhomes and the distinction was they were two-story townhomes, specifically.
That was how I understood that project to come through. I didn't understand them to be apartments. I understood them to be one to two bedroom townhomes.
Q. Okay. When we're talking about these townhomes or apartments today, if I reference them as apartments, can we at least agree that the apartments and the townhomes, for purposes of this deposition, are to be treated the same?
A. I prefer you call them townhomes because that was how I understood them to be

Page 256

when I was considering the application.

Q. Okay. The minutes of the trustee meetings regarding these townhomes indicate that the trustees rejected them for density issues, right?

A. Not exclusively.

Q. What was the other reason for rejecting them?

A. As I mentioned in my prior deposition, I had other concerns and I have nothing more to add in that regard given that I've already fully responded to that.

Q. Well, no, that won't work today. When I ask you a question, I'm going to expect that you give me a complete answer. You can't simply reference a long deposition. In fact, it won't be efficient for today's purposes.

Now if you want, you can say that I did talk about safety concerns last time, so it was density and safety concerns or density and other concerns, but it would be much more efficient if you could simply say what the response is and we'll move along really quickly today, I believe, if that's the case, okay?

Page 257

MS. WRIGHT: Andrew, you're not going to instruct my client on how she's going to answer the question. She can answer the question however she chooses. You can ask follow-up questions and, certainly, we're not going to re-depose her on issues that were already discussed in her prior deposition. We already sat through an entire day of deposition. Would you please answer the question one more time.

MR. MARGOLIUS: Number one, it wasn't entire day. Number two, it was -- we don't want to be pedantic but the focus here is on just getting precise answers when, perhaps, we didn't always get precise answers.

But we can't just simply say I said that before at deposition. I don't think there was the type of clarity that we're all looking for, but it will be important here that we establish a dialogue.

And you're free to -- there may be some repetition, that's an invariable but, nonetheless, let's get these questions asked and answered as efficiently as possible.

BY MR. MARGOLIUS:

Page 258

Q. So the question was, did the trustees reject the T&R application for townhouses for density and you said -- seemed to say mostly, but there were other considerations, right, Trustee Raehll?

MS. WRIGHT: Objection. Mischaracterizes her testimony.

BY MR. MARGOLIUS:

Q. Is that correct, Trustee?

A. I stated that that was not the explicit concern and reason for rejection.

Q. Do you have the trustee minutes before you; particularly, Exhibit 4, Trustee Raehll?

A. I do not, but I was provided them yesterday evening so I can pull them up if you would like me to.

MR. MARGOLIUS: Yes, please have them present. Let's go off the record as you do that.

(A discussion was held off the record from 8:21 a.m. to 8:22 a.m.)

BY MR. MARGOLIUS:

Q. We're looking at page 6 of exhibit -- which was previously marked as

Exhibit 4, and these are the June 12th, 2023, Berlin Township trustee records. Do you have that before you, Trustee?

A. Yes, I do.

Q. And do you see in the first complete paragraph the minutes state all three trustees agree that it was a good plan but the density was too high? Do you see that?

A. Yes.

Q. Is that accurate?

A. Wait. Sorry. Hold on one second. Page six of the Exhibit 4.

Q. And the first complete paragraph at the top.

A. Mine says Sabatino said they know there are issues with the BIO Overlay and the Comprehensive Land Use Plan. That's where my -- on page six?

Q. That's right. If you can see in the middle of the paragraph, there is a sentence in your minutes that says all three trustees agreed that it was a good plan but the density was too high.

MS. WRIGHT: Time out. Your question asked about page six. We're looking

Page 260

at page 16, I think.

THE WITNESS: Yeah.

MS. WRIGHT: I think there's a disconnect in the question and what we're being shown.

MR. MARGOLIUS: I, I think Trustee Raehll was accurate in describing the first sentence in that paragraph. I'm looking at the second sentence.

BY MR. MARGOLIUS:

Q. Do you see that, and isn't it up on the screen before you now?

A. I don't have my screen up because I'm -- I pulled up the minutes from the e-mail, but I do see the sentence that you're referencing now. There was just a little moment of confusion for the referenced area, but I see it now.

Q. Would you read it aloud for us, please, Trustee Raehll?

A. All three trustees agreed that it was a good plan but that the density was too high.

Q. So you were rejecting, according to the minutes, the plan because the density was

Page 261

too high?
A. That was not the exclusive reason for the rejection of the plan.
Q. So these minutes are incomplete? Is that what you're saying?
A. I believe --
MS. WRIGHT: Objection.
THE WITNESS: -- that, I believe that meeting minutes are referenced elsewhere that I had persistent concerns, which I've already testified to.
BY MR. MARGOLIUS:
Q. Well, I'm just going by your minutes in this -- these minutes were approved by you, correct?
A. Correct. And density was a concern.
Q. Including -- I'm sorry, I didn't hear that last sentence.
A. Correct, the meeting minutes were approved by me and, yes, density was a concern.
Q. Well, it lists density as the only reason, at least in this paragraph, correct?
A. In this paragraph, yes.
Q. And then, apparently, you followed

Page 262

that up at this meeting by further talking about the density and that you would want the density cut by 30 percent, correct?

MS. WRIGHT: Objection.

THE WITNESS: The density was, the density was not being cut by 30 percent according to our zoning code.

BY MR. MARGOLIUS:

Q. Doesn't the following sentence, there in your minutes, indicate that you stated at that meeting that if they wanted a vote, they would have to cut the density by 30 percent?

MS. WRIGHT: Objection. Misstates the minutes.

MR. MARGOLIUS: She is fully capable of stating that herself, so go ahead, Trustee Raehll --

MS. WRIGHT: You're fully capable of asking a question that accurately reflects the minutes.

MR. MARGOLIUS: That's, that's accurate, too.

BY MR. MARGOLIUS:

Q. So what I stated, is that correct,

Page 263

Trustee Raehll, you wanted the density cut by 30 percent?
A. No.
Q. So again, would these minutes be inaccurate when we're looking at the final sentence of that very same paragraph at the top of page six of the June 12th, 2023, minutes?
MS. WRIGHT: Objection.
THE WITNESS: Your statement was inaccurate about the minutes.
BY MR. MARGOLIUS:
Q. What was inaccurate about it?
A. I did not say that I wanted the density cut by 30 percent.
Q. Doesn't the minutes state that you wanted that -- the density cut by 30 percent?
A. No. It said that Sabatino said that they did cut the density by 30 percent.
Q. If you would, read that sentence out loud which begins with Raehll asked.
A. Raehll asked if the applicant wanted a vote this evening, and Sabatino said that they did cut the density by 30 percent and they would like a vote tonight.

Page 264

Q. Oh. Fair enough. All right. So I misunderstood that.

And you can simply say it was Sabatino who said he already cut it by 30 percent and that should be sufficient as, in effect, was what he was saying, right?

MS. WRIGHT: Objection.

THE WITNESS: That's correct.

BY MR. MARGOLIUS:

Q. And then immediately thereafter -- not immediately -- but in the minutes after that, you and your fellow Trustees, Bullard and O'Brien, voted against the resolution to approve the application of T&R, is that correct?

A. I can't speculate on the timing of that, but there was a lull between that request and when we actually voted, which is also reflected in the minutes by the resolution that we passed before we voted on it.

Q. Has Berlin Township, to the best of your knowledge, approved of any apartments within Berlin Township in the last 20 years?

A. Yes.

Page 265

Q. What apartments were those that you recall?
A. I recall Elysian and I recall -- that was the one that I voted for, and that's the only one I can really speak to with my history.
Q. What was the density approved for with regard to the Elysian apartments?
A. Elysian was ten acres -- or ten apartments per acre, R-10.
Q. And the T&R project townhouses would be at a 6.92 density?
A. Correct.
Q. The T&R project, for their townhomes, was approximately one mile away from these Elysian apartments?
A. I don't know the mileage, but I would not say it was one mile.
Q. Well, that's why I was saying approximately. What would you estimate it to be? You live in this area.
A. I would say probably closer to two, two miles.
Q. Okay. I won't hold you to it. I know you're estimating. I mean, I'll hold you

Page 266

to it, but I know it's an estimate.
A. Very good.
Q. Did the Elysian apartments if, in fact, they were built, pose any safety concerns with their density issue?
A. I believe that we addressed there were some safety concerns in that, which would be reflected in the minutes, but that they were adequately addressed at the time we came to vote on them.
Q. Did the project of T&R, with regard to their amount of homes, have more safety concerns from your perspective than the Elysian apartments?
A. I don't -- I would not say more. I would say that they were not addressed at the time that Mr. Sabatino requested a vote.
Q. Was that problematic to you that he was requesting a vote where there were outstanding safety concerns regarding his residential application?
A. I've already testified to this and stated that I lamented to the fact that he requested that vote without fully going through the concern process with us.

Page 267

Q. Was the T&R application important to Berlin and you as you considered them in the various meetings in 2023?

MS. WRIGHT: Objection.

THE WITNESS: Could you clarify the question?

MR. MARGOLIUS: Yeah.

BY MR. MARGOLIUS:

Q. Was this application, like so many other things you do as a trustee, important to you in 2023?

A. I don't have a personal opinion on projects. I, I believe that we should fairly and equitable apply zoning compliance. So just like any other project that would come through Berlin for zoning, it would have to go through the due process.

Q. Understood. Did you take notes during these meetings regarding the T&R application?

A. I think I jotted down a few personal thoughts. I don't recall exactly what they were at the time.

Q. So you took minimal notes? Is that what you're saying?

A. More of just -- I don't even think it was notes. I think it was one word reminders.

Q. Maybe one word reminders of issues that you wanted clarified or what, what did these notes or reminders entail?

A. Just internal thought processes that I wanted to make certain we discussed.

Q. You seem to indicate that these were minimal notes, if I can call them that. Was it limited to one page, perhaps?

A. It wouldn't have even been a page. It would have been like four words.

Q. Do you still have a copy of whatever document you wrote that down on?

A. No. Because personal notes aren't public record. I don't believe I have that anywhere.

Q. You threw it away?

A. I, I don't recall getting rid of it, but I don't believe I could find it.

Q. Do you recall what the content of those notes or reminders were?

A. Of my internal thought process that I wrote down?

Page 269

Q. Yes. The reminders, as you referenced them.
A. But it was of my personal thinking. Are you asking me to reconstruct a memory of it?
Q. Yeah. That's what I'm asking.
A. I'm not able to reconstruct a memory of what I jotted down.
Q. You formalized it but you don't remember what you wrote down, right?
A. No. Anything that I would offer would prob -- would be speculation.
Q. You mean anything that you might try and remember would be speculative?
A. Correct.
Q. The T&R project that you were considering included the proposal of a density of 6.92 for its residential units, correct?
A. Correct.
Q. And you three trustees wanted it lower, is that correct?
A. We wanted an application that complied with our zoning text.
Q. And that zoning text was a density of 4.0?

Page 270

A. The zoning text permitted various uses and the, the specific area called for no greater than four units per acre.

Q. So to synthesize, T&R wanted 6.92 and you trustees in Berlin wanted 4.0?

MS. WRIGHT: Objection.

THE WITNESS: The zoning text called for no greater than 4.0. The Berlin Township Trustees I cannot speak to, but I can speak to the fact that my decision was made due to the compliance of the zoning resolution.

BY MR. MARGOLIUS:

Q. But what was the number you personally felt would be satisfactory for this?

A. I don't have a personal opinion about this project. I, I want to ensure that our zoning text is complied with.

Q. Okay. So what was the number, in your professional opinion or from your perspective as a trustee, that would be in compliance? 4.0?

A. Whatever number was in the zoning text would be what would be in compliance.

Page 271

Q. What number was that, Trustee Raehll?
A. I believe --
MS. WRIGHT: Objection. You can answer one more time.
MR. MARGOLIUS: Go ahead.
THE WITNESS: As I already stated, the zoning text called for no greater than four units per acre.
BY MR. MARGOLIUS:
Q. Did the trustees have the discretion or ability to allow this project with a higher number than 4.0?
A. Could you clarify the question?
Q. No.
A. Then I, I'm confused about what you're asking.
Q. So you don't understand whether you, as a trustee, had the power to approve this project of T&R if it had a density greater than 4.0? Do you know?
A. Me, as a trustee, I am one vote so, technically, I don't have that power.
Q. Yes. But the trustees as a whole, if you know, either had the power to approve

Page 272

something greater than 4.0 or did not. Do you have an opinion on that?
A. The Board of Trustees has the authority to approve zoning in our township, if that's what you're asking.
Q. No.
A. Okay.
Q. I'm asking with regard to this particular project, did the Board of Trustees have the power to approve density greater than 4.0 for T&R?
MS. WRIGHT: Objection. Calls for a legal conclusion. You can answer if you know.
THE WITNESS: I do believe trustees have the power to override zoning codes.
BY MR. MARGOLIUS:
Q. So with that in mind, you did have the ability -- the trustees did have the ability to approve a density higher than 4.0 but rejected it with regard to T&R?
A. The trustees have the ability to approve density higher than the zoning resolution, yes.

Page 273

Q. Did you and your fellow trustees identify a density number in between the 4.0 and the 6.92 requested by T&R that might be approved?

MS. WRIGHT: Objection.

THE WITNESS: The trustees and I did not have a discussion about an acceptable density number between all of us.

BY MR. MARGOLIUS:

Q. So the answer would simply be no, right?

MS. WRIGHT: Objection. Her answer was her answer.

MR. MARGOLIUS: It's a new question. Answer --

THE WITNESS: Can you repeat the question, then?

MR. MARGOLIUS: Sure.

BY MR. MARGOLIUS:

Q. Did you and your fellow trustees discuss a number in between 4.0 and 6.92 that might be acceptable for the T&R residential units?

A. There's no -- there was no acceptable number between us and beyond 4.0.

Page 274

Q. Did you and the trustees -- well, we've established that you and the trustees have the power to approve something above 4.0, but you're saying that there was no acceptable number above 4.0 that would work for the T&R project, is that correct?
A. There was no acceptable number that the board agreed upon that we discussed for the T&R project.
Q. So let's go back for a moment to the rationale for denying the application of T&R with regard to its residential units. It was because of the density concern, right?
A. I've already answered this question.
MS. WRIGHT: Objection.
BY MR. MARGOLIUS:
Q. And you answered it, yes, it was density and some other factors, is that true?
A. Density was not the only concern. I've already answered this question, sir.
Q. What were the other factors, beyond density, causing the trustees, or at least you, to reject a T&R residential application?
A. I've already addressed this question as well, and I indicated that roads were a

Page 275

concern. Beyond what I've already testified to, I have no further additional information. My testimony will speak for itself on that.

Q. Well, I don't think your testimony was fully clear, nor do I think it's fully clear today but let's see if we can distill it.

Okay. So you felt that there were safety concerns regarding the roads for justifying the density issues, right?

A. I have nothing more to offer other than what I've already provided on record.

Q. That's not the question, ma'am. I don't think you can foreclose future questions based on that. I'm asking you a direct question, and I'll expect a direct answer.

And if you don't have knowledge, that's fine. If you can't remember, that's fine. But if I ask you to verify information, I'll expect an answer and, otherwise, we may have to take some of these issues direct to the judge which will simply slow down the process.

Now I'm asking you right now to verify, number one, that this application was

Page 276

turned down for density reasons, and I think you agreed that that's true, but you also qualified it and said there were other reasons, is that correct?

A. Yes.

Q. Thank you. And you specified, I believe, that those other reasons were because of the roads, is that correct?

A. Roads was one of the other reasons.

Q. What reasons, beyond the roads, were part of these other reasons that you rejected the T&R application?

A. Beyond what I've already testified to, this matter is already fully on record, as well as the formal process. There's nothing more that I have to give you today other than what I have already provided.

Q. Ma'am, it's not fully on the record. I'm asking you a question right here, right now. What reasons, other than the roads, factored into your decision-making?

MS. WRIGHT: And I'm going to object. The objection is asked and answered but, Meghan, to speed this up, why don't you go ahead and answer the question one more

Page 277

time.

THE WITNESS: I have nothing further to add at this time.

BY MR. MARGOLIUS:

Q. Okay. And this is your time to state your position. So if you don't have anything further at this time, the record is effectively closed.

So let's search your memory because I know you're clear that this project was turned down, at least for the residential, for density reasons, and underlying your concern for density reasons were safety concerns involving the roads, but you can't recall any other reasons beyond the roads at this moment. Is that your testimony?

A. Sir, I can speak to the process and its final decision here but I -- I'm not able to recall internal deliberations or undeveloped thoughts beyond what I've already provided from that time.

Q. In other words, you don't remember any other reasons?

A. I remember that there were other reasons. I'm not saying -- I'm saying -- what

I'm saying is what I have already said and I feel that you are asking the same question over and over again. So I'm able to the speak to the final, I'm able to speak to the final process.

You're asking me for internal thoughts of a deliberative process at that time, and I'm saying I can't give you beyond what I've already stated on the record.

Q. Well, you haven't stated specifically on the record what those other safety reasons are beyond the roads. Do you recognize that? If so, why don't you point to your deposition transcript and tell us what other safety reasons there are, or go from your memory and tell us what other safety reasons there are.

But, yes, I'm asking you about your thoughts and your deliberations regarding the T&R project because it's important to us in this lawsuit. And if you don't remember, that's fine.

A. All right. I've stated what I can.

Q. When you say you've stated what you can, you're saying that you refuse to answer

Page 279

this question because you've already identified these reasons and you can't remember anything in addition to that?

A. Beyond what the meeting minutes have, the deposition, the final decision, I -- there's nothing else that I have to offer. I don't recall --

Q. Well, I'm --

A. -- anything else.

Q. That will invariably lead me to point to your previous deposition transcript, so we're going to have to go through that and that may be inefficient and cost us time in this deposition.

But we'll have to be thorough because the reasons for your rejection of this T&R application with regard to the residential housing are important, your rationale in rejecting it is important, and that's why I'm asking these questions.

Please don't take offense, but I think it's important to this loss, okay?

A. Good. Fine. Thank you.

Q. Mr. Ballard stated that with this townhouse complex or apartment complex, that

Page 280

he had an expectation of a lot of children there and was concerned that they not get in on the streets. Did he express that to you?

MS. WRIGHT: Objection.

THE WITNESS: I'm sorry. Who are you referencing to?

BY MR. MARGOLIUS:

Q. Trustee Ballard.

A. Okay. Bullard?

MR. NAGY: Bullard.

BY MR. MARGOLIUS:

Q. I'm sorry if I mispronounced that.

A. No worries. Could you repeat the question, sir?

Q. Yes. Trustee Bullard indicated that he had concerns about a lot of children being at the townhouses or apartments and that he has safety concerns about them getting on the street. Did he express that to you?

A. I do recall him intimating something like that within a public meeting, yes.

Q. Did you and Trustee Bullard ever discuss this outside of the public meeting?

A. No.

Q. Did you and your fellow trustees

Page 281

discuss any issues regarding the T&R development outside of the trustee meetings?

A. We don't discuss or deliberate outside of public meetings.

Q. So your answer would be no?

A. Correct.

Q. Did you and any constituent or citizen of Berlin Township discuss any of the T&R development issues outside of these public meetings?

A. Yes.

Q. Which citizens did you speak with regarding the T&R development outside of the public meetings?

A. I cannot recall who all I spoke with outside of the public meetings from the residents or citizen standpoint. I know that there were several people who voiced concerns and I replied to them that they're welcome to attend the public hearing and voice those concerns within that context.

Q. And let's explore that a bit. How many of these citizens voiced their concerns to you, about?

A. I would probably say about six or

Page 282

so. Not an exact number.
Q. Understood. Did you take any notes about these conversations?
A. No.
Q. Did you simply tell them something to the effect of, well, if you have concerns, speak up at the public meetings?
A. That would be the gist of what I relatively, consistently communicate.
Q. Do you recall any of the names of these individuals who complained to you outside of the public hearings?
A. I wouldn't call it a complaint.
Q. Well, then let's call it voiced concerns. Do you recall the names of any of these people who voiced concerns to you about the T&R project outside of the public meetings?
A. Thank you. That's a clear question. I recall -- yeah, I recall a few names.
Q. Well, who are they?
A. One is Jerry Valentine. One is Darcy Kaplan. One I don't recall the name. I believe it was Deb and her husband, but I don't recall their full names. And the other

Page 283

names, I can't recall those who I spoke with outside of a context of a public meeting.

Q. How about a Mr. Aker? Did Mr. Aker privately complain to you or voice concerns?

A. No.

MR. NAGY: Do you want to take five in a minute?

MR. MARGOLIUS: Yeah, in a minute.

BY MR. MARGOLIUS:

Q. How about a Mr. DeChristopher?

A. Jasper DeChristopher, is that --

Q. Yes, that gentleman.

A. He is a BZC member. So I recall having conversations about that project in a process capacity and that's, that's pretty much the extent. I know that he had concerns, but I don't recall us getting so much into them as him, as him and I having conversation about the, the general process for that application.

Q. So Mr. DeChristopher was a (Zoom difficulties) of Berlin Township?

A. I'm sorry. You cut out for one word.

Page 284

Q. Mr. DeChristopher was an official of Berlin Township?
A. A Berlin Zoning Commission member. Not an official. An appointed commission member.
Q. Did you take notes from this conversation?
A. No.
Q. Did any of these people identify density or safety concerns?
A. Jerry Valentine is also a Berlin Zoning Commission member, and so is Darcy Kaplan.
Q. So -- hold on one second. Were these people expressing private concerns or opinions that they had developed as part of their somewhat official capacity with the city of Berlin or the township of Berlin?
A. I can't speak to really what capacity that they felt that they were operating in. I recall Darcy Kaplan asking more procedural questions, and the same being true about Jasper DeChristopher and Jerry Valentine.
Q. So do you remember specifically what

Page 285

any of them talked about with you?
A. Do you want me to go, like, one by one through the names and then state -- is that what you're asking?
Q. Yep. Yes.
A. Okay. We'll go with Jasper first. Jasper DeChristopher, Mr. DeChristopher, we had a conversation about his proximity to the application and I recall asking him to -- or him -- I don't know who brought it up, but there was a question of whether or not, due to his proximity, he should recuse himself from the case. And to my knowledge, he sought the appropriate legal counsel and I don't know --
Q. Hold on there.
A. -- what the --
Q. I don't want to -- if one of you people got advice from legal counsel, that's a little bit out of bounds for my purposes.
A. I don't know what the outcome was anyway. That was where it was left was that, you know, it would be good -- my recommendation.
And then outside of the public meeting, I don't recall any, any, any concerns

Page 286

that he specifically mentioned but I recall him saying that he did have concerns. I just can't recall what those specifics were outside of a public meeting.

Jerry Valentine, Jerry Valentine had concerns that what was communicated to the Berlin Zoning Commission was not accurately conveyed between the Berlin Zoning Commission and Mr. Sabatino, and we had a conversation about just making certain that we follow the procedure and stay, you know, within the boundaries of the due process. And that was the extent, pretty much, to our conversation.

Darcy Kaplan, I want to say when we spoke --

Q. Be careful there. I don't want you to speculate. So when you say I want to say, if you have a memory, that's great. If you're speculating, let's not go that route, okay?

A. Fair. Thank you. Darcy Kaplan and I spoke, and she was concerned about procedural questions and had some concerns about the application itself and for her -- am I breaking up?

Q. No. You're fine.

Page 287

A. Okay. And for her I encourage -- not encouraged. She said would it be beneficial for me to come to provide any further clarification if needed? And I said that she was welcome to provide -- to attend the public meeting and provide any further clarification as needed. And she did attend that meeting, one of those meetings, I believe, as a result.

And Jasper DeChristopher also attended the meeting. I don't know if it was a result of our discussion but, as I mentioned, I encouraged them to attend the public hearing.

Q. If you had concerns about safety with regard to density and this application, did you seek the advice of somebody who had some level of safety expertise?

A. Could you be more specific?

Q. No.

A. I recall having conversations with, for example, ODOT that I've previously testified to.

Q. Is that it?

A. I recall the Delaware County

Page 288

Regional Planning Commission, having discussions with them. Well, not really discussions, but I recall consideration of this application and reviewing those meeting minutes.

Q. That would have been before these meeting minutes -- or, excuse me, before these meetings about the T&R application, right?

A. For clarification, I was referencing their meeting minutes.

Q. Okay. But the discussions you had with these other bodies or officials was before the meetings that you had about the T&R application in April, June, and September of 2023, right?

A. I'm not sure I understand what you're asking. The Delaware County Regional Planning provided a recommendation, and there were meeting minutes that the Delaware County Regional Planning meeting had and they had a recommendation and I recall reviewing those prior to the conclusion of our -- of the application, yes.

Q. Okay. So these events were before you considered the T&R application in April,

Page 289

June, and September of 2023, right?
A. They were part of the consideration.
Q. Well, did they occur before April or June or September of 2023 or after, if you know?
MS. WRIGHT: Andrew, I think that might be three different questions. I'm confused on what you're -- what time period you're referencing.
MR. MARGOLIUS: I think it's pretty clear. We're starting with April of 2023.
BY MR. MARGOLIUS:
Q. Did these events that you're saying occurred, were they before or after April of 2023?
A. We received the recommendation of the Delaware County Regional Planning as part of that application, so it was before we made a decision on the application, yes.
Q. I see the minutes from the Delaware County Regional Planning Commission dated May 25th, 2023. So it was apparently after the April meeting but before the June decision, right?

Page 290

A. That sounds accurate. I, I don't recall the exact, specific dates of when we received them, no.

MR. MARGOLIUS: Okay. We've been going at this for a little bit. It's seven after 9. How about a ten-minute break? Does that sound okay, Cara?

MS. WRIGHT: I'll defer to Meghan.

THE WITNESS: I prefer not to break.

MR. MARGOLIUS: Well -- okay. Well, I prefer to take a break. It's only ten minutes. We'll try and be brief, but I think it actually might make questioning efficient and there's a private thing that I must attend to, okay? So we'll, we'll resume in ten minutes.

MS. WRIGHT: Thank you.

(A recess was taken at 9:07 a.m. and questioning resumed at 9:20 a.m.)

MR. MARGOLIUS: Okay. Let's go back on the record. We had a bathroom break and then we had a little bit of a computer issue from the court reporter, but we're ready

Page 291

to go and we'll see if we can be as efficient as possible.

BY MR. MARGOLIUS:

Q. Regarding some of these conversations that you had with constituents or people on the Zoning Board or even fellow trustees, Trustee Raehll, did you ever communicate with any of these individuals via text?

A. No.

Q. I mean regarding T&R.

A. Yeah. Not that I recall via text, no.

MR. MARGOLIUS: Okay. I might ask you and counsel to review your texts to see if you have anything relating to those. Certainly, if they're not about T&R, we're not interested. But if you do have them, please preserve them and forward them to us.

BY MR. MARGOLIUS:

Q. Did you have any e-mails with any constituents, or any of these individuals that you referenced before, regarding the T&R project?

A. I, I recall a, I recall a resident

Page 292

reaching out -- a couple residents reaching out via e-mail, and all of that information would have been provided previously in the request for discovery.

MR. MARGOLIUS: We may have to look at that, Cara. I'm not so sure we've gotten any e-mails.

MS. WRIGHT: I know we produced a large volume of e-mails, but I don't remember the content of the e-mails here today.

MR. MARGOLIUS: Let's try to tackle that issue at a later time, if you don't mind.

MS. WRIGHT: Sure.

BY MR. MARGOLIUS:

Q. Now to follow up from what you said at your last deposition, you were concerned about safety concerns involving roads and the quality of roads and access to turn out on 36 or 37.

Did you ever consult with either the fire chief or anybody at the sheriff's office or a police chief about your safety concerns?

A. I consulted with ODOT, which I've

Page 293

already testified to.
Q. Did ODOT indicate that these conditions were unsafe?
A. ODOT had a number of concerns.
Q. Did they indicate the conditions were unsafe?
A. They had safety concerns.
Q. Were those safety concerns resolved prior to your decision?
A. To my knowledge, they were not.
Q. What were those specific safety concerns?
A. I believe I have also already testified to this, and so my account is on record.
Q. I don't believe it is, so tell us now.
A. I think the record will show that I've already adequately addressed my conversations with ODOT.
Q. Do you want to go off the record right now and point to your deposition and tell me exactly where it is, or do you want to give me your recollection right now and it would save a lot of time?

A. I would prefer to point to where it is because I've already spoken to this, sir.

MR. MARGOLIUS: Okay. Let's go off the record and your client is asking that --

THE WITNESS: Sir, I am not asking it. You are, you are giving one of two options, and I'm saying that it is on record and it should be on your time.

MR. MARGOLIUS: No, it's not. And this is not for you to make that decision. I don't mean --

MS. WRIGHT: Okay, we're not -- Mr. Margolius, we're not going to argue with her or instruct or yell at her or tell her what we're going to do. If you'd like for us to show you in the deposition where she's already been asked these questions and she's already presented that testimony, we're happy to do so.

She's already answered these questions. She already sat for over five hours of deposition, but if you want us to show you where she's already testified to it, we certainly can. It doesn't make sense to

Page 295

ask her the same question over and over and over again. It's not an efficient use of time.

MR. MARGOLIUS: I'm not at all asking that and it would -- there's always a predicate to asking questions that have been previously discussed but have not been followed through.

So if she remembers, that's fine. If she wants to go off the record and look at her deposition -- I will tell you that I think some of the answers are vague and incomplete and that's why I'm asking follow-up.

So it's your choice as to what you want to do with the time here, but this will be off the record time as you get the deposition transcript out if she's referencing that. I think it would be more efficient if she just stated what her memory is and we go from there. Your choice.

MS. WRIGHT: She's, she's indicated a preference to see her deposition testimony, so I think we should honor that request.

MR. MARGOLIUS: Okay. Heather,

Page 296

let's go off the record and why don't you get that up. And I assume you can make it available to Ms. Raehll -- or, excuse me, Trustee Raehll?

MS. WRIGHT: Yes.

(A recess was taken from 9:26 a.m. until 9:29 a.m.)

BY MR. MARGOLIUS:

Q. Okay. Trustee Raehll, we're back on the record. Do you have a precise answer now that you've reviewed your deposition testimony?

A. It is my understanding that my prior deposition, I have nothing further to add still, and I am prepared to reference the area that I speak to it.

Q. What is the area that you speak to it about, because I'll have some follow-up? That's what happens at depositions.

A. No problem. Page 174 moving forward to approximately page 177.

Q. There's references to you saying you spoke with him, for example, at page 174, I believe. Is that a Mr. Turkowski? Turowski?

A. Yeah. I think we clarified it was

Page 297

Turowski, perhaps --
Q. Okay.
A. -- but yeah.
Q. Did you ever --
A. That's who --
Q. Did you ever receive any form of documentation from any of these sources concerning safety concerns?
A. We received general sketches of ways to handle the traffic flow and increase of the traffic, as well as the, the right turn in, right turn in/right turn out for that area.
We did not receive any final plan for what the plan is for that area to address the traffic.
Q. Well, so did you receive any specific document that stated there were safety concerns regarding the roads?
A. As I mentioned in my testimony, I spoke with Turowski and there were concerns that it would become a 23 situation and that there would be traffic concerns related to the development in that area.
Q. Okay. But if you listen to my question, it was asking whether you had

Page 298

documentation. So I understand that you had an oral conversation. To be clear, did you receive any document that described specific safety concerns about the roads?

A. I believe that we received a PowerPoint from ODOT to address safety concerns related to the roads in that area.

Q. Did you make that a part of the record in terms of the T&R application?

A. I don't know when we reviewed or had -- when I saw that presentation. I don't know that that presentation was ever provided directly to the township, either.

Q. And if it was never provided directly to the township, you would agree that it was never provided to T&R to rebut, was it?

A. I can't say what T&R was provided or not provided by another entity.

Q. All right. Well, did you, as part of your safety concerns with the T&R project, ever provide any documentation or report indicating the safety concerns and give T&R an opportunity to rebut it?

A. I indicated that I had persisting safety concerns prior to the, the request to a

Page 299

vote and, as I've already mentioned on record, the fact that we did not have the continued conversations regarding that.

Q. Please try and listen to my questions, however. I asked whether you provided any form of document or report to T&R concerning your safety concerns or ODOT's safety concerns prior to turning down their application?

A. No. It was not requested.

Q. Do you think it would have been a good idea to give them something in writing to address to make sure that there were no safety problems in their project, or would it be better to sort of just not talk about it or not give them any documentation whatsoever?

MS. WRIGHT: Objection. Compound question. Which question do you want her to answer?

MR. MARGOLIUS: I think she can understand it.

THE WITNESS: I actually don't.

BY MR. MARGOLIUS:

Q. Do you think it would have been a good idea to give T&R some form of

Page 300

documentation which allows them to directly address their safety issues with this project?

A. T&R was the one that requested the vote. I think it would have been good to continue the conversations, as I've stated on record.

Q. But your answer doesn't address the question.

A. It directly addresses the question, sir. I said it would have been a good idea to have those conversations with T&R.

Q. But I was asking about a document.

A. It would have been good to have T&R have a document related to that, but it's on the applicant to provide the material. It's not on the township to provide a reason for why something does or does not comply with zoning. It's on the applicant to provide the information to assuage those concerns prior to requesting a vote.

Q. So you had oral conversations with a third party about safety concerns you had about this project. You didn't have any documentation and you didn't provide anything in writing to T&R to address those safety

Page 301

concerns, did you?
MS. WRIGHT: Objection. You can answer.
THE WITNESS: I would say that's a mischaracterization of the situation, sir.
BY MR. MARGOLIUS:
Q. I'll break it down. Did you give T&R a document addressing your safety concerns?
A. I did not provide T&R a document addressing the safety concerns because we did not have ample time to have those discussions prior to T&R requesting a vote.
Q. Are you aware that T&R had approval from various public officials, including the fire chief, regarding their plans for this project, including the residential project?
A. I am aware that we had a letter from fire.
Q. And was that letter from fire satisfactory to you or not?
A. Regarding the fire concerns, it was.
Q. Well, they, they are also addressing safety concerns, aren't they?
A. Fire's job is to address fire safety

Page 302

in the consideration of zoning compliance applications.

Q. So the fire concerns were ameliorated, but are you saying that the traffic concerns were not?

A. What I have said on record is on record, and I've referenced the prior deposition to that.

Q. Yes, but this is a separate question and this is follow-up and it's perfectly legitimate, and you're free to say, yes, no or I don't know or even somewhere in between.

Do you want me to repeat the question?

A. Yeah.

Q. Or have it reread to you?

A. Yes.

MR. MARGOLIUS: Madame Court Reporter, could you reread it to the witness?

(The requested portion of the record was read.)

THE WITNESS: I would say that there were other safety concerns that were not ameliorated.

BY MR. MARGOLIUS:

Page 303

Q. And those safety concerns, Trustee Raehll, were regarding traffic or are there other concerns beyond traffic?
A. I've already spoken to this answer about my safety concerns. I've provided full testimony and the record will speak to itself regarding that.
Q. All right. Let's go off the record and you can tell me, you can tell me where in your prior deposition you discussed safety concerns other than traffic concerns. I welcome that.
A. No. That's -- sir, that's not what I said. I said that I have concerns regarding safety that I've already addressed in my prior testimony, and I have brought up two of them, and that fully concludes what I have to provide at this time. It's the same.
Q. I don't mean to be rude but I want to inquire, if you had safety concerns beyond traffic, I want to know what they are and I don't see it from your prior testimony. So if you recall any of these safety concerns beyond traffic, please let us know. And if you don't remember, that's fine, too, say I don't

Page 304

remember.

Trustee Raehll, the ball is in your court.

A. Sir, the record will reflect what I said.

Q. Okay. Well -- will you turn to page 147 of the record?

Did you have any discussion with Trustee O'Brien about his concerns or objections to the T&R application?

A. Outside of the public meeting, no.

Q. Do you know what his concerns were or objections were with regard to the T&R application?

A. I don't recall specifically, but I imagine that the meeting minutes will reflect what his concerns were. As I recall reviewing those meeting minutes a few months ago, I think that they would be stated there.

Q. So the meeting minutes should be complete in identifying those concerns, right?

A. I don't know what Trustee O'Brien's other concerns might be, but the meeting minutes would be what were Mr. -- some of Mr. O'Brien's concerns.

Page 305

Q. Did you feel that the density number that T&R submitted of 6.92 would create ghetto conditions in this rental property?
A. No.
MS. WRIGHT: Objection. Asked and answered.
BY MR. MARGOLIUS:
Q. Why did you not object or say something when a citizen identified that there were going to be ghetto conditions in this development at the public comments in this hearing?
MS. WRIGHT: Objection. You can answer.
THE WITNESS: I don't feel that it's the board's role to engage with residents during their provision of public testimony.
The standard operating procedure that I follow is to simply allow the individual to make a comment and then ask for the next person to provide comment as needed. It's the way that we can keep it consistent, and that's for or against various zoning applications the way that we operate for hearings.

BY MR. MARGOLIUS:

Q. Did you feel, perhaps, that this constituent who raised the issue of ghetto conditions was inferring that there would be minorities and overcrowding at this T&R property?

MS. WRIGHT: Objection.

THE WITNESS: I can't speak to what the resident would have said or intended to say, but I can say that those factors are not part of our zoning comply -- or zoning code.

BY MR. MARGOLIUS:

Q. I'm asking you your interpretation when you heard this resident say this.

MS. WRIGHT: Objection.

THE WITNESS: My interpretation was that I need to interpret according to the zoning resolution.

BY MR. MARGOLIUS:

Q. But I asked you how you interpreted this ghetto reference when you heard it and did not object to it or ask any questions about it. What was your interpretation of the ghetto reference by this constituent?

Page 307

MS. WRIGHT: Objection.
THE WITNESS: My interpretation was we don't factor in to zoning compliance whatever he meant by it, and I have no idea what he meant by it.
BY MR. MARGOLIUS:
Q. Let's talk about CDBG funding. Are you in favor of Berlin Township getting CDBG funding or not?
A. Could I clarify? I believe I may have spoken to this already in deposition.
Q. Well, do you know what CDBG stands for?
A. No, I don't recall.
Q. Community Develop Block Grants.
A. I don't have a personal opinion about Community Develop Block Grants.
Q. Well, how about a professional opinion? Did this --
A. I don't have --
Q. -- issue ever come up?
A. If it did, I don't have a, I don't have an opinion of that.
Q. Did you ever vote or seek CDBG funding for the city -- for the township of

Page 308

Berlin?
A. The name rings a bell. It -- I want to say that there was something that may have come through -- I believe came through from the county in reference to that. I can't recall the specifics, though, so if I had a document or something in front of me, I would maybe be able to recall it better.
Q. Okay. I'm going to put something up on the screen, and I'll ask that you pay attention to this.
A. Yes.
MR. MARGOLIUS: Why don't we label this as -- we'll call this Deposition Exhibit Raehll A-6. And we are going to like yesterday, Cara, label those other depositions as A-1 through 4 or 5, however many there are.
MS. WRIGHT: Okay.
MR. MARGOLIUS: Even though they may be competitive.
(Deposition Raehll Exhibit A-6 was marked for identification.)
BY MR. MARGOLIUS:
Q. All right. So if you see there on the screen what we are labeling Deposition

Page 309

Exhibit A-6, this is a Berlin Township Board of Trustees Resolution dated June 24th, 2024.

A. Uh-huh.

Q. Is that a yes?

A. Yeah. Can you zoom in, though, a little bit?

Q. Sure thing. Let's go back to the first page, though. Thank you, Josh.

Do you see the first whereas there? We're going to make it bigger --

A. Thank you.

Q. -- hopefully. Is that any better?

A. Yes, that's better. Thank you.

MR. MARGOLIUS: Okay. I think we have to scroll down a hair, Josh. I don't know where it went. No. I think you're on the wrong page. I think you've got to go up.

MR. NAGY: That was the first page. What are you looking --

MR. MARGOLIUS: That is the first page.

MR. NAGY: This is the third page.

MR. MARGOLIUS: Well, then let's go to the third page.

Page 310

BY MR. MARGOLIUS:
Q. Do you see the whereas Board Delaware County eligible for qualification as an urban county within the CDBG program? Do you see that?
A. Yes, I do see it, and I recall it now. I think it was listed -- yeah, the resolution was listed as something different, so it took a minute.
Q. And the -- do you want to read that?
A. Oh, dear.
MS. WRIGHT: Do you want her to read it out loud?
THE WITNESS: Do you want me to read it --
BY MR. MARGOLIUS:
Q. Well, this is -- no, you don't have to read it out loud.
A. Okay.
Q. Let me know when you're done, however. Scroll down to that -- to the next page. Let us know when you're ready to see the next page, okay, Trustee?
A. Okay. I'm ready for the next page.
MR. NAGY: This page?

Page 311
THE WITNESS: Yes.
MR. MARGOLIUS: Next page.
MR. NAGY: The next page?
MR. MARGOLIUS: Well, that page is fine. Yeah. Okay. Let's go back on record.
I don't think she's had the ability to read page four, please. Okay. Thank you, sir.
BY MR. MARGOLIUS:
Q. And let's move on to the next page, which I think includes your signature as well as the other trustees?
A. Correct.
Q. And so do you now recall being involved in a resolution as to whether Berlin Township should accept or not accept CDBG funding?
A. Yes.
Q. And you understand what CDBG funding is?
A. Yes.
Q. Do you know whether or not CDBG funding entails an obligation to further fair housing?

Page 312

A. No.
Q. You don't know whether it does or not, or it doesn't?
A. I do not know.
Q. We put up a page which starts with an indented paragraph, Trustee Raehll. Do you see that?
A. Yes.
Q. And do you see in the middle there's a comment that you apparently said that says Trustee Raehll reported that one of the major problems is a risk of townships losing some local authority related to zoning and housing?
A. Yes.
Q. Is that accurate? Did you report that?
A. Yes.
Q. And what type of authority were you concerned about losing if you accepted CDBG funds?
A. I think I was -- as these meeting minutes show -- I recommended moving slowly because there were outstanding questions that we had. And if I recall correctly, the township was told by the county that if we did

Page 313

not explicitly opt out, that we would be opted in, and we wanted to understand the implications of what that meant before we approved that. So I think this was a matter of more information.
Q. So this was in 2024, right?
A. Yes.
Q. More precisely, June of 2024, right?
A. Correct.
Q. So since June of 2024, has the township of Berlin accepted CDBG funding or grants?
A. Not to my knowledge.
Q. So you wanted to move really slowly on this, is that it?
MS. WRIGHT: Objection.
THE WITNESS: I don't have an opinion on how slow or fast to move on this.
BY MR. MARGOLIUS:
Q. Is this issue pending before Berlin Township, whether to accept or not, CDBG funding or is it dormant?
A. I don't think I can speak either way to that.
Q. You don't know?

Page 314

A. No. I'm saying I don't think it's dormant or active. The county approached us, and so it would be a question for the county.

Q. Did you perceive the T&R project leading to overcrowding in Berlin Township?

A. Could you repeat the question? I'm sorry. It cut off right at the end.

MR. NAGY: Stop sharing?

MR. MARGOLIUS: Yes.

THE WITNESS: Still breaking up.

MR. MARGOLIUS: No. Josh was just saying we should maybe stop sharing that particular document. I'm moving on.

BY MR. MARGOLIUS:

Q. Did you perceive the T&R project in Berlin Township, including the residential portion of that project, leading to overcrowding in T&R -- excuse me, in Berlin Township?

A. I didn't have a perspective on overcrowding. I perceived it to be out of compliance with zoning.

Q. Are you saying you didn't consider whether or not it might lead to overcrowding?

A. I think, generally, overcrowding

Page 315

isn't really a factor when we're considering a particular parcel but, generally, more broadly, with the township, that's whether or not it's in compliance with zoning or not.

Q. Well, isn't overcrowding related to density considerations or not?

A. I would say overcrowding could be related to safety considerations. And when you create the zoning resolution, that's what you do, you take those factors into consideration.

Q. Yes. But I asked is overcrowding related to density considerations?

A. I would say overcrowding is related to safety considerations, yes.

Q. Are safety considerations a part of density consideration?

A. I think, broadly, safety considerations include a whole list of different items and we have to take into consideration the number of areas and the proportion from a township perspective.

So one area, for example, that might allow ten units per acre balances out in other areas and having that diversity is

Page 316

important for productive growth.

Q. Was Berlin Township interested in diversity?

A. I can't speak for Berlin Township. I can say that I am interested in ensuring that anybody who wants to live in Berlin, can live in Berlin, and those are factors that I think have been adequately addressed in our Comprehensive Land Use Plan.

Q. Does Berlin Township encourage low income or affordable housing? Not low income, but low income people moving in or affordable housing in Berlin Township?

A. I don't think that --

MS. WRIGHT: Objection.

THE WITNESS: -- I can speak to Berlin Township. I can speak to myself and say I don't have an opinion about low income housing or high income housing.

BY MR. MARGOLIUS:

Q. The -- Berlin Township is part of the Olentangy School System?

A. Olentangy, yes.

Q. So is that school system overcrowded or does it need more funding?

Page 317

A. I don't have an opinion about that in my capacity as a township official.
Q. Hasn't issues come up in terms of increasing funding to the schools in front of the trustees? Haven't those issues come up?
A. The township doesn't have a stance on schools' overcrowding, levies, or anything, anything related to that.
Q. Has the township had to increase funding towards the schools over the last five years?
A. I'm not exactly sure what you mean by that.
Q. Well, there's been newspaper coverage about increased funding for the Olentangy Schools, right?
A. Are you asking am I aware that there was a levy for Olentangy Schools?
Q. Okay. Let's start with that, yes.
A. Yes.
Q. And did that affect Berlin Township?
MS. WRIGHT: Objection.
THE WITNESS: I don't really understand what you're saying, sir.
BY MR. MARGOLIUS:

Page 318

Q. Did Berlin Township residents have to pay money towards that levy as a --

A. Yes. Berlin Township residents pay money towards the schools, yes.

MR. MARGOLIUS: All right. Let's take a break. I'll see if I can finish up. We need just five minutes, and then we'll be back and hopefully conclude, okay?

MS. WRIGHT: Thank you.

THE WITNESS: I prefer not to take a break.

MR. MARGOLIUS: Yes, I understand that. I'm sorry, but sometimes we need to just to be a little more efficient, so we're just asking for five minutes.

THE WITNESS: Okay.

(A recess was taken from 10:00 a.m. until 10:06 a.m.)

MR. MARGOLIUS: Okay. So I just have a little bit more, and thank you for your patience and, again, thank you for your participation today. I know, apparently, you think it's quite tasking to have to come back, but sometimes we have to do these things.

BY MR. MARGOLIUS:

Page 319

Q. Quick follow-up questions, but this one we haven't really talked about. Did you participate in any executive sessions about the T&R application?

MS. WRIGHT: I'm going to interpose an objection. The executive sessions are confidential under Ohio law and you are not to testify about what was testified to in executive session.

MR. MARGOLIUS: Yes, and I'm not asking what was discussed. We'll reserve that, however.

THE WITNESS: I would need a little bit more clarification related to the timing of that. For example --

MR. MARGOLIUS: Oh, yes. Let me clarify. You're right.

BY MR. MARGOLIUS:

Q. During the application process, up until the point where T&R's application was turned down in September, prior to that date did you, as a trustee, engage in any executive sessions regarding T&R's application?

A. Forgive me. I'm just trying to think through the timing of it. I know that

Page 320

we did have executive sessions. I don't know when the timing was, but I know it would have been -- it was under imminent or pending lawsuit when we had executive discussions related to that nature.

MS. WRIGHT: And I will just remind you, any discussions that are had with attorneys are protected by attorney-client privilege and you're not to disclose those, either.

THE WITNESS: Thank you.

MR. MARGOLIUS: I'm not asking. I'm just asking whether she had any prior to approval.

BY MR. MARGOLIUS:

Q. And you're saying, I think, probably not but you might have had some executive sessions involving potential litigation afterwards, which I don't want to ask about, certainly.

A. I don't recall having any executive sessions prior to the denial of the application.

Q. Thank you. That, that answers that.

Is there any affordable housing

Page 321

in Berlin Township?
MS. WRIGHT: Objection.
THE WITNESS: I would need to understand what you mean by affordability, but I can say that we have a variety of different housing types in Berlin Township.
BY MR. MARGOLIUS:
Q. What percentage of housing units do you estimate are apartments or townhomes in Berlin Township versus homes?
MS. WRIGHT: Objection.
THE WITNESS: I don't know the percentage.
BY MR. MARGOLIUS:
Q. Yes, I know you don't know the exact percentage, but what do you think? Is it about 50-50? Eighty-twenty? Ninety-nine-one?
A. I can't speculate.
Q. You can't even estimate?
A. I --
MS. WRIGHT: Objection. Asked and answered.
THE WITNESS: Yeah, I can't speculate.
BY MR. MARGOLIUS:

Page 322

Q. How many apartment complexes or townhouse complexes are there in Berlin Township?
A. I don't know that answer.
Q. More than 20?
MS. WRIGHT: Objection.
THE WITNESS: I think I would actually need you to be a little bit more precise about what you're, like, meaning by apartments.
BY MR. MARGOLIUS:
Q. You don't know what the meaning of an apartment is?
A. I do not, not according to this definition. I can define for you various types of housing and I can say whether or not we have it for the most part in our township or not.
Q. Okay. So let's go with the general definition that an apartment is a rental unit on some property where there are other rental units in the same building or close by.
A. If a rental unit is what your definition of apartment is, then I would need to eliminate what I think is the townhomes and

Page 323

what has already been on record as the manufactured home community, and I would go with the fact that I can speak to the fact I have approved a number of rental units for our township but those rental units were not approved or disapproved based on the rental capacity or it being an apartment.

Q. I really don't understand what you said. So do you have an estimate as to the amount of rental units or apartments in Berlin Township?

A. I don't have an estimate.

Q. And going back to that exhibit that we discussed before -- I don't think there's a need to put it on the screen yet -- but you stated, and I'll quote you again, Trustee Raehll reported that one of the major items is a risk of townships losing some local authority related to zoning and housing. And that was in relation to accepting CDBG funding, right?

MS. WRIGHT: Which exhibit are you referring to?

THE WITNESS: Yeah.

MR. MARGOLIUS: That was the one

Page 324

we put on the screen, that resolution in 2024, I believe June. I believe it's Exhibit A-5. Would you like us to put it on the screen?

THE WITNESS: Yeah. Just for a quick reference. I think I know what you're referencing.

MR. MARGOLIUS: Yeah, I think so, too, but I'm happy to put it on the screen.

BY MR. MARGOLIUS:

Q. Do you see it there?

MR. MARGOLIUS: Thank you, Josh.

THE WITNESS: Yes.

BY MR. MARGOLIUS:

Q. I think you identified that this statement was accurate, but you are saying that one of the major items about this CDBG funding is the risk of townships losing some local authority related to zoning and housing.

How did you know that there was that risk of losing authority or control?

A. I don't think that I am saying that I know that we will. I think that the purpose of this paragraph, and in the meeting minutes, was that it was discussed with the DCTA, the Delaware County Township Association, and that

Page 325

there was a concern of that.

And so as I stated, I recommended moving more slowly and opting in after the township had better information, potentially. And I think that's reflected in the meeting minutes there.

Q. Yes. But what basis did you have to conclude that there was a risk of losing some sort of authority? Was it just your general knowledge or had you read about it or did somebody advise you? Apart from an attorney. I don't want to know about that.

A. Yeah. The Delaware County Township Association, there was discussion among a few members of that association. I don't recall who all, but as I'm reading this, it looks like Genoa was a part of that. I noted that there were a couple others involved in that conversation. I'm not exactly sure who but that was -- coming from that conversation, that was how we determined to take action because, again, it was an automatically opted in unless you exclusively opt out.

And so, like I say on these meeting minutes here, it was recommended that

Page 326

we get more information before we opt in, potentially.
Q. Okay. So who was it that you referenced there? Delaware?
A. Genoa Township -- Delaware County Township Association.
Q. And did you receive some documentation from them about CDBG funding?
A. You know, I think I did at that time. I, I know that we received documentation from the county. I believe that we received documentation from -- I don't recall who but I -- we did receive documentation related to this, this topic.
MR. MARGOLIUS: Okay. Cara, if you don't mind, can we have a separate discussion about getting that documentation? I think that would be helpful for our purposes here, okay?
MS. WRIGHT: Yeah. Absolutely.
MR. MARGOLIUS: Thank you. I appreciate that.
BY MR. MARGOLIUS:
Q. You were chair, legislative chair, of the Delaware County Township Association,

Page 327

weren't you?
A. Correct.
Q. So you would have fairly close ties to this association and have the ability to look at CDBG funding and talk with others about their experiences, right?
A. The issue at hand on this was not the issue of the funding itself. It was the county and what the county had and had not provided and whether or not you -- one township should move forward or how to handle the rapid nature of the response being requested.
So we actually didn't dive into the specifics of either. I think this -- if I recall correctly, this wasn't just the funding that you mentioned. I think there was another type of funding that was included in this consideration.
Q. So you felt this was moving along too quickly, and so you voted to be excluded from this CDBG funding, right?
A. I -- it was my understanding, at the time, that we needed more information prior to opting in to this resolution that the county

Page 328

had proposed.

Q. Did you know at that time that there would be some sort of requirement or affirmative action or some sort of effort necessary for Berlin Township to engage in furthering fair housing --

A. I did not.

Q. -- if you accepted --

A. Sorry. My apologies.

Q. I think I got that answer. If you accepted that funding, you were unaware of those things, right?

A. Correct.

Q. And let me just review my notes, but I think we're almost done, okay?

A. Great.

Q. A quick follow-up. Did you have any concerns in your safety concerns about the safety of children?

A. I believe that when we discussed the multi-use trails that would go in, as well as the sidewalks, I recall that mitigating that concern for me. I don't recall if at the time we had more to discuss.

As I recollect now, I do feel

Page 329
that there were a couple outstanding items, perhaps, to address related to safety concerns but, again, the vote was requested. So I'm not sure that -- and I can't recall what, exactly, those were.

I'd have to bring up the application again to see if those were completely eliminated, or if they were just mitigated and we still needed some more conversation about that. I'd have to review the application and, specifically, what was agreed upon at the time that we voted.

Q. Did Berlin Township ever identify to T&R in writing, or in some other form of specific manner, what their safety concerns were with regard to this project?

A. I believe I've noted on record, pretty extensively, the answer to those questions.

I noted already on record, for example, that density was one concern but not the only concern. I believe that both trustees in public meetings have referenced numerous safety concerns and so I, I would leave -- there's nothing additional that I

Page 330
have to provide you that has not already been provided to you all on record.
Q. So other than what's identified in the minutes, there's nothing that was ever provided to T&R saying please correct these conditions because they involve safety concerns that are a problem for us as trustees? Nothing like that?
A. T&R requested the vote before the conversation was complete.
Q. Well, when they requested the vote, did you --
A. At the time of the, at the time of the vote, there had been nothing produced, to my knowledge, from a report standpoint, like I've already answered you so --
Q. After the vote where T&R's proposal was denied, there was a later meeting where, I think, T&R was essentially asking reconsideration. Do you recall that?
A. I do.
Q. In the interim, did the township identify to T&R any deficiencies in their application that needed to be addressed to get this project approved?

Page 331

A. I believe that it was very different from the time that we denied the application to when T&R asked to have it reconsidered; specifically, Ron Sabatino, Senior, expressed on numerous occasions his intent to sue us as a township, and we requested that communication start going back and forth between respective counsels.

We did have on record those initial concerns and -- until, until I asked for new information on that final meeting, and no new information had been produced by T&R.

Q. Prior to the decision which actually denied this project, did the township of Berlin ever specifically inform T&R how they should correct any perceived problems with their sidewalks?

A. I can't comment for anybody else on that, so I would just reference the record on that and whatever anyone else had conversations with T&R.

Q. Well, there, you would agree, is certainly no document that informed T&R of their deficiencies or safety concerns regarding their sidewalks within their

Page 332

proposal, right?
A. I can't --
MS. WRIGHT: Objection.
THE WITNESS: -- speak to what Berlin Township has fully provided to you all.
BY MR. MARGOLIUS:
Q. No. Well, from your perspective, you're unaware of any document coming from the township of Berlin to T&R identifying safety deficiencies or sidewalk deficiencies with their proposal, correct? No document?
A. The meeting minutes --
MS. WRIGHT: Objection.
THE WITNESS: -- are a document and I would say that, as I recall, they did come up within the meeting.
BY MR. MARGOLIUS:
Q. Okay. Other than the meeting minutes, was there a document directed to T&R which identified the specific deficiencies or safety issues with their proposed development?
A. To my knowledge I, I cannot recall any other entity providing information other than the Delaware Regional Planning Commission.

Page 333

Q. So no document other than, perhaps, that one, right?

MS. WRIGHT: Objection. Asked and answered.

THE WITNESS: To my knowledge -- yeah.

MR. MARGOLIUS: I'm sorry. That came through a little garbled. I think you were talking over each other, Cara.

MS. WRIGHT: My objection was asked and answered.

THE WITNESS: Okay. And my response was, again, to my knowledge, no.

MR. MARGOLIUS: Okay. No, all right. All right. I have nothing further. Cara, waiver of signature or does your client want to review.

MS. WRIGHT: We'll read.

(The deposition concluded at 10:27 a.m.)

* * * * *

Page 334

# C E R T I F I C A T E

STATE OF OHIO
SS:
COUNTY OF PREBLE

I, Heather M. Lunsford, the undersigned, a Certified Court Reporter and Notary Public within and for the State of Ohio, do hereby certify that before the giving of aforesaid deposition, said MEGHAN RAEHLL, was by me first duly sworn to depose the truth; the whole truth, and nothing but the truth; that the foregoing is the deposition given at said time and place by said MEGHAN RAEHLL; that said deposition was taken in all respects pursuant to the agreement and stipulations of counsel hereinbefore set forth; that said deposition was taken in stenotypy by the court reporter and transcribed into typewriting under her supervision; that the transcribed deposition is to be submitted to the witness for her examination and signature; the court reporter was neither a relative of nor attorney for any of the parties to the case, nor relative of nor employee for any of the counsel and has no interest whatever in the result of the action; I am not under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I herein set my hand and official seal of office this 14th day of January 2026.

Heather M. Lunsford

Heather M. Lunsford
Notary Public, State of Ohio

My commission expires
June 29, 2027

Page 335

Errata Sheet

NAME OF CASE: T&R PROPERTIES vs BERLIN TOWNSHIP

DATE OF DEPOSITION: 01/09/2026

NAME OF WITNESS: Meghan Raehll

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

_______________________

**1**

**10:00** 318:17

**10:06** 318:18

**10:27** 333:19

**12th** 259:1 263:7

**147** 304:7

**16** 260:1

**174** 296:20,23

**177** 296:21

**2**

**20** 264:24 322:5

**2022** 250:2,23

**2023** 246:17 249:16,19 250:4,23 251:1 252:12 253:16,19,22 259:1 263:7 267:3,11 288:15 289:1,4, 12,16,23

**2024** 309:2 313:6,8,10 324:1

**23** 297:21

**24th** 309:2

**25th** 289:23

**3**

**30** 262:3,6,12 263:2,15,17,19,24 264:4

**36** 292:19

**37** 292:20

**4**

**4** 258:13 259:1,12 308:17

**4.0** 269:25 270:5,8,23 271:13,21 272:1,11,21 273:2,21,25 274:3,5

**5**

**5** 308:17

**50-50** 321:17

**57** 244:22

**58** 244:22

**6**

**6** 258:24

**6.92** 265:12 269:18 270:4 273:3, 21 305:2

**8**

**8:02** 244:1

**8:21** 258:22

**8:22** 258:22

**9**

**9** 290:6

**9:07** 290:20

**9:20** 290:21

**9:26** 296:6

**9:29** 296:7

**A**

**A-1** 308:17

**A-5** 324:2

**A-6** 308:15,21 309:1

**a.m.** 244:1 258:22 290:20,21 296:7 318:18 333:19

**ability** 271:12 272:20,21,23 311:8 327:4

**Absolutely** 326:20

**accept** 311:17 313:21

**acceptable** 273:7,22,25 274:4,7

**accepted** 312:19 313:11 328:8, 11

**accepting** 323:20

**access** 292:19

**account** 293:14

**accurate** 248:2,4 259:10 260:7 262:23 290:1 312:15 324:15

**accurately** 262:20 286:7

**acre** 265:10 270:3 271:9 315:24

**acres** 265:9

**action** 325:21 328:4

**active** 314:2

**add** 256:11 277:3 296:14

**addition** 279:3

**additional** 275:2 329:25

**address** 297:14 298:6 299:13 300:2,7,25 301:25 329:2

**addressed** 266:6,9,16 274:24 293:19 303:15 316:8 330:24

**addresses** 300:9

**addressing** 301:8,11,23

**adequately** 266:9 293:19 316:8

**advice** 285:18 287:17

**advise** 325:11

**affect** 317:21

**affected** 249:2

**affirmative** 328:4

**affordability** 321:4

**affordable** 316:11,12 320:25

**African** 251:22

**age** 244:3

**agree** 255:21 259:7 298:15 331:22

**agreed** 259:22 260:21 274:8 276:2 329:12

**agreement** 244:13,19

**ahead** 262:17 271:6 276:25

**Aker** 283:3

**aloud** 260:19

**ameliorated** 302:4,24

**American** 251:23

**amount** 266:12 323:10

**ample** 301:12

**Andrew** 244:8 257:1 289:6

**answers** 247:3 257:14,15 295:12 320:24

**apartment** 279:25 322:1,13,20, 24 323:7

**apartments** 254:25 255:3,6,16, 19,20,21 264:23 265:1,8,10,16 266:3,14 280:17 321:9 322:10 323:10

**apologies** 328:9

**apparently** 261:25 289:23 312:10 318:22

**appeared** 248:4

**applicant** 263:22 300:15,18

**applicants** 254:18

**application** 246:12 254:10,13 256:1 258:2 264:14 266:21 267:1, 9,20 269:22 274:11,23 275:25 276:12 279:17 283:21 285:9 286:23 287:16 288:4,8,14,23,25 289:19,20 298:9 299:9 304:10,14 319:4,19,20,23 320:23 329:7,11 330:24 331:2

**applications** 254:18 302:2 305:24

**apply** 267:14

**appointed** 284:4

**approached** 314:2

**approval** 301:14 320:14

**approve** 264:14 271:19,25 272:4,10,21,24 274:3

**approved** 247:23 254:14,17,22 261:14,20 264:23 265:7 273:4 313:4 323:4,6 330:25

**approximately** 265:15,20 296:21

**April** 246:17 248:7 288:14,25 289:3,11,15,24

**area** 251:3,15 253:15 254:19,20 260:17 265:21 270:2 296:15,17 297:12,14,23 298:7 315:23

**areas** 315:21,25

**argue** 294:14

**association** 324:25 325:14,15 326:6,25 327:4

**assuage** 300:19

**assume** 246:4 296:2

**attend** 281:20 287:5,7,13 290:16

**attended** 287:11

**attention** 308:11

**attorney** 325:11

**attorney-client** 320:8

**attorneys** 244:13 320:8

**August** 247:13

**authority** 272:4 312:13,18 323:19 324:18,20 325:9

**automatically** 325:22

**aware** 247:5 250:6 301:14,18 317:17

**B**

**back** 247:8 274:10 290:23 296:9 309:7 311:5 318:8,23 323:13 331:7

**balances** 315:24

**ball** 304:2

**Ballard** 279:24 280:8

**barely** 254:2

**based** 275:15 323:6

**basis** 254:2 325:7

**bathroom** 290:23

**bedroom** 255:17

**begins** 263:21

**behalf** 244:10

**bell** 308:2

**beneficial** 287:3

**Berlin** 246:10,11,13 250:8 259:2 264:22,24 267:2,16 270:5,8 281:8 283:23 284:2,3,11,18 286:7,8 307:8 308:1 309:1 311:16 313:11, 20 314:5,16,18 316:2,4,6,7,10,13, 17,21 317:21 318:1,3 321:1,6,10 322:2 323:10 328:5 329:13 331:15 332:5,9

**big** 245:5

**bigger** 309:10

**BIO** 259:16

**bit** 245:3 249:14 281:22 285:19 290:5,24 309:6 318:20 319:14 322:8

**Block** 307:15,17

**board** 272:3,9 274:8 291:6 309:1 310:2

**board's** 305:16

**bodies** 288:12

**boundaries** 286:12

**bounds** 285:19

**break** 245:24 290:6,11,13,23 301:7 318:6,11

**breaking** 286:24 314:10

**bring** 329:6

**broadly** 315:3,18

**brought** 255:10 285:10 303:16

**building** 322:22

**built** 266:4

**Bullard** 264:12 280:9,10,15,22

**BZC** 283:14

**C**

**calculated** 244:21

**call** 254:20 255:24 268:10 282:13,14 308:14

**called** 250:12 270:2,8 271:8

**Calls** 272:12

**capable** 262:17,19

**capacity** 283:16 284:17,20 317:2 323:7

**Cara** 245:4 252:16 290:7 292:6 308:16 326:15 333:9,16

**careful** 286:16

**case** 256:24 285:13

**causing** 274:22

**CDBG** 307:7,8,12,24 310:4 311:17,20,23 312:19 313:11,21 323:20 324:16 326:8 327:5,22

**certified** 244:4

**chair** 326:24

**chief** 292:22,23 301:16
**children** 280:1,16 328:19
**choice** 295:14,20
**chooses** 257:4
**circumstances** 254:6
**citizen** 281:8,17 305:9
**citizens** 281:12,23
**city** 250:8 284:17 307:25
**clarification** 287:4,7 288:9 319:14
**clarified** 268:5 296:25
**clarify** 267:5 271:14 307:10 319:17
**clarity** 250:17 257:18
**clear** 275:5,6 277:10 282:19 289:11 298:2
**client** 257:2 294:4 333:16
**close** 322:22 327:3
**closed** 277:8
**closer** 265:22
**code** 248:22 249:3 262:7 306:12
**codes** 272:17
**cold** 249:15
**comment** 305:20,21 312:10 331:18
**comments** 248:6,9,11,15,19 249:1,10 305:11
**commercial** 246:12 254:10
**commercial/residential** 254:20
**commission** 284:3,4,12 286:7,8 288:1 289:22 332:25
**communicate** 282:9 291:8
**communicated** 286:6
**communication** 331:7
**community** 307:15,17 323:2
**compare** 253:14
**competitive** 308:20
**complain** 283:4
**complained** 282:11
**complaint** 282:13
**complete** 256:15 259:5,13 304:21 330:10
**completely** 329:8
**complex** 279:25
**complexes** 322:1,2
**compliance** 249:7 267:14 270:11,23,25 302:1 307:3 314:22 315:4
**complied** 269:23 270:19
**complies** 248:22
**comply** 300:17 306:11
**component** 246:25
**Compound** 299:17
**Comprehensive** 259:17 316:9
**computer** 290:24
**concern** 255:7 258:11 261:16,21 266:25 274:13,19 275:1 277:13 325:1 328:23 329:21,22
**concerned** 280:2 286:21 292:17 312:19
**concerns** 256:10,19,20,21 261:10 266:5,7,13,20 275:9 277:14 280:16,18 281:18,21,23 282:6,15,16 283:4,17 284:10,15 285:25 286:2,6,22 287:15 292:18, 24 293:4,7,8,12 297:8,18,20,22 298:4,7,20,22,25 299:7,8 300:19, 22 301:1,9,11,22,24 302:3,5,23 303:1,3,5,11,14,20,23 304:9,12, 17,21,23,25 328:18 329:2,15,24 330:7 331:10,24
**conclude** 318:8 325:8
**concluded** 333:19
**concludes** 303:17
**conclusion** 272:13 288:22
**conditions** 293:3,5 305:3,10 306:4 330:6
**conducting** 244:9,11
**confidential** 319:7
**confused** 249:4 271:16 289:8
**confusion** 260:17
**consideration** 288:3 289:2 302:1 315:11,17,21 327:19
**considerations** 258:5 315:6,8, 13,15,16,19
**considered** 255:11 267:2 288:25
**consistent** 244:12,14 305:22
**consistently** 282:9
**constituent** 281:7 306:3,25
**constituents** 253:14 291:5,22
**consult** 292:21
**consulted** 292:25
**content** 268:22 292:10
**context** 281:21 283:2
**continuation** 245:17
**continue** 244:19 300:5
**continued** 244:18 299:2
**continuing** 252:18
**control** 324:20
**conversation** 283:19 284:7 285:8 286:9,13 298:2 325:19,20 329:10 330:10
**conversations** 244:12 282:3 283:15 287:21 291:5 293:20 299:3 300:5,11,21 331:21
**conveyed** 286:8
**copy** 268:14
**correct** 246:15 251:1,2 254:8 258:9 261:15,16,19,23 262:3,25 264:8,15 265:13 269:15,18,19,21 274:6 276:4,8 281:6 311:14 313:9 327:2 328:13 330:5 331:16 332:11
**correctly** 248:5 312:24 327:16
**cost** 279:13
**counsel** 285:14,18 291:15
**counsels** 331:8
**county** 287:25 288:17,19 289:18, 22 308:5 310:3,4 312:25 314:2,3 324:25 325:13 326:5,11,25 327:9, 25
**couple** 245:19 246:17 247:1,8 292:1 325:18 329:1

**court** 244:14 290:25 302:18 304:3

**coverage** 317:15

**create** 305:2 315:9

**CROSS** 244:6

**cumbersome** 252:18

**cure** 252:19

**current** 250:22

**cut** 262:3,6,12 263:1,15,17,19,24 264:4 283:24 314:7

**D**

**Darcy** 282:23 284:12,21 286:14, 20

**date** 250:20 319:21

**dated** 289:22 309:2

**dates** 290:2

**day** 257:8,12

**DCTA** 324:24

**deal** 245:5

**dear** 310:11

**Deb** 282:24

**Dechristopher** 283:11,12,22 284:1,23 285:7 287:10

**decision** 248:21 270:10 277:18 279:5 289:20,24 293:9 294:11 331:13

**decision-making** 248:12 249:2, 11 276:21

**Defendant** 244:3

**defer** 290:8

**deficiencies** 330:23 331:24 332:10,20

**define** 322:15

**definition** 322:15,20,24

**Delaware** 287:25 288:17,19 289:18,21 310:3 324:25 325:13 326:4,5,25 332:24

**deliberate** 281:3

**deliberations** 277:19 278:19

**deliberative** 278:7

**denial** 320:22

**denied** 254:14,23,24 255:4 330:18 331:2,14

**density** 256:4,20 258:3 259:7,22 260:22,25 261:16,20,22 262:2,3, 5,6,12 263:1,15,17,19,24 265:7, 12 266:5 269:17,24 271:20 272:10,21,24 273:2,8 274:13,18, 19,22 275:10 276:1 277:12,13 284:10 287:16 305:1 315:6,13,17 329:21

**denying** 274:11

**depend** 248:22

**deposed** 244:5

**deposition** 244:1,10,11,19,20 245:1,17 246:25 247:7 255:9,22 256:10,16 257:7,9,17 278:14 279:5,11,14 292:17 293:22 294:17,23 295:11,17,22 296:11, 14 302:8 303:10 307:11 308:14, 21,25 333:19

**depositions** 296:19 308:16

**describing** 260:7

**determined** 325:21

**develop** 254:10 307:15,17

**developed** 284:16

**development** 246:13 281:2,9,13 297:23 305:11 332:21

**dialogue** 257:20

**difficulties** 283:23

**direct** 275:15,16,21

**directed** 332:19

**directly** 298:13,15 300:1,9

**disapproved** 323:6

**disclose** 320:9

**disconnect** 260:4

**discovery** 292:4

**discretion** 271:11

**discuss** 273:21 280:23 281:1,3,8 328:24

**discussed** 257:7 268:8 274:8 295:7 303:10 319:11 323:14 324:24 328:20

**discussion** 258:21 273:7 287:12 304:8 325:14 326:17

**discussions** 250:1 252:11,23 288:2,3,11 301:12 320:4,7

**distill** 275:6

**distinction** 255:12

**dive** 327:14

**diversity** 315:25 316:3

**document** 268:15 297:17 298:3 299:6 300:12,14 301:8,10 308:7 314:13 331:23 332:8,11,14,19 333:1

**documentation** 297:7 298:1,21 299:16 300:1,24 326:8,11,12,14, 17

**dominated** 252:10

**Dooley's** 250:12,15,18 251:3,14, 19,22 252:1,8 253:15,18

**dormant** 313:22 314:2

**driven** 252:1

**due** 267:17 270:11 285:11 286:12

**duly** 244:4

**duplicative** 244:24

**E**

**e-mail** 260:15 292:2

**e-mails** 291:21 292:7,9,10

**effect** 264:6 282:6

**effectively** 277:8

**efficient** 245:6,18 256:17,22 290:15 291:1 295:2,18 318:14

**efficiently** 257:24

**effort** 328:4

**Eighty-twenty** 321:17

**eligible** 310:3

**eliminate** 322:25

**eliminated** 329:8

**Elysian** 265:3,8,9,16 266:3,14

**encourage** 287:1 316:10

**encouraged** 287:2,13
**end** 314:7
**engage** 305:16 319:22 328:5
**engaged** 250:10
**ensure** 270:18
**ensuring** 316:5
**entail** 268:6
**entails** 311:24
**entire** 257:8,12
**entity** 298:18 332:23
**equitable** 267:14
**essentially** 330:19
**establish** 257:20
**established** 274:2
**estimate** 265:20 266:1 321:9,19 323:9,12
**estimating** 265:25
**et al** 246:10
**evening** 258:16 263:23
**events** 288:24 289:14
**exact** 250:20 282:1 290:2 321:15
**EXAMINATION** 244:6
**examined** 244:5
**excluded** 327:21
**exclusive** 261:2
**exclusively** 256:6 325:23
**excuse** 249:14 288:7 296:3 314:18
**executive** 319:3,6,9,22 320:1,4, 17,21
**exhibit** 258:13,25 259:1,12 308:15,21 309:1 323:13,22 324:2
**expect** 256:14 275:16,20
**expectation** 280:1
**experiences** 327:6
**expertise** 287:18
**explain** 254:15 255:7
**explicit** 258:11
**explicitly** 313:1
**explore** 248:19 281:22
**express** 280:3,19
**expressed** 331:4
**expressing** 284:15
**extensively** 329:18
**extent** 283:17 286:13

**F**

**fact** 248:15 252:8 255:2 256:16 266:4,23 270:10 299:2 323:3
**factor** 307:3 315:1
**factored** 276:21
**factors** 274:18,21 306:10 315:10 316:7
**fair** 264:1 286:20 311:24 328:6
**fairly** 267:13 327:3
**familiar** 249:17,20 250:11,15,16
**familiarity** 250:3
**fast** 313:18
**favor** 307:8
**feedback** 245:4 248:20
**feel** 278:2 305:1,15 306:2 328:25
**fellow** 252:11 264:12 273:1,20 280:25 291:6
**felt** 270:15 275:8 284:20 327:20
**filed** 250:7
**final** 263:5 277:18 278:4 279:5 297:13 331:11
**find** 268:21
**fine** 275:18,19 278:22 279:23 286:25 295:9 303:25 311:5
**finish** 318:6
**fire** 292:22 301:16,19,20,22,25 302:3
**Fire's** 301:25
**flies** 247:15
**flow** 297:10
**focus** 257:13
**follow** 286:10 292:16 305:19
**follow-up** 257:5 295:13 296:18 302:10 319:1 328:17
**foreclose** 275:14
**Forgive** 319:24
**form** 297:6 299:6,25 329:14
**formal** 276:15
**formalized** 269:9
**forward** 291:19 296:20 327:11
**foundation** 253:1,2,9
**free** 253:6,7,8 257:21 302:11
**front** 308:7 317:4
**full** 282:25 303:5
**fully** 256:12 262:16,19 266:24 275:5 276:14,18 303:17 332:5
**function** 247:22
**funding** 307:7,9,25 311:18,20,24 313:11,22 316:25 317:4,10,15 323:21 324:17 326:8 327:5,8,16, 18,22 328:11
**funds** 312:20
**furthering** 328:6
**future** 275:14

**G**

**garbled** 333:8
**general** 248:18 283:20 297:9 322:19 325:9
**generally** 314:25 315:2
**Genoa** 325:17 326:5
**gentleman** 283:13
**ghetto** 305:2,10 306:3,22,25
**gist** 282:8
**give** 256:15 276:16 278:8 293:24 298:22 299:12,16,25 301:7
**giving** 294:7
**good** 245:3 247:17 259:7,22 260:22 266:2 279:23 285:22 299:12,25 300:4,10,13
**grants** 307:15,17 313:12

**great** 286:18 328:16

**greater** 270:3,8 271:8,20 272:1, 10

**ground** 245:19

**growth** 316:1

**H**

**hair** 309:15

**hand** 327:7

**hand-in-hand** 249:8

**handle** 297:10 327:11

**happy** 247:15 294:19 324:8

**head** 247:4

**hear** 261:18

**heard** 306:15,22

**hearing** 281:20 287:14 305:12

**hearings** 246:16 249:10,16,19 250:4,25 282:12 305:25

**Heather** 295:25

**held** 258:21

**helpful** 253:4 326:18

**hereinafter** 244:4

**high** 259:8,23 260:23 261:1 316:19

**higher** 271:12 272:21,24

**history** 265:6

**hold** 259:11 265:24,25 284:14 285:15

**holidays** 247:16

**home** 323:2

**homes** 266:12 321:10

**honor** 295:23

**hope** 247:16

**hour** 244:22

**hours** 244:20 294:23

**housing** 251:4 253:15 279:18 311:25 312:13 316:11,13,19 320:25 321:6,8 322:16 323:19 324:18 328:6

**husband** 282:24

**I**

**idea** 299:12,25 300:10 307:4

**identification** 308:22

**identified** 279:2 305:9 324:14 330:3 332:20

**identify** 273:2 284:9 329:13 330:23

**identifying** 304:21 332:9

**imagine** 304:16

**immediately** 264:10,11

**imminent** 320:3

**implications** 313:3

**important** 257:19 267:1,10 278:20 279:18,19,22 316:1

**in/right** 297:12

**inaccurate** 263:5,11,13

**include** 315:19

**included** 269:17 327:18

**includes** 311:12

**including** 261:17 301:15,17 314:16

**income** 251:4,16,23 252:9,23 316:11,12,18,19

**incomplete** 261:4 295:12

**increase** 297:10 317:9

**increased** 317:15

**increasing** 317:4

**indented** 312:6

**indicating** 298:22

**individual** 305:20

**individuals** 282:11 291:8,22

**industrial/commercial** 254:19

**inefficient** 279:13

**inferring** 306:4

**influence** 248:11 249:11

**influenced** 248:16 249:1

**influences** 248:21

**inform** 331:15

**information** 253:22 275:2,19 292:2 300:19 313:5 325:4 326:1 327:24 331:11,12 332:23

**informed** 253:20,24 331:23

**initial** 331:10

**initially** 253:20

**initiated** 249:25 250:21

**inquire** 303:20

**instruct** 257:2 294:15

**insulting** 245:12

**intended** 254:21 306:9

**intent** 251:12 331:5

**interested** 291:18 316:2,5

**interferes** 245:5

**interim** 330:22

**internal** 249:5 268:7,24 277:19 278:6

**interpose** 319:6

**interpret** 306:18

**interpretation** 306:14,17,24 307:2

**interpreted** 306:21

**interrupt** 245:22

**intimating** 280:20

**invariable** 257:22

**invariably** 279:10

**involve** 330:6

**involved** 311:16 325:18

**involving** 251:15 277:14 292:18 320:18

**issue** 255:5 266:5 290:25 292:12 306:3 307:21 313:20 327:7,8

**issues** 256:5 257:6 259:16 268:4 275:10,21 281:1,9 300:2 317:3,5 332:21

**items** 315:20 323:17 324:16 329:1

**iteration** 245:1

J

**Jasper** 283:12 284:23 285:6,7 287:10

**Jerry** 282:22 284:11,23 286:5

**job** 301:25

**Josh** 309:8,15 314:11 324:11

**jotted** 267:21 269:8

**judge** 275:22

**June** 246:18 248:7 259:1 263:7 288:14 289:1,4,24 309:2 313:8,10 324:2

**justifying** 275:10

K

**Kaplan** 282:23 284:13,21 286:14, 20

**knew** 254:1

**knowledge** 252:3,25 253:5 264:23 275:17 285:13 293:10 313:13 325:10 330:15 332:22 333:5,13

L

**label** 308:14,16

**labeling** 308:25

**lack** 253:2

**lamented** 266:23

**Land** 259:17 316:9

**large** 292:9

**law** 319:7

**lawful** 244:3

**lawsuit** 246:9 250:7 278:21 320:4

**lead** 279:10 314:24

**leading** 314:5,17

**learn** 250:18 253:22

**learning** 253:17

**leave** 329:25

**left** 285:21

**legal** 272:13 285:14,18

**legislative** 326:24

**legitimate** 302:11

**letter** 301:18,20

**level** 287:18

**levies** 317:7

**levy** 317:18 318:2

**limited** 268:11

**list** 315:19

**listed** 310:7,8

**listen** 245:20 297:24 299:4

**lists** 261:22

**litigation** 320:18

**live** 252:2 265:21 316:6,7

**lives** 251:19

**local** 312:13 323:18 324:18

**long** 256:16

**losing** 312:12,19 323:18 324:17, 20 325:8

**loss** 279:22

**lot** 280:1,16 293:25

**loud** 247:3 263:21 310:13,18

**low** 251:4,16,23 252:9,23 316:10, 11,12,18

**lower** 269:21

**lull** 264:17

M

**Madame** 302:18

**made** 270:10 289:19

**major** 312:11 323:17 324:16

**make** 268:8 290:15 294:11,25 296:2 298:8 299:13 305:20 309:10

**making** 286:10

**manner** 329:15

**manufactured** 323:2

**Margolius** 244:7,9 245:2,7 248:24 251:8,13,20 252:4,16 253:3,11,13 257:11,25 258:8,18, 23 260:6,10 261:12 262:8,16,22, 24 263:12 264:9 267:7,8 270:13 271:6,10 272:18 273:9,14,18,19 274:16 277:4 280:7,11 283:8,10 289:10,13 290:4,12,22 291:3,14, 20 292:5,11,15 294:3,10,14 295:4,25 296:8 299:20,23 301:6 302:18,25 305:7 306:1,13,20 307:6 308:13,19,23 309:14,20,24 310:1,16 311:2,4,10 313:19 314:9,11,14 316:20 317:25 318:5, 12,19,25 319:10,16,18 320:12,15 321:7,14,25 322:11 323:25 324:7, 9,11,13 326:15,21,23 332:6,17 333:7,14

**marked** 258:25 308:22

**material** 300:15

**matter** 276:14 313:4

**meaning** 322:9,12

**meant** 307:4,5 313:3

**meeting** 248:1 261:9,19 262:1,11 279:4 280:21,23 283:2 285:25 286:4 287:6,8,11 288:4,7,10,19, 20 289:24 304:11,16,18,20,23 312:21 324:23 325:5,25 330:18 331:11 332:12,16,18

**meetings** 247:21,23 248:7,10 256:3 267:3,19 281:2,4,10,14,16 282:7,18 287:8 288:8,13 329:23

**Meghan** 244:2,15 276:24 290:9

**member** 283:14 284:3,5,12

**members** 325:15

**memory** 269:4,7 277:9 278:16 286:18 295:19

**mentioned** 255:8 256:9 286:1 287:13 297:19 299:1 327:17

**met** 250:10

**middle** 246:1 259:20 312:9

**mile** 265:15,18

**mileage** 265:17

**miles** 265:23

**mind** 272:19 292:13 326:16

**Mine** 259:15

**minimal** 267:24 268:10

**minorities** 251:4,16 306:5

**minority** 252:10

**minute** 283:7,9 310:9

**minutes** 244:23 246:21 248:1 256:2 258:12 259:6,21 260:14,25 261:4,9,13,14,19 262:10,15,21 263:4,8,11,16 264:11,19 266:8 279:4 288:5,7,10,19 289:21 290:14,18 304:16,18,20,24 312:22 318:7,15 324:23 325:6,25 330:4 332:12,19

**mischaracterization** 301:5

**Mischaracterizes** 258:7

**mispronounced** 280:12

**Misstates** 262:15

**misunderstood** 264:2

**mitigated** 329:9

**mitigating** 328:22

**moment** 260:17 274:10 277:16

**money** 318:2,4

**months** 247:1,8,10 304:18

**move** 256:23 311:11 313:14,18 327:11

**moving** 296:20 312:22 314:13 316:12 325:3 327:20

**multi-family** 254:22

**multi-use** 328:21

**N**

**NAGY** 280:10 283:6 309:18,22 310:25 311:3 314:8

**names** 282:10,15,20,25 283:1 285:3

**nature** 320:5 327:12

**needed** 287:4,7 305:21 327:24 329:9 330:24

**newspaper** 317:14

**nice** 247:16

**Ninety-nine-one** 321:17

**nod** 247:3

**nonetheless** 257:23

**note** 252:18

**noted** 325:17 329:17,20

**notes** 267:18,24 268:2,6,10,16, 23 282:2 284:6 328:14

**noticed** 251:21

**number** 257:11,12 270:14,20,24 271:1,13 273:2,8,21,25 274:5,7 275:25 282:1 293:4 305:1 315:21 323:4

**numerous** 329:24 331:5

**O**

**O'BRIEN** 264:13 304:9

**O'Brien's** 304:22,25

**object** 244:23 253:8 255:2 276:23 305:8 306:23

**objectable** 252:20

**objecting** 252:25

**objection** 248:17 251:5,9,17,24 252:13,19 253:2 258:6 261:7 262:4,14 263:9 264:7 267:4 270:6 271:4 272:12 273:5,12 274:15 276:23 280:4 299:17 301:2 305:5, 13 306:7,16 307:1 313:16 316:15 317:22 319:6 321:2,11,21 322:6 332:3,13 333:3,10

**objections** 252:17 304:10,13

**obligation** 311:24

**occasions** 331:5

**occur** 289:3

**occurred** 289:15

**ODOT** 287:22 292:25 293:2,4,20 298:6

**ODOT's** 299:7

**offense** 245:14 279:21

**offer** 269:11 275:11 279:6

**office** 292:23

**official** 284:1,4,17 317:2

**officials** 288:12 301:15

**Ohio** 319:7

**Olentangy** 316:22,23 317:16,18

**operate** 305:24

**operating** 284:21 305:18

**opinion** 251:19 252:2 267:12 270:17,21 272:2 307:16,19,23 313:18 316:18 317:1

**opinions** 284:16

**opportunity** 298:23

**opt** 313:1 325:23 326:1

**opted** 313:1 325:22

**opting** 325:3 327:25

**options** 294:8

**oral** 298:2 300:21

**Orchard** 250:12,16,19 251:3,15, 19,22 252:1,8 253:15,18

**order** 244:14

**original** 244:25 247:7

**outcome** 285:20

**outstanding** 266:20 312:23 329:1

**overcrowded** 316:24

**overcrowding** 306:5 314:5,18, 21,24,25 315:5,7,12,14 317:7

**Overlay** 259:16

**override** 272:16

**P**

**paragraph** 259:6,13,20 260:8 261:23,24 263:6 312:6 324:23

**parcel** 315:2

**part** 276:11 284:16 289:2,18 298:8,19 306:11 315:16 316:21 322:17 325:17

**participate** 319:3

**participation** 318:22

**party** 300:22

**passed** 264:20

**patience** 318:21

**pay** 308:10 318:2,3

**pedantic** 257:13
**pending** 313:20 320:3
**people** 251:22 281:18 282:16 284:9,15 285:18 291:6 316:12
**perceive** 314:4,15
**perceived** 314:21 331:16
**percent** 262:3,6,13 263:2,15,17, 19,24 264:5
**percentage** 321:8,13,16
**perfectly** 302:10
**period** 289:8
**permitted** 244:20 270:1
**persistent** 261:10
**persisting** 298:24
**person** 305:21
**person's** 254:6
**personal** 252:24 267:12,21 268:16 269:3 270:17 307:16
**personally** 270:15
**perspective** 266:13 270:22 314:20 315:22 332:7
**Plaintiffs** 244:10
**plan** 259:7,17,22 260:22,25 261:3 297:13,14 316:9
**Planning** 288:1,18,20 289:18,22 332:24
**plans** 301:16
**point** 245:25 247:22 253:19 278:13 279:11 293:22 294:1 319:20
**police** 292:23
**portion** 302:20 314:17
**pose** 266:4
**position** 277:6
**potential** 320:18
**potentially** 325:4 326:2
**power** 271:19,23,25 272:10,16 274:3
**Powerpoint** 298:6
**precise** 257:14,15 296:10 322:9
**precisely** 313:8
**predicate** 295:6
**prefer** 255:24 290:10,13 294:1 318:10
**preference** 295:22
**prepared** 296:15
**prerogative** 253:12
**present** 258:19
**presentation** 298:11,12
**presented** 294:19
**preserve** 291:19
**pretty** 248:1 283:16 286:13 289:11 329:18
**previous** 279:11
**previously** 250:7 258:25 287:22 292:3 295:7
**prior** 246:24 249:16,19 255:9 256:9 257:7 288:22 293:9 296:13 298:25 299:8 300:19 301:13 302:7 303:10,15,22 319:21 320:13,22 327:24 331:13
**private** 284:15 290:16
**privately** 283:4
**privilege** 320:9
**prob** 269:12
**problem** 296:20 330:7
**problematic** 266:18
**problems** 299:14 312:12 331:16
**procedural** 284:22 286:22
**procedure** 286:11 305:18
**process** 249:6 266:25 267:17 268:24 275:23 276:15 277:17 278:5,7 283:16,20 286:12 319:19
**processes** 268:7
**produced** 292:8 330:14 331:12
**productive** 316:1
**professional** 270:21 307:18
**program** 310:4
**project** 249:12 250:11,17,19 251:12 252:9,12 253:15,18 255:15 265:11,14 266:11 267:15 269:16 270:18 271:12,20 272:9 274:6,9 277:10 278:20 282:17 283:15 291:24 298:20 299:14 300:2,23 301:17 314:4,15,17 329:16 330:25 331:14
**projects** 250:2,22 267:13
**pronouncing** 245:8
**proper** 253:9
**property** 254:11 305:3 306:6 322:21
**proportion** 315:22
**proposal** 269:17 330:17 332:1, 11
**proposed** 328:1 332:21
**proposing** 253:16
**protected** 320:8
**provide** 287:3,5,6 298:21 300:15, 16,18,24 301:10 303:18 305:21 330:1
**provided** 258:15 275:12 276:17 277:21 288:18 292:3 298:12,14, 16,17,18 299:6 303:5 327:10 330:2,5 332:5
**providing** 332:23
**provision** 305:17
**proximity** 285:8,12
**public** 248:6,9,11,15,19 249:10 268:17 280:21,23 281:4,9,14,16, 20 282:7,12,17 283:2 285:24 286:4 287:6,14 301:15 304:11 305:11,17 329:23
**pull** 258:16
**pulled** 260:14
**purpose** 248:14,18 324:22
**purposes** 255:22 256:17 285:19 326:18
**put** 244:17 253:1 308:9 312:5 323:15 324:1,3,8

**Q**

**qualification** 310:3
**qualified** 276:3

**quality** 292:19

**question** 245:20 246:1,3,5 247:6 249:5,21 252:22 253:8,10 256:14 257:3,4,10 258:1 259:25 260:4 262:20 267:6 271:14 273:15,17 274:14,20,24 275:13,16 276:19, 25 278:2 279:1 280:14 282:19 285:11 295:1 297:25 299:18 300:8,9 302:9,14 314:3,6

**questioning** 290:15,21

**questions** 244:24,25 245:23 246:2 257:5,23 275:14 279:20 284:22 286:22 289:7 294:18,22 295:6 299:5 306:23 312:23 319:1 329:19

**quick** 319:1 324:5 328:17

**quickly** 256:24 327:21

**quote** 323:16

**R**

**R-10** 265:10

**Raehll** 244:2 245:9,10,13,16 258:5,14 260:7,20 262:18 263:1, 21,22 271:2 291:7 296:3,4,9 303:2 304:2 308:15,21 312:6,11 323:17

**Rail** 245:11

**railroad** 245:10

**raised** 306:3

**rapid** 327:12

**rationale** 274:11 279:18

**re-depose** 257:6

**reaching** 292:1

**read** 260:19 263:20 302:21 310:10,13,15,18 311:8 325:10 333:18

**reading** 325:16

**ready** 290:25 310:22,24

**reason** 256:7 258:11 261:2,23 300:16

**reasons** 276:1,4,7,9,10,11,20 277:12,13,15,23,25 278:12,15,17 279:2,16

**rebut** 298:16,23

**recall** 246:19 248:5,8,9,10 250:20 252:14 253:17,21,23,25 265:2,3 267:22 268:20,22 277:15,19 279:7 280:20 281:15 282:10,15, 20,23,25 283:1,14,18 284:21 285:9,25 286:1,3 287:21,25 288:3,21 290:2 291:12,25 303:23 304:15,17 307:14 308:6,8 310:6 311:15 312:24 320:21 325:15 326:13 327:16 328:22,23 329:4 330:20 332:15,22

**receive** 297:6,13,16 298:3 326:7, 13

**received** 289:17 290:3 297:9 298:5 326:10,12

**recently** 246:22,23

**recess** 290:20 296:6 318:17

**recognize** 278:13

**recollect** 328:25

**recollection** 293:24

**recommendation** 285:23 288:18,21 289:17

**recommended** 312:22 325:2,25

**reconsideration** 330:20

**reconsidered** 331:3

**reconstruct** 269:4,7

**record** 244:18 258:19,22 268:17 275:12 276:14,18 277:7 278:9,11 290:23 293:15,18,21 294:4,8 295:10,16 296:1,10 298:9 299:1 300:6 302:6,7,21 303:6,8 304:4,7 311:6 323:1 329:17,20 330:2 331:9,19

**records** 259:2

**recuse** 285:12

**redundant** 252:7

**reference** 251:1 255:20 256:16 296:15 306:22,25 308:5 324:5 331:19

**referenced** 255:3,6 260:17 261:9 269:2 291:23 302:7 326:4 329:23

**references** 296:22

**referencing** 260:16 280:6 288:9 289:9 295:17 324:6

**referring** 323:23

**reflect** 304:4,16

**reflected** 264:19 266:8 325:5

**reflects** 262:20

**refuse** 278:25

**regard** 251:14 256:11 265:8 266:11 272:8,22 274:12 279:17 287:16 304:13 329:16

**Regional** 288:1,17,20 289:18,22 332:24

**reject** 258:2 274:23

**rejected** 256:4 272:22 276:11

**rejecting** 256:8 260:24 279:19

**rejection** 258:11 261:3 279:16

**related** 297:22 298:7 300:14 312:13 315:5,8,13,14 317:8 319:14 320:5 323:19 324:18 326:14 329:2

**relating** 291:16

**relation** 323:20

**remember** 254:4,6 269:10,14 275:18 277:22,24 278:21 279:3 284:25 292:9 303:25 304:1

**remembered** 254:2

**remembers** 295:9

**remind** 245:15 320:7

**reminders** 268:3,4,6,23 269:1

**rental** 305:3 322:20,21,23 323:4, 5,6,10

**repeat** 273:16 280:13 302:13 314:6

**repetition** 257:22

**rephrase** 249:9

**replied** 281:19

**report** 298:21 299:6 312:15 330:15

**reported** 312:11 323:17

**reporter** 290:25 302:19

**request** 264:18 292:4 295:24 298:25

**requested** 266:17,24 273:3

299:10 300:3 302:20 327:13 329:3 330:9,11 331:6

**requesting** 266:19 300:20 301:13

**requirement** 328:3

**reread** 302:16,19

**reserve** 319:11

**resident** 253:20,23 291:25 306:9,15

**residential** 246:13 254:11,21,25 255:4 266:21 269:18 273:22 274:12,23 277:11 279:17 301:17 314:16

**residents** 248:20 251:16 252:2 281:17 292:1 305:16 318:1,3

**resolution** 264:13,20 270:12 272:25 306:19 309:2 310:8 311:16 315:9 324:1 327:25

**resolved** 293:8

**respective** 331:8

**responded** 256:12

**response** 256:23 327:12 333:13

**result** 287:9,12

**resume** 290:17

**resumed** 290:21

**review** 291:15 328:14 329:10 333:17

**reviewed** 246:21,24 247:20,21 248:3 296:11 298:10

**reviewing** 288:4,21 304:17

**rid** 268:20

**rings** 308:2

**risk** 312:12 323:18 324:17,20 325:8

**roads** 274:25 275:9 276:8,9,10, 20 277:14,15 278:12 292:18,19 297:18 298:4,7

**role** 305:16

**Ron** 331:4

**route** 286:19

**rude** 303:19

**rules** 244:21 245:19

**S**

**Sabatino** 250:17,19 253:18 259:15 263:18,23 264:4 266:17 286:9 331:4

**Sabatinos** 249:18,20,25 250:6, 12,21 252:8

**safety** 256:19,20 266:4,7,12,20 275:9 277:13 278:12,15,16 280:18 284:10 287:15,18 292:18, 23 293:7,8,11 297:8,18 298:4,6, 20,22,25 299:7,8,13 300:2,22,25 301:8,11,24,25 302:23 303:1,5, 10,15,20,23 315:8,15,16,18 328:18,19 329:2,15,24 330:6 331:24 332:9,21

**sat** 257:8 294:22

**satisfactory** 270:15 301:21

**save** 293:25

**school** 316:22,24

**schools** 317:4,10,16,18 318:4

**schools'** 317:7

**screen** 260:12,13 308:10,25 323:15 324:1,3,8

**scroll** 309:15 310:21

**search** 277:9

**seek** 287:17 307:24

**Senior** 331:4

**sense** 294:25

**sentence** 259:20 260:8,9,15 261:18 262:9 263:6,20

**separate** 302:9 326:16

**September** 246:18 288:14 289:1,4 319:21

**series** 246:2

**session** 319:9

**sessions** 319:3,7,23 320:1,18,22

**sharing** 314:8,12

**sheriff's** 292:22

**show** 293:18 294:17,24 312:22

**shown** 260:5

**sidewalk** 332:10

**sidewalks** 328:22 331:17,25

**signature** 311:12 333:16

**simply** 256:16,22 257:16 264:3 273:10 275:22 282:5 305:19

**sir** 244:16 274:20 277:17 280:14 294:2,6 300:10 301:5 303:13 304:4 311:9 317:24

**situation** 297:21 301:5

**sketches** 297:9

**slow** 275:22 313:18

**slowly** 312:22 313:14 325:3

**sort** 249:8 251:9 254:1 299:15 325:9 328:3,4

**sought** 285:13

**sound** 290:7

**sounds** 245:3 290:1

**sources** 297:7

**speak** 245:21 251:6 265:5 270:9, 10 275:3 277:17 278:3,4 281:12 282:7 284:19 296:16,17 303:6 306:8 313:23 316:4,16,17 323:3 332:4

**specific** 254:12 270:2 287:19 290:2 293:11 297:17 298:3 329:15 332:20

**specifically** 255:13 278:11 284:25 286:1 304:15 329:11 331:4,15

**specifics** 286:3 308:6 327:15

**speculate** 264:16 286:17 321:18, 24

**speculating** 286:19

**speculation** 269:12

**speculative** 269:14

**speed** 276:24

**spoke** 281:15 283:1 286:15,21 296:23 297:20

**spoken** 294:2 303:4 307:11

**stance** 317:6

**standard** 305:18

**standing** 253:1

**standpoint** 281:17 330:15

**stands** 307:12

**start** 317:19 331:7

**started** 244:1

**starting** 252:17 289:11

**starts** 312:5

**state** 248:20 259:6 263:16 277:6 285:3

**stated** 258:10 262:11,25 266:23 271:8 278:9,10,23,24 279:24 295:19 297:17 300:5 304:19 323:16 325:2

**statement** 263:10 324:15

**stating** 262:17

**stay** 286:11

**stop** 314:8,12

**street** 280:19

**streets** 280:3

**stuff** 247:17

**submitted** 305:2

**sue** 331:5

**sufficient** 264:5

**sworn** 244:4

**synthesize** 270:4

**system** 316:22,24

**T**

**T&r** 246:9,12 249:10 253:16 258:2 264:14 265:11,14 266:11 267:1,19 269:16 270:4 271:20 272:11,22 273:3,22 274:5,9,11,23 276:12 278:20 279:17 281:1,9,13 282:17 288:8,13,25 291:11,17,23 298:9,16,17,20,22 299:6,25 300:3,11,13,25 301:8,10,13,14 304:10,13 305:2 306:5 314:4,15, 18 319:4 329:14 330:5,9,19,23 331:3,12,15,21,23 332:9,19

**T&r's** 254:9 319:20,23 330:17

**tackle** 292:12

**talk** 256:19 299:15 307:7 327:5

**talked** 285:1 319:2

**talking** 249:17 254:5 255:18 262:1 333:9

**tasking** 318:23

**technically** 271:23

**ten** 265:9 290:13,17 315:24

**ten-minute** 290:6

**terms** 298:9 317:3

**testified** 252:24 261:11 266:22 275:1 276:13 287:23 293:1,14 294:24 319:9

**testify** 319:8

**testimony** 258:7 275:3,4 277:16 294:19 295:23 296:12 297:19 303:6,16,22 305:17

**text** 269:23,24 270:1,7,19,25 271:8 291:9,12

**texts** 291:15

**thing** 290:16 309:7

**things** 267:10 318:24 328:12

**thinking** 269:3

**thought** 249:6 268:7,24

**thoughts** 267:22 277:20 278:7, 19

**threw** 268:19

**ties** 327:3

**time** 246:22,24 247:15 250:9 251:9 256:19 257:10 259:24 266:9,17 267:23 271:5 277:1,3,5, 7,21 278:8 279:13 289:8 292:12 293:25 294:9 295:3,15,16 301:12 303:18 326:10 327:24 328:2,23 329:12 330:13 331:2

**timing** 264:16 319:15,25 320:2

**today** 244:10 245:6,18 246:9 255:19 256:13,24 275:6 276:16 292:10 318:22

**today's** 256:17

**told** 312:25

**tonight** 263:25

**top** 259:14 263:7

**topic** 246:2 326:14

**townhomes** 255:11,13,17,19,21, 24 256:3 265:15 321:9 322:25

**townhouse** 279:25 322:2

**townhouses** 258:3 265:11 280:17

**township** 246:11,14 250:1,22 255:10 259:2 264:22,24 270:9 272:4 281:8 283:23 284:2,18 298:13,15 300:16 307:8,25 309:1 311:17 312:25 313:11,21 314:5, 16,19 315:3,22 316:2,4,10,13,17, 21 317:2,6,9,21 318:1,3 321:1,6, 10 322:3,17 323:5,11 324:25 325:4,13 326:5,6,25 327:11 328:5 329:13 330:22 331:6,14 332:5,9

**townships** 312:12 323:18 324:17

**traffic** 297:10,11,15,22 302:5 303:2,3,11,21,24

**trails** 328:21

**trample** 245:21

**transcript** 278:14 279:11 295:17

**treated** 255:23

**true** 274:18 276:2 284:23

**trustee** 245:10 246:10,11 247:4, 22 256:2 258:5,9,12,13 259:2,3 260:7,20 262:18 263:1 267:10 270:22 271:1,19,22 280:8,15,22 281:2 291:7 296:4,9 303:1 304:2, 9,22 310:23 312:6,11 319:22 323:16

**trustees** 247:23 252:11 256:4 258:2 259:6,21 260:21 264:12 269:20 270:5,9 271:11,24 272:3, 9,16,20,23 273:1,6,20 274:1,2,22 280:25 291:7 309:2 311:13 317:5 329:23 330:8

**Turkowski** 296:24

**turn** 292:19 297:11,12 304:6

**turned** 276:1 277:11 319:21

**turning** 299:8

**Turowski** 296:24 297:1,20

**two-story** 255:12

**type** 257:18 312:18 327:18

**types** 321:6 322:16

**U**

**Uh-huh** 309:3

**unaware** 328:11 332:8

**underlying** 277:12

**understand** 246:4,5 253:4 255:15 271:18 288:16 298:1 299:21 311:20 313:2 317:24 318:12 321:4 323:8

**understanding** 244:16 248:3 255:11 296:13 327:23

**understood** 255:14,16,25 267:18 282:2

**undeveloped** 277:20

**unit** 322:20,23

**units** 269:18 270:3 271:9 273:23 274:12 315:24 321:8 322:22 323:4,5,10

**unsafe** 293:3,6

**urban** 310:4

**V**

**vague** 295:12

**Valentine** 282:22 284:11,24 286:5

**variety** 321:5

**verify** 275:19,25

**versus** 246:9 321:10

**voice** 281:20 283:4

**voiced** 281:18,23 282:14,16

**volume** 292:9

**vote** 262:12 263:23,25 266:10,17,19,24 271:22 299:1 300:4,20 301:13 307:24 329:3 330:9,11,14,17

**voted** 254:9 264:13,18,20 265:4 327:21 329:12

**W**

**Wait** 259:11

**waiver** 333:16

**wanted** 262:11 263:1,14,17,22 268:5,8 269:20,22 270:4,5 313:2,14

**ways** 297:9

**whatsoever** 299:16

**word** 268:2,4 283:25

**words** 268:13 277:22

**work** 256:13 274:5

**worries** 280:13

**WRIGHT** 244:17 248:17 251:5,17,24 252:13,21 253:7 257:1 258:6 259:24 260:3 261:7 262:4,14,19 263:9 264:7 267:4 270:6 271:4 272:12 273:5,12 274:15 276:22 280:4 289:6 290:8,19 292:8,14 294:13 295:21 296:5 299:17 301:2 305:5,13 306:7,16 307:1 308:18 310:12 313:16 316:15 317:22 318:9 319:5 320:6 321:2,11,21 322:6 323:22 326:20 332:3,13 333:3,10,18

**writing** 245:15 299:12 300:25 329:14

**wrong** 309:17

**wrote** 268:15,25 269:10

**Y**

**years** 264:24 317:11

**yell** 294:15

**yesterday** 258:16 308:16

**Z**

**zoning** 248:21,22 249:7 262:7 267:14,16 269:23,24 270:1,7,11,19,24 271:8 272:4,16,24 284:3,12 286:7,8 291:6 300:18 302:1 305:23 306:11,19 307:3 312:13 314:22 315:4,9 323:19 324:18

**zoom** 283:22 309:5