**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| T&R Properties, Inc, *et al.*, | : | Case No.: 2:24-cv-03761 |
| Plaintiffs, | : | |
| v. | : | Judge James L. Graham<br>Magistrate Judge Kimberly A. Jolson |
| Berlin Township, et. al. | : | |
| Defendants. | : | |

***Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment***

**TABLE OF CONTENTS**

Page(s)

TABLE OF CONTENTS AND SUMMARY PER S.D. OHIO CIV. R. 7.2(a)(3) ....................... 1-4

INTRODUCTION ........................................................................................................5

PROCEDURE ..............................................................................................................5

SUMMARY JUDGMENT STANDARD ......................................................................5

PERTINENT FACTS ................................................................................................ 6-16

MEMORANDUM OF LAW ..................................................................................... 17-32

I. Evidence of Intentional Discrimination Exists Sufficient to Deny Summary Judgment ........ ...................................................................................................... 17-23

A. Discrimination Against Children ("Familial Status") Was an Unlawful Motive Behind the 4.0 Density Requirement ........................................................ 18-19

B. Berlin's Actions Also Show Bias Against African Americans by Inferring that Apartments Would Create Violent Ghetto Conditions .................................... 20-22

C. Defendants' Reliance on the *White Oak Property Development* Case is Misplaced ..........................................................................................................23

II. The Actions of Berlin in Requiring a 4.0 Density Under its Comprehensive Zoning Policies Creates a Disproportionate Impact on Blacks and Families .......................... 23-32

A. Plaintiffs' Expert Report Shows Disproportionate Impact and a Robust Causation…….......................................................................................... 25-28

B. Berlin's Argument that Other R-10 Zoned Apartments Exist is a Fiction........ 29-32

CONCLUSION..........................................................................................................32

**PLAINTIFF'S SUMMARY AS REQUIRED PER S.D. OHIO CIV. R. 7.2(a)(3)**

Berlin Township is a nearly all-white community: 3.6% of its residents are Black and 3.5% Hispanic, against statewide figures of 12.3% and 4.4%, and only 5.6% of its housing is renter-occupied, against 34.6% statewide. Between 2009 and 2021 the Township approved twenty-two single-family developments and three condominium developments, and not one apartment. T&R proposed the only apartment community ever sought inside an overlay Berlin itself adopted to provide "a variety of housing options" at flexible and discretionary densities. The County recommended approval. T&R then cut seventy-two units, increased its setbacks, added parking, and left roughly seventy percent of the site in open space. The Trustees rejected the project anyway, their minutes recording that "[a]ll three trustees agreed that it was a good plan but the [6.97] density was too high." (pp. 6-15.).

The Fair Housing Act reaches both intentional discrimination and disparate impact, and a municipality answers under either theory where its zoning carries the purpose or the effect of excluding racial minorities and families. *Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015). On this record, both issues present material issues of disputed fact. (pp. 16-32.)

The evidence of discriminatory purpose satisfies the *Arlington Heights* totality inquiry — impact, historical background, the sequence of events, departures from the ordinary course, and

contemporaneous statements. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977); (pp. 17-22). Berlin now ties its 4.0 density cap to child safety, but "safety" appears once in the minutes rejecting the project, no document supports the concern, and Trustee Bullard testified that he never saw any evidence of it even as he conceded that it underlay his position on density. A rationale first articulated after the decision and unsupported by anything contemporaneous is evidence of pretext, and a rationale aimed at children is evidence of bias against families. *Lindsay v. Yates*, 578 F.3d 407 (6th Cir. 2009); *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579 (6th Cir. 2002); *Choices in Cmty. Living, Inc. v. Petkus*, 517 F. App'x 501 (6th Cir. 2013); *Selden v. U.S. Dep't of Hous. & Urban Dev.*, 785 F.2d 152 (6th Cir. 1986); (pp. 18-20.).

The same record carries racially coded language into the decision. A resident told the Trustees that "[a]nything above R4 is a crime and will create a ghetto," and no trustee objected or asked what was meant; a member of the Board of Zoning Appeals asked T&R to identify the "target market" and "demographic" for the apartments, prompting T&R to invoke the Fair Housing Act on the record; and the Township opted out of CDBG funding to avoid the obligation affirmatively to further fair housing. While a citizen's racial comment itself might not be imputed to a government decisionmaker, officials who adopt or acquiesce to such sentiment can be found to have acted upon it. *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188 (2003); *United States v. Birmingham*, 727 F.2d 560 (6th Cir. 1984); *Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982); *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974); *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581 (2d Cir. 2016). (pp. 20-22.).

Independent of motive, the 4.0 requirement produces a disparate impact. (pp. 23-32.) Dr. Lichtman's unrebutted statistical analysis establishes that the requirement makes apartment development economically infeasible and disproportionately burdens African Americans,

Hispanics, and families with children, who rent at far higher rates and earn substantially less. Defendants' expert, which Defendants now ignore in their Motion, largely agrees with Dr. Lichtman and offers no competing analysis. That showing supplies the robust causal connection the Act demands. *Inclusive Cmtys.*, 576 U.S. at 542-43 (discussing 24 C.F.R. § 100.500(c)); *Arthur v. City of Toledo*, 782 F.2d 565 (6th Cir. 1986); *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493 (9th Cir. 2016). (pp. 23-26.). Absent a showing of competing statistical evidence, as is the case here, case law traditionally calls for the denial of summary judgment. *Pickett v. City of Cleveland*, No. 1:19 CV 2911, 2023 WL 11987525 (N.D. Ohio Sept. 29, 2023); *Sw. Fair Housing Council, Inc. v. Maricopa Domestic Water Improvement District*, 17 F.4th 950, 964 (9th Cir. 2021). (pp. 27-28.)

In lieu of competing statistical evience, Berlin asserts that another R-10 parcel is developable. However, this is a fiction, because the parcel Berlin identifies has never been developed and that its own expert concedes are unlikely ever to be built. (p. 29.) Its business justification, a vague appeal to rural character, is subjective and disputed, and is undercut both by the coded language surrounding the denial and by the apartments standing in adjacent communities. *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950 (9th Cir. 2021). (pp. 29-30.)

Genuine issues of material fact exist as to both motive and effect, and Defendants' Motion for Summary Judgment should be denied. (p. 32.)

## I. INTRODUCTION

This Court should deny the Motion for Summary Judgment (the "Motion") of Defendants Berlin Township, the Berlin Township Board of Trustees, and the Berlin Township Board of Zoning Appeals (collectively, "Berlin" or the "Township") because genuine issues of material fact exist on Plaintiffs' Fair Housing Act claims. Plaintiffs T&R Properties, Inc., Berlin Industrial, LLC, and Berlin Apartments, LLC (collectively, "T&R") sought to develop the only apartment community ever proposed within Berlin Township's business park. Defendants refused, and their zoning scheme has precluded apartment development altogether. The record permits a jury to find that the stated reasons for the density restriction were pretextual, and that the resulting exclusion of rental housing disproportionately burdens African Americans, Hispanics, and families with children. Defendants' Motion should be denied.

## II. PROCEDURE

Discovery is complete in this matter. Part of the case has been dismissed via a Motion to Dismiss, leaving only fair housing related claims.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only where there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). The movant bears the initial burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views all evidence and reasonable inferences in favor of the nonmovant, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), and may not weigh evidence, assess credibility, or choose between competing inferences. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990). Claims turning on intent and motive are therefore rarely suited to summary disposition, and the *Arlington Heights* totality of the circumstances inquiry resists resolution on a paper record.

## IV. PERTINENT FACTS

### A. Berlin Township is a Nearly All-white Community with Almost No Rental Housing.

Berlin Township is a fast-growing community in Delaware County, Ohio. Under the 2020 Decennial Census, Black residents comprise 3.6% of Berlin's population, and Hispanic residents comprise 3.5%. *Lichtman Report*, ECF No. 137-4, PageID 7576, Table 1. Statewide, those figures are 12.3% and 4.4%; across the Columbus Metropolitan Region, they are 15.5% and 5.2%. *Id*. In absolute terms, Berlin is home to 349 Black residents and 327 Hispanic residents. *Id*., PageID 7506. Defendants' expert (Trende) does not dispute these figures, conceding that Plaintiffs' expert (Dr. Lichtman) "reports the Black and Hispanic population for Berlin Township accurately." *Trende Report*, ECF No. 137-6, PageID 7672.

Berlin's housing stock mirrors its demographics. Only 5.6% of the Township's housing units are renter-occupied, compared to 34.6% statewide and 20.1% across Delaware County. *Lichtman Report*, ECF No. 137-4, PageID 7502, 7577, Table 2. The Township's median home value is $392,000 – more than double Ohio's $159,900 median. *Id*., PageID 7580, Table 5. Between 2009 and 2021, Berlin approved twenty-two single-family developments and three condominium developments but **approved no apartment developments.** *Id*., PageID 7570-71 (emphasis added). To this day, not one multi-family apartment project has been completed within the Township. *Id*.

The Township's own school data confirms the point rather than undercutting it. Across the nine schools serving Berlin Township, Black enrollment stands at 5.8% and Hispanic enrollment at 4.8% for FY 2025 – 62.9% and 42.7% below the respective statewide school percentages. *Lichtman Reply Report,* ECF No. 137-5, PageID 7641, 7647, Table 1R. Every one of those nine schools has a lower percentage of Black and Hispanic students than the State as a whole. *Id*.,

PageID 7641. Trende's observation that White enrollment has declined since 2019 is accurate but immaterial: that decline is attributable almost entirely to surging Asian enrollment, which rose from 10.5% to 19% on average, while Black enrollment only rose 2.1 percentage points and Hispanic enrollment 0.7 percentage points. *Id.*, PageID 7640, 7647, Table 1R.

Those facts are connected to the zoning at issue. In Ohio, 64.7% of Black households and 56.4% of Hispanic households rent, compared to 27.5% of white households. *Lichtman Report*, ECF No. 137-4, PageID 7578, Table 3. Median household income is $66,750 for white households, $36,985 for Black households, and $50,221 for Hispanic households. *Id.*, PageID 7579, Table 4. Children are present in 59.4% of Black families and 65.9% of Hispanic families, compared to 43.9% of white families. *Id.*, PageID 7587, Table 11. Accordingly, where a community approves only ownership housing priced above $392,000 and no rental housing at all, the households it excludes are disproportionately Black, Hispanic, and families with children. *Id.*, PageID 7483, 7567-68.

### B. Berlin Created the Business Park Overlay with Goal of "a variety of housing options."

On November 23, 2020, the Berlin Township Board of Trustees (the "Trustees") adopted Article 19 of the Zoning Resolution, creating the Berlin Industrial Overlay (the "BIO") across roughly 1,900 acres and permitting light industrial, office, commercial, and multi-family uses. *Breidenstein Report*, ECF No. 137-7, PageID 7692; *Lichtman Report*, ECF No. 137-4, PageID 7516-17. By its terms the BIO "[e]nhances the welfare and economy of the Township by…providing a variety of housing options for the Township residents." *Id.*, PageID 7517. Trustee O'Brien described the overlay as taking Berlin "from a density of at most 1.25 units per acre all the way up to 10 units per acre," so that "a developer that wanted to come in didn't have to think about zoning." *Id.*, PageID 7525, 7527.

In June 2021, the County entered into an economic incentive agreement with Berlin Township to further development within the Business Park. *Second Am. Compl*., ECF No. 66, ¶ 6. Accordingly, Delaware County echoed the goal of encouraging development, resolving in its 2023 strategic plan to "[p]ursue policies to encourage diversification of housing unit availability to support retirees, empty-nesters, new families, and younger workers." *Lichtman Report*, ECF No. 137-4, PageID 7517.

### C. T&R Relied on the Township's Invitation, Sought the Township's Guidance, and Purchased the Parcels.

T&R develops and manages residential, commercial, and industrial property in Ohio and several other states. *Lichtman Report*, ECF No. 137-4, PageID 7518. Beginning in the spring of 2022, T&R worked with Township and County officials on a coordinated, mixed-use plan for two adjoining parcels inside the BIO: industrial warehousing on the western parcel, and an apartment community on the eastern parcel. *Breidenstein Report*, ECF No. 137-7, PageID 7695-96. In conjunction with the County and Township's stated objectives, the project was positioned as the "gateway" to the Business Park – with T&R offering to fund, at its own expense, extensions of Reed Road and Plunkett Road, a roundabout, and significant regional water and sanitary sewer lines that would service adjoining parcels. *Id*.

Relying on the overlay, the Township's stated housing goals, and the guidance it received, T&R applied to rezone the residential parcel from FR-1 to PRD to permit 368 apartment units on 44.176 acres – a density of 8.33 units per gross acre, below the ten units per acre the BIO and Berlin Zoning Resolution permits elsewhere. *Id*., PageID 7694-95. T&R expressly framed the application as intended to remain "within the spirit of Article 19." *Id*., PageID 7694. T&R thereafter took title to both parcels, with deeds recorded June 23, 2023. *Id*., PageID 7700.

**D. Berlin Zoning Commission Rejected T&R's Plan, Despite the County Recommending Approval, and T&R Making All Requested Concessions.**

On January 26, 2023, the Delaware County Regional Planning Commission ("DCRPC") considered T&R's mixed-use plan and voted to recommend approval of the residential rezoning, subject to conditions. *Id*., PageID 7696; *DCRPC Minutes*, 26 Jan. 2023, ECF No. 137-8, PageID 7737-43. The DCRPC conditioned its approval of the companion industrial application upon the successful rezoning of the residential parcel. *Breidenstein Report*, ECF No. 137-7, PageID 7696; *DCRPC Minutes*, 26 Jan. 2023, ECF No. 137-8, PageID 7746-47.

The Berlin Township Zoning Commission (the "BZC") first heard the application on February 14, 2023, and voted to table and continue it to March 21, 2023. *BZC Minutes*, 14 Feb. 2023, ECF No. 137-9, PageID 7764 (Res. 2023.02.14.#C). In the interim, T&R made substantial concessions, including reducing the number of apartments (from 368 to 296), increasing the buffer/setback, increased guest parking; and mor than tripled the open space over the minimum required. *Lichtman Report*, ECF No. 137-4, PageID 7519, 7526. Despite the concessions, the BZC voted unanimously against the application. *BZC Minutes*, 21 Mar. 2023, ECF No. 137-10, PageID 7775.

**E. Berlin Trustees' Rejection of Plaintiffs' Apartments**

The Trustees first took up the residential application on April 24, 2023, discussing divergences on density, setbacks, one-bedroom unit size, and parking "in the spirit of the BIO," and then recessed the matter to June 12, 2023. *Breidenstein Report*, ECF No. 137-7, PageID 7699. At the June 12 hearing, Sabatino reported that T&R had agreed to join the Township JEDD, and Delaware County Economic Development's analysis – distributed at the meeting – showed the project would generate $500,000 in total JEDD revenue, of which "Berlin Township would receive $300,000." *Trustees' Minutes*, 12 June 2023, ECF No. 137-11, PageID 7782. Sabatino then

returned to the dispositive issue: "density was a primary issue, and they are open to a conversation on the other items if they can get passed the density that they need." *Id*.

The Trustees did not question the quality of the plan. O'Brien "said he likes the plan, but he cannot get to the density that they are asking." *Id*. Raehll "said they acquired the land knowing that R4 was *proposed* for this area and they justified increasing the density by adding amenities but it does not get them so far that they get 6.97 and asked if there was a number they could agree with." *Id*. (emphasis added). Sabatino responded that "they cannot lower the density because this is what they need and what any other developer will need." *Id*., PageID 7783. The minutes then record in the Township's own words: "All three trustees agreed that it was a good plan but the density was too high." *Id*., PageID 7784. Sabatino noted that T&R "did cut the density by 30%" and requested a vote. *Id*. The Trustees voted unanimously to deny the application. *Id*. (Res. 23-06-05). Raehll confirmed the "good plan" language, verbatim, at her deposition, and conceded that the paragraph "lists density as the only reason." *Raehll Depo*., Vol. II, ECF No. 118, PageID 5451-53.

Berlin does not deny that it had the discretion to approve a higher density. *Id*., PageID 5464; *Raehll Depo.,* Vol. I, ECF No. 102, PageID 3331. At deposition, Trustee Raehll stated she denied the proposed project due to density and safety concerns. *Raehll Depo.*, Vol. I, ECF No. 102, PageID 3332-33. No discussions occurred at the meetings regarding any specific safety concerns. Single family housing, however, received favorable treatment: during this same period, the Trustees rezoned FR-1 agricultural land more than forty times to accommodate single-family subdivisions. *Lichtman Report*, ECF No. 137-4, PageID 7569-70.

**F. The Public Opposition to Apartments was Explicit in Opposing the Development on Racially Coded Reasons, and the Trustees Let it Stand.**

The hearing record supplies the context in which the Trustees acted. At the June 12, 2023 hearing, public comments were allowed. Resident Chris Acker told the Trustees that the project would "bring traffic, lights and noise," that "[a]nything above R4 is a crime and will create **a ghetto.**" He stated he wanted condos over rentals. *Trustees' Minutes*, 12 June 2023, ECF No. 137-11, PageID 7783 (emphasis added). No Trustee objected to the "ghetto" remark, or asked the speaker what he meant by it. See *Id.*, PageID 7783-84.

Trustee O'Brien's testimony explains the silence. Asked whether he would object if a speaker used "an extremely offensive name" at a public meeting, he answered "No," deferring to "the Chair's role." *O'Brien Depo*., Vol. II, ECF No. 134, PageID 6915-16. Asked whether Chair Raehll should have intervened when the "ghetto" comment was made, he answered, "I don't know." *Id*., PageID 6916-17. He acknowledged "ghetto" is a "pejorative" and "negative" term but could supply no further definition. *Id*., PageID 6917-19. Raehll refused to respond to Acker's ghetto comment because she believed it was not the Trustees' role to engage with public. *Raehll Depo*., Vol. II, ECF No. 118, PageID 5497.

The "ghetto" comment was not isolated. At the March 21, 2023 BZC hearing, another homeowner objected stating "the apartments should go somewhere else." *BZC Minutes*, 21 Mar. 2023, ECF No. 137-10, PageID 7771. At the September 11, 2023 hearing, resident Edie Parker stated that while "she feels for lower income people she **doesn't want that in her backyard**, so doesn't want it for Berlin Township." *Trustees' Minutes*, 11 Sept. 2023, ECF No. 137-12, PageID 7818-19; *Lichtman Report*, ECF No. 137-4, PageID 7561 (emphasis added). At that same hearing, resident Nicki Acker felt the development would be like another in Orange Township with bullet holes and safety issues. *Trustees' Minutes*, 11 Sept. 2023, ECF No. 137-12, PageID 7819. Homeowner Jasper DeChristopher said that T&R "owns Dooley's Orchard apartments" and that

"if that's what these apartments will look like in 10-15 years, they don't want them." *BZC Minutes*, 14 Feb. 2023, ECF No. 137-9, PageID 7762. He confirmed at deposition that he preferred condominium owners to renters because they are "homeowners, much like ourselves." *DeChristopher Depo*., ECF No. 129, PageID 6753.

Trustee O'Brien conceded that Berlin is "definitely a plurality" white. *O'Brien Depo*., Vol. II, ECF No. 134, PageID 6922. He volunteered, unprompted, that he notices Berlin's "awful large Asian population," while testifying that he had no idea how many Black residents live in the Township because it was "not something that I pay attention to." *Id*., PageID 6921-23.

### G. The Trustees Refused Reconsideration Yet Approved a Phantom Apartment Project (Elysian) that Same Night.

At T&R's request, the Trustees reconvened on September 11, 2023 to consider reopening the application. *Trustees' Minutes*, 11 Sept. 2023, ECF No. 137-12, PageID 7802. The Trustees voted not to reopen the application. *Id*., PageID 7821-22.

At that same meeting, the Trustees approved the Township's only recent apartment project, called "The Elysian at Alum Creek" (hereinafter "Elysian"). *Id*., PageID 7828 (Res. 23-09-23). This apartment complex was, however, never built. Trustee Raehll admits that no apartments have been built in Berlin for twenty years, while Trustee O'Brien adds that the Elysian Apartments have not been built because there is no sewer or water. *Raehll Depo*., Vol. II, ECF No. 118, PageID 5456-57; *O'Brien Depo*., Vol. I, ECF No. 120, PageID 5716. (Lichtman discusses this issue at length in his *Lichtman Report*, ECF No. 137-4, PageID 7545-53 and *Lichtman Reply Report*, ECF No. 137-5, PageID 7643-44). Three years later, the site remains a vacant, unplatted lot; the principal developer appears to have relocated to Arizona; and the project does not appear on Delaware County's current list of county development projects. *Lichtman Report*, ECF No. 137-4, PageID 7570.

The Township's remaining R-10 ground fares no better, and remain unbuildable. Plaintiffs' land-use expert, Thomas Breidenstein ("Breidenstein") – a planner and land-use attorney with forty years of experience – examined the parcels Berlin designated R-10 and concluded that they front narrow, low-capacity roads (Sweeney Road, Roloson Road, and Curve Road) that are "unsuited to the amount of traffic expected from a multi-family development with R-10 densities." *Breidenstein Report*, ECF No. 137-7, PageID 7716. T&R's parcel, by contrast, fronts the four-lane divided US 36/SR 37. *Id*. In Breidenstein's opinion, "the Residential Parcel should have been designated for R-10 development, and the R-10 properties should have been designated for R-4 development," and it is "unlikely that the R-10 parcels should ever be developed at that density." *Id*.

### H. Before the BZA, the Viability Testimony was Uncontroverted – and a Board Member Asked Who Would be Living in the Apartments.

During that hearing, BZA Member Cook asked T&R, "who is your target market for these apartments?" Sabatino answered, "anyone who is qualified." Cook pressed, "that's who your demographic that you were gearing it toward?" A T&R representative responded, "We have fair housing laws to follow, ma'am." When reminded of fair housing laws, Cook then said she "wasn't going at that" and was asking about the marketing plan and unit upgrades. *BZA Tr.*, 6 Feb. 2024, ECF No. 137-13, PageID 7866-67.

The BZA nonetheless denied the variance.

### I. Although Berlin Now Asserts Safety Justification for the Restrictive R4 Density Zoning, this Rationale Appears Nowhere in the Contemporaneous Record, with Deposition Testimony Showing Safety Relates to Concerns about Children.

Defendants now assert that the Trustees denied T&R's application out of concern for road infrastructure, road quality, and residents' access to State Route 36/37. *Defs.' Mot. Summ. J.*, ECF No. 122, PageID 6608. The contemporaneous record does not bear that out.

All three trustees testified during deposition that the density requirement rested on child safety. Trustee Raehll stated that safety concerns motivated the denial. *Raehll Depo*., Vol. I, ECF No. 102, PageID 3332-33. Trustee Bullard tied density to "safety concerns" about "children on sidewalks" – "I may have made some comments about that if there was an expectation of being a lot of children there, just to make sure they didn't get in the streets" – and confirmed that "there were safety concerns regarding children underlying your density concerns." *Bullard Depo*., Vol. I, ECF No. 135, PageID 7215-16; at 281. In the same breath, he conceded the Trustees had "no indication from the developer as to the target people that were going to be living there." *Bullard Depo*., Vol. II, ECF No. 136, PageID 7355-56. Trustee O'Brien identified safety issues in parking lots and on sidewalks "where children were likely to be." *O'Brien Depo*., Vol. I, ECF No. 120, PageID 5637-38, 5641-42, 5729, 5731.

No documentation supports the now-asserted child safety concerns. Trustee O'Brien testified that the only documents the Trustees had were "the plan itself" and "regional planning documents" – "nothing out of the ordinary that addressed [safety] specifically." He confirmed the fire chief's concerns "were addressed," and that no safety concerns remained after T&R's presentation: "[a]s I recall, that's correct." *O'Brien Depo*., Vol. II, ECF No. 134, PageID 6920.

Trustee Raehll similarly could not identify any document given to T&R addressing her purported safety concerns, testifying that the Trustees "did not have ample time to have those discussions." *Raehll Depo*., Vol. II, ECF No. 118, PageID 5492-93. She referenced ODOT concerns, but could not specify what they actually were, deferring repeatedly to "the record." *Id*.,

PageID 5484-86. She acknowledged that the fire department's letter was satisfactory as to fire safety concerns. *Id*., PageID 5493-94. Raehll also admitted that she had received "a satisfactory answer" from T&R "regarding the sidewalks and walkability." *Raehll Depo*., Vol. I, ECF No. 102, PageID 3259-60. O'Brien also testified that the fire chief's concerns "were addressed." *O'Brien Depo*., Vol. II, ECF No. 134, PageID 6920.

### J. Berlin's Zoning Language Is Internally Contradictory, and Its Density Rule Shifted from Requirement to Mere Guidance.

Breidenstein concluded that the Berlin Industrial Overlay ("BIO") text is "unnecessarily convoluted and confusing." *Breidenstein Report*, ECF No. 137-7, PageID 7705. As one illustration, the BIO simultaneously requires a minimum of 0.5 and a maximum of 0.25 parking spaces per 1,000 square feet of warehouse space – standards that cannot both be met. *Id*.

Berlin Township's zoning regarding density also lacked consistency. Raehll, with O'Brien agreeing, testified that R-4 was binding. *Raehll Depo.,* Vol. II, ECF No. 118, PageID 5461-62; *Lichtman Report*, ECF No. 137-4, PageID 7557. However, after it was established that neither the current Zoning Resolution nor the current Comprehensive Land Use Plan was in effect when the Trustees voted, O'Brien reversed course and acknowledged that the R-4 figure was "guidance" only, and that it was "more into the applicant's favor than the current Comprehensive Land Use Plan." *O'Brien Depo*., Vol. II, ECF No. 134, PageID 6953; *Lichtman Report*, ECF No. 137-4, PageID 7557-58. Breidenstein concluded that applying a 4.0-unit cap to T&R's parcel was "arbitrary and thus illegal," and "contrary to sound land-use planning principles." *Breidenstein Report*, ECF No. 137-7, PageID 7713. He further noted that the 4.0 figure is in practice 3.4 units per acre once Berlin's automatic fifteen-percent deduction is applied. *Id*.; *Lichtman Report*, ECF No. 137-4, PageID 7529.

**K. The Township Opted Out of a Financially Beneficial Federal Fair Housing Program to Preserve Its Zoning Authority Over Housing.**

At a special meeting on June 24, 2024, the Trustees voted to exclude Berlin Township from qualification as an Urban County for purposes of HUD's Community Development Block Grant ("CDBG") Program. *Trustees' Minutes*, 24 June 2024, ECF No. 66-4, at 2-3 (Res. 24-06-28). The grant would provide virtually free funds to Berlin, but Raehll reported that "one of the major items is a risk of townships losing some local authority related to zoning and housing." *Id*. at 2. Bullard explained the vote as ensuring "everybody knows Berlin Township is not a part of it," adding that "[r]estraint upon the Township with no benefit to the Township is a restraint upon the Township." *Id*. at 6.

Delaware County and at least four other communities within it – Orange Township, the Villages of Ostrander and Shawnee Hills, and the City of Powell – participate. *Lichtman Report*, ECF No. 137-4, PageID 7559.

**L. The Impact and Consequences of Berlin's Density Zoning Policy.**

Dr. Allan Lichtman – an expert in quantitative statistician and historian – produced a detailed report, supported by statistical tables and charts, analyzing Berlin's zoning history, demographics, and housing market. *Lichtman Report*, ECF No. 137-4, PageID 7479-7626. He identified that the addition of T&R's 296 apartments would have increased Berlin's rental housing stock by 120%. *Lichtman Depo.*, ECF No. 105, PageID 3879-80. He then testified to a robust statistical relationship between Berlin's Comprehensive Zoning policies and their discriminatory effect upon Black residents, Hispanic residents, and families with children, showing housing became far less available. *Id*., PageID 3981. He further concluded that the Township's adherence to R-4, four per acre, renders *any* multi-family rental development economically infeasible – not

merely T&R's. *Lichtman Report*, ECF No. 137-4, PageID 7531-34; *Lichtman Depo*., ECF No. 105, PageID 3928-30, 3951.

Defendants' expert, Sean Trende, does not dispute the demographic and housing data underlying Dr. Lichtman's analysis and offers no alternative explanation for the near-absence of Black residents and families. His report contains no statement of purpose, no summary of opinions, and no statement of methodology; it advances no competing theory of the decision-makers' intent and reaches no conclusion at all regarding discriminatory effect. *Lichtman Reply Report*, ECF No. 137-5, PageID 7629.

Whatever Berlin asserts, the end result is not in dispute. Berlin has built no apartments, and has denied any developable apartment on the feigned basis of its density zoning policy. Consequently, the households most likely to need them – Black households, Hispanic households, and less affluent families with children – remain, as they have for decades, outside the Township. *Lichtman Report*, ECF No. 137-4, PageID 7570-71.

## MEMORANDUM OF LAW

The Fair Housing Act prohibits discrimination in housing on the basis of race, color, religion, sex, familial status, or national origin, and prohibits any policy or conduct that "otherwise make[s] unavailable or den[ies]" a dwelling on those grounds. 42 U.S.C. § 3604(a). That language reaches both intentional discrimination and disparate impact. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 534-35 (2015). Municipalities may be held liable under either theory when their zoning decisions have the purpose or effect of excluding racial minorities. *United States v. City of Parma*, 661 F.2d 562 (6th Cir. 1981).[1]

[1] The state-court judgments Defendants invoke have no preclusive effect. T&R's appeals from the BZA's orders arose under R.C. 2506 and presented one question: whether those orders were "unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record." R.C. 2506.04. That review was confined to the certified administrative record and

## I. EVIDENCE OF INTENTIONAL DISCRIMINATION EXISTS SUFFICIENT TO DENY SUMMARY JUDGMENT

Courts analyze Fair Housing Act intent claims under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), asking whether an "invidious discriminatory purpose was a motivating factor" behind the challenged action. *Id*. at 265-66. A plaintiff need not show that discrimination was the sole or even the dominant purpose; it is enough that it was a motivating factor. *Id*.; *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 790 (6th Cir. 1996). Here, Berlin has shown that its insistence on 4.0 density zoning was motivated by a bias against families with children and blacks.

### A. Discrimination Against Children ("Familial Status") Was an Unlawful Motive Behind the 4.0 Density Requirement.

Evidence shows that the Trustees insisted on an extraordinarily low density requirement because of concerns about families with children. Familial status is a protected class. 42 U.S.C. §§ 3602(k), 3604. A plaintiff need not prove that the discriminatory purpose was the sole purpose of the challenged action, only that it was "a motivating factor." *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 790 (6th Cir. 1996) (quoting *Arlington Heights*, 429 U.S. at 266).

The density zoning policy imposed by Berlin upon this development is extraordinarily restrictive. Multiple experts assert this makes apartment building in Berlin not feasible. *Lichtman Depo*., ECF No. 105, PageID 3928-30, 3951; *Breidenstein Depo*., ECF No. 106, PageID 4086; *Breidenstein Report*, ECF No. 137-7, PageID 7713-17). Asked at deposition why they insisted on a 4.0 density, the Trustees uniformly invoked child safety. Trustee Bullard tied density to "safety

---

afforded no damages remedy. Each assignment of error in the Fifth District addressed the trial court's handling of that record and its application of the R.C. 2506.04 standard; the trial court further held it lacked subject-matter jurisdiction as to BZA 23-007. No Fair Housing Act claim was raised, briefed, or decided, and none could have been. That two Ohio courts declined to disturb the BZA's orders under a deferential administrative standard says nothing about whether Berlin's zoning was adopted or applied with discriminatory intent, or whether it produces a discriminatory effect.

concerns" about "children on sidewalks," testifying: "I may have made some comments about that if there was an expectation of being a lot of children there, just to make sure they didn't get in the streets." *Bullard Depo*., Vol. I, ECF No. 135, PageID 7215-16; at 279-281. He confirmed the point directly: asked whether "there were safety concerns regarding children underlying your density concerns," he answered, "That's correct" – while conceding in the same breath that "[w]e didn't have any indication from the developer as to the target people that were going to be living there." *Bullard Depo*., Vol. II, ECF No. 136, PageID 7355-56. This quote demonstrates Berlin's preference to target one protected class over another. Trustee O'Brien identified safety issues in parking lots and on sidewalks "where children were likely to be." *O'Brien Depo*., Vol. I, ECF No. 120, PageID 5637-38, 5641-42, 5729, 5731. Trustee Raehll testified that safety concerns motivated the requirement. *Raehll Depo*., Vol. I, ECF No. 102, PageID 3332-33.

The sequence defeats the rationale. Berlin consulted on safety and received satisfactory answers, then denied the application on safety grounds anyway, without a single supporting document. The Fire Department attended the August 22, 2022 project meeting. *Breidenstein Report*, ECF No. 137-7, PageID 7694. O'Brien testified that the fire chief's concerns "were addressed" before the vote and that the only documents the Trustees had were "the plan itself" and "regional planning documents." *O'Brien Depo*., Vol. II, ECF No. 134, PageID 6920. Raehll acknowledged the fire department's letter was satisfactory and that she received "a satisfactory answer" on "sidewalks and walkability" that "would have included children." *Raehll Depo*., Vol. I, ECF No. 102, PageID 3259-60. She could not articulate any remaining safety concern, deferring to "the record." *Raehll Depo*., Vol. II, ECF No. 118, PageID 5484-86. Bullard was blunter still: asked whether he had seen "any evidence of any general safety concerns," he answered, "You had asked that before, and I said no," and confirmed he never "looked at any evidence suggesting that

the density of 6.97 might create additional safety concerns." *Bullard Depo*., Vol. I, ECF No. 135, PageID 7215.

The word "safety" appears once in the minutes of the June 12 and September 11, 2023 Trustee meetings, in a remark about sign placement near a cemetery made months after the project was rejected. *Lichtman Report*, ECF No. 137-4, PageID 7563. A justification first articulated after the challenged decision, unsupported by contemporaneous evidence, will support a finding of pretext. *Lindsay v. Yates*, 578 F.3d 407, 419-21 (6th Cir. 2009); *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 591-92 (6th Cir. 2002); *Choices in Cmty. Living, Inc. v. Petkus*, 517 F. App'x 501, 506 (6th Cir. 2013). At a minimum, Defendants' shifting and undocumented rationales present an issue of fact as to motive.

Defendants alternatively assert that the low-density requirement preserves Berlin's rural character, stating that T&R's parcels were "intentionally zoned…to serve as a transition…" without citing record support. *Defs.' Mot. Summ. J.*, ECF No. 122, PageID 6606. A rationale that conflicts with the trustees' own sworn explanation, and that appears nowhere in the contemporaneous record, is itself evidence of pretext. *Selden Apartments v. U.S. Dep't of Hous. & Urban Dev.*, 785 F.2d 152, 159-60 (6th Cir. 1986). Accordingly, the Trustees assertions are disputed issues of material fact regarding the motives of Berlin on insisting on the extraordinarily low density requirements.

### B. Berlin's Actions Also Show Bias Against African Americans by Inferring that Apartments Would Create Violent Ghetto Conditions.

Defendants clearly acknowledge that the Berlin Township's approval process included concerns the apartments would create a "ghetto." This statement occurred in the public hearing process before the Trustees, but it was not isolated nor can it be dismissed as simply a resident's isolated concerns. Admittedly, a citizen's racial comment is not *automatically* imputed to a

government decisionmaker. *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196-97 (2003). "'Municipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority.'" *United States v. City of Birmingham*, 727 F.2d 560, 564 (6th Cir. 1984) (quoting *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064-65 (4th Cir. 1982)).

Statements by residents may be considered in determining whether municipal officials gave effect to those residents' racial bias. *Id*. Defendants' briefing omits this line of authority entirely.

The coded language in this matter creates an inference that Berlin felt this housing development would bring in violent low-income minorities. In *United States v. City of Birmingham*, 538 F. Supp. 819 (E.D. Mich. 1982), the district court ruled that a city was liable for its obstruction of a racially integrated housing project where the decision-making body's impedance of the project was a response to the racial animus of a majority of its virtually all-white community. *Id*. at 828. The court stated:

> The government need not prove that the [decision-making body] itself intended to discriminate on the basis of race in order to establish that the City acted with a racially discriminatory intent. In order to demonstrate a city's racially discriminatory intent, *it is sufficient to show that the decision-making body acted for the sole purpose of effectuating the desires of private citizens, that racial considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the motivations of the private citizens.* Any other rule of law would permit a legislative body to place its official stamp of approval on private racial discrimination.

*Id*. (citing *United States v. City of Black Jack*, 508 F.2d 1179, 1185 n. 3 (8th Cir. 1974))(emphasis added). Plaintiffs can [show that discriminatory purpose was a motivating factor] by showing that the defendants were personally motivated by discriminatory animus or by showing that the defendants "were knowingly responsive" to others who were so motivated. *Mhany Mgmt., Inc. v.*

*Cnty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (internal quotation marks and citation omitted) (evaluating an FHA claim). *Arlington Hts.* instructs that a Court should look to the broad circumstances surrounded a challenged discriminatory decision.

The Court need not rely on imputing the "ghetto" comment alone, because a decisionmaker inquired into who would live in the apartments. At the February 6, 2024 variance hearing, BZA Member Cook asked T&R, "who is your target market for these apartments?" and pressed, "that's who your demographic that you were gearing it toward?" – prompting a T&R representative to answer, "We have fair housing laws to follow, ma'am." *BZA Tr.*, 6 Feb. 2024, ECF No. 137-13, PageID 7866-67. Cook then said she "wasn't going at that" and was asking about marketing and unit upgrades. *Id*. R.J. Sabatino identified the exchange under oath as "blatant public discriminatory language," describing it as "a BZA board member asking, quote, what kind of people will live here." *Sabatino Depo*., Vol. I, ECF No. 103, PageID 3624. An inquiry by a sitting member of the quasi-judicial body into the demographic composition of prospective tenants requires no attribution analysis at all.

Trustee Raehll did disagree with the remark only during deposition, testifying that she did not agree that anything above R-4 "is a crime" or "will create a ghetto," and that she associates the word "ghetto" with "Warsaw and concentration camps." *Raehll Depo*., Vol. I, ECF No. 102, PageID 3300-02. But she said nothing at the hearing, testifying that she did not believe it was "the board's role to engage with residents during their provision of public testimony." *Raehll Depo*., Vol. II, ECF No. 118, PageID 5497-99. Whatever the Trustees said under oath long afterward, none responded at the time during the public hearings. This conduct is evidence of racial bias sufficient to create a genuine dispute of material fact.

Other such evidence exists. Nicki Acker contrasted Berlin's "wonderful neighborhoods" and "high dollar developments" with a T&R property where "one of the residents wanted bullet holes fixed in their door," adding that she "can't see Berlin Township with something in our area where we would have to worry about our safety." *Trustees' Minutes*, 11 Sept. 2023, ECF No. 137-12, PageID 7819. Edie Parker said she "feels for lower income people" but "doesn't want that in her backyard." *Lichtman Report*, ECF No. 137-4, PageID 7561. An adjacent owner objected that apartments "next to expensive and established homes does not seem appropriate" and "should go somewhere else." *BZC Minutes*, 21 Mar. 2023, ECF No. 137-10, PageID 7771.

### C. Defendants' Reliance on the *White Oak Property Development* Case is Misplaced.

Defendants argue that Plaintiffs' claim rests on low income as a protected characteristic. *Defs.' Mot. Summ. J.*, ECF No. 122, PageID 6609-10 (citing *White Oak Prop. Dev., LLC v. Washington Twp.*, 606 F.3d 842, 851 (6th Cir. 2010)). Plaintiffs do not assert income as a protected class. Income and the lack of rental housing is the mechanism through which the racial and familial disparity operates, not the classification. As T&R's representative explained, "housing does not need to be low income in order to be affordable and attainable"; "any supply increase of market rate housing…brings affordability more in line with what people can afford"; and "when there's an affordability crisis…it factually disproportionately negatively impacts minorities." *Sabatino Depo.*, Vol. I, ECF No. 103, PageID 3625-26.

Defendants cannot argue both that the units were too expensive to benefit minorities and that excluding them produced no disparate effect. Nor does the testimony they cite establish "luxury." Neither side produced a rent schedule, so Dr. Trende's speculation that the units "might be" unaffordable rests on no more foundation than he attributes to Plaintiffs. Dr. Lichtman explained what the comparison omits: "home purchases are not limited to mortgages. You also

have to put down a down payment, and given the high prices in Berlin Township, that down payment could be very substantial," plus "insurance, property taxes, upkeep." *Lichtman Depo*., ECF No. 105, PageID 3943.

## II. THE ACTIONS OF BERLIN IN REQUIRING 4.0 DENSITY UNDER ITS COMPREHENSIVE ZONING POLICIES CREATE A DISPROPORTIONATE IMPACT ON BLACKS AND FAMILIES

Berlin's density zoning plan imposes a 4.0-unit density requirement that precludes apartment development entirely, causing a disproportionate impact on African Americans, Hispanics, and families with children, and thereby making housing unavailable under 42 U.S.C. § 3604(a).

The Sixth Circuit's framework governs. *Arthur v. City of Toledo*, 782 F.2d 565 (6th Cir. 1986), which arose from a municipality's obstruction of a sewer line serving proposed low-income housing, identifies four considerations: the strength of the statistical showing, evidence of discriminatory intent, the defendant's interest in the challenged action, and whether the plaintiff seeks affirmative action or merely to be free of interference. *Id*. at 575; see also *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 373-75 (6th Cir. 2007). All four factors favor Plaintiffs. Dr. Lichtman's statistical showing is unrebutted; the record contains substantial evidence of intent; Berlin's asserted interests are undocumented, and Plaintiffs seek only the opportunity to develop free of discriminatory interference. *Lichtman Depo*., ECF No. 105, PageID 3982

As identified below, expert Lichtman has meticulously reported and testified to evidence that Berlin's density zoning policy has resulted in the absolute preclusion of apartments within the township, which has had a disproportionate impact upon African Americans and families. See *Lichtman Report*, ECF No. 137-4, PageID 7479-7626; and *infra* § II(A). Defendant's expert

largely agrees with Lichtman and offers no alternative explanation for the lack of Blacks in Berlin, and decreased families. The rejection of Plaintiff's proposed housing development because of the zoning scheme impacts the protected classes as identified by Lichtman, with Berlin's argument of other R10 apartment housing is a red herring.

Under the disparate impact analysis, a plaintiff must "produce statistical evidence demonstrating a causal connection" between an identified neutral policy and any alleged disparities that affects members of a protected class. *Inclusive Cmtys.*, 576 U.S. at 543; see 24 C.F.R. § 100.500(c). The burden-shifting framework in an impact claim requires the plaintiff to first make a prima facie showing of disparate or disproportionate impact by proving that the challenged practice has caused or will cause a discriminatory effect. *Inclusive Communities*, supra; *Pickett v. City of Cleveland*, No. 1:19 CV 2911, 2020 WL 11627247, at *3 (N.D. Ohio Sept. 29, 2020). Next, the burden shifts to the defendant to prove that the challenged practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest. Once the defendant has satisfied its burden, the plaintiff may prevail by showing that the defendant's interest could be served by another practice that has a less discriminatory effect. *Id*.

Zoning practices violate the FHA even if they only "contribute to 'mak[ing] unavailable or deny[ing] housing'" to protected individuals. *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1157 (9th Cir. 2013). Statistical evidence may establish discriminatory intent in municipal zoning. Cf. *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 606-07 (2d Cir. 2016). Where discriminatory purpose is shown to be a motivating factor, ordinary deference to the zoning decision is no longer warranted. *Arlington Heights*, 429 U.S. at 265-66.

### A. Plaintiffs' Expert Report Shows Disproportionate Impact and a Robust Causation

Dr. Allan Lichtman, a quantitative statistician and historian, produced a 118-page report and a 24-page reply report with 24 statistical tables and 19 charts, applying the *Arlington Heights* factors and establishing a statistically based causal connection between Berlin's density zoning policy and its impact on the housing opportunities of African Americans, Hispanics, and families with children. *Lichtman Depo*., ECF No. 105, PageID 3880, 3962; *Lichtman Report*, ECF No. 137-4, PageID 7482-87, 7530-42, 7562-74.

Defendants' expert does not dispute the demographic and housing data underlying that analysis, offers no competing statistical analysis, expresses no opinion whether a disparate impact exists, and conducted no independent analysis. *Trende Depo*., ECF No. 127, PageID 6636, 6639, 6677.

Dr. Lichtman concluded that Berlin's rejection of the project based on R-4 density disproportionately burdened Black and Hispanic households and less-affluent families with children by denying access to rental housing in a Township with high-performing schools, low crime, high homeownership costs, and almost no rental stock. *Lichtman Depo*., ECF No. 105, PageID 3880; *Lichtman Report*, ECF No. 137-4, PageID 7501-15, 7566-74. He testified to "a very robust statistical relationship here, which is very specifically tied to the policies and their application," establishing "both discriminatory effect and…the *Arlington Heights* analysis of discriminatory intent." *Lichtman Depo*., ECF No. 105, PageID 3981. He further described "[t]he almost total unavailability of rental units" in Berlin and testified that T&R's project would have expanded rental availability for those protected classes by roughly 120%. *Id*., PageID 3879-80.

Dr. Lichtman also accounted for Berlin's use of its discretion to grant variances and approve development in every instance except T&R's. Contrary to Defendants' briefing, he considered the Township's only approved R-10 development, the Elysian, and showed that it exists

on paper only. *Lichtman Report*, ECF No. 137-4, PageID 7545-53; *Lichtman Reply Report*, ECF No. 137-5, PageID 7643-44. Berlin has never completed a single multifamily apartment project while repeatedly approving single-family developments. *Lichtman Report*, ECF No. 137-4, PageID 7501-04, 7577-79. Defendants' assertion that Dr. Lichtman he had no evidence regarding which race would have rented the proposed apartments, *Defs.' Mot. Summ. J.*, ECF No. 122, PageID 6615, confuses the inability to identify particular future tenants with the ability to determine a policy's probable (disparate) effects on protected classes. As he explained, the analysis concerns "discrimination against groups of people, not against any particular individual." *Lichtman Depo.*, ECF No. 105, PageID 3940

Dr. Lichtman reached his conclusions by comparing rental availability in neighboring Delaware County communities against Berlin, and the relationship of that availability to minority population share. *Lichtman Depo*., ECF No. 105, PageID 3915-16, 3935-36; *Lichtman Report*, ECF No. 137-4, PageID 7510-15. Berlin's Black population share is 3.6%, against 12.3% statewide and 15.5% across the Columbus Metropolitan Region. *Lichtman Report*, ECF No. 137-4, PageID 7576, Table 1. Even Defendants' expert states that neighboring municipalities have considerably higher African American populations. *Trende Report*, ECF No. 137-6, PageID 7657. Dr. Lichtman's analysis of the post-2020 period, including school enrollment, confirms Black and Hispanic populations have remained exceptionally low in Berlin. *Lichtman Reply Report*, ECF No. 137-5, PageID 7640-41, 7647-50. With statistics showing far higher percentages of African Americans in surrounding municipalities, Berlin's zoning practices prohibiting apartments have effectively created a wall by grossly limiting rental opportunities for Blacks, Hispanics, and less-affluent families out of Berlin.

A municipality's motivations remain central once impact is shown. In *Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493 (9th Cir. 2016), the court reversed summary judgment for the city, holding that the availability of similarly priced housing elsewhere did not defeat a developer's claim that the city's refusal to rezone for higher density deprived Hispanic residents of affordable housing opportunities. *Id*. at 510-12. A prima facie showing does not require a municipality to approve every application in a price range; it requires the municipality to justify an action that adversely affects minorities. *Id*. at 512.

In *Pickett v. City of Cleveland*, No. 1:19 CV 2911, 2023 WL 11987525 (N.D. Ohio Sept. 29, 2023), the court denied summary judgment where the plaintiffs' expert showed statistically significant disparities and the defendant "did not offer its own statistical evidence, identify errors or omissions, or dispute" those findings. *Id*. at *5, *9. The court held that robust causality "does not amount to a requirement that Plaintiffs categorically disprove the relevance of all other factors," because "it would be impossible for plaintiffs ever to prove the irrelevance of every possible additional correlating factor." *Id*. at *12.

Defendants have failed to produce any rebuttal to Plaintiffs' expert evidence. In both *Pickett* and *Sw. Fair Housing Council, Inc. v. Maricopa Domestic Water Improvement District*, 17 F.4th 950, 964 (9th Cir. 2021), summary judgment was denied in part because the defendant offered no competing statistical evidence and identified no errors in the plaintiff's expert evidence. The same is true here. Indeed, Defendants do not rely on their own expert at all. Dr. Trende's report and deposition were available when Defendants moved, yet the Motion nowhere cites them, and Defendants offer the Court no rebuttal statistical analysis of any kind. See S.D. Ohio Civ. R. 7.2(d) (all available evidence "*shall be discussed in, and submitted no later than, the primary memorandum of the party relying upon such evidence*")(emphasis added). The only statistical

evidence in this summary judgment record is Dr. Lichtman's. Regardless, Defendants' own expert confirms that rental units constitute only 5.6% of Berlin's housing stock, against 34.6% statewide and 20.1% in Delaware County, *Trende Depo*., ECF No. 127, PageID 6644; *Trende Report*, ECF No. 137-6, PageID 7657, and offers no contrary opinion on whether the absence of apartments burdens African Americans, Hispanics, and families disproportionately.

**B. Berlin's Argument that Other R-10 Zoned Apartments Exist is a Fiction**

Defendants argue that other R-10 parcels exists, but the argument is illusory. The R-10 parcel they identify was approved for the "Elysian" apartments, which have never been built. Trustee Raehll testified that no apartments have been built in Berlin for twenty years, and Trustee O'Brien explained that the Elysian was never built for lack of utilities – "[t]hey have to have sewer, so you're right," and "[a]ctually, I think the problem is the water." *Raehll Depo*., Vol. I, ECF No. 102, PageID 3313; *Raehll Depo*., Vol. II, ECF No. 118, PageID 5456-57; *O'Brien Depo*., Vol. I, ECF No. 120, PageID 5716. Breidenstein's unrebutted opinion confirms the Township's remaining R-10 parcels' front narrow, low-capacity roads are "unsuited to the amount of traffic expected from a multi-family development with R-10 densities," and that it is "unlikely that the R-10 parcels should ever be developed at that density." *Breidenstein Report*, ECF No. 137-7, PageID 7716. Parcels where apartments are technically permitted but cannot be built does not show that Berlin's zoning allows apartments.

Defendants contend that Berlin's small population undermines the analysis. Dr. Lichtman addressed that methodologically. Because American Community Survey estimates are unreliable for populations of Berlin's size – a 2.5% annual sample of 349 Black and 327 Hispanic residents captures roughly nine and eight individuals per year. *Lichtman Report*, ECF No. 137-4, PageID 7506-07. Year-to-year ACS movement reflects sampling noise rather than demographic change.

*Id*. He therefore used Decennial Census counts for population and ACS data only for characteristics. *Id*. Defenses' Expert, Trende, similarly concludes that ACS data is unreliable for a fast-growing area with a relatively small population. *Trende Depo.*, at 57; *Trende Report*, ECF No. 137-6, PageID 7672. In any event, *Inclusive Communities* requires a robust causal connection between the challenged practice and the disparate impact, not proof of the exact future tenants of apartments that were never built. 576 U.S. at 542-43.

In an impact analysis, following the initial statistical showing, Defendants have the burden of at least showing a legitimate business justification to their R-4 zoning, and Plaintiffs can rebut. Here, Plaintiffs' have shown Berlin's vague business justification of a transition from rural to suburban housing is a pretext and a disputed issue of fact to rebut. *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist*., 17 F.4th 950, 968 (9th Cir. 2021). While Defendants may assert, however vaguely, that they want to preserve the rural character of its Township, this position is simply subjective and subject to dispute as being pretextual, especially when coupled with coded language to keep out African Americans and young families. The remarkable evidence of apartment availability in adjacent City of Sunbury, City of Delaware, and Orange Township shows the rejection here was 'not routine, and not common to the area, but unique to the discriminatory decision making in Berlin Township,' and it 'helps explain why Delaware County overall has a higher black percentage than does Berlin Township in particular.' *Lichtman Depo*., ECF No. 105, PageID 3915-16. Even Defendant's expert agrees there are more apartments, and African Americans, in neighboring towns to Berlin. *Trende Depo*., ECF No. 127, PageID 6695.

The trustees' own testimony undermines the density rationale. All three agreed T&R's was "a good plan but the density was too high." *Trustees' Minutes*, 12 June 2023, ECF No. 137-11,

PageID 7784. Yet O'Brien testified that "sometimes density doesn't really matter to me," observing that "Vancouver is very highly, densely populated, but it's beautiful," and that "the density number really depends on the amenities." *O'Brien Depo.*, Vol. I, ECF No. 120, PageID 5688-89. He later testified that "[d]ensity has nothing to do with that," that density "could enhance the township…[i]f it's developed appropriately," and that he regards density as "neutral" and "not, personally, the driver." *Id.*, PageID 5752, 5753, 5755. The trustee who calls density neutral and amenity-dependent nonetheless voted to reject a plan he called good, on density alone, after T&R offered roughly seventy percent open space, a pool, a fitness facility, and developer-funded road and sewer infrastructure.

Berlin's decision to opt out of federal Community Development Block Grant funding supports the same inference. On June 24, 2024, the Trustees voted to exclude the Township from qualification as an Urban County under HUD's CDBG program. *Trustees' Minutes*, 24 June 2024, ECF No. 66-4, at 2-3. Chair Raehll's stated reason was "a risk of townships losing some local authority related to zoning and housing." *Id.* at 2. Bullard added that "[r]estraint upon the Township with no benefit to the Township is a restraint upon the Township." *Id.* at 3. A township declining federal housing funds expressly to preserve local control over zoning and housing is documentary evidence bearing on the background and sequence of events under *Arlington Heights*. Delaware County and at least four other communities within it participate. *Lichtman Report*, ECF No. 137-4, PageID 7559.

Defendants' briefing ignore that its own expert acknowledged that Berlin Township's Black population is significantly lower than Delaware County's Black population. However, he has no opinion why that disparity exists, but states that racial clustering is a "well-established

phenomenon." *Trende Depo*., ECF No. 127, PageID 6678-83. There is no valid explanation for this disparity – other than Berlin's density zoning plan.

The Defendants also assert that other minorities, Asians, exist in higher numbers in Berlin Township. There is no dispute that the Berlin area is growing but allowing one ethnicity or minority grouping does not negate any bias against African Americans or families with children. See *United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419 (E.D.N.Y. 1995). Discriminatory effect under the FHA may be proved by showing adverse impact on a particular minority group, not all protected classes, and the disparate impact liability serves as a prophylactic measure against unconscious prejudices and disguised animus that escape easy classification as disparate treatment. See *1 Federal Civil Rights Acts* (3d ed.) § 3:51.

## CONCLUSION

Genuine issues of material fact exist. The record permits a jury to find that Berlin was motivated at least in part by a desire to exclude minorities and families with children, that its child-safety and rural-character rationales were post hoc and undocumented. The evidence also shows that Berlin's density zoning plan disproportionately burdens African Americans, Hispanics, and families by precluding multifamily housing altogether. Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted,

*/s/ Andrew L. Margolius*
Andrew L. Margolius (0003402)
Emily E. Warren (0080174)
Margolius, Margolius and Associates
55 Public Square, Suite 1770
Cleveland, OH 44113
(216) 621-2034; Fax (216) 621-1908
Email: Andrew@margoliuslaw.com

*/s/ Joshua Nagy*
Joshua Nagy (#0097099)
Wesp, Barwell and Berardino
465 Metro Place, Suite 350
Dublin, OH 43017
(614) 456-0488
Jnagy@wesplaw.com

Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Joshua S. Nagy*
Joshua S. Nagy